**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

Jorge A. Zea (Pro Se)          )
                         )
       Plaintiff,        )
                         )
     v.                 )
                         )
National Association of REALTORS®  )
(NAR), Beaches MLS, Inc., Broward, Palm )
Beaches and St. Lucie REALTORS®, Inc., )
Miami Association of REALTORS®, Inc., )
Orlando Regional REALTOR®      )
Association, Inc., Florida Gulf Coast   )
Multiple Listing Service, Inc., Royal Palm )
Coast REALTOR® Association, Inc.,   )
Naples Area Board of REALTORS® and )
Association of Real Estate Professionals, )
Inc.(NABOR®), My Florida Regional  )
MLS, Inc. (d/b/a  Stellar MLS),  Space  )
Coast Multiple Listing Service, Inc., Space )
Coast Association of REALTORS®, Inc., )
Northeast Florida Multiple Listing Service, )
Inc. (d/b/a RealMLS), Northeast Florida )
Association of REALTORS®, Inc., Central )
Panhandle Association of REALTORS®, )
Inc., Connecticut Association of     )
REALTORS®, Inc., Smart MLS, Inc.,  )
West and Southeast REALTORS® of The )
Valley, Inc., and Midwest Real Estate Data )
LLC (d/b/a MRED).          )
                         )
                         )
       Defendants.     )
                         )
                         )
                         )
_____ )

FILED BY ___ D.C.

**AUG 1 5 2025**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

Case No. 25-cv-81016-WM

**ANTITRUST COMPLAINT**

**TRIAL BY JURY REQUESTED**

**TABLE OF CONTENT**

I. INTRODUCTION..................................................................................................................1

II. JURISDICTION AND VENUE........................................................................................2

III. ANTITRUST STANDING...............................................................................................3

IV. PLAINTIFF.......................................................................................................................4

V. DEFENDANTS...................................................................................................................6

VI. ORGANIZATIONAL STRUCTURE............................................................................10

VII. RELEVANT MARKETS AND DEFENDANTS' MARKET POWER........................16

VIII. CONCERTED ACTIONS AND COLLUSION...........................................................20

IX. STEERING.......................................................................................................................21

X. EVIDENCE AND SUPPORT..........................................................................................26

XI. PRE SUIT EXHAUSTION OF ALTERNATIVE RESOLUTION..............................29

XII. FACTS............................................................................................................................30

A. The Lack of Direct Prohibition of Steering................................................................. 30

B. Ethics Enforcement as Useless Enforcement of Indirect Prohibition............................... 33

    1. Structure of the Ethics Complaint Process.......................................................33

    2. Structural Injustice: Legal and Evidentiary Barriers........................................ 35

    3. No Deterrence, No Enforcement.......................................................................36

    4. Conflicts of Interest and Biases in Ethics Enforcement....................................37

    5. Absence of Due Process....................................................................................38

    6. Ethics is Unenforceable in a growing number of MLS users..............................39

B. The Buyer-Broker Agreement (MLS Rule).......................................................................... 40

    1. Failure to Enforce Buyer-Broker Agreement Requirements............................ 41

    2. The Compensation Cap - Agreed, Issued but Nullified by Design....................42

    3. Wide Open Workarounds and Loopholes......................................................... 45

    4. Buyer-Broker Agreements Built to Deceive and Advance the Restraints.......... 47

C. The Prominent Display of the Listing Firm's Name and Contact - (MLS/IDX Rule).......55

    1. The Binary Nature of Compliance...................................................................58

    2. Non-Compliance: The Case of realtor.com...................................................... 58

    3. Non-Compliance: The Case of Free IDX Feeds - Provided by MLSs.......................... 59

    4. Market-Wide Noncompliance..........................................................................60

    5. The Industry Confirms Defendants' Capacity and Intent................................. 60

    6. Defendants Acknowledge Violations and Yet Fail to Act................................. 61

    7. IDX Vendors Confirm Intentional Violation and MLS Control....................... 63

    8. Exponential Effect of Non-compliance and Non-enforcement.........................68

D. The Prohibition of Filtering - (MLS Rule)...........................................................................71

E. The Prohibition of Commissions-Fixing Guidance - (MLS Antitrust Compliance Policy)73

F. The Reinforced and Promoted Incentive for Steering............................................................ 80

**XIII. CAUSES OF ACTION.................................................................................................... 85**

A. COUNT I - Violation of Section 1 of The Sherman Act (15 U.S.C. § 1) - Conspiracy to Restraint Trade by Collectively Refusing to Adopt Rules Expressly and Directly Prohibiting Steering......................................................................................................................................... 87

B. COUNT II - Violation of Section 1 of The Sherman Act (15 U.S.C. § 1) : Conspiracy to Restraint Trade by Collective Refusal to Enforce Steering Prohibition Under the Indirect Guidance as a Violation of Article 1 of the Code of Ethics...................................................... 89

C. COUNT III - Violation of Section 1 of The Sherman Act (15 U.S.C. § 1) – Conspiracy To Restrain Trade Through Collective Refusal To Enforce The Buyer-Broker Agreement Rule 92

D. COUNT IV - Violation of Section 1 of The Sherman Act (15 U.S.C. § 1) – Conspiracy To Restrain Trade By Permitting, Recommending, Suggesting and Encouraging Inflated Buyer-Broker Commission Offers and the Status Quo Commission Structure........................ 94

E. COUNT V - Violation of Section 1 of The Sherman Act (15 U.S.C. § 1) – Conspiracy To Restrain Trade Through Non-Enforcement and Violation of the IDX Display Rule.............. 97

F. COUNT VI – Violation of Section 1 of The Sherman Act (15 U.S.C. § 1) – Conspiracy to Restrain Trade by Violating the MLS Non-Filtering Rule.................................................... 100

**XIV. COUNT SUMMARY AND DEFENDANT/COUNT MAPPING................................ 102**

**XV. THE COMPOUNDING AND EXPONENTIAL ANTITRUS EFFECT....................... 104**

**XVI. TIMELINESS OF CLAIMS.......................................................................................... 107**

**XVII. HARM TO COMPETITION AND INJURY TO PLAINTIFF................................... 107**

**A. Harm to Competition and Consumers......................................................................... 108**

1. Steering-Enabled Price Fixing (Maintaining Inflated Commissions).......................... 108

2. Suppression of Price Competition by Market Allocation............................................. 109

3. Restriction of Consumer Choice................................................................................... 109

4. Exclusion of Innovative Business Models and Output Reduction................................ 110

5. Market Misrepresentation and Deception..................................................................... 110

6. Distinct from Mere Competitor Injury.......................................................................... 111

**B. Injury to Plaintiff.......................................................................................................... 111**

**XVIII. CONCLUSION........................................................................................................... 113**

**XIX. PRAYER FOR RELIEF................................................................................................ 114**

**A. Declaratory Relief......................................................................................................... 117**

**B. Injunctive Relief............................................................................................................ 117**

1. IDX Listing Broker Contact Display Compliance........................................................ 117

2. Steering Prohibition Enforcement................................................................................. 118

3. Buyer-Broker Agreement Rule Compliance................................................................. 119

4. Non-Filtering Rule Compliance.................................................................................... 119

5. Immediate Cessation of Enabling Conduct, Price Signaling and Commission Payment Structure.................................................................................................................................. 120

**C. Monetary Relief.............................................................................................................. 120**

1. Compensatory Damages....................................................................................... 120

2. Treble Damages................................................................................................... 120

3. Prejudgment Interest........................................................................................... 120

4. Post-Judgment Interest........................................................................................121

5. Costs and Fees.....................................................................................................121

**D. Other Relief as Just and Proper................................................................................. 121**

**XX. DEMAND FOR JURY TRIAL.............................................................................. 121**

**XXI. CONSENT TO ELECTRONIC SERVICE.............................................................121**

## I.    INTRODUCTION

1.      Defendant NAR repeatedly affirms that its policies foster competition and are not discriminatory, as stated by its General Counsel and Senior Vice President of Legal Affairs, Jon Waclawski, in an August 1, 2025 press release published on NAR-s official website.

2.      Furthermore, for each rule cited in this Complaint, NAR has issued specific rationales explaining the pro-market, transparency and pro-consumer purpose and intent behind them, leaving no doubt as to the letter and spirit of each rule.

3.      Plaintiff agrees with Defendant's NAR position regarding the pro-competitive intention and effect of its rules; specifically of the ones referenced in this Complaint.

4.      Nevertheless, Defendants systematically refuse to comply with, monitor, or enforce the very pro-competitive rules they impose on themselves and their members, rendering those rules meaningless.

5.      By NAR's own statements, such non-compliance, non-monitoring, and non-enforcement of the procompetitive rules have an anticompetitive effect that restrains trade.

6.      Plaintiff will address each rule in detail and each behavior by Defendants that defeat NAR's pro-competitive public standings.

7.      While the narrative may be lengthy, given the number of Defendants and the multiple rules and actions at issue, the injunctive relief sought is, by contrast, straightforward and indisputable: that Defendants comply with, monitor, and enforce the same pro-competitive rules they impose on themselves.

8.      This is a federal antitrust action brought pro se by Jorge A. Zea, a REALTOR® and licensed Real Estate Broker, against the National Association of REALTORS® (NAR), several multiple listing services (MLSs), and several REALTOR® associations (Associations).

1

9.     Plaintiff brings this action under Section 1 of the Sherman Act and the Clayton Act. Plaintiff seeks declaratory, injunctive, and monetary relief for ongoing harms caused by Defendants' anticompetitive conduct, and to prevent further injury to Plaintiff, consumers, and the competitive integrity of the real estate brokerage market.

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff brings claims under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26). The conducts alleged herein are currently ongoing and occurring in or substantially affecting interstate commerce, as required under Section 1 of the Sherman Act.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b) and 15 U.S.C. § 22, because a substantial part of the events giving rise to the claims occurred within this District, and the anticompetitive conduct caused injury to Plaintiff and to interstate commerce within the Southern District of Florida. Plaintiff is domiciled in Florida and operates from Palm Beach County.

12.     This Court has personal jurisdiction over all Defendants. All Defendants participate in, enforce, or benefit from a coordinated framework of mandatory rules, policies, and compliance structures that collectively restrain trade and distort market competition.

13.     Some Defendants operate directly within Florida's residential real estate market. Others, though based outside Florida, have purposefully directed conduct at Plaintiff through service, rulemaking, communications, and regulatory proceedings that materially affected Plaintiff's business in this District.

2

14.     Defendant West and Southeast REALTORS® of the Valley, Inc. ("WeSERV") is subject to specific personal jurisdiction in Florida because it committed an intentional act expressly aimed at this state, knowing the harm would be felt here. Based in Arizona and lacking direct market overlap with Plaintiff, WeSERV nonetheless unilaterally assumed jurisdiction over an ethics complaint against Plaintiff, a known Florida resident. The brunt of the injury from this extraterritorial adjudication was necessarily felt in Florida. This conduct demonstrates purposeful availment, satisfies the minimum contacts requirement, and evidences WeSERV's participation in a nationwide conspiracy, making jurisdiction in this District both constitutional and proper.

## III.     ANTITRUST STANDING

15.     Plaintiff has standing to seek damages and injunctive relief under the Clayton Act, having suffered direct economic injury from Defendants' anticompetitive conduct and being the proper party to enforce the antitrust laws.

16.     First, Plaintiff has suffered an antitrust injury of the type the antitrust laws are designed to prevent. Defendants' coordinated scheme harms competition itself by targeting and suppressing Plaintiff's pro-competitive brokerage model, restricting consumer choice, and maintaining supracompetitive prices. Plaintiff's injury is the direct and intended result of this distortion of the competitive process, not the result of legitimate competition.

17.     Second, under the generally recognized "efficient enforcer" factors, Plaintiff is best positioned to bring this action. As a licensed real estate broker and REALTOR® who directly purchases Defendants' MLS services and association memberships, and whose pro-competitive brokerage model is targeted by Defendants' unlawful actions, Plaintiff's injury is neither remote nor derivative. The causal connection between Defendants' scheme and Plaintiff's harm is direct and unbroken.

18.     Finally, Plaintiff's harm is concrete, current, ongoing, and distinct from any claims released in prior litigation, and has not been remedied by any settlement or other proceeding. As the immediate victim of market exclusion, Plaintiff is in the best position to vindicate the harm to competition. The relief sought, particularly injunctive relief requiring compliance with Defendants' own pro-competitive rules, addresses harms for which there has been no redress and cannot result in any duplicative recovery.

**IV.     PLAINTIFF**

19.     Plaintiff operates an innovative, non-traditional, low-cost real estate brokerage service through its trademarked platform, www.snapflatfee.com®. Under this model, home sellers pay a low listing fee in exchange for limited brokerage services.

20.     These services include full listing exposure on the corresponding Multiple Listing Service (MLS) with the maximum number of photos allowed by the MLS, as well as syndication of the listing data through the MLS-enabled data feed and data sharing technologies (referenced in this complaint as IDX), to participating brokerages and individual REALTORS® who operate MLS-fed (IDX) websites. Listings are also syndicated to major real estate portals.

21.     *Sellers who choose Plaintiff's service typically do so because they do not need, do not want, or cannot afford to engage a traditional, full-service or more expensive listing broker.* Many are also unwilling or unable to pay a buyer-broker commission. As a result, a significant portion of Plaintiff's clients either offer a low upfront buyer-agent commission to buyer agents or no upfront buyer-agent compensation at all - understanding that such compensation, if any, may be negotiated as part of an eventual good faith and bindable purchase offer.

4

22.     All leads received by Plaintiff - regardless of their origin - are forwarded directly to the seller. The seller then assumes responsibility for showings, communications, negotiations, and overall coordination of the transaction.

23.     A core objective for many sellers using this model is to avoid paying any commission (a reasonable and personal choice). Achieving this goal requires transparency so that prospective buyers are able to contact the seller directly (or through Plaintiff), without having to hunt for the listing agent's (or seller's) contact information and without unnecessary steering, misleading, misrepresentation, interference, diversion, deflection, funneling, or redirection.

24.     The violations detailed in this Complaint directly obstruct that flow of contact information, intentionally frustrating the essential function of Plaintiff's service and causing substantial, ongoing harm.

25.     Plaintiff's business model is built on the premise of a competitive, transparent marketplace; one free of artificial restraints and marked by fair access to information. In fact, the model deliberately aligns with Defendants' own published rules, policies, and professional standards, which claim to promote consumer transparency, fair market competition, and broker independence.

26.     Had Defendants been truthful and implemented, complied with, monitor and enforced their own rules and regulations in good faith, Plaintiff's model would have been allowed to thrive. Instead, Defendants' coordinated failures and actions have denied Plaintiff the opportunity to grow, scale, gain market share, increase revenue, profit, build brand recognition, increase business value and compete fairly; ultimately foreclosing Plaintiff's ability to establish a leading, cost-saving alternative in the national real estate market.

5

## V.    DEFENDANTS

27.    Each Defendant is, in itself, a trade organization composed of direct horizontal competitors - licensed real estate professionals. Plaintiff is likewise a licensed real estate broker, REALTOR® and a direct competitor in the same residential real estate brokerage and geographic markets, offering listing services that compete with the services of Defendants' members. Accordingly, Plaintiff has both standing and direct exposure to the anticompetitive effects of the rules and enforcement practices at issue in this Complaint.

28.    Defendant **National Association of REALTORS® (NAR)** is a non-profit trade association organized under the laws of Illinois, with its principal place of business at 430 North Michigan Avenue, Chicago, Illinois 60611. NAR is the national trade association for real estate professionals in the United States. It promulgates and enforces mandatory policies, including the Code of Ethics and MLS/IDX rules which, when mandatory, bind all member REALTOR® associations and affiliated MLSs.

29.    Defendant **Beaches MLS, Inc.** is a for-profit corporation organized under the laws of the State of Florida, with its principal place of business at One Harvard Circle, Suite 102, West Palm Beach, Florida 33409. Beaches MLS operates a multiple listing service in South East Florida and is subject to, and responsible for enforcement of mandatory rules and regulations issued by NAR, including those governing MLS/IDX and participant conduct under these rules.

30.    Defendant **Broward, Palm Beaches and St. Lucie REALTOR®s, Inc.** is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at One Harvard Circle, Suite 102, West Palm Beach, Florida 33409. It is a regional REALTOR® association affiliated to NAR and responsible for enforcing the Code of

6

Ethics among its members. It is affiliated with and in direct control of Beaches MLS.; hence bears responsibility for complying with MLS/IDX rules and their enforcement.

31.     Defendant **Orlando Regional REALTOR® Association, Inc. (ORRA)** is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 1330 Lee Road, Orlando, Florida 32810. It is a local NAR-chartered REALTOR® association serving the Greater Orlando area and is responsible for Code of Ethics enforcement and is a shareholder with decision-making capacities of StellarMLS and must comply with and enforce MLS/IDX Rules.

32.     Defendant **Miami Association of REALTORS®, Inc**. is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 700 South Royal Poinciana Boulevard, Suite 400, Miami, Florida 33166. It is a local REALTOR® association member of NAR and responsible for Code of Ethics enforcement among members in the Miami metropolitan area, and directly operates the South East Florida MLS along with the enforcement mandates of its rules and regulations.

33.     Defendant **Florida Gulf Coast Multiple Listing Service, Inc.** is a for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 12381 S Cleveland Ave Suite 502 FORT MYERS, FL 33907. It operates an MLS (SWFLMLS) and is subject to NAR's mandatory MLS/IDX rules and data policies. The MLS is under direct control of defendants: Royal Palm Coast REALTOR® Association, Inc. and Naples Area Board of REALTOR®s, Inc. (NABOR®).

34.     Defendant **Royal Palm Coast REALTOR® Association, Inc.** is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 12381 S Cleveland Ave Suite 502 FORT MYERS, FL 33907. It is a local REALTOR®

association recognized by NAR and affiliated with Florida Gulf Coast MLS. It is responsible for Code of Ethics and MLS/IDX rules compliance and enforcement among its members.

35.     Defendant **Naples Area Board of REALTORS®, Inc. (NABOR®)** is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 1455 Pine Ridge Road, Naples, Florida 34109. It is a local NAR-affiliated REALTOR® association and is responsible for Code of Ethics enforcement in the Naples region and enforcement of MLS/IDX rules upon its members.

36.     Defendant **My Florida Regional MLS, Inc.,** d/b/a **Stellar MLS**, is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 247 Maitland Avenue, Altamonte Springs, Florida 32701. Stellar MLS is subject to mandatory MLS/IDX policies issued by NAR.

37.     Defendant **Space Coast Association of REALTOR®s, Inc.** is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 2950 Pineda Plaza Way, Melbourne, Florida 32940. It is a local REALTOR® association affiliated with NAR and responsible for enforcing the Code of Ethics for members in Brevard County, Florida.

38.     Defendant **Space Coast Multiple Listing Service, Inc.** is a for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 2950 Pineda Plaza Way, Melbourne, Florida 32940. It operates the MLS and is directly under control by the Space Coast Association of REALTORS® and is subject to mandatory NAR policies, including the MLS/IDX rules.

39.     Defendant **Northeast Florida Multiple Listing Service, Inc.,** d/b/a **RealMLS**, is a for-profit corporation organized under the laws of the State of Florida, with its principal place

8

of business at 7801 Deercreek Club Road, Jacksonville, Florida 32256. RealMLS operates a

regional multiple listing service in Florida's Northeast region and is bound by mandatory NAR

MLS/IDX policies.

40.     Defendant **Northeast Florida Association of REALTORS®, Inc. (NEFAR)** is a

not-for-profit corporation organized under the laws of the State of Florida, with its principal

place of business at 7801 Deercreek Club Road, Jacksonville, Florida 32256. It is a local

REALTOR® association responsible for enforcing NAR's Code of Ethics among members in the

greater Jacksonville (FL) region and is the direct controlling entity for the Regional MLS:

RealMLS.

41.     Defendant **Central Panhandle Association of REALTORS®, Inc.** is a

not-for-profit corporation organized under the laws of the State of Florida, with its principal

place of business at 4952-B US Highway 98, Santa Rosa Beach, Florida 32459. It is a local

REALTOR® association obligated under mandatory NAR policies and responsible for Code of

Ethics enforcement in the Florida Central Panhandle area. In addition, it operates its own MLS

system under direct control and enforcement responsibilities of the MLS/IDX rules.

42.     Defendant **Connecticut Association of REALTORS®, Inc. (CT**

**REALTORS®)** is a non-stock corporation organized under the laws of the State of Connecticut,

with its principal place of business at 111 Founders Plaza, Suite 1101, East Hartford, Connecticut

06108. It is a state-level REALTOR® association affiliated to NAR and is responsible for Code

of Ethics enforcement among local associations in Connecticut. It *does not have* controlling

voice or decision making over the Connecticut state-wide MLS (SmartMLS).

43.     Defendant **SMART MLS, Inc.** is a non-stock corporation organized under the

laws of the State of Connecticut, with its principal place of business at 55 Old Gate Lane,

9

Milford, Connecticut 06460. SMART MLS operates a multiple listing service covering most of Connecticut and is subject to NAR's mandatory MLS/IDX rules.

44.     Defendant **Midwest Real Estate Data LLC (MERD)** is a Limited Liability Company organized under the laws of the State of Illinois, with principal address at: 2443 Warrenville Rd. Ste 600 Lisle, IL 60532. It operates a multiple listing service with regional coverage in northern Illinois, southern Wisconsin, and northwest Indiana, and is subject to NAR's mandatory MLS/IDX rules.

45.     Defendant **West and Southeast REALTORS® of the Valley, Inc. (WeServe)** is a non-profit corporation organized under the laws of the State of Arizona, with its principal place of business at 1733 East Northrop Boulevard, Chandler, Arizona 85286. It is a local NAR-affiliated REALTOR® association responsible for enforcing the Code of Ethics.

46.     Plaintiff is a member, participant, or otherwise bound by the policies and enforcement of each named Defendant, or has been directly impacted by their conduct, including the Arizona Defendant's adjudication of ethical matters central to this complaint.

## VI.     ORGANIZATIONAL STRUCTURE

47.     The National Association of REALTORS® ("NAR") is a national trade association of real estate professionals, with more than 1.5 million members (REALTORS®), that exerts centralized control over the residential real estate brokerage industry through its Membership and MLS/IDX rules, regulation, policies, ethics standards and its enforcement structure.

10

48.     NAR wields near-complete market power[1] at the national level through its control

of the MLS infrastructure, mandatory policy framework, the Code of Ethics and REALTOR®

membership system.

49.     At the same time, its affiliated Associations and MLSs exercise dominance within

their respective local, regional, or statewide markets. These overlapping entities are bound by

and implement NAR's uniform *mandatory policies,* allowing NAR to enforce national directives

through local enforcement mechanisms. This hierarchical structure gives Defendants the ability

to coordinate, impose, and perpetuate anticompetitive restraints across the entire residential real

estate brokerage market.

50.     NAR issues *mandatory* rules, regulations, policies, and standards of practice -

including the Code of Ethics and the Handbook on Multiple Listing Policy - which its affiliated

local, regional and state REALTOR® associations (Associations) and multiple listing services

(MLSs) are required to comply with, adopt, implement, and enforce.

51.     Compliance, by Associations, MLSs and REALTORS®, with NAR's *mandatory*

*rules is not optional.* Associations must incorporate all such NAR-issued mandatory rules into

their own governing documents, rules, regulations and operating procedures by the NAR-set

date.

52.     To ensure this, NAR requires each MLS and Associations to submit its rules and

regulations for formal *certification*, verifying that all mandatory provisions are present,

[1] Studies estimate that between 83% and 88% of all existing home sales occur through the
MLS or with the assistance of a REALTOR® or licensed agent affiliated with the MLS,
demonstrating the market power and reach of Defendants through the MLS and
association system. See National Association of REALTORS®, Quick Real Estate
Statistics, accessed July 6, 2025,
https://www.nar.realtor/research-and-statistics/quick-real-estate-statistics; see also Bright
MLS, On-MLS Study 2023, accessed July 6, 2025,
https://www.brightmls.com/article/on-mls-study-2023.

11

mandatory and enforceable at the local level. This process reinforces NAR's top-down control over regional and local enforcement, ensuring uniformity across jurisdictions and entrenching NAR's regulatory dominance.

