# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

FILED BY _____ D.C.

AUG 27 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

|  |  |  |
|---|---|---|
| Jorge A. Zea (Pro Se) | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| | ) | |
| National Association of REALTORS®, et, al. | ) | Case No. 25-cv-81016-WM |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

# PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
# AND SUPPORTING MEMORANDUM OF LAW
# TO COMPEL DEFENDANTS' COMPLIANCE
# WITH THEIR OWN BINDING RULES

**TABLE OF CONTENT**

**INTRODUCTION**     1

**PLAINTIFF EXHAUSTED PRIVATE REMEDIES BEFORE SEEKING
JUDICIAL RELIEF - STRENGTHENING, NOT WEAKENING,
THIS MOTION**     2

**STATEMENT ON THE UNDISPUTED RECORD**     3

**LEGAL STANDARD FOR A PRELIMINARY INJUNCTION**     4

**PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION**     5

    I. Plaintiff Has A Substantial Likelihood Of Success On The Merits.     5

       A. The Conspiracy to Not Comply and Not Enforce is Pervasive     6

       B. The Refusal to Enforce Specific Rules Constitutes an Illegal Group  Boycott
and Market Allocation Scheme under The Sheram Act.     8

    II. Plaintiff and the Public Will Suffer Irreparable Harm Absent an Injunction     14

    III. The Balance of Hardships Decidedly Favors an Injunction     16

    IV. The Injunction is in the Public Interest     17

**OPPORTUNITY FOR VOLUNTARY COMPLIANCE**     18

**CONCLUSION**     18

**PRAYER FOR RELIEF**     19

**CERTIFICATION PURSUANT TO S.D. FLA. L.R. 7.1(a)(3)**     20

**CERTIFICATE OF SERVICE**     22

## INTRODUCTION

This motion presents a paradox. Plaintiff does not ask the Court to introduce new regulations or impose new rules, but simply to require Defendants to follow their own rules - the very rules Defendants drafted to protect consumers, promote transparency, and preserve competition. By their own admissions, Defendants have already provided the foundation for relief: they acknowledge that each Defendant is a trade association of horizontal competitors acting collectively; they concede that the rules were designed to eliminate steering and prevent group boycott, market allocation, and restrictions on price competition; and they admit that non-compliance injures both consumers and competitors.

Under the Sherman Act, an agreement among competitors that restrains trade is unlawful. Defendants' own words supply every element: (1) an agreement - already admitted by Defendants themselves, (2) a restraint - Defendants admit these rules exist precisely to prevent unreasonable restraints, and (3) harm to competition and consumers - Defendants admit this occurs when the rules are not enforced. When horizontal competitors collectively refuse to comply with and enforce rules they themselves mandate to prevent this kind of antitrust harm, the result is a *per se* group boycott, a *per se* price-competition restriction, and a *per se* market allocation.

The merits therefore come almost entirely from Defendants' own statements, publications, and governing documents. Plaintiff's role is merely to place those admissions side by side so the Court can see the full picture. This is a case where

Defendants have already argued the merits of granting a preliminary injunction—Plaintiff simply organizes the record they created.

## PLAINTIFF EXHAUSTED PRIVATE REMEDIES BEFORE SEEKING JUDICIAL RELIEF - STRENGTHENING, NOT WEAKENING, THIS MOTION

Plaintiff's timing reflects good faith, not delay. From 2021 through 2024, Plaintiff reasonably expected the Burnett litigation to resolve steering, as steering was presented there as a core element of the complaint and promised reforms. When the final settlement omitted the specific rule prohibiting steering, and Defendants simultaneously decided not to enforce the derivative rules that should have eliminated steering, Plaintiff spent the following year pursuing private remedies - filing ethics complaints, submitting compliance requests, and engaging Defendants directly via email and conversations. These efforts were met only with deflections, misrepresentations, and even admissions of violation and non-enforcement. The cumulative effect of systemic noncompliance became unsustainable.

Furthermore, the confluence of three recent developments confirms the unmistakable and immediate urgency necessitating injunctive relief:

First, Defendants have materially escalated the dispute. Their recent public pronouncements, which double down on the pro-competitive nature of the rules while asserting non-existent prohibitions of steering (see Exhibit 1.5), demonstrate that voluntary compliance is a nullity. Good-faith resolution is now objectively impossible.