53.     To compel compliance, NAR leverages its market domination, financial and institutional power. NAR threatens to revoke the Associations' or MLSs' charter [2] and/or to withhold critical benefits, such as liability insurance, that it secures and pays for Associations and MLSs, when its policies are not followed.[3][4]

54.     At the same time, Associations are explicitly permitted, and indeed encouraged, by NAR to adopt additional local rules, so long as they do not conflict with NAR's mandatory provisions. In fact, NAR goes further with respect to antitrust: its own Handbook affirms that local Associations and MLSs are authorized to "*establish rules or policies necessary to prevent illegal collective action, including price-fixing and boycotts.*" [5]

---

[2] See National Association of REALTORS®, *2025 Handbook on Multiple Listing Policy* at 21. "It is the duty and responsibility of all boards and associations of REALTORS® and MLSs owned by or controlled by boards or associations of REALTORS® to ensure that all bylaws, rules, regulations, and other governance provisions comply with all mandatory multiple listing policies of the National Association of Realtors®. *Boards and associations of REALTORS® failing to conform with these policies will be required to show cause why their charters should not be revoked".*

[3] See National Association of REALTORS®, *2025 Multiple Listing Service Handbook*, Introduction (Mandatory Rules): "Adoption is necessary to ensure compliance with mandatory policies established by the National Association of REALTORS® Board of Directors and coverage under the National Association's master professional liability insurance policy. Local adoption is required by August 17, 2024." Available at: https://www.nar.realtor/handbook-on-multiple-listing-policy (accessed July 16, 2025).
[4] See National Association of REALTORS®, *2025 Multiple Listing Service Handbook*, at 8: "Those associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not consistent with mandatory policies of the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation". Available at: https://www.nar.realtor/handbook-on-multiple-listing-policy (accessed July 16, 2025)
[5] See National Association of REALTORS®, *2025 Multiple Listing Service Handbook*, at 8: "This policy does not prohibit boards or associations of REALTORS® or their MLSs

12

55. Therefore, each Defendant is liable for its failure to enact their own regulation to address known antitrust conduct and failure to enforce existing such rules at the local, regional, or state level. The uniform omission and non-enforcement across all jurisdictions (in this complaint), despite this explicit authorization by NAR, and Plaintiff's requests, demonstrates more than mere parallel conduct. It reflects concerted inaction by collectives of horizontal competitors operating through their associations, with foreseeable and compounding anticompetitive effects.

56. This structure reflects an *enhanced hub-and-spoke conspiracy*: NAR serves as the central hub, promulgating mandatory policies and leveraging institutional authority to drive uniform adoption. Each MLS and Association operates as a *spoke-turned-sub-hub*, composed of independent direct horizontal competitors (REALTORS® and/or licensed real estate agent).

57. Within these sub-hubs, horizontal competitors collectively decide not to comply with, monitor or enforce mandatory rules, and collectively decide not to impose discipline under the mandates of the Code of Ethics. As a result, each sub-hub independently satisfies Sherman Act § 1 by embodying a "contract, combination or conspiracy" among competitors, while NAR's overarching coordination ensures a nationwide network of interlinked conspiracies aimed at suppressing competitive threats such as Plaintiff's business model.

58. In addition to adopting NAR's mandatory rules, each Association and MLS is responsible for complying with, supervising and enforcing those rules, along with the NAR Code of Ethics (Associations in particular), at the local level.

---

from adopting rules or policies establishing the legitimate uses of MLS information, from prohibiting unauthorized uses of MLS information, or from *establishing rules or policies necessary to prevent illegal collective action, including price-fixing and boycotts*." Emphasis added. Available at:

https://www.nar.realtor/handbook-on-multiple-listing-policy (accessed July 16, 2025)

13

59.     The Code of Ethics is only obligatory to REALTORS® and does not bind

licensees that, while not REALTORS®, may have a subscription to and participate in some

MLSs.

60.     Defendants routinely exercise this enforcement authority against rules that protect

historic commission structures or preserve status quo business practices. However, they have

uniformly declined to enforce rules - such as those promoting consumer transparency or

preventing and prohibiting steering - that would enhance competition or benefit alternative

brokerage models like Plaintiff's.

61.     This selective enforcement underscores the coordinated nature of Defendants'

conduct and highlights the systemic failure of self-regulation when enforcement would reduce

their market power rather than entrench it.

62.     In 2015, NAR commissioned and published a report titled *D.A.N.G.E.R. Report,*

*(Definitive Analysis of Negative Game Changers Emerging in Real Estate)* distributed nationally

as a proactive strategic planning tool for real estate leaders and organizations.[6] Rather than

providing neutral market analysis, the report explicitly identifies alternative business models -

such as flat-fee, low commission structures and technology-driven brokerages (among others), as

a threat and a "DANGER" to the industry (ignoring that *these are part of the industry* and most

are also REALTORS®).

63.     The report explicitly identifies alternative and lower-cost brokerage models as

existential threats to the traditional structure. Apart from these these, other listed threats are:

---

[6] See National Association of REALTORS®, *The DANGER Report: Definitive Analysis*
*of Negative Game Changers Emerging in Real Estate* (2015),
https://www.nar.realtor/realtor-ae-magazine/d-a-n-g-e-r-report-guides-association-strategi
c-planning and https://www.dangerreport.com/ (both accessed July 16, 2025).

14

- "Home buyers might not always want to use a real estate agent, but most think they have to. What happens if their perspective changes?" (p. 23)

- "Consumers are definitely becoming more motivated to find an alternate solution." (p. 23).

- "The 'uberization' of real estate threatens agents the same way it did cab drivers." (p. 39)

- "A tech company cracks the code and connects enough of the dots to conduct real estate transactions without the need of an agent." (p. 38)

- "The existing compensation structure gets eclipsed as new business models gain rapid traction." (p. 52)

- "The next winning model could be a technology-powered, agent-centric, *flat fee*, transaction-based fee, salaried, or auctioneering model." (pg 52)

- "Brokers are undercut by outsiders offering the same support and services at a fraction of the cost." (p. 54)

64.     These statements are not neutral guidances; they are framed as internal threats to

be mitigated, confirming NAR's institutional view that consumer-focused innovation, buyers free

representation choice, alternative compensation structures and commission price competition are

dangers to "the industry".

65.     Hence, it is easy to discern that when the report refers to "the industry", it really

refers to a subset within the industry: traditional brokerage, buyer representation, and

compensation models; others are simply referred as "*outsiders*"[7].

66.     Accordingly, over the subsequent decade, Defendants have taken deliberate

action, through non compliance, omissions, and selective enforcement, and public messaging to

prevent those "DANGERS" from materializing. The playbook outlined in the report became and

still is a strategic blueprint and guiding force for maintaining the status quo.

---

[7] "Brokers are undercut by outsiders offering the same support and services at a fraction of the cost.": National Association of REALTORS®, D.A.N.G.E.R. Report: Definitive Analysis of Negative Game Changers Emerging in Real Estate 55 (2015), https://www.nar.realtor/sites/default/files/reports/2015/2015-nar-danger-report.pdf.

67.     The result is a coordinated suppression of innovation, alternative business models, transparency, consumer choice and price competition by design. The very business model Plaintiff (Flat Fee - Limited Service) represents is identified (along with other innovative models), in Defendants' own strategic materials, as a threat to be mitigated and curtailed, not as a legitimate alternative within the industry. Plaintiff and similarly positioned non-traditional brokers are portrayed as outsiders to be managed, not peers to be protected.

68.     Despite being dues-paying member, REALTOR®, and participant in the same MLS systems, Plaintiff is treated as a structural threat rather than an industry valid stakeholder; he is denied equal standing, fair enforcement, and the protections afforded to traditional brokerages.

## VII.   RELEVANT MARKETS AND DEFENDANTS' MARKET POWER

69.     The relevant product market is the real estate brokerage services market and for purposes of this action, Plaintiff alleges three interrelated relevant product markets:

70.     (1) The national market for NAR policy-making, including the promulgation, interpretation, and enforcement of MLS/IDX rules, and professional ethics under the National Association of REALTORS® Code of Ethics; (2) The local markets for MLS data feeds and listing exposure, where NAR-affiliated MLSs serve as the sole or dominant platforms for regional access to property listings and IDX data sharing; and (3) The local markets for REALTOR® association services, including membership, continuing education, ethics enforcement, and licensing support governed by NAR affiliation.

71.     In the NAR Policy Market, brokerages, MLS Participants and consumers nationwide are subject to uniform rules that they cannot practically avoid without forfeiting access to the nation's dominant residential listing infrastructure. According to NAR's own

16

figures, approximately 83% to 88% of all U.S. residential home sales occur through MLS-facilitated transactions (see supra note 2), making NAR's rules functionally inescapable.

72.     In each Local MLS market in this complaint, there is only one MLS service available and participation in the sole available MLS is essential for brokers to compete, access a complete, real-time compilation of active listings and IDX feeds. No substitute exists for MLS data within each defined territory. Non-participation means functional exclusion from the marketplace.

73.     In the Local REALTOR® association market, only the local chartered NAR-affiliated association holds authority to provide REALTOR® membership and enforce NAR's Code of Ethics. Brokers operating outside that framework lose competitive access to industry branding, credibility, and ethical standing; each essential to compete on equal footing.

74.     *These markets are geographically defined* by the exclusive service territories covered by each Defendant MLS or association, with no viable alternative in each area as follows:

75.     Defendants Miami Association of REALTORS® (SEFMLS) and BeachesMLS, operate in conjunction with Broward, Palm Beaches & St. Lucie REALTORS® and serve over 102,000 members[8] and control 100% of MLS listings and all IDX feeds across Miami-Dade, Broward, Palm Beach, and St. Lucie Counties.

---

[8] See *RWorld Is Leading the Charge in Florida*, Broward, Palm Beaches & St. Lucie Realtors®, RWorld Blog (Jan. 9, 2024), available at
https://rworld.com/blog/rworld-is-leading-the-charge-in-florida (visited July 31, 2025) and *About MIAMI REALTORS®*, MIAMI Association of REALTORS®, available at
https://www.miamirealtors.com/about-miami/ (visited July 31, 2025).

17

76.     Defendants Royal Palm Coast REALTOR® Association, NABOR®, and Florida Gulf Coast MLS, Inc. jointly operate the only MLS systems in Collier, Lee, and Hendry Counties, serving over 18,000 members.[9] Additionally it provides the IDX feed for the region.

77.     Defendant in Central Florida, StellarMLS, governed by 18 shareholder associations, controls the entire MLS listing infrastructure for 59,000 members across 20 counties[10] where there is no alternative or competing MLS. While Defendant Orlando Regional Realtor Association (ORRA), who is a shareholder in StellarMLS, enforces the ethics standards upon its own 20,000 members.[11]

78.     Defendants Space Coast Association of REALTORS® and Space Coast MLS operate as a unified entity controlling all MLS, IDX access and Realtor membership in Brevard County with 6,000 members.[12]

79.     Defendants Northeast Florida MLS and NEFAR control all MLS and IDX services and enforce Ethics mandates via REALTOR® membership for 12,000 members across Duval, Clay, Putnam, and St. Johns Counties.[13]

---

[9] See History, Royal Palm Coast REALTOR® Association, available at
https://rpcra.org/about-rpcra/about-us/history.html (visited July 31, 2025) and See NABOR®
History, Naples Area Board of REALTORS®, available at
https://www.nabor.com/about-us/nabor-history (visited July 31, 2025)
[10] See Shareholders, Stellar MLS, available at https://www.stellarmls.com/about/shareholders
(visited July 31, 2025).
[11] See Who We Are, Orlando Regional REALTOR® Association, available at
https://www.orlandorealtors.org/whoweare (visited July 31, 2025)
[12] See About the Association, Space Coast Association of REALTORS®, available at
https://www.spacecoastmls.com/about-us/about-the-association (visited July 31, 2025).
[13] See About, Northeast Florida Association of REALTORS® (NEFAR), available at
https://nefar.realtor/about/ (visited July 23, 2025)

18

80. Defendant Central Panhandle Association of REALTORS® provides the only MLS/IDX service and ethics enforcement in six northwest Florida counties (Bay, Calhoun, Washington, Holmes, Jackson & Liberty), serving 2,400 professionals.[14]

81. In Connecticut, Defendant SmartMLS, Inc. serves over 20,000 agents as the only statewide MLS and IDX feed source,[15] while Defendant Connecticut Association of REALTORS® is the ethics enforcement authority for its 18,000 members statewide[16].

82. Significantly, Arizona-based WeSERV, a Defendant, responsible for enforcement of the NAR's Code of Ethics upon its Arizona members; with no geographic overlap or service or membership relation with Plaintiff, voluntarily intervened in a Connecticut ethics matter involving no Arizona parties. This conduct illustrates that REALTOR® associations do not operate as siloed, local entities, but as components of a coordinated, nationwide system with shared enforcement and governance mechanisms.

83. Thus, all Defendants' activities occur in the flow of, and have a substantial effect on, interstate commerce.

84. Defendants' market power in each of the relevant markets is substantial, beyond monopoly threshold and legally significant. NAR controls a nationwide network of over 1.5 million members and governs virtually all MLS participation through centralized rulemaking and enforcement.

85. Each local Defendant exercises exclusive and absolute control over MLS data, listing exposure, and IDX feeds within its territory, leaving no viable substitute for brokers seeking to compete in the residential real estate brokerage market.

---

[14] See Central Panhandle Association of REALTORS®, *IDX Information for Vendors and Brokers*, https://www.cpar.us/ (last visited Aug. 2, 2025)
[15] See Home Page, SmartMLS, available at https://smartmls.com/ (visited July 31, 2025).
[16] See About, Connecticut Association of REALTORS®, available at https://www.ctrealtors.com/about/ (visited July 31, 2025).

19

86.     This dominance is maintained through mandatory policies, rules and regulations, financial penalties, and the threat of suspension of benefits (including IDX feed suspension). Both individually and collectively, Defendants' market power is confirmed by NAR's own publications, publicly available MLS directories, and regional transaction data, establishing their monopoly or near-monopoly positions in their respective territories.

## VIII.   CONCERTED ACTIONS AND COLLUSION

87.     The collusion and concerted actions at issue are neither speculative nor inferred. They are established by the very nature of Defendants' organizational structure and explicitly acknowledged in Defendants' own materials.

88.     As Defendant NAR, in their guide for association management teams (published in January 2024), acknowledges the collective nature of professional associations acts. This publication states:

> "Antitrust laws are violated when competitors act collectively to restrain
> competition. By definition, *a trade association consists of a group of competitors
> acting in a collective fashion. When a trade association acts, the key antitrust
> question is whether that action limits or restrains competition in some way, and if
> so, whether it does so unreasonably.*" [17] (emphasis added)

89.     Federal courts have affirmed that trade association rules, particularly those that are mandatory, constitute concerted action under Section 1 of the Sherman Act. When a group of horizontal competitors agree, through a governing body such as a trade association, to adopt a binding rule, that agreement itself satisfies the concerted action element.

90.     Thus, these rules are not advisory, optional or local in origin. They are centrally crafted, nationally disseminated, and uniformly required, constituting binding collective action

---

[17] See National Association of REALTORS®, *The Answer Book: The Source for REALTOR® Association Management Leaders* (Jan. 2024), at 18. Available at: https://www.nar.realtor/sites/default/files/2024-09/The-Answer-Book-2024-09-05.pdf (accessed July 16, 2025).

20

by horizontal competitors. That these same competitors uniformly (through an Association or an MLS) fail to enforce or comply with these rules further underscores the existence of a coordinated, systemic policy; one designed not to prevent anticompetitive behavior, but to preserve it behind a veil of procedural compliance.

91.     Each Defendant, by its very nature as a professional association composed of competing real estate brokers, is itself a forum for collective action. These entities do not operate as neutral platforms; they are governed and directed by their own members (horizontal competitors) who make decisions collectively through boards, committees, panels and voting processes. When such an entity chooses not to enforce a mandatory rule, not to monitor compliance, or not to require adherence among its members, that decision is not unilateral, it is a collective action taken by a group of competitors acting jointly.

92.     Accordingly, the concerted action requirement of Sherman Act §1 is fully satisfied.

## IX.    STEERING

93.     For purposes of this Complaint, "steering" refers to the well-documented practice by which buyer agents divert clients away from properties that offer reduced or no buyer-agent commissions, by filtering them out, omitting them from recommendations, or actively disparaging them. This conduct has been extensively analyzed in economic studies,[18] cited in

---

[18] See, e.g., Borys Grochulski & Zhu Wang, *Real Estate Commissions and Homebuying*, Fed. Res. Bank of Richmond, Working Paper No. 24-01R (updated June 8, 2025), https://www.richmondfed.org/-/media/RichmondFedOrg/publications/research/working_papers/2 024/wp24-01.pdf

Case 9:25-cv-81016-WM   Document 1   Entered on FLSD Docket 08/15/2025   Page 26 of 126

antitrust enforcement actions,[19] and described in industry literature[20] as the mechanism used to preserve traditional commission levels and structures and to suppress price competition.

94.     Steering exerts coercive pressure on sellers to offer higher commissions out of fear that their properties will otherwise be excluded from buyer consideration. This systemic pressure disproportionately harms innovative or low-fee business models by impairing their visibility and reducing transaction volume. As recognized by regulators, researchers, and courts, steering operates not only as a price-maintenance device but as a mechanism of group boycott[21] and de facto market exclusion for models that deviate from the traditional commission framework.

95.     In the residential real estate brokerage market, steering is structurally incentivized by the historic and existing commission structure. It is the mechanism by which competitors are kept in check - restricted to traditional models, service levels, pricing structures, and permissible forms of competition. As a result, any genuine effort to curtail, prevent, prohibit or dismantle steering has been systematically avoided and circumvented by Defendants.

96.     The mechanisms that enable steering are numerous, deeply entrenched, and operate both horizontally and vertically. Defendant Royal Palm Coast REALTOR® Association

---

[19] See, e.g., U.S. Dep't of Justice, *Statement of Interest of the United States, Nosalek v. MLS Property Information Network, Inc.*, No. 1:20-cv-12244-PBS, Dkt. 110 at 9–14 (D. Mass. Mar. 3, 2023); see also *Statement of Interest of the United States, Burnett v. National Ass'n of REALTORS®*, No. 4:19-cv-00332-SRB (W.D. Mo. Nov. 24, 2024); see also *Competitive Impact Statement, United States v. National Ass'n of REALTORS®*, No. 1:20-cv-03356-TJK, ECF No. 11 at 7–8 (D.D.C. Dec. 10, 2020),
https://www.justice.gov/atr/case-document/file/1342096/download.
[20] Barry, Jordan M., *Et Tu, Agent? Commission-Based Steering in Residential Real Estate*, 110 Iowa L. Rev. 665 (2025),
https://ilr.law.uiowa.edu/sites/ilr.law.uiowa.edu/files/2025-05/ILR-110-Barry.pdf.
[21] Svoboda, Mary T., & Miller, James C., III, *Real Estate Brokerage: Antitrust and Reform*, 44 Regulation 8 (Summer 2021),
https://www.cato.org/sites/cato.org/files/2021-06/regulation-v44n2-2.pdf.

22

openly acknowledged in an email on December 16 ,2024 that providing buyers with access to a seller's contact information "…can lead someone to bypass their own contracted agent to seek out the listing agent."

97.     But what happens when a buyer doesn't have a "contracted agent"; or does not want, need, or cannot afford to hire a buyer agent? In such cases, the system leaves the buyer with no meaningful choice - effectively forcing them to engage a buyer agent merely to advance the transaction and maintaining the status quo commission and brokerage model.

98.     The industry's persistent fear that buyers might transact without engaging a buyer agent is explicitly acknowledged in the D.A.N.G.E.R. Report (see ¶ 63), where the prospect of buyers working directly with listing agents (who may delegate the transaction responsibility onto the seller directly, as Plaintiff) - particularly those operating outside traditional commission structures - is described as a fundamental threat.

99.     In response, Defendants have developed a multi-pronged, multilevel enterprise-like structure, reinforced by collusion, designed to keep buyers as far removed as possible from any direct contact with sellers or with listing agents representing alternative business models. Hence steering them towards buyer agent representations.

100.     Most buyers today rely on the Internet as their primary tool for property searches, and thousands of websites display MLS listings via IDX feeds. Yet, even in that setting, buyer choice is systematically constrained. These platforms - often operating under the direction, approval or influence of MLSs and Associations - routinely obscure or omit the listing agent's contact information, further distancing buyers from the seller and reinforcing the steering dynamic.

23

101. The vertical dimension of this restraint is advanced by MLSs and Associations who instruct (or configure through their own technology platforms - e.g. Trestle from Cotality) IDX vendors to circumvent their own pro-competitive rules, specifically by concealing the required listing firm name and contact information. This practice severely limits a buyer's ability to decide whether to engage a buyer agent and directly undermines the transparency and consumer empowerment the IDX rules were expressly designed to protect.

102. When buyer agents steer clients away from properties offering no or low commission, sellers are pressured to offer the "market rate" out of fear their homes will be ignored, will not sell or take longer to sell. As a result, sellers feel compelled to offer higher commissions than they otherwise would, inflating transaction costs across the board. These costs are ultimately borne by both buyers and sellers, distorting price competition and locking in an artificially high baseline for commissions.

103. Steering, and its anticompetitive effects of price fixing, market allocation and group boycott, as a *per se* restraint of trade, has been extensively studied, analyzed, documented and condemned by nearly every relevant authority. The Federal Trade Commission (FTC) has published reports documenting the harms of steering in real estate transactions. The U.S. Department of Justice (DOJ) has initiated enforcement actions, submitted amicus briefs, and issued public statements recognizing steering as a serious threat to competition and consumer choice. Federal agencies, including the Federal Reserve, have published recent economic analyses confirming that steering distorts market dynamics and reinforces artificially high commission structures.

104. In addition, a vast body of legal, scholar articles, economic literature, and antitrust case commentary, spanning law journals, policy reviews, and empirical studies, has consistently

24

recognized steering as an exclusionary and coercive practice that undermines price competition, suppresses innovation, restrains trade and dramatically reduces consumer welfare..

105.    Even Defendant NAR has repeatedly acknowledged, in its own policies and public statements, that steering, because it restrains trade via price fixing and group boycott, is prohibited.[22]

106.    NAR's Code of Ethics, MLS policies, and antitrust guidance materials confirm that steering violates the principles of transparency, fairness, and consumer autonomy that Defendants claim to uphold. Nevertheless, there is no direct rule prohibiting the behavior.

107.    These steering practices - and the actions that enable and promote them - are so damaging, pervasive, institutionalized, and intentional that they warrant *per se* treatment under Section 1 of the Sherman Act. Defendant NAR recognizes this in its own literature. Among several other public statements, it explains:

> "Both conspiracies to fix prices and group boycotts are considered per se violations of the antitrust laws, meaning these restraints are deemed to be so inherently anticompetitive that their anticompetitive effects on trade are presumed. Defendants will be given no opportunity to demonstrate the reasonableness of the restraint, and the only question will be whether the defendant participated in the alleged conspiracy." [23]

108.    Furthermore, even if Defendants come before this Court and attempt to disavow or contradict their own prior statements, justifications, rules and rulemaking rationale, their conduct remains subject to antitrust scrutiny under the per se concept. Even under a quick look analysis - Defendants have already conceded the applicability of either standard through their

---

[22]See National Association of REALTORS®, NAR Settlement FAQs (last updated Sept. 5, 2024), at 22 : "*Under NAR's Code of Ethics, steering buyers based on the amount of broker compensation is prohibited.*" and at 23: "*NAR reaffirms its commitment to requiring that MLS Participants must not limit the listings their client sees because of broker compensation.* Emphasis Added. Available at: https://www.nar.realtor/the-facts/nar-settlement-faqs (accessed July 16, 2025).
[23] Answer Book, supra note 6, at 19.

25

public representations and their adoption of rules explicitly intended to promote competition and protect consumers.

109.     *They cannot credibly argue that ignoring, promoting, enabling or facilitating steering, and/or refusing to enforce anti-steering obligations they themselves enacted, serves any legitimate procompetitive justification.*

110.     On the contrary, the record is clear and well-supported: government findings, academic consensus, and Defendants' own rules, statements, guides, and materials all demonstrate that steering practices are *inherently anticompetitive*.

111.     Actions that enable, promote, or condone steering, as per Defendant NAR's own words, are a direct and substantial *per se restraint of trade* because they function as the primary mechanism for enforcing *price fixing, executing group boycotts, and maintaining market allocation*.

## X.     EVIDENCE AND SUPPORT

112.     Prior to August 2024 rule changes, which removed cooperative compensation fields from public MLS displays, steering was difficult to detect or prove. Buyer agents could bypass Plaintiff's listings based solely on commission information available privately in the MLS, without any verifiable record of exclusion or misconduct.

113.     However, under the new rules, buyer agents must now contact the listing broker directly to inquire about compensation. This procedural change has allowed Plaintiff to collect physical, written, extensive, contemporaneous, and direct evidence of steering. These incidents span every Defendant MLS and Association jurisdiction, include all property types, and involve agents and brokers from local and independent firms to large national franchises. In many instances, the steering behavior was openly acknowledged by the agents involved.

114.    The following are a a very small subset of examples of direct quotes from documented text and email communications received by Plaintiff ( from May 2024 to July 2025).

115.    A REALTOR® asked what compensation was being offered to the buyer's agent on a property listed by Plaintiff. Plaintiff responded that the commission offered was 1.75%. The agent replied, simply and emphatically: "Hard pass".

116.    In another instance a REALTOR® emailed Plaintiff: " I have a buyers agreement in place with these buyers that specifically states that the buyers do not wish to see homes where the selling party or listing brokerage has not offered compensation to the buyers agent."