Second, the barrier to compliance is will, not feasibility. As confirmed by the General Counsel for the nation's largest MLS, technical compliance with the IDX

2

display rule is neither time consuming, complex nor costly (see Exhibit 3.1). This conclusively refutes any defense that the ongoing violations are excusable; revealing them instead as a deliberate choice.

Third, the public harm is now authoritatively quantified. A recent study by The Federal Reserve Bank of Richmond published on June 25th, 2025 (Exhibit 7) provides concrete, empirical evidence that removing the restraints at issue "could increase consumer welfare by nearly $40 billion a year." The harm is thus both vast and ongoing.

This Court should not mistake Plaintiff's years of restraint and multiple direct resolution attempts for a lack of urgency. To the contrary, this history demonstrates the exact good-faith exhaustion of alternatives that precedes a necessary request for judicial intervention. These three tipping points now compel it.

## STATEMENT ON THE UNDISPUTED RECORD

Plaintiff respectfully submits that the evidentiary record required to adjudicate this Motion is already complete. This is not a case built on speculation requiring discovery. Instead, it is a case made ripe for an immediate ruling by Defendants' own pre-litigation conduct.

For months prior to filing this action, Plaintiff engaged in a voluminous, good-faith effort to persuade Defendants to simply comply with and enforce their own binding, pro-competitive rules. The goal was to achieve compliance, not to litigate.

In response to these efforts, Defendants and their agents provided what amounts to a complete discovery record. Their emails, their public statements, their

official publications, their violation admissions and their refusals to act, have filled in every gap that formal discovery would typically be needed to address.

Furthermore, because this Motion is grounded almost entirely in materials authored and published by Defendants themselves - rules, statements, admissions, publications and official guidance - there is no need for protracted discovery to resolve the *limited issues raised by this request for preliminary relief.*

The facts herein contained, all supporting granting this preliminary injunction, are effectively undisputed because they originate from Defendants' own hand. Plaintiff does not possess, and cannot reasonably be expected to possess, any evidence that would contradict Defendants' own arguments and admissions. In practice it is as if discovery had already happened.

This case presents a rare opportunity to fulfill the mandate of Federal Rule of Civil Procedure 1: "the just, speedy, and inexpensive determination" of a matter properly before the Court. The record is complete. The Court may act now.

## LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

Under the binding law of this Circuit, a preliminary injunction is warranted where the movant establishes: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest. See *Siegel v. LePore, 234 F.3d 1163 (11th Cir. 2000) (en banc) (per curiam).*

4

## PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION

**I.     Plaintiff Has A Substantial Likelihood Of Success On The Merits.**

The National Association of Realtors enacts and issues Mandatory rules that it passes down onto its chartered associations and Realtor controlled MLSs. These are contained in the guiding document: MLS Policy Handbook (Exhibit 1.3).

The 3 mandatory rules mentioned in this motion are: the IDX listing form contact information display rule (enacted in November 2021) (The rule, its clarification, and purpose in Exhibit 1.1; and the rule in Exhibit 1.2), The Buyer Broker Written Agreement Rule (Enacted August 2024) (Exhibit 1.3) and the Non-Filtering Rule (Enacted in November 2021) (See Exhibit 1.2).

This is not a case of mere parallel conduct. Each Defendant association and MLS is itself a forum of horizontal competitors. Their decisions - within such a forum - to refuse to comply and enforce the very rules designed to foster competition constitutes a 'contract, combination... or conspiracy' under Section 1 of the Sherman Act.

NAR itself removes any doubt as to whether the conduct at issue is concerted action. In its January 2024 publication, The Answer Book: The Source for REALTOR® Association Management Leaders, NAR admits that: "By definition, a trade association consists of a group of competitors acting in a collective fashion. When a trade association acts, the key antitrust question is whether that action limits or restrains competition in some way, and if so, whether it does so unreasonably." (Exhibit 1.4).

Each Defendant here is such a trade association, composed of horizontal competitors, bound to adopt and enforce NAR's mandatory policies. *Thus, by NAR's own*

5

*admission, the actions of each Defendant association - and of NAR itself - are concerted actions by horizontal competitors, satisfying the "meeting of the minds" requirement under Section 1 of the Sherman Act.*

Defendants' conduct constitutes a per se restraint of trade under Section 1 of the Sherman Act. By their own design, the rules at issue were enacted to protect competition, promote transparency, fairness, and to benefit consumers. Each rule is accompanied by NAR's stated rationale underscoring its pro-competitive purpose. The collective decision by horizontal competitors to not comply with and not enforce those very rules - rules they themselves deemed necessary to protect competition -renders the restraint per se unlawful.