117.    Other examples include: "Not enough commission for the price of the house "; "No one is going to show a house that the seller is paying one Percent";

118.    "We have decided not to show it since they don't offer any compensation."

119.    These statements are just a very few examples of a broader pattern of steering, documented across multiple MLSs and associations and jurisdictions. If Defendants consider such a pattern of conduct as anecdotal, anonymous or isolated, Plaintiff has preserved the full records of all steering incidents - including names, brokerages, dates, and contexts - and will present them accordingly when needed.

120.    Plaintiff's evidence is not indirect, isolated, or circumstantial. It is direct, widespread, contemporaneous, properly documented, and objectively self-evident. While individual REALTORS® and other market participants, whether acting independently or through MLSs and REALTOR® associations, with knowledge of the conspiracy, have engaged in the conduct detailed in this complaint, they are not named as Defendants at this time.

121.    This Complaint, however, is directed at the concerted, systemic, and policy-level actions and omissions of the named Defendants; entities vested with the self imposed

27

responsibility, authority, and professional obligation to prevent steering, yet have consistently declined to do so.

122.    Plaintiff's evidence is grounded in a robust and largely complete factual record. It consists of Defendants' own rules, policies, training materials, public statements, and ethics decisions, supported by Plaintiff's direct documentation of steering conduct across jurisdictions and numerous and extensive (since September 2024) good-faith efforts and communications with Defendants to secure compliance and enforcement without judicial intervention. Additionally supported by case law, extensive literature, economic studies, legal opinion, private litigation,and scholar articles.

123.    Furthermore, because the vast majority of supporting evidence consists of public records, currently available websites, Defendants' own published rules and statements, direct communications between Defendants and Plaintiff; and Defendants' ethics proceedings, the relevant materials are already in Defendants' possession or otherwise publicly accessible.

124.    Plaintiff's business model is public, and its income stream is reasonably inferable from publicly available MLS statistics maintained by Defendants themselves. As such, discovery in this matter is expected to be both limited and efficient.

125.    Plaintiff nonetheless reserves the right to pursue expanded discovery should Defendants raise factual disputes or assert defenses inconsistent with the publicly available record or materials already in Defendants' possession. Any such discovery will be narrowly tailored, efficient, and focused on clarifying Defendants' internal intent, motivation, coordination, and potential bad faith and potential liable individuals.

## XI.    PRE SUIT EXHAUSTION OF ALTERNATIVE RESOLUTION

126.    Since September 2024, Plaintiff has made extensive efforts to resolve the issues described in this Complaint through non-judicial means. Prior to initiating this action, Plaintiff directly contacted every named Defendant - including senior personnel within the NAR's legal and policy departments, as well as executive and compliance staff at Association and MLS levels.

127.    These outreach efforts included email and telephone communications, as well as formal submissions of multiple ethics complaints under NAR's Code of Ethics, filed with different Association Defendants in multiple states starting in September 2024.

128.    Despite these efforts, Defendants have decided not to act, not to take corrective measures and failed to provide meaningful clarification, and continued to allow the conducts at issue to persist.

129.    *This litigation is therefore not Plaintiff's first resort, it is Plaintiff's last. Nonetheless, Plaintiff continues to encourage good faith compliance and welcomes any voluntary corrective action undertaken by Defendants in the spirit of transparency, fairness, and the rule of law.*

130.    In the interest of judicial economy and to avoid burdening the Court with voluminous supporting material at the pleading stage, the names of individuals and brokerages referenced throughout this Complaint, including staff members, policy officials, compliance personnel, Realtors®, affiliated brokerage firms, and others, have been intentionally omitted. Plaintiff will provide all additional and relevant identities and documentation if contested, challenged, or if necessary for any motion, response, or answer.

29

## XII.   FACTS

131.    Because there is no rule expressly and directly prohibiting steering, Defendants rely on a subjective and imperfect Ethics Complaint procedure to enforce acts of steering. Nevertheless, Defendants have additionally enacted and adopted several mandatory rules, described below, that at least on paper, are intended to prevent the market restraints that steering creates.

132.    By adopting these rules, NAR tacitly acknowledges that steering exists, harms competition, and is serious enough to warrant corrective action. The enactment of these rules and the rationales offered confirm that NAR recognizes the problem and seeks to project public messaging that it is being addressed.

133.    For purposes of this section, the term "*rule*" refers broadly to any written rule, regulation, policy, ethics standard, or official public interpretation of any of these.

### A.    The Lack of Direct Prohibition of Steering

134.    Defendants have never issued any rule that expressly and directly prohibits steering. Nevertheless, they have published rules intended to address the practice. It must be noted that any Defendant could have, and still can, enact a clear, unambiguous rule expressly prohibiting steering, yet none have done so, even after publicly acknowledging both the harm it causes and the impropriety of the conduct.

135.    NAR publishes on its website a series of antitrust statements and guidance for the updated MLS rules. In this publication, which remains available online as of August 12, 2025, NAR states: "*Under NAR's Code of Ethics, steering buyers based on the amount of broker compensation is prohibited,*" and further, "*If a REALTOR® does anything to put their own (or another broker's) compensation before her client's interests, they are violating this primary code*

30

*of ethics and potentially violating the broker's fiduciary duties to their client (depending on the broker-buyer relationship and state law)*" (emphasis added)[24].

136.    Under this direct public guidance, it is not a matter of interpretation: steering is unequivocally an ethics violation, at the very least. All Defendants, therefore, are fully aware that steering in the residential real estate brokerage market is a problem that restraints trade.

137.    By issuing this guidance and enacting rules (as described in the subsequent subsections) that are pro-competitive and specifically aimed at preventing steering, Defendants have effectively admitted that steering exists, that it harms competition, and that it functions as a restraint of trade. This is not a matter of inference, it is their own acknowledgment, embodied in their official publications and mandatory rules, that the practice is both harmful and unlawful under the principles they claim to uphold.

138.    Notwithstanding these representations, the NAR's Code of Ethics contains no provision that directly and expressly prohibits the practice and has no reference to, does not mention, or contains any definition of "steering" - it is absent from the Code itself and from the Code of Ethics and Arbitration Manual, the complete guide for ethics and arbitration matters and the interpretation of its rules.

139.    As a result, any enforcement is left to subjective interpretation rather than grounded in a specific direct rule or article. This omission undermines the purported prohibition and reflects a deliberate reluctance to codify or enforce the principle.

140.    Despite these public acknowledgments, and guidance towards the ethical standards complaint process to resolve direct steering, none of the Defendants have acted to implement or enforce a binding and direct prohibition consistent with their premises.

---

[24] Footnote: National Association of REALTORS®, NAR Settlement FAQs, available at https://www.nar.realtor/the-facts/nar-settlement-faqs (last visited Aug. 12, 2025).

141.    Plaintiff, confronted with multiple steerings by Realtors® (buyer agents) filed at least one ethics complaint with each of the Ethics-Responsable Defendants (between September 2024 and January 2025) and all cases were either dismissed during initial grievance committee review or after a hearing (with one exception where the respondent waived the right to a hearing and accepted the fine and reprimand). These results directly contradict Defendants guide and interpretation.

142.    Recognizing that the structure described by Defendants neither addresses nor corrects the issue, and seeking further clarification, compliance, enforcement, and a fair standard, Plaintiff emailed Defendants NAR and the Broward, Palm Beaches and St. Lucie Realtors, Inc. on January 8, 2025, to ask why *no direct anti-steering rule has ever been enacted.*

143.    NAR' General Counsel and Vice President of Legal Affairs and Antitrust Compliance responded on behalf of both associations without answering why the absence of such rule and instead referring Plaintiff to the ethics enforcement process.

144.    Plaintiff sent an additional email to Broward, Palm Beaches And St. Lucie Realtors, Inc.'s legal counsel (on January 15th 2025): "If the Association and NAR honestly want to stop steering (which is the core of the Burnett case ... and other ongoing litigation), why not just issue the direct, unambiguous rule? ... in the very least, the Association could issue it locally."

145.    Instead of resolving the issue or explaining the omission, Plaintiff was directed to the MLS non-filtering rule; a rule that, as detailed in the following subsections, is also neither complied with nor enforced. Plaintiff was again instructed to file ethics complaints, despite having already done so multiple times without resolution, which was the very reason Plaintiff had sought guidance directly from Defendants' legal counsel.

32

**B.** **Ethics Enforcement as Useless Enforcement of Indirect Prohibition.**

146. All REALTORS® (and only REALTORS®) are bound and obligated to adhere to the NAR Code of Ethics. Enforcement is the responsibility of the Association to which the respondent (in the complaint) is a member of. The enforcement process is governed by NAR's Code of Ethics and Arbitration Manual.

147. Steering is not merely a professional misconduct issue, as Defendants describe it, in direct contradiction with its assertion that as a restraint of trade, it is a violation of federal antitrust law with far-reaching consequences for competition, market fairness, restraint of trade and consumer welfare. Treating such conduct as a mere ethics infraction rather than a restraint of trade mischaracterizes the severity of the harm and severely undermines the enforcement process.

148. Nonetheless, Defendants systematically frame steering as an ethical violation under Article 1 of the Code of Ethics, deflecting responsibility from NAR and shifting the burden to local associations' ethics procedures. Procedures that are not only legally inadequate but structurally incapable of adjudicating violations with such profound antitrust implications.

**1. Structure of the Ethics Complaint Process**

149. Plaintiff has filed multiple documented ethics complaints against REALTORS® for steering buyers away from Plaintiff listings due to sellers offering low or on buyer-agent compensation.

150. After an Ethics Complaint is received by the association, the process starts with an initial review by the Grievance Committee, which determines whether the complaint alleges a possible violation assuming the facts as true.

33

151. If advanced, the complaint proceeds to a hearing before a Professional Standards Panel. During the hearing, members of the panel hear testimony (under oath), and are allowed to ask questions, review evidence and supporting documents. After the hearing, the Panel goes into executive session (without parties) to discuss the case, weigh the evidence, review the documentation and declarations received during the hearing; then they write, sign and issue the decision. The only available appeal is procedural, not factual or legal, and must be brought before the Association's Board of Directors.

*152. Crucially, all members of the Grievance Committee and the Hearing Panel are REALTORS® - licensed agents affiliated with the same local Association as the respondent.*

153. Panel members are not trained in any legal, antitrust or contract basics, and the process does not require legal experience, evidentiary procedures, or discovery. In some cases, an attorney is present, but this individual represents the Association, not the panel or committee members, and no disclosure is made to clarify this for participants, often creating confusion about the legal representation.

154. In some of the cases filed by Plaintiff, the ethics panelists adjudicating Plaintiff's complaints demonstrated a lack of familiarity with antitrust law and were unaware of the Sitzer/Burnett settlement details, its intent or its relevance to steering and the case before them. They failed to recognize that steering is not only an ethical lapse but a federal antitrust violation.

155. In one case, the hearing chairperson openly acknowledged that it was her first time presiding over such a proceeding, underscoring the inexperience and lack of training among those tasked with evaluating systemic market harms. This absence of legal understanding and formal procedures further discredits the ethics enforcement process as a meaningful remedy for practices with broad anticompetitive consequences regulated under federal law.

34

## 2. Structural Injustice: Legal and Evidentiary Barriers

156.     In the ethics complaint process, the complainant (Plaintiff) carries the full burden of proof, not only to establish a prima facie case, but effectively to disprove any defense the respondent may raise, even when that defense is affirmative in nature. Unlike in civil litigation, where an affirmative defense shifts the burden of production in support of the affirmation, to the defendant, ethics proceedings impose no such obligation.

157.     This creates a structurally flawed process: respondents may assert, without evidence, that a buyer declined to view a property or that no steering occurred - yet panels place no duty on them to substantiate those claims. *The result is a system in which the complainant is tasked with proving a negative.*

158.     This procedural imbalance renders fair adjudication of steering complaints virtually impossible and undermines any meaningful enforcement of the anti-steering principles Defendants claim to uphold.

159.     This creates a predictable and repeatable scenario in which respondents simply attend the hearing and assert: "*You don't have evidence to prove that I steered my client*" or  "*I had a buyer broker agreement with a clause that states "Buyer Broker Compensation will be paid by The Seller*", and "*I wasn't steering, because I planned to buy the property myself*",  a defense that surprisingly and coincidentally, has been used repeatedly across unrelated cases.

160.     And what is more troubling, the cases where respondents just state that they were instructed by their buyers not to show properties with lower (or no) commissions are just dismissed outright at the Grievance Committee stage with no due process whatsoever.

161.     When cases got to the Professional Standards Committee, the hearing panel members made no effort to validate the Respondent's assertions or to verify their accuracy.

Despite the fact that the Respondent's statements effectively functioned as an affirmative

defense, the panels failed to ask any validating question or request support explanations (which

they are allowed to request)[25]. This lack of inquiry or scrutiny contradicts basic principles of due

process and impartial adjudication, especially in matters where factual disputes are central to the

alleged violation.

162.    These hearings are procedurally shallow, lack adversarial rigor, and are

structurally biased toward dismissal.

### 3. No Deterrence, No Enforcement

163.    Even in the rare case (one out of many filed by plaintiff) where a REALTOR® is

found to have violated Article 1, (only after admitting in writing to the steering behavior) the

sanctions are nominal and functionally meaningless. In such a case, the respondent received only

a $500 fine and an educational requirement, despite admitting to steering a buyer away due to a

low commission. This fine pales in comparison to the tens of thousands of dollars the agent stood

to gain through steering, rendering the penalty an acceptable cost of doing business, not a

deterrent.

164.    This system, which Defendants use as the remedy for steering, is unfit for

purpose, legally inadequate, and structurally biased in favor of respondents. It provides no

protection for consumers, no enforcement for ethical violations that mirror federal offenses, and

no avenue for addressing the widespread, well-documented, and systemic steering that underpins

the anticompetitive conduct at issue in this case.

---

[25] See National Association of REALTORS®, *Code of Ethics & Arbitration Manual*
(2025), Part Five, "Outline of Procedure for Conduct of an Ethics Hearing," at 82.
Available at: https://www.nar.realtor/code-of-ethics-and-arbitration-manual

36

#### 4. Conflicts of Interest and Biases in Ethics Enforcement

165.    The ethics enforcement system is fundamentally compromised by structural conflicts of interest. The REALTORS® who serve on ethics grievance committees and professional standards panels (as well as boards of directors) are direct horizontal competitors of Plaintiff and nearly all operate under traditional brokerage models that view ( have been taught to view) Plaintiff's low-cost service as a threat and danger.

166.    This bias is concrete, not abstract. It has been fostered, legitimized, and perpetuated by Defendants through official publications and training materials that explicitly frame discount and alternative brokerage models as existential threats and danger to the industry.

167.    Additionally some panelists (or committee members) hold managerial or administrative roles (maybe fiduciary obligations) within their own firms. Enforcing the rules fairly could expose their own companies to financial adversity, liability or scrutiny. Given that these roles are unpaid and voluntary, panelists have strong incentives to protect their own (and their businesses) interests and not jeopardize relationships or income streams by enforcing rules against peers or themselves.

168.    Some adjudicators are likely in non-compliance with the same standards being violated[26] in the complaints before them, further disincentivizing enforcement. The result is a system where those who benefit from rule violations are the same ones charged with enforcing

---

[26] Plaintiff does not allege that ethics hearing panelists themselves are in violation of the Code of Ethics. However, Plaintiff possesses direct and uncontroversial evidence that multiple individuals in positions of authority, including members of several Defendant organizations, including NAR, are actively violating other mandatory MLS rules identified in this Complaint. These individuals hold direct responsibility for policy interpretation and enforcement decisions, raising serious concerns about structural impartiality and the selective application of rules.

them. In effect, the rule-makers are also the rule-enforcers, and they have no incentive to enforce rules that would limit their own competitive advantage.

169.    This dynamic renders the ethics system ineffective in addressing antitrust harms like steering, and underscores the need for judicial intervention.

### 5. Absence of Due Process

170.    The ethics complaint process Defendants promote as a remedy for steering violations is structurally flawed and lacks basic procedural safeguards. In multiple cases, Plaintiff encountered serious due process failures that rendered the process ineffective and unreliable; not just for Plaintiff, but for any party seeking fair adjudication of anticompetitive conduct through Defendants' internal ethics enforcement process.

171.    As an example, in one case, the ethics hearing proceeded, but the ruling appears to have been electronically signed in advance (before the panel had adjourned and had enough time to discuss, review, deliberate, and render a decision). In this particular case, Plaintiff requested the electronic signature audit trail to confirm the timing and sequence, but the Association refused to provide it, despite the clear procedural implications. This suggests the outcome was predetermined, and the hearing itself was reduced to a hollow procedural formality.

172.    In another case, after filing a complaint with full documentation on August 29, 2024, Plaintiff received no further communication from the Association until November 11th, 2024, when Plaintiff was informed that the Respondent in the case had "waived the right to a hearing." Under Defendants' typical procedures, this would mean the respondent accepted the violation.[27] However, the accompanying document indicated that the Association had dismissed

---

[27] See National Association of REALTORS®, *Code of Ethics and Arbitration Manual*, Part Four, Section 20 — "Initiating an Ethics Hearing": "If the Grievance Committee concludes that the complaint alleges conduct which, if taken as true, could support a possible violation of the Code of Ethics… The complaint will then be sent to the

the complaint altogether. Plaintiff never received required notices, respondent's answer, was not informed of any hearing or procedural steps, and was given no explanation for the dismissal. It remains unclear whether any proper process occurred at all.

173.     These are not isolated administrative oversights, they are characteristics of a system designed to preserve the status quo and protect traditional market structures, shield misconduct, and avoid accountability. As these and other examples show, the ethics enforcement structure lacks transparency, impartiality, and even basic procedural consistency. For matters as serious and federally significant as steering, such a system is incapable of delivering meaningful enforcement.

### 6. Ethics is Unenforceable in a growing number of MLS users

174.     As explained earlier, *only members of NAR* (REALTORS®) are bound by the Code of Ethics. However, a growing number of MLS subscribers are licensed real estate professionals who are *not members of NAR* and therefore not subject to the Code of Ethics.

175.     Despite this, Defendants continue to rely on the Code of Ethics as the primary enforcement mechanism against steering, while knowingly omitting any parallel rule or process applicable to non-REALTOR® participants. Hence a growing number of MLS subscribers and licensed agents are entirely outside of the reach of anti-steering compliance or enforcement

176.     The deliberate failure and reluctance to enact and implement a universal and direct anti-steering provision within MLS rules (which apply to ALL participants regardless of membership status) - despite the fact that 25% of all MLS subscribers are now

---

respondent together with a response form (Form #E-20, Notice to Respondent [Ethics] and Optional Waiver of Right to Hearing) ... *which will give the respondent an opportunity to waive the right to a hearing by acknowledging the conduct alleged in the complaint and by agreeing to accept discipline."* (fragments; emphasis added).

non-REALTORS®, a figure projected to keep growing - creates a glaring and dangerous

loophole for anticompetitive conduct.[28]

177.    This policy gap allows a rapidly growing segment of licensees, who are not bound

by NAR's Code of Ethics, to engage in steering practices based on commission structures

without consequence. The result is a system that actively undermines fair competition and

consumer choice in the real estate market. This is not a mere oversight, but a structural defect

designed to preserve the appearance of compliance while enabling conduct that directly violates

both the spirit and the letter of the Sherman Act.

## B.    The Buyer-Broker Agreement (MLS Rule)

178.    In August 2024 NAR mandated and Defendants incorporated a new *mandatory*

*rule specifically enacted to eliminate steering*, to be monitored and enforced by the MLSs.

179.    The rule requires that prior to a buyer touring a property the buyer-agent must

have an executed buyer-broker agreement with the following four (4) mandatory provisions.

> "1) Specify and conspicuously disclose the amount or rate of any compensation
> the MLS Participant will receive from any source, or how this amount will be
> determined; 2) The amount of compensation must be objectively ascertainable
> and may not be open-ended (e.g.,"buyer broker compensation shall be whatever
> amount the seller is offering to the buyer"); 3) Include a statement that MLS
> Participants may not receive compensation from any source that exceeds the
> amount or rate agreed to with the buyer; 4) Disclose in conspicuous language that
> broker commissions are not set by law and are fully negotiable"[29]

---

[28]See *Record Gap Emerges Between MLS Subscribers and REALTOR® Members,* PR
Newswire, May 29, 2024. The article reports that 25% of MLS subscribers are now
non-REALTORS®, highlighting a growing enforcement gap, since these participants are
not bound by the NAR Code of Ethics. Available at:
https://www.prnewswire.com/news-releases/record-gap-emerges-between-mls-subscriber
s-and-realtor-members-302472612.html (last visited June 29, 2025, at 4:31 PM EST)
[29] See National Association of REALTORS®, *Written Buyer Agreements 101* (2024),
available at: https://www.nar.realtor/the-facts/written-buyer-agreements-101 (last visited
June 29, 2025, at 4:31 PM EST).

180.    As explained by NAR, this rule *eliminated any steering and that any*

*compensation offered by the seller is irrelevant*:

> "Written buyer agreements, required by the NAR practice changes that will be
> implemented on August 17, 2024, will also outline that MLS Participants may not
> receive compensation for brokerage services from any source that exceeds the
> amount or rate agreed to in the agreement with the buyer. *Since a broker working
> with a buyer cannot receive more compensation than the buyer has agreed to in
> that agreement, the amount of any offer of compensation is irrelevant to the
> buyer-broker's compensation.* Under these practice changes, *NAR has eliminated
> any theoretical steering* because a broker will not make more compensation by
> steering a buyer to a particular listing because it has a "higher" offer of
> compensation. (Added 5/29/24)"[30] (emphasis added)

181.    Obviously, for the rule (or any rule) to achieve what Defendants claim, it must

first be implemented, complied with, monitored, and enforced. Absent these steps, the rule

becomes either moot or merely a suggestion and sham rule..

182.    The rule is incorporated into the Multiple Listing Service mandatory rules and is

to be supervised and enforced by MLS Defendants. Nevertheless they have collectively failed to

enforce this rule, rendering it ineffective in practice.

183.    This deliberate non-enforcement enables and perpetuates the very steering

behavior the rule was intended to prevent. This refusal to enforce the rule constitutes a concerted

and intentional violation of the Sherman Act.

### 1. Failure to Enforce Buyer-Broker Agreement Requirements

184.    Plaintiff has submitted multiple verification requests to Defendants regarding

whether agents showing Plaintiff's listings had a compliant buyer-broker agreement in place at

the time of showing.

---

[30] See National Association of REALTORS®, NAR Settlement FAQs, at 93 (last updated
Sept. 5, 2024). Available at:
https://www.nar.realtor/the-facts/nar-settlement-faqs#realestate (last visited July 16, 2025,
at 4:57 PM).

185.    The only response Plaintiff received (out of many requests), was conclusory and unsubstantiated, lacking date verification or any kind of documentation, confirming the absence of meaningful monitoring or enforcement. Furthermore, most Plaintiff's requests were just ignored. These are properly documented by Plaintiff and Defendants can access their own records for validation.

### 2. The Compensation Cap - Agreed, Issued but Nullified by Design

186.    The rule also purports (in order to eliminate steering) to *cap the total compensation a buyer broker may receive from any source, to the amount set in that agreement with their buyer*. This, as explained by Defendants, makes any commission offered in advance, irrelevant.

187.    Plaintiff on April 9th. 2025 contacted NAR's Policy Information Manager[31] and during the conversation this NAR Manager either misunderstood, misinterpreted, or misrepresented the rule. He stated that "*any source*" did not include commissions paid by the seller (or listing agent) and that this only included third parties like title company, inspection companies, etc.

188.    Immediately following the call, Plaintiff memorialized (and sent) the conversation in a contemporaneous email summarizing the exchange. Included in that email Plaintiff clarified:

> "... to any reasonable reader, the phrase "any source" would include compensation from listing agents and sellers - not just unrelated third parties like title companies or inspectors. That's the only interpretation that would truly neutralize the incentive to steer buyers toward higher-commission listings. "

---

[31] The names of individuals and brokerages referenced throughout this Complaint, including staff members, policy officials, compliance personnel, affiliated with Defendants, have been intentionally omitted at this stage. Plaintiff will disclose all relevant identities and supporting documentation if contested, challenged, or necessary for any motion, response, or answer.

189.    In that email, Plaintiff additionally requested clarification *in writing* on two specific issues: 1) Whether "any source" includes sellers and listing brokers, and 2) How this rule was being monitored or enforced, if at all.

190.    On April 10, 2025 , Plaintiff received an email from NAR providing the following clarification regarding item No 1: "*your understanding is correct that 'any source' would include compensation/money remitted by the seller/listing broker.*"

191.    However, regarding item 2 - monitoring and enforcement of compliance - Plaintiff had to request written clarification multiple times, as NAR repeatedly insisted on providing the explanation only via phone call. Plaintiff maintained that a phone conversation was insufficient to confirm NAR's official position on a matter of this importance.