Moreover, Defendant NAR has gone further by publicly reiterating the competitive benefits of these rules while simultaneously refusing to enforce them. In a public statement issued on August 19, 2025 (Exhibit 1.5), NAR described the rules as fostering competition, fairness, and transparency. The collective decision by associations of direct competitors to disregard and withhold enforcement of such acknowledged pro-competitive obligations is not merely unreasonable; it is a per se violation of Section 1 of the Sherman Act. The evidence of this conspiracy is documented in Defendants' own publications, statements, and admissions.

A.    **The Conspiracy to Not Comply and Not Enforce is Pervasive**

As a threshold matter, several MLS Defendants (see matrix below) have failed to incorporate the mandatory NAR rules into their own governing documents, as required. This failure persists despite their obligation to certify compliance with NAR whenever

mandatory rules are amended or introduced through an established procedure (Exhibit 1.6).

The following matrix, supported by excerpts (as Exhibits) from each Defendant's governing documents, summarizes this pattern of systemic restraint:

**Compliance Matrix: Adoption (or not) of NAR-Mandated Pro-Competitive Rules by MLS-Responsable Defendants**

|  | Exhibit | IDX Listing Firm Display | Filtering Prohibition | Buyer-Broker Agreement |
|---|---|---|---|---|
| Smart MLS, Inc. | 2.1 | NO | NO | NO |
| Beaches Mls, Inc. | 2.2 | YES | YES | YES |
| Florida Gulf Coast Multiple Listing Service, Inc. | 2.3 | YES | YES | YES |
| Naples MLS (NABOR) | 2.4 | YES | YES | YES |
| Stellar MLS | 2.5 | NO | YES | YES |
| Space Coast Multiple Listing Service, Inc. | 2.6 | YES | YES | YES |
| Northeast Florida Multiple Listing Service, Inc. ( RealMLS) | 2.7 | YES | YES | YES |
| Midwest Regional Data LLC - (MRED) | 2.8 | NO | YES | YES |
| Miami Association of Realtors | 2.9 | YES | YES | YES |
| Central Panhandle Association Of Realtors, Inc. | 2.10 | YES | YES | YES |

This documented decisions by the referenced defendants to not adopt mandatory rules and by NAR to refuse to enforce them onto the Associations and MLSs, despite its

stated mandate, authority, and enforcement tools (the cancellation of liability insurance maintained and paid by NAR for each Association (Exhibit 1.3 at pg. 2 and 5) and the revocation of their NAR charter  Exhibits 1.3 at pg.4) are in themselves, direct evidence of collective actions amongst competitors of an unlawful agreement to unreasonably restrain of trade.

### B.      The Refusal to Enforce Specific Rules Constitutes an Illegal Group Boycott and Market Allocation Scheme under The Sheram Act.

Even where the rule exists (on paper) Defendants' collective decision not to enforce their own mandatory rules, despite acknowledging their pro-competitive intent - functions as a :

**1. Group Boycott** against innovative business models like Plaintiff's. This type of conduct has long been condemned as *per se unlawful*. See *Fashion Originators' Guild of America v. FTC, 312 U.S. 457, 467–68 (1941)* (coordinated industry boycott of resellers deemed a per se violation of the Sherman Act). No elaborate inquiry into harm is needed because such restraints are *"so plainly anticompetitive"* that they are presumed unreasonable. *Nat'l Soc. of Prof'l Engineers v. United States, 435 U.S. 679, 692 (1978).*

**2. Market Allocation:** Defendants' conduct also constitutes a horizontal market allocation. Although not geographic in nature, the restraint functions as a market allocation by enabling the routing of customers towards traditional brokerage models and preserving the status quo commission structures, while excluding innovative, lower-cost competitors like Plaintiff. Market allocation has long been held *per se illegal. See United States v. Topco Associates, Inc., 405 U.S. 596, 608 (1972).* The Supreme Court further

confirms that allocation schemes need not be geographic, and may instead divide markets by customers, services, or business models. *See Palmer v. BRG of Georgia, Inc., 498 U.S. 46, 49–50 (1990)*.