192.    In an email received by Plaintiff from NAR's Policy Information Manager on May 2nd, 2025, NAR made clear that Defendants neither monitor compliance with this cap nor have or provide any guidance or enforcement mechanism:

> "The buyer broker must ensure they comply with their written buyer agreement which includes an objectively ascertainable amount of compensation, and that they won't receive more compensation than that amount from any other source. If there is a breach of an agreement, then the parties can take appropriate action which includes any proper legal recourse, an ethics complaint, or contacting the appropriate state or local agency. "[32]

193.    This statement is critical as it confirms that NAR knowingly issued (and other Defendants adopted) a rule they have no intention, capacity or willingness of supervising, verifying, or enforcing. The burden is instead shifted entirely to private actors, in forums such as ethics complaints, that have repeatedly proven ineffective, opaque, and structurally biased (as detailed in prior sections).

---

[32] Email correspondence from a senior staff member at the National Association of REALTORS®, Policy Information Manager, to Plaintiff (on file with Plaintiff and Defendant NAR).

194.     On April 1st, 2025 an MLS Director of Defendant Naples Area Board of Realtors (NABOR) had already confirmed the absence of enforcement and lack of a compliance verification. When trying to clarify a buyer-broker possible rule violation, she wrote: "*NAR has stated that the MLS only verifies that the proper documentation is in place.  We do not verify the compensation.*" (emphasis added)

195.     The rule exists on paper, but functionally operates as a sham provision  designed to mislead courts, regulators, and consumers into believing that meaningful reform has occurred when, in practice, nothing of substance has changed.

196.     Given the high financial incentives for buyer brokers to ignore this cap - combined with the complete lack of oversight or enforcement - it is not plausible to suggest that the rule as enacted and implemented (or not) serves a legitimate pro-competitive purpose. Rather, its existence without enforcement further evidences Defendants' systemic pattern of issuing hollow rules to deflect scrutiny and preserve anticompetitive conduct.

197.     Moreover, the parties to the buyer-broker agreement - the buyer and the buyer agent - have no aligned incentive to enforce the cap provision. The agent, who would be the recipient of any excess compensation, obviously has no reason to challenge their own conduct.

198.     The buyer, meanwhile, would not typically be injured if the seller or listing broker overpays his/her agent, and thus lacks standing or incentive to bring any claim. As a result, no party to the agreement has the ability or reason to police the rule's breach, effectively nullifying the compensation cap provision and defeating the rule altogether.

199.     NAR's suggestion that buyer agents should simply "self-monitor" and "self-enforce" compliance with the buyer-broker agreement, particularly in a market defined by commission-based incentives, is not merely inadequate, it is absurd.

44

200.     This effectively abandons any pretense of compliance, supervision or enforcement. It relies on individual brokers to police themselves, while shifting the burden of detection and enforcement onto consumers (not injured) or third parties after the violation has already occurred.

201.     In the context of a mandatory rule adopted under the guise of antitrust compliance, this structure is not only toothless, but insulting to the regulatory and judicial systems it purports to satisfy. No meaningful compliance framework can exist where the party most financially incentivized to breach a rule is the only one tasked with enforcing it against themselves without any other monitoring or enforcement alternative.

202.     Defendants were - or should at least have been - well aware of this defect when drafting and agreeing to issue the rule. Selling this rule as a meaningful reform to eliminate steering is misleading at best and intentionally deceptive at worst, particularly given Defendants' public representations that "...*NAR has eliminated any theoretical steering..*".

203.     On the contrary, rather than constraining steering, the rule functions as a façade, appearing to restrict behavior that, in practice, remains entirely unchecked.

### 3. Wide Open Workarounds and Loopholes

204.     Buyer agents knowingly manipulate (and Defendants tolerate) the written buyer-broker agreement requirement by including clauses or amending the agreement to mirror whatever compensation the seller is already offering, or to shift the steering responsibility onto the buyer, rendering the rule meaningless.

205.     As one example, in a recent case, a buyer-agent (REALTOR®) wrote an email to Plaintiff: "I have a buyer's agreement in place with these buyers that specifically states that the

45

buyers do not wish to see homes where the selling party or listing brokerage has not offered compensation to the buyer's agent."

206.    Another buyer-broker agreement (in Plaintiff's possession) defeated the purpose of the rule by an included clause stating that the "Buyer's Broker commission will be paid by the Seller or the Listing's Broker. However, the buyer will pay, the buyer's agent broker, a non-refundable broker fee & process of $417 at the closing time". In this case, Plaintiff submitted a request to Defendant Beaches MLS to verify whether the agreement complied with the rule (which it evidently does not). No response was ever received.

207.    During an ethics Proceeding, Defendant Central Panhandle Association of Realtors, Inc., processed and heard (on February 10, 2025) an ethics complaint where the respondent (REALTOR®) provided the buyer-broker agreement in support of her defense against the steering allegation filed against her.

208.    In paragraph 13 (an added clause) of the state-provided form, it states: "Buyer Broker compensation will be paid by the Seller. Buyers Realtor will show properties that meet the search criteria for the Buyer and or on their list that Seller offers Buyers Broker compensation". The ethics hearing panel, in this case, dismissed the complaint, even after confronted with an undeniably flawed buyer-broker agreement that supports steering and circumvents the intent and letter of the rule itself. And directly contradicts NAR's guidance.

209.    These are not genuine, arms-length agreements; they are crafted in bad faith to render themselves useless, preserving the steering mechanism under a veneer of compliance. They are often drafted with advance knowledge that at least one party - typically the buyer - will not perform, particularly regarding the payment of fees. This calls into question whether the

46

contract reflects a legitimate meeting of the minds or merely a formalized workaround designed to create the appearance of compliance.

210.     Defendants' failure to supervise or enforce these violations reinforces a broader pattern: rules that threaten the commission structure are ignored, even when breaches are overt and reported, thereby perpetuating rather than curtailing the targeted practice of steering and reducing the rule to a sham.

**4. Buyer-Broker Agreements Built to Deceive and Advance the Restraints**

211.     Defendants go to deliberate lengths to preserve the anticompetitive restraints by ensuring that buyers remain dissociated from any clear obligation to pay their own agents. They develop and distribute contracts and complementary forms that perpetuate vagueness and consumer confusion.

212.     Some REALTOR® associations draft and circulate their own buyer-broker agreement forms for members' use. As an example, the forms provided by the Florida Association of REALTORS® are clear instances of contracts (forms) intentionally designed to obscure who is responsible for paying the buyer-agent's fee. Nowhere in the agreement is the obligation to pay explicitly assigned to the buyer.

213.     This association is not named as a Defendant in this action, but is an active co-conspirator in the anticompetitive scheme described herein. If it fails to promptly revise these forms to correct deceptive drafting and eliminate the embedded restraint, it will effectively confirm its knowing participation in the conspiracy.

214.     Under basic contract law, the parties' obligations are essential terms. Yet these forms expressly enumerate the buyer's duties in detail - while omitting any duty to pay - thereby undermining contractual clarity, misleading consumers, and advancing the anticompetitive objectives of the conspiracy.

47

215.       Figure 1 - (Excerpt from the EBBA - Exclusive Buyer Broker
          Agreement distributed by Florida Association of Realtors

---

5. **CONSUMER'S OBLIGATIONS: Consumer** agrees to cooperate with **Broker** in accomplishing the objectives of this Agreement, including:

   **(a)** Conducting all negotiations and efforts to locate suitable property only through **Broker** and referring to **Broker** all inquiries of any kind from real estate licensees, property owners or any other source. If **Consumer** contacts or is contacted by an owner or a real estate licensee who is working with an owner, or views a property unaccompanied by **Broker, Consumer,** will, at first opportunity, advise the owner or real estate licensee that **Consumer** is working with and represented exclusively by **Broker.**

   **(b)** Providing **Broker** and necessary third parties (i.e., any lender, closing agent, etc.) with accurate information requested by **Broker** or third parties in connection with ensuring **Consumer's** ability to acquire property. **Consumer** authorizes **Broker** to run a credit check to verify **Consumer's** credit information.

   **(c)** Being available to meet with **Broker** at reasonable times for consultations and to view properties.

   **(d)** Indemnifying and holding **Broker** harmless from and against all losses, damages, costs and expenses of any kind, including attorney's fees, and from liability to any person, that **Broker** incurs because of acting on **Consumer's** behalf.

   **(e)** Not asking or expecting to restrict the acquisition of a property according to race, color, religion, sex, handicap, familial status, country of national origin or any other category protected under federal, state or local law.

   **(f)** Consulting an appropriate professional for legal, tax, environmental, engineering, foreign reporting requirements and other specialized advice.

   **(g)** Making a diligent good faith effort to perform the contract terms of any purchase agreement or contract to lease and close on the sale of any property **Consumer** contracts to acquire.

---

216.    Additionally, the compensation clause (within this contract) specifies "when" the
broker's compensation is earned, states that the compensation is for real estate services provided
to the consumer (buyer), and notes that if the seller or listing broker pays, the compensation will
be reduced accordingly. It also sets the amount or rate of compensation.

217.    Yet, once again, the clause fails to impose any clear responsibility on the buyer to
pay, forcing the buyer to infer who will cover the fee. In practice, the language implies that the
seller is the payer and, with calculated ambiguity, declares only that the "*Broker will be
compensated*", strategically leaving unanswered the critical question: *compensated by whom?*

48

218.        Figure 2 - (Excerpt from the EBBA - Exclusive Buyer Broker
            Agreement distributed by Florida Association of Realtors

7.  **COMPENSATION: Broker's** compensation is earned when, during the term of this Agreement or any renewal or extension, **Consumer** or any person acting for or on behalf of **Consumer** contracts to acquire real property as specified in this Agreement or defaults on any contract to acquire property. This compensation is for **Broker's** services for **Consumer**. Compensation received by **Broker**, if any, from an owner or owner's broker for services rendered to **Consumer** will reduce any amount owed by **Consumer** per this paragraph.
(a) **Purchase or exchange:** $_____ or _____% (select only one); or $_____ or _____ % plus $_____ (select only one) of the total purchase price or other consideration for the acquired property, payable no later than the date of closing specified in the sales contract; however, closing is not a prerequisite for **Broker's** fee being earned.
(b) **Lease:** $_____ or _____ % of _____ month's rent (select only one); or $_____ or _____% plus $_____ (select only one) of the gross lease value, payable when **Consumer** enters into a lease with the owner. If **Consumer** enters into a lease-purchase agreement, the amount of the leasing fee which **Broker** receives will be credited toward the amount due **Broker** for the purchase.
(c) **Option: Broker** will be paid $_____ or _____ % of the option amount (select only one), to be paid when **Consumer** enters into the option agreement. If **Consumer** enters into a lease with option to purchase, **Broker** will be compensated for both the lease and the option.
(d) **Other: Broker** will be compensated for all other types of acquisitions as if such acquisition were a purchase or exchange.

219.    Without this specificity, these forms function more like disclosures than binding,

enforceable agreements. If a buyer ultimately refused to pay, the buyer broker would likely find

the contract unenforceable due to the fatal omission of any clear buyer obligation to pay

compensation. As a result, these forms not only advance the conspiracy and its restraint of trade,

but also expose (financially and legally) the association's own members through ill-drafted

agreements.

220.    Developed alongside the buyer-broker agreement are additional forms that further

undermine both the agreement itself and the stated purpose of NAR's rule - which NAR claims

"completely eliminates steering". The Florida Association of REALTORS®, in particular, issues

forms as mentioned.

221.    One is an addendum to the sale and purchase agreement, titled "Seller's

Agreement With Respect to Buyer's Broker Compensation". This addendum allows a buyer to

make the purchase agreement contingent upon the seller (or listing broker) agreeing to pay

buyer-broker compensation agreeable by buyer within a certain time frame (defaulted to 3 days after effective date).

222. In effect, this shifts commission negotiations after contract execution, rather than at the time of the buyer-broker agreement as intended.

223. In practice, this addendum becomes a coercive tool, pressuring sellers - under the penalty of losing the sale - into paying the buyer-broker fee after the fact. It disproportionately harms sellers who either cannot afford or do not wish to pay buyer-broker compensation, including many of Plaintiff's clients. These sellers are left with a false choice: lose the sale or agree to cover whatever amount the buyer demands - an amount the buyer often has no real expectation of paying themselves.

224. **Figure 3 - (Wording from "Seller's Agreement With Respect to Buyer's Broker Compensation" addendum by Florida Association of Realtors)**

---

**GG. SELLER'S AGREEMENT WITH RESPECT TO BUYER'S BROKER COMPENSATION**

This Contract is contingent upon (check one) ☐ Seller's Broker and Buyer's Broker or ☐ Seller and Buyer's Broker executing a compensation agreement with terms acceptable to Buyer ("Compensation Agreement") within _____ days (if left blank, then *three (3) days*) after the Effective Date ("Time Period"). If the Compensation Agreement described herein is not executed and delivered within the Time Period, then Buyer may, within three (3) days thereafter deliver written notice to Seller, terminating this Contract in which event the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all further obligations under this Contract. If Buyer fails to timely deliver said written notice to Seller, this contingency shall have no further force or effect.

**Broker commissions are not set by law and are fully negotiable.**

---

225. In addition to these, the Florida Association of REALTORS® also distributes a form titled "Modification to Exclusive Brokerage Agreement/Showing Agreement". As the title suggests, it allows the buyer and buyer's broker to modify the original buyer-broker agreement at any time. This provides yet another sanctioned method for buyer agents to circumvent the originally agreed compensation amount.

50

226. In practice, it allows the agreement - which already omits a clear buyer obligation to pay - to be freely rewritten to match whatever compensation is offered by the seller or listing broker.

227. Under these forms, a buyer and buyer's broker can perfectly initially agree to a nominal $1 commission and later modify the agreement to mirror the seller's or listing broker's offer. Even more directly, the buyer can invoke the Seller's Agreement With Respect to Buyer's Broker Compensation addendum to demand any compensation they want (usually the full fee sought by the buyer's broker), with near certainty that the seller will either agree or lose the sale entirely.

228. While all contract terms are negotiable, these forms go far beyond mere flexibility. They provide the tools and the sanctioned workarounds to nullify the buyer-broker agreement's intent, knowing and exploiting the fact that NAR has no mechanism to monitor or enforce compliance and that Defendant Associations follow NAR's lead in ignoring both supervision and enforcement.

229. Whoever drafted these forms deliberately avoided a direct, unambiguous statement of the buyer's payment obligation and instead engineered deceitful, but "lawful" workarounds to preserve the illusion that buyer-agent services are "free" or that buyer payment is optional. This illusion is the fuel for the steering mechanism at the heart of the anticompetitive scheme.

230. These are not the actions of independent competitors making separate decisions to comply with the buyer-broker rule and its stated purpose of eliminating steering. They are coordinated decisions by direct competitors acting through their professional association to

51

maintain inflated commissions, boycott models that do not conform, and allocate the market toward traditional brokerage structures.

231.    In stark contrast, the Illinois REALTORS® buyer-broker agreement is direct and risk-averse: it clearly states the buyer's obligation to pay and omits any suggestion that the seller might pay or contribute. It offers no "solutions" or mechanisms to circumvent the rule - most probably because the Illinois association recognizes that providing such tools would constitute collective antitrust conduct by the very nature of an association's membership.

232.    Their guidance instructs that if a member wishes to act differently, they must do so independently and with separate legal counsel, thereby protecting both the association and its members from the collective action element that is so blatant in Florida's forms. Florida's versions, by contrast, embed the restraint into the very language of the contracts and into multiple interrelated forms and explain who and how these restraints were developed; hence not only  perpetuating consumer confusion, discouraging price competition, and preserving the existing commission structure.

233.    In furtherance of the conspiracy, the Florida Association of REALTORS® openly describes the collaborative decision process behind these forms:

> "The legal team at Florida REALTORS® worked with a Presidential Advisory Group, various committees, the leadership team, and other members of our association to assist in identifying the preferences of our membership for amending existing forms and creating new forms."[33]

234.    Most, if not all, of these committees, advisory groups, and leadership positions are composed of or held by REALTORS® - direct horizontal competitors; all versed, in the very

---

[33] Florida REALTORS®, Webinar: *Let's Talk Buyer-Broker Agreements* at 7:12, https://www.floridarealtors.org/news-media/video-library/learning/webinar-lets-talk-buyer-broke r-agreements (last visited Aug. 12, 2025).

least, in basic contract and antitrust law and should recognize the elements necessary for a contract to be valid and binding.

235.    This statement by the Florida Association of Realtors is an explicit admission that the buyer-broker agreement and its related forms are the product of collective action among market competitors acting through their trade association, a textbook example of concerted conduct under §1 of the Sherman Act. The process is biased by design and conspiratorial by definition.

236.    Furthermore, the association's training materials and public-facing guides reinforce this bias, preserving vagueness in the agreement while sustaining the existing fee structure. On the Florida Association's own website, the first FAQ reads:

> "What is a 'written buyer agreement'? What does it do?" The answer: "It is an agreement between a consumer and a real estate professional outlining the services the professional will provide *and what they will be paid for those services.*"[34] (emphasis added)

237.    As with the form itself, this wording leaves unstated - and therefore implied - that someone other than the buyer will be responsible for payment.

238.    This same vagueness pervades NAR's own national guidance to consumers. NAR's homebuyer guide describes the compensation requirement merely as a "specific and conspicuous disclosure of the *amount or rate of compensation the agent will receive* or how this amount will be determined." Again, there is no direct statement that the buyer is responsible for payment - leaving the same impression that payment will come from another source, namely the seller.

---

[34] Florida REALTORS®, *Let's Talk Buyer-Broker Agreements* (webinar), https://www.floridarealtors.org/news-media/video-library/learning/webinar-lets-talk-buyer-broke r-agreements (last visited Aug. 12th, 2025).

239.     NAR's President, Kevin Sears, has reinforced this interpretation publicly when
describing the buyer-broker agreement:

> "If buyers want to tour a home, they can expect to have a written
> agreement presented to them where it will spell out the services that will
> be provided by the Realtor, and *the fee that that Realtor will be looking to
> get paid. The seller may still offer compensation to their agent*, but what
> the buyer will need to understand is that *if the seller does not offer
> compensation, does not offer the amount that is in their agreement, the
> buyer will have to come to the closing table with extra money to pay for
> their representative.*" (emphasis added)[35]

240.     This statement contains the same calculated vagueness. The phrase "*the fee that
the Realtor will be looking to get paid*" omits the payor. Yet the very next sentence supplies the
expected payor: *the seller*.

241.     Only in the last sentence does the buyer appear as a potential payor, but only "*if
the seller does not offer*" compensation or the full amount. The structure assumes that the buyer's
contractual obligation to pay is the exception, not the rule, and frames it as an extra burden,
rather than the default obligation.

242.     If the buyer-broker agreement were truly intended to stop steering, it would not be
interpretive or ambiguous. It would plainly state: "The buyer must pay the buyer-broker's agreed
compensation. Any amount, if agreed to be paid by the seller or listing broker will reduce the
buyer's obligation to the buyer-broker by that amount." Hence the buyer obligation will be *less,
not more* as portrayed by Mr. Sears.

243.     But Mr. Sears's description flows from the assumption that the buyer will pay
nothing, and that if payment is ever required, it would be "extra." This framing assumes that the

---

[35]  Freakonomics Radio, *Are Realtors Having an Existential Crisis?* (podcast),
https://freakonomics.com/podcast/are-realtors-having-an-existential-crisis/ (last visited Aug. 9,
2025).

compensation amount stated in the buyer-broker agreement was never intended as a binding obligation on the buyer. It reflects a non–arm's-length agreement in which both parties understand in advance that performance - particularly the buyer's payment - will not occur. This interpretation undermines the entire purpose of the rule and actively encourages, enables, and promotes unenforceable agreements, potentially rendering their execution unlawful.

244.     This is not accidental. It is a coordinated effort, through association channels, to create documents and public messaging that appear compliant while sustaining the steering mechanism and commission structure. These actions are particularly impactful because of NAR's self-described market power: over 1.5 million members, control of nearly all MLS infrastructure, and influence over 83–88% of all U.S. residential transactions. When NAR's president speaks, it is understood across the market, by consumers and by the industry, as authoritative direction, reinforcing the very restraints that the buyer-broker rule was supposedly designed to eliminate.

## C.     The Prominent Display of the Listing Firm's Name and Contact -  (MLS/IDX Rule)

245.     Before describing the following rule, Plaintiff notes, for context, Paragraph 63 and the statement from the DANGER Report identifying several perceived threats to the industry,  including the need to prevent buyers from seeking alternative representation or bypassing an agent altogether.

246.     The facts in this section illustrate precisely what that strategic planning tool sought to achieve: preventing these "dangers" (among others) from materializing. Particularly relevant are the following threats outlined in the DANGER Report, which read almost as a guide for the actions addressed in this subsection: "Home buyers might not always want to use a real estate agent, but most think they have to. What happens if their perspective changes?" (p. 23); "Consumers are definitely becoming more motivated to find an alternate solution." (p. 23); "A

55

tech company cracks the code and connects enough of the dots to conduct real estate transactions without the need of an agent." (p. 38); and "The existing compensation structure gets eclipsed as new business models gain rapid traction." (p. 52).

247. The mandatory IDX (Internet Data Exchange) Display Rule was enacted by Defendants in November 2021 (and still in effect today) and incorporated into the NAR Multiple Listing Policy Handbook (still mandatory and enforceable). It states:

> "An MLS participant's IDX display *must identify the listing firm, and the email or phone number provided by the listing Participant in a reasonably prominent location* and in a readily visible color and typeface not smaller than the median used in the display of listing data. (Amended 11/21)[36]" (emphasis added)

248. During an official NAR informational video ("The MLS Hour") introducing the new rule, a senior NAR official explained the rationale and purpose of the rule:

> Minute 32:47 of the video "The rule previously required that the listing broker needed to be identified. *Now MLS participants will also have to display an email or phone number provided by the listing participant along with that brokerage name. The reasoning behind that is that some consumers have expressed concerns about their ability to get the questions answered and to get more information about the property, so rather than having the public hunt for information*, contact information for the listing brokerage (because that information is available online), we are going to have the MLS provide that information and have it part of the display so as a last resource consumers have a way to contact the listing broker to get their specific questions answered. *Again this is a consumer interest topic and something that we think is going to benefit the public*"[37] (emphasis added)

---

[36]See National Association of REALTORS®, Handbook on Multiple Listing Policy (2022 ed.), where the relevant rule appears in multiple sections. This rule is also incorporated into the Rules and Regulations of each Defendant MLS, with the exception of SmartMLS, which has never adopted the rule.

[37] Transcript from *The MLS Hour* (Aug. 2022), an informational video published by the National Association of REALTORS®, minute 32:47. Available at:
https://www.nar.realtor/videos/the-mls-hour/the-mls-hour-august-2022 (last visited June 25, 2025, at 10:51 PM EST))

249.    The intent of the rule is unambiguous - in its language, intention, purpose and in

the official rationale provided, and in its mandatory implementation. It is a pro-competitive and

consumer protection rule, designed to promote transparency, ensure fair access to information,

and allow the consumer to choose who to contact when inquiring about a property.

250.    While the phrase "reasonably prominent location" in the IDX Display Rule might

appear open to subjective interpretation, its intended meaning and purpose is clearly established

and reaffirmed by Defendant NAR. The rationale for this rule was expressly articulated by

NAR's own MLS Technology and Emerging Issues Advisory Board during its September 9 and

10, 2021 meeting, where the rule was drafted and presented as follows:

> *"An MLS Participant's IDX display must identify the listing firm <u>and contact</u>*
> <u>*information*</u> *in a reasonably prominent location and in a readily visible color and*
> *typeface not smaller than the median used in the display of listing data. <u>The</u>*
> <u>*contact information for the listing firm must be clearly*</u>
> <u>*identified and displayed at least as prominently as any other contact information*</u>
> <u>*or lead form on the site.*</u> *"* [38] (emphasis in original underlines and italic)

251.    This record confirms that the rule's purpose was to ensure that consumers would

not be misled or unknowingly (or unwillingly) funneled toward buyer agents while attempting to

inquire about a property.

252.    Both purposivist and textualist interpretations converge here: the text of the rule

and its stated purpose leave no ambiguity about what it requires, how it must be implemented or

why it exists. Defendants' failure to enforce this rule, despite its clarity and their own articulation

of its consumer-protective intent, is therefore indefensible.

253.    The violation of this rule is widespread, systemic, and plainly visible across the

market. Few, if any, IDX-fed websites are in compliance. Plaintiff has engaged in extensive

---

[38] See National Association of REALTORS®, *MLS Technology and Emerging Issues*
*Advisory Board* Meeting Minutes (Sept. 9–10, 2021), § IX(12) ("Underlining indicates
additions; strikeouts indicate deletions.")

written communications with Defendants in an effort to encourage compliance and request enforcement of this rule - *compliance upon which Plaintiff's business model critically depends.* Defendants' continued failure to act threatens to render Plaintiff unable to compete and risks forcing Plaintiff out of business entirely. Despite repeated good-faith efforts, Plaintiff's communications have been deflected, ignored, or left unaddressed.