Alternatively, should the Court decline to apply the per *se rule,* Defendants' conduct is unlawful even under the more flexible "quick look" analysis as there is no procompetitive justification to violate and not enforce pro-competitive rules.. See *FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 459 (1986)* ("no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement"); *Nat'l Soc'y of Prof'l Engineers v. United States, 435 U.S. 679, 692 (1978)* (even professional rules that appear consumer-focused may be illegal if they suppress competition).

The harm at issue extends far beyond injury to a single competitor. Defendants' collective restraints undermine the integrity of the competitive process itself, distort market outcomes, harm consumers through reduced choice and higher costs, and inflict direct, compounding exponential injury on Plaintiff. The Sherman Act was designed precisely to prohibit this kind of structural market manipulation.

The rules include:

**The IDX Display Rule**: Designed for the benefit of the consumer and to ensure consumers can easily contact the listing broker (Exhibit 1.1 at Pg. 3 and 1.2 at pg. 3-4), this rule is violated market-wide. Just using 3 examples to not overwhelm the court, but the issues is not isolated and plainly publicly visible:

Exhibit 3.1 is from Realtor.com where a consumer must scroll through voluminous information and at least seven (7) *call to action* forms and buttons (that don't

go to the listing agent) before getting to the required listing firms name and contact information, which the rule requires in a reasonably prominent location…).

Exhibits 3.2 and 3.3 are examples of 2 brokerages that simply ignore the rule and avoid displaying the contact information for the listing firm altogether.

The blatant violation of this rule has been addressed repeatedly by Plaintiff all the way to NAR and while some Defendants admit the violations, none have acted to correct them. (see admissions' emails Exhibits 3.4 to 3.7). These admissions and the collective decision to refuse to comply and to enforce this transparency rule harms competition through group Boycott and Market Allocation towards traditional business models.

Vendors (co-conspirators, not name defendants), who provide the technological platforms for distribution of the MLS data feeds and who provide MLS-fed web-site services to MLS participants  ratify that the rule is ignored and they openly admit to violating it without consequences (see exhibits 3.9 and 3.10).

Furthermore, the most compelling evidence that Defendants' collective failure to enforce their own rules is a conscious and conspiratorial act comes not from Plaintiff, but from the top legal officer of the largest Multiple Listing Service (MLS) in the United States, the California Regional MLS (CRMLS) - (not a name Defendant).

In a public statement made on August 20, 2025, Edward Zorn, the Vice President and General Counsel of the California Regional MLS (CRMLS) - the largest multiple listing service in the United States - provided a critical admission that dismantles any potential defense for the Defendants' widespread non-enforcement.

10

First, Mr. Zorn confirms that enforcing the mandatory IDX rules is a simple and trivial matter for any MLS, stating: *'[I]t is not expensive or costly for any MLS to enforce their IDX rules. They just need to do it.* (emphasis added) (Exhibit 3.10)'

Even more critically, Mr. Zorn explicitly acknowledged that the current, industry-wide omission is 'non-compliant' and detailed the direct enforcement mechanism all MLSs possess. He states: '...but *a quick threat to terminate the IDX data feed for non-compliance brings them into compliance very quickly.*' (Emphasis Added) (See Exhibit 3.10).

As the top legal officer for the industry's leading MLS, Mr. Zorn's account is powerful evidence of three undisputed facts: (1) the current, market-wide practice is non-compliant and is a known issue; (2) all MLSs, including the Defendants, have a simple and effective tool to force immediate compliance; and (3) the Defendants' uniform refusal to use this tool is therefore a conscious and concerted choice to allow an anticompetitive restraint to persist. This admission directly refutes any claim that enforcement is burdensome, complex, time consuming or infeasible.

**The Buyer-Broker Agreement Rule**: Designed to stop steering by ensuring buyer-brokers work within the specificity of a structured contract executed with their buyers; this rule is openly flouted. Particularly ignored is the most relevant mandatory provision of the rule that requires:

> "Include a statement that MLS Participants may not receive compensation from any source that exceeds the amount or rate agreed to with the buyer;" (see Exhibit 1.7)

11

According to NAR, this precise specific mandate eliminates steering; yet it is the very element defendants collectively decide not to enforce.