### 1. The Binary Nature of Compliance

254.    The IDX Display Rule's compliance is binary and self-evident. An IDX-fed website either prominently displays the listing brokerage name and contact email or phone number or it does not. There is no gray area, no need for debate, and no justification for non-compliance.

### 2. Non-Compliance: The Case of realtor.com [39]

255.    One of the most glaring examples of noncompliance comes from realtor.com, a flagship platform that bears the REALTOR® brand and benefits directly from NAR's licensing and promotional power. Though realtor.com is operated by a third party, it is licensed and contractually bound to NAR, which retains control over the REALTOR® brand, and copyrights of the consumer-facing narrative of the website.

256.    If NAR will not comply with or enforce this rule on a platform bearing its name, it cannot credibly claim to enforce it anywhere.

---

[39] NAR licenses the REALTOR® trademark to Move, Inc., which operates Realtor.com. Through this relationship, NAR profits from a lead generation model that sells buyer leads to REALTORS®. This creates a structural conflict: NAR financially benefits from platforms that obscure listing broker contact information, enabling steering and undermining enforcement of the IDX Display rule. Enforcing the rule would likely diminish lead conversion and revenue, giving NAR a financial disincentive to act.

257.    *Realtor.com fails to display the listing broker's contact information in a*

*reasonably prominent location.* This is self evident and not open to interpretation. This is a

blatant violation of the spirit and letter of the NAR-issued mandatory IDX Display Rule while

profiting from redirecting leads to paid advertisers or buyer agents, in direct competition with its

own members. Here the consumer's deception and misleading is self-evident.

### 3. Non-Compliance: The Case of Free IDX Feeds - Provided by MLSs

258.    The problem is not limited to real estate portals and brokerages (or individual

agents') websites. Some Defendant MLSs provide direct "free IDX feeds" (via a generated link

or iframe code) to their members for them to use in their own websites and display the properties

in their MLS coverage area allowing search functionality; nevertheless some of these

MLS-Provided free IDX feeds don't even include the rule-required listing broker contact fields

(email or phone number).

259.    When questioned, some MLSs acknowledge that it only displays "Courtesy

of…(name of the brokerage)"; an evident violation of the rule. Until today, MLSs have not taken

any corrective action. [40]

260.    This failure makes it technically impossible for MLS participants to comply even

if they wanted to, when using these resources. It reveals a structural breakdown in intention,

compliance and enforcement, where the very entities tasked with upholding the rule are

---

[40] Email exchange between Plaintiff and two of the Defendant MLSs, in which Plaintiff
requested compliance with the IDX Listing Broker Contact Display Rule in their free
IDX data feed. The MLS acknowledged that the feed lacked the required contact fields
(e.g., email or phone number), confirming that only a generic "Courtesy of [Brokerage
Name]" label was used. Despite this admission, no corrective action was taken, and the
MLS ceased communication after its final reply. (On file with Plaintiff and Defendant
MLS)

59

distributing noncompliant data and creating systemic violations across hundreds (potentially several thousands) of websites.

261.    This has been brought to the attention of several MLSs several months ago with no action or communication back from them.

### 4. Market-Wide Noncompliance

262.    From small brokerages to national franchises to high-traffic portals, noncompliance with the IDX rule is widespread and entrenched. The violations are so blatant and easily observable that any argument about ambiguity, technical barriers, or implementation timelines is implausible. These are not good-faith errors or isolated technical oversights - they reflect a sustained, market-wide refusal to comply and defendants evident non-enforcement.

### 5. The Industry Confirms Defendants' Capacity and Intent

263.    Industry participants, including major real estate portals, have publicly acknowledged that Defendants' mandatory IDX rules are binding, with serious consequences for noncompliance. In recent appellate proceedings, one such brokerage, represented by experienced counsel, confirmed that violating NAR's mandatory rules could lead to IDX feed termination. A statement that in itself should obligate NAR to suspend that Broker's IDX feed or at the very least compel compliance with the letter and spirit of the rule, being this is one of the examples of non-compliance.

264.    This confirms that Defendants possess and effectively have direct enforcement authority recognized by industry leaders. Yet, despite ongoing violations of the IDX Display Rule - a rule promoting transparency and competition - Defendants have taken no action.

## 6. Defendants Acknowledge Violations and Yet Fail to Act

265.     When confronted directly with clear examples of IDX Display Rule violations,

Defendants have acknowledged the noncompliance but failed to take any corrective action. In

one recent communication (June 23, 2025) when Plaintiff requested enforcement and provided

several non-compliant examples, Defendant MRED - admitted (yet no action was taken):

> *"you are correct that the remaining three sites do not currently display the*
> *required broker attribution.* We appreciate you bringing this to our attention.
> We'll be working closely with MLS Grid to *not only correct these issues but also*
> *to strengthen the enforcement of these rules across all participating IDX sites."*
> (emphasis added)

266.     In another instance, on September 12th 2024, Plaintiff received the following

email response regarding this same issue from CEO of Defendant Space Coast Association of

Realtors:

> "Thank you for your email. *Upon checking our public facing MLS site along with*
> *testing a members permalink share from inside our MLS software it appears that*
> *the contact information has disappeared from display. I am not sure when this*
> *dropped as broker attribution has always been provided within the feed and on*
> *display on websites pursuant to the MLS Rules and Regulations.* I would like to
> thank you for taking the time to point this out to us for us to further investigate.
> Please know that an urgent ticket has been submitted to our MLS vendor to ensure
> the proper data is being served in the feed. Secondary, an urgent email is also
> being sent to all vendors who receive either an API or RETS feed from Space
> Coast MLS to ensure that they are properly displaying all data pursuant to the
> MLS Rules and Regulations.
> As soon as I hear from the vendor I will follow up with a response.
> " (emphasis added)

267.     This specific issue has not been resolved and no follow-up, as promise was ever

received.

268.     In a similar, but more troubling case, Defendant SmartMLS, when questioned, the

compliance department emailed Plaintiff on Sept. 18, 2024: "...*MLS is not enforcing these rules*

*because they need to be voted into our rules and regulations* ". This Defendant not just ignores

61

the rule, but admits that they have not even included it into their local rules as mandated by NAR.

269.   Plaintiff wonders how they got their required rules re-certification from NAR while omitting this rule mandated since 2022. The rule is still absent and non-compliance and non-enforcement continues as of August 10th, 2025.

270.   This particular MLS included an incomplete IDX Display rule only in August 16th, 2024 (almost 3 years after NAR enacted it as Mandatory - November 2021), and intentionally omitted the part of the rule for which the rule was mandated in first place (so buyers could contact the listing agent directly). When including the rule in their local policies they omitted a very specific portion of the wording: "...and the email or phone number provided by the listing participant" … while the remainder of the rule is exactly as mandated by NAR.

271.   The intentional omission couldn't be more evident.

**272.   Figure 4 - Omission of Contact Information Requirement in SmartMLS Rule's Version**



**NAR Version -**
Enacted as Mandatory on November, 2021.

"All listings displayed pursuant to IDX shall identify the listing firm, and the email or phone number provided by the listing participant in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data."

**SmartMLS Version -**
Adopted August 16, 2024.

**Section 12.3.2 Listing Firm Displayed**
"All listings displayed pursuant to IDX shall identify the listing firm ___ in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data."

### 7. IDX Vendors Confirm Intentional Violation and MLS Control

273.    Industry-wide steering scheme extends deep and wide. It involves outside

technology providers that supply web platforms used by Portals, Brokerages and individual

REALTOR® participants.

274.    Vendors that provide IDX-fed websites to REALTORS® have openly

acknowledged their awareness of the mandatory IDX Display Rule and admit their deliberate

practice of obscuring listing agent contact information with explicit intent of steering buyers

towards buyer-agent relationships. This vendor wrote:

> "Some MLS's require that we have the listing agent name and contact info
> displayed. Its typically not well received by agents because if someone looks at
> another agents listing it will have the listing agents contact info listed and the
> person looking might call them instead of the agent who's website they are on.
> *This is not a feature we can turn on individually. Its an all or nothing setting for
> the MLS as a whole*. The Contact Agent button will always send the lead to the
> website owner instead of the listing agent of the listing." (email exchange with
> IDX vendor on July 28th, 2025)

275.    Even more telling is the admission posted on another IDX vendor's publicly

accessible website's FAQ section:

> "Is it required to identify the listing firm information on search results?
> Most of the time some information that identifies the listing firm is required. This
> is usually some combination of the listing agent name and/or phone, or the listing
> office and/or phone. *Every board/MLS requires a different combination. The "rule
> of thumb" is that we are required to display the listing Broker or Agent name.
> Because of this we attempt to place this information at the very bottom of the page
> in an inconspicuous location.*"[41] (emphasis added)

---

[41] See: What Is IDX?, IDX Broker, https://idxbroker.com/what-is-idx (visited July 23, 2025).

276.    **Figure 5 – (Contradiction Between NAR IDX Rule and IDX Vendor Display Practice and Conspiracy Acknowledgement)[42]**

NAR IDX Attribution rule as enacted and adopted on
November 15th, 2021 and still in full force:

12. An MLS participant's IDX display must identify the listing firm, and
    the email or phone number provided by the listing Participant in a
    reasonably prominent location and in a readily visible color and
    typeface not smaller than the median used in the display of listing
    data. (*Amended 11/21*)

IDX Vendor's FAQ page from vendor's website (last visited August 4, 2025):

Is it required to identify the listing firm information
on search results?

Most of the time some information that identifies the listing firm is required. This is usually some
combination of the listing agent name and/or phone, or the listing office and/or phone. Every
board/MLS requires a different combination. The "rule of thumb" is that we are required to display
the listing Broker or Agent name. Because of this we attempt to place this information at the very
bottom of the page in an inconspicuous location.

277.    Plaintiff in an attempt to identify where the issue was, contacted Cotality (f/k/a

CoreLogic), a technology company who provides the MLS services for approximately half of the

MLS systems in the country (including 4 of MLS Defendants named in this complaint).

278.    Their technical department explained that each MLS can determine and filter the

fields they decide and all feeds from that MLS will have the fields that they decide. Hence, the

MLS has the ability, and as it appears, is actively making a decision not to provide these fields in

their feed.

279.    In another example, Plaintiff contacted another large IDX-vendor who provides

MLS-fed websites and asked regarding this specific requirement and why the samples provided

---

[42] Direct screenshots from NAR's IDX Rules website and from Vendor's website (added
underlines and arrow to emphasize context for clarity).

nor the sites of participants who use their service display the required information as required.

This Vendor wrote:

> "At the bottom of every listing you should see where it says "listing courtesy of and then the agent that has the property listed". Because we are preferred partners with every MLS in the country we have to get an IDX agreement signed by you, your broker & your MLS so your site will always be 100% compliant."
> We are 100% compliant with all regulations. We have 258 active websites on Stellar MLS, 121 on Beaches & 50 on Miami. Please call all the boards and you can hear from them directly that we are a verified partner and 100% compliant."

280.    Seeking further clarification, Plaintiff insisted that the sample was not compliant, that the rule was clear, and that non-compliance would make the end user (participant) liable. Plaintiff requested a website displaying the information exactly as required by the rule, for which the Vendor further explained:

> "I know, I'm saying is this isn't a Real Geeks issue. Every website in the industry does this. So you are looking for something that doesn't exist. Best of luck with the search and let me know if you're able to find something different!"

281.    Several concerning issues are easily identified. Starting with the direct contradiction of the text and intent of the rule with how Vendors, as guided by the MLS-Responsible Defendants, circumvent, and directly violate the rule and defeat its pro-competitive objective and explicit intent.

282.    No explanation is needed (see Figure 5) when the rule states that the display must be "in a reasonably prominent location" but the Vendor publicly confesses that they display it "at the very bottom of the page in an inconspicuous location"; these are directly opposite concepts.

283.    Furthermore, these public disclosures constitute direct validation of:

284.    a) The vertical conspiracy between MLS-Responsible Defendants with the Vendor when they describe that … "Every board/MLS requires a different combination." and when the Platform provider confirms that the MLS is who, via Trestle, filters and decides the fields to feed.

285.     Vendors admit to colluding with MLS-Responsible Defendant to omit and/or hide
a valuable piece of information in direct violation of a mandatory, pro-competitive rule enacted
by Defendant NAR, and adopted as obligatory by MLS Responsible Defendant.

286.     b). Bad-Faith "Non Compliance" and directly converting the public pro-consumer
policy into a sham rule.

287.     c) Coordinated industry-wide practice.: The uniform "rule of thumb" and "So you
are looking for something that doesn't exist" reveals an industry-wide policy adopted across the
entire MLS/IDX infrastructure.

288.     d) Systematic intent to mislead: Defendants and Vendors knowingly and
consistently bury listing firm's contact, a fact that they acknowledge and is evident even to the
untrained eye by visiting an IDX-Fed website.

289.     e) This admission establishes intentional deception to divert and steer leads
towards the traditional buyer-agent relationship and protects traditional commission structures.

290.     The intentional nature of this conduct becomes even more apparent when
reviewing the IDX Data Feed licensing agreements. As one vendor explains, "we have to get an
IDX agreement signed by you, your broker, and your MLS," where each party agrees to abide by
and conform with the MLS rules.

291.     Yet all parties sign knowing those rules will not be followed nor enforced. This
renders the licensing agreement a sham, executed by separate entities (and/or individuals) in
collusion and in bad faith, with full knowledge and intent of breaching it in furtherance of the
ongoing antitrust conspiracy.

292.     The admission of deliberate, industry-wide noncompliance transforms what might
otherwise appear to be isolated or technical enforcement failures into a central, intentionally

66

designed component of an ongoing, anticompetitive, multi-level, market-wide, deep scheme coordinated to undermine the pro-competitive stance Defendants publicly advocate.

293.    It reveals both forms of concerted action described under Section 1 of the Sherman Act: (1) horizontal agreement among direct competitors - members of the Association or MLS - who collectively decide to instruct the IDX vendor to violate the rule and/or simply decide not to enforce it; and (2) vertical coordination with a separate entity at a different level of the structure - the vendor itself - in furtherance of the restraint. The vendor, in turn, knowingly complies with the instruction in violation of both the IDX rule and its executed legal data licensing agreement.

294.    Critically, the party responsible for enforcing that agreement - the MLS and/or Association - is the same entity described as directing the violation and who has no intention of enforcing compliance with respect to this provision. Defendants invite other participants (some external, but tangential to the industry) into the conspiracy, and they, in turn voluntarily participate in it.

295.    This scheme persists despite binding MLS–Vendor-Participant licensing agreements that expressly require each vendor to ensure that all listing displays comply with the IDX rules, including the following provision:

> "3. Compliance with IDX Policy.
> *Vendor shall ensure that any display of Licensed Listings, and each Display Page, and each Participant or Sales Licensee, is in compliance with the terms of the IDX Policy. Vendor shall not cause the display of any Licensed Listings to be inconsistent with the terms of the IDX Policy, and Vendor shall not facilitate any noncompliance with the terms of the IDX Policy by any third party, including a Participant or Sales Licensee*, the host or creator of each Participant/Sales Licensee Website."[43] (emphasis added)

---

[43] See Sample Model IDX License Agreement, National Association of REALTORS®, available at https://www.nar.realtor/legal/managing-listing-content/license-agreement (visited July 23, 2025). Document reference: Schedule E – Display Standards for IDX Display, Standard No. 3.

67

296.     It is clear that the MLS-responsible Defendants possess the contractual obligation and authority, technical access, and policy responsibility to comply with, monitor and enforce the rule and the contractual terms. Their deliberate failure to do so, in the face of widespread vendor and MLS/Association-guided noncompliance, is not passive. It is active participation in a system designed to divert consumer leads and entrench the existing commission model.

297.     Although vendors are not named as Defendants in this Complaint, their conduct confirms the existence, scale, and sophistication of the coordinated restraint, making them unnamed co-conspirators along with the individual agents, brokerages, and portals that use and display the IDX feed in violation of the rule and in violation of their own data licensing agreements in furtherance of the conspiracy.

298.     Not correcting these evident MLS/IDX and the perceived breach of Data Licensing Agreements after this public legal notice will only reinforce their voluntary participation in the antitrust conspiracy.

299.     Far from refuting liability, these disclosures reinforce the central role of MLSs in enabling the suppression of listing-broker contact information and the steering it facilitates.

### 8. Exponential Effect of Non-compliance and Non-enforcement

300.     Defendants enacted and adopted the IDX Display Rule specifically to prevent these practices, acknowledging in their own training materials that consumers struggle to reach listing agents. Yet they have neither monitored nor enforced compliance, and in many cases, have facilitated the very violations the rule was intended to stop.

301.     These coordinated actions operate much like a formal and informal enterprise, linking NAR, Associations, MLSs, vendors, and participants in a common course of dealing. The

68

result is a sustained, market-wide practice that misrepresents and misguides consumers at the precise moment they make decisions about engaging (or not) real estate professionals.

302. By enabling the IDX display rule violation, MLS-fed websites are routinely published with interfaces (UX/UI)[44] designed around "dark patterns";[45] [46] that omit, conceal or minimize listing-broker contact information and divert inquiries to agents financially tied to the platform or website. These design strategies exploit consumer behavior, cognitive biases such as

---

[44] See Interaction Design Foundation, "User Interface (UI) Design" and "User Experience (UX) Design," describing UI design as "the process designers use to build interfaces in software or computerized devices, focusing on looks or style," and UX design as "the process design teams use to create products that provide meaningful and relevant experiences to users." Available at: https://www.interaction-design.org/ (last visited July 16, 2025).

[45] See Harry Brignull, *Deceptive.Design* (formerly DarkPatterns.org), defining deceptive patterns (also known as "dark patterns") as "tricks used in websites and apps that make you do things that you didn't mean to, like buying or signing up for something." Available at: https://www.deceptive.design/ (last visited July 16, 2025).

[46] See Federal Trade Commission, *Bringing Dark Patterns to Light: Staff Report* (Sept. 2022), at 2 ("[T]he term 'dark patterns' has been used to describe design practices that trick or manipulate users into making choices they would not otherwise have made and that may cause harm."). Available at: https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report.pdf (last visited July 16, 2025).

69

anchoring" [47] [48] and "framing" [49], introducing friction, ambiguity, and visual misdirection to effectively influence, misguide and mislead consumer choice.

303.    In effect, these practices function as commercial advertising that is false or misleading in its presentation of options and transparency, steering buyers toward agents and agreements they may neither sought, need or can't afford; and away from direct engagement with the listing broker or the seller.

304.    As a foreseeable consequence, Sellers (as Plaintiff's) are deprived of fair market participation of their listings, and consumers are denied the transparency and competitive benefits the rule was enacted to provide.

305.    Ethics proceedings have already produced sworn testimony describing a two-layer diversion process: first, concealment or downplaying of listing-broker contact; second, referral-fee-driven buyer agents steering clients toward high-commission listings.

306.    Properties marketed through Plaintiff's cost-competitive model are disproportionately excluded, reflecting open industry strategic planning descriptions of such models as a "threat" to the prevailing system.

---

[47] See Deceptive.Design, defining the anchoring effect as a cognitive bias in which individuals rely too heavily on the first piece of information they receive (the "anchor") when making decisions. Available at: https://www.deceptive.design (last visited July 16, 2025).

[48] Anchoring Bias is the cognitive bias where an individual's decisions are influenced by an initial piece of information, known as the "anchor," which serves as a reference point for subsequent judgments. Source: Harry Brignull, "Chapter 6" in Deceptive Patterns, Deceptive.Design. https://www.deceptive.design/book/contents/chapter-6 (accessed July 6, 2025)

[49] See Harry Brignull, "Chapter 6," in *Deceptive Patterns, Deceptive.Design*, defining framing as a cognitive bias in which individuals rely too heavily on the way information is presented rather than on the underlying facts. Available at:
https://www.deceptive.design/book/contents/chapter-6 (accessed July 6, 2025)

307.     This pattern is continuous, crosses state lines, and repeatedly involves the same actors engaging in the same conduct, causing direct harm to Plaintiff's business and to competition.

308.     This active behavior and non-enforcement not only violates Defendants' own mandatory, pro-competitive policy - it constitutes a concerted restraint of trade under Section 1 of the Sherman Act. Even without any external discovery or production, this violation is plain: NAR's own mandatory rule, its stated rationale, and the transparency goals it claims to serve stand in irreconcilable contrast with the widespread, ongoing noncompliance and total intentional absence of enforcement. This count requires no factual interpretation or inference; the violation is structural, publicly observable, and self-evident.

309.     The result is not merely theoretical. With each instance of lead diversion and downstream steering, Plaintiff surfers antitrust injury, loses a potential client, revenue opportunity, and foothold in the market. The harm is immediate, ongoing, and exponential; impacting both Plaintiff's ability to grow and the public's ability to engage with competitive, cost-saving alternatives in the residential real estate market.

### D.     The Prohibition of Filtering - (MLS Rule)

310.     Following antitrust scrutiny and enforcement action by the U.S. Department of Justice, NAR adopted and disseminated mandatory rule changes in 2021 explicitly prohibiting MLS participants from filtering, and MLS from enabling filtering property search results based on offer of compensation, the name of the listing broker or agent. The rule reads:

> "MLS participants and subscribers must not, and MLSs must not enable the ability to, filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to the cooperating broker or the name of a brokerage or agent. (Adopted 11/21)"[50]

---

[50] See National Association of REALTORS®, Handbook on Multiple Listing Policy (2022 ed.), at 22.

71

311.    The rule was adopted with the clear stated intent of curbing steering and

reinforcing the obligation under Article 1 of the Code of Ethics to present all properties that meet

a client's stated criteria, regardless of commission or source.

312.    NAR,  through a public video, describes these changes as follows:

> Minute 6:29 – "*Filtering of listings. The rule restricts the ability to filter listings*
> *based on* the offer of compensation *or the name of the listing broker or the listing*
> *agent.* We know that Article 1 of the Code of Ethics has a duty for REALTOR®s
> to act in their clients' best interest, which means that all listings that meet the
> client's needs or desires or stated parameters should be presented, regardless of
> offer of compensation or name of the listing broker or listing agent. … *The rules*
> *will need to be amended to eliminate the ability to search or restrict the listings*
> *based on* offer of compensation or *the name of the listing broker or listing agent,*
> *and also to remove the ability to filter by level of service* or membership …
> because those last two could be used as a pretext to circumvent the rules
> prohibiting filtering based on the name of the listing agent or broker."[51] (emphasis
> added)

313.    The violation by the defendants is just visible by any REALTOR® subscriber to

the Defendants' MLS service. Any REALTOR® can right now (as of July 25th, 2025) log-in to

the MLS and search using the filters prohibited by this rule. The violation is direct and NAR has

taken no action when the violation is not isolated but by all MLS-Responsable Defendants

314.    However, despite these rules being mandatory and in effect for over four years,

MLSs continue to enable the functionality to filter and allow users to filter listings by these very

parameters. Buyer agents can still easily search and filter properties based on listing broker

identity (listing agent and/or brokerage name) or level of service, effectively nullifying the

pro-competitive purpose of the rule and enabling persistent, unmonitored steering. This systemic

---

[51] Transcript from video published by the Greater San Diego Association of
REALTORS®, featuring the General Counsel and Vice President of Legal Affairs and
Antitrust Compliance of the National Association of REALTORS®, discussing 2021
mandatory rule changes following Department of Justice intervention. Available at:
https://www.youtube.com/embed/Ud8YzP3gq7I (last visited June 25, 2025, at 10:59 PM
EST).

failure to comply with and enforce a DOJ-mandated rule constitutes a concerted and ongoing restraint of trade in violation of Section 1 of the Sherman Act.

315.     This is not an isolated lapse, but yet another example of Defendants issuing rules to appear compliant with antitrust scrutiny, while taking no meaningful action to implement, supervise, or enforce them. This pattern of issuing unenforced rules functions as a smokescreen - misleading regulators, courts, and market participants -and exponentially magnifies the harm to Plaintiff. Each time a buyer is steered away from one of Plaintiff's listings due to this enabled filtering feature, the antitrust injury is real, immediate, and compounding. Such conduct constitutes a concerted and ongoing restraint of trade in violation of Section 1 of the Sherman Act.

## E.     The Prohibition of Commissions-Fixing Guidance - (MLS Antitrust Compliance Policy)

316.     The 2025 MLS Antitrust Compliance Policy established by NAR in its Multiple Listing Handbook, states in (page 8) Part Two, Section A: " Boards and associations of Realtors® and their MLSs shall not: 1. Fix, control, *recommend, or suggest* the commissions or fees charged for real estate brokerage services. 2. Fix, control, *recommend, or suggest* the cooperative compensation offered by listing brokers to potential cooperating brokers."