> Since a broker working with a buyer *cannot receive more compensation than the buyer has agreed to in that agreement*, the amount of any offer of compensation is irrelevant to the buyer-broker's compensation. Under these practice changes, *NAR has eliminated any theoretical steering* because a broker will not make more compensation by steering a buyer to a particular listing because it has a "higher" offer of compensation. (emphasis added) (Added 5/29/24) . (Exhibit 1.8)

The evidence here is once more uncontroversial. The support is in Defendants own words, by enacting and mandating the rule is their admission that steering is an illegal restraint; Defendants then describe the rule's purpose: stop steering. They even assert that with this rule NAR has already "*eliminated steering*" (a powerful public standing).

Nevertheless, Defendants have neither monitored compliance with nor enforced the rule. In fact, they expressly admit that there is no mechanism in place to monitor or verify whether the compensation received by a buyer broker exceeds the amount agreed upon in the buyer-broker agreement. As a result, the rule is rendered effectively meaningless - reduced to a sham - because the very element that Defendants claim "eliminated steering" is unenforceable in practice. These facts are not speculative; they are admitted by Defendants themselves. (See Exhibits 4.1 to 4.4.)

Furthermore NAR recently went on the record to reinforce their support of Granting this Preliminary Injunction by describing both the illegality of steering, while publicly misrepresenting the factual omission of the existence of a direct rule prohibiting steering. On August 19th, 2025 (just 4 days after this complaint was filed):

12

An NAR spokesperson told RISMedia that "(t)he National Association of Realtors® *fosters a fair, transparent, and competitive real estate marketplace. Steering is a prohibited practice under NAR policy and the Realtor® Code of Ethics.* The Code of Ethics is enforced by state and local Realtor® associations, and MLS rules are enforced at the MLS level. We will respond to the plaintiff's claims in court." (Exhibit 1.5)

Statement that completely ignores the fact that "steering" is not directly prohibited in any of the mentioned documents. It is not mentioned in the Code of Ethics, in the Code's official interpretations, in the Code of Ethics and Arbitration Manual and completely absent from the MLS Policy Handbook; hence, leading the public to believe the illegal practice of steering has been eradicated.

A more perplexing situation, where the public (and probably even the court) is led to believe that steering has been eliminated can be found in Plaintiffs Motion for Preliminary Approval of the Settlement Agreement in Burnet v NAR (Case 4:19-cv-00332-SRB Document 1458, page 14); as well in the Plaintiff's Motion for Final Approval in the same case (document 1595, page 23).

When describing the practice changes agreed with Defendants (in that case), Plaintiff's Counsel emphasizes this particular rule as groundbreaking ("for the first time"). The Document describes it as: (Exhibit 5)

> "*NAR must also adopt, for the first time, rules expressly and directly prohibiting steering* by REALTORS® and REALTOR® MLS Participants, including that they "must not filter out or restrict MLS listings communicated to their customers or clients based on the existence or level of compensation offered . . . ." (Agreement ¶ 58(x))." (emphasis added).

Nevertheless the Corrected Settlement Agreement (which was approved), filed concurrently with the Motion for Preliminary Approval (doc 1458) , *differs specifically in*

13

*the steering prohibition* portion while leaving the remainder of the rule as described. The rule here appears as:

> 58 "x. require that REALTORS® and REALTOR® MLS Participants and subscribers must not filter out or restrict MLS listings communicated to their customers or clients based on the existence or level of compensation offered ...; (emphasis added). (Doc 1458-1 pg 37)

This pattern of collective decisions is a direct agreement amongst direct competitors to permit the very steering NAR's spokesperson falsely claimed to have eliminated.

**The Non-Filtering Rule**: Prohibits MLSs from enabling filtering property searches by listing brokerage name and listing agent name, because it directly enables and promotes market allocation and group boycott via direct steering.

Nevertheless, defendants' MLS platforms continue to enable participants to filter listings by brokerage name and listing agent name, in direct violation of the rule, thereby facilitating steering away from disfavored competitors. This is a direct restraint of trade by directly enabling steering, group boycott and market allocation. (Exhibits 6.1 to 6.8 are screenshots of search interphase from the MLS defendants showing the prohibited filters still enabled).

## II.    Plaintiff and the Public Will Suffer Irreparable Harm Absent an Injunction

An injunction is essential to halt ongoing, irreparable harm that poisons the competitive process, deceives consumers, and directly injures Plaintiff's business. This harm is proven by a clear timeline of defiance.