317.     In stark contradiction, NAR continues to affirmatively promote a standardized commission and pricing structure through its own publications, which are issued under its authority, carry its trademarks, and are publicly available (as of July 24th, 2025), disseminated widely to both the public and its 1.5 million members. These materials are copyrighted by NAR, prominently feature the REALTOR® brand, and some are published on Realtor.com®, and/or linked from NAR's own website: www.nar.realtor - which is NAR's primary consumer-facing platform.

73

318.    Realtor.com® describes itself (on its own website) as "the #1 most trusted real estate brand" and promotes its role as a leading source of information, guidance, and advice. According to Move, Inc., which operates Realtor.com® (under NAR´s licensing) attracted 237 million visits in May (2025) alone, *underscoring the platform's undeniable extraordinary public reach and influence*. The site's authority and credibility is reinforced by the footer displayed on every web page: "© *1995–2025 National Association of REALTORS® and Move, Inc. All rights reserved.*"

319.    These are not independent commentaries or opinions by just any source or third-party editorials. They are official NAR materials, presented as definitive guidance to consumers and professionals, and carrying the full weight and credibility of the NAR's and REALTOR® branding. *NAR's messaging is not neutral market commentary. It is deliberate and strategic price signaling, designed to instruct sellers, buyers, and brokers on what amounts of commissions are expected and appropriate and who should pay them. Effect that is evident by the exact market level of commissions falling in line with what they broadcast.*

320.    These are not isolated or ambiguous statements. All examples are contemporaneous, properly documented and preserved by Plaintiff and were last accessed on July 24th, 2025.

321.    Just as an example, in a published consumer guide dated November 13, 2024 - months after the Sitzer/Burnett verdict - the article states: "*Sellers typically pay all real estate agents' commissions, which amount to 4% to 7% of the home's sales price.*"[52] (emphasis added).

322.    In another - even more recent article dated May 12, 2025, it reaffirms: "*While the standard commission is often between 5% and 6% of the sale price (split between buyer's and*

---

[52] See Realtor.com, How Much Are Closing Costs? Unpack Fees and Hidden Charges (last visited July 24, 2025), available at https://www.realtor.com/advice/buy/reduce-closing-costs/

*seller's agents)*, the actual rate depends on: Local market conditions, Agent experience, Scope of services."[53] (emphasis added).

323.    And in yet another widely circulated article, it states: "*On average, home sellers pay their listing agent a commission amounting to about 6% of the price of their home* (although that percentage can vary). On a $250,000 house sale, this amounts to roughly $15,000."[54] (emphasis added).

324.    The direct and recurring price specificity and commission structure that NAR instructs is self evident, recurring, direct, undeniable and voluminous. In another instance  - just another example of many - a guide to assist First Time Home Buyers titled "Aims to Close the Gap in Homeownership", published (and still accessible) in NAR's own website (nar.realtor) directly links to to an eBook hosted under their public facing brand Realtor.com® titled: "First-time Homebuying 101" (available for download *free* in english and in spanish).  The book describes commissions and commission structure as follows:

> "As a homebuyer, you're in luck: *Usually, the seller pays the real estate commission.* Here's how it usually works: The commission is split at the settlement table between the seller's agent and the buyer's agent. *So, let's say you're a home seller, and your agent charges you a 6% commission to sell your $200,000 home. The agent then has to split that 6% ($12,000) with the buyer's agent. If the split is 50/50, this would leave the buyer's agent with 3% ($6,000)."*[55]

---

[53] See Realtor.com, Who Pays the Real Estate Commission and Closing Costs (published 2 months ago), available at https://www.realtor.com/advice/finance/realtor-fees-closing-costs/ (last visited July 24, 2025).

[54] See Realtor.com, How Much Does It Cost to Sell a House? (last visited July 24, 2025), available at https://www.realtor.com/advice/sell/how-much-does-it-cost-to-sell-a-house/.

[55] See First-time Homebuying 101, by the editors at Realtor.com®, https://www.realtor.com/ebook/ (linked to PDF at https://b2cdata.marketing.moveaws.com/mk/images/ebook/FTHB-101-ebook.pdf), (version in spanish contains the same price signaling and commission structure  in spanish; available at: https://b2cdata.marketing.moveaws.com/mk/images/ebook/FTHB-101-libro.pdf) linked from Realtor® Magazine, Realtor.com® Aims to Close the Gap in Homeownership, https://www.nar.realtor/magazine/real-estate-news/law-and-ethics/realtorcom-aims-to-close-the-g ap-in-homeownership (last visited July 25, 2025).

(emphasis added). Version in Spanish contains the same translated price signaling and structure.

325. The fixed expected price and NAR-described structure is additionally reinforced by a video published in (NAR's owned branded website: Realtor.com®) under the series "House Rules, Advice from real estate pros" where the hostesses reiterate that sellers pay an average of 6% of the price (32 seconds into the video) of the home to their listing agents. Additionally they explain the status quo structure where half goes to the listing agent and half to the buyer agent (39 seconds into the video). They go even further and emphasize that if a seller decides to sell a property on their own, they still must pay the buyer agent's commission (minute 1:32).[56]

326. What makes the pattern even more revealing of intentionality is that, in addition to the antitrust policy statement (quoted in paragraph 316), in November 2021, following a Department of Justice antitrust inquiry, Defendants enacted a mandatory rule expressly prohibiting the very type of messaging that NAR continues to disseminate to the public. That rule provides:

> "MLS participants and subscribers *must not represent that their brokerage services to a client or customer are free or available at no cost to their clients,* unless the participant or subscriber will receive no financial compensation from any source for those services." [57](Amended 11/21) (emphasis added)

327. This mandatory rule is in undisputed and irreconcilable contradiction to NAR's own public materials, which repeatedly describe the traditional structure as one in which the seller pays the entire commission - including the buyer agent's fee - making the service "free" or "at no cost" to the buyer.

---

[56] See Realtor.com, How Much Does It Cost to Sell a House? (last visited July 24, 2025), available at https://www.realtor.com/advice/sell/how-much-does-it-cost-to-sell-a-house/.
[57] National Association of REALTORS®, 2022 Multiple Listing Policy Handbook, at 30, available at https://www.nar.realtor/about-nar/policies/mls-policy-handbook

328.     In fact, NAR goes further, portraying this arrangement as an outstanding benefit to the buyer, stating in its official guides that "*as a homebuyer, you're in luck: the seller typically pays the commission.*" This framing not only contradicts the written rule, their own antitrust statement, but also cements the deceptive pricing narrative that steers consumer behavior and reinforces the very market distortions the rule was intended to curtail.

329.     This is evident in the furtherance of fixing prices, maintaining a de-facto, status-quo, compensation structure, boycotting alternative brokerages and allocating markets to those who conform with what NAR standardizes.

330.     These are not suggestions or third-party quotes - they are authoritative, NAR-copyrighted and NAR-linked statements that describe a specific commission range and clearly assign payment responsibility to the seller. They are neither isolated nor anonymous; they are recurrent, both historically and recently, including some issued after the Sitzer/Burnett verdict.

331.     This is deliberate price guidance issued by the entity that governs professional rules and provides training and guidance for 1.5 million members, available to hundreds of millions of consumers each month. It directly shapes public expectations through its consumer-facing platform. By repeatedly referring to 4%–7% as "typical" and 5%–6% as "standard" or "average" NAR creates a powerful pricing signal that defines the baseline for real estate transactions and implies that any material deviation is abnormal or improper. Additionally it clearly states that the entire commission shall be paid by the seller.

332.     These statements are interpreted as normative by the industry. With over 1.5 million members who rely on NAR for compliance guidance, professional reputation, and marketing framing, these publications function as a *de facto directive*.

77

333.     Furthermore, the messages (by the leader) are amplified and echoed by brokers, agents, and media outlets who look to NAR as the policy-setting authority. It is entirely foreseeable that NAR's messaging will be internalized by the market, leading to collective adherence to the prescribed price range and payment structure. NAR uses this influence to preserve the traditional commission model and effectively and efficiently set commission amount standards, sustain seller-pays-all expectations, and suppress innovation or deviation from the pricing and structure scheme that benefits traditional brokerages.

334.     Additionally, as Plaintiff already described, flat-fee business models (as Plaintiff's) and enhanced For Sale by Owner alternatives were listed by Defendant NAR as a threat and a danger in their strategic planning publication: The DNAGER report.[58] The report is still widely distributed and published to all industry participants with its own dedicated website directly linked from NAR's own platform. This is just another direct call to maintain a price control, commission structure and to boycott alternatives and allocate the market to traditional structures.

335.     Plaintiff, a licensed real estate broker and REALTOR® offering flat-fee and limited-service listing options that enable sellers to reduce or eliminate commission expenses, is directly and foreseeably harmed by Defendants' coordinated efforts to standardize high commissions and preserve the traditional seller-pays-all model.

336.     The result is a coordinated scheme that allocates the market in favor of traditional brokerages and commission structures, while efficiently and effectively excluding alternative service providers like Plaintiff. It operates as a constructive group boycott, disincentivizing

---

[58] National Association of REALTORS®, D.A.N.G.E.R. Report: *Definitive Analysis of Negative Game-Changers Emerging in Real Estate* §§ B5 ("New Business Models Go Mainstream") & B8 ("FSBO Develops into a Do-It-Yourself Model"), at 53, 58 (2015)

engagement with any listing that falls outside the prescribed structure, and reinforcing systemic steering away from Plaintiff's clients.

337.    The harm to Plaintiff is direct, ongoing, and structural. Sellers are told - explicitly and repeatedly - that they are expected to pay a set percentage in commissions and to cover the buyer agent's fee, leaving them to question why they would use Plaintiff's flat-fee model if it differs from NAR-defined structure and pricing.

338.    Hence the public understands, by this messaging, to avoid any brokerage service (including Plaintiff's) that deviates from the NAR-supported standards out of fear that doing so will result in buyer-agent retaliation, failed showings, or stalled transactions.

339.    Buyer agents, in turn, bypass Plaintiff's listings to protect their expected commission payout, steering clients toward listings that conform to the NAR-described "standard" structure. Meanwhile, consumers internalize NAR's messaging and come to view Plaintiff's model as irregular, risky, or noncompliant. These effects are not isolated or coincidental; they are the direct and foreseeable result of Defendant's broad market influence, unified messaging, and coordinated strategy to preserve a commission structure that excludes innovative competition.

340.    This conduct constitutes a textbook *per se violation of Section 1 of the Sherman Act.* It is not subject to a rule-of-reason defense because it involves expressed, direct, recurring price signaling by a powerful trade association (self-proclaimed to be "The Voice of Real Estate"), coupled with market allocation and group exclusion that injure competition itself - not just an individual competitor. The Supreme Court and lower courts have long recognized that such practices, when undertaken by a professional body with widespread market influence, fall squarely within the per se prohibition the Sherman Act was designed to address.

F.      **The Reinforced and Promoted Incentive for Steering**

341.    The blanket offer of compensation, where sellers or listing agents promise in advance to pay a fee to any cooperating buyer broker, paired with steering, has long functioned as one tool to preserve inflated commission structures, suppress competition and innovation, and restrain trade through coordinated conduct across the industry.

342.    While Defendants removed the requirement to publish a blanket offer of compensation through the MLS (effective August 2024), they did not prohibit the steering incentive itself: the advance blanket offer of compensation that fuels the anticcompetitive behavior.

343.    Eliminating only the MLS display of commission information, while leaving the underlying incentive structure intact, does nothing to deter steering. Instead, it preserves the very motivation that drives it (commissions), continuing to financially reward agents for directing buyers based on compensation rather than client interest.

344.    Instead of removing the incentive for steering, Defendants simply recategorized the blanket offer of compensation from "NAR-mandated communication of commission via MLS" to "NAR-recommended, encouraged as important, highly needed or suggested and communicated through any other method other than the MLS". Hence preserving and even promoting steering by maintaining the incentive intact.

345.    A published article by NAR directly pushes for sellers to offer buyer agent commission "as a way of marketing your home or making your listing more attractive to buyers."[59]

---

[59] National Association of REALTORS®, "Home Sellers: What the NAR Settlement Means," available at https://www.nar.realtor/the-facts/home-sellers-what-the-nar-settlement-means (last visited Aug. 10, 2025).

346.     In a widely circulated Op-Ed authored by NAR's President, Kevi Sears, and

published in Dallas Morning News on Sept. 5, 2024, he wrote:

> "If you bought a home in the past, you probably didn't pay out of pocket for your agent's services. The seller's agent likely shared their commission with the buyer's agent to compensate them for the value they brought to the transaction. In the industry, these are known as '*offers of compensation,*' and at the National Association of REALTORS®, *we believe these remain an important option for agents, buyers and sellers. At their core, these offers of compensation provide access. Some buyers, especially first-time or lower-income buyers, may not have the upfront cash to compensate a real estate professional… Offers of compensation have clear benefits for sellers as well. By expanding access to a greater number of prospective buyers, they drive competition and help sellers get the best offer for their property.*"[60]

347.     Sellers using Plaintiff's service, who typically offer limited or no buyer-agent

compensation in order to reduce transaction costs for consumers, are thereby penalized. Sellers

are repeatedly and constantly forced into a coercive choice: offer an inflated commission or risk

their listing being ignored, delayed, or steered against - documented conduct that Plaintiff has

repeatedly observed and reported.

348.     Furthermore, a public (and common) position by NAR exemplifies fearmongering

by a perceived authoritative source, as in this statement by NAR Chief Economist Lawrence

Yun:

> "… if the buyer have to pay out of their pocket to their agent, essentially you are denying the people in more moderate wealth circumstances, which in the U.S. is substantially minority homebuyers." [61]

---

[60] Kevin Sears, Dallas Morning News, Sept. 5, 2024. Available at:
https://www.dallasnews.com/opinion/commentary/2024/09/05/buying-a-house-new-chan
ges-will-bring-transparency-and-choice (accessed July 1, 2025).
[61]  See Are Realtors Having an Existential Crisis?, Freakonomics Radio (May 3, 2024),
available at: https://freakonomics.com/podcast/are-realtors-having-an-existential-crisis/
(last visited July 23, 2025) (statement by Lawrence Yun, Chief Economist for the
National Association of REALTORS®).

349.    Continued reiteration of what sellers "should" do: offer commission and the reasons for doing so - delivered by none other than the NAR President and NAR's Chief Economist under the indisputable banner of the National Association of REALTORS® is far from insignificant. It is an influential guidance from the most powerful real estate organization in the country, echoed by some of its highest-ranking officers.

350.    Additionally, during this same interview, Mr. Yun states:

> "The real estate profession is one of the most competitive out there. It's almost like, economic textbook definition of perfect competition. You have so many new entrants every year, roughly 200,000 new people, entrepreneurs trying to test out their skill set. And then you have roughly 200,000 Realtors who gave their best, but they said, "No, it's not for me." And then, of course, you have all different business models: full-service, limited service, discount brokerages. And great thing about America is that Americans can do it by themselves if they want to. So, I thought the market was competitive, but I guess the lawyers can always convince few people to get the verdict they want."

351.    This statement insists there is no problem with the existing structure, characterizes competition as fair, and dismisses concerns as the view of "a few people" (the jury), while ignoring the restraints Defendants deploy as described in this Complaint.

352.    While Yun correctly notes that different business models exist and that buyers could buy unrepresented, the reality is that steep obstacles prevent consumers from successfully using them and prevent these alternatives from competing on equal footing - especially when the prevailing narrative dictates the "expected commission structure" and "the amount of commission to be offered and paid."

353.    Additionally, labeling representation alternatives as "discount brokers," Mr. Yun implicitly frames the commission amount and pricing structure described by NAR, as the regular, going market rate from which certain participants merely "discount or reduce" their fees from the normal price (this is the definition of "discount"). This portrayal systematically casts

82

non-traditional brokers as outliers, reinforcing the perception that there is a"market going rate"
and that deviation from the traditional commission structure is abnormal and undesirable.

354.    Such messaging is repeated often enough to reverberate in the minds of
consumers and in the business practices of NAR's 1.5 million members, reinforcing the
perception that offering a buyer-agent commission is expected and necessary. This sustained
narrative functions as de facto guidance, preserving the existing commission structure and
discouraging competitive deviation.

355.    Defendants' position - that requiring buyers to pay their own agents would
prevent them from purchasing a home - rests on two unfounded premises: first, that demand for
buyer-agent services is inherently and naturally price inelastic, and second, that the prevailing
price for such services would remain unchanged if demand shifts. Neither premise withstands
scrutiny.

356.    Such an outcome could only occur if demand for buyer representation were
naturally inelastic (which it is not), or if inelasticity were artificially preserved through structural
restraints. Defendants' conduct accomplishes precisely that: by embedding buyer-agent
compensation into the seller's side of the transaction and reinforcing uniform commission
practices (and amounts), they have removed the cost of these services from the buyer's
decision-making process entirely, thereby suppressing the natural price sensitivity that would
otherwise exist.

357.    *Fundamental economic principles and empirical research confirm that when the
cost of a non-mandatory complementary service - such as brokerage - exceeds a consumer's
willingness or ability to pay, the predictable market response is not abandonment of the primary*

83

*product (housing), but a shift toward lower-cost service providers or the decision to forgo the*
*service altogether.*

358.    Housing and brokerage are distinct markets with different demand elasticities. By
conflating them, Defendants perpetuate the false narrative that unbundling commissions would
harm vulnerable buyers, when in fact it would increase market efficiency, stimulate price
transparency, and expand competitive alternatives while giving more choice to the consumer - all
of which are hallmarks of improved consumer and economic welfare.

359.    By masking the buyer-agent cost under the "seller pays" construct, Defendants
preserve the illusion that buyer representation is "free," insulating the service from competitive
pressures and enabling commission levels to remain artificially high. Buyers, perceiving no
direct cost, feel no incentive to negotiate price or explore alternatives and buyer agents feel no
need for offering more affordable representation options.

360.    In a competitive market free from these restraints, requiring buyers to pay their
agent directly, would realign incentives, producing downward pressure on commission rates,
encouraging innovation in brokerage models, and increasing the range of affordable service
options, while restoring the welfare being siphoned away from the consumer.

361.    The result would be a reallocation of resources from supra-competitive brokerage
fees toward the primary asset - the home itself - yielding measurable gains in consumer surplus,
economic efficiency, and overall economic welfare. The opposition to such a shift is not
grounded in preserving access to housing; it is driven by the desire to protect the existing
commission structure and the supra-competitive profits it sustains.

362.    By directly promoting the need (or preference) for a determined amount of
buyer-agent commission from the seller side, and pairing that with their refusal to adopt a direct,

84

unambiguous rule prohibiting steering and other behavior addressed in this Complaint, Defendants knowingly enabled the very anticompetitive conduct these rules were purported to correct.

363.    By requiring (until August 2024), and thereafter promoting, enabling, and encouraging blanket offers of compensation by sellers or listing agents—regardless of the method of communication - Defendants are directly and repeatedly harming consumers, curtailing competition, and injuring Plaintiff. These coordinated practices have the foreseeable and intended effect of maintaining commission inflation and reinforcing buyer-agent steering, thereby suppressing competition from innovative business models like Plaintiff's.

364.    Specific to this section, the continued direct signaling by Defendants that offering compensation in advance is necessary (or highly desirable) to secure buyer-agent cooperation creates a coercive market environment.

## XIII.  CAUSES OF ACTION

365.    While any individual count could warrant judicial intervention, it is the combined pattern and compounding effect of these interlocking and interdependent structural restraints that exposes the systemic, anticompetitive framework maintained by Defendants.

366.    This structure operates across jurisdictions, policies, enterprise levels and time, with full knowledge and acquiescence by every participant. Plaintiff is prepared to present each count on its own merits but emphasizes that the overall pattern is deliberate, persistent, and designed to exponentially restrain competition. *The compound harm is greater than the sum of the harm inflicted by each count independently.*

367.    The rules and regulations central to the Counts that follow are not open to factual controversy or their collective nature. These provisions have been duly enacted, formally

85

incorporated, and stand as an indispensable part of the mandatory regulatory framework governing Defendants' associations, multiple listing services, and their respective members.

*368. It is, therefore, impossible to genuinely contest the rules' existence, their purpose or them being binding and mandatory. Consequently, their strict compliance and rigorous enforcement remains unequivocally mandatory across all Defendants. This fact constitutes a foundational and undeniable premise.*

369.    The *collective* nature of Defendants' conduct has been established in the preceding Section VIII. As explained there, each Defendant is itself a forum for collective action among horizontal competitors, and their decisions not to comply with, monitor, or enforce mandatory rules constitutes concerted action under the Sherman Act.

370.    The causal connection between Defendants' conduct and the resulting harm is clear and direct. Each time a buyer is steered, diverted, or funneled away from Plaintiff's listings, the injury is not incidental or market-driven, it is the foreseeable direct consequence of Defendants' collective failure to comply with, monitor and enforce their own rules.

371.    This conduct is not passive; it is enabling. By systematically refusing to monitor, enforce, or even acknowledge violations of their mandatory policies, Defendants perpetuate and legitimize the very behavior those rules were intended to prevent.

*372. Every instance of steering constitutes a discrete antitrust injury; one that multiplies daily and compounds the competitive harm inflicted on Plaintiff and the market.*

373.    Defendants are not neutral actors. They are the very organizations entrusted with upholding the rules they create; rules that were adopted and publicly intended to prevent antitrust violations, protect consumers, and promote fair competition. But instead of fulfilling that duty,

86

Defendants issue these rules as a shield: to appear compliant with antitrust law while deliberately avoiding any meaningful compliance or enforcement.

374. In doing so, *Defendants have transformed what should be a regulatory safeguard into a systemic mechanism for restraint of trade* - where steering, misguidance, misrepresentation, and exclusion flourish unchecked.

375. Each count below identifies specific defendants sued under that count. Each factual allegation within a count applies only to defendants specifically named in that count's heading. Where an allegation references 'Defendants' collectively, it applies only to those defendants named in the current count who engaged in the specific conduct described.

## A. COUNT I - Violation of Section 1 of The Sherman Act (15 U.S.C. § 1) - Conspiracy to Restraint Trade by Collectively Refusing to Adopt Rules Expressly and Directly Prohibiting Steering.

376. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 375 as if fully set forth herein.

377. This Count is asserted against all Defendants named in this action, namely: National Association of REALTORS® (NAR); Beaches MLS, Inc.; Broward, Palm Beaches and St. Lucie REALTORS®, Inc.; Miami Association of REALTORS®, Inc.; Orlando Regional REALTOR® Association, Inc.; Florida Gulf Coast Multiple Listing Service, Inc.; Royal Palm Coast REALTOR® Association, Inc.; Naples Area Board of REALTORS® and Association of Real Estate Professionals, Inc. (NABOR®); My Florida Regional MLS, Inc. (d/b/a Stellar MLS); Space Coast Multiple Listing Service, Inc.; Space Coast Association of REALTORS®, Inc.; Northeast Florida Multiple Listing Service, Inc. (d/b/a RealMLS); Northeast Florida Association of REALTORS®, Inc.; Central Panhandle Association of REALTORS®, Inc.; Connecticut Association of REALTORS®, Inc.; Smart MLS, Inc.; West and Southeast REALTORS® of The Valley, Inc.; and Midwest Real Estate Data LLC (d/b/a MRED).

378.   As detailed in the FACTS section, all Defendants have entered into and continue to engage in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act.

379.   This conspiracy consists of a continuing agreement, understanding, and concerted action among Defendants (and internally within each) to collectively refuse to enact a clear, direct, and unambiguous rule prohibiting steering based on broker compensation. This concerted refusal is evidenced by the specific, shared conduct of each Defendant (which by definition is collective action): a. Defendant NAR's Role: As the "hub" of the conspiracy, NAR has deliberately omitted the adoption expressly and directly prohibiting steering, despite publicly acknowledging the practice is harmful and unethical.  This creates the foundational loophole that enables the entire anticompetitive scheme. b. All Other Defendants' Roles: As "spokes" in the conspiracy, each MLS and Association Defendant has joined and ratified NAR's conspiracy of omission. Despite having the independent authority to enact local rules to prohibit steering, they have uniformly and collectively refrained from doing so, thereby ensuring the anticompetitive status quo is maintained across all their respective markets.

380.   The purpose and effect of this conspiracy is to shield buyer agents who engage in steering from accountability and promoting and enabling this practice; thereby suppressing competition from low-commission and alternative brokerage models like Plaintiff's.

381.   This scheme further coerces sellers into offering the "market rate" buyer-broker commission by creating an operational threat that any property offering a lower commission will be boycotted by buyer-brokers and buyers steered away.

382.   This conduct constitutes three distinct per se violations of the Sherman Act: (1) a group boycott of low-commission listings and the brokers who facilitate them; (2) market

88

allocation that favors traditional, high-commission brokerage models; and (3) price fixing by stabilizing buyer-broker commissions at an artificially inflated level.