For years, Defendants have refused to enforce rules enacted as far back as 2021. For months preceding this lawsuit, Plaintiff engaged in extensive, good-faith efforts to seek compliance, only to be met with delay and deflection. Finally, in the days immediately following the filing of this Complaint, Defendant NAR responded not with a good-faith effort to comply, but with a defiant public statement doubling down on its position. This post-filing intransigence is the ultimate proof that the harm is ongoing and that Defendants have no intention of voluntarily complying.

Every instance in which Plaintiff loses a business opportunity enabled by the restraints, results in irreparable harm. In the real estate industry, a lost customer is not merely a temporary setback - it is a permanent loss. Real estate transactions are typically one-time engagements, and the opportunity to serve that client again is unlikely.

More importantly, the harm is exponential: losing a single client means also losing the exponential network effects and economic synergies that come from a successful transaction. These include potential referrals, word-of-mouth growth, and the reputational goodwill that brokers rely on to sustain and grow their businesses.

Binding precedent establishes that "[t]he loss of customers and goodwill is an 'irreparable' injury." See *Spiegel, 636 F.2d at 1001*. By deciding to refuse to enforce rules that prohibit steering and mandate transparency, Defendants' conspiracy directly harms Plaintiff's ability to compete on the merits of his low-cost model, causing the loss of customers, reputation and market opportunities that cannot be remedied by money damages alone.

This Court need not look solely to Plaintiff's harm, however, because binding precedent confirms that irreparable harm to the public and the competitive process is itself sufficient to warrant preliminary relief.

And the damage to the public, just to quote one out of many scholar and economic studies, empirically quantifies the consumer welfare and broad social surplus is constrained by more than $100 Million per day, as per the Federal Reserve Bank of Richomond study titled: "Real Estate Commissions and Homebuying" (Exhibit 7)

The Supreme Court has long recognized that "the interest of the public" is a primary factor in exercising equitable discretion. In the antitrust context specifically, the Court has emphasized that anticompetitive conduct inflicts a "grave harm on the public." *California v. American Stores Co., 495 U.S. 271, 284 (1990)*.

Binding Eleventh Circuit precedent is to the same effect: irreparable harm to the public itself - through suppression of competition - can independently justify injunctive relief. *Fla. Businessmen for Free Enter. v. City of Hollywood, 648 F.2d 956, 958 (5th Cir. 1981), adopted by the Eleventh Circuit in Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981)*.

Accordingly, even if Defendants attempt to minimize Plaintiff's individual injuries, the ongoing systemic harm to consumers and to the competitive process alone compels the issuance of a preliminary injunction.

## III.    The Balance of Hardships Decidedly Favors an Injunction

The balance of equities tips decidedly in Plaintiff's favor. The only "harm" an injunction would cause Defendants is forcing them to do what they are already legally

and ethically obligated to do: enforce their own rules, which they publicly praise as being pro-competitive; this is no cognizable harm. On the contrary, the harm to the public and to Plaintiff from continued non-enforcement is immense and ongoing.

## IV.    The Injunction is in the Public Interest

The requested injunction is decisively in the public interest. The Supreme Court has long held that the purpose of the antitrust laws is 'the protection of competition, not competitors' precisely because vigorous market competition is the foundation of a dynamic economy, serving the public through lower prices, better quality, and greater innovation. Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 338 (1990) (emphasis in original); see also F.T.C. v. Procter & Gamble Co., 386 U.S. 568, 577 (1967).

This injunction serves that exact purpose. It does not seek to protect Plaintiff as a single competitor, but to protect the competitive process itself from a concerted, industry-wide refusal to adhere to pro-competitive rules. The harm alleged is a systemic distortion of the market that inflates consumer costs, suppresses innovative business models, and reduces choice for all participants. Granting this injunction would halt this systemic harm and restore the level playing field that Defendants' own rules were designed to create. Thus, the public's interest in a fair and open market is profoundly served by compelling Defendants to simply comply with the very rules they publicly champion as essential for consumer protection and market fairness.

## OPPORTUNITY FOR VOLUNTARY COMPLIANCE

Plaintiff sincerely urges Defendants to consider voluntary compliance with the relief sought in this Motion. The facts are clear and grounded in Defendants' own mandates. Rather than burden this Court with the need to compel adherence to rules Defendants themselves created and championed, they could immediately cease their anticompetitive conduct and instead uphold their professed commitment to a fair and transparent marketplace.