383.    In the alternative, should this conduct not be deemed a per se violation, it is so inherently suspect and devoid of any plausible procompetitive justification that it is unlawful under the quick look doctrine. No legitimate, procompetitive purpose can be served by a collective agreement to refuse to adopt a direct unambiguous rule to stop the antitrust behavior of steering when defendants have the authority and responsibility to do so. The anticompetitive nature of this concerted refusal is obvious and requires no elaborate industry analysis to condemn.

384.    Finally, should a full Rule of Reason analysis be required, the conduct is still an unreasonable restraint of trade, as its profound anticompetitive effects - including foreclosing competition, allocating markets, and harming consumer choice overwhelmingly outweigh any purported procompetitive justifications, which are nonexistent and pretextual.

385.    The activities of the Defendants described herein are within the flow of, and have a substantial and direct effect upon, interstate commerce.

386.    As a direct and proximate result of Defendants' unlawful conduct under this Count, Plaintiff has suffered antitrust injury to its business and property, as it is directly targeted by the group boycott and foreclosed from competing on the merits in a market free from anticompetitive steering.

**B. COUNT II - Violation of Section 1 of The Sherman Act (15 U.S.C. § 1) : Conspiracy to Restraint Trade by Collective Refusal to Enforce Steering Prohibition Under the Indirect Guidance as a Violation of Article 1 of the Code of Ethics**

387.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 375 as if fully set forth herein.

388.     This Count is asserted against Defendants: National Association of REALTORS®

(NAR); Broward, Palm Beaches and St. Lucie REALTORS®, Inc.; Miami Association of

REALTORS®, Inc.; Orlando Regional REALTOR® Association, Inc.; Royal Palm Coast

REALTOR® Association, Inc.; Space Coast Association of REALTORS®, Inc.; Northeast

Florida Association of REALTORS®, Inc.; Central Panhandle Association of REALTORS®,

Inc.; Connecticut Association of REALTORS®, Inc.; and West and Southeast REALTORS® of

The Valley, Inc.

389.     As detailed in the FACTS section, the above-named Defendants have entered into

and continue to engage in a contract, combination, or conspiracy in unreasonable restraint of

trade and commerce in violation of Section 1 of the Sherman Act.

390.     This conspiracy consists of a continuing agreement, understanding, and concerted

action among these Defendants to collectively refuse to enforce the existing indirect ethical

prohibitions against steering as described by NAR, particularly as violations to Article 1 of the

NAR Code of Ethics. This concerted refusal is evidenced by the specific, shared conduct of each

Defendant named in this Count:

391.     **a.** Defendant NAR's Role as the "hub" of this enforcement conspiracy, NAR

maintains the pretext that steering is prohibited under the Code of Ethics, while actively

orchestrating a policy of non-enforcement. It deflects its own enforcement responsibility to the

local associations, knowing that they will not act, thereby condoning and permitting the

anticompetitive conduct to flourish without consequence.

392.     **b.** Association Defendants' Roles As the designated "spokes turned sub-hubs" for

local ethics enforcement, each of the other Defendants named in this Count has knowingly joined

the conspiracy by uniformly dismissing steering complaints and avoiding discipline for their

90

members for the practice, even when presented with direct evidence of violations by Plaintiff. This collective abdication of their core enforcement duty is a deliberate act in furtherance of the conspiracy.

393. The purpose and effect of this conspiracy is to shield brokers who engage in steering from accountability, thereby suppressing competition from low-commission and alternative brokerage models like Plaintiff's.

394. This scheme further coerces sellers into offering the "market rate" buyer-broker commission by creating a credible threat that any property offering a lower commission will be boycotted by buyer-brokers without consequences.

395. This conduct constitutes three distinct *per se* violations of the Sherman Act: 1) a group boycott of low-commission listings and the brokers as Plaintiff, who facilitate them; (2) market allocation that favors traditional, high-commission brokerage models; and (3) price fixing by stabilizing buyer-broker commissions at an artificially inflated level.

396. In the alternative, should this conduct not be deemed a per se violation, it is so inherently suspect and devoid of any plausible procompetitive justification that it is unlawful under the 'quick look' doctrine. No legitimate, procompetitive purpose can be served by a collective agreement to refuse to enforce the Ethical Prohibition of steering while defendants have the authority, obligation and responsibility to do so. The anticompetitive nature of this concerted refusal is obvious and requires no elaborate industry analysis to condemn.

397. Finally, should a full Rule of Reason analysis be required, the conduct is still an unreasonable restraint of trade, as its profound anticompetitive effects—including foreclosing competition, allocating markets, and harming consumer choice -overwhelmingly outweigh any purported procompetitive justifications, which are nonexistent and pretextual.

398.    The activities of the Defendants described herein are within the flow of, and have a substantial and direct effect upon, interstate commerce.

399.    As a direct and proximate result of Defendants' unlawful conduct under this Count, Plaintiff has suffered antitrust injury to its business and property, as it is directly targeted by the group boycott and foreclosed from competing on the merits in a market free from anticompetitive steering.

## C.   COUNT III - Violation of Section 1 of The Sherman Act (15 U.S.C. § 1) – Conspiracy To Restrain Trade Through Collective Refusal To Enforce The Buyer-Broker Agreement Rule

400.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 375 as if fully set forth herein.

401.    This Count is asserted against Defendants: National Association of REALTORS® (NAR); Beaches MLS, Inc.; Miami Association of REALTORS®, Inc.; Florida Gulf Coast Multiple Listing Service, Inc.; My Florida Regional MLS, Inc. (d/b/a Stellar MLS); and Central Panhandle Association of REALTORS®, Inc.

402.    As detailed in the FACTS section, the above-named Defendants have entered into and continue to engage in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act.

403.    This conspiracy consists of a continuing agreement, understanding, and concerted action among these Defendants to collectively refuse to enforce NAR's mandatory rule requiring REALTORS® to have a written and executed buyer-brokerage agreement (with clear specific elements) with buyers prior to working with them. This concerted refusal is evidenced by the specific, shared conduct of each Defendant named in this Count:

404.    a. Defendant NAR's Role as the "hub" of this enforcement conspiracy, NAR issues the rule to create a facade of consumer protection and transparency. However, it tacitly

agrees to and facilitates widespread non-enforcement to preserve the ambiguity that props up the traditional, high-commission structure, which would be threatened by the clear, negotiated terms of an arms length, universally enforced agreement.

405.     b. MLS Defendants' Roles as the "spokes turn sub hubs" governing the local supervision and enforcement, Defendants Beaches MLS, Inc., Miami Association of REALTORS®, Inc., Florida Gulf Coast Multiple Listing Service, Inc., and Stellar MLS knowingly join the conspiracy through their uniform failure to monitor or enforce the rule. They possess the technical capability to verify compliance but collectively refuse to do so, thereby enabling steering and defeating the purpose of the rule (eliminate steering).

406.     c. Association Defendant's Role as a designated ethics enforcement body, Defendant Central Panhandle Association of REALTORS®, Inc. joined the conspiracy by, directly refusing to enforce the rule even when presented with clear and incontrovertible evidence of a violation during a formal ethics proceeding, thereby confirming the existence of the conspiracy of non-enforcement.

407.     The purpose and effect of this conspiracy is to prevent the market transparency and price competition that written buyer-broker agreements would generate and to reduce to a sham the rule that according to NAR would *eliminate steering*.

408.     By ensuring the rule is not enforced and by not adopting a mechanism for its enforcement, Defendants allow buyer-brokers to avoid upfront negotiations over their compensation and instead steer clients toward properties based on the commission offered in the MLS. This conduct constitutes three distinct per se violations of the Sherman Act: (1) a group boycott of brokers like Plaintiff who rely on clear, enforceable contracts entered in good faith by parties; (2) market allocation that favors the traditional brokerage model over innovative,

93

transparent alternatives; and (3) price fixing by obscuring commission negotiations and anchoring compensation to artificially inflated, non-negotiable MLS offers.

409.     In the alternative, should this conduct not be deemed a per se violation, it is so inherently suspect and devoid of any plausible procompetitive justification that it is unlawful under the quick look doctrine. No legitimate, procompetitive purpose can be served by a collective agreement to refuse to enforce an established Buyer-Broker Agreement requirement with all its elements and provide the necessary mechanisms and tools to circumvent this obligation and defeat the purpose of the rule. The anticompetitive nature of this concerted refusal is obvious and requires no elaborate industry analysis to condemn.

410.     Finally, should a full Rule of Reason analysis be required, the conduct is still an unreasonable restraint of trade, as its profound anticompetitive effects—including foreclosing competition, allocating markets, and harming consumer choice -overwhelmingly outweigh any purported procompetitive justifications, which are nonexistent and pretextual.

411.     The activities of the Defendants described herein are within the flow of, and have a substantial and direct effect upon, interstate commerce.

412.     As a direct and proximate result of Defendants' unlawful conduct under this Count, Plaintiff has suffered antitrust injury to its business and property, as its transparent, contract-based model is directly undermined by the conspiracy to maintain market-wide opacity regarding commission structures.

### D. COUNT IV - Violation of Section 1 of The Sherman Act (15 U.S.C. § 1) – Conspiracy To Restrain Trade By Permitting, Recommending, Suggesting and Encouraging Inflated Buyer-Broker Commission Offers and the Status Quo Commission Structure

413.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 375 as if fully set forth herein.

414.    This Count is asserted against all Defendants named in this action, namely:

National Association of REALTORS® (NAR); Beaches MLS, Inc.; Broward, Palm Beaches and

St. Lucie REALTORS®, Inc.; Miami Association of REALTORS®, Inc.; Orlando Regional

REALTOR® Association, Inc.; Florida Gulf Coast Multiple Listing Service, Inc.; Royal Palm

Coast REALTOR® Association, Inc.; Naples Area Board of REALTORS® and Association of

Real Estate Professionals, Inc. (NABOR®); My Florida Regional MLS, Inc. (d/b/a Stellar MLS);

Space Coast Multiple Listing Service, Inc.; Space Coast Association of REALTORS®, Inc.;

Northeast Florida Multiple Listing Service, Inc. (d/b/a RealMLS); Northeast Florida Association

of REALTORS®, Inc.; Central Panhandle Association of REALTORS®, Inc.; Connecticut

Association of REALTORS®, Inc.; Smart MLS, Inc.; West and Southeast REALTORS® of The

Valley, Inc.; and Midwest Real Estate Data LLC (d/b/a MRED).

415.    As detailed in the FACTS section, the above-named Defendants have entered into

and continue to engage in a contract, combination, or conspiracy in unreasonable restraint of

trade and commerce in violation of Section 1 of the Sherman Act.

416.    This conspiracy consists of a continuing agreement, understanding, and concerted

action among all Defendants to permit, recommend, encourage, and provide the essential

infrastructure for universal, blanket, and inflated offers of buyer-broker compensation. This is

achieved through the combination of NAR's publicly stated positions, recommendation and

suggestions, which normalize and promote the practice of the seller-pays commission structure,

the 50/50 split  and a direct, repeated and evident price signaling of the amount of commission

expected to be paid (by the seller).

417.    The remaining defendants participate in the collusion under this count by further

cementing NAR's actions and the ongoing harmful steering antitrust violation by allowing,

95

promoting and enabling the continuation of blanket seller-offered buyer broker commissions and by refusing to enact and mandate a rule prohibiting this practice. All defendants, including NAR have the authority to issue such a rule and yet collectively decide not to do it.

418.    This conduct constitutes three distinct per se violations of the Sherman Act: (1) a group boycott of brokers like Plaintiff who rely on clear, neutral guidance and free market environment devoid of manipulation in order to compete and provide an alternative service; (2) market allocation that favors the traditional brokerage model over innovative, transparent alternatives; and (3) price fixing  by direct, repeated and evident price signaling by a highly influential organization as NAR, of the amount of commission expected to be paid and the expected structure (compensation paid by the seller).

419.    In the alternative, should this conduct not be deemed a per se violation, it is so inherently suspect and devoid of any plausible procompetitive justification that it is unlawful under the quick look doctrine. No legitimate, procompetitive purpose can be served by this intentional, overt and recurring conduct. The anticompetitive nature of this concerted action requires no elaborate industry analysis to condemn.

420.    Finally, should a full Rule of Reason analysis be required, the conduct is still an unreasonable restraint of trade, as its profound anticompetitive effects - including foreclosing competition, allocating markets, and harming consumer choice - overwhelmingly outweigh any purported procompetitive justifications, which are nonexistent and pretextual.

421.    The activities of the Defendants described herein are within the flow of, and have a substantial and direct effect upon, interstate commerce.

422.    As a direct and proximate result of Defendants' unlawful conduct under this Count, Plaintiff has suffered antitrust injury to its business and property, as its transparent,

contract-based model is directly undermined by the conspiracy to maintain market-wide opacity regarding commission structures.

## E. COUNT V - Violation of Section 1 of The Sherman Act (15 U.S.C. § 1) – Conspiracy To Restrain Trade Through Non-Enforcement and Violation of the IDX Display Rule

423.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 375 as if fully set forth herein.

424.    This Count is asserted against Defendants: NAR, Miami Association of Realtors, Inc. (d/b/a SEFMLS), Central Panhandle Association of Realtors, Inc., Beaches MLS, Inc., Florida Gulf Coast Multiple Listing Service, Inc., My Florida Regional MLS, Inc. (d/b/a Stellar MLS), Space Coast Multiple Listing Service, Inc., Northeast Florida Multiple Listing Service, Inc. (d/b/a RealMLS), Smart MLS, Inc., Midwest Regional Data LLC - (MRED).

425.    As detailed in the FACTS section, the above-named Defendants have entered into and continue to engage in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act.

426.    This conspiracy consists of a continuing agreement, understanding, and concerted action to collectively violate and refuse to comply and enforce NAR's mandatory, pro-competitive IDX Display Rule.

427.    This concerted action operates at two distinct but intertwined levels: (a) Intra-Association Conspiracy: The members of Defendant NAR, and the members of each respective Association and MLS Defendant - who are direct competitors - have agreed, combined, and conspired through the formal mechanisms of their associations to make decisions and engage in practices that result in the widespread non-compliance, violation of, and collective refusal to enforce, the IDX Display Rule. This conduct constitutes an unlawful conspiracy within each Defendant entity. (b). Inter-Entity Conspiracy: Concurrently, the corporate Defendants have

97

engaged in a broader conspiracy among each other, with NAR acting as the hub and the other MLS and Association Defendants as the spokes, to ensure the violation and non-enforcement of the IDX Display Rule is implemented and maintained uniformly across the entire market.

428.    This conspiracy operates as a sophisticated hub-and-spoke arrangement, with the admissions of unnamed co-conspirators (the IDX vendors and technology platform providers) confirming its existence and intent: (a) NAR's Role (The "Hub"): NAR enacted the IDX Display Rule as a pretextual, consumer-protection measure, publicly stating its purpose is to allow consumers to easily contact listing brokers. Simultaneously,  NAR has facilitated and presided over the rule's market-wide violation and non-enforcement, creating a sham policy designed to insulate the industry from criticism while allowing the anticompetitive steering conduct to continue unabated. (b) MLS and Association Defendants' Roles (The "Spokes Turn Hubs"): The MLS and Association Defendants knowingly joined the conspiracy through a shared refusal to monitor or enforce the rule. This concerted inaction is proven by their direct admissions of non-enforcement (e.g., MRED, SmartMLS, Space Coast Association of REALTORS®), their failure to act when presented with clear evidence of violations, and, in some cases, their active distribution of non-compliant data feeds that make it technically impossible for members to comply. (c) Confirmation by Unnamed Co-Conspirators (IDX Vendors): The existence and intent of the conspiracy is further confirmed by direct admissions from IDX Vendors who, as active but unnamed co-conspirators, have stated they intentionally place listing firm contact information in "inconspicuous locations", in direct contradiction of the rule's "prominent display" requirement.

429.    The purpose and effect of this conspiracy is to mislead consumers by creating deceptive online interfaces ("dark patterns") that make it difficult or impossible to contact a listing broker directly. This systematically funnels consumer (unknowingly) inquiries away from

98

listing agents and towards buyer-brokers, thereby protecting the traditional high-commission structure and preventing the competition that direct consumer-to-listing-broker communication would foster and additionally enabling and enhancing steering.

430.    This conduct constitutes three distinct per se violations of the Sherman Act: (1) a group boycott against innovative brokerage models like Plaintiff's that rely on direct consumer contact; (2) market allocation that forecloses buyer-to-listing agent (or buyer-to-seller) negotiation and channels consumers into high-commission, buyer-broker service model; and (3) a mechanism that facilitates price fixing by preventing the direct price negotiations that would disrupt the inflated commission offers prevalent in the in the industry.

431.    In the alternative, should this conduct not be deemed a per se violation, it is so inherently suspect and devoid of any plausible procompetitive justification that it is unlawful under the quick look doctrine. No legitimate, procompetitive purpose can be served by a collective agreement to violate and refuse to enforce a mandatory rule designed and adopted by defendants to promote competition, transparency and consumer choice.  The anticompetitive nature of this conduct is obvious and requires no elaborate industry analysis to condemn.

432.    Finally, should a full Rule of Reason analysis be required, the conduct is still an unreasonable restraint of trade, as its profound anticompetitive effects - including foreclosing competition, misleading consumers, and allocating markets - overwhelmingly outweigh any purported procompetitive justifications, which are nonexistent and pretextual.

433.    The activities of the Defendants described herein are within the flow of, and have a substantial and direct effect upon, interstate commerce.

434. As a direct and proximate result of Defendants' unlawful conduct under this Count, Plaintiff has been deprived of consumer leads, its transparent business model has been directly undermined, and it has suffered antitrust injury to its business and property.

## F. COUNT VI – Violation of Section 1 of The Sherman Act (15 U.S.C. § 1) – Conspiracy to Restrain Trade by Violating the MLS Non-Filtering Rule

435. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 375 as if fully set forth herein.

436. This Count is asserted against Defendants: NAR, Miami Association of Realtors, Inc. (d/b/a SEFMLS), Central Panhandle Association of Realtors, Inc., Beaches MLS, Inc., Florida Gulf Coast Multiple Listing Service, Inc., My Florida Regional MLS, Inc. (d/b/a Stellar MLS), Space Coast Multiple Listing Service, Inc., Northeast Florida Multiple Listing Service, Inc. (d/b/a RealMLS), Smart MLS, Inc., Midwest Regional Data LLC - (MRED).

437. As detailed in the FACTS section, the above-named Defendants have entered into and continue to engage in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act.

438. This conspiracy consists of a continuing agreement, understanding, and concerted action to collectively violate NAR's mandatory and pro-competitive rule prohibiting the filtering of MLS properties by listing brokerage or listing agent's name.

439. Despite the mandatory nature and clear pro-competitive purpose of this rule, the MLS Defendants named in this Count have systematically violated it by continuing to provide their subscribers with the technological functionality to filter MLS searches based on the identity of the listing brokerage and listing agent.

100

440.    This violation is not isolated or accidental; it is an ongoing and easily verifiable feature of the Defendants' MLS platforms. This conspiracy consists of a continuing agreement, understanding, and concerted action to collectively violate the mandatory Non-Filtering Rule.

441.    This concerted action operates at two distinct but intertwined levels: (a) Intra-Association Conspiracy: The members of Defendant NAR, and the members of each respective MLS Defendant - who are direct competitors - have agreed, combined, and conspired through the formal mechanisms of their associations to provide the technological tools that directly violate the Non-Filtering Rule. This conduct constitutes an unlawful conspiracy within each Defendant entity. (b) Inter-Entity Conspiracy: Concurrently, the corporate Defendants have engaged in a broader conspiracy among each other, with NAR acting as the hub and the other MLS Defendants as the spokes, to ensure the Non-Filtering Rule is uniformly violated, thereby creating a market-wide system that facilitates steering against disfavored competitors.

442.    The purpose and effect of this conspiracy is to provide brokers who engage in steering with the precise technological tools to identify and exclude listings from specific competitors, including low-commission and alternative-model brokerages like Plaintiff's. This conduct functions as a group boycott of disfavored competitors, market allocation towards conventional model-abiding brokerages, price fixing by enabling the steering as the controlling mechanism and constitutes a per se violation of Section 1 of the Sherman Act.

443.    In the alternative, should this conduct not be deemed a per se violation, it is so inherently suspect and devoid of any plausible procompetitive justification (as explained by Defendant NAR) that it is unlawful under the quick look doctrine. The practice of enabling filtering by competitor name, serves no purpose other than to facilitate anticompetitive exclusion, market allocation and price fixing.

101

444.     In the further alternative, if a full rule of reason analysis is applied, the substantial

and direct anticompetitive effects of this conduct - including the suppression of competition,

facilitation of a group boycott, and stifling of innovation in brokerage models - far outweigh any

purported procompetitive justifications, rendering the restraint unreasonable and unlawful under

Section 1 of the Sherman Act.

445.     As a direct and proximate result of this conspiracy, Plaintiff has suffered and

continues to suffer injury to its business and property. The Defendants' provision of filtering

tools enables competing brokers to systematically exclude Plaintiff's listings from search results

shared to prospective buyers.

## XIV. COUNT SUMMARY AND DEFENDANT/COUNT MAPPING

446.     To promote clarity, efficiency, and ease of reference, the following section

provides a brief summary of each Count asserted in this Complaint, followed by a table

identifying the specific Defendants named in each Count.

447.     This organizational structure is intended to assist the Court and all parties in

understanding the legal theories at issue and the scope of liability as applied to each Defendant,

without the need to cross-reference or duplicate material from earlier sections, and to avoid any

potential characterization as a "shotgun pleading" under Eleventh Circuit precedent, while

accurately reflecting the unified conspiracy alleged herein.

- COUNT I - Conspiracy to Restraint Trade by Collectively Refusing to Adopt Rules Expressly and Directly Prohibiting Steering.
- COUNT II - Conspiracy to Restraint Trade by Collective Refusal to Enforce Steering Prohibition Under the Indirect Guidance as a Violation of Article 1 of the Code of Ethics
- COUNT III - Conspiracy To Restrain Trade Through Collective Refusal To Enforce The Buyer-Broker Agreement Rule

102

- COUNT IV - Conspiracy To Restrain Trade By Permitting, Recommending, Suggesting and Encouraging Inflated Buyer-Broker Commission Offers and the Status Quo Commission Structure

- COUNT V - Conspiracy To Restrain Trade Through Non-Enforcement and Violation of the IDX Display Rule

- Count VI – Conspiracy To Restrain Trade By Violating The MLS Non-Filtering Rule.

448. **Table A -** Matrix **of Counts Asserted Against Each Defendant**

|  | COUNT | | | | | |
|---|---|---|---|---|---|---|
| **Defendant** | **I** | **II** | **III** | **IV** | **V** | **VI** |
| National Association of Realtors (NAR) | X | X | X | X | X | X |
| Broward, Palm Beaches and St. Lucie Realtors, Inc. | X | X | | X | | |
| Beaches MLS, Inc. | X | | X | X | X | X |
| Miami Association of Realtors, Inc. | X | X | X | X | X | X |
| Royal Palm Coast Realtor Association, Inc. | X | X | | X | | |
| Naples Area Board of Realtors and Association of Real Estate Professionals, Inc. | X | | | X | | |
| Florida Gulf Coast Multiple Listing Service, Inc. | X | | X | X | X | X |
| Space Coast Association of Realtors, Inc. | X | X | | X | | |
| Space Coast Multiple Listing Service, Inc. | X | | | X | X | X |
| Orlando Regional Realtor Association, Inc. | X | X | | X | | |
| My Florida Regional MLS, Inc. (Stellar MLS) | X | | X | X | X | X |
| Northeast Florida Association of Realtors, Inc. | X | X | | X | | |
| Central Panhandle Association of Realtors, Inc. | X | X | X | X | X | X |
| Northeast Florida Multiple Listing Service, Inc. (realMLS) | X | | | X | X | X |
| Connecticut Association of Realtors, Inc. (Ct Realtors) | X | X | | X | | |
| Smart MLS, Inc. | X | | | X | X | X |

| Midwest Regional Data LLC - (MRED) | X | | | X | X | X |
| West And Southeast Realtors of The Valley, Inc (WeServe) | X | X | | X | | |

## XV. THE COMPOUNDING AND EXPONENTIAL ANTITRUS EFFECT

449.    Plaintiff brings multiple, distinct violations of Section 1 of the Sherman Act, each of which - standing alone - would survive judicial scrutiny as an independent and well-supported antitrust complaint. The counts detailed herein involve separate rules, policies, and courses of conduct, each with documented violations and clearly defined restraints on competition.

450.    The evidence for each is self-contained, thoroughly supported, and drawn almost entirely from Defendants' own words, rules, publications, correspondence, and actions.

451.    Yet what elevates this case beyond the sum of its parts is the compounding antitrust effect that results from Defendants' systematic, layered, and coordinated misconduct. Across different rules, across distinct factual contexts, and through the actions and omissions of different actors at different levels within Defendants' organizational structure and organizations tangentially interrelated. The pattern repeats:

- A rule is adopted as mandatory - often after regulatory scrutiny or litigation - and publicly justified as pro-competitive.