Such voluntary compliance would render further judicial action under this Motion unnecessary - an outcome that would conserve the Court's resources, protect the public interest, and fulfill the very principles Defendants have long claimed to support. Plaintiff has made repeated efforts to secure compliance without litigation, and this Motion offers one additional opportunity for Defendants to align their conduct with their own rules before judicial intervention becomes unavoidable.

## CONCLUSION

The requested injunction is the narrowest possible remedy, crafted from Defendants' own mandatory rules and public justifications for them. It does not ask the Court to impose new obligations, but only to order Defendants to honor their existing, self-imposed commitments. For Defendants to oppose this relief, they would be forced to repudiate their own rulemaking rationales, public statements, and years of advocacy - a position that would be not only illogical but would demonstrate the very bad faith and anticompetitive intent alleged in the Complaint.

18

The balance of equities could not be more lopsided. The burden on Defendants is *de minimis*, requiring only that they execute the simple, ministerial acts of enforcement they have long acknowledged are both feasible and necessary. In stark contrast, the harm to competition from further delay is severe, quantifiable, and irreparable - harm that Defendants' own rules were specifically designed to prevent.

By granting the targeted injunction compelling compliance with the pro-competitive rules as written—the very competitive environment Defendants' rules were meant to foster—this Court would be acting on a record of exceptional strength. That record, drawn almost entirely from Defendants' own admissions and documents, provides an unassailable foundation for relief that is unlikely to be disturbed on appeal.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jorge A. Zea respectfully requests that this Court enter a Preliminary Injunction ordering Defendants, their officers, agents, employees, and all persons acting in concert with them, to:

1.  Immediately cease their concerted refusal to enforce the mandatory, pro-competitive rules and policies set forth in the National Association of REALTORS® MLS Policy Handbook and their own respective governing documents;

2.  Specifically enforce the IDX Display Rule requiring all MLS participants and subscribers to display the listing broker's email or phone number in a reasonably prominent manner at least as prominently as any other contact information or lead form on the site.

19

3.  Specifically enforce the Buyer-Broker Agreement Rule, including all mandatory provisions enacted to eliminate steering, and require all participants and subscribers to use compliant agreements in their dealings with prospective buyers;

4.  Specifically enforce the Non-Filtering Rule, thereby prohibiting their MLS platforms from enabling or using filters that restrict or sort property searches based on the listing brokerage or listing agent's name; and

5.  Grant such other and further relief as the Court deems just and proper.

Plaintiff further requests that, because the evidentiary record confirms that the rules exist, they are mandatory and compliance is technologically simple, cost-free, and has been inexcusably delayed for years, the Court order that full compliance with this injunction be completed no later than five (5) business days from the date of the Court's Order.

## CERTIFICATION PURSUANT TO S.D. FLA. L.R. 7.1(a)(3)

Pursuant to S.D. Fla. L.R. 7.1(a)(3), I hereby certify that I have made a good-faith effort to confer with all opposing parties in an attempt to resolve the issues raised in this Motion. These efforts consisted of email communications, phone conversations, filing ethics complaints and official requests for clarification of rules and verification of compliance.

These good faith efforts which took place over several months prior to filing the Complaint (starting in September 2024), were entirely futile. Defendants consistently refused to meaningfully address the systemic non-compliance with their own rules. These pre-litigation efforts were summarily rejected, and Defendants' post-filing

20

public statements have confirmed their defiant position, demonstrating that any further attempt to confer would be a useless formality.

Dated: August 27th, 2025.

Respectfully submitted,

Jorge A. Zea
Pro Se Plaintiff
2234 N Federal Hwy
PMB68073
Boca Raton, FL 33431
Phone: (305) 244-7242
Email: antitrust@jorgezea.com

21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 27th, 2025, a true and correct copy of the foregoing Motion for Preliminary Injunction was served via Certified Mail, Return Receipt Requested, upon the registered agent for each Defendant who has previously been served with the Complaint in this action.

I FURTHER CERTIFY that a true and correct copy of the foregoing Motion for Preliminary Injunction will be served by a licensed process server upon SmartMLS, Inc. and the Connecticut Association of REALTORS®, Inc.

Respectfully submitted,

Jorge A. Zea
Pro Se Plaintiff
2234 N Federal Hwy
PMB68073
Boca Raton, FL 33431
Phone: (305) 244-7242

Email: antitrust@jorgezea.com