- Defendants issue explanatory materials reinforcing that the rule promotes competition, consumer choice, market transparency, or ethical conduct.

- In practice, however, Defendants fail to comply with, implement, monitor, and enforce the rule.

- When confronted with the violation and corrective action is requested, Defendants ignore, mislead, dismiss, or deflect those concerns.

- Instead Defendants (through NAR) publicly set an expected price and brokerage model and commission structure.

452.    This is not an isolated failure or oversight (not individually and much less in general context). It is a repeated, deliberate, multilayered sequence of continued violations, non-compliance and non-enforcement. A structural pattern spanning from NAR's top leadership to mid-level executives, compliance department staff, standard-setting committees, and hearing panels.

453.    This pattern extends beyond the organizational boundaries of NAR and its affiliated associations, operating through IDX vendors and technology providers who facilitate, normalize, and profit from systemic rule circumvention.

454.    It reflects concerted action not only within each level of governance, but also vertically, through the entire enforcement and communications hierarchy, where each participant plays its part in furtherance of the overall conspiracy.

455.    Each failure, omission, and evasive response further enables anti-competitive conduct - particularly price fixing, market allocation, group boycott, steering, concealment, and bias against low-commission listings and the brokerages that operate within this cost saving structure - to persist unchallenged.

456.    The result is not simply regulatory negligence. It is an orchestrated and self-reinforcing cyclical structure to preserve the dominance of traditional, high-commission brokerages and to exclude and marginalize alternative business models such as Plaintiff's. The pattern is undeniable and well-documented - it appears in Defendants' own training videos, official FAQs, compliance responses, ethics rulings, and policy language.

105

457.     This sustained refusal to enforce rules that Defendants themselves label pro-competitive constitutes a series of independent and concerted acts by direct competitors, working through associations, MLSs, and trade committees enabled through individuals with knowledge and authority representing the organizations - carries legal consequences.

458.     As a unified, multi-layered scheme, the conduct described in this Complaint reveals a compounding and exponential antitrust effect, where each violation reinforces, validates, interwinds and amplifies the others, resulting in a systemic injury and harm far greater than the sum of its parts. This coordinated structure of rulemaking without enforcement, pro-competitive messaging contradicted by inaction, and hierarchical complicity across all levels of Defendants' organizations has produced a market distortion that is both self-sustained and self-reinforcing.

459.     The consequence is not limited to Plaintiff; it extends to the entire public and the competitive process itself, by preserving an inflated, deceptive, and coercively stabilized commission level and compensation structure that is nearly impossible for consumers or alternative business models to escape.

460.     *This pattern of conduct demands comprehensive, urgent, and immediate injunctive relief to restore fair market conditions and prevent further structural abuse.*

461.     This direct interference with Plaintiff's ability to compete has resulted in lost opportunities, lost revenue, and damage to Plaintiff's goodwill and competitive standing in the marketplace. This harm is ongoing, compounding, and of the type the antitrust laws were designed to prevent.

## XVI. TIMELINESS OF CLAIMS

462.    This case presents a live, ongoing controversy involving distinct Sherman Act violations that continue to deteriorate the free competitive market, injure Plaintiff and harm consumers.

463.    All of the rules base for this Complaint were enacted on or after November 2021, well within the four-year statute of limitations. Additionally, the actions described herein are properly dated and/or specifically referenced to events occurring after that date, some as recent as the month prior to filing.

464.    While the facial timeliness of this action is evident, and sufficient to establish admissibility within the allotted statutory period, each Defendant has continuously engaged in repeated, distinct, independent and new overt acts that separately restart the statute of limitations under the continuing violation doctrine.

465.    Each time a rule violation was reported and ignored, an ethics complaint was dismissed, a decision was made not to enforce a rule, or a request for clarification was misrepresented or left unanswered, a new independent overt act occurred.

466.    Each of these actions maintains the ongoing objective of the conspiracy. Accordingly, this case is not only timely on its face, it also satisfies the continuing violation doctrine through the discrete and ongoing conduct of each Defendant.

## XVII. HARM TO COMPETITION AND INJURY TO PLAINTIFF

467.    Defendants' coordinated failure to comply with, adopt and enforce clear, operational rules, particularly with respect to steering and listing transparency; while continuing to signal the acceptable price and commission structure, has produced both systemic harm to consumers, the real estate brokerage market and direct injury to Plaintiff.

107

468.     The anticompetitive effects are not incidental; they are the predictable

consequence of strategic planning (part of the roadmap provided in the DANGER report),

structural design and collective actions that protect the traditional commission model, suppress

lower-cost alternatives, and mislead consumers at critical decision points.

## A.     Harm to Competition and Consumers

469.     Antitrust law protects more than just a competitor. It protects the competitive

process itself. That includes *consumer welfare*, the openness of the market dynamics, and the

freedom of businesses to enter, compete, and innovate.

470.     The law requires not just allegations of harm to a single firm, but evidence of

harm to competition in general; the kind of market-wide injury that arises from conduct as

presented in this complaint, which restrains price competition, limits consumer choice,

suppresses innovation, or distorts the natural forces of supply and demand.

471.     The focus on *consumer welfare* prioritizes ensuring that consumers benefit from

competitive markets through lower prices, higher-quality services, and greater choice. It also

recognizes that innovation and dynamic, supply-side (analysed in conjunction with demand-side

behavior and economics) developments are essential drivers of competition and long-term

market health. The facts in this Complaint reflect exactly that kind of harm that reduces

consumer welfare.

### 1.     Steering-Enabled Price Fixing (Maintaining Inflated Commissions)

472.     Defendants' refusal to prohibit and prevent steering directly enables a

marketplace in which sellers are coerced into offering inflated commissions, based on the

predictable, known and well-documented consequence, that buyer agents will otherwise avoid or

delay showing their properties (via steering).

473.    This forced pricing behavior distorts market dynamics, inflicts financial harm on sellers, and traps buyers in opaque, non-negotiated cost structures. Steering of buyers away from low-fee and flat-fee listings coerces sellers industry-wide to offer supracompetitive commissions to secure showings.

### 2.    Suppression of Price Competition by Market Allocation

474.    By obligating (until August 2024), publicly recommending and promoting upfront offers of compensation; and by failing to enact, comply with or enforce meaningful anti-steering rules, Defendants have actively suppressed price competition.

475.    Sellers who might otherwise offer reduced (or no upfront commissions) are chilled by the threat - and documented reality - of being excluded by buyer agents, while buyers are steered toward agents whose financial incentives are misaligned with their buyer's interests.

476.    At the same time, by continuing to shift the entire commission burden to the seller side, and by allowing and encouraging this distortion, the restraints enable buyer agents to avoid negotiating their fees directly with buyers.

477.    As a result, buyer agents routinely market their services as having "no apparent cost" to the buyer, shielding themselves from price scrutiny and eliminating the pressure to offer reduced-fee or limited-scope buyer representation options.

478.    Defendants' coordinated steering effectively allocates markets by business model (traditional vs. alternative), reinforcing per se illegal price fixing and market division.

### 3.    Restriction of Consumer Choice

479.    Buyers are covertly funneled toward agents who maximize commission capture, often without the buyer's informed consent or knowledge. Through filtering search tools, misleading contact interfaces, dark pattern website design, and failure to enforce listing

109

transparency rules, Defendants interfere with consumers' ability to select agents, representation types, and listings on neutral, transparent terms.

### 4.   Exclusion of Innovative Business Models and Output Reduction

480.   Alternative brokerage models that offer innovation, flat-fee or reduced-cost services are systematically suppressed through steering, whether by commission-based steering, stigmatization and enabled by MLS filtering, manipulation of IDX contact pathways, or other practices that redirect buyers away from listings associated with lower compensation and alternative options. These steering mechanisms, combined with Defendants' selective rule enforcement, operate as institutional barriers that shield incumbents from competition and prevent innovation from gaining market traction.

### 5.   Market Misrepresentation and Deception

481.   Consumer-facing platforms and IDX-enabled websites (in violation of clear mandatory rules, that Defendants fail to abide by or enforce) routinely omit, obscure, or subordinate listing agent contact information, intentionally steering buyers toward platform-affiliated buyer agents. This practice misleads consumers into believing they must engage a buyer representative, often one with a financial relationship with the platform itself.

482.   Far from accidental, this obfuscation reflects a deliberate strategy aligned with the DANGER Report, a strategic planning resource, published by NAR which explicitly identified buyer independence as a threat to the industry's survival by describing an existential threat as: "*Home buyers might not always want to use a real estate agent, but most think they have to. What happens if their perspective changes?*"[62] *The failure to enforce the IDX display rule is not*

---

[62] See DANGER Report, Section A2, p. 28 (Nat'l Ass'n of REALTORS®, 2015), available at: https://www.dangerreport.com/ (last visited July 23, 2025): "*Home buyers might not always want to use a real estate agent, but most think they have to.* What happens if their perspective changes?" (emphasis added). The report explicitly frames

an oversight; it is the conscious implementation of a systemic mechanism designed to neutralize that perceived threat, suppress consumer choice, and preserve the commission-based status quo.

483.    This conduct not only distorts the market—it *directly undermines consumer welfare, a central goal of modern antitrust law*. Defendants' collective inaction and enforcement bias have led to higher transaction costs, less transparency, fewer real choices, and the exclusion of newer, more efficient models that could lower prices or improve service.

484.    Consumers are denied the ability to make autonomous, informed decisions about the services they want, the professionals they engage, and the costs they bear. In every relevant sense - price, choice, quality, innovation - competition has been restrained. This Complaint alleges market-wide harm, not private grievance, and targets the exact type of conduct the Sherman Act was designed to prevent.

### 6.    Distinct from Mere Competitor Injury

485.    Plaintiff's injury is not simply lost clients or opportunities to a rival broker, but harm to the entire competitive structure: inflated fixed prices, reduced product variety, and diminished service and structural innovation. Defendants' conduct alters market dynamics, erecting anticompetitive barriers that shield incumbents from non-traditional business models - the very harm Sherman Act § 1 prohibits.

### B.    Injury to Plaintiff

486.    Lost listings from sellers deterred by the risk of buyer-agent steering away from Plaintiff's properties, despite Plaintiff's lawful participation in the MLS. Loss of customers and clients is a recognized form of antitrust injury under controlling case law.

---

the *buyer's freedom to choose as a threat*. That perceived threat is effectively and strategically mitigated, in part, through Defendants' refusal to enforce rules that would empower consumers to bypass intermediaries and directly engage with listing agents or sellers.

487.    Lost buyer traffic and showings on active listings, resulting in reduced exposure, fewer inquiries, and diminished transaction outcomes - each a foreseeable consequence of Defendants' enabling of steering behavior.

488.    Loss of referrals (for new customers) as a primary source for exponential market acquisition, a common, powerful market-expansion mechanism. According to NAR 88% of consumers would "*recommend their agent to others*"[63].

489.    Reputational Harm and Stigmatization, with Plaintiff's business model branded as a threat, DANGER, "non-cooperative" or "unfriendly to buyer agents," damaging trust, deterring referrals, and undermining professional credibility.

490.    Lost Income and Profit, Constrained Growth, Restriction to Gain Market Share, and Diminished Business Value, as Plaintiff is denied equal access to the marketplace, limiting scale, reducing operational efficiency, and devaluing the business's "good will" as ongoing concerns.

491.    Together, these harms reflect the dual impact of Defendants' conduct: one that blocks competition and allocate market to traditional brokerages, effectively and efficiently fix prices, degrades market integrity, competition and has an economically quantifiable disproportionate negative effect on *consumer welfare and social surplus[64]*; and another that

---

[63] See National Association of REALTORS®, Quick Real Estate Statistics (published July 8, 2024), accessed July 8, 2025, available at: https://www.nar.realtor/research-and-statistics/quick-real-estate-statistics.

[64]See Borys Grochulski & Zhu Wang, *Real Estate Commissions and Homebuying*, United States Federal Reserve Bank of Richmond, Working Paper No. 24-01R (updated June 8, 2025), estimating that transitioning to a cost-based commission system for buyer agents would generate approximately $40 billion in annual consumer welfare and broad social surplus gains, equivalent to roughly $109 million per day. Available at: https://www.richmondfed.org/publications (last visited July 16, 2025).

112

inflicts direct, ongoing damage and injury to Plaintiff. The injuries are not abstract, they are the natural result of and directly caused by a system strategically designed to preserve commission incentives and punish deviation.

## XVIII. CONCLUSION

492. Defendants have developed and maintained an institutional structure in which authority flows from the top - from NAR - while responsibility is diffused downward to local associations and MLSs.

493. These local entities are compelled to adopt, follow, supervise and enforce NAR's Mandatory Rules under threat of exclusion from critical tools, protections, and resources, including the access to professional liability insurance, which premiums are paid by NAR. Yet NAR simultaneously declines to assume direct responsibility for enforcement or supervision, creating a systemic accountability vacuum.

494. In this framework, rules are issued with the appearance of pro-competitive intent, but are either not complied with, not monitored and/or not enforced at all, especially when compliance would disrupt the entrenched commission model. This deliberate non-enforcement enables pervasive market manipulation, including steering, visibility suppression, discriminatory filtering, and retaliation against innovative business models like Plaintiff's. Actors who adhere to the traditional model are shielded; those who deviate are marginalized.

495. The consequences are extraordinary: persistent high commission structure, huge harm to consumers, suppression of innovation, distortion of market, and the exponential, current and continued erosion of Plaintiff's ability to compete on lawful, fair terms. These harms are not speculative; they are ongoing, expanding, and directly tied to Defendants' systemic concerted decision.

113

496.     Judicial intervention is now essential. Plaintiff has exhausted all alternative

remedies. Only this Court can redress the continuing violations, halt the damage, and restore

lawful competition to a market deliberately shielded from it.

## XIX.   PRAYER FOR RELIEF

While the requested relief applies jointly and severally to all Defendants, each

Defendant (whether association or MLS) also bears independent authority and responsibility to

act. Under NAR's own policy framework adopted by Associations and MLSs, local and regional

entities may adopt and enforce rules that do not conflict with national-mandated standards and

are not required to await centralized direction to do so; especially for antitrust conduct

prevention, as directed and authorized by NAR[65], all Defendants bear the weight of the entire

scheme.

*This Complaint serves both as a request for judicial intervention, an*

*industry-wide notice and as an additional opportunity for voluntary compliance, without the*

*need for Plaintiff to seek immediate Court involvement. Accordingly, Plaintiff expects each*

*Defendant and co-conspirators (not named in the complaint), to take immediate - independent*

*and collective - corrective actions in good faith. The rules at issue are already written,*

*acknowledged, mandatory, integrated into Defendant's own policies, clearly understood, and*

*technically possible.*

*The harm to consumers, competition, and the integrity of the market is ongoing,*

*compounding, exponential, self-reinforcing, and irreparable.* Consumers are misled, steered, and

---

[65]See National Association of REALTORS®, *2025 Handbook on Multiple Listing Policy,*
at p. 22: "This policy does not prohibit boards or associations of REALTORS® or their
MLSs from adopting rules or policies establishing the legitimate uses of MLS
information, from prohibiting unauthorized uses of MLS information, *or from
establishing rules or policies necessary to prevent illegal collective action, including
price-fixing and boycotts*." (emphasis added)

deprived of transparent, competitive options; new innovative entrants are systematically excluded; and the natural forces of supply and demand are distorted. These harms are not hypothetical - they occur daily, by design, and with full knowledge of Defendants. Plaintiff, as a competitive alternative, continues to suffer irreparable injury.

*This is not harm that can be undone or redressed through monetary compensation alone.* Each additional day of noncompliance further entrenches consumer deception, multiplies the injury to Plaintiff, and undermines the public's confidence in fair and competitive real estate markets. The damage is not static, it is exponential and accelerating.

Plaintiff has made every good faith effort to resolve these issues without litigation. But where private actors impose rules on the industry, proclaiming them as pro-competitive, consumer-protective, and mandatory, they cannot then ignore or refuse to enforce those rules once scrutiny arises. The balance of equities weighs heavily in favor of compliance and enforcement: *the benefit to consumers, competition, and the market far outweighs any alleged burden on Defendants in applying and complying with the very rules they created.*

Moreover, compliance is both technically feasible (as admitted by IDX Vendors) and long overdue. There are examples of IDX websites and syndicated platforms that already technically comply (some partially) with the rules, demonstrating that there are no meaningful technological barriers to enforcement. Nor can time be a legitimate defense: most of the mentioned rules have been mandatory and on the books since November 2021, and Defendants have had over three and a half years to guide implementation, issue clarifications, and monitor adherence. Their failure to do so reflects not incapacity, but inaction.

115

This case thus presents a rare clarity of posture: *there is no plausible scenario under which Defendants could ask this Court to permit them to continue disregarding mandatory rules they themselves enacted for the benefit of the consumer and fair competition.* That would be a contradiction in terms, and an invitation for the Court to bless a structure in which pro-competitive rules aimed to curtail antitrust harm are imposed but never complied with or enforced by the same rule-maker.

Restoring compliance with Defendants' own obligations is not only in the public interest, it is a necessary first step toward freeing the forces of supply and demand to operate in a fair and lawful competitive environment, free of artificial restraints. *Plaintiff trusts that Defendants will recognize this and act promptly in good faith.*

Plaintiff respectfully submits that the foregoing allegations establish a substantial likelihood of success on the merits; urgent and irreparable harm is evident that is compounding exponentially to consumers, the free market, and Plaintiff, and that the balance of equities and public interest all favor prompt relief.

*As injunctive relief, which couldn't be more clear, direct and narrow, Plaintiff simply asks the court to compel Defendants to comply with, monitor and enforce the rules they have already promulgated, in the form and intent they publicly endorsed.*

Accordingly, Plaintiff respectfully seeks all remedies authorized under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), including but not limited to permanent injunctive relief, treble damages, costs of suit, and reasonable attorneys' fees..

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against all Defendants, jointly and severally, and award the following relief:

## A. Declaratory Relief

Plaintiff respectfully requests that this Court declare that Defendants' knowing and persistent non compliance, non supervision, and/or refusal to enforce their own rules - including direct prohibitions against steering, restrictions on listing filtering, IDX display requirements, and buyer-broker agreement provisions - as well as their continued price signaling and efforts towards the preservation of a preferred (by Defendants) commission structure, constitute an ongoing restraint of trade in violation of Section 1 of the Sherman Act, and that these actions warrant treatment as a per se violation. Plaintiff, however, respectfully defers to the Court should it determine that a "quick look" analysis is more appropriate under the circumstances. These coordinated actions and omissions result in continuing harm to consumers, distortion of the competitive market, and direct injury to Plaintiff.

## B. Injunctive Relief

Defendants have adopted comprehensive rules designed to promote competition and consumer transparency. *The Court need not craft expansive remedies or navigate complex regulatory questions* - only and simply compel faithful implementation of binding obligations that Defendants impose on themselves, yet have systematically neglected. This narrow, simple and targeted relief will start to restore competitive balance while *requiring Defendants to honor commitments they have voluntarily undertaken and publicly defended.*

Plaintiff respectfully requests a permanent injunction as follows:

### 1. IDX Listing Broker Contact Display Compliance

Order all Defendants to immediately comply with, monitor, and enforce the existing IDX Listing Broker Contact Display Rule, as written and intended, by ensuring that the listing firm's contact information is displayed (in all MLS-fed websites

117

and, portals and platforms) clearly and prominently - at least as prominently as any other contact information or lead form on the site.[66]

## 2.   Steering Prohibition Enforcement

*Order Defendants, in consensus amongst them all to meet and confer:*

a.   To issue market-wide compliance guidance for REALTORS® and enforcement guidelines for Associations, clarifying that steering - defined as the practice of directing buyers away from certain properties based on commission structure or listing agent name or brokerage affiliation - is prohibited under Article 1 of the NAR Code of Ethics and must be strictly complied by, monitored and enforced accordingly;

b.   To issue public, market-wide guidance and official interpretation clarifying that all forms of steering described in this Complaint - when undertaken with knowledge of the ongoing conspiracy in restraint of trade and in furtherance of it - constitute participation in a horizontal conspiracy in violation of Section 1 of the Sherman Act and that Steering is not merely an individual ethical lapse, but a knowing act that advances the anticompetitive scheme, rendering the actor a liable co-conspirator, even if they joined the conspiracy at a later stage or acted independently.

c.   To take all necessary steps to ensure that enforcement bodies, compliance staff, and decision-making committees are adequately equipped and trained to

---

[66] See National Association of REALTORS® *MLS Technology and Emerging Issues Advisory Board, Meeting Minutes*, September 9–10, 2021, where the advisory board included the following explanatory language for the IDX display rule: "The contact information for the listing firm must be clearly identified and displayed at least as prominently as any other contact information or lead form on the site." This language was crafted by Defendants themselves to clarify the rule's intent and ensure objective, enforceable implementation. No legitimate procompetitive justification exists for its exclusion. To the contrary, removal of this language from the final rule served only to introduce ambiguity, enable continued noncompliance, and frustrate the rule's unambiguous stated purpose, consumer transparency and competitive fairness.

identify, evaluate and address conduct under existing basic antitrust and contract law principles, including but not limited to the identification of steering practices that constitute unlawful restraints of trade under Section 1 of the Sherman Act and professional standard violation under Article 1 of the Code of Ethics.

### 3. Buyer-Broker Agreement Rule Compliance

a.      Order Defendants to monitor and enforce compliance with the Buyer-Broker Agreement Rule in full, consistent with its stated terms and intended application.

b. Order Defendants to implement and maintain comprehensive education and training programs for Associations, MLSs, members, and consumers, covering the fundamental elements of a contract and the specific requirements of the Buyer-Broker Agreement Rule  - including the duty to act in good faith and the prohibition against entering into agreements lacking genuine intent to perform.

c. Order defendants to expressively prohibit vague wording and/or self-steering clauses built into the buyer-broker agreement or any indication or insuibu¡nuation that the seller will pay any compensation.

d. Order defendants to require specific wording in the buyer-broker agreement stating the buyer will pay the buyer agent compensation.

### 4. Non-Filtering Rule Compliance

Order Defendants to comply with and enforce their filtering restrictions, including prohibiting MLSs from enabling any and all tools and resources that allows and enables participants to search or filter property listings based on name of listing agent or broker, level of service, type of listing agreement, or membership status.

119

### 5.    Immediate Cessation of Enabling Conduct, Price Signaling and Commission Payment Structure

Order Defendants to immediately cease, (and remove from all platforms, website and materials) any and all statements, publications, articles, blogs, podcasts, videos, guides, or training content that directly or indirectly promote, suggest, recommend, or condone: (1) the practice of sellers offering blanket, advance compensation to buyer agents; (2) any price signaling, including references to "standard," "customary," "traditional", "historic", "local" or "typical" commission rates or splits; and (3) any guidance or messaging that implies or states that sellers are expected to, or should pay both the listing and buyer agent commissions.

### C.    Monetary Relief

#### 1.    Compensatory Damages

Plaintiff seeks recovery of all monetary damages arising from Defendants' unlawful conduct, including but not limited to lost profits, lost business opportunities, and loss of business value. These damages are ongoing and continue to accrue as a direct and foreseeable result of the concerted restraints on competition described in this Complaint. Plaintiff also seeks recovery for all damages incurred during the pendency of this action.

#### 2.    Treble Damages

Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff seeks an award of treble damages for all antitrust injuries sustained as a result of Defendants' concerted and unlawful conduct.

#### 3.    Prejudgment Interest

To ensure full compensation and to account for the time value of money, Plaintiff seeks prejudgment interest on all damages, including those incurred prior to the filing of this

120

action and during its pendency, as permitted by federal law and the equitable powers of this Court.

### 4.     Post-Judgment Interest

Plaintiff further seeks post-judgment interest on the total amount awarded, including any treble damages, from the date of entry of judgment until payment is made in full, in accordance with 28 U.S.C. § 1961.

### 5.     Costs and Fees

Although Plaintiff is appearing pro se, Plaintiff seeks reimbursement of all costs incurred in this action and expressly reserves the right to seek attorneys' fees should counsel be retained during the course of this litigation, as permitted by law.

### D.     Other Relief as Just and Proper

Any additional relief this Court deems just, necessary, and proper under the circumstances, including but not limited to expedited discovery, preliminary injunctive relief, evidentiary hearings on such relief, or other equitable measures required to prevent further harm and to restore competitive conditions in the market.

## XX. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby respectfully demands trial by jury on all issues so triable.

## XXI. CONSENT TO ELECTRONIC SERVICE

Pursuant to Federal Rule of Civil Procedure 5(b)(2)(E), Plaintiff consents to service of *all documents* by email and respectfully requests that counsel for all Defendants serve all filings, notices, and correspondence at the following email address: antitrust@jorgezea.com

Dated:  August 15th, 2025,


Respectfully Submitted,



Jorge A. Zea
Pro Se Plaintiff
2234 N Federal Hwy
PMB68073
Boca Raton, FL 33431
Phone: (305) 244-7242

Email: antitrust@jorgezea.com