Exhibit  1

# Exhibit 1.1

**NATIONAL ASSOCIATION OF REALTORS®**
MLS TECHNOLOGY AND EMERGING ISSUES ADVISORY BOARD
September 9-10, 2021
430 N Michigan Ave., Sky Level, Elevation Board Room

# MINUTES

| | |
|---|---|
| **CHAIR** | Greg Zadel (Firestone, CO) |
| **COMMITTEE LIAISON** | Rick Harris (Medford, OR) |
| **STAFF EXECUTIVE** | Rodney Gansho (Chicago, IL) |

### I.   CALL TO ORDER / OPENING REMARKS:

The meeting of the MLS Technology and Emerging Issues Advisory Board was called to order at 8:30 A.M. CT by Advisory Board Chair Greg Zadel.

### II.   APPROVAL OF THE MINUTES:

The minutes for the March 25-26 meeting were approved as written.

### III.   ANTI-TRUST AND CONFIDENTIALITY STATEMENT:

Information about NAR's anti-trust and confidentiality policy was shared by Charlie Lee, Senior Counsel and Director of Legal Affairs.

### IV.   RESO UPDATE:

Sam DeBord, CEO, RESO, reported on the latest details for certifications with Web API 1.0.2 and Data Dictionary 1.7. He also shared information about the RESO's education course, *Working with Real Estate Data: Business Concepts*, and the upcoming RESO Retreat October 18-21 in Kiawah Island, SC.

### V.   PROHIBITING THE ADVERTISING OF SERVICES AS "FREE":

It was moved, seconded, and carried.

**Motion:** That the following be adopted as MLS Policy Statement 8.4:

*Policy Statement 8.4: MLS Participants and Subscribers must not represent that their services as an agent or representative to a buyer or seller in a real estate transaction are free or available at no cost to their clients.*



**NATIONAL
ASSOCIATION OF
REALTORS®**

3

**Rationale:** While REALTORS® have always been required to advertise their services accurately and truthfully, and many REALTOR® services have no cost to the recipient, this change creates a bright line rule on the use of the word "free" that is easy to follow and enforce. These benefits outweigh the fact that this bright line may result in REALTORS® being unable to use the word "free" for some services they provide at no cost to the recipient.

## VI.     NON-FILTERING LISTINGS BASED ON OFFERS OF COMPENSATION OR BROKERAGE

It was moved, seconded, and carried.

**Motion:** That a new MLS Policy Statement 8.5 be adopted and the IDX and VOW policies and model rules be amended, as provided below. (Strikeouts indicate deletions, underscoring indicates additions):

*Policy Statement 8.5: MLS Participants and Subscribers must not, and MLSs must not enable the ability to, filter or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to the cooperating broker or the name of a brokerage or agent.*

### *Amendments to Policy Statement 7.58 (in pertinent part):*

*Policies Applicable to Participants' IDX Websites and Displays…*

*4. Participants may select the IDX listings they choose to display based only on objective criteria including, but not limited to, factors such as geography or location ("uptown", "downtown", etc.), list price, type of property (e.g., condominiums, cooperatives, single family detached, multi-family), cooperative compensation offered by listing brokers, or type of listing (e.g., exclusive right-to-sell or exclusive agency), or the level of service provided by the listing firm. Selection of IDX listings to be displayed must be independently made by each participant.*

### *Amendments to Policy Statement 7.91 (VOW) (in pertinent part):*

*Section II. Policies Applicable to Participants' VOWs…*

*5.h. A VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, or type of property, cooperative compensation offered by listing broker or whether the listing broker is a REALTOR®.*

### *Amendments to NAR's Model MLS Rules and Regulations (both types) (in pertinent part):*

*Section 18. IDX Defined*



**NATIONAL ASSOCIATION OF REALTORS®**

4

- *MLSs in their reasonable discretion may expand the definition of Brokerage Back Office Feed Use in conformance with other NAR MLS policies, such as Policy Statement 7.85, which provides that "Use of listings and listing information by MLSs for purposes other than the defined purposes of MLS requires Participants' consent."*

**Rationale:** Today's brokerage community utilizes many productivity tools, and proprietary reports and resources that call for enhanced access to and use of MLS data. This new Policy Statement will empower Participants with the information they need to better serve their clients and customers.

---

### IX.   LISTING BROKER ATTRIBUTION

It was moved, seconded, and carried.

**Motion:** That the IDX and VOW policies be amended as follows:

*(Underlining indicates additions; strikeouts indicate deletions.)*

*Internet Data Exchange (IDX) Policy, Policy Statement 7.58*

*Policies Applicable to Participants' IDX Websites and Displays*

*12. An MLS Participant's IDX display must identify the listing firm and contact information in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data. The contact information for the listing firm must be clearly identified and displayed at least as prominently as any other contact information or lead form on the site.*

---

*IV. Requirements that MLSs May Impose on the Operation of VOWs and Participants, Policy Statement 7.91.*

*d. Any listing displayed on a VOW shall identify the name of the listing firm and contact information in a readily visible color, and reasonably prominent location, and in typeface not smaller than the median typeface used in the display of listing data. The contact information for the listing firm must be clearly identified and displayed at least as prominently as any other contact information or lead form on the site.*

(Accompanying changes will be made to the NAR Model MLS Rules and Regulations.)

---

**Rationale:** Listing broker attribution with contact information could provide a more accurate representation to the public about the listing, and improve the public's ability to seek additional property details.

---

*430 North Michigan Avenue • Chicago, IL 60611-4087 • 800.874.6500 • www.NAR.realtor*



# Exhibit 1.2

6

## Summary of 2022 MLS Policy Changes

This Summary highlights changes in NAR MLS policy adopted in 2021, including changes to the Model MLS Rules and Regulations, and changes to the MLS Policy Statements, both found in the 2022 *Handbook on Multiple Listing Policy*. Shaded portions in the Handbook highlight all areas that have changed. All changes become effective January 1, 2022, unless indicated otherwise.

For comprehensive background information and additional detail, the Multiple Listing Issues and Policy Committee agenda and minutes can be found at http://nar.realtor/natmeet.nsf.

Throughout the Summary, underscoring indicates additions and strikeouts indicates deletions. At the end of each policy change, the compliance classification category is noted by the letters:

**M**   Mandatory*
**R**   Recommended
**O**   Optional
**I**    Informational

*Adoption is necessary to ensure compliance with mandatory policies and ensure coverage under the NAR's insurance policy for associations and MLSs. Unless indicated otherwise, local adoption is required by March 1, 2022.*

### Changes to Model MLS Rules and Regulations

- **(New) Section 1.16, Property Addresses**
  At the time of filing a listing, participants and subscribers must include a property address available to other participants and subscribers, and if an address doesn't exist a parcel identification number can be used. Where an address or parcel identification number are unavailable, the information filed with the MLS must include a legal description of the property sufficient to describe its location. **M**

- **(New) Section 4.5, Services Advertised as "Free"**
  MLS participants and subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the participant or subscriber will receive no financial compensation from any source for those services. **M**

- **(New) Section 5.4, Display of Listing Broker's Offer of Compensation**
  Participants and subscribers who share the listing broker's offer of compensation for an active listing must display the following disclaimer or something similar.

  *The listing broker's offer of compensation is made only to participants of the MLS where the listing is filed.* **M**

- **Section 18.2.4**
  Participants may select the listings they choose to display through IDX based only on objective criteria including, but not limited to, factors such as geography or location ("uptown," "downtown," etc.), list price, or type of property (e.g., condominiums, cooperatives, single-family detached, multi-family), cooperative compensation offered by listing brokers, or type of listing (e.g., exclusive right-to-sell or exclusive agency), or the level of service being provided by the listing firm. Selection of listings displayed through IDX must be independently made by each participant. **M**

- **Section 18.2.12**

  (While the typical implementation deadline is March 1, 2022 for local adoption of MLS policy changes, the deadline for implementation for the following has been extended to September 1, 2022.)

  All listing displayed pursuant to IDX shall identify the listing firm, and the email or phone number provided by the listing participant in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data. **M**

**Section 18.3.1**
Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS participants and users (e.g., ~~cooperative compensation offers cooperative compensation offers,~~ showing instructions, and property security information, ~~etc.~~) may not be displayed. **O**

- **Section 18.3.12**
  Display of expired, and withdrawn, ~~and sold~~ listings ~~**\*\***~~ is prohibited. (Amended 11/15) **O**

  ~~\*\*Note: If "sold" information is publicly accessible, display of "sold" listings may not be prohibited. (Adopted 11/14)~~

- **Section 19.12**. A participant's VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, or type of property. ~~cooperative compensation offered by listing broker and whether the listing broker is a REALTOR®.~~ **M**

- **Section 19.15**
  A participant's VOW may not make available for search by or display to Registrants any of the following information: ...

  f. Sales price if sold information is not publicly accessible in the jurisdiction of the MLS ~~Sold information~~ **O**

  Note: If sold information is publicly accessible in the jurisdiction of the MLS, Subsection 19.15 f must be omitted. (Revised 11/15) **M**

- **Section 19.18**

  (While the typical implementation deadline is March 1, 2022 for local adoption of MLS policy changes, the deadline for implementation for the following has been extended to September 1, 2022.)

  A participant shall cause any listing that is displayed on his or her VOW to identify the name of the listing firm, ~~and~~ the listing broker or agent, and the email or phone number provided by the listing participant in a readily visible color, in a reasonably prominent location, and in typeface not smaller than the median typeface used in the display of the listing data. **O**

**Changes to Multiple Listing Policy Statements**

- **MLS Policy Statement 7.3, Statistical Reports**

   MLSs may, as a matter of local determination, make statistical reports, sold information, and other informational reports derived from the MLS available to REALTORS® who do not participate in the MLS but who are engaged in real estate brokerage, management, appraising, land development, or building. Additional expenses incurred in providing such information to REALTORS® who do not participate in the MLS may be included in the price charged for such information. Any information provided may not be transmitted, retransmitted, or provided in any manner to any individual, office, or firm, except as otherwise authorized in the MLS rules and regulations.

   MLSs may, as a matter of local determination, provide statistical reports, sold information, and other informational reports derived from the MLS to government agencies. MLSs may, as a matter of local discretion, require that such agencies (or representatives of such agencies) hold an appropriate form of membership in the MLS or in the association of REALTORS® as a condition of such access.

   It is strongly recommended that any irrelevant information such as the names of current or former owners, or information concerning the sales commission or the compensation offered or paid to cooperating brokers be deleted. *(Revised 11/04)* M

- **MLS Policy Statement 7.85, Internet Data Exchange (IDX) Policy**

   … To comply with this requirement MLSs must, if requested by a participant, promptly provide basic downloading of all active listings, sold* listing data starting from January 1, 2012, non-confidential pending sale listing data, and other listings authorized under applicable MLS rules. MLSs may not exclude any listings from the information which can be downloaded or displayed under IDX except those listings for which a seller has affirmatively directed that their listing or their property address not appear on the Internet or other electronic forms of display or distribution.

   *Note: If "sold" information is not publicly accessible, sold listings can be removed from the MLSs' IDX feeds/downloads display of sales price may be prohibited. "Publicly accessible" sold information as used in IDX policy and rules, means data that is available electronically or in hard copy to the public from city, county, state and other government records. MLSs must provide for its participants' IDX displays publicly accessible sold information maintained by the MLS starting January 1, 2012. (Amended 5/17) **M** …

   **Polices Applicable to Participants' IDX Websites and Displays…**

   *4. Participants may select the IDX listings they choose to display based only on objective criteria including, but not limited to, factors such as geography or location ("uptown", "downtown", etc.), list price, or type of property (e.g., condominiums, cooperatives, single family detached, multi-family), cooperative compensation offered by listing brokers, or type of listing (e.g., exclusive right-to-sell or exclusive agency), or the level of service provided by the listing firm. Selection of IDX listings to be displayed must be independently made by each participant.* **M**…

   (While the typical implementation deadline is March 1, 2022 for local adoption of MLS policy changes, the deadline for implementation for the following has been extended to September 1, 2022.)

   *12. An MLS participant's IDX display must identify the listing firm, and the email or phone number provided by the listing participant in a reasonably prominent location and in a readily*

9

*visible color and typeface not smaller than the median used in the display of listing data.*
**M**...

Note: While the typical implementation deadline is March 1, 2022 for local adoption of MLS Policy Changes, the deadline for implementation of this policy has been extended to September 1, 2022.

**Policies Applicable to Multiple Listing Services**

<u>MLSs must designate compensation fields as non-confidential and make them available for display via participants' and subscribers' IDX and VOW displays.</u>

The following guidelines are recommended but not required to conform to National Association policy. *MLSs may:*

*1. prohibit display of expired, or withdrawn , or sold listings\* (Amended 11/15)*

*\*Note: If "sold" information is not publicly accessible, display of "sold" listings may not be prohibited. <u>sales price of completed transactions may be prohibited</u>. O*

2.   prohibit display of confidential information fields intended for cooperating brokers rather than consumers including compensation offered to other MLS participants, showing instructions, <u>and</u> property security information, etc...

- **MLS Policy Statement 7.91, Virtual Office Websites (VOW) Policy**

   *II. Policies Applicable to Participants' VOWs...*

   *5. A participant's VOW must comply with the following additional requirements...*

   *h. A VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, or type of property, cooperative compensation offered by listing broker or whether the listing broker is a REALTOR®. O ...*

   *III. Policies Applicable to Multiple Listing Services ...*

   *2. An MLS shall, if requested by a participant, provide basic downloading of all MLS non-confidential listing data, including, without limitation, address fields, listing types, photographs, and links to virtual tours. Confidential data includes only that which participants are prohibited from providing to customers orally and by all other delivery mechanisms. They include fields containing the information described in Section IV.1. of this policy, provided that sold data (i.e., listing information relating to properties that have sold) shall be deemed confidential and withheld from a download only if the actual sales prices of completed transactions are not accessible from public records, <u>sales prices may be deemed confidential and withheld from display</u>. ...*

   *IV. Requirements that MLSs May Impose on the Operation of VOWs and Participants*

   *1. An MLS may impose any, all, or none of the following requirements on VOWs, but may impose them only to the extent that equivalent requirements are imposed on participants' use of MLS listing data in providing brokerage services via all other delivery mechanisms.*

*10*

a. *A participant's VOW may not make available for search by or display to Registrants the following data, intended exclusively for other MLS participants and their affiliated licensees:*

    i. *expired, withdrawn, or pending listings*
    ii. <u>*sales price on sold data if the actual sales price of completed transactions is not accessible from public records.*</u> ~~*sold data, unless the actual sales price of completed transactions is accessible from public records.*~~
    iii. ~~the compensation offered to other MLS participants~~ …

(While the typical implementation deadline is March 1, 2022 for local adoption of MLS policy changes, the deadline for implementation for the following has been extended to September 1, 2022.)

d. *Any listing displayed on a VOW shall identify the name of the listing firm<u>, and the email or phone number provided by the listing participant</u> in a reasonably prominent location and in typeface not smaller than the median typeface used in the display of listing data. O*

---

- **(New) MLS Policy Statement 8.4, Services Advertised as "Free"**
  MLS participants and subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the participant or subscriber will receive no financial compensation from any source for those services. **M**

- **(New) MLS Policy Statement 8.5, Non-filtering of Listings**
  MLS participants and subscribers must not, and MLSs must not enable the ability to, filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to the cooperating broker or the name of a brokerage or agent. **M**

---

- **(New) MLS Policy Statement 8.6, One Data Source**

  (While the typical implementation deadline is March 1, 2022 for local adoption of MLS policy changes, the deadline for implementation for the following has been extended to September 1, 2022.)

  MLSs must offer a participant a single data feed in accordance with a participant's licensed authorized uses.

  At the request of a participant, MLS must provide the single data feed for that participant's licensed uses to that participant's designee. The designee may use the single data feed only to facilitate that participant's licensed uses on behalf of that participant. **M**

  Note: While the typical implementation deadline is March 1, 2022 for local adoption of MLS Policy Changes, the deadline for implementation of this policy has been extended to September 1, 2022.

- **(New) MLS Policy Statement 8.7, Brokerage Back Office Feed**
  That participants are entitled to use, and MLSs must provide to participants, the BBO Data, for BBO Use subject to the Terms below:

  "BBO Data" means all real property listing and roster information in the MLS database, including all listings of all participants, but excludes (i) MLS only fields (those fields only

11

visible to MLS staff and the listing participant), and (ii) fields and content to which MLS does not have a sufficient license for use in the Brokerage Back Office Feed.

"BBO Use" means use of BBO Data by participant and subscribers affiliated with the participant for the following purposes:

- Brokerage management systems that only expose BBO Data to participant and subscribers affiliated with participant.
- Customer relationship management (CRM) and transaction management tools that only expose the BBO Data to participant, subscribers affiliated with participant, and their bona fide clients as established under state law.
- Agent and brokerage productivity and ranking tools and reports that only exposes BBO Data to participant and subscribers affiliated with participant.
- Marketplace statistical analysis and reports in conformance with NAR MLS Policy Statement 7.80, which allows for certain public distribution.

BBO Use may only be made by participant and subscriber affiliated with participant, except that at the request of a participant, MLS must provide BBO Data to that participant's designee. The designee may use the BBO Data only to facilitate the BBO Use on behalf of that participant and its affiliated subscribers.

There is no option for participants to opt-out their listings from the Brokerage Back Office Feed Use as defined.

"Terms" mean the following:

- MLSs may impose reasonable licensing provisions and fees related to participant's license to use Brokerage Back Office Feed Data. MLSs may require the participant's designee to sign the same or a separate and different license agreement from what is signed by the participant. Such provisions in a license agreement may include those typical to the MLS's data licensing practices, such as security requirements, rights to equitable relief, and dispute resolution terms. (The foregoing examples are not a limitation on the types of provisions an MLS may have in a license agreement.)
- Use of roster information may be limited by the MLS participation agreement and license agreements.
- Brokerage Back Office Feed Use is subject to other NAR MLS policies and local rules.
- MLSs in their reasonable discretion may expand the definition of Brokerage Back Office Feed Use in conformance with other NAR MLS policies, such as Policy Statement 7.85, which provides that "Use of listings and listing information by MLSs for purposes other than the defined purposes of MLS requires participants' consent." M

- **(New) MLS Policy Statement 8.8, Display of Listing Broker's Offer of Compensation**
  MLSs must include the listing broker's offer of compensation for each active listing displayed on its consumer-facing website(s) and in MLS data feeds provided to participants and subscribers and must permit MLS participants or subscribers to share such information though IDX and VOW displays or through any other form or format provided to clients and consumers. The information about the offer of compensation must be accompanied by a disclaimer stating that the offer is made only to participants of the MLS where the listing is filed. M

- **(New) MLS Policy Statement 8.9, Property Addresses**

12

Residential listings filed with the MLS must include a property address where one exists at the time the listing is filed. If a property address is unavailable, then the parcel identification number must be submitted at the time the listing is filed. If no address or parcel identification number is available at the time the listing is filed, the listing must, at a minimum, contain a legal description of the property sufficient to describe the location of the property. This information shall be available to participants and subscribers at the time of filing. M

13

# Exhibit  1.3

14



# NAR

# 2025 HANDBOOK

# MULTIPLE LISTING POLICY

15

# Handbook on Multiple Listing Policy

NATIONAL ASSOCIATION OF REALTORS®
430 North Michigan Avenue
Chicago, Illinois 60611-4087

Thirty Sixth Edition: March 2025

The compliance classification category of each item is denoted by the following symbol:

M   Mandatory*

R   Recommended

O   Optional

I    Informational

For ease of reference, all amended provisions are shaded to highlight additions.

Prepared for the Multiple Listing Issues and Policies Committee by Board Policy and Programs

---

*Adoption is necessary to ensure compliance with mandatory policies established by the NATIONAL ASSOCIATION OF REALTORS® Board of Directors and coverage under the National Association's master professional liability insurance policy. Local adoption is required by August 17, 2024.

16

# Part Two: Policies

## A. MLS Antitrust Compliance Policy

The purpose of multiple listing is the orderly correlation and dissemination of listing information to Participants so they may better serve the buying and selling public. Boards and associations of REALTORS® and their multiple listing services shall not enact or enforce any rule which restricts, limits, or interferes with Participants in their relations with each other, in their broker/client relationships, or in the conduct of their business in the following areas.

Boards and associations of REALTORS® and their MLSs shall not:

1. Fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services (Interpretation 14).

2. Fix, control, recommend, or suggest the cooperative compensation offered by listing brokers to potential cooperating brokers.

3. Base dues, fees, or charges on commissions, listed prices, or sales prices. Initial participation fees and charges should directly relate to the costs incurred in bringing services to new Participants.

4. Modify, or attempt to modify, the terms of any listing agreement; this does not prohibit administrative corrections of property information necessary to ensure accuracy or consistency in MLS compilations.

5. Refuse to include any listing in an MLS compilation solely on the basis of the listed price.

6. Prohibit or discourage Participants from taking exclusive agency listings or refusing to include any listing in an MLS compilation solely on the basis that the property is listed on an exclusive agency basis.

7. Prohibit or discourage Participants from taking "office exclusive" listings; certification may be required from the seller or listing broker that the listing is being withheld from the MLS at the direction of the seller.

8. Give Participants or Subscribers blanket authority to deal with or negotiate with buyers or sellers exclusively represented by other Participants (Interpretation 10).

9. Establish, or permit establishment of, any representational or contractual relationship between an MLS and sellers, buyers, landlords, or tenants.

10. Prohibit or discourage cooperation between Participants and brokers that do not participate in the MLS.

11. Prohibit or discourage Participants or Subscribers from participating in political activities (Interpretation 15).

12. Interfere in or restrict Participants in their relationships with their affiliated licensees (Interpretations 16 and 17).

17

As used in this policy, "rule" includes all rules, regulations, bylaws, policies, procedures, practices, guidelines, or other governance provisions, whether mandatory or not. "Multiple listing service" and "MLS" means multiple listing service committees of boards and associations of REALTORS® and separately-incorporated multiple listing services owned by one or more boards or associations of REALTORS®.

These policy prohibitions are subject to and limited by applicable statutes, ordinances, and governmental regulations, to agreements entered into by an MLS or board or association of REALTORS® and an agency of government, and to final decrees of courts or administrative agencies.

> This policy does not prohibit boards or associations of REALTORS® or their MLSs from adopting rules or policies establishing the legitimate uses of MLS information, from prohibiting unauthorized uses of MLS information, or from establishing rules or policies necessary to prevent illegal collective action, including price-fixing and boycotts.
>
> It is the duty and responsibility of all boards and associations of REALTORS® and MLSs owned by or controlled by boards or associations of REALTORS® to ensure that all bylaws, rules, regulations, and other governance provisions comply with all mandatory multiple listing policies of the NATIONAL ASSOCIATION OF REALTORS®. Boards and associations of REALTORS® failing to conform with these policies will be required to show cause why their charters should not be revoked.

The numbered references refer to the official interpretations of Article I, Section 2 of the bylaws of the NATIONAL ASSOCIATION OF REALTORS®. *(Amended 11/04)* M

## B. Structure

### Section 1  Types of Multiple Listing Services
Basically, there are two types of multiple listing activities used by associations of REALTORS®. The essential characteristics of each may be summarized as follows:

1.  A multiple listing activity available for voluntary participation, but requiring members (principals) who participate to submit all listings of designated types of property, is termed "a mandatory listing service."

    The mandatory service permits each REALTOR® to decide whether or not multiple listing is consistent with the REALTOR®'s method of doing business. If a decision is made to participate in the activity, however, then all listings covered by the rules are required to be submitted.

2.  A multiple listing activity available to all members (principals), but the submission of any listing is an option of the member; this is termed "a voluntary listing service."

18

**Note:** Any multiple listing activity in which it is compulsory that all members of an association of REALTORS® participate and submit information on all designated types of listings would be in direct conflict with the National Association's bylaws, Article I, Section 2, which bans the adoption by associations of REALTORS® of inequitable limitations on membership. On November 15, 1960, the Board of Directors of the National Association officially adopted the following interpretation: "A requirement to participate in a multiple listing service in order to gain or maintain REALTOR® membership is an inequitable limitation on membership." I

---

**Section 2  Association and MLS Compliance with National Association Policy (Policy Statement 7.17)**

Those associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not consistent with mandatory policies of the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation. I

---

**Section 3  Multiple Listing Service Reciprocal Agreements Between Associations, Contract Service for Multiple Listing Service, or Other Association Agreements Concerning the Association Multiple Listing Service  (Policy Statement 7.19)**

If an agreement is in effect or being considered between associations of REALTORS® or between MLSs for establishment of an MLS cooperative venture of any type, the agreement should be in writing including, but not limited to, the following items:

1. purpose of the agreement

2. geographic territory to be served

3. rights and responsibilities of each association and its members

4. form of governing body

5. method of appointment or election of such governing body

6. responsibilities and accountability of the governing body to the respective associations party to the agreement

7. roles and responsibilities of each association for enforcement of the Code of Ethics and for dispute resolution between MLS Participants

8. intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association

9. terms and procedures for resolving controversies between associations or between the association and the MLS. The agreement should also specify the terms under which the agreement may be terminated

10. rights and responsibilities of recipients of data related to relicensing of data *(Amended 11/04)* M

19

**Section 3  Required Consumer Disclosure (Policy Statement 8.12)**

**Disclosure of Compensation: MLS Participants and Subscribers must:**

1. Disclose to prospective sellers and buyers that broker compensation is not set by law and is fully negotiable. This must be included in conspicuous language as part of any listing agreement, buyer written agreement, and pre-closing disclosure documents (if any).

2. Conspicuously disclose in writing to sellers, and obtain the seller's authority, for any payments or offer of payment that the listing Participant or seller will make to another broker, agent, or other representative (e.g. real estate attorney) acting for buyers. This disclosure must include the amount or rate of any such payment and be made in writing in advance of any payment or agreement to pay. *(Adopted 8/24)* **M**

---

**Section 4  Written Buyer Agreements Required (Policy Statement 8.13)**

Unless inconsistent with state or federal law or regulation, all MLS Participants working with a buyer must enter into a written agreement with the buyer prior to touring a home. The written agreement must include:

a. a specific and conspicuous disclosure of the amount or rate of compensation the Participant will receive or how this amount will be determined, to the extent that the Participant will receive compensation from any source.
b. the amount of compensation in a manner that is objectively ascertainable and not open-ended.
c. a term that prohibits the Participant from receiving compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer; and
d. a conspicuous statement that broker fees and commissions are not set by law and are fully negotiable. *(Adopted 8/24)* **M**

---

20

**Other Advertising Issues**

**Section 6  Services Advertised as "Free" (Policy Statement 8.4)**
MLS Participants and Subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to clients, unless the Participant or Subscriber will receive no financial compensation from any source for those services. **M**

**Section 1  Statewide Data Sharing Defined  (Policy Statement 8.10)**
A statewide data share should deliver MLS data through a common technology interface (e.g., API) of all data fields to all Participants of MLSs in the statewide data share. However, the data should not include MLS-only data fields that are viewable only to the listing Participant and the respective local MLS.

**Note:**  Considerations should be given to:

• Inclusion of local data fields (non-RESO Standard fields).

• Individual MLS's "attached document" retention policies and state laws regarding the sharing and retention of documents related to a previous transaction (privacy laws). **R**


# E. Participants' Rights

### Section 1  Participation Should Be Optional
No REALTOR® shall be required to participate. A requirement to participate in a multiple listing service in order to gain and maintain REALTORS® membership is an inequitable limitation on its membership (from Official Interpretation No. 1 of Bylaws, Article I, Section 2, adopted by the Board of Directors of the National Association, November 15, 1960). However, if a REALTOR® chooses to participate in the activity, the REALTOR® should be required to exchange information on the same basis, according to the same rules and costs imposed on all who participate. **M**

### Section 2  Association Membership as Prerequisite to MLS Participation  (Policy Statement 7.7)
To the extent permitted by law, the National Association remains firmly and unequivocally committed to the principle that association membership is a reasonable condition of participation in the association's multiple listing service providing membership in the association is readily available to all eligible and qualified individuals on reasonable and nondiscriminatory terms and conditions. *(Amended 11/04)* **R**

### Section 3  Participation in an Association Multiple Listing Service of a Branch Office Manager Who Is Not a Principal of the Real Estate Firm  (Policy Statement 7.24)
In the event a REALTOR® has a principal office in one and only a branch office in another association, and the branch office manager is a REALTOR® member of the second association but is not a principal of the real estate firm with which he is affiliated, the branch manager shall be considered as standing in the shoes of the principal, and shall be eligible for participation in the multiple listing service of any association's MLS where he qualifies as a Participant. *(Amended 11/96)* **I**

9.  Participants shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the Participant beyond that supplied by the MLS and that relates to a specific property. The Participant shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for that property explaining why the data or information is false. However, the Participant shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment. *(Amended 05/12)*

10. An MLS Participant (or where permitted locally, an MLS Subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS Participant (or MLS Subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that Participants may display listings from each IDX feed on a single webpage or display. *(Adopted 11/14)*

11. Participants shall not modify or manipulate information relating to other Participants' listings. MLS Participants may augment their IDX displays of MLS data with applicable property information from other sources to appear on the same webpage or display, clearly separated from the data supplied by the MLS. The source(s) of the information must be clearly identified in the immediate proximity to such data. This requirement does not restrict the format of MLS data display or display of fewer than all of the available listings or fewer authorized fields. *(Adopted 05/15)*

12. An MLS Participant's IDX display must identify the listing firm, and the email or phone number provided by the listing Participant in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data. *(Amended 11/21)*

## Policies Applicable to Multiple Listing Services
The following guidelines are recommended but not required to conform to National Association policy. MLSs may:

1.  prohibit display of expired or withdrawn listings* *(Amended 5/21)*

**\*Note:** If "sold" information is publicly accessible, display of sales price of completed transactions may be prohibited. *(Amended 5/21)*

2.  prohibit display of confidential information fields intended for cooperating brokers rather than consumers including showing instructions and property security information. *(Amended 5/21)*

3.  prohibit display of the type of listing agreement, e.g., exclusive right to sell, exclusive agency, etc.

4.  prohibit display of seller's(s') and occupant's(s') name(s), phone number(s), and e-mail address(es)

5.  require that the identity of listing agents be displayed

22

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers. Any MLS content in data feeds available to Participants for real estate brokerage purposes must also be available to Participants for valuation purposes, including automated valuations. MLSs must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLSs may require execution of a third-party license agreement where deemed appropriate by the MLS. MLSs may require Participants who will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may not be used as supporting documentation. Any other use of such information is unauthorized and prohibited by these rules and regulations. *(Amended 05/14)* M

### Section 20  Property Addresses  (Policy Statement 8.9)
Residential listings filed with the MLS must include a property address where one exists at the time the listing is filed.  If a property address is unavailable, then the parcel identification number must be submitted at the time the listing is filed.  If no address or parcel identification number is available at the time the listing is filed, the listing must, at a minimum, contain a legal description of the property sufficient to describe the location of the property.  This information shall be available to Participants and Subscribers at the time of filing.  *(Adopted 5/21)* M

### Section 21 Non-filtering of Listings (Policy Statement 8.5)
MLS Participants and Subscribers must not, and MLSs must not enable the ability to, filter out or restrict MLS listings that are communicated to consumers or clients based on the existence or level of compensation offered to the cooperating broker or the name of a brokerage or agent. *(Amended 8/24)* M

# Sold/Comparable/Off-market Information

### Section 1  Reporting Sales to the MLS  (Policy Statement 7.75)
Sales of listed property, including sales prices, shall be reported promptly to the MLS by listing brokers. If negotiations were carried on directly between a cooperating Participant and the seller, the cooperating broker shall report the accepted offer and price to the listing broker, and the listing broker shall report that information to the MLS. Listing agreements should also include provisions expressly granting the listing broker the right to authorize dissemination of sales price information by the MLS to its Participants.

**Note applicable in "disclosure" states:** In disclosure states, if the sale price of a listed property is recorded, then reporting of the sale price may be required by the MLS.

**Note applicable in "nondisclosure" states:** In states where the actual sale prices of completed transactions are not publicly accessible, failure to report sale prices can result in disciplinary action only if the MLS:

1.  categorizes sale price information as confidential and

2.  limits use of sale price information to Participants and Subscribers in providing real estate services, including appraisals and other valuations, to customers and clients; and to governmental bodies and third-party entities only as provided below.

23

# Exhibit 1.4

24



JANUARY 2024

# The Answer Book

The Source
for REALTOR®
Association
Management
Leaders

**2.2** LEGAL AND POLICY

Antitrust laws are violated when competitors act collectively to restrain competition. By definition, a trade association consists of a group of competitors acting in a collective fashion. When a trade association acts, the key antitrust question is whether that action limits or restrains competition in some way, and if so, whether it does so unreasonably. Therefore, trade associations must avoid actions that adversely affect the competitive freedom of individual members—who are competitors—to operate their businesses in the way they determine is best.

The most common antitrust issues in real estate include price-fixing and group boycotts. A conspiracy to fix prices, such as commissions or other terms and conditions of the broker-client relationship, occurs when a group of competitors come together and agree on such prices or terms in an effort to, or with the effect of, eliminating competition. To be sure, competitors may not agree on commissions charged or terms and must take care not to imply any such agreement. A group boycott is a concerted effort by a group of competitors to cooperate or not to cooperate with a particular party in an attempt to force a change in a competitor's behavior or to drive competition out of the marketplace. Both conspiracies to fix prices and group boycotts are considered *per se* violations of the antitrust laws, meaning these restraints are deemed to be so inherently anticompetitive that their anticompetitive effects on trade are presumed. Defendants will be given no opportunity to demonstrate the reasonableness of the restraint, and the only question will be whether the defendant participated in the alleged conspiracy.

Trade associations are made up of groups of competitors that gather to promote their common business interests, which provides opportunity for anticompetitive behavior. Trade association staff should be knowledgeable about and alert to any activity that may violate the antitrust laws and be prepared to take action to stop such activities. At the outset, including an antitrust statement in association meeting materials is a smart practice that will alert participants to the sensitivities of these matters and the association's commitment to complying with antitrust laws. Should any potentially concerning discussions take place, someone should be prepared to end the discussion, change the topic or even end the meeting, if necessary.

Brokers are liable for the anticompetitive actions of their salespeople, and therefore it is advisable for brokers to institute their own office antitrust education and compliance programs to sensitize their salespeople to these issues and to avoid intentional or unintentional illegal conduct.

The Board of Choice concept also means that associations themselves are competitors who compete with one another to provide membership services and a variety of other products and services to their respective member real estate professionals. As a result, associations also need to be sensitive to their own competitive conduct as business organizations, and ensure that they do not engage in practices or participate in agreements that restrain competition among associations in that respect. (See the Membership Policies and Procedures chapter of *The Answer Book*.)

## Common Sources of Antitrust Programs

Some areas REALTOR® associations should be particularly attentive to potential antitrust concerns are:

- Association meetings
- Agreements or relationships with other boards and associations
- Mergers and acquisitions
- Association and MLS standard forms
- Association advertising publications
- Conduct of grievance and arbitration proceedings

NAR offers several products that can help an association educate its members about antitrust laws, including:

### Antitrust Pocket Guide for REALTORS® and REALTOR® Associates

Antitrust knowledge is crucial to a successful real estate practice. This 40-page brochure, designed specifically for real estate licensees, offers information and examples about how antitrust impacts current real estate practices. Topics include: relations with customers, clients, competitors, and an association of REALTORS®; office compliance program; dangerous words and phrases; antitrust compliance policy; and an antitrust self-test. Affordably priced—purchase one for each associate.

### Antitrust and Real Estate: Compliance Guide for Association and Board Leadership

A 32-page brochure directed toward REALTOR® associations, AEs and legal counsel. Discusses ways to avoid liability and explains how to conduct association meetings, maintain records, review association and MLS standard forms, and conduct grievance and arbitration proceedings.

*26*

# Exhibit 1.5

27

Jorge Zea

NEWS    PREMIER    REPORTS    EVENTS    POWER BROKER    NEWSMAKERS    MORE ⌄          Search…    Q

Agents    Brokers    Teams    Marketing    Coaching    Technology    ≡ More

# FLORIDA DISCOUNT BROKER SELF-REPRESENTS IN LAWSUIT FILED AGAINST NAR, LOCAL ASSOCIATIONS

In a Pro Se filing, Jorge A. Zea claims that "selective" enforcement of rules allows "anticompetitive conduct."

HOME > AGENTS

By Clarissa Garza    August 19, 2025    Reading Time: 3 mins read    💬



Florida real estate agent and flat-fee broker Jorge A. Zea has filed a lawsuit against the National Association of Realtors® (NAR), along with other local associations and MLSs, for alleged antitrust violations and steering.

In his filing, Zea claims that the defendants' "coordinated scheme" targeted his pro-competitive brokerage model, restricted consumer choice and maintained supracompetitive prices. His brokerage, Snap Flat Fee, is designed to charge sellers a low listing fee in exchange for limited brokerage services.

In the 126-page Pro Se filing, Zea claims that, "While the narrative may be lengthy, given the number of defendants and the multiple rules and actions at issue, the injunctive relief sought is, by contrast, straightforward and indisputable: that defendants comply with, monitor and enforce the same pro-competitive rules they impose on themselves."

Snap Flat Fee syndicates listing data to the MLS-enabled data feed, and Zea forwards all leads, "regardless of their origin," directly to the seller. For that transparency to occur, there can not be any "unnecessary steering, misleading, misrepresentation, interference, diversion, deflection, funneling or redirection," according to the filing.

An NAR spokesperson told RISMedia that "(t)he National Association of Realtors® fosters a fair, transparent, and competitive real estate marketplace. Steering is a prohibited practice under NAR policy and the Realtor® Code of Ethics. The Code of Ethics is enforced by state and local Realtor® associations, and MLS rules are enforced at the MLS level. We will respond to the plaintiff's claims in court."

Zea previously sought to intervene in the Burnett settlement, putting forth many of the same allegations and claiming that an anti-steering stipulation proposed as part of the deal was modified. NAR previously claimed that the terms of the settlement **prevented "theoretical steering"** related to buyer agent commissions.

In his lawsuit, Zea claims the listed defendants "directly obstruct(ed) that flow of contact information, intentionally frustrating the essential function" of his service and caused substantial, ongoing harm.

"Defendants' coordinated failures and actions have denied plaintiff the opportunity to grow, scale, gain market share, increase revenue, profit, build brand recognition, increase business value and compete fairly, ultimately foreclosing Plaintiff's ability to establish a leading, cost-saving alternative in the national real estate market," read the filing.

**Alleged Steering**

In the filing, Zea accuses the defendants of having buyer agents steer clients away from properties that offer reduced or no buyer-agent commissions, by filtering them out, omitting them from recommendations or actively disparaging them. By keeping buyers removed from direct contact with sellers or listing agents representing alternative models, these defendants are "steering them towards buyer agent representation," Zea argues.

According to the filing, online platforms routinely obscure or omit the listing agent's contact information, "further distancing buyers from the seller and reinforcing the steering dynamic."

Between September 2024 and January 2025, Zea—allegedly confronted with multiple issues of steering—filed at least one ethics complaint with each of the "ethics-responsible" defendants and all cases were dismissed.

**'Selective Enforcement'**

In the filing, Zea also outlines what he refers to as "selective enforcement" by the defendants when it comes to "enforcing authority against rules protecting historic commission structures."

The defendants, argues Zea in the court document, enacted a "coordinated suppression of innovation, alternative business models, transparency, consumer choice and price competition by design."

Filed in the U.S. District Court for the Southern District of Florida's West Palm Beach Division, Zea is suing the following groups:

- NAR

- Beaches MLS

- Broward, Palm Beaches & St. Lucie Realtors®

- Miami Association of Realtors®

- Orlando Regional Realtor® Association (ORRA)

- Florida Gulf Coast Multiple Listing Service

- Royal Palm Coast Realtor® Association

- Naples Area Board of Realtors® and Association of Real Estate Professionals (NABOR®)

- Stellar MLS

- Space Coast Multiple Listing Service and Space Coast Association of Realtors®

- RealMLS

- Northeast Florida Association of Realtors®

- Central Panhandle Association of Realtors®

- Connecticut Association of Realtors®

- Smart MLS

- West and Southeast Realtors® of the Valley (WeSERV)

- Midwest Real Estate Data

**Tags:** **Antitrust Violations**   **Conspiracy**   **District of Florida's West Palm Beach Division**   **Jorge A. Zea**   **MLSNewsFeed**

**NAR**   **National Association of REALTORS®**   **Real Estate Lawsuits**   **Selective Enforcement**   **Steering**   **Zea**

Share        Tweet        in Share        ↪



### CLARISSA GARZA

Clarissa Garza is an associate editor for RISMedia.

RELATED **POSTS**

30

# Exhibit 1.6

31





# MLS Governing Documents Certification Process, Information and Resources

 Share

MLS Self-Certification for 2025 is now open.

Certify ⬏

Since 2021, NAR uses new, streamlined process to verify compliance of MLS governing documents. Similar to the process used to certify local board bylaws, the goal is to provide multiple listing services with the best resources, allowing them to adopt and implement policies and procedures that result in the most effective governance for their organizations. Moving forward, MLSs do not need to submit their governing documents for review. Instead, MLSs will need to certify that MLS' rules and regulations and bylaws contain all of the mandatory provisions established by NAR.

The MLS executive will be able to access the form with their NAR username and password. Please note that the language that must be included in your rules and

Feedback

32

regulations and bylaws is the exact same language that was required in the Handbook on Multiple Listing Policy.

## Certification Form

**View the MLS Self Certification Checklist** ⬇ docx    **(74.16 KB)**

To view annual summaries of changes to NAR's model MLS governing documents go here.

## FAQs:

Read frequently asked questions regarding this new process:

Collapse All

___

When does this process begin?                              —

**This process will begin in early January.**

___

Who can access and execute the certification form?      —

**MLS executives designated in the M1 database will be able to access the certification form.**

___

What is the deadline to certify governing documents?    —

*33*

MLSs are expected to certify their governing documents by March 1. Consistent with NAR policy, MLSs must adopt changes to mandatory policy within sixty (60) days of the effective date of January 1 (unless otherwise specified by the Board of Directors).

---

Do all MLSs need to certify their governing documents?   —

MLSs owned and/or operated by a local association of REALTORS® must certify their governing documents comply with NAR policy. Regional MLSs are asked to certify their MLSs governing documents on behalf of the associations that are shareholders of their organization.

MLSs that are not wholly owned by one or more association of REALTORS® (independent) do not need to certify their governing documents.

How often must MLSs certify their governing documents?   —

MLSs will be asked to certify their rules and regulations and/or bylaws only when there are mandatory changes to the respective documents. MLSs do not need to certify their governing documents any time they make changes that do not correspond to the mandatory provisions. However, MLSs that have pending litigation will be asked to submit their governing documents for review.

34

Will MLSs need to recertify their rules and regulations
when updated language following the proposed DOJ          —
settlement is released?

As a result of the proposed settlement agreement, NAR
and the DOJ are currently in discussions about
additional changes to NAR's model MLS rules and
regulations and adoption of mandatory provisions. This
information will be communicated to MLSs when
available, including the timeframe for local adoption.

Will MLSs who Opted-In to the MLS Settlement
Agreement before August 17th, 2024 still need to          —
complete MLS Certification in 2025?

Yes, this MLS self-certification process confirms that the
MLS has adopted provisions consistent with mandatory
policies established by the National Association of
REALTORS®, which is necessary in order to maintain
their coverage under the National Association's master
professional liability insurance policy.

The NAR Model MLS rules and regulations include
many other provisions that are not on the certification    —
form. Do we need to delete the other provisions?

No. Model MLS rules and regulations contains optional
language that are recommended and optional but are
not mandatory to ensure compliance with NAR policy.
State law may also specify what provisions must be
contained in the MLSs bylaws and/or rules and
regulations. It is recommended MLSs consult with their

35

governing bodies and counsel when deciding which
provisions outside of the mandatory policies they
choose to include. NAR also encourages MLSs to
consider adopting the recommended provisions in the
model MLS rules and regulations to ensure efficient
operation of their service.

What provisions are required to be in our MLS rules and
regulations and bylaws?

All mandatory provisions established by NAR in the
Handbook of Multiple Listing Policy are required to be
in an MLSs rules and regulations and bylaws. NAR
encourages the verbatim adoption or slight
modification in the wording that does not change the
intent.

Must all the provisions on the certification form be in
our rules and regulations and bylaws?

Yes.

How do we ensure our MLS governing documents
comply with state law?

MLSs are encouraged to consult with legal counsel to
ensure their governing documents comply with state
law.

36

# Exhibit 1.8

37

# NAR SETTLEMENT FAQS

**Last Updated: September 5, 2024**

## TABLE OF CONTENTS

CHANGES IN RESIDENTIAL REAL ESTATE—QUICKSTART FAQ FOR CONSUMERS ............................ 2

    Overview ................................................................................................ 2

    For Home Sellers ................................................................................. 2

    For Homebuyers ................................................................................. 4

CHANGES IN RESIDENTIAL REAL ESTATE—DETAILED FAQ FOR REAL ESTATE
PROFESSIONALS ......................................................................................... 7

  SETTLEMENT OVERVIEW ....................................................................... 7

    Key Settlement Details ........................................................................ 7

    Who Is Covered ................................................................................... 9

    Class Notice ...................................................................................... 12

    Practice Changes & MLS Information ............................................ 12

    Effective Date ................................................................................... 13

  REPRESENTING SELLERS ...................................................................... 13

    Offers Of Compensation ................................................................. 14

    Written Listing Agreements ............................................................ 17

    Concessions ...................................................................................... 18

  REPRESENTING BUYERS ....................................................................... 19

    Written Buyer Agreements .............................................................. 19

    Anti-Steering ..................................................................................... 22

    Non-Filtering of Listings ................................................................... 24

  ADDITIONAL SETTLEMENT DETAILS ..................................................... 24

    Transaction Brokerage ..................................................................... 24

    Commercial Non-Residential Listings ............................................. 25

    Financing ........................................................................................... 26

  NAR OPERATIONS ................................................................................. 26

*Note: New or revised FAQs are noted with the date added or updated.*

38

- If a REALTOR® does anything to put their own (or another broker's) compensation before her client's interests, they are violating this primary code of ethics and potentially violating the broker's fiduciary duties to their client (depending on the broker-buyer relationship and state law). *(Added 5/29/24)*

**93. Does NAR's settlement address the theoretical possibility of steering?**
- Yes. In the agreement, NAR reaffirms its commitment to requiring that MLS Participants must not limit the listings their client sees because of broker compensation.
- Written buyer agreements, required by the NAR practice changes that will be implemented on August 17, 2024, will also outline that MLS Participants may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer.
- Since a broker working with a buyer cannot receive more compensation than the buyer has agreed to in that agreement, the amount of any offer of compensation is irrelevant to the buyer-broker's compensation.
- Under these practice changes, NAR has eliminated any theoretical steering because a broker will not make more compensation by steering a buyer to a particular listing because it has a "higher" offer of compensation. *(Added 5/29/24)*

**94. Can a broker tell a potential buyer the amount of broker commissions and explain who is paying those commissions?**
- Yes. In fact, REALTORS® must provide this information to potential buyers under NAR's Code of Ethics.
- The NAR Settlement also requires that "to the extent that such a REALTOR® or Participant will receive compensation from any source, the agreement must specify and conspicuously disclose the amount or rate of compensation it will receive or how this amount will be determined." *(Added 5/29/24)*

**95. Can a listing broker explain to a seller that the buyer will know who is paying the commissions?**
- Yes, Articles 2 and 12 of NAR's Code of Ethics apply equally to brokers working with sellers.
- The listing broker should explain to her client the benefits and costs of the various types of marketing that can be done for a listing, and how potential buyers might respond to such marketing—including any buyer costs that the listing broker or seller may offer to pay.
- A listing broker should inform the seller about costs the buyer will incur, how the buyer might react to those costs, and how the seller can market a house considering the buyer's costs; but a listing broker must not tell a seller that a broker will steer buyers based on the amount that broker is compensated. *(Added 5/29/24)*

**96. Appraisers often use MLS data as an accurate source of information for appraisal reports. How are the practice changes going to impact the appraisal process?**
- Appraisers need to know the details of the transactions they are analyzing, including the sales they consider as possible comparables.
- Compensation paid on the subject property will remain readily available to the appraiser through analysis of the sales contract.
- It is imperative that NAR members facilitate open lines of communication with appraisers. This includes answering and engaging their inquiries on what

39

# Exhibit 1.7

40


**NATIONAL ASSOCIATION OF REALTORS®**

# WRITTEN BUYER AGREEMENTS 101

*Written buyer agreements benefit consumers because they clearly and transparently outline the services an MLS Participant will provide and how they will be compensated.*

As of August 17, 2024, an MLS Participant "working with" a buyer is required to enter into a written agreement with the buyer prior to touring a home, including both in-person and live virtual tours. This resource provides information about what provisions must be included in the written agreement pursuant to the NAR settlement as well as other provisions that, while not required by the settlement, MLS Participants may consider addressing with their clients.

As you develop or refresh your agreement forms, keep in mind:

- Agreement forms should account for the choice and optionality consumers and real estate professionals have when negotiating the terms of their relationship permissible under state law.

- Agreement forms should give the real estate professional and consumer the ability to efficiently memorialize the relationship based on the transparent and clear conversation they have when deciding to work together.

## MANDATORY PROVISIONS

Pursuant to paragraph 58(vi) of the NAR proposed settlement agreement, written buyer agreements must:

- Specify and conspicuously disclose the amount or rate of any compensation the MLS Participant will receive from any source;

- The amount of compensation must be objectively ascertainable and may not be open-ended (e.g., "buyer broker compensation shall be whatever amount the seller is offering to the buyer");

- Include a statement that MLS Participants may not receive compensation from any source that exceeds the amount or rate agreed to with the buyer;

- Disclose in conspicuous language that broker commissions are not set by law and are fully negotiable; and

- Include any provisions required by law.

## OTHER CONSIDERATIONS WHEN ENTERING INTO A BUYER AGREEMENT:

*VISIT FACTS.REALTOR FOR ADDITIONAL RESOURCES AND ANSWERS TO FREQUENTLY ASKED QUESTIONS. THE INFORMATION PROVIDED HEREIN IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR LEGAL ADVICE OR FOR THE TERMS OF THE NAR SETTLEMENT ITSELF. PLEASE CONSULT YOUR LEGAL COUNSEL.*

41



**NATIONAL ASSOCIATION OF REALTORS®**

While not required by NAR policy changes, there are several other considerations and contractual provisions for MLS Participants, associations, MLSs and other forms providers to consider when creating or updating written buyer agreements:

- <u>Format:</u> Agreements should be organized, written in understandable terms for all parties, and use a clear, readable font size. MLS Participants are cautioned to avoid pre-filing key terms like length of the agreement and compensation, and to avoid changing provisions without legal advice.

- <u>Types of Representation:</u> To maximize broker and buyer choice, consider all types of written buyer agreements permitted by state law, including short form, limited service, agency, non-agency, transactional, customer, among others.

- <u>Broker Services:</u> Agreements should clearly articulate the services the MLS Participant will provide buyer.

- <u>Consumer Protection:</u> Agreements should clearly disclose all contractual obligations of the buyer, duties of confidentiality owed to the buyer, the Equal Housing Opportunity statement. Consider including warnings regarding wire fraud as well as video and audio recording by sellers while touring a home for sale. MLS Participants may also notify consumers that they are providing real estate brokerage services and advise buyers to seek appropriate professional services from inspectors, lenders, attorneys, tax advisors and title agents, among others.

- <u>Term and Termination:</u> MLS Participants and buyers can negotiate and agree to the duration of the agreement, including whether the term is automatically extended until closing upon purchase contract ratification. Buyer agreements may include provisions addressing termination with cause and without cause by both the buyer and the MLS Participant. Termination by the buyer may also address whether there is a carryover period, where compensation may be owed to the MLS Participant if the buyer terminates the written buyer agreement and subsequently executes a purchase agreement within an agreed upon time following termination of the buyer agreement.

- <u>Compensation and Fees:</u> In addition to the mandatory provisions above, MLS Participants and buyers may agree to a retainer fee and address whether any retainer is included in total compensation, credited against compensation and/or refundable.

- <u>Conflicts of Interest:</u> Consider addressing how MLS Participants resolve potential conflicts of interest during the term of the agreement, including disclosure and consent for representing other buyers submitting offers on the same property, dual agency, designated agency, or transaction brokerage.

- <u>Dispute Resolution:</u> Written buyer agreements may include mandatory or optional alternative dispute resolution, such as mediation or arbitration. The parties may also agree to waive trial by jury and class actions in the event of litigation relating to the agreement.

42

*VISIT <u>FACTS.REALTOR</u> FOR ADDITIONAL RESOURCES AND ANSWERS TO FREQUENTLY ASKED QUESTIONS. THE INFORMATION PROVIDED HEREIN IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR LEGAL ADVICE OR FOR THE TERMS OF THE NAR SETTLEMENT ITSELF. PLEASE CONSULT YOUR LEGAL COUNSEL.*



**NATIONAL
ASSOCIATION OF
REALTORS®**

## NAR POLICY WILL NOT DICTATE:

- Type of relationship the professional has with the potential buyer (e.g., agency, non-agency, exclusive, non-exclusive, subagency, transactional, customer);

- Term of the agreement (e.g., one day, one month, one house, one zip code);

- Services to be provided (e.g., ministerial acts, a certain number of showings, negotiations, presenting offers); or

- Type or amount of compensation charged (e.g., $0, X flat fee, X percent, X hourly rate).

*VISIT FACTS.REALTOR FOR ADDITIONAL RESOURCES AND ANSWERS TO FREQUENTLY ASKED QUESTIONS. THE
INFORMATION PROVIDED HEREIN IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR LEGAL
ADVICE OR FOR THE TERMS OF THE NAR SETTLEMENT ITSELF. PLEASE CONSULT YOUR LEGAL COUNSEL.*

# Exhibit 2

44

# Exhibit 2.1

45



## Rules and Regulations

**Adopted: July 28, 2017**
**Last Updated:  August 16, 2024**

SMART MLS

46

# Contents

Article 1 - Name, Authority and Purpose ................................................................................................. 3

Article 2 - Participation ................................................................................................................................ 4

Article 3 - Fees, Charges and Fines ......................................................................................................... 8

Article 4 - Listing Procedures .................................................................................................................. 11

Article 5 - Selling Procedures .................................................................................................................. 25

Article 6 - Prohibitions ............................................................................................................................... 28

Article 7 - Disclosure ................................................................................................................................... 28

Article 8 - Compliance With and Enforcement of Rules and Regulations ............................... 29

Article 9 - Confidentiality of Service Information ............................................................................ 30

Article 10 - Ownership of the Service Compilation and Copyrights ......................................... 32

Article 11 - Use of Copyrighted MLS Publications and the Service Compilation ................ 33

Article 12 - Internet Data Exchange (IDX) .......................................................................................... 34

Article 13 - Use of Data and Information in Advertising ............................................................... 45

Article 14 - Limitation on Use of Service  Compilation ................................................................. 46

Article 15 - Rules and Regulations ........................................................................................................ 46

Article 16 - Smart MLS Lockbox Service ............................................................................................. 46

Article 17 – Definitions .............................................................................................................................. 47

Appendix A - Service Fees, Charges and Fines ................................................................................. 52

Appendix B -Compliance with Rules ..................................................................................................... 53

Attachment A – Schedule of Fines ........................................................................................................ 55

Attachment B - Listing Status Codes ................................................................................................... 58

Attachment C - Media Submission Policy ........................................................................................... 60

Attachment D - Virtually Staged Photos Permitted and Prohibited Uses ............................. 62

Attachment E - Application for Participant  Membership .............................................................. 63

Attachment F - Coming Soon Addendum ............................................................................................ 63

Attachment G - Delayed Listing Addendum ...................................................................................... 63

Attachment H - Non-MLS Closed Transaction form ....................................................................... 63

Attachment I - Sellers Instructions to Withhold from MLS ......................................................... 63

Attachment J - Sellers Instructions to File a Withheld Listing ................................................... 63

Attachment K - Listing Agreement Compliance Certification ..................................................... 63

Smart MLS, Inc. .............................................................................................................................................. 63

47

SMART∎▮▮

### Section 12.3.1.3 Restrictions on Display of "Closed" and Off Market Data

Display of closed listings is permitted only on websites owned and controlled by the Participant or the Service. Closed data older than January 1, 2012 shall not be displayed without the express written authorization by the MLS. Only the primary photo is allowed to              display              on              Closed              listings.

### Section 12.3.1.4 Non-Display of Listing Agreement Type

The type of listing agreement (e.g., exclusive right to sell, exclusive agency, etc.) may not be displayed.

### Section 12.3.2 Listing Firm Displayed

All listings displayed pursuant to IDX shall identify the listing firm in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data. Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures.

### Section 12.3.3 Participant Consent

Non-principal brokers and sales licensees affiliated with IDX participants may display information available through IDX on their own Web sites subject to their participant's consent and control and the requirements of state law and/or regulation.

### Section 12.3.4 Identify Listing Agent

All listings displayed pursuant to IDX shall identify the listing agent.

### Section 12.3.6 MLS As Source

All listings displayed pursuant to IDX shall show the MLS as the source of the information. Displays of minimal information (e.g., "thumbnails", text messages, "tweets "of two hundred
[200] characters or less, automated audio responses via Siri, Alexa, etc.,) are exempt from this requirement but only when linked directly to a display that includes all required disclosures.

### Section 12.3.7 Non-Commercial Use

Participants (and their affiliated licensees, if applicable) shall indicate on their Web sites that IDX information is provided exclusively for consumers' personal, non-commercial use, that it may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing, and that the data is deemed reliable but is not guaranteed accurate by the MLS. The MLS may, at its discretion, require use of other disclaimers as necessary to protect participants and/or the MLS from liability. Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures.

48

# Exhibit 2.2

49



# **BEACHES**MLS
# Rules and Regulations

50

## Article V

**Section 5 – MLS Antitrust Compliance Policy**

The purpose of multiple listing is the orderly correlation and dissemination of listing information to participants so they may better serve the buying and selling public. BMLS shall not enact or enforce any rule which restricts, limits, or interferes with participants in their relations with each other, in their broker/client relationships, or in the conduct of their business in the following areas. BMLS shall not:

1. Fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services.
2. Fix, control, recommend, or suggest the cooperative compensation offered by listing brokers to potential cooperating brokers.
3. Base dues, fees, or charges on commissions, listed prices, or sales prices. Initial participation fees and charges should directly relate to the costs incurred in bringing services to new participants.
4. Modify, or attempt to modify, the terms of any listing agreement; this does not prohibit administrative corrections of property information necessary to ensure accuracy or consistency in MLS compilations.
5. Refuse to include any listing in an MLS compilation solely on the basis of the listed price.
6. Prohibit or discourage participants from taking exclusive agency listings or refusing to include any listing in an MLS compilation solely on the basis that the property is listed on an exclusive agency basis.
7. Prohibit or discourage participants from taking "office exclusive" listings; certification may be required from the seller or listing broker that the listing is being withheld from the MLS at the direction of the seller.
8. Give participants or subscribers blanket authority to deal with or negotiate with buyers or sellers exclusively represented by other participants.
9. Establish, or permit establishment of, any representational or contractual relationship between an MLS and sellers, buyers, landlords, or tenants.
10. Prohibit or discourage cooperation between participants and brokers that do not participate in the MLS.
11. Prohibit or discourage participants or subscribers from participating in political activities.
12. Interfere in or restrict participants in their relationships with their affiliated licensees.

As used in this policy, "rule" includes all rules, regulations, bylaws, policies, procedures, practices, guidelines, or other governance provisions, whether mandatory or not. "Multiple listing service" and "MLS" means BMLS. These policy prohibitions are subject to and limited by applicable statutes, ordinances, and governmental regulations, to agreements entered into by BMLS and BROWARD, PALM BEACHES & ST. LUCIE REALTORS® and an agency of government, and to final decrees of courts or administrative agencies.

This policy does not prohibit BMLS or BROWARD, PALM BEACHES & ST. LUCIE REALTORS® from adopting rules or policies establishing the legitimate uses of MLS information, from prohibiting unauthorized uses of MLS information, or from establishing rules or policies necessary to prevent illegal collective action, including price-fixing and boycotts.

## Article VI        Prohibitions

**Section 6 Information for Participants Only; No Password Sharing**

Any listing filed with the service shall not be made available to any broker or firm not a member of MLS without the prior consent of the listing Participant. No Participant or Subscriber who has an ID/password from MLS to access the service's data may provide that ID/password to any other person (whether or not the latter is also a Participant or Subscriber).

**Section 6.1 For Sale Signs**

51

Only the "for sale" signs of the listing Participant may be placed on a property.

Participant that facilitates such unauthorized use shall be responsible for annual fees retroactively on behalf of any unauthorized users for the greater of twelve (12) months or the period during which such unauthorized access occurred and may be subject to further discipline as determined by the Board of Directors.

**Section 6.7 No Filtering of Listing**
Participants and Subscribers must not filter out or restrict MLS listings that are communicated to customers or clients based on the existence or level of compensation offered to the cooperating broker or the name of a brokerage or agent.

## Article VII          No Compensation Specified on MLS Listings

**Section 7 No Compensation Offers in MLS**
The MLS must not accept listings containing an offer of compensation in the MLS to other MLS Participants and Subscribers. Further, the MLS may not create, facilitate, or support any non-MLS mechanism (including by providing listing information to an internet aggregator's website for such purpose) for Participants, Subscribers, or sellers to make offers of compensation to buyer brokers or other buyer representatives.

Use of MLS data or data feeds to directly or indirectly establish or maintain a platform of offers of compensation from multiple brokers to buyer brokers or other buyer representatives is prohibited and must result in the MLS terminating that Participant's access to any MLS data and data feeds.

MLS must not have a rule requiring the listing Participant to disclose the amount of total negotiated commission in his listing contract, and MLS shall not publish the total negotiated commission on a listing which has been submitted to MLS by a Participant. MLS must prohibit disclosing in any way the total commission negotiated between the seller and the listing Participant or total broker compensation (i.e. combined compensation to both listing brokers and buyer brokers).

**Section 7.0.1 Disclosing Potential Short Sales**
Participants must disclose potential short sales (defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies) when reasonably known to the listing Participants.

**Section 7.1 Participant as Principal**
If a Participant or Subscriber has any ownership interest in a property, the listing of which is to be disseminated through MLS, that person shall disclose that interest when the listing is entered into the MLS Database, and such information shall be disseminated to all MLS Participants.

**Section 7.2 Participant as Purchaser**
If a Participant or Subscriber wishes to acquire an interest in property listed with another Participant, such contemplated interest shall be disclosed, in writing, to the listing Participant not later than the time an offer to purchase is submitted to the listing Participant.

**Section 7.3 Written Buyer Agreement**
Unless inconsistent with state or federal law or regulation, all MLS Participants working with a buyer must enter into a written agreement with the buyer prior to touring a home. The written agreement must include:                                                                                                        5Z

a. a specific and conspicuous disclosure of the amount or rate of compensation the Participant will receive or how this amount will be determined, to the extent that the Participant will receive compensation from any source;
b. the amount of compensation in a manner that is objectively ascertainable and not open-ended.
c. a term that prohibits the Participant from receiving compensation for brokerage services from any source that

exceeds the amount or rate agreed to in the agreement with the buyer; and

d.   a conspicuous statement that broker fees and commissions are not set by law and are fully negotiable.

**Section 7.4 Notice of Exceptions**
If a Participant accepts a listing agreement in which there are exceptions to the agreement this must be noted on the listing agreement and the word "exceptions" noted in the broker remarks section of the MLS Database.

**Section 7.5 Disclosure of Compensation**
MLS Participants and Subscribers must:

1.   Disclose to prospective sellers and buyers that broker compensation is not set by law and is fully negotiable. This must be included in conspicuous language as part of any listing agreement, buyer written agreement, and pre-closing disclosure documents (if any).
2.   Conspicuously disclose in writing to sellers, and obtain the seller's authority, for any payments or offer of payment that the listing Participant or seller will make to another broker, agent, or other representative (e.g. real estate attorney) acting for buyers. This disclosure must include the amount or rate of any such payment and be made in writing in advance of any payment or agreement to pay.

## Article VIII        Service Charges

**Section 8 Service Fees and Charges**
The specific amounts of fees and charges and the requirements for payment are set from time to time by the Association Board of Directors and are published in the MLS "Schedule of Fees" available from the association. Each designated broker of a Participant of MLS shall be responsible for payment of fees, for their offices, subscribed sales associates, non-subscribed sales associates and support staff. Payment of such fees may be accepted from the Participant or the Subscriber. None of the foregoing shall preclude the MLS Participant from being reimbursed by the Subscribers licensed with Participant for fees or charges incurred on their behalf pursuant to any in-house agreement that may exist. All fees paid for services including advance payments are non-refundable. However, MLSs must provide participants the option of a no-cost waiver of MLS fees, dues, and charges for any licensee or licensed or certified appraiser who can demonstrate subscription to a different MLS or Commercial Information Exchange (CIE) where the principal broker participates. MLSs may, at their discretion, require that broker participants sign a certification for nonuse of its MLS services by their licensees, which can include penalties and termination of the waiver if violated.

## Article IX        Compliance with Rules

**Section 9 Compliance with Rules—Authority to Impose Discipline**
By becoming and remaining a Participant or subscriber in MLS, each Participant and subscriber agrees to be subject to the rules and regulations and any other MLS governance provision. MLS may, through the administrative and hearing procedures established in these rules, impose discipline for violations of the rules and other MLS governance provisions as outlined in the Compliance Guidleines. Discipline that may be imposed may only consist of one or more of the following:

a.   letter of warning
b.   letter of reprimand
c.   attendance at MLS orientation or other appropriate courses or seminars which the Participant or subscriber can reasonably attend taking into consideration cost, location, and duration
d.   appropriate, reasonable fine not to exceed $15,000
e.   suspension of MLS rights, privileges, and services for not less than thirty (30) days nor more than one (1) year
f.   termination of MLS rights, privileges, and services with no right to reapply for a specified period not to exceed

53

content, images and the URLs and domain names they use, and Participants may not:

a. engage in deceptive or unauthorized framing of real estate brokerage websites;
b. manipulate (e.g., presenting content developed by others) listing and other content in any way that produces a deceptive or misleading result;
c. deceptively use metatags, keywords or other devices/methods to direct, drive, or divert Internet traffic;
d. present content developed by others without either attribution or without permission; or
e. otherwise mislead consumers, including use of misleading images.

**Standard 18.21**

The services which MLS Participants provide to their clients and customers shall conform to the standards of practice and competence which are reasonably expected in the specific real estate disciplines in which they engage; specifically, residential real estate brokerage, real property management, commercial and industrial real estate brokerage, land brokerage, real estate appraisal, real estate counseling, real estate syndication, real estate auction, and international real estate.

MLS Participants shall not undertake to provide specialized professional services concerning a type of property or service that is outside their field of competence unless they engage the assistance of one who is competent on such types of property or service, or unless the facts are fully disclosed to the client. Any persons engaged to provide such assistance shall be so identified to the client and their contribution to the assignment should be set forth.

**Standard 18.22**

Cooperating participants or their representatives have the right to participate in the presentation of any offer they secure to purchase or lease to the seller or lessor. They do not have the right to be present at any discussion or evaluation of the offer by the seller or lessor and the listing broker. However, if a seller or lessor gives written instructions to a listing broker that cooperating brokers may not be present when offers they procure are presented, cooperating brokers have the right to a copy of those instructions.

This policy is not intended to affect listing brokers' right to control the establishment of appointments for presentation of offers. Where the cooperating broker is not present during the presentation of the offer, the cooperating broker can request in writing, and the listing broker must provide, written affirmation stating that the offer has been submitted to the seller, or written notification that the seller has waived the obligation to have the offer presented.

**Standard 18.23**

MLS Participants and Subscribers must not represent that their services as an agent or representative to a buyer or seller in a real estate transaction are free or available at no cost to their clients, unless the Participant or Subscriber will receive no financial compensation from any source for those services.

**Section 18.24**

If charged with a violation of the BeachesMLS Rules or asked to present evidence or to cooperate in any other way, in any compliance proceeding or investigation, Participants and Subscribers shall place all pertinent facts before the proper tribunals of the Member Board or affiliated institute, society, or council in which participation is held and shall take no action to disrupt or obstruct such processes.

## Article XIX        Orientation and Training

Any applicant for MLS participation and any licensee (including licensed or certified appraisers) affiliated with an MLS Participant who has access to and use of MLS-generated information shall complete  orientation programs of no more than eight (8) classroom or online hours devoted to the MLS rules and regulations, Fair Housing and computer training related to MLS information entry and retrieval and the operation of the MLS within sixty (60)

54

from each of the MLSs on a single search results page; and that Participants may display listings from each IDX feed on a single webpage or display.

## Section 20.3 Display
Display of listing information pursuant to IDX is subject to the following rules:

### Section 20.3.1
Listings displayed pursuant to IDX shall contain only those fields of data designated by MLS. Display of all other fields (as determined by MLS) is prohibited. Confidential fields intended only for other Participants and users (e.g., showing instructions, property security information, etc.) may not be displayed.

### Section 20.3.2
The type of listing agreement (e.g., exclusive right to sell, exclusive agency, etc.) may not be displayed

### Section 20.3.3
All listings displayed pursuant to IDX shall identify the listing firm and an email or phone number provided by listing participant in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data. Displays of minimal information (e.g., "thumbnails," text messages, "tweets," etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the devices application.

### Section 20.3.5
Non-principal brokers and sales licensees affiliated with IDX Participants may display information available through IDX on their own websites subject to their Participant's consent and control and the requirements of state law and/or regulation.

### Section 20.3.6
All listings displayed pursuant to IDX shall show MLS as the source of the information by inclusion of the BeachesMLS logo.

**BEACHES**MLS

Displays of minimal information (e.g., "thumbnails," text messages, "tweets," etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures.

### Section 20.3.7
Participants (and their affiliated licensees, if applicable) shall indicate on their websites that IDX information is provided exclusively for consumers' personal, non-commercial use, that it may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing, and that the data is deemed reliable but is not guaranteed accurate by BeachesMLS. MLS may, at its discretion, require use of other disclaimers as necessary to protect Participants or MLS from liability. Displays of minimal information (e.g., "thumbnails," text messages, "tweets," etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. Pursuant to this section, MLS requires the display of the following notice/disclaimer:

55

**BEACHES**MLS All listings featuring the BMLS logo are provided by BeachesMLS, Inc. This information is not verified for authenticity or accuracy and is not guaranteed. Copyright ©20xx BeachesMLS, Inc. (the year should be updated annually)

# Exhibit 2.3

56



# FLORIDA GULF COAST MULTIPLE LISTING SERVICE, INC. RULES AND REGULATIONS

**Updated:** 5/25
Certified by NAR: 02/25

> **Any matter not specifically addressed in these Rules and Regulations shall be governed by the policies and procedures set forth by the National Association of REALTORS® as from time to time amended as well as the Policies and Procedures established by**
> **Florida Gulf Coast MLS.**

57

**Section 4.2 "Sold" Signs**
Before closing, only the "Sold" sign of the listing broker may be placed on a property, unless the listing broker authorizes the cooperating (selling) broker to post such a sign. *(Amended 4/96)*

**Section 4.3 Solicitation of Listing Filed with the Service**
Participants shall not solicit a listing on any property filed with the Service unless such solicitation is consistent with Article 16 of the REALTOR® Code of Ethics, its Standards of Practice, and its Case Interpretations.

**Note**: This Section is to be construed in a manner consistent with Article 16 of the Code of Ethics and particularly Standard of Practice 16-4. This Section is intended to encourage sellers to permit their properties to be filed with the Service by protecting them from being solicited, before the expiration of the listing, by brokers and salespersons seeking the listing upon its expiration.

Without such protection, a seller could receive hundreds of calls, communications, and visits from brokers and salespersons who have been made aware through MLS filing of the date the listing will expire and desire to substitute themselves for the present broker.

This Section is also intended to encourage brokers to participate in the Service by assuring them that other Participants will not attempt to persuade the seller to breach the listing agreement or to interfere with their attempts to market the property. Absent the protection afforded by this Section, listing brokers would be most reluctant to generally disclose the identity of the seller or the availability of the property to other brokers.

This Section does not preclude solicitation of listings under the circumstances otherwise recognized by the Standards of Practice related to Article 16 of the Code of Ethics.

**Section 4.4 Use of the Terms MLS and Multiple Listing Service**
No MLS participant, subscriber, or licensee affiliated with any participant shall, through the name of their firm, their URLs, their e-mail addresses, their website addresses, or in any other way represent, suggest, or imply that the individual or firm is an MLS, or that they operate an MLS. Participants, subscribers, and licensees affiliated with participants shall not represent, suggest, or imply that consumers or others have direct access to MLS databases, or that consumers or others can search MLS databases available only to participants and subscribers. This does not prohibit participants and subscribers from representing that any information they are authorized under MLS rules to provide to clients or customers is available on their websites or otherwise. (Adopted 11/07)

**Section 4.5 Services Advertised as "Free"**
MLS participants and subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the participant or subscriber will receive no financial compensation from any source for those services. **(Amended 11/21)**

## No Compensation Offers In The MLS

**Section 5.1 Compensation Notice**
1. A broker's compensation and fees for services are not set by law and are fully negotiable.
2. A broker's compensation for services rendered to a seller or for services rendered to a buyer is solely a matter of negotiation between the broker and their client, and is not fixed, controlled, recommended, or maintained by any persons not a party to the brokerage service agreement.
3. The compensation paid by a listing broker to a cooperating broker in respect to any listing is established by the listing broker and is not fixed, controlled, recommended, or maintained by any persons other than the listing broker.

MLS Participants and Subscribers must not, and MLSs must not enable the ability to, filter out or restrict MLS listings that are communicated to customers or clients based on the existence or level of compensation offered to the cooperating broker or the name of a brokerage or agent. (Adopted 8/24 Part 2D Section 21)**M**

MLS Participants and Subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to clients, unless the Participant or Subscriber will receive no financial compensation from any source for those services.

The MLS must not accept listings containing an offer of compensation in the MLS to other MLS Participants and

**Section 18.2.11**
Participants shall not modify or manipulate information relating to other participants' listings. MLS Participants may augment their IDX display of MLS data with applicable property information from other sources to appear on the same webpage or display, clearly separated by the data supplied by the MLS. The source(s) of the information must be clearly identified in the immediate proximity to such data. This requirement does not restrict the format of MLS data display or display of fewer than all of the available listings or fewer authorized fields. *(Adopted 05/15)*

**Section 18.2.12**
All listings displayed pursuant to IDX shall identify the listing firm, and the email or phone number provided by the listing participant in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data.\* (Amended 11/21)

**Section 18.3 Display**
Display of listing information according to IDX is subject to the following rules:

**Section 18.3.1**
Listings displayed according to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS participants and users (e.g., showing instructions, property security information, etc.) may not be displayed. *(Amended 05/12)*

**Section 18.3.1.1**
The type of listing agreement (e.g., exclusive right to sell, exclusive agency, etc.) may not be displayed *(Amended 05/12)*

**Section 18.3.4**
All listings displayed according to IDX shall identify the listing agent.

**Section 18.3.5**
Non-principal brokers and sales licensees affiliated with IDX Participants may display information available through IDX on their websites subject to their Participant's consent and control and the requirements of  state law and/or regulation.

**Section 18.3.8**
Participants (and their affiliated licensees, if applicable) shall indicate on their websites that IDX information is provided exclusively for consumers' personal, non-commercial use, that it may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing, and that data is deemed reliable but is not guaranteed accurate by the MLS. The MLS may, at its discretion, require the use of other disclaimers as necessary to protect participants and/or the MLS from liability. *(Amended 05/17)*

**Section 18.3.9**
The data consumers can retrieve or download in response to an inquiry shall be determined by the MLS but in no instance shall be limited to fewer than one hundred (500) listings or five percent (50%) of the listings available for IDX display, whichever is fewer. *(Amended 11/17)*

**Section 18.3.10**
The right to display other Participants' listings according to IDX shall be limited to a Participant's office(s) holding participatory rights in this MLS.IDX Policy amended by NAR.

**Section 18.3.12**
Display of expired, withdrawn, terminated, and sold listings\* is prohibited. *(Amended 11/14)*

\*Note: If "sold" information is publicly accessible, display of "sold" listings may not be prohibited. *(Adopted 11/14)*

**Section 18.3.13**
Display of seller's(s') and/or occupant's(s') name(s), phone number(s), and email address(es) is prohibited.

**Section 18.3.14**
Participants are required to employ appropriate security protection such as firewalls on their websites and displays, provided that any security measures required may not be greater than those employed by the MLS. *(Amended 05/12)*

from the sale or lease of such information, services, or products. Associations of REALTORS® and MLSs may make nominal administrative expenditures out of reserves, dues, or fees to initiate or maintain optional services and products. (*Amended* 8/24 Part 2C Section 8)**M**

**Section 23.2 Customer Service and Tech Support**
The MLS must display customer service and technical support contact information on the MLS website. (*Adopted* 11/20 Part 2C Section 19)**M**

---

## Written Buyer Agreements Required

**Section 24 Written Buyer Agreements Required (Policy Statement 8.13)**
Unless inconsistent with state or federal law or regulation, all MLS Participants working with a buyer must enter into a written agreement with the buyer prior to touring a home. The written agreement must include:
   a) a specific and conspicuous disclosure of the amount or rate of compensation the Participant will receive or how this amount will be determined, to the extent that the Participant will receive compensation from any source.
   b) the amount of compensation in a manner that is objectively ascertainable and not open-ended.
   c) a term that prohibits the Participant from receiving compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer; and
   d) a conspicuous statement that broker fees and commissions are not set by law and are fully negotiable.

Adopted and amended in compliance with mandatory policies established by the National Association of REALTORS® Board of Directors and coverage under the National Association's master professional liability insurance policy.

---

The Handbook on Multiple Listing Policy and Code of Ethics and Arbitration Manual is available on www.realtor.org the National Association of REALTORS® website.

---

## MLS Antitrust Compliance Policy

**Section 25 MLS Antitrust Compliance Policy**
The purpose of multiple listing is the orderly correlation and dissemination of listing information to participants so they may better serve the buying and selling public. Boards and associations of REALTORS® and their multiple listing services shall not enact or enforce any rule which restricts, limits, or interferes with participants in their relations with each other, in their broker/client relationships, or in the conduct of their business in the following areas.

Boards and associations of REALTORS® and their MLSs shall not:
   • Fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services (Interpretation 14).
   • Fix, control, recommend, or suggest the cooperative compensation offered by listing brokers to potential cooperating brokers.

---

   • Base dues, fees, or charges on commissions, listed prices, or sales prices. Initial participation fees and charges should directly relate to the costs incurred in bringing services to new participants.
   • Modify, or attempt to modify, the terms of any listing agreement; this does not prohibit administrative corrections of property information necessary to ensure accuracy or consistency in MLS compilations.
   • Refuse to include any listing in an MLS compilation solely on the basis of the listed price.
   • Prohibit or discourage participants from taking exclusive agency listings or refusing to include any listing in an MLS compilation solely on the basis that the property is listed on an exclusive agency basis.
   • Prohibit or discourage participants from taking "office exclusive" listings; certification may be required from the seller or listing broker that the listing is being withheld from the MLS at the direction of the seller.
   • Give participants or subscribers blanket authority to deal with or negotiate with buyers or sellers exclusively represented by other participants (Interpretation 10).
   • Establish, or permit establishment of, any representational or contractual relationship between an MLS and sellers, buyers, landlords, or tenants.
   • Prohibit or discourage cooperation between participants and brokers that do not participate in the MLS.
   • Prohibit or discourage participants or subscribers from participating in political activities (Interpretation 15).
   • Interfere in or restrict participants in their relationships with their affiliated licensees (Interpretations 16 and 17).

As used in this policy, "rule" includes all rules, regulations, bylaws, policies, procedures, practices, guidelines, or other

# Exhibit 2.4

61



# MLS OF NAPLES
## MULTIPLE LISTING SERVICE

# RULES AND REGULATIONS

## 2025

**NATIONAL
ASSOCIATION OF
REALTORS®**

62

# M.L.S. OF NAPLES, INC.

# MULTIPLE LISTING SERVICE

# RULES AND REGULATIONS

**EFFECTIVE DATE: February 10, 2025**

63

## PART TWO: POLICIES

### A. MLS ANTITRUST COMPLIANCE POLICY

The purpose of multiple listing is the orderly correlation and dissemination of listing information to participants so they may better serve the buying and selling public. Boards and associations of REALTORS® and their multiple listing services shall not enact or enforce any rule which restricts, limits, or interferes with participants in their relations with each other, in their broker/client relationships, or in the conduct of their business in the following areas.

Boards and associations of REALTORS® and their MLSs shall not:

Fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services (Interpretation 14).

Fix, control, recommend, or suggest the cooperative compensation offered by listing brokers to potential cooperating brokers.

Base dues, fees, or charges on commissions, listed prices, or sales prices. Initial participation fees and charges should directly relate to the costs incurred in bringing services to new participants.

Modify, or attempt to modify, the terms of any listing agreement; this does not prohibit administrative corrections of property information necessary to ensure accuracy or consistency in MLS compilations.

Refuse to include any listing in an MLS compilation solely on the basis of the listed price.

Prohibit or discourage participants from taking exclusive agency listings or refusing to include any listing in an MLS compilation solely on the basis that the property is listed on an exclusive agency basis.

Prohibit or discourage participants from taking "office exclusive" listings; certification may be required from the seller or listing broker that the listing is being withheld from the MLS at the direction of the seller.

Give participants or subscribers blanket authority to deal with or negotiate with buyers or sellers exclusively represented by other participants (Interpretation 10).

Establish, or permit establishment of, any representational or contractual relationship between an MLS and sellers, buyers, landlords, or tenants.

Prohibit or discourage cooperation between participants and brokers that do not participate in the MLS.

Prohibit or discourage participants or subscribers from participating in political activities (Interpretation 15).

Interfere in or restrict participants in their relationships with their affiliated licensees (Interpretations 16 and 17).

As used in this policy, "rule" includes all rules, regulations, bylaws, policies, procedures, practices, guidelines, or other governance provisions, whether mandatory or not. "Multiple listing service" and "MLS" means multiple listing service committees of boards and associations of REALTORS® and separately-incorporated multiple listing services owned by one or more boards or associations of REALTORS®.

These policy prohibitions are subject to and limited by applicable statutes, ordinances, and governmental regulations, to agreements entered into by an MLS or board or association of REALTORS® and an agency of government, and to final decrees of courts or administrative agencies.

64

**SECTION 1.C: No Compensation Offers in MLS (Policy Statement Statement 8.11)**
The MLS must not accept listings containing an offer of compensation in the MLS to other MLS Participants and Subscribers. Further, the MLS may not create, facilitate or support any non-MLS mechanism (including by providing listing information to an internet aggregator's website for such purpose) for Participants, Subscribers, or sellers to make offers of compensation to buyer brokers or other buyer representatives.

Use of the MLS data or data feeds to directly or indirectly establish or maintain a platform of offers of compensation from multiple brokers to buyer brokers or other buyer representatives is prohibited and must result in the MLS terminating that Participant's access to any MLS data and data feeds.

The MLS must not have a rule requiring the listing broker to disclose the amount of total negotiated commission in his listing contract, and the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a Participant. The multiple listing service must prohibit disclosing in any way the total commission negotiated between the seller and the listing broker, or total broker compensation (i.e. combined compensation to both listing brokers and buyer brokers). **(8/24)M**

**SECTION 1.D: Statement 8.12 Disclosure of Compensation: MLS Participants and Subscribers must:**
Disclose to prospective sellers and buyers that the broker compensation is not set by law and is fully negotiable.  This must be included in conspicuous language as part of any listing agreement, and pre-closing disclosure documents (if any).

Conspicuously disclose in writing to sellers, and obtain the seller's authority, for any payments or offer of payment that the listing Participant or seller will make to another broker, agent, or other representative (e.g. real estate attorney) acting for buyers.  This disclosure must include the amount or rate of any such payment and be made in writing in advance of any payment or agreement to pay. **(8/24) M**

---

**SECTION 1.E.: Statement 8.13 Written Buyer Agreements Required**
Unless inconsistent with state or federal law or regulation, all MLS Participants working with a buyer must enter into a written agreement with the buyer prior to touring a home.  The written agreement must include:
   a. A specific and conspicuous disclosure of the amount or rate of compensation the Participant will receive or how this amount will be determined, to the extent that the Participant will receive compensation from any source.
   b. The amount of compensation in a manner that is objectively ascertainable and not open-ended.
   c. A term that prohibits the Participant from receiving compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer; and
   d. A conspicuous statement that broker fees and commissions are not set by law and are fully negotiable. **(8/24) M**

~~SECTION 1.1: Detail on Listing Entered Into the MLS Database~~

---

When a listing is first entered into the MLS Database, it is the Agent's responsibility to enter, or cause to be entered, correct information about a listing into the MLS Database. The listing information entered into the MLS Database, shall be complete in every detail which is required by these Rules and Regulations and/or the current Profile Sheet from which the information is entered into the MLS Database. The full gross listing

price stated in the listing contract will be included in the MLS information published in the MLS compilation of current listings. MLS will not accept a listing entered into the MLS Database that does not have all the required fields entered correctly. If incorrect information about a listing is entered into a required field of the MLS Database, the Listing Agent will be subject to discipline as outlined in Article 7.

If the information cannot be correctly entered into the MLS Database because the computerized system will not accept the correct information, then the listing will remain in the MLS Database until such time as the information can be entered correctly.

Auction properties that may be entered into the MLS Database are those properties that meet the following three requirements: (1) The property must be available for sale prior to the auction at the full gross listing price entered into the MLS Database in the Listing Price field, which must be the same full gross listing price at
65

listing and the listing status changes to Pending with Contingencies or Pending, the Listing Office shall extend the Expiration Date of the listing in the MLS Database no more than 5 Business Days after the Closing Date as stated in the Sales Contract, provided that the Closing Date is later than the original Expiration Date of the listing. This is only valid if the original or amended listing agreement has a provision for an automatic extension of the Expiration Date under the circumstances described herein. This will give offices time to change the status of the listing from Pending with Contingencies or Pending to Closed Sale without the listing automatically expiring in the MLS Database. However, if the closing does not occur, the Expiration Date shall be the date the Sales Contract terminates unless the listing has been renewed or extended. For failure to comply with this rule, the Listing Agent will be subject to discipline as outlined in Article 7. **(1/93) (10/00) (9/02) (4/05) (2/06)(4/08) (2/09)(5/11)M**

## SECTION 1.9: MLS Has no Control of Commission Rates or Fees Charged by Participating Offices
The Multiple Listing Service shall not fix, control, recommend, suggest, or maintain commission rates or fees for services to be rendered by Participants. Further, the Multiple Listings Service shall not fix, control, recommend, suggest, or maintain the division of commissions or fees between cooperating Participants or between Participants and nonparticipants. **(8/24)M**

The Multiple Listing Service shall make no rule on the division of commissions between Participants and non-Participants.  This should remain solely the responsibility of the listing broker. **(8/24)M**

## SECTION 1.10: Services Advertised as "Free"
MLS Participants and Subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to clients, unless the Participant or Subscriber will receive no financial compensation from any source for those services. **(8/24)M**

## SECTION 1.11: Compensation Notice (Policy Statement 7.39)
MLS shall publish the following notice to its general membership no less than annually:

### Compensation Notice
1. A broker's compensation and fees for services are not set by law and fully negotiable.
2. **A broker's compensation for services rendered to a seller or for services rendered to a buyer is** solely a matter of negotiation between the broker and their client, and is not fixed, controlled, recommended, or maintained by any persons not party to the brokerage service agreement.
3. The compensation paid by a listing broker to a cooperating broker in respect to any listing is established by the listing broker and is not fixed, controlled, recommended, or maintained by any persons other than the listing broker. **(8/24)M**

## SECTION 1.12: Statewide Data Sharing Defined
A statewide data share should deliver MLS data through a common technology interface (e.g., API) of all data fields, to all Participants of MLSs in the statewide data share.  However, the data should not include MLS-only data fields that are viewable only to the listing Participant and the respective local MLS.

Note: Considerations should be given to:
- Inclusion of local data fields (non-RESO standard fields).
- Individual MLSs attached document retention policies and state laws regarding the sharing and retention of documents related to a previous transaction (privacy laws)**. (8/24)R**

## SECTION 1.13 MLS Participation by Brokers Acting as Agents of Potential Purchasers
No association or association MLS may take or maintain a rule which would preclude an individual or firm, otherwise qualified, from participating in an association MLS solely on the basis that the individual or firm functions, to any degree, as the agent of potential purchasers under a contract between the individual (or firm) and the prospective purchaser (client).  However, in instances where the Participant is representing the potential purchaser as an agent, the Participant cannot function simultaneously as the subagent of the listing broker without buyer and seller consent or as provided by state law; and must make his true position clearly known to all interested parties at first contact. **(8/24)M**

66

Assistant that accesses the MLS computerized system for him/herself or on behalf of another, must have his/her own unique Login ID and Password.

2. All Brokers and Agents who participate in Naples's MLS will be issued a unique Login ID and Password when their participation begins, the cost of which is included in their monthly participation fee.

3. All Unlicensed Clerical Staff that are staff of a Naples MLS participating office and that access the MLS computerized system must have their own unique Login ID and Password. The cost of each unique Login ID will be 50% of the monthly participation fee for brokers and agents.

4. All Unlicensed Personal Assistants that are Personal Assistants of a Naples MLS Broker or Agent and that access the MLS computerized system must have their own unique Login ID and Password. The cost of each unique Login ID will be 50% of the monthly participation fee for brokers and agents.

5. the MLS computerized system is programmed to allow the following:
   (a) A Broker Participant, or his/her designee with M Access or UM Access, can assign the ability to input/edit the office's listings to the Unlicensed Clerical Staff or other Agents as he/she determines.
   (b) A Broker Participant, or his/her designee with M Access or UM Access, can assign the ability to input/edit an Agent's listings to the Agent's Licensed or Unlicensed Personal Assistant or to another
   Agent within the office. **(1/07) (4/08) (8/13)**


## ARTICLE 4: PROHIBITIONS

### SECTION 4: Information for Participating Offices Only
Any listing filed with the MLS shall not be made available to any non-MLS Participating Office without the prior written consent of the Listing Broker. (1/93)

### SECTION 4.1: "FOR SALE" Signs
Only the "For Sale" signs of the Listing Broker may be placed on a property; however, MLS shall make no rule prohibiting the Seller from placing a sign on the property. (5/90) (4/05) (2/06)

### SECTION 4.2: "SOLD" Signs
Prior to closing, only the "Sold" sign of the Listing Broker may be placed on a property, unless the Listing Broker authorizes the cooperating (selling) Broker to post such a sign. (5/90) (3/98)

### SECTION 4.3: Solicitation of Listing Filed With the Service
Participants shall not solicit a listing on property filed with the MLS unless such solicitation is consistent with Article 16 of the REALTORS□' Code of Ethics, its Standards of Practice, and its Case Interpretations. **(2/92) (3/98) (4/08)**

### SECTION 4.4: Use of the Terms MLS and Multiple Listing Service
No MLS Participant, Subscriber or Licensee affiliated with any Participant shall, through the name of their firm, their URLs, their e-mail addresses, their website addresses, or in any other way represent, suggest or imply that the individual or firm is an MLS, or that they operate an MLS. Participants, Subscribers and Licensees affiliated with Participants shall not represent, suggest or imply that consumers or others have direct access to MLS databases, or that consumers or others are able to search MLS databases available only to Participants and Subscribers. This does not prohibit Participants and Subscribers from representing that any information they are authorized under MLS rules to provide to clients or customers is available on their websites or otherwise. **(4/08)**

### SECTION 4.5 No Filtering of Listings
MLS and Subscribers must not filter out or restrict MLS listings that are communicated to customers or clients based on the existence or level of compensation offered to the cooperating broker or the name of a brokerage or agent. **(8/24)M**

67

the foregoing and subject to paragraph 9, a participant's IDX display may communicate the participant's professional judgment concerning any listing. Nothing shall prevent an IDX display from notifying customers that a particular feature has been disabled at the request of the seller. **(05/12)**

9. Participants shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the participant beyond that supplied by the MLS and that relates to a specific property. The participant shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for that property explaining why the data or information is false. However, the participant shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment. **(05/12)**

10. An MLS participant (or where permitted locally, an MLS subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS participant (or MLS subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that participants may display listings from each IDX feed on a single webpage or display. **(11/14)**

11. Participants shall not modify or manipulate information relating to other participants' listings. MLS participants may augment their IDX displays of MLS data with applicable property information from other sources to appear on the same webpage or display, clearly separated from the data supplied by the MLS. The source(s) of the information must be clearly identified in the immediate proximity to such data. This requirement does not restrict the format of MLS data display or display of fewer than all of the available listings or fewer authorized fields. **(05/15)**

12. An MLS participant's IDX display must identify the listing firm and the email address or phone number provided by the listing participant in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data. **(01/22)**

Policies Applicable to Multiple Listing Services
The following guidelines are recommended but not required to conform to National Association policy. MLSs may: 1. prohibit display of expired, withdrawn, or sold listings* **(11/15)**
*Note: If "sold" information is publicly accessible, display of "sold" listings may not be prohibited. **(11/14)**

### BROKER/AGENT LIMITED ELECTRONIC DISPLAYS MUST DISCLOSE FIRM'S NAME AND STATE OF LICENSURE
The "Broker Reciprocity Program Database" (BR Database) is the current aggregate compilation of all Active (A) and Closed Sale (CS) listings, including Open Houses, of all BR Participants except those listings that a BR Participant does not permit to be included in the Broker Reciprocity Program ("BR Program"), with the exception of Closed Sales (CS) listings, do not need permission of the Listing Broker for display on their Internet limited electronic displays (see below for further explanation of withholding listings). The display of listing statuses applies to Agent limited electronic displays. **(6/11) (2/13)**

**PARTICIPATION IN BR PROGRAM.** MLS Rules assume that all Participants who are eligible to be BR Participants shall participate in the BR Program, and that all BR Participants consent to the display of their listings in the Broker Reciprocity Program; however, where participants have given blanket authority for other participants to display their listings on BR sites, such consent may be withdrawn on a listing- by- listing basis where the Seller has prohibited all Internet display. The Participant can stop participating in the BR Program at any time by following the procedures adopted by MLS. BR Participants can also prohibit the display of one or more of their listings by checking the appropriate field in the MLS computer system. In the MLS computer system there will be a field(s) indicating whether the listing may be displayed in the Broker Reciprocity

**SECTION 21.12.** A Participant's VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, type of property and whether the listing broker is a REALTOR®.

**SECTION 21.13.** A Participant who intends to operate a VOW to display MLS Listing Information must notify the MLS of its intention to establish a VOW and must make the VOW readily accessible to the MLS and to all MLS Participants for purposes of verifying compliance with these Rules, the VOW Policy, and any other applicable MLS rules or policies.

**SECTION 21.14.** A Participant may operate more than one VOW himself or herself or through an AVP. A Participant who operates his or her own VOW may contract with an AVP to have the AVP operate other VOWs on his or her behalf. However, any VOW operated on behalf of a Participant by an AVP is subject to the supervision and accountability of the Participant.

**SECTION 21.15.** The following requirements apply to VOWs to the extent that equivalent requirements are imposed on Participants' use of MLS listing data in providing brokerage services via all other delivery mechanisms. A Participant's VOW may not make available for search by or display to Registrants the following data intended exclusively for other MLS Participants and their affiliated licensees:
1. The type of listing agreement, i.e., exclusive right to sell or exclusive agency.
2. The seller's and occupant's name(s), phone number(s), or e-mail address (es).
3. Instructions or remarks intended for cooperating brokers only, such as those regarding showings or security of listed property.
4. The number of current or, if permitted, sold listings that Registrants may view, retrieve, or download in response to an inquiry may be limited to a reasonable number. Such number shall be determined by the MLS, but in no event may the limit be fewer than one hundred (100) five hundred (500) listings or five percent (5%) fifty percent (50%) of the listings in the MLS, whichever is less.

**SECTION 21.16.** A Participant shall not change the content of any MLS Listing Information that is displayed on a VOW from the content as it is provided in the MLS. The Participant may, however, augment MLS Listing Information with additional information not otherwise prohibited by these Rules or by other applicable MLS rules or policies as long as the source of such other information is clearly identified. This rule does not restrict the format of display of MLS Listing Information on VOWs or the display on VOWs of fewer than all of the listings or fewer than all of the authorized information fields.

**SECTION 21.17.** A Participant shall cause to be placed on his or her VOW a notice indicating that the MLS Listing Information displayed on the VOW is deemed reliable but is not guaranteed accurate by the MLS. A Participant's VOW may include other appropriate disclaimers necessary to protect the Participant and/or the MLS from liability.

**SECTION 21.18.** A Participant shall cause any listing that is displayed on his or her VOW to identify the name of the listing firm, and the email address or phone number provided by the listing participant in a readily visible color, in a reasonably prominent location, and in typeface not smaller than the median typeface used in the display of listing data.

**SECTION 21.19.** A Participant shall limit the number of listings that a Registrant may view, retrieve, or download to not more than 500 current listings and not more than 500 sold listings in response to any inquiry. SECTION 21.20. A Participant shall require that Registrants' passwords be reconfirmed or changed every 180 days.

**SECTION 21.20.** A Participant shall require that Registrants' passwords be reconfirmed or changed every 180 days.

**SECTION 21.21.** A Participant may display advertising and the identification of other entities ("co- branding") on any VOW the Participant operates or that is operated on his or her behalf. However, a Participant may not display on any such VOW deceptive or misleading advertising or co-branding. For purposes of this Section, co-branding will be presumed not to be deceptive or misleading if the Participant's logo and contact information

69

# Exhibit 2.5



# Stellar MLS® Rules and Regulations

Last Update on 04/25/2025

71

the owner(s) of record or lessor. They do not have the right to be present at any discussion or evaluation of a counteroffer by the purchaser or lessee. However, if the purchaser or lessee gives written instructions to the cooperating Participant that the Listing Participant / User may not be present when a counter-offer is presented, the Listing Participant has the right to a copy of the purchaser's or lessee's written instructions.

## Article 06.06: Advertising of Listing Filed with Stellar MLS®

A listing shall not be advertised by any other Participant without the prior written consent of the Listing Participant. Use of information from Stellar MLS® compilation of current listing information, from the Association's "Statistical Report" or from any "sold" or "comparable" report of an Association or Stellar MLS® for public mass-media advertising by a Participant or in other public representations may not be prohibited. However, any print or non-print forms of advertising or other forms of public representations based in whole or in part on information supplied by the Associations or Stellar MLS® must include the following notice:

"Based on information from the Stellar Multiple Listing Service for the period (date) through (date). This information may or may not include all listed expired, withdrawn, pending or sold properties of one or more members of the Stellar Multiple Listing Service".

**Services Advertised as "FREE": MLS Participants and Subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to their clients unless the Participant or Subscriber will receive no financial compensation from any source for those services.**

## Article 06.07: Participant as Principal

If a Participant or User has an ownership interest in a property, the listing of which is to be disseminated through Stellar MLS®, the person shall disclose that interest in the Realtor Only Remarks section of the listing. (Updated 11/14/2023)

## Article 06.08: Participant as Purchaser

If a Participant or User wishes to acquire an interest in a property listed in Stellar MLS®, such contemplated interest shall be disclosed, in writing, to the Listing Participant not later than the time an offer to purchase is submitted. (Updated 11/14/2023)

## Article 06.09: Reporting Cancellation of Pending and Contingent Pending Sales

The Listing Participant shall report to Stellar MLS® the cancellation of a pending sale and the listing shall be reinstated to active status within two days excluding weekends and federally recognized holidays, if applicable.

# Article 07 - Refusal to Sell

## Article 07.00

72

If the owner(s) of record of any listed property filed with Stellar MLS® refuses to accept a written offer satisfying the terms and conditions stated in the listing, such fact should be transmitted immediately to

in the fields related to Auctions and also may be included in the "Realtor Only Remarks" field. When the listing broker receives knowledge that the sale of the listed property may be conditioned upon an Auction, then such disclosure must be made in the "Auction Y/N", "Special Sale Provision ", and any other required auction fields. (Adopted 3/2015); (Updated 11/14/23)

## Article 05:24 Disclosure of Compensation to Seller(s)

**Disclosure of Compensation:**
MLS Participants and Subscribers must disclose the following, outside of the MLS:
1.  Disclose to prospective sellers and buyers that broker compensation is not set by law and is fully negotiable. This must be included in conspicuous language as part of any listing agreement, buyer written agreement, and pre-closing disclosure documents (if any).
2.  Conspicuously disclose in writing to sellers, and obtain the seller's authority, for any payments or offer of payment that the listing Participant or seller will make to another broker, agent, or other representative (e.g. real estate attorney) acting for buyers. This disclosure must include the amount or rate of any such payment and be made in writing in advance of any payment or agreement to pay.

# Article 06 - Selling Procedures

## Article 06.01: Written Buyer Agreements Required
A.  Unless inconsistent with state or federal law or regulation, all MLS Participants working with a buyer must enter into a written agreement with the buyer prior to touring a residential dwelling of one-four units.
    The written agreement must include:
    i.   A specific and conspicuous disclosure of the amount or rate of compensation the Participant will receive or how this amount will be determined, to the extent that the Participant will receive compensation from any source.
    ii.  The amount of compensation in a manner that is objectively ascertainable and not open-ended.
    iii. A statement that prohibits the Participant from receiving compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer; and
    iv.  A conspicuous statement that broker fees and commissions are not set by law and are fully negotiable.

B.  Definition: Touring a property is defined as either a) when the buyer(s) and the agent from the brokerage working with the buyer physically enter a dwelling, or b) when an agent from the brokerage working with the buyer(s) enters a dwelling to provide a live, virtual tour if the buyer(s) is not physically present.

C.  Requirement: Failure to submit a signed buyer brokerage agreement within one business day of request by the MLS will result in a Level III – Severe Penalty assessed to the showing agent. (see Article 11.04.3.3)

D.  Use of a buyer brokerage agreement that does not meet the requirements outlined above will result in a Level III – Severe Penalty assessed to the showing agent's broker. (see Article

73

23

necessary to protect Member Participant, and/or their MLS from liability.

Each display or use of the IDX Listings, or any portion of the IDX Listings shall include the conspicuous display of the following: "Based on information submitted to the MLS GRID as of _____ (date and time MLS GRID Data was obtained). All data is obtained from various sources and may not have been verified by broker or MLS GRID. Supplied Open House Information is subject to change without notice. All information should be independently reviewed and verified for accuracy. Properties may or may not be listed by the office/agent presenting the information."

Displays of minimal information (e.g. "thumbnails", text messages, "tweets," etc., of two hundred (200) characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. (Updated 11/2020)

## Article 19.25: Map Display of IDX Listings

With a map display on an IDX website showing the locations of the listings matching a consumer's search with icons or pins, where a consumer may display a "popup" or "balloon" over the icon or pin by clicking or holding the mouse over it, required elements need not be displayed provided that (a) the consumer can click on the pop-up or balloon and view a page, including the listing information and the required elements; or (b) there is a display elsewhere on the page on which the map appears that includes the listing information and the required elements for all such listings on the map. (Updated 11/2020)

## Article 19.26: Limit on Number of Listings Displayed

The display of any IDX listings in response to a query from a consumer shall not be limited to fewer than five hundred (500) listings or fifty percent (50%), whichever is fewer, and no more than two thousand-five hundred (2,500) listings per search. This does not apply to displays showing mapping pins and no other listing data. (Updated 11/2020)

## Article 19.27: Display of Off-Market or Sold Listings

The display of expired, withdrawn, and sold listings may be prohibited by the Member Participant's applicable Governing Documents, and may be excluded from MLS GRID Data. If expired, withdrawn, or sold listings are available in MLS GRID Data for IDX, the display of those listings authorized. (Updated 11/2020)

## Article 19.28: Display of Seller Information

The display of the seller's and/or occupant's name(s), phone number(s), and email address(es) is prohibited. (Updated 11/2020)

## Article 19.29: No Filtering of Listings

Participants and Subscribers must not filter out or restrict MLS listings that are communicated to consumers or clients based on the existence or level of compensation offered to the cooperating broker or the name of a brokerage or agent. (Updated 8/2024)

74

Member Participant; except that the display of IDX listings or other data may be augmented with additional data not otherwise prohibited from display so long as the source of the other data is clearly identified.

This requirement does not restrict the modification of the listing using RESO-approved synonyms for normalization purposes. This requirement does not restrict the format of the display of the IDX listings or display of fewer than all of the IDX listings or display of fewer than the authorized data fields. (Updated 11/2020)

### Article 19.22: Identifying the Listing Brokerage

With the display of any IDX listings, all listings displayed pursuant to IDX shall identify the listing brokerage name, the listing number, and the status of the listing immediately adjacent to the property information. When displaying a sold listing, the name of the cooperating brokerage OR the following disclaimer must also appear: "Properties displayed may be listed or sold by various participants in the MLS"; as established by the applicable MLS Governing Documents.

With the display of IDX Listings from Northwest MLS, all listings displayed pursuant to IDX shall identify the listing brokerage name, the listing number, and the status of the listing immediately adjacent to the primary photo or group of prominent photos.

Required items must be displayed in a readily visible color and typeface not smaller than the median used in the display of listing data. For example, no tiny text or gray text displayed on a gray background. Displays of minimal information (e.g., "thumbnails, text messages, "tweets", etc. of two hundred (200) characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the devices application (Updated 11/2020)

### Article 19.23: Identifying the Source of IDX Listings

The display of any IDX listings shall clearly and conspicuously identify the providing MLS as the source of the IDX listings as distributed by the MLS GRID (e.g. "Listings courtesy of APPLICABLE MLS as distributed by MLS GRID") in accordance with these IDX Rules. MLS GRID approved icons or logos identifying MLS GRID as the source of IDX listings must appear on the first page where any listings are displayed. Displays of minimal information (e.g. "thumbnails", text messages, "tweets", etc., or two hundred (200) characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the devices application. (Updated 11/2020)

### Article 19.24: Consumer use of IDX Listings

Member Participants (and their affiliated licensees, if applicable) shall indicate on their  websites that IDX information is provided exclusively for consumers' personal non-commercial use, that it may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing, that the data is deemed reliable but is not guaranteed by MLS GRID, and that the use of the MLS GRID Data may be subject to an end user license agreement prescribed by the Member Participant's applicable MLS if any and as amended from time to time. MLS GRID may, at its discretion, require use of other disclaimers as

# Exhibit 2.6



# Space Coast Multiple Listing Service, Inc.

# <u>Rules and Regulations</u>




77

## PROHIBITIONS (Section 4)

**Section 4 - Information for Participants Only:**
Any listing filed with the MLS shall not be made available to any broker or firm not a Member of the MLS without the prior consent of the listing broker.

**Section 4.1 - "For Sale" Signs:**
Only the "For Sale" sign of the listing broker may be placed on a property.

**Section 4.2 - "Sold" Signs:**
Prior to closing, only the "Sold" sign of the listing broker may be placed on a property, unless the listing broker authorizes the cooperating (selling) broker to post such a sign.

**Section 4.3 - Solicitation of Listing Filed with the MLS:**
Participants shall not solicit a listing on property filed with the MLS unless such solicitation is consistent with Article 16 of the REALTORS® Code of Ethics, its Standards of Practice, and its Case Interpretations.

This section is to be construed in a manner consistent with Article 16 of the Code of Ethics and particularly Standard of Practice 16-4. This section is intended to encourage sellers to permit their properties to be filed with the service by protecting them from being solicited, prior to expiration of the listing, by brokers and salespersons seeking the listing upon its expiration. Without such protection, a seller could receive hundreds of calls, communications, and visits from brokers and salespersons who have been made aware through MLS filing of the date the listing will expire and desire to substitute themselves for the present broker. This section is also intended to encourage brokers to participate in the service by assuring them that other participants will not attempt to persuade the seller to breach the listing agreement or to interfere with their attempts to market the property. Absent the protection afforded by this section, listing brokers would be most reluctant to generally disclose the identity of the seller or the availability of the property to other brokers. This section does not preclude solicitation of listings under the circumstances otherwise recognized by the Standards of Practice related to Article 16 of the Code of Ethics.

**Section 4.4 - Use of the Terms MLS and Multiple Listing Service:**
No MLS participant, subscriber or licensee affiliated with any participant shall, through the name of their firm, their URLs, their e-mail addresses, their website addresses, or in any other way represent, suggest, or imply that the individual or firm is an MLS, or that they operate an MLS. Participants, subscribers and licensees affiliated with participants shall not represent, suggest, or imply that consumers or others have direct access to MLS databases, or that consumers or others are able to search MLS databases available only to participants and subscribers. This does not prohibit participants and subscribers from representing that any information they are authorized under MLS rules to provide to clients or customers is available on their websites or otherwise.

**Section 4.5 – Services Advertised as "Free":  See Fine Section 22.15**
MLS Participants (Brokers) and Subscribers (Agents) must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the Participant (Broker) or Subscriber (Agent) will receive no financial compensation from any source for those services. Services advertised as "free" will result in an administrative fine.

**Section 4.6 – No Filtering of Listings:** Participants (Brokers) and Subscribers (Agents) must not filter out or restrict MLS listings that are communicated to customers or clients based on the existence or level of compensation offered to the cooperating broker or the name of a brokerage or agent.

## No Compensation Specified on MLS (Section 5)

**Section 5.0 – No Compensation Specified MLS on Listings: See Fine Section 22.16**
Participants (Brokers), Subscribers (Agents), or their sellers may not make offers of compensation or the intent to make offers of compensation to buyer brokers and other buyer representatives in the MLS.

If an offer of compensation or the intent to communicate an offer of compensation is communicated within the MLS or any of the ancillary products, the offer of compensation will be removed immediately by the MLS department.

Use of MLS data or data feeds to directly or indirectly establish or maintain a platform to make offers of compensation from multiple brokers to buyer brokers or other buyer representatives is prohibited and must result in the MLS terminating that Participant's access to any MLS data and data feeds.

*78*

Note 1: The MLS must not have a rule requiring the listing broker to disclose the amount of total negotiated commission in his listing contract, and the MLS shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a Participant. The MLS must prohibit disclosing in any way the total commission negotiated between the seller and the listing broker, or total broker compensation (i.e. combined compensation to both listing brokers and buyer brokers).

Note 2: The MLS has no rule on the division of commissions between Participants and non-participants. This should remain solely the responsibility of the listing broker.

Note 3: Multiple listing services must give Participants the ability to disclose to other participants any potential for a short sale. As used in these rules, short sales are defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale, and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies. The MLS requires participants to disclose potential short sales when participants know a transaction is a potential short sale. In any instance where a participant discloses a potential short sale.

### Section 5.0.0 – Required Consumer Disclosure:
Disclosures of Compensation: MLS Participants and Subscribers must:
1. Disclose to prospective sellers and buyers that broker compensation is not set by law and is fully negotiable. This must be included in conspicuous language as part of any listing agreement, buyer written agreement, and pre-closing disclosure documents (if any).
2. Conspicuously disclose in writing to sellers, and obtain the seller's authority, for any payments or offer of payment that the listing Participant or seller will make to another broker, agent, or other representative (e.g. real estate attorney) acting for buyers. This disclosure must include the amount or rate of any such payment and be made in writing in advance of any payment or agreement to pay.

### Section 5.0.1 - Disclosing Potential Short Sales:
Participants must disclose potential short sales (defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies) when reasonably known to the listing participants.

---

### Section 5.0.2 – Written Buyer Agreement: See Fine Section 22.17
Unless inconsistent with state or federal law or regulation, all MLS participants working with a buyer must enter into a written agreement with the buyer prior to touring a home. The written agreement must include:
   a. A specific and conspicuous disclosure of the amount or rate of compensation the Participant will receive or how this amount will be determined, to the extent that the Participant will receive compensation from any source;
   b. The amount of compensation in a manner that is objectively ascertainable and not open-ended.
   c. A term that prohibits the Participant from receiving compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer; and
   d. A conspicuous statement that broker fees and commissions are not set by law and are fully negotiable.

---

If it is reported that an agent is working with a buyer without a written buyer agreement, the MLS staff will contact the agent to request a copy of the agreement. The MLS will not maintain copies of written buyer agreements or information therein.

### Section 5.1 - Participant as Principal:
If a participant or any licensee (or licensed or certified appraiser) affiliated with a participant has any ownership interest in a property, the listing of which is to be disseminated through the multiple listing service, that person shall disclose that interest when the listing is filed with the multiple listing service and such information shall be disseminated to all multiple listing service participants.

### Section 5.2 - Participant as Purchaser:
If a participant or any licensee (including licensed and certified appraisers) affiliated with a participant wishes to acquire an interest in property listed with another participant, such contemplated interest shall be disclosed, in writing, to the listing broker not later than the time an offer to purchase is submitted to the listing broker.

## ELECTRONIC LOCKBOXES AND eKEY App (Section 6)

79

### Section 6.1.1 - Electronic Lock Box System:

**Section 18.2.7 -** Any IDX display controlled by a participant must clearly identify the name of the brokerage firm under which they operate in a readily visible color and typeface. For purposes of the IDX policy and these rules, "control" means the ability to add, delete, modify and update information as required by the IDX policy and MLS rules.

**Section 18.2.8 -** Any IDX display controlled by a participant or subscriber that

a. allows third parties to write comments or reviews about particular listings or displays a hyperlink to such comments or reviews in immediate conjunction with particular listings, or
b. displays an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing, either or both of those features shall be disabled or discontinued for the seller's listings at the request of the seller,

either or both of those features shall be disabled or discontinued for the seller's listings at the request of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all displays controlled by participants. Except for the foregoing and subject to Section 18.2.9, a participant's IDX display may communicate the participant's professional judgment concerning any listing. Nothing shall prevent an IDX display from notifying its customers that a particular feature has been disabled at the request of the seller.

**Section 18.2.9 -** Participants shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the participant beyond that supplied by the MLS and that relates to a specific property. Participants shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for the property explaining why the data or information is false. However, participants shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment.

**Section 18.2.10 -** An MLS Participant (or where permitted locally, an MLS Subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS Participant (or MLS Subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that Participants may display listings from each IDX feed on a single webpage or display.

**Section 18.2.11 -** Participants shall not modify or manipulate information relating to other participants listings. MLS Participants may augment their IDX display of MLS data with applicable property information from other sources to appear on the same webpage or display, clearly separated by the data supplied by the MLS. The source(s) of the information must be clearly identified in the immediate proximity to such data. This requirement does not restrict the format of MLS data display or display of fewer than all of the available listings or fewer authorized fields.

**Section 18.2.12 -** All listings displayed pursuant to IDX shall identify the listing firm, and the email or phone number provide by the listing participant in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data. \*

\*Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application.

**Section 18.3 -** Display of listing information pursuant to IDX is subject to the following rules:

**Section 18.3.1 -** Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS participants and users (e.g. showing instructions, property security information,) may not be displayed.

**Section 18.3.1.1 -** The type of listing agreement (e.g., exclusive right to sell, exclusive agency, etc.) may not be displayed.

**Section 18.3.2 -** Deliberately Left Blank

**Section 18.3.3 -** Deliberately Left Blank



**Section 18.3.4 –** All listings displayed pursuant to IDX shall identify the listing agent.

Exhibit 2.7

81

## NORTHEAST FLORIDA MULTIPLE LISTING SERVICE, INC.
## RULES AND REGULATIONS

(Effective August 17, 2024)

**Definitions:** Unless otherwise defined herein, terms which are defined in the Bylaws of the Northeast Florida Multiple Listing Service, Inc. (the "Corporation" and "NEFMLS" herein) shall govern terms used herein.

A multiple listing service (MLS) is defined as a means by which cooperation among participants is enhanced; by which information is accumulated and disseminated to enable authorized participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; by which participants engaging in real estate appraisal contribute to common databases; and is a facility for the orderly correlation and dissemination of listing information so participants may better serve their clients and the public.

Times ending on a Saturday, Sunday or Federal Holiday shall be extended to the end of the next day that is not a Saturday, Sunday, or Federal Holiday.

**Membership defined:** Members of NEFMLS include brokers, appraisers and their licensees. Users include NEFMLS staff, authorized vendors, office assistants and personal assistants of Members. Brokers and Appraisers may execute a waiver for those licensees that choose to be members of a different MLS however NEFMLS must receive written proof of the licensee's current paid membership in a different MLS.

## LISTING PROCEDURES
Section 1      **Listing Procedures.** Listings of real property or any interest in or concerning real property of the following types, which are listed by a licensed real estate broker, and which are located within the service area of Northeast Florida Multiple Listing Service, Inc., as defined in the Bylaws Article IV shall be entered into the system as follows. Broker-loaded listings ("broker loaded") shall be entered in the Corporation's computer system by the broker within 24 hours after all necessary signatures of seller(s) have been obtained or the listing term beginning date whichever occurs last. If Listings are unable to be Broker loaded, they must be delivered to the Corporation for entry by Staff within 72 hours after all necessary signatures of seller(s) have been obtained or the listing term beginning date whichever occurs last.  Listings include but are not limited to:

     (a)   Residential homes for sale; (Residential)
     (b)   Two-family, three-family or four-family residential buildings for sale (Residential Income )
     (c)   Condominiums
     (d)   Land
     (e)   Rental
     (f)   Commercial for Sale
     (g)   Business opportunity
     (h)   Motel-Hotel
     (I)   Mobile/Manufactured homes with deeded land
     (j)   Mobile home parks
     (k)   Commercial for Lease
     (l)   Industrial
     (m)   Equitable Interests in Purchase Contracts that are Assignable

This section does not preclude solicitation of listings under the circumstances otherwise recognized by the Standards of Practice related to the Code of Ethics for Participants who are members of a Shareholder of the Corporation, or in the case of nonmember Participants, under the circumstances recognized by Section 16.4 hereof.

> Section 4.5   **Services Advertised as "Free".** MLS participants and subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the participant or subscriber will receive no financial compensation from any source for those services.

Section 4.6   **Use of the Terms NEFMLS, MLS and Multiple Listing Service.** No Participant, Subscriber or licensee affiliated with any Participant shall, through the name of their firm, their URLs, their e-mail addresses, their website addresses, or in any other way represent, suggest, or imply that the individual or firm is a multiple listing service (MLS), or that they operate a multiple listing service. Participants, Subscribers and licensees affiliated with Participants shall not represent, suggest, or imply that consumers or others have direct access to multiple listing service databases, or that consumer's or others are able to search multiple listing service databases available only to Participants and Subscribers. This does not prohibit Participants and Subscribers from representing that any information they are authorized under the Corporation's rules to provide to clients or customers is available on their websites or otherwise.

## NO COMPENSATION SPECIFIED ON MLS LISTINGS

Section 5   **No compensation specified on MLS Listings.** MLS will not accept listings containing an offer of compensation in the MLS to other MLS Participants and Subscribers. Participants, Subscribers, or their sellers may not make offers of compensation to buyer brokers and other buyer representatives in the MLS.

Use of MLS data or data feeds to directly or indirectly establish or maintain a platform to make offers of compensation from multiple brokers to buyer brokers or other buyer representatives is prohibited and must result in the MLS terminating that Participant's access to any MLS data and data feeds.

## REQUIRED CONSUMER DISCLOSURE

Section 5.0.0 **Required Consumer Disclosure.** MLS Participants and Subscribers must:

1. Disclose to prospective sellers and buyers that broker compensation is not set by law and is fully negotiable. This must be included in conspicuous language as part of any listing agreement, buyer written agreement, and pre-closing disclosure documents (if any).
2. Conspicuously disclose in writing to sellers, and obtain the seller's authority, for any payments or offer of payment that the listing Participant or seller will make to another broker, agent, or other representative (e.g. real estate attorney) acting for buyers. This disclosure must include the amount or rate of any such payment and be made in writing in advance of any payment or agreement to pay.

**WRITTEN BUYER AGREEMENT**

Section 5.0.1   **Written Buyer Agreements.** Unless inconsistent with state or federal law or regulation, all MLS Participants working with a buyer must enter into a written agreement with the buyer prior to touring a home. The written agreement must include:

   a) a specific and conspicuous disclosure of the amount or rate of compensation the Participant will receive or how this amount will be determined, to the extent that the Participant will receive compensation from any source;
   b) the amount of compensation in a manner that is objectively ascertainable and not open-ended.
   c) a term that prohibits the Participant from receiving compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer; and
   d) a conspicuous statement that broker fees and commissions are not set by law and are fully negotiable.

The Participant is required to submit a copy of the signed agreement and any addenda, if any, to the Corporation within 24 hours upon request.

Section 5.1   **Participant as Principal.** If a Participant or any licensee (or licensed or certified appraiser) affiliated with a Participant has any interest in property, the listing of which is to be disseminated through the Corporation, that person shall disclose that interest when the listing is filed with the Corporation and such information shall be disseminated to all Participants.

Section 5.2   **Participant as Purchaser.** If a Participant or any licensee (including licensed and certified appraisers and appraiser trainees) affiliated with a Participant wishes to acquire an interest in property listed with another Participant, such contemplated interest shall be disclosed in writing to the listing broker not later than the time an offer to purchase is submitted to the listing broker.

**CHARGES, FEES, DEPOSITS AND PENALTIES**

Section 6   **Charges, Fees, Deposits and Penalties.** NEFMLS may assess charges, fees, deposits and penalties to defray costs, and those are subject to change from time to time as adopted by the Board of Directors of the Corporation.  The charges, fees, deposits and penalties shall be published by the Corporation from time to time in its Policy Manual.

Anyone who has been a member in good standing of NEFMLS within the preceding 24 months shall not pay a new application fee.

A reinstatement fee may be charged for anyone terminating membership and rejoining within 12 months.

   (a)   Initial Fees:  An applicant for membership as a Participant, NON-Member Broker or Subscriber in the Corporation shall pay fees and such fees shall accompany the application.

   (b)   Annual Membership Fee:  The annual membership fee of each Participant, NON-Member Broker and Subscriber shall be an amount determined by the Board of Directors of the Corporation times the number of salespersons and licensed or certified appraisers  employed by or affiliated as an independent contractor with such Participant or NON-Members Broker who have

No contact information including but not limited to Office/Licensee name, phone number, email address, website address, seller's name and seller's phone number shall be permitted in directions, customer (public) remarks or photos. Identifiable persons shall not be permitted in photos, unbranded tours or videos. Virtual tours without advertising must be supplied when available. All content including but not limited to Photographs, images, graphics, audio and video recordings, virtual tours, drawings, descriptions, remarks, narratives, pricing information, and other details or information related to listed property must be an accurate depiction of the property without enhancement, editing, alterations or misrepresentation. NEFMLS reserves the right to remove photos and virtual tours at any time.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers. Any NEFMLS content in data feeds available to Participants for real estate brokerage purposes must also be available to Participants for valuation purposes, including automated valuations. MLS's must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLS's may require execution of a third-party license agreement where deemed appropriate by the MLS. MLS's may require Participants who will use such data feeds to pay the reasonably estimated costs incurred by an MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may <u>not</u> be used as supporting documentation. Any other use of such information is unauthorized and prohibited by these Rules and Regulations.

Section 12.3  **Use of Logo.** Only Participants who are members of a Shareholder of the Corporation may use the official registered Multiple Listing Service logo of the National Association of REALTORS®.  Use by a nonmember Participant would be a misrepresentation and would violate the registration rights of the National Association of REALTORS®, the lawful owner of said collective service mark.

Section 12.5  **Non-filtering of Listings.**  MLS participants and subscribers must not, filter out or restrict MLS listings that are communicated to customers or clients based on the existence or level of compensation offered to the cooperating broker or the name of a brokerage or agent.

## INTERNET DATA EXCHANGE (IDX)

Section 13 **Authority.** In accordance with the mandate from the National Association of Realtors®, the Corporation enacts the following rules to enable Participants' to display and deliver on Participants' public websites, mobile apps, and audio devices active listings, contingent listings, non-confidential pending sale listing data and sold listing data starting from January 1, 2012 at Participant's option.  As used throughout these rules, "display" includes "delivery" of such listings, by either downloading and placing the data on Participant's public access web sites or in applications using mobile devices or by audio devices or by framing such information subject to the requirements of the rules of NEFMLS as well as state law and regulations.

A Participant's consent for such display is presumed unless a Participant affirmatively notifies NEFMLS that the Participant refuses to permit display (either on a blanket or on a listing-by-listing basis).  If a Participant refuses on a blanket basis to permit the display of that Participant's listings, then that Participant may not download, frame or display the aggregated NEFMLS data of other Participants.  Even where Participants have given blanket authority for other Participants to display their listings on IDX sites, such consent may be withdrawn on a listing-by-listing basis where the seller has prohibited all internet display, or other electronic forms of display or distribution, or display of the listing's property address including but not limited to publicly accessible websites,

*85*

- Text data about the listing property
- A photo of the listing property
- "Buttons" providing links to the Detailed Display

F)     **Detailed Display Requirements.** A Detailed Display of another IDX Broker's listing shall not include any Branding within the "body" of the listing data. The "body" is defined as the space whose borders are delimited by the utmost extent in each direction of the listing text and photo data. Any IDX display must be controlled by a Participant. For purposes of this IDX Policy and these Rules and Regulations control means the ability to add, delete, modify and update information as required by the IDX Policy and NEFMLS Rules and Regulations. Immediately following the property information on a Detailed Display of another IDX Broker's listing, the following information shall be displayed conspicuously in type that is at least as large as the largest type size used to display the listing data.

- Listing IDX Broker's Firm name under which they operate, and the email or phone number provided by the listing participant in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data.

- NEFMLS copyright notice.  One of the following copyright notices must be displayed **exactly** as specified below on any display of detailed listing data of another IDX Broker:

- "Copyright (insert current year) Northeast Florida Multiple Listing Service, Inc.  All rights reserved."

- "© (insert current year) Northeast Florida Multiple Listing Service, Inc.  All rights reserved."

- It is not permissible to substitute a "c" in parenthesis - "(c)" - for the copyright symbol - ©.  If a web site cannot display the copyright symbol, the word "Copyright" must be spelled out.

All listings displayed pursuant to IDX shall show NEFMLS as the source of the information. Displays of minimal information (e.g. thumbnails, text messages, tweets, etc. of 200 characters or less are exempt from this requirement but only when directly linked to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application.

G)     **Required Disclosures**

1.     **Information Source Disclosure.** The following disclosure, or similar language that achieves the same objective, must appear on the first page where any IDX listing data is displayed:  "The data relating to real estate for sale on this web site comes in part from the Internet Data Exchange (IDX) program of the Northeast Florida Multiple Listing Service, Inc.  Real estate listings held by brokerage firms other than [insert firm name] are marked with the listing broker's name and detailed information about such listings includes the name of the listing brokers.  Data provided is deemed reliable but is not guaranteed."  At the option of NEFMLS, any NEFMLS logo, icon or symbol may be displayed next to this disclosure.

86

# Exhibit 2.8

87




# Rules and Regulations

## Midwest Real Estate Data

## MRED Quick Reference Guide

| | |
|---|---|
| TRAINING REGISTRATION | 630-955-2755 |
| HELP DESK | 630-955-2755 |

**HELP DESK HOURS:  M-F 8:00 AM – 6:00 PM, Sat:  9:00AM – 3:00PM**



**VISIT US AT MREDLLC.COM FOR TRAINING REGISTRATION, FORMS AND MORE...**

2443 WARRENVILLE RD, SUITE 600   LISLE, ILLINOIS 60532   T  630-955-0011   F  630-955-0353   MREDLLC.COM

## Rules and Regulations

2. Conspicuously disclose in writing to sellers, and obtain the seller's authority, for any payments or offer of payment that the listing Participant or seller will make to another broker, broker, or other representative (e.g. real estate attorney) acting for buyers. This disclosure must include the amount or rate of any such payment and be made in writing in advance of any payment or agreement to pay.

Section 1(c)       **WRITTEN BUYER AGREEMENTS**

Unless inconsistent with state or federal law or regulation, all Participants working with a buyer must enter into a written agreement with the buyer prior to touring a home. The written agreement must include:

a. a specific and conspicuous disclosure of the amount or rate of compensation the Participant will receive or how this amount will be determined, to the extent that the Participant will receive compensation from any source.

b. the amount of compensation in a manner that is objectively ascertainable and not open-ended.

c. a term that prohibits the Participant from receiving compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer; and

d. a conspicuous statement that broker fees and commissions are not set by law and are fully negotiable.

Section 1(d)      **SERVICES ADVERTISED AS FREE**

Participants and Subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to clients, unless the Participant or Subscriber will receive no financial compensation from any source for those services.

SECTION 1(e):      **EXCLUSIVE BROKERAGE AGREEMENTS**

The Service only accepts property listings subject to an "Exclusive Right to Sell", "Exclusive Right to Lease" or "Exclusive Agency" brokerage agreement for listings of real property located within the United States. For business only listings, the Service will accept a contract between the broker and their client which provides for the Broker's exclusive representation and gives the Broker the authority to place the business for sale in the Service. For International listings (where the subject property is located outside the United States), the Service will additionally accept an Exclusive Marketing/Advertising agreement between the broker and their client if it provides for the Broker's exclusive right within the Service Area to market and/or advertise the subject property for sale or lease.

An Exclusive Right to sell brokerage agreement is a written agreement between a broker and seller to market the seller's property, giving the broker (the "Listing Broker") the exclusive right to place the listing into the Service.

An Exclusive Right to Lease brokerage agreement is a written agreement between a broker and lessor to lease the lessor's property, giving the Listing Broker the exclusive right to place the listing into the Service.

The Exclusive Agency brokerage agreement also authorizes the Listing Broker, as exclusive broker to place the listing in the service but reserves to the seller the general right to sell the property on an unlimited or restrictive basis. Exclusive agency and exclusive right to sell brokerage agreements with named exceptions should be clearly distinguished from exclusive right to sell brokerage agreements with no named exceptions pursuant to Section 1.9 below since they can present special risks of procuring cause controversies and administrative problems not posed by exclusive right to sell brokerage agreements with no named exceptions.

An Exclusive Marketing/Advertising brokerage agreement is a written agreement between the broker and the seller to market and/or advertise the seller's property giving the broker the right to place the listing into the Service. . Broker and/or buyer registration processes may be required. Exclusive Marketing/Advertising brokerage agreements are only accepted for International listings, where the subject property is located outside the United States.

"Open listings" and "net listings" are not accepted by the Service. Net listings are not accepted because they are considered unethical,

Note that Illinois Real Estate License Law requires that all exclusive brokerage agreements must provide for minimum services to (1) accept delivery of and present to the client all offers and counteroffers to buy, sell or lease the client's property or the property the client seeks to purchase or lease (2) assist the client in developing, communicating, negotiating, and presenting offers, counteroffers and notices that relate to the offers and counteroffers until a lease or purchase agreement is signed and all contingencies are satisfied or waived, and (3) answer the client's questions relating to the offers, counter offers, notices and contingencies.

The Service reserves the right to refuse to accept any exclusive brokerage agreement for a property or business placed into the Service which fails to adequately protect the interest of the public and the Participants, or which fails to comply with the Illinois Real Estate License laws...The Service also reserves the right to investigate reports of any broker failing to provide minimum services and request a copy of that broker's exclusive brokerage agreement for property listings. As the Service only accepts exclusive brokerage



**Rules and Regulations**

See MRED's Listing Exemption Policy for details.

### SECTION 1.7: CHANGE OF STATUS OF LISTING

Any change in listed price or other change in the original exclusive brokerage agreement (other than expirations and extensions - see Section 1.12) shall be made only when authorized in writing by the Seller and shall be placed into the Service within 48 hours after the authorized change is received by the Listing Broker.

### SECTION 1.8: REMOVAL OF LISTING PRIOR TO EXPIRATION

Listings of property may be removed from the Service by the Listing Broker before the expiration date of the exclusive brokerage agreement provided Seller authorizes the cancellation in writing.

### SECTION 1.10: LISTING MULTIPLE UNIT PROPERTIES

Contiguous or multiple unit properties located within the same block or unit of a subdivision, according to the legal description, may be placed into the Service as one listing, however, when part of a listed property has been sold, proper notification must be placed into the Service. If the Listing Broker has a Master Marketing or Exclusive brokerage agreement for a development, condominium, conversion or new construction with multiple condominium units, lots or homes, the Listing Broker must either include all units (at time of input) or a selection of each price and style of units, lots or homes available. All unit(s), lot(s) or home(s) sold or pending, must be reported to the Service as "contingent," "pending" or "closed" within 48 hours of the activity.

### SECTION 1.11: NO CONTROL OF COMMISSION RATES OR FEES CHARGED BY PARTICIPANTS

The Service shall not fix, control, recommend, suggest, or maintain commission rates or fees for services to be rendered by Participants. Further, the Service shall not fix, control, recommend, suggest, or maintain the division of commissions or fees between cooperating Participants or between Participants and nonparticipants.

### SECTION 1.12: EXPIRATION, EXTENSION, AND RENEWAL OF LISTINGS

Each listing placed into the Service shall automatically expire at midnight on the date specified in the exclusive brokerage agreement unless renewed and placed into the Service prior to expiration.

If notice of renewal or extension is dated after the expiration date of the original listing, then an updated - exclusive brokerage agreement must be secured for the listing to be placed into the Service. Any extension or renewal of a listing must be signed by the Seller(s.)

### SECTION 1.12.1 NON-FILTERING OF LISTINGS

Participants and Subscribers must not filter out or restrict Service listings that are communicated to customers or clients based on the existence or level of compensation offered to the cooperating broker or the name of a brokerage or broker.

### SECTION 1.13: TERMINATION DATES ON LISTINGS

Listings placed into the Service shall bear a definite and final termination date as negotiated between the Listing Broker and the Seller.

### SECTION 1.14: JURISDICTION

Only listings of the designated types of property located within the combined territorial jurisdiction of the Associations/Board that Midwest Real Estate Data provides services to are required to be placed into the Service. Listings of property located outside those locations will be accepted if placed voluntarily by a Participant but are not required by the Service.

90

**Rules and Regulations**

Note: Effective October 1, 2011

MRED prohibits the delivery of Broker Only Information to the general public, with the exception of seller clients, administrative staff and technical vendors. "Broker Only Information" is defined as the following data: Broker Remarks, Showing Instructions, Lockbox Codes, and Expiration Dates. Violation of this rule will result in an automatic fine of $250.00 per reported occurrence.

SECTION 30.1:     SHARING OF MLS ID

Dissemination of your MLS ID number with non-subscribers except for authorized vendors or required contract disclosures is strictly prohibited.

## SECTION 31: USE OF SERVICE INFORMATION

SECTION 31:     LIMITATIONS ON USE OF SERVICE INFORMATION

Use of information from the Service's Compilation of current listing information, from the Participant's "Statistical Report," or from any "sold" or "comparable" report of the Service for public mass media advertising by a Participant or in other public representations by a Participant may not be prohibited.

However, any printed or non-print forms of advertising or other forms of public representations must clearly demonstrate the period of time over which such claims are based and must include the following notice:

"This representation is based in whole or in part on data supplied by Midwest Real Estate Data, LLC for the period (date) through (date). Midwest Real Estate Data, LLC does not guarantee nor is it in any way responsible for its accuracy. Data maintained by Midwest Real Estate Data LLC may not reflect all real estate activity in the market."

## SECTION 32:  BROKER RECIPROCITY / IDX

These policies are available through the MLS GRID at <u>MLS Grid IDX Rules.</u>

Sellers may elect to withhold their property's listing from display on the internet outside of MRED MLS platform systems. Those sellers who are making this choice shall execute option A of                               with their listing broker.

Sellers may elect to withhold display of the listing's property address from the internet outside of MRED MLS platform systems. Those who are making this choice shall execute option B of Appendix B: Seller Opt-Out Form with their listing broker.

## SECTION 36:  USE OF TERMS

SECTION 36.1:     USE OF TERMS

The acceptable use of the term "Service" or "MLS" or "Multiple Listing Service" is for a Participant to indicate they are a Participant of Midwest Real Estate Data LLC.

As used in Sections 36 of these Rules, the term "Participant" includes a Participant's affiliated non-brokers and sales licensees- except when the term is used in the phrases "Participant's consent" and "Participant's oversight, supervision and accountability".

No Participant or Non-Participant shall indicate or imply or infer in any medium (electronic or otherwise) that the Participant or Non-Participant is or operates a multiple listing service. Participants and Non-Participants shall not use the term "multiple listings service" the acronym "MRED" or any derivatives in company/firm names. No Participant or Non-Participant shall indicate, imply or infer in any manner that the Participant is a multiple listing service or that the public has access to or may search the multiple listing service (e.g. "Search the MLS" or "Access/Search MRED/Midwest Real Estate Data, LLC") on their own Web sites or in any advertising media. All existing uses of such terms in the previously stated manner are subject to the penalties stated in this rule.

Use of the term "multiple listing service" the acronym "MLS" or any derivatives is acceptable in Domain names, web addresses, and URL's, as long as the name does not imply and/or infer that the web site is associated with, or operated by Midwest Real Estate Data, LLC (MRED).

91

# Exhibit 2.9



# MLS RULES AND REGULATIONS ("MLS RULES")

## MIAMI ASSOCIATION OF REALTORS®, INC.
## D/B/A SOUTHEAST FLORIDA MULTIPLE LISTING SERVICE

*LAST UPDATED NOVEMBER 14, 2024*

## 1.  PURPOSE

MIAMI Association of REALTORS®, Inc. ("MIAMI") d/b/a Southeast Florida Multiple Listing Service ("SEFMLS" or "MLS") is a multiple listing service, which is: a facility for the orderly correlation and dissemination of listing information so that "Participants" and "Other Subscribers," as defined herein, may better serve their customers, clients, and the public; a means of enhancing cooperation among Participants and Other Subscribers; a means by which information is accumulated and disseminated to enable authorized Participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; and, a means by which Participants engaging in real estate appraisal contribute to common databases. Any matter not specifically addressed in these MLS Rules shall be governed by the policies and procedures set forth by the NATIONAL ASSOCIATION OF REALTORS® ("NAR"), including but not limited to the NAR "Handbook on Multiple Listing Policy," as from time to time amended, and which are incorporated herein by reference. The NAR Handbook on Multiple Listing Policy shall in no instance be interpreted as requiring any constituent member association, such as MIAMI, or association member to adopt or follow any policy which would contravene law applicable to MIAMI or association member.

## 2.  SUPERVISION & EFFECTIVE DATE OF CHANGES IN MLS RULES

SEFMLS is supervised by the Residential and BROWARD-MIAMI Boards of Governors of MIAMI, which supervision includes making changes in, and enforcing, the MLS Rules, subject to the final approval of the Corporate Board of Directors of MIAMI. Any changes to the MLS Rules are effective upon approval by the Corporate Board of Directors of MIAMI. Participants' and Subscribers' ongoing and continued use of and access to the SEFMLS constitutes their consent to be bound by the MLS Rules, both as they exist now and as may be amended in the future.

93

the listing from the SEFMLS, where the Participant or Subscriber has refused or failed to timely report status changes. Prior to the status change or removal of any listing from the SEFMLS, the Participant or Subscriber shall be advised of the intended removal so the Participant or Subscriber can either make the change themselves and/or advise their customer of the same.

### 15.10 PROHIBITIONS

#### 15.10.1 "For Sale" signs

Only the "For Sale" sign of the listing Broker may be placed on a property.

#### 15.10.2 "Sold" signs

Prior to closing, only the "Sold" sign of the listing Broker may be placed on a property, unless the listing Broker authorizes the cooperating (selling) Broker to post such a sign.

#### 15.10.3 Use of the terms MLS and Multiple Listing Service

No SEFMLS Participant, Subscriber, or licensee affiliated with any Participant or Subscriber shall, through the name of their firm, their URLs, their e-mail addresses, their website addresses, or in any other way represent, suggest, or imply that the individual or firm is the SEFMLS, that they are a multiple listing service, or that they operate a multiple listing service. Participants, Subscribers, and licensees affiliated with Participants and Subscribers shall not represent, suggest, or imply that consumers or others have direct access to SEFMLS databases, or that consumers or others are able to search SEFMLS databases available only to Participants and Subscribers. This does not prohibit Participants and Subscribers from representing that any information they are authorized under SEFMLS rules to provide to clients or customers is available on their websites or otherwise.

#### 15.10.4 Services advertised as "Free"

SEFMLS Participants and Subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to their clients or customers, unless the Participant or Subscriber will receive no financial compensation from any source for those services.

#### 15.10.5 No filtering of listings

Participants and Subscribers must not filter out or restrict SEFMLS listings that are communicated to customers or clients based on the existence or level of compensation offered to the cooperating broker or the name a brokerage or agent.

### 15.11 REQUIRED CONSUMER DISCLOSURES

**15.11.1** Participants and Other Subscribers must disclose to prospective sellers and buyers that buyer compensation is not set by law and is fully negotiable. This must be included in conspicuous language as part of any listing agreement, buyer written agreement,

94

and pre-closing disclosure documents (if any).

**15.11.2** Participants and Other Subscribers must conspicuously disclose in writing to sellers, and obtain the seller's authority, for any payments or offer or payment that the listing Participant or seller will make to another broker, agent, or other representative (e.g. a real estate attorney) acting for buyers. This disclosure must include the amount or rate of any such payment and be made in writing in advance of any payment or agreement to pay.

## 15.12 WRITTEN BUYER BROKER AGREEMENTS ARE REQUIRED

**15.12.1** Unless inconsistent with state or federal law or regulation, all Participants and Subscribers working with a buyer must enter into a written agreement with the buyer prior to touring or showing a home, whether that is virtually or in-person. The written agreement must include:

**15.12.1.1** A specific and conspicuous disclosure of the amount or rate of compensation, if any, the Participant or Subscriber will receive or how this amount, if any, will be determined, to the extent that the Participant will receive compensation from any source;

**15.12.1.2** The amount of compensation in a manner that is objectively ascertainable and not open-ended;

**15.12.1.3** A term that prohibits the Participant or Subscriber from receiving compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer; and,

**15.12.1.4** A conspicuous statement that broker fees, commission, and compensation, if any, are not set by law and are fully negotiable.

**15.12.2** Buyer broker agreements are not required in leasing transactions or commercial transactions; however, these MLS Rules do not prevent Participants or Subscribers from using representation agreements in those transactions.

**15.12.3** The written buyer broker agreement must include the buyer's written authorization to submit the agreement to the SEFMLS if requested or audited. Upon request of the SEFMLS, Participants and Subscribers shall produce documentation of the written buyer broker agreement or any changes thereto, within 2 business days of said request from the SEFMLS. Failure to do so may result in discipline, sanctions, and/or fines.

## 16. ORIENTATION

Any applicant for SEFMLS participation and any licensee (including licensed or certified appraisers) affiliated with an SEFMLS Participant or Subscriber who has access to and use of SEFMLS-generated information shall complete an orientation program of no more than 8 classroom hours devoted to the MLS Rules and computer training related to SEFMLS information entry and retrieval and the operation of the SEFMLS within 30 days after access has been provided. Participants and Subscribers may be required, at the discretion of the SEFMLS,

or another participant harmed?

        **28.8.2.3**     Was the violation inadvertent or unintentional or, conversely, was it the result of knowing disregard for the obligations of MLS participants and subscribers?

        **28.8.2.4**     How much real estate experience did the violator have? Did he, or should he, have known better?

        **28.8.2.5**     Has the violator been found in violation of the rules previously? How often? How recently? Is the current violation related or similar to earlier violations?

        **28.8.2.6**     Are there mitigating or extenuating circumstances that should be considered in determining appropriate discipline?

        **28.8.2.7**     Did the violator acknowledge the violation? Did the violator express remorse or contrition?

        **28.8.2.8**     Are there other factors that ought to be considered?

### 28.9  MLS RULES VIOLATIONS: LEGAL ACTION

    SEFMLS Participants and/or Subscribers may not take legal action against other Participants and/or Subscribers for alleged violation(s) of the MLS Rules unless the complaining Participant and/or Subscriber has first exhausted the remedies provided in the MLS Rules.

### 29.    SEFMLS ANTITRUST COMPLIANCE POLICY

    **29.1**   The purpose of multiple listing is the orderly correlation and dissemination of listing information to participants so they may better serve the buying and selling public. Boards and associations of REALTORS® and their multiple listing services shall not enact or enforce any rule which restricts, limits, or interferes with Participants and/or Subscribers in their relations with each other, in their Broker/client or Broker/customer relationships, or in the conduct of their business in the following areas. MIAMI and SEFMLS shall not:

        **29.1.1** Fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services.

        **29.1.2** Fix, control, recommend, or suggest the cooperative compensation offered by listing Brokers to potential cooperating Brokers.

        **29.1.3** Base dues, fees, or charges on commissions, listed prices, or sales prices. Initial participation fees and charges should directly relate to the costs incurred in bringing services to new Participants and Subscribers.

        **29.1.4** Modify, or attempt to modify, the terms of any listing agreement; this does

*96*

# Exhibit 2.10

97

# CPAR

# MLS

## Central Panhandle Association of Realtors® Multiple Listing Service Rules

**Last Revision**

**November 2024**



EQUAL HOUSING
OPPORTUNITY

98

## Section 4.3 - Solicitation of Listing Filed with the Service

Participants shall not solicit a listing on property filed with the Service unless such solicitation is consistent with Article 16 of the REALTORS® Code of Ethics, its Standards of Practice and its Case Interpretations.

**NOTE**       This Section is to be construed in a manner consistent with Article 16 of the REALTORS® Code of Ethics and particularly Standard of Practice 16-4

This Section is intended to encourage sellers to permit their properties to be filed with the Service by protecting them from being solicited, prior to expiration of the listing, by brokers and salespersons seeking the listing upon its expiration.

Without such protection, a seller could receive hundreds of calls, communications, and visits from brokers and salespersons who have been made aware through the MLS filing of the date the listing will expire and desire to substitute themselves for the present broker.

This Section is also intended to encourage brokers to participate in the Service by assuring them that other Participants will not attempt to persuade the seller to breach the listing agreement or to interfere with their attempts to market the property. Absent the protection afforded by this Section, listing brokers would be most reluctant to generally disclose the identity of the seller or the availability of the property to other brokers.

This Section does not preclude solicitation of listings under the circumstances otherwise recognized by the Standards of Practice related to Article 16 of the Code of Ethics. **M**

## Section 4.4 – Use of Terms MLS and Multiple Listing Service

No MLS Participant, subscriber or licensee affiliated with any participant shall, through the name of their own firm, their URL's, their email addresses, their website addresses, or in any other way represent, suggest, or imply that the individual or firm is an MLS, or that they operate an MLS. Participants, subscribers and licensed affiliated with participants shall not represent, suggest or imply that consumers or others have direct access to MLS databases, or that consumers or others are able to search MLS database available only to participants and subscribers. This does not prohibit participants and subscribers from representing that any information they are authorized under MLS rules to provide clients or customers is available on their websites or otherwise. (Adopted 11/07) **O**

---

### Section 4.5 – Services Advertised as "Free"

MLS participants and subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the participant or subscriber will receive no financial compensation from any source for those services. **M**

---



## Section 4.6 – No Filtering of Listings

Participants and Subscribers must not filter out or restrict MLS Listings that are communicated to customers or clients based on the existence or level of compensation offered to the cooperating broker or the name of a brokerage or agent. M

## Section 4.7 – Comments/Non-Essential Information to the Transaction

The MLS system shall not be used as a platform or means of retaliation, defamation of character or derogatory remarks against anyone. The MLS Department will immediately remove any comments not pertinent to the transaction and notification of such will be disseminated via email.  (Amended 9/23) C

## Section 4.8 - Information in Public Remarks

The MLS does not allow the placement of names, phone numbers, email addresses, or other information of this nature that is not descriptive in nature and relevant to an accurate portrayal of the property and transaction being marketed, to be placed in the remarks, directions, internet remarks or photo sections of a listing.  Photos or Virtual Tours submitted with a listing must be free of advertising logos or images of any kind of agent information superimposed or inserted in the photo.

NOTE: The only exception shall be the BUILDER'S NAME. If the builder is the seller/agent or had ownership interest, the BUILDER'S NAME may NOT be placed in the public remarks.  No other contact information shall be given.(Amended 8/2024)

No reference to web sites is allowed to be entered into any field including Agent-to-Agent Remarks. (Adopted 10/2008)

NOTE: An exception is made to allow a URL linking to rental Application in Public Remarks on Residential Rental listings. (Added 2/2/22) C

## Section 4.9 – Seller Concessions

Participants may communicate on the MLS offers by a seller to cover all or part of a buyer's closing costs. Any offer from a seller to cover buyer's closing costs communicated on the MLS may not be                    C
conditioned upon retention of or payment to a buyer broker.

Seller Concessions other than buyer broker payments are allowed in agent-to-agent remarks, public remarks and closing sale notes

*Note: New Seller Concession field will not be Searchable in MLS.*                    100

Updated 11/2024

**CPAR**

## Section 5.0.1 - Disclosing Potential Short Sales

Removed 2024

### Section 5.0.2 - Written Buyer Agreement

Unless inconsistent with state or federal law or regulation, all MLS Participants working with a buyer must enter into a written agreement with the buyer prior to touring a home. The written agreement must include:

a. a specific and conspicuous disclosure of the amount or rate of compensation the Participant will receive or how this amount will be determined, to the extent that the Participant will receive Compensation from any source;
b. the amount of compensation in a manner that is objectively ascertainable and not open-ended.
c. a term that prohibits the Participant from receiving compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer; and
d. a conspicuous statement that the broker fees and commissions are not set by law and are fully negotiable. M

**Note:**   Violations of this rule will be assessed a $500 fine for the first violation, a $1,000 fine for the second violation, and a $5,000 fine plus a 30-day suspension of the subscriber's MLS account for any subsequent violations.

## Section 18.2.11

Participants shall not modify or manipulate information relating to other participants listings. MLS participants may augment their IDX display of MLS data with applicable property information from other sources to appear on the same webpage or display, clearly separated by the data supplied by the MLS. The source(s) of the information must be clearly identified in the immediate proximity to such data. This requirement does not restrict the format of MLS data display or display of fewer than all of the available listings or fewer authorized fields. (Adopted 05/15) M

## Section 18.2.12

All listings displayed pursuant to IDX shall identify the listing firm, and the email or phone number provided by the listing participant in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data.* (Amended 05/17)

*Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. M

## Section 18.3 – Display

Display of listing information pursuant to IDX is subject to the following rules:

## Section 18.3.1

Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS participants and users (e.g., showing instructions and property security information) may not be displayed. *(Amended 11/21)* O

## Section 18.3.1.1

The type of listing agreement (e.g., exclusive right to sell, exclusive agency, etc.) may not be displayed. *(Amended 05/12)* O

**Section 18.3.2 -** Deleted May 2015

**Section 18.3.3 -** Deleted May 2017; moved to 18.2.12 May 2017

102

CPAR

# Exhibit 3

# Exhibit 3.1



AT&T — Learn how everyone can get the new iPhone 16e for $5.99/mo. with any unlimited plan — Learn more

🏠 **realtor.com**   Buy   Rent   Sell   Mortgage   Find Realtors*   My Home   News & Insights      Manage rentals   Advertise      Log in   **Sign up**

< Back    | Bethany, CT    ✕  🔍 |    Homes For Sale > Connecticut > South Central Connecticut County > Bethany > 138 Litchfield Tpke      ♡  ⬆  🚫



New

Listed by Jorge Zea
Brokered by Blue Lighthouse Realty

Kitchen

Living room

Bathroom

◉ All 40 photos                    1/40

♡ 6 saves this month

### Schedule tour

**What is your preferred tour date?**

| Thu Jul 3 | Fri Jul 4 | J > |

Email*

Phone*

☐ I've served in the U.S. military  ⓘ

**Request tour**

### More about this property

**Email agent**

By proceeding, you consent to receive calls and texts at the number you provided, including marketing by autodialer and prerecorded and artificial voice, and email, from realtor.com and others about your inquiry and other home-related More...

Check 0% down VA Loan eligibility as of July 2025   |   How much home can I afford? (Find out!)

● House for sale

# $899,000

5 bed   4.5 bath   3,070 sqft   2.9 acre lot

138 Litchfield Tpke, Bethany, CT 06524

Est.$5,914/mo  ✎    | Get pre-approved |

| 🏠 | Single family Property type | 📅 | 2 days On Realtor.com | ⬛ | $293 Price per sqft |
| 🏠 | 2 Cars Garage | ⇗ | 1996 Year built |

| Contact agent |    Share this home

Realtor.com checked: A few minutes ago | Listing last updated: Jul 1, 2025 at 9:03 PM (EDT)
Source: SMARTMLS, MLS #24108292

**xfinity**  New Home? Easily level up your Wifi.

Street View

Google    Map data ©2025

🚗 Add a commute

5x miles on flights booked with Capital One travel — CapitalOne Business — Apply now

SHOPPING — Actually Good-Looking Dog Crate Furniture, According to Designer — Read More

### 🗓 Open houses                                                              ⌃

Contact agent for a private showing.

| Schedule tour |

< Back

Contact agent    ♡ Save    ⬆ Share    ◻ Hide

## Schedule tour

Contact agent for a private showing.

Schedule tour

**What is your preferred tour date?**

| Thu Jul 3 | Fri Jul 4 | J > |

Email*

Phone*

◻ I've served in the U.S. military    ⊙

Request tour

### 🏠 Property details                                                    ∧

Exquisite 5-Bedroom Retreat on 3.18 Acres - Modern Luxury in Horse Country! Nestled on a serene 3.18-acre lot in the heart of Bethany's renowned equestrian community, this 5-bedroom, 4.5-bathroom masterpiece, built in 1996, expanded in 2013, and updated in 2021, offers 3,070 square feet o... **Show more**

## More about this property

Email agent

By proceeding, you consent to receive calls and texts at the number you provided, including marketing by autodialer and prerecorded and artificial voice, and email, from realtor.com and **others** about your inquiry and other home-related **More...**

### 🛋 Interior

**Bedrooms**
- Bedrooms: 5
- Bedroom 1 Level: Upper

**Other Rooms**
- Total Rooms: 9
- Living Room Level: Main
- Basement Description: Full, Partially Finished

**Bathrooms**
- Total Bathrooms: 5
- Full Bathrooms: 4
- 1/2 Bathrooms: 1

**Interior Features**
- Audio System
- Auto Garage Door Opener
- Cable - Available
- Central Vacuum
- Security System

**Appliances**
- Gas Cooktop
- Cook Top
- Wall Oven
- Microwave
- Refrigerator
- Icemaker
- Dishwasher
- Washer
- Wine Chiller

**Heating and Cooling**
- Cooling Features: Ceiling Fans, Central Air, Ductless
- Heating Features: Heat Fuel Type: Propane, Wood, Heat Type: Baseboard, Hydro Air, Radiant, Wood/Coal Stove
- Heating Fuel: Propane, Wood
- Number Of Fireplaces: 1
- Water Heaters: Propane, Tankless Hotwater

**Kitchen and Dining**
- Dining Room Level: Main

### 🏡 Exterior

**Land Info**
- Lot Description: Secluded, Treed, Sloping Lot
- Lot Size Acres: 2.9
- Lot Size Square Feet: 126324

**Garage and Parking**
- Garage Spaces: 2
- Garage Description: Attached Garage

### 🏘 Community

**School Information**
- Elementary School: Bethany Community
- High School: Amity Regional

**Homeowners Association**
- Calculated Total Monthly Association Fees: 0

### 📋 Listing

**Other Property Info**
- Annual Tax Amount: 12332
- Source Listing Status: Active
- County: New Haven

< **Back**

 Contact agent   ♡ Save   ⬆ Share   ☒ Hide

## Other Property Info

- Annual Tax Amount: 12332
- Source Listing Status: Active
- County: New Haven
- Directions: Route 15/Merritt Parkway Exit 59, North On Route 69, Which Is Litchfield Tpke, Approx. 4 Miles On Right. Or, The Intersection Of Route 69 And Route 42, Head South, Approx. 4 Miles On Left.
- Source Property Type: Single Family For Sale
- Postal Code Plus 4: 3517
- Zoning: R-130
- Source System Name: C 2 C

### ⌂ Features

**Building and Construction**

- Total Square Feet Living: 3070
- Year Built: 1996
- Above Grade Finished Area: 3070
- Attic: Attic Description: Unfinished, Storage Space, Pull-Down Stairs, Attic YN: Y
- Building Exterior Type: Clapboard, Wood
- Construction Materials: Frame
- Foundation Details: Concrete
- Property Age: 29
- House Style: Colonial
- Total Area Sqft: 3070

**Utilities**

- Sewer: Septic
- Water Source: Private Well

Show less ∧

### Schedule tour

**What is your preferred tour date?**

| Thu **Jul 3** | Fri **Jul 4** | J > |

Email*

Phone*

☐ I've served in the U.S. military   ⓘ

Request tour

### More about this property

Email agent

By proceeding, you consent to receive calls and texts at the number you provided, including marketing by autodialer and prerecorded and artificial voice, and email, from realtor.com and **others** about your inquiry and other home-related **More...**

---

Find out more about this property.   Contact agent

 **Should You Rent or Should You Buy?**   🏠  Find Out

---

**Local Home Services**

Advertisement

**Cable and Internet**

See Internet & TV Offers Near You

**SEE OFFERS NOW** ⬈

Presented By

smartmove ▶

**Moving**

Need a Mover? Get Free Moving Quotes and a Cost Estimate

**GET MOVING QUOTES** ⬈

Presented By

@ moving.com

---

### ▤ Monthly payment    ∧

**RealCost™ for this home**

**$5,914**/month    ⬦ **Edit payment**

**Is this affordable?**

Calculate your buying power

---

< Back

Contact agent     ♡ Save     ⬆ Share     ⚲ Hide

## RealCost™ for this home

**$5,914**/month          ✎ **Edit payment**

| Home price | | $899,000 |
|---|---|---|
| Loan | 30-year fixed average rate of 6.603%* | |
| ● Principal & interest | | $4,595 |
| ● Property tax | | $1,028 |
| ● Home insurance<br>Compare rates | | $292 |
| ● HOA fees | | $0 |
| ● Mortgage insurance | | $0 |
| **Total due at close** | | **$215,760** |
| Down payment (20%) | | $179,800 |
| Estimated closing cost (4%) | | $35,960 |

Apply veterans benefits ⓘ          ( Off )

( Get pre-approved )     View today's rates

### Is this affordable?

**Calculate your buying power**

### Schedule tour

What is your preferred tour date?

| Thu<br>**Jul 3** | Fri<br>**Jul 4** | > |

Email*

Phone*

☐ I've served in the U.S. military     ⓘ

( Request tour )

### More about this property

( Email agent )

By proceeding, you consent to receive calls and texts at the number you provided, including marketing by autodialer and prerecorded and artificial voice, and email, from realtor.com and **others** about your inquiry and other home-related **More..**

**RealCost™ Disclosure**

*30-year fixed averages: 6.633% APR / 6.603% Rate. Averages are provided for informational purposes only and are based on averages for CT.
**Disclosures.**

How much home can I afford? (Find out!)



## Over 500,000 new listings every month

### 30-year fixed average:

**6.633%**     **6.603%**
APR          Rate

| Location | Bethany, CT |
|---|---|
| Purchase price | $899,000 |
| Down payment (20%) | $179,800 |

Averages are provided for informational purposes only and are based on averages for CT. **Disclosures**.

**30-year fixed**   15-year fixed   5-year ARM

🏛 Veterans: 0% Down VA Loans (Check Eligibility & Rates)

| | APR | Payment | Rate | Fees | |
|---|---|---|---|---|---|
| **Reliant** Home Funding<br>30-year fixed<br>NMLS 292473 | **5.989%** | **$4,255/mo** | **5.875%** | $8,849 ⓘ<br>Includes 0.953 points ($6,854) | ( Get your quote ) |
| **BISON** STATE BANK<br>30-year fixed<br>NMLS 757416 | **6.311%** | **$4,429/mo** | **6.250%** | $4,675 ⓘ<br>Includes 0.650 points ($4,675) | ( Get your quote ) |
| **SFC** Superior Funding<br>30-year fixed | **6.329%** | **$4,429/mo** | **6.250%** | $6,020 ⓘ<br>Includes 0.837 points | ( Get your quote ) |

‹ Back    Contact agent    ♡ Save    ⬆ Share    ◌ Hide

NMLS 757416

**SFC Superior Funding**
30-year fixed
NMLS 2972

| APR | Payment | Rate | Fees |
|-----|---------|------|------|
| 6.329% | $4,429/mo | 6.250% | $6,020 ⓘ Includes 0.837 points ($6,020) |

Get your quote

## Shop around for providers based on your financial criteria

View more providers

Advertising disclosure

Rate data provided by RateUpdate.com. Displayed by ICB, a division of Mortgage Research Center, NMLS #1907, Equal Housing Opportunity. Payments do not include taxes or insurance premiums. Actual payments will be greater with taxes and insurance included. Rate and product details.

### ⑤ Connect with a lender ⌃

**See how much you can afford**

What type of home are you looking for?

| ⌂ Single Family | 🏢 Town Home |
|---|---|
| 🏢 Condominium | 🏢 Multi-Family |
| ⌂ Mobile / Manufactured | ☺ New Construction |

### Schedule tour

**What is your preferred tour date?**

| Thu Jul 3 | Fri Jul 4 | ⟩ |
|---|---|---|

Email*

Phone*

☐ I've served in the U.S. military ⓘ

Request tour

### More about this property

Email agent

By proceeding, you consent to receive calls and texts at the number you provided, including marketing by autodialer and prerecorded and artificial voice, and email, from realtor.com and others about your inquiry and other home-related. More.

---

Provided by **MRC** MORTGAGE RESEARCH CENTER

Mortgage Research Center, LLC. A mortgage licensee. NMLS ID 1907. Equal Housing Opportunity. Lender advertisers are not recommended or endorsed by realtor.com® or Mortgage Research Center, LLC, and are not the only providers of mortgage loan services of the kinds they offer.

Advertising disclosure

### ⚐ Veterans & military benefits ⌃

Sponsored by  Veterans United.

**Check Your 0% Down VA Loan Eligibility!**

What is your branch of service?

| Army | Marine Corps |
|---|---|
| Navy | Air Force |
| Coast Guard | Military Spouse |
| Other Eligibility | None - Civilian |

---

< Back

Contact agent   ♡ Save   ⬆ Share   ☒ Hide

| Navy | Air Force |
| Coast Guard | Military Spouse |
| Other Eligibility | None – Civilian |

Presented by ◆ Veterans United
Home Loans

NMLS #1907 | Equal Housing Lender | VA Approved Lender | Not a government agency | Not available in NY.

Advertising disclosure

## ⌂ Property history                                          ∧

| 🖄 **+$434,000** | ⚖ **$12,332** | 🏷 **1 sale** | 🛰 **29 years old** |
| Since last sold in 2012 | 2024 taxes | Since 2010 | Built in 1996 |

**Price history**

**Today**

| Jul 1, 2025 | 🔟 Listed | $899,000 | $293/sqft |
| 2 days on Realtor.com | SMARTMLS | +93.33% | |

**2012**

| Jul 3, 2012 | 🔟 Sold | $465,000 | $151/sqft |
| | Public Record | -6.81% | |

| Jun 23, 2012 | ⊖ Listing removed | $499,000 | $159/sqft |
| 63 days after listed | CTMLS | | |

| Apr 21, 2012 | 🔟 Listed | $499,000 | $159/sqft |
| | CTMLS | | |

| Mar 14, 2012 | ⊖ Listing removed | $519,000 | $165/sqft |
| 175 days after listed | CTMLS | | |

**2011**

| Sep 21, 2011 | 🔟 Listed | $519,000 | $165/sqft |
| | CTMLS | | |

**2010**

| May 29, 2010 | ⊖ Listing removed | $2,000 | $1/sqft |
| | CTMLS | | |

| Apr 6, 2010 | 🔟 Listed for rent | $2,000 | $1/sqft |
| | CTMLS | | |

**1996**

| 1996 | 🔘 Built | - | - |
| | SMARTMLS | | |

Show less ∧

**Tax history**

### Schedule tour

What is your preferred tour date?

| Thu **Jul 3** | Fri **Jul 4** | J ❯ |

Email*

Phone*

☐ I've served in the U.S. military                ⓘ

Request tour

### More about this property

Email agent

By proceeding, you consent to receive calls and texts at the number you provided, including marketing by autodialer and prerecorded and artificial voice, and email, from realtor.com and others about your inquiry and other home-related More...

< Back                                                            Contact agent    ♡ Save    ⬆ Share    ⎘ Hide

1996                    Built
                        SMARTMLS

Show less ∧

## Tax history

| Year | Taxes | Total assessment | | Land | | Additions |
|------|-------|------------------|---|------|---|-----------|
| 2024 | $12,332 | $433,930 | = | $70,490 | + | $363,440 |
| 2023 | $11,602 | $307,100 | = | $78,350 | + | $228,750 |
| 2022 | $11,056 | $307,100 | = | $78,350 | + | $228,750 |
| 2021 | $10,595 | $307,100 | = | $78,350 | + | $228,750 |
| 2020 | $11,228 | $307,100 | = | $78,350 | + | $228,750 |
| 2019 | $11,332 | $307,100 | = | $78,350 | + | $228,750 |
| 2018 | $11,090 | $300,540 | = | $87,180 | + | $213,360 |
| 2017 | $11,090 | $300,540 | = | $87,180 | + | $213,360 |
| 2016 | $10,669 | $300,540 | = | $87,180 | + | $213,360 |
| 2015 | $10,531 | $300,540 | = | $87,180 | + | $213,360 |
| 2013 | $9,099 | $307,410 | = | $98,280 | + | $209,130 |
| 2006 | $7,936 | $281,320 | = | $75,600 | + | $205,720 |
| 2005 | $7,629 | $281,320 | = | $75,600 | + | $205,720 |
| 2003 | $5,788 | $175,780 | = | $65,100 | + | $110,680 |

Show less ∧

The price and tax history data displayed is obtained from public records and/or MLS feeds from the local jurisdiction. Contact your REALTOR® directly in order to obtain the most up-to-date information available.

**Want to get comps?**    Contact agent

◉ **Neighborhood & schools**                                                              ∧



### Schedule tour

**What is your preferred tour date?**

| Thu Jul 3 | Fri Jul 4 | J › |
|-----------|-----------|-----|

Email*

Phone*

☐ I've served in the U.S. military                                    ⓘ

Request tour

### More about this property

Email agent

By proceeding, you consent to receive calls and texts at the number you provided, including marketing by autodialer and prerecorded and artificial voice, and email, from realtor.com and others about your inquiry and other home-related More...

Document title: 138 Litchfield Tpke, Bethany, CT 06524 [Updated 6/30]
Capture URL: https://www.realtor.com/realestateandhomes-detail/M3086882693
Capture timestamp (UTC): Thu, 03 Jul 2025 14:26:30 GMT

111



< Back                                                             Contact agent      ♡ Save    ⬆ Share    ⬚ Hide

**Schedule tour**

**What is your preferred tour date?**

| Thu Jul 3 | Fri Jul 4 | J > |

Email*

Phone*

☐ I've served in the U.S. military                              ⓘ

**Request tour**

**More about this property**

**Email agent**

By proceeding, you consent to receive calls and texts at the number you provided, including marketing by autodialer and prerecorded and artificial voice, and email, from realtor.com and **others** about your inquiry and other home-related **More...**

## Bethany city in South Central Connecticut, CT

Nearby      Lifestyle      Transportation

**1/10    🍴 Restaurants**
Teddy B's Restaurant (1.5 mi), Grand Apizza of Bethany (1.5 mi), The VUE (2.0 mi)

**-/10    🏪 Groceries**
Hindinger Farm (1.9 mi), Clover Nook Farm (2.5 mi), Steve's Deli & Grocery (2.7 mi)

**-/10    🛒 Shopping**
Whitlocks Book Barn (0.7 mi), Fenwick's Florist & Farm Market (1.6 mi), Bethany Florist And Gift Shop (1.7 mi)

**-/10    🍸 Nightlife**
The VUE (2.0 mi), Hamden Symphony Orchestra (3.4 mi)

**-/10    ☕ Cafes**
Loose Leaf Boba Co (3.4 mi), McDonald's (3.5 mi), Starbucks (3.5 mi)

**-/10    ⊕ Daycares**
The Surreybrook School (1.5 mi), Bunny Village Learning Center (1.7 mi), Childcare Training & Consulting Group (1.9 mi)

Show less ∧

Scores provided by **Local Logic**  |  Locations provided by **yelp**

Ask a neighborhood expert.    **Contact agent**

## Schools

**From listing agent: Jorge Zea**

Elementary School: Bethany Community                    High School: Amity Regional

Nearby schools      Elementary      Middle      High      Private

**9/10    Bethany Community School**
Grades K-6  |  2.1 mi away  |  429 students  |  ★★★★☆ 8 reviews

**-/10    Laurel Oaks Adventist School**
Grades PK-8  |  2.5 mi away  |  37 students  |  ★★★★★ 2 reviews

**-    Whitney High School West**                    · · · · ·

‹ Back                                                        Contact agent    ♡ Save    ⬆ Share    🏷 Hide

**Laurel Oaks Adventist School**
Grades PK-8 | 2.5 mi away | 37 students | ★★★★★ 2 reviews

**Whitney High School West**
Grades 9-12 | 3.9 mi away | 42 students | ☆☆☆☆☆ 0 reviews

Contact the school or district directly to verify enrollment eligibility. Location provided by Precisely | Ratings provided by GreatSchools.org

GreatSchools Ratings are based on student performance on state tests, progress over time, and college readiness, in addition to how effectively schools serve s...
Show more

## Nearby neighborhoods in Bethany

Popular searches in Bethany include: Homes for sale in Bethany, CT with garage 3 or more, Homes for sale in Bethany, CT with horse stable:
Show more

D✕
BUILT TO INSPIRE
DELL Technologies   Our best tech. Your bold ideas.    [Shop Now]

### Schedule tour
What is your preferred tour date?

| Thu Jul 3 | Fri Jul 4 | J ❯ |

Email*

Phone*

☐ I've served in the U.S. military    ⓘ

[Request tour]

### More about this property

[Email agent]

By proceeding, you consent to receive calls and texts at the number you provided, including marketing by autodialer and prerecorded and artificial voice, and email, from realtor.com and others about your inquiry and other home-related More...

---

## 🜨 Environmental risk                                    ⌃

🏠 **Flood Factor** Minimal                                   ❯
This property's flood risk is not changing.

🔥 **Fire Factor** Moderate                                   ❯
This property's wildfire risk is increasing.

🌡 **Heat Factor** Moderate                                   ❯
7 days above 97°F this year

💨 **Wind Factor** Major                                      ❯
Major risk of severe winds over next 30 years

🍃 **Air Factor** Moderate                                    ❯
Risk of poor air quality is increasing

Provided by First Street Foundation ⓘ

---

## 🏡 Home value                                            ⌃

**RealEstimate℠**                        [Chart]  [Table]

● $900K

$800K        ● Current list price    $899,000

$700K           **July 2025**

             Valuation provider      Estimate

113

‹ **Back**

Contact agent    ♡ Save    ⬆ Share    ⌧ Hide

● Current list price    $899,000

| July 2025 | |
|---|---|
| Valuation provider | Estimate |
| --- Collateral Analytics | - |
| — CoreLogic® | $790,419 |
| -- Quantarium | $753,941 |

$800K
$700K
$600K
$500K
$400K

2021   2022   2023   2024   2025

Want to track your home's value? **Claim your home**

**More about RealEstimate℠ data**

The estimate(s) shown, which come from one or more automated valuation model providers independent of Realtor.com®, represent information that may provide a helpful starting point for discussions with a real estate agent.

Contact agent

## Renovation Estimate

What would you like to renovate?

| 🗓 Kitchen ○ | 🛁 Bathroom ○ | 🖼 Paint ○ |
|---|---|---|

☼ Upgrading your home could boost your home's value. Select the area of your home you'd like to update above.

**See renovation cost details ›**

### Schedule tour

**What is your preferred tour date?**

| Thu Jul 3 | Fri Jul 4 | J › |
|---|---|---|

Email*

Phone*

☐ I've served in the U.S. military    ⓘ

Request tour

### More about this property

Email agent

By proceeding, you consent to receive calls and texts at the number you provided, including marketing by autodialer and prerecorded and artificial voice, and email, from realtor.com and **others** about your inquiry and other home-related **More...**

---

## Bethany market trends

A city in South Central Connecticut, CT

| Listing price median | List price/sqft median | Sold price median | Days on market |
|---|---|---|---|
| $454,950 | $259 | $500,000 | 29 |



‹ Back

Contact agent   ♡ Save   ⬆ Share   ✗ Hide

## Schedule tour

**What is your preferred tour date?**

| Thu Jul 3 | Fri Jul 4 | J › |

Email*

Phone*

☐ I've served in the U.S. military   ⓘ

**Request tour**

## More about this property

**Email agent**

By proceeding, you consent to receive calls and texts at the number you provided, including marketing by autodialer and prerecorded and artificial voice, and email, from realtor.com and others about your inquiry and other home-related more...

## Nearby home values

| Address | RealEstimate™ | Bed | Bath | Sqft | Lot (sqft) |
|---|---|---|---|---|---|
| This home: 138 Litchfield Tpke | $899,000 | 5 | 4.5 | 3070 | 126324 |
| 128 Litchfield Tpke, Bethany, CT 06524 | $762,600 | 4 | 2.5 | 3180 | 130680 |
| 26 Mountain View Rd, Bethany, CT 06524 | $445,323 | 3 | 1.5 | 1903 | 52272 |
| 20 Mountain View Rd, Bethany, CT 06524 | $455,000 | 3 | 2 | 1710 | 43560 |
| 118 Litchfield Tpke, Bethany, CT 06524 | $626,200 | 4 | 2.5 | 2352 | 87991 |
| 21 Mountain View Rd, Bethany, CT 06524 | $470,900 | 3 | 1.5 | 1624 | 35719 |
| 123 Litchfield Tpke, Bethany, CT 06524 | $795,308 | 4 | 2.5 | 3256 | 152460 |
| 11 Mountain View Rd, Bethany, CT 06524 | $713,000 | 4 | 3 | 3164 | 54450 |
| 80 Litchfield Tpke, Bethany, CT 06524 | $1,090,000 | 4 | 3.5 | 4731 | 229561 |
| 109 Litchfield Tpke, Bethany, CT 06524 | $720,171 | 4 | 2.5 | 2682 | 154202 |
| 113 Litchfield Tpke, Bethany, CT 06524 | $1,245,323 | 5 | 3.5+ | 6383 | 275735 |
| 179 Litchfield Tpke, Bethany, CT 06524 | $789,400 | 4 | 2.5 | 3193 | 130244 |
| 81 Litchfield Tpke, Bethany, CT 06524 | $684,000 | N/A | N/A | N/A | 95832 |
| 200 Litchfield Tpke, Bethany, CT 06524 | $507,000 | N/A | 1 | 1928 | 178596 |
| 154 Sperry Rd, Bethany, CT 06524 | $908,541 | 5 | 3 | 3049 | 206910 |
| 160 Sperry Rd, Bethany, CT 06524 | $810,795 | 3 | 2.5 | 2900 | 137214 |
| 69 Litchfield Tpke, Bethany, CT 06524 | $492,000 | 4 | 2 | 1691 | 65340 |

‹ Back    Contact agent   ♡ Save   ⬆ Share   ⊠ Hide

| Address | Price | Beds | Baths | Sqft | Lot |
|---|---|---|---|---|---|
| 160 Sperry Rd, Bethany, CT 06524 | $810,795 | 3 | 2.5 | 2900 | 137214 |
| 69 Litchfield Tpke, Bethany, CT 06524 | $492,000 | 4 | 2 | 1691 | 65340 |
| 84 Bethway Rd, Bethany, CT 06524 | $658,700 | 2 | 2 | 2317 | 304920 |
| 10 Brinton Rd, Bethany, CT 06524 | $497,623 | 5 | 2 | 1770 | 101059 |
| 155 Sperry Rd, Bethany, CT 06524 | $485,426 | 3 | 2 | 1800 | 54450 |
| 16 Brinton Rd, Bethany, CT 06524 | $490,500 | 3 | 2 | 1950 | 65340 |
| 84 Sperry Rd, Bethany, CT 06524 | $574,000 | 3 | 3 | 2540 | 55321 |
| 260 Sperry Rd, Bethany, CT 06524 | $780,940 | 3 | 3.5 | 3560 | 145490 |
| 94 Downs Rd, Bethany, CT 06524 | $1,125,200 | 3 | 3 | 2985 | 77101 |
| 144 Downs Rd, Bethany, CT 06524 | $633,703 | 4 | 2.5 | 3252 | 140263 |

See less ⌃

### Schedule tour

What is your preferred tour date?

| Thu Jul 3 | Fri Jul 4 | › |

Email*

Phone*

☐ I've served in the U.S. military ⓘ

**Request tour**

### More about this property

**Email agent**

By proceeding, you consent to receive calls and texts at the number you provided, including marketing by autodialer and prerecorded and artificial voice, and email, from realtor.com and **others** about your inquiry and other home-related **More...**


DELL Technologies — BUILT TO INSPIRE — Our best tech. Your bold ideas. — Shop Now

## Learn more about 138 Litchfield Tpke

**More about this property**

Full name    required

Email    required

Phone    required

How can an agent help?

I am interested in 138 Litchfield Tpke.



116

How can an agent help?

I am interested in 138 Litchfield Tpke.

☐ I've served in the U.S. military ⓘ

**Email agent**

By proceeding, you consent to receive calls and texts at the number you provided, including marketing by autodialer and prerecorded and artificial voice, and email, from realtor.com and others about your inquiry and other home-related matters, but not as a condition of any purchase. More...



 Listed by Jorge Zee 🆁
#REB.0790521
Brokered by Blue Lighthouse Realty
(786) 268-9772

| | |
|---|---|
| Broker location: | BOCA RATON, FL |
| Data source: | SMARTMLS |
| Source's property ID: | 24108292 |
| Data source Copyright: | @2025 SmartMLS, Inc. All rights reserved. |

## 🏠 Similar homes



● For Sale
**$929,000**
4 bed  2.5 bath  3,300 sqft
776 Bethany Mountain Rd
Cheshire, CT 06410



● For Sale
**$1,000,000**
5 bed  3.5 bath  3,668 sqft
36 Burnt Swamp Rd
Woodbridge, CT 06525



● For Sale
**$799,000**
4 bed  2.5+ bath  4,560 sqft
41 Mesa Dr
Bethany, CT 06524



● For Sale
**$689,900**
5 bed  3 bath  4,125 sqft
403 Bethmour Rd
Bethany, CT 06524



● For Sale
**$799,00(**
3 bed  2 bath
34 Cedar Rock
Woodbridge, C

## 🏠 Homes with similar exteriors

Based on images of this property's exterior



● For Sale
**$649,000**
4 bed  3.5 bath  3,027 sqft
291 Miller Rd
Bethany, CT 06524



New
● For Sale
**$689,900**
5 bed  3 bath  4,125 sqft
403 Bethmour Rd
Bethany, CT 06524



● For Sale
**$649,000**
4 bed  2.5 bath  3,168 sqft
290 Amity Rd
Bethany, CT 06524



● For Sale
**$750,000**
3 bed  2 bath  2,289 sqft
78 Knollwood Rd
Bethany, CT 06524



● For Sale
**$795,00(**
4 bed  2.5 b
35 Bethany Fa
Bethany, CT 0(



117

# Exhibit 3.2

118



855-510-SOLD
(855-510-7653)

BUY    SELL    JOIN    AGENTS    OFFICES    ABOUT    RESOURCES

Search    Dashboard    Listings    Searches    Sign in / Sign up

★ Save    ❶ Ask    🏃 Tour    ✕ Hide    ➤ Share

## $824,999    55 Days On Site

### 138 Litchfield Turnpike
### Bethany, CT 06524

FOR SALE    SINGLE FAMILY RESIDENCE    ACTIVE

| 5 Beds | 5 Total Baths | 4 Full Baths | 1 Partial Bath |
|---|---|---|---|
| 3,070 SqFt | $269 /SqFt | 1996 Built | |

County:    New Haven

Listing courtesy of Jorge Zea of Blue Lighthouse Realty, Inc

❶ Ask a Question

🏃 Schedule a Tour

Is this the listing for you? We can help make it yours.

**(855) 510-7653**



📷 Photos    🗺 Map    📍 Nearby Listings







Exquisite 5-Bedroom Retreat on 3.18 Acres - Modern Luxury in Horse Country! Nestled on a serene 3.18-acre lot in the heart of Bethany's renowned equestrian community, this 5-bedroom, 4.5-bathroom masterpiece, built in 1996, expanded in 2013, and updated in 2021, offers 3,070 square feet of luxurious living space plus an additional 1,025 square feet of finished basement. Abutting 70 acres of water company property with scenic trails, this home combines wooded privacy, natural beauty, and proximity to Route 15/Merritt Parkway-perfectly positioned halfway between New Haven and Waterbury. Served by the highly regarded Amity School District, it's ideal for families seeking rural charm and top-tier education. Step into an open floor plan bathed in natural light, with soaring cathedral ceilings and skylights creating an airy, inviting ambiance. The remodeled kitchen (2021) is a chef's dream, boasting white and gray cabinetry, a farmhouse sink, large island, granite countertops, and premium Wolf cooktop and GE double oven-perfect for bakers and entertainers. The grand dining room impresses with a sophisticated tray ceiling, custom woodwork, and a sparkling chandelier, ideal for hosting memorable gatherings. Cozy up by the soapstone wood stove atop a granite and stone-accented hearth, adding warmth and charm to the living space. The first floor features a luxurious master suite with a private bath, while the second-floor master bedroom elevates relaxation with a tray ceiling,



★ Save    ❶ Ask    🏃 Tour    ✕ Hide    ➤ Share

### Listing Snapshot

| Price | $824,999 | Days On Site | 55 Days |
|---|---|---|---|
| Bedrooms | 5 | Inside Area (SqFt) | 3,070 sqft |
| Total Baths | 5 | Full Baths | 4 |



119





Quickview: Next Photos

   
Save    Ask    Tour    Hide    Share

## Listing Snapshot

| | | | |
|---|---|---|---|
| Price | $824,999 | Days On Site | 55 Days |
| Bedrooms | 5 | Inside Area (SqFt) | 3,070 sqft |
| Total Baths | 5 | Full Baths | 4 |
| Partial Baths | 1 | Lot Size | 2.9 Acres |
| Year Built | 1996 | MLS® Number | 24108292 |
| Status | Active | Property Tax | $12,645 |
| HOA/Condo/Coop Fees | N/A | Sq Ft Source | N/A |

## Friends & Family

☺ React    ◯ Comment    👤+ Invite

Comment privately with friends and family...

⑦         ⌄   Post

## Recent Activity

| | | |
|---|---|---|
| 4 days ago | 👁 | You viewed this listing |
| 3 weeks ago | ♺ | Listing updated with changes from the MLS® |
| 3 weeks ago | ❗ | Status changed to Active |
| 3 weeks ago | ❗ | Price changed to $824,999 |
| 2 months ago | ☁ | Listing first seen on site |

## Market Snapshot - 06524 Zip



138 Litchfield Turnpike
$824,999

Least Expensive Listing        Average Price        Most Expensive Listing
$        $        $

Source: ATTOM Data Solutions

## General Features

| | |
|---|---|
| Acres | 2.9 |
| Attached Garage | Yes |
| Foundation | Concrete Perimeter |
| Garage | Yes |
| Garage Spaces | 2 |
| Parking | Garage Door Opener    Attached |
| Property Sub Type | Single Family Residence |
| Security | Security System |
| Sewer | Septic Tank |
| SqFt Total | 3070 |
| Style | Colonial |
| Water Source | |




120

Document title: 138 Litchfield Turnpike, Bethany, CT, 06524
Capture URL: https://www.lamacchiarealty.com/homes-for-sale/listing/SmartMLS/24108292/Bethany/138-Litchfield-Turnpike
Capture timestamp (UTC): Tue, 26 Aug 2025 00:50:43 GMT

| Security | Security System |
| Sewer | Septic Tank |
| SqFt Total | 3070 |
| Style | Colonial |
| Water Source | Well |
| Zoning | R-130 |

## Interior Features

| Appliances | Cooktop   Dishwasher   Gas Cooktop   Ice Maker   Microwave   Refrigerator   Oven   Washer   Wine Cooler |
| Basement | Full   Partially Finished |
| Cooling | Ceiling Fan(s)   Central Air   Ductless |
| Fireplace | Yes |
| Fireplaces | 1 |
| Heating | Propane   Wood   Baseboard   Radiant |
| Interior | Sound System   Central Vacuum |
| Dining Room | Level - Main |



| ★ Save | ❶ Ask | 🚶 Tour | ✖ Hide | ↪ Share |

## Exterior Features

| Construction Details | Wood Siding   Frame   Clapboard |
| Lot Features | Sloped   Wooded |
| Roof | Asphalt |

## Schools

| **School District**<br>*Unknown* | **Elementary School**<br>Bethany Community |
| **Middle School**<br>*Unknown* | **High School**<br>Amity Regional |

Listing courtesy of Jorge Zea of Blue Lighthouse Realty, Inc

## SMART▫▌▌

The data relating to real estate for sale on this website appears in part through the SMARTMLS Internet Data Exchange program, a voluntary cooperative exchange of property listing data between licensed real estate brokerage firms, and is provided by SMARTMLS through a licensing agreement. Listing information is from various brokers who participate in the SMARTMLS IDX program and not all listings may be visible on the site. The property information being provided on or through the website is for the personal, non-commercial use of consumers and such information may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing. Some properties which appear for sale on the website may no longer be available because they are for instance, under contract, sold or are no longer being offered for sale. Property



121

The data relating to real estate for sale on this website appears in part through the SMARTMLS Internet Data Exchange program, a voluntary cooperative exchange of property listing data between licensed real estate brokerage firms, and is provided by SMARTMLS through a licensing agreement. Listing information is from various brokers who participate in the SMARTMLS IDX program and not all listings may be visible on the site. The property information being provided on or through the website is for the personal, non-commercial use of consumers and such information may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing. Some properties which appear for sale on the website may no longer be available because they are for instance, under contract, sold or are no longer being offered for sale. Property information displayed is deemed reliable but is not guaranteed. Copyright 2025 SmartMLS, Inc.
Last checked: 2025-08-26 12:44 AM UTC.

## Neighborhood & Commute

### 138 Litchfield Turnpike Bethany CT 06524

SCORES    NEARBY



Walk Score
**4**

Car-Dependent
Almost all errands require a car



Bike Score
**22**

Somewhat Bikeable
Minimal bike infrastructure

View map of nearby restaurants, grocery stores, and more.

## Population Insight - 06524 Zip

| 5,586 | 47 | 264 | 11.12 | 0.41 |
|---|---|---|---|---|
| Total Population | Median Age | Population Density (People/sq mile) | Population Change (Since 2000) | Population Change (Since 2010) |

### Population by Gender

● 50% Women                                                                                    ● 50% Men

### Population by Age Group

| Age Group | Percentage |
|---|---|
| 00 - 09 | 8.9% |
| 10 - 19 | 15.8% |
| 20 - 29 | 10.0% |
| 30 - 39 | 6.5% |
| 40 - 49 | 13.2% |
| 50 - 59 | 19.7% |
| 60 - 69 | 15.0% |
| 70 - 79 | 7.0% |







30 - 39   6.5%
40 - 49   13.2%
50 - 59   19.7%
60 - 69   15.0%
70 - 79   7.0%
80 - UP   3.9%

## Education Level

- 23% High School
- 15% Some College
- 37% College Degree
- 25% Graduate Degree

Source: ATTOM Data Solutions

## Household Insight - 06524 Zip

**1,977**
Total Households

**2.825**
Avg Household Size

**$101K**
Median Household Income

**$44K**
Avg Individual Income

### Marital Status

- 61% Married
- 39% Single

### Households with Children

- 54% Households with Children
- 46% Households without Children

The cost of living is 32% above the national average.

Source: ATTOM Data Solutions

## Employment & Commute Insight - 06524 Zip

### Blue Collar vs White Collar Workers

- 34% White Collar
- 66% Blue Collar

### Type of Commute

- 91% Driving
- 1% Public Transport
- 1% Non-Motorized
- 8% Telecommute

The average commute to work is 26 minutes.




The cost of living is 32% above the national average.

Source: ATTOM Data Solutions

### Employment & Commute Insight - 06524 Zip

Blue Collar vs White Collar Workers

● 34% White Collar                                                          ● 66% Blue Collar

### Type of Commute

● 91% Driving          ● 1% Public Transport     ● 1% Non-Motorized      ● 8% Telecommute

The average commute to work is 26 minutes.

Source: ATTOM Data Solutions

Community information and market data Powered by ATTOM Data Solutions. Copyright ©2019 ATTOM Data Solutions.
Information is deemed reliable but not guaranteed.

POWERED BY SHOWCASE IDX, A CONSTELLATION1 COMPANY



| ★ | ❶ | 🚶 | ✕ | ➡ |
|---|---|---|---|---|
| Save | Ask | Tour | Hide | Share |

QUICK SEARCH

BUY   SELL   JOIN

Agents | Offices | Resources | Commercial    Search...   🔍

*Leading* REAL ESTATE COMPANIES IN THE WORLD®

🅕 ▶ 📷 in     Privacy Policy    ADA Compliance

© Copyright 2025 Lamacchia Realty - All Rights Reserved.
Lamacchia Realty, Inc and the Lamacchia Realty logo, are federally registered trademarks of Lamacchia Realty, Inc. Lamacchia Realty, Inc. fully supports
the principles of the Fair Housing Act and Equal Housing Opportunity. Listing information is deemed reliable but is not guaranteed.
Managing Broker: Anthony Lamacchia – (781) 786-8080



© Copyright 2025 PrimeMLS, Inc.

All rights reserved. This information is deemed reliable, but not guaranteed. The data relating to real estate displayed on this display comes in part from the IDX Program of PrimeMLS. The information being provided is for consumers' personal,
noncommercial use and may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing.




# Exhibit 3.3

# stratwell
Your home, our mission.

SELL ⌄ BUY ⌄ REO ⌄ TEAM ⌄ EXPLORE  TESTIMONIALS  BLOG  CONTACT     Sign In / Sign Up     ☐ (305) 614-7129

← SEARCH LISTINGS          BUY WITH US · 200 OCEAN LANE DR UNIT 503          ♡ SAVE     ⊰ SHARE

## 200 OCEAN LANE DR UNIT 503
KEY BISCAYNE, FL 33149

| BEDS | BATHS | SQUARE FT. |
|------|-------|------------|
| 1    | 1     | 1,225      |




ACTIVE   RESIDENTIAL

VIRTUAL TOUR ⤢

# $990,000

Delightful ocean views from this 1/1 apt, beautifully remodeled, natural light throughout, porcelain floors, open kitchen, top-of-the-line appliances & accessories, custom-made built-ins, plenty of storage space, electric roll-up shades, washer & dryer, large balcony. Oceanfront Island Resort Style w/private beach access, lovely landscape & infinity edge pool, impact windows, offers... Read More

**Courtesy of Fortune Christie's International Real Estate.**

### LISTING SNAPSHOT

| DAYS ONLINE | LAST UPDATED | PROPERTY TYPE |
|-------------|--------------|---------------|
| 0 | Aug 25, 2025 | Stock Cooperative |

| BEDS | FULL BATHS | SQUARE FT. |
|------|-----------|------------|
| 1 | 1 | 1,225 |

| YEAR BUILT | MLS NUMBER |
|------------|-----------|
| 1961 | A11844338 |

**EDDIE BLANCO**
REALTOR®

| ASAP | WED 27 AUG | THU 28 AUG | › |
|------|-----------|-----------|---|

TOUR IN PERSON          TOUR VIRTUALLY

**SCHEDULE A TOUR**

CONTACT EDDIE BLANCO

---

30 Days Snapshot Of **33149**          SNAPSHOT   AREA MAP

| $2.24M -25% | 19 -9% | 111 +30% |
|-------------|--------|----------|
| (AVG) SOLD PRICE | HOMES SOLD | (AVG) DAYS ON MARKET |

126

**$2.24M**
(AVG) SOLD PRICE

**19**
HOMES SOLD

**111**
(AVG) DAYS ON MARKET

**EDDIE BLANCO**
REALTOR®

| | WED **27** AUG | THU **28** AUG | > |
| --- | --- | --- | --- |
| ⊙ ASAP | | | |

TOUR IN PERSON          TOUR VIRTUALLY

**SCHEDULE A TOUR**

**CONTACT EDDIE BLANCO**

## ADDITIONAL DETAILS

| | |
| --- | --- |
| APPLIANCES & EQUIPMENT | Appliances: Dishwasher, Disposal, Dryer, Microwave, Electric Range, Refrigerator, Washer |
| BUILDING | Living Area: 1225, Architectural Style: High Rise, Construction Materials: CBS Construction, Direction Faces: Northeast, Year Built: 1961, Year Built Details: Newly Updated/Renovated, Building Area Total: 1225, Building Name: Island House, Entry Level: 5, Structure Type: Co-Op 5+ Stories, Co-Op |
| COMMUNITY | Senior Community, Units In Community: 132 |
| COOLING | Cooling: Ceiling Fan(s), Central Air, Electric |
| DOORS | Features: High Impact Doors |
| DINING ROOM | Features: Dining/Living Room |
| EXTERIOR FEATURES | Features: Barbeque, Open Balcony, Patio/Porch: Open Balcony |
| GARAGE | Garage, Covered Spaces: 1, Garage Spaces: 1 |
| HEATING | Heating: Central, Electric |
| HOME OWNER'S ASSOCIATION | Fee: $5,601, Fee Frequency: Quarterly, Amenities: Barbecue, Bike Storage, Elevator(s), Exercise Room, Storage, Heated Pool, Kitchen Facilities, Trash Chute, Vehicle Wash Area |
| INTERIOR FEATURES | Features: Built-In Features, Fire Sprinklers, Storage |
| LIVING ROOM | Features: Storage Room |
| PRIMARY BEDROOM | Features: Dual Sinks, Separate Tub & Shower |
| MISCELLANEOUS | Inclusions: Deeded Beach Access, Other |
| PARKING | Features: 1 Space, Assigned, Valet |
| PROPERTY | Property Attached, Property Condition: Updated/Remodeled, Completely Renovated, View, View: Garden View, Ocean View, Waterfront, Waterfront Features: Ocean Access, Ocean Front |
| SECURITY FEATURES | Features: Fire Sprinklers, Smoke Detector, Complex Fenced, Card Entry, Lobby Secured |
| TAXES | Parcel Number: 24-42-32-008-0440, Tax Annual Amount: $4,918, Tax Exemptions: Tax Reflects Homestead Exemption, Tax Legal Description: ISLAND HOUSE APT INC - CO-OP APT 503 30.5 SHARES OF 5973.5 MATHESON ESTS 4.42 AC PB 46-86 BEG SE COR TR 2 W624FT N100.68FT W125.86FT N1 Y171 . |

127

Tax Exemptions: Tax Reflects Homestead Exemption,
Tax Legal Description: ISLAND HOUSE APT INC - CO-OP
APT 503 30.5 SHARES OF 5973.5 MATHESON ESTS 4.42
AC PB 46-86 BEG SE COR TR 2 W624FT N100.68FT
W125.86FT NLY171.,
Tax Year: 2024

WINDOWS

Features: Complete Impact Glass, Blinds, High Impact
Windows, Sliding

## EDDIE BLANCO
REALTOR®

| ASAP | WED 27 AUG | THU 28 AUG › |

TOUR IN PERSON        TOUR VIRTUALLY

**SCHEDULE A TOUR**

CONTACT EDDIE BLANCO



FIND THE PERFECT HOME
## 'VIP' LISTING SEARCH
Whenever a listing hits the market that matches
your criteria you will be immediately notified.

**JOIN THE LIST**

## MORTGAGE CALCULATOR

| SELLING PRICE | DOWN PAYMENT |
|---|---|
| $990,000 | $0 |
| **TERM (YEARS)** | **INTEREST RATE (%)** |
| 30 | 6.25 |

MONTHLY PAYMENT **$6,096**

# SCHOOLS IN THE AREA
Check out nearby schools with ratings and contact info.

TOP RATED ⌄

| Key Biscayne K-8 Center | 305-361-5418 | Public | PK-5 | ★★★★★ |
| Ponce De Leon Middle School | 305-661-1611 | Public | 6-8 | ★★★☆☆ |

128



| | | | | | |
|---|---|---|---|---|---|
| **Ponce De Leon Middle School** | | 305-661-1611 | Public | 6-8 | ★★★☆☆ |
| **Coral Gables Senior High School** | | 305-443-4871 | Public | 9-12 | ★★★★☆ |

# SIMILAR LISTINGS

VIEW MORE LISTINGS



$975,000

**200 Ocean Lane Dr Unit 305**
Key Biscayne, FL

**Listing Information © 2025 MIAMI and Miami REALTORS®. All Rights Reserved.**

Information herein is deemed reliable but not guaranteed and is provided exclusively for consumers personal, non-commercial use, and may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing.





## s stratwell

This isn't just a job, it's our life. We wake up in the morning focused on your goals and eager to make your life easier.

f  ▶  in  ◎

### ABOUT
MEET THE TEAM
TESTIMONIALS
BLOG
CONTACT

### LET'S WORK
BUY WITH US
WHY STRATWELL
OUR LISTINGS
SELL WITH
STRATWELL
PERFECT HOME
FINDER

### SERVICES
REO
PROPERTY MANAGEMENT
5 HOME STAGING TIPS
TRADE-IN
CASH OFFER
ALL OPTIONS

129

ocument title: 200 Ocean Lane Dr Unit 503, Key Biscayne, FL 33149 - Stratwell
apture URL: https://stratwell.co/listing/mmmls/A11844338/Key-Biscayne/200-Ocean-Lane-Dr-Unit-503/

# Exhibit 3.4



Jorge Zea <deals@bluelighthouserealty.com>

## RE: IDX Question -

1 message

**Sarah Chenoweth** <schenoweth@rworld.com>                                    Wed, Sep 4, 2024 at 5:07 PM
To: Jorge Zea - Broker <deals@bluelighthouserealty.com>

Jorge,

A ticket has been opened with Matrix and escalated.

Kind Regards,

Sarah

**From:** Jorge Zea - Broker <deals@bluelighthouserealty.com>
**Sent:** Wednesday, September 4, 2024 4:54 PM
**To:** Sarah Chenoweth <schenoweth@rworld.com>
**Subject:** Re: IDX Question -

Sarah thanks for your fast response.
I really appreciate it.

I am not concern with me being in violation.

I am concern that the association's MLS is not providing (or not enforcing) the feed and listing firm's disclosure on participant's websites as per NAR, and the association's (and MLS) own rules.

My business model depends on potential buyers being able to reach the listing agent directly and for this we depend on IDX feeds being displayed as required.  Nevertheless, the feed, as provided, is hindering my availability to offer my service.

Please advice when this is addressed.

Thanks

## Jorge Zea
Real Estate Professional
Senior Broker
Realtor®

Phone: 855-550-0528
**(but email is always better and faster)**
*deals@bluelighthosuerealty.com*

**Address:**
Blue Lighthouse Realty
2234 N Federal Hwy PMB 68073
Boca Raton FL 33431

131

**Licenses:**
**FL**: Broker Jorge Zea BK3015808; Blue Lighthouse Realty INC: CQ1021361
**CT**: Broker: Jorge Zea REB.0190508;  Blue Lighthouse Realty INC:. REB.0790521
**MA:** Broker: Jorge Zea 10000016
**WA**: Managing Broker: Jorge Zea 21020609/ Firm 21024014
**IL**: Managing Broker: Jorge Zea 471.021295
**NC**: Broker: Jorge Zea 332276 (BIC "Broker in Charge")
**CO**: Broker:  Jorge Zea EI.100094281 (Employing Level)
**MD**: Broker: Jorge Zea 01-5007935
**DC**: Broker: Jorge Zea IBF40000011
**CA**: Broker: Jorge Zea 1986168

Sarah Chenoweth wrote on 9/4/24 3:33 PM:

Good afternoon Jorge,

If your concern is a compliance violation on data hosted by BeachesMLS on the iframe link from Matrix; BeachesMLS will not file a complaint against you.

Kind Regards,

Sarah

---

**From:** Jorge Zea <deals@bluelighthouserealty.com>
**Sent:** Wednesday, September 4, 2024 1:56 PM
**To:** Sarah Chenoweth <schenoweth@rworld.com>
**Subject:** Re: IDX Question -

Compliance with this by the association is of survival importance for our business model.

I appreciate you getting back to me as soon as possible.

Jorge Zea

Managing Broker

Realtor

From my iPhone

132

Jorge,

Thank you for bringing this to our attention.  We will forward this to our Vendor to research further.

The basic information that should display is 'coutesy of listing brokerage'

Kind Regards,

Sarah

---

**From:** Jorge Zea - Broker <deals@bluelighthouserealty.com>
**Sent:** Monday, September 2, 2024 1:07 PM
**To:** IDX Department <IDX@Rworld.com>
**Subject:** IDX Question -

Hello.
I am trying to include the IDX feed into my website.
I went over all the IDX rules and instructions.
I generated the *iframe* via Matrix and was checking the preview.
I am not seeing the  listing firm and an email or phone number, which I am required to display as per IDX Rules
My question is how I comply with this if the feed does not include this information?
Or is this something that is not required any longer?

Can you please clarify this for me so I can post it without any issues.

Thanks,

## Jorge Zea
Real Estate Professional
Senior Broker
Realtor®
Blue Lighthouse Realty

Phone: 855-550-0528
**(but email is always better and faster)**
*deals@bluelighthosuerealty.com*

**Address:**
Blue Lighthouse Realty
2234 N Federal Hwy PMB 68073
Boca Raton FL 33431

**Licenses:**
**FL:** Broker Jorge Zea BK3015808; Blue Lighthouse Realty INC: CQ1021361

133

# Exhibit 3.5

134



Jorge Zea <deals@bluelighthouserealty.com>

## RE: IDX question

1 message

**MLSTrestle** <MLSTrestle@rpcra.org>                                    Mon, Sep 9, 2024 at 1:51 PM
To: Jorge Zea - Broker <deals@bluelighthouserealty.com>
Cc: Joanna Rowell <Joanna@rpcra.org>, Jason Jakus <Jason@rpcra.org>

Hello Joe,

I have verified and Currently the IDX displays will show **Courtesy of** [whatever listing office belongs to listing]

Thank You,



**LUIS ESPINOZA**

MLS TECH/DATA ADMINISTRATOR

Royal Palm Coast Realtor® Association
P: 239.936.3537 x242 I RPCRA.ORG





**From:** Jorge Zea - Broker <deals@bluelighthouserealty.com>
**Sent:** Friday, September 6, 2024 2:23 PM
**To:** MLSTrestle <MLSTrestle@rpcra.org>
**Subject:** IDX question

Hello.
I am trying to include the IDX feed into my website.

135

I am not seeing the listing firm and an email or phone number in the feed, as required by NAR MLS IDX Rules.

Please advice.

Thanks,

**Jorge Zea**
Real Estate Professional
Senior Broker
Realtor®
Blue Lighthouse Realty

Phone: 855-550-0528
**(but email is always better and faster)**
*deals@bluelighthosuerealty.com*

**Address:**
Blue Lighthouse Realty
2234 N Federal Hwy PMB 68073
Boca Raton FL 33431

**Licenses:**
**FL:** Broker Jorge Zea BK3015808; Blue Lighthouse Realty INC: CQ1021361

136

# Exhibit 3.6

137



Jorge Zea <deals@bluelighthouserealty.com>

## [SmartMLS] Re: IDX issues - non compliance

1 message

**SmartMLS** <compliance@smartmlshelp.zendesk.com>                Sun, Sep 29, 2024 at 10:59 PM
Reply-To: SmartMLS <compliance+id684076@smartmlshelp.zendesk.com>
To: "Jorge A. Zea" <deals@bluelighthouserealty.com>



Technical Support: **Mon-Thur 8:30am-7pm**
**Fridays 8:30am - 6PM and Weekends 9AM - 3PM**
Call: **1.203.750.6000** email: **Support@SmartMLS.com**

Your request (ticket #684076) has new comments from SmartMLS. To add additional comments, please reply to this email.

**Kathy** (SmartMLS)
September 29, 2024 at 10:59PM

Jorge,

Francisco forwarded me your concern. Now that our system conversion and the NAR practice changes implementation are complete we are in the process of creating a mechanism to add email and telephone information to IDX listings. As soon as our vendors provides us with the mechanism to add telephone and email, we will add the language to our rules and regulations.

Francisco will keep you update as we move through the process.

Thanks,
Kathy

Kathy Elson
SmartMLS, Inc.

*Have questions about connectMLS?* **Visit our Help Center for video tutorials, webinars, our knowledge base, and more.**

**Jorge A. Zea** (SmartMLS)
September 18, 2024 at 7:22PM

Thanks Francisco,

*138*

years ago), after a settlement with the US Department of Justice (these are mandated changes part of that settlement agreement). Implementing them was not an "option".

By not implementing this, SmartMLS has and continues to enable buyer agents to steer buyers away form listing that offer lower commissions and also enables agents to boycott non-traditional brokerage models like mine. It suppresses competition and allow for monopolistic and anti-trust practices.

When does SmartMLS plan to vote them in?

I cordially request SmartMLS implement these DOJ and NAR-mandated rules as soon a possible.

Cordially,

**Jorge Zea**
Real Estate Professional
Senior Broker
Realtor®

Phone: 305-244-7242
**(but email is always better and faster)**
***deals@bluelighthosuerealty.com***

**Licenses:FL:** Broker Jorge Zea BK3015808; Blue Lighthouse Realty INC: CQ1021361
**CT:** Broker: Jorge Zea REB.0190508;  Blue Lighthouse Realty INC:. REB.0790521

SmartMLS wrote on 9/18/24 5:15 PM:

---

**Francisco Garcia (SmartMLS)**
September 18, 2024 at 5:15PM

Good afternoon Jorge,

SmartMLS is not enforcing these rules because they need to be voted into our rules and regulations.

139

Regards,

Francisco.

***Have questions about connectMLS?* Visit our Help Center for video tutorials, webinars, our knowledge base, and more.**

---

**Jorge A. Zea** (SmartMLS)
September 18, 2024 at 10:45AM

Jacquie thanks.

Where can I find the numerous Rules updates (post 2017) that you mention?

I don't see them online.

Thanks

JORGE ZEA

SmartMLS wrote on 9/18/24 9:22 AM:

---

**Jacquie Germain** (SmartMLS)
September 18, 2024 at 9:22AM

Good morning Jorge,

Since the rules were adopted in 2017, numerous updates have been made. Your NAR question has been escalated for additional review.

With best regards,

Jacquie Germain
SmartMLS Compliance Team

---

**Jorge A. Zea** (SmartMLS)
September 17, 2024 at 8:56PM

**External Sender** - From: (Jorge Zea - Broker                      Learn More
~~<deals@bluelighthouserealty.com>)~~

*190*

Hello.

I was reviewing the most updated version of SmartMLS Rules and Regulation that we have, and they are from 2017.

Is there an updated version of SmartMLS Rules and Regulations, or is this the most updated one? This version (if it hasn't been updated in the last 7 years) is missing some mandatory updates that NAR has issued since then.

I want to address one specific rule.  NAR requires that participants using the IDX feed on their website *"must display the listing firms name and email or phone number in a prominent manner...."*. It is very concerning if SmartMLS has not included this in an updated version of the Rules).

Regardless, I find that almost no participant abides by this NAR-mandated rule and just ignore it completely or just display the information in a non-compliant manner.

I have informed this issue to NAR, but they refer me back to the MLS or association.

The current practices, along with the lack of enforcement, are resulting in a market environment that continues to allow buyer agents to steer buyers toward traditional commission-offering listings, often to the detriment of sellers and buyers who might choose to engage without intermediary representation.

Not including this Rule as mandated by NAR, and/or not enforcing it is enabling the continued practice by buyer agents of steering potential buyers away form properties that offer low or no commisison. Neverthless after August 17th 2024 with the new post-settlement requirements we have tools and software that can monitor and measure the amount of steering happening and we can now quantify its effect on non-traditional brokerages.

This non-compliance and non-enforcement is negatively affecting my business model.

I would greatly appreciate if you take corrective action and advice me as to how this issue will be addressed.

Thanks,

**Jorge Zea**
Real Estate Professional
Senior Broker
Realtor®
Blue Lighthouse Realty

Phone: 305-244-7242

141

*deals@bluelighthosuerealty.com*

**Address:**

Blue Lighthouse Realty

2234 N Federal Hwy PMB 68073

Boca Raton FL 33431

---

Be a part of the Community:   |   | Explore our Knowledge Base - The SmartDesk!

[Z1R9L3-E3DZ1]

142

# Exhibit 3.7

143



Jorge Zea <deals@bluelighthouserealty.com>

---

## re: IDX rules non-compliance
1 message

---

**Christopher Harrigan (Member Policy)** <narpolicyquestions@nar.realtor>          Fri, Sep 13, 2024 at 12:55 PM
Reply-To: Member Policy <narpolicyquestions@nar.realtor>
To: Jorge Zea / Bue Lighthouse Realty <deals@bluelighthouserealty.com>

##- Please type your reply above this line -##

The following will receive any replies to this ticket:
Requester: Jorge Zea / Bue Lighthouse Realty
Assignee: Christopher Harrigan
(CC: Lindsey Ruschak, MLS)

---

### Christopher Harrigan (Member Policy)
Sep 13, 2024, 11:55AM CDT

Hi Jorge,

Thank you for your feedback and input; I've shared it with others at NAR for their information and consideration.

Sincerely,

Chris

Christopher Harrigan

Manager, Policy Information | Member Experience, Engagement and Legal Affairs

NATIONAL ASSOCIATION OF REALTORS® | 430 N Michigan Ave | Chicago, IL 60611

Email: NARPolicyQuestions@nar.realtor | Office: 312-329-8399

https://nar.realtor

The NATIONAL ASSOCIATION OF REALTORS® is an unrivaled advocate and resource in the real estate market for its members and their clients, and only members of NAR can call themselves REALTORS®

---

### Jorge Zea / Bue Lighthouse Realty
Sep 12, 2024, 5:01PM CDT

Thanks Christopher.
It is not specific to isolated to one MLS, Association or brokerage.

It is a wide spread practice, either by the MLS, the local association or the participant displaying the IDX feed and/or a combination of these. Even Grid MLS is non-compliant an/or not interested in enforcing their own rules (which mirror those by NAR)

144

should have a compliance and enforcement mechanism to enforce its rules and regulations.

As an individual Brokerage I don't have the resources (or obligation) to verify compliance; NAR does (some time through the affiliated MLS systems).

I have already informed some of the MLS that I am subscribed to so that they can enforce the rule ... but I strongly believe that by NAR no enforcing rules in the industry as a whole, it is, by inaction, complicit in this issue.

I would appreciate a prompt resolution by NAR as the all-encompassing and regulation-creating entity.

Cordially,

Jorge Zea
Broker
REALTOR@
NRDIS 277008888
305-244-7242 (private)


Christopher Harrigan (Member Policy) wrote on 9/12/24 2:59 PM:

---

## Jorge Zea / Bue Lighthouse Realty
Sep 12, 2024, 4:42PM CDT

Thanks Lindsay

Lindsey Ruschak wrote on 9/12/24 3:49 PM:

**Attachment(s)**

image.png

---

## Lindsey Ruschak
Sep 12, 2024, 2:50PM CDT

Good afternoon REALTOR Zea,

Thank you for your email. Upon checking our public facing MLS site along with testing a members permalink share from inside our MLS software it appears that the contact information has disappeared from display. I am not sure when this dropped as broker attribution has always been provided within the feed and on display on websites pursuant to the MLS Rules and Regulations. I would like to thank you for taking the time to point this out to us for us to further investigate. Please know that an urgent ticket has been submitted to our MLS vendor to ensure the proper data is being served in the feed. Secondary, an urgent email is also being sent to all vendors who receive either an API or RETS feed from Space Coast MLS to ensure that they are properly displaying all data pursuant to the MLS Rules and Regulations.

*145*

As soon as I hear from the vendor I will follow up with a response.

please let me know.

Lindsey Ruschak, RCE
Chief Executive Officer
**Space Coast Association of REALTORS®, Inc.**
2950 Pineda Plaza Way Palm Shores FL  32940
Main (321) 242-2211 ext. 206 | Cell (321) 508-1881 |Fax (321) 255-7669
www.Spacecoastmls.com
*The Voice for Real Estate in Brevard County®*
*CONFIDENTIALITY NOTICE: Unless otherwise stated, the information in this email transmission is*
*privileged and confidential.  If you are not the intended recipient, nor the employee or agent responsible*
*for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this*
*transmission (including any attachments) is strictly prohibited.  If you have received this email*
*transmission in error, please notify the sender by email reply immediately.  Thank you.*



**Christopher Harrigan** (Member Policy)
Sep 12, 2024, 1:59PM CDT

Hi Jorge,

We're glad you reached out to NAR.

Whenever anyone has information/evidence that someone has not abided by a local MLS's rules and regulations, the person with that first-hand information is encouraged to file an MLS complaint with the local MLS alleging the violation (in this case, you are saying you are seeing websites not displaying listing broker information in IDX displays).

Each local MLS will have a rule on how to initiate complaints, but I've reproduced below the model MLS rule Section 9 that addresses the ability to file a complaint, even without revealing the complainant's name (details below), if desired.

## Section 9: Consideration of Alleged Violations

The committee shall give consideration to all written complaints having to do with violations of the rules and regulations. By becoming and remaining a participant, each participant agrees to be subject to these rules and regulations, the enforcement of which are at the sole discretion of the Committee (Board of Directors). (Amended 5/18) **M**

When requested by a complainant, the MLS will process a compliant without revealing the complainant's identity. If a complaint is subsequently forwarded to a hearing, and the original complainant does not consent to participating in the process, the MLS will appoint a representative to serve as the complainant. (Amended 11/20) **M**

146

Complaints could be filed against the MLS participant(s) operating the website(s) that are not complying with any rule, including this IDX rule.

Because you have copied the Space Coast association on previous correspondence related to IDX, I have carbon copied the Association Executive of the Space Coast Association on this reply for her information. She, and her MLS staff, will be able to confirm whether the MLS's IDX feeds contain information for listing broker attribution.

Jorge, we appreciated the opportunity to serve you today, and I hope this information is helpful. If there's any other way I can assist, please let me know.

Thanks,
Chris

Christopher Harrigan
Manager, Policy Information | Member Experience, Engagement and Legal Affairs
NATIONAL ASSOCIATION OF REALTORS® | 430 N Michigan Ave | Chicago, IL 60611
Email: NARPolicyQuestions@nar.realtor | Office: 312-329-8399
https://nar.realtor
The NATIONAL ASSOCIATION OF REALTORS® is an unrivaled advocate and resource in the real estate market for its members and their clients, and only members of NAR can call themselves REALTORS®

---

**Jorge Zea / Bue Lighthouse Realty**
Sep 11, 2024, 8:57PM CDT

Hello,

I hope this message finds you well. I am writing to bring to your attention a matter of significant concern that I believe is critical to the integrity and competitive fairness of the real estate marketplace.

As a longstanding professional in the real estate industry, I have always respected NAR's mission to promote transparency, fairness, and competition. However, I must express my concern regarding the apparent non-enforcement of certain NAR policies, specifically those related to the display of listing broker (firm) contact information (email or phone number) on IDX-fed brokerage websites.

I have observed that many websites using MLS data feeds (IDX) do not display the listing broker's phone number or email address, as required by NAR MLS and IDX policies. I have also found out that some MLS systems (and/or association) don't even provide this information with their IDX feed.

This lack of transparency is not only misleading for consumers but also has a direct and negative impact on businesses like mine, which operate under innovative models that aim to facilitate more direct interactions and generate choices, freedom and savings to the consumer.

The current practices, along with the lack of enforcement, are resulting in a market environment that continues to steer buyers toward traditional commission-based brokers, often to the detriment of sellers and buyers who choose to engage without intermediary representation.

*147*

Justice (DOJ) settlement to ensure greater transparency and fairness in the market. Unfortunately, the current situation suggests that compliance with these policies is not being uniformly applied nor enforced, putting businesses like mine at a distinct disadvantage.

I kindly request that NAR addresses and enforces these issues promptly.

I believe that these issues can be resolved in a way that benefits all stakeholders in the real estate market while maintaining a level playing field for businesses offering alternative service models.

I appreciate your prompt attention to this matter and would welcome the opportunity to discuss any steps NAR plans to take in resolving these concerns. Please do not hesitate to contact me if further details are required.

Thank you for your time and consideration.

**I look forward to your prompt response.**

Warm regards,

**Jorge Zea**
Broker
REALTOR@
NRDIS 277008888
305-244-7242 (private)

This email is a service from Member Policy. Delivered by Zendesk

[9GZVDN-P9110]

148

# Exhibit 3.8

144



Jorge Zea <deals@bluelighthouserealty.com>

## Re: IDX interest - FlexMLS

1 message

**STEVE REFLING** <srefling@fbsdata.com>
To: Jorge Zea <deals@bluelighthouserealty.com>

Wed, Jul 30, 2025 at 9:54 AM

Correct.

**Steve Refling**
Broker/Agent Product Consultant
FBS Products Logo
srefling@fbsdata.com
701-353-2284
FBSProducts.com
Nationally Recognized and 100% Employee-Owned
SmartFrame | WordPress | Flexmls® | Spark® | FlōPlan®
FB Logo  Twitter Logo  LinkedIn Logo

On 7/29/25 3:58 PM, Jorge Zea wrote:

> I get it.
> So the MLSs that don't have; it is a decision by the MLS, not by you guys?
>
>
> Jorge Zea
> Managing Broker
> Realtor
>
>
> From my iPhone
>
>
>> On Jul 29, 2025, at 11:45 AM, STEVE REFLING <srefling@fbsdata.com> wrote:
>>
>>
>>
>> Some MLS's require that we have the listing agent name and contact info displayed. Its typically not well
>> received by agents because if someone looks at another agents listing it will have the listing agents contact
>> info listed and the person looking might call them instead of the agent who's website they are on. This is not
>> a feature we can turn on individually. Its an all or nothing setting for the MLS as a whole. The Contact Agent
>> button will always send the lead to the website owner instead of the listing agent of the listing.
>>
>> **Steve Refling**
>> Broker/Agent Product Consultant
>> FBS Products Logo
>> srefling@fbsdata.com
>> 701-353-2284
>> FBSProducts.com
>> Nationally Recognized and 100% Employee-Owned
>> SmartFrame | WordPress | Flexmls® | Spark® | FlōPlan®
>> FB Logo  Twitter Logo  LinkedIn Logo
>>
>> On 7/29/25 10:34 AM, Jorge Zea wrote:
>>
>>> My concern is: There is no contact for the listing agent in the property display page.
>>>
>>>
>>> Jorge Zea
>>> Managing Broker
>>> Realtor

150

On Jul 28, 2025, at 5:37 PM, STEVE REFLING <srefling@fbsdata.com> wrote:

On the brokerage version you can either set that up so it does a round robin assign of the leads to agents in the office or you can set that to send all leads to an admin person to follow up or manually assign.

**Steve Refling**
Broker/Agent Product Consultant
FBS Products Logo
srefling@fbsdata.com
701-353-2284
FBSProducts.com
Nationally Recognized and 100% Employee-Owned
SmartFrame® | WordPress | Flexmls® | Spark® | FlöPlan®
FB Logo  Twitter Logo  LinkedIn Logo

On 7/28/25 4:24 PM, Jorge Zea - Broker wrote:

Thanks Steve.
Just looking through these samples.

See screenshot attached.
There is no contact for the listing agent in the property display page
In the example attached - who does the "contact agent" button go to?

This i just the sample page I was looking at:
https://www.fbswebsites.com/idx/4700-Sanctuary-Lane-Boca-Raton-FL-33431-mls_25-896/?pg=1&OrderBy=-ListPrice&p=y&n=y&search_referral_url=https%3A%2F%2Fwww.fbswebsites.com%2Fidx%2Fsearch%3FSavedSearch%3D20180731160723464678000000%26Limit%3D10%26City%3DBoca+Raton

I am just trying to figure this out.

Thanks,

**Jorge Zea**
Real Estate Professional
Senior Broker
Realtor®

Phone: 855-550-0528
**(but email is always better and faster)**
*deals@bluelighthouserealty.com*

**Address:**
Blue Lighthouse Realty
2234 N Federal Hwy PMB 68073
Boca Raton FL 33431

**Licenses:**
FL: Broker Jorge Zea BK3015808; Blue Lighthouse Realty INC: CQ1021361
CT: Broker: Jorge Zea REB.0190508;  Blue Lighthouse Realty INC:. REB.0790521
MA: Broker: Jorge Zea 10000016
WA: Managing Broker: Jorge Zea 21020609/ Firm 21024014
IL: Managing Broker: Jorge Zea 471.021295
CO: Broker:  Jorge Zea EI.100094281 (Employing Level)
MD: Broker: Jorge Zea 01-5007935
DC: Broker: Jorge Zea IBF40000011
GA: Broker: Jorge Zea 1986160

151

STEVE REFLING wrote on 7/28/25 1:45 PM:

Hi Jorge,

Thanks for reaching out! I have included more info on our Smart Frame and WordPress plugin below. Are you interested for your personal site or the brokerage site?

Click to see an example of the SmartFrame solution. The SmartFrame gives you fully hosted hyperlinks to add live MLS searches to your website(s).
The SmartFrame allows you to create featured listings links based off of almost any Flexmls "Saved Search." These can also be used in other places such as your email signature, newsletters or on social media.

- Live Data powered by FlexMLS
- Desktop and mobile friendly
- Location enabled, showing nearby listings
- Lead Capture
- Integration with FlexMLS Portal and CRM
- Listing Carts, Favorites, schedule Showing and more

Still not completely clear? See how easy it is to add a SmartFrame link to a Wix or Squarespace website.


More info on our all-inclusive WordPress Suite can be found here. The plugin can be downloaded, but cannot be fully activated without first obtaining a special key. A sample site using the powerful IDX plugin to display MLS listings can be seen at
http://fbswebsites.com.
Just some of the features include:

- Live Data powered by Flexmls
- Desktop and mobile friendly
- Listing Details
- Slideshow widgets
- Market Stats widgets
- Lead Capture
- Search engine indexable
- Unlimited custom search links

SmartFrame access *Included with WordPress Suite

**Steve Refling**
Broker/Agent Product Consultant
FBS Products Logo
srefling@fbsdata.com
701-353-2284

152

Nationally Recognized and 100% Employee-Owned
SmartFrame | WordPress | Flexmls® | Spark® |
FlōPlan®
FB Logo Twitter Logo LinkedIn Logo
On 7/28/25 12:19 PM, Matt Flatin from FBS wrote:

> ---------- Forwarded message ---------
> From: Jorge Zea - Broker
> <deals@bluelighthouserealty.com>
> Date: Monday, July 28, 2025,
> 11:57:30AM -0500
> Subject: IDX interest - FlexMLS
> To: idxsupport@fbsdata.com
>
> I see 3 levels of service for the IDX
> feed.
> I know how the IDX LIte looks, but
> want to look at examples for Smart
> Frame and WordPress login.
> I subscribe to several Flex-serviced
> MLSs in FL:
> Space Coast MLS
> RealMLS
> Central Panhandle (FL)
>
> Thanks
>
>
> **Jorge Zea**
> Real Estate Professional
> Senior Broker
> Realtor ®
>
> Phone: 855-550-0528
> **(but email is always better and
> faster)**
> *deals@bluelighthouserealty.com*
>
> **Address:**
> Blue Lighthouse Realty
> 2234 N Federal Hwy PMB 68073
> Boca Raton FL 33431

To unsubscribe from this group and
stop receiving emails from it, send an
email to idxsupport+unsubscribe@
fbsdata.com.

153

# Exhibit 3.9

# When was the Broker Reciprocity policy approved?

The NAR Board of Directors originally approved the policy on May 22, 2000. Since that time the NAR has made several revisions. IDX has been around for a few years, but recently it has become critical to the online marketing successes of real estate professionals.

# What is the general level of participation in an MLS IDX Program?

Participation in any IDX program varies greatly. We have seen some cases where participation is below 50%, or as high at 100%. Participation is on the rise as more Brokers across the country choose to be involved in the program. Based on experience, we believe the average participation rates nationwide are somewhere in the 70-75% range.

# Does the IDX data contain any confidential information?

No. The IDX data fields available for display to the public are approved by the board/MLS and do not contain confidential information.

# Is it required to identify the listing firm information on search results?

Most of the time some information that identifies the listing firm is required. This is usually some combination of the listing agent name and/or phone, or the listing office and/or phone. Every board/MLS requires a different combination. The "rule of thumb" is that we are required to display the listing Broker or Agent name. Because of this we attempt to place this information at the very bottom of the page in an inconspicuous location.

# What does VOW stand for and how is it different from IDX?

VOW is an acronym for Virtual Office Website. VOWs are an effort to distinguish property listings on the Internet from the displays governed by the IDX policies. The primary feature of a VOW is the requirement that visitors register by entering an email address and receive a password prior to accessing MLS listing data. Some MLS participants also post terms of use on their VOW's and require visitors to agree to those terms. In contrast, IDX allows brokers to include each others listings on their websites, with the consent of the other broker. The MLS data presented by IDX is slightly less detailed, and viewers of the data can choose to remain anonymous.

If you do not find your question and / or answer here, please review our knowledgebase
(https://support.idxbroker.com).

"LOVING the upgraded product! I am seeing rankings, traffic and incoming calls increase already. Thank You!"

*Ken Jansen, REALTOR®*

155

# What is IDX?

Simply put, "IDX" is how MLS listings end up on your real estate site.

CONTACT US (/CONTACT_IDX)

## What is IDX?

IDX (Internet Data Exchange) allows agents and brokers to access and display MLS listing information on their real estate websites.

Also known as Broker Reciprocity, the term "IDX" refers to the software, rules and regulations which allow MLS data to show on your site. This data feed typically encompasses the listing data for properties entered into the MLS system, while IDX rules may determine where, what, and how it is displayed. If your MLS provides access to this data feed, you may use it to promote all eligible listings on your website, not just your featured listings.

IDX Broker is engineered to collect, organize and maintain your local MLS listings, allowing you to seamlessly display all MLS properties on your real estate site.

## What is IDX / Broker Reciprocity?

IDX is an acronym for Internet Data Exchange. IDX is the policy instituted by the National Association of Realtors (NAR) to govern how MLS member participants can display active MLS listing information on their websites. In simple terms, IDX is the means of extracting the data from a Multiple Listing Service and delivering it to a website for public consumption. IDX is sometimes called Broker Reciprocity or IDD.

## Who can participate in IDX / Broker Reciprocity?                    156

This depends on the rules established by your local board and/or Multiple Listing Service. Since your board/MLS is independently governed, these rules might be different than rules of another boards and MLS's. Normally all Broker members (Participants) may participate in IDX/Broker Reciprocity. Agents (Subscribers) may, or may not, participate in Broker Reciprocity program depending on the

Call                                    Chat                        Order (https://signup.idxbroker.com?)

Exhibit 3.10

157

## Zea v. NAR: The Theory of Concerted Inaction

🔒  ROB HAHN   AUG 20   ♡ 3   💬 2   🔁 1

It's a long shot... but an angry REALTOR is taking it...

Read →

## 2 Comments



Write a comment...



**Edward Zorn** 1d                                                                                    ...

Rob,

Good analysis on this suit. Some of us did read the entire 129 pages and the AI summary is accurate. On the rule enforcement issue, it is not expensive or costly for any MLS to enforce their IDX rules. They just need to do it. If the listing agent community complains enough, like they do for other issues, then the MLS will take the 15 minutes required to send the email and make the follow up call with the IDX user. Many IDX sites do not voluntarily display the Listing Credit requirements properly, but a quick threat to terminate the IDX data feed for non-compliance brings them into compliance very quickly. Many MLS IDX displays properly display the Listing Agent Contact information correctly.

Here is the typical Zillow display in the CRMLS market: https://www.zillow.com/homedetails/3090-Mangular-Ave-Corona-CA-92882/54952347_zpid/. Seems like any buyer can reach out to the Listing Agent if that buyer would like to do that from this display. They have access to the name and phone number of the Listing Agent right under the main photo, and the contact information appears again, a second time, right under the Property Description and Days on Zillow count.

Any MLS in the country can have this IDX experience if they want to enforce the actual rules. It is an email and a phone call. No need to get crazy and call for governmental regulation on such a simple issue.

Ed

♡ LIKE (1)   💬 REPLY (1)                                                                         ⬆ SHARE

158



**John** 19h

The problem as I see it, is that most of the MLS across the country are operated on a part time basis. Local associations run them as part of their overall association operations and simply

can't keep up in many cases. Rules enforcement becomes reactive, not proactive, and the local Directors often don't want to upset their apple cart of working with other agents by actively enforcing rules against those that they might have to work with in a future transaction. (It is true that this can work in the opposite direction, when they don't like a particular business, as this lawsuit suggests). The problem is you have the fox guarding the hen house. NAR will never do direct COE or MLS rules enforcement, but the state associations can and some do with respect to the COE.

♡ LIKE    ◯ REPLY                                                                                    ⬆ SHARE

© 2025 Rob Hahn · Privacy · Terms · Collection notice
Substack is the home for great culture

159

# Exhibit 4

160

# Exhibit 4.1



Jorge Zea <deals@bluelighthouserealty.com>

---

## RE: Buyer agent - potential violation of buyer agent written agreement
1 message

**Cindy Cornman** <cindy@nabor.com>                                        Tue, Apr 1, 2025 at 1:03 PM
To: Jorge Zea - Broker <deals@bluelighthouserealty.com>
Cc: MLS <mls@nabor.com>, Amy Newton <amy@rpcra.org>

Jorge,

We have verified that a BBA was in place prior to the offer and the selling agent was in
compliance. You should check with the title company on verifying the compensation on the BBA.
They will disburse the funds accordingly. If the amount is lower than what your seller is offering,
the balance either goes to the seller or list agent, depending on what is on your agreement with
the seller.

NAR has stated that the MLS only verifies that the proper documentation is in place. We do not
verify the compensation.

Thank you,

Cindy

**CINDY** CORNMAN, C2EX, PSA

*Director of MLS*



1455 Pine Ridge Road

Naples, Florida 34109

239 597 1666 x242

NABOR.com  NaplesArea.com  Facebook  Twitter  Instagram

162

REALTOR® is a registered collective membership mark which may be used only by real estate professionals who are members of the NATIONAL
ASSOCIATION OF REALTORS® and subscribe to its strict Code of Ethics.

**REALTORS®** are required to complete ethics training within NAR's 8th period (Jan 1, 2025 – Dec 31, 2027). The 14-hour real estate CE class meets this requirement; however, members must forward a copy of their certificates of completion to ethics@nabor.com. Upon receipt, NABOR will update your COE education record and confirm the same. Please click here to view alternate COE training opportunities.

**REALTORS®** are required to complete Fair Housing / Anti-Bias within NAR's 8th period (Jan 1, 2025 – Dec 31, 2027). Please click here to view NAR's available courses

REALTOR® is a registered collective membership mark which may be used only by real estate professionals who are members of the NATIONAL ASSOCIATION OF REALTORS® ("NAR") and subscribe to its strict Code of Ethics.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTE:

This electronic mail transmission may contain confidential or privileged information. If you believe that you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it. All personal messages express views solely of the sender, which are not to be attributed to the Naples Area Board of Realtors.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**From:** Jorge Zea - Broker <deals@bluelighthouserealty.com>
**Sent:** Tuesday, April 1, 2025 11:56 AM
**To:** Cindy Cornman <cindy@nabor.com>
**Cc:** MLS <mls@nabor.com>; Amy Newton <amy@rpcra.org>
**Subject:** Re: Buyer agent - potential violation of buyer agent written agreement

Hello Cindy, good morning.
Can you be so kind and give me an update regarding this?
Closing is approaching and I need to verify if the Listing Agent is allowed to collect the commission negotiated with and payable by the seller (it must be less than or equal to the compensation buyer agent negotiated with his buyer in the buyer-agent agreement).

Nevertheless, from what you write below, there is no way to verify compliance.

I need urgent guidance please.

Has NAR given any guidance as to how to address this issue?

Greatly appreciated.

**Jorge Zea**
Real Estate Professional
Senior Broker
Realtor®

Phone: 855-550-0528
**(but email is always better and faster)**
*deals@bluelighthouserealty.com*

**Address:**
Blue Lighthouse Realty
2234 N Federal Hwy PMB 68073
Boca Raton FL 33431

**Licenses:**
**FL:** Broker Jorge Zea BK3015808; Blue Lighthouse Realty INC: CQ1021361
**CT:** Broker: Jorge Zea REB.0190508; Blue Lighthouse Realty INC:. REB.0790521
**MA:** Broker: Jorge Zea 10000016
**WA:** Managing Broker: Jorge Zea 21020609/ Firm 21024014
**IL:** Managing Broker: Jorge Zea 471.021295

163

CO: Broker: Jorge Zea EI.100094281 (Employing Level)
MD: Broker: Jorge Zea 01-5007935
DC: Broker: Jorge Zea IBF40000011
CA: Broker: Jorge Zea 1986168

Cindy Cornman wrote on 3/19/25 8:17 AM:

Good morning Jorge,

The MLS is responsible for ensuring that the buyer's agent has the necessary
documentation as required by NAR rules. If the buyer's agent fails to provide the proper
documentation, they will be subject to a violation and fine in accordance with MLS
regulations.

As the listing agent, it is your responsibility to negotiate your compensation directly with
your seller. Similarly, the buyer's agent is responsible for negotiating their fee with their
client. Once an offer is accepted and the transaction proceeds to closing, the title
company determines the final amounts for each side based on the Buyer Broker
Agreement (BBA) and the Listing Agreement.

You are not entitled to know the details of the buyer's agent's compensation
agreement, just as they are not entitled to know the specifics of your arrangement with
your seller. While you may choose to share this information verbally, it is not required.
The settlement terms from last year clearly state that the MLS must remain uninvolved
in the negotiation of compensation, and each party should handle these discussions
with their respective clients.

I will request the necessary agreement from our agent but will not be sharing it with
you.

**CINDY** CORNMAN, C2EX, PSA

*Director of MLS*


NABOR
NAPLES AREA BOARD OF REALTORS

1455 Pine Ridge Road

Naples, Florida 34109

239 597 1666 x242

164

NABOR.com  NaplesArea.com  Facebook  Twitter  Instagram

REALTOR® is a registered collective membership mark which may be used only by real estate professionals who are members of the NATIONAL ASSOCIATION OF REALTORS® and subscribe to its strict Code of Ethics.

REALTORS® are required to complete ethics training within NAR's 8th period (Jan 1, 2025 – Dec 31, 2027). The 14-hour real estate CE class meets this requirement; however, members must forward a copy of their certificates of completion to ethics@nabor.com. Upon receipt, NABOR will update your COE education record and confirm the same. Please click here to view alternate COE training opportunities.

REALTORS® are required to complete Fair Housing / Anti-Bias within NAR's 8th period (Jan 1, 2025 – Dec 31, 2027). Please click here to view NAR's available courses

REALTOR® is a registered collective membership mark which may be used only by real estate professionals who are members of the NATIONAL ASSOCIATION OF REALTORS® ("NAR") and subscribe to its strict Code of Ethics.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTE:

This electronic mail transmission may contain confidential or privileged information. If you believe that you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it. All personal messages express views solely of the sender, which are not to be attributed to the Naples Area Board of Realtors.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**From:** Jorge Zea - Broker <deals@bluelighthouserealty.com>
**Sent:** Tuesday, March 18, 2025 5:09 PM
**To:** Cindy Cornman <cindy@nabor.com>
**Cc:** MLS <mls@nabor.com>; Amy Newton <amy@rpcra.org>
**Subject:** Re: Buyer agent - potential violation of buyer agent written agreement

**GAMMA SHIELD - Gamma Tech Services**

**Warning:** Sender @deals@bluelighthouserealty.com is not yet trusted by your organization. Please be careful before replying or clicking on the URLs.

Report Phishing    Report as Safe

powered by Graphus®

165

Cindy, thanks.

Cindy how would you determine that the buyer agent is in compliance just form the buyer agent agreement?

Compliance, in this case must be corroborated with 2 elements.

1. That the buyer agent had an executed buyer-broker agreement at the time of touring the property.
2. The amount of compensation that the buyer broker may receive (so the payment form seller-side is within this limit).

How can I make sure that the agent is compliance if I don't have at least these 2 pieces of information?

...Or does the burden of proof of non-compliance falls on me as complainant as is in ethics.

Regardless, please let me know how this works, because it is the first for me.

Cordially,

**Jorge Zea**
Real Estate Professional
Blue Lighthouse Realty INC
Realtor ®

Phone: 855-550-0528
**(but email is always better and faster)**
*deals@bluelighthouserealty.com*

**Address:**
Blue Lighthouse Realty
2234 N Federal Hwy PMB 68073
Boca Raton FL 33431

**Licenses:**
**FL:** Broker Jorge Zea BK3015808; Blue Lighthouse Realty INC: CQ1021361

Cindy Cornman wrote on 3/18/25 2:12 PM:

Jorge,

For compliance we can reach out to the buyer's agent and verify they have a buyers broker agreement. Once we have that information, we will only let you know they are in compliance and not share the details of the agreement.

A buyer's agent is not required to share the details of their agreement with you, as the listing agent. Just like as the listing agent, you are not required to share your listing agreement with the buyer's agent, disclosing what the seller is willing to pay and to whom it goes to.

Based on this, would you like us to reach out to the agent?

Thank you,

Cindy

166

**CINDY** CORNMAN, C2EX, PSA

*Director of MLS*



1455 Pine Ridge Road

Naples, Florida 34109

239 597 1666 x242

NABOR.com  NaplesArea.com  Facebook  Twitter  Instagram

REALTOR® is a registered collective membership mark which may be used only by real estate professionals who are members of the NATIONAL ASSOCIATION OF REALTORS® and subscribe to its strict Code of Ethics.

**REALTORS® are required to complete ethics training within NAR's 8th period (Jan 1, 2025 – Dec 31, 2027).** The 14-hour real estate CE class meets this requirement; however, members must forward a copy of their certificates of completion to ethics@nabor.com. Upon receipt, NABOR will update your COE education record and confirm the same. Please click here to view alternate COE training opportunities.

**REALTORS® are required to complete Fair Housing / Anti-Bias within NAR's 8th period (Jan 1, 2025 – Dec 31, 2027).** Please click here to view NAR's available courses

REALTOR® is a registered collective membership mark which may be used only by real estate professionals who are members of the NATIONAL ASSOCIATION OF REALTORS® ("NAR") and subscribe to its strict Code of Ethics.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTE:

This electronic mail transmission may contain confidential or privileged information. If you believe that you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it. All personal messages express views solely of the sender, which are not to be attributed to the Naples Area Board of Realtors.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**From:** Amy Newton <amy@rpcra.org>
**Sent:** Tuesday, March 18, 2025 11:51 AM
**To:** Jorge Zea - Broker <deals@bluelighthouserealty.com>; Compliance <compliance@rpcra.org>
**Cc:** MLS <mls@nabor.com>; MLS <mls@rpcra.org>
**Subject:** RE: Buyer agent - potential violation of buyer agent written agreement

Hi Jorge,

167

Yes, we share the same MLS, however there are separate Boards (Naples, Bonita and Royal Palm). MLS violations are reported to the Boards the participant is a member of.

The agent you are reporting , belongs to the Naples Board and they will process the complaint.

I have copied Nabor MLS on the Email, however you can Email the MLS compliance directly at MLS@NABOR.COM.

The NABOR MLS will assist you with this compliant.

Have a Great Day!

*Listing Data Integrity is Everyone's Responsibility*

────────────────────

**AMY NEWTON**

MLS ADMINISTRATOR, COMPLIANCE

Royal Palm Coast Realtor® Association



**From:** Jorge Zea - Broker <deals@bluelighthouserealty.com>
**Sent:** Tuesday, March 18, 2025 11:41 AM
**To:** Compliance <compliance@rpcra.org>
**Cc:** Amy Newton <amy@rpcra.org>; mls@nabor.com; MLS <mls@rpcra.org>
**Subject:** Re: Buyer agent - potential violation of buyer agent written agreement

Don't we use the same SWFLMLS? or doe NABOR have a seprate MLS?

Compliance wrote on 3/18/25 11:39 AM:

HI Jorge,

Yes, the MLS does assist with this request.

The member you are reporting belongs to the Naples Realtor Board of Realtors (NABOR), not Royal Palm Coast Realtor Association.

The NABOR MLS will assist you with the request with their member.

- **Buyer Agent in question**: Hugues J Christian
- **MLS ID**: N638474

168

Have a Great Day!


*Listing Data Integrity is Everyone's Responsibility*

---

**AMY NEWTON**

MLS ADMINISTRATOR, COMPLIANCE

Royal Palm Coast Realtor® Association




**From:** Jorge Zea - Broker <deals@bluelighthouserealty.com>
**Sent:** Tuesday, March 18, 2025 10:59 AM
**To:** Amy Newton <amy@rpcra.org>
**Cc:** mls@nabor.com; MLS <mls@rpcra.org>; Compliance <compliance@rpcra.org>
**Subject:** Re: Buyer agent - potential violation of buyer agent written agreement


Thanks Amy, but isn't the MLS who must enforce this?

Thanks

### Jorge Zea
Real Estate Professional
Senior Broker
Realtor®

Phone: 855-550-0528
**(but email is always better and faster)**
*deals@bluelighthouserealty.com*

**Address:**
Blue Lighthouse Realty
2234 N Federal Hwy PMB 68073
Boca Raton FL 33431

**Licenses:**
**FL:** Broker Jorge Zea BK3015808; Blue Lighthouse Realty INC: CQ1021361
**CT:** Broker: Jorge Zea REB.0190508;  Blue Lighthouse Realty INC:. REB.0790521
**MA:** Broker: Jorge Zea 10000016
**WA**: Managing Broker: Jorge Zea 21020609/ Firm 21024014
**IL:** Managing Broker: Jorge Zea 471.021295
**CO:** Broker:  Jorge Zea EI.100094281 (Employing Level)
**MD:** Broker: Jorge Zea 01-5007935
**DC:** Broker: Jorge Zea IBF40000011
**CA**: Broker: Jorge Zea 1986168

169

Amy Newton wrote on 3/18/25 9:40 AM:

Hi Jorge,

The member, Huges Christian, is a member of the Naples Board.

I'm copying the Naples Board in this request. They will assist you with
your request from this point forward. Their Email is: mls@nabor.com.

Have a Great Day!

*Listing Data Integrity is Everyone's Responsibility*

---

**AMY NEWTON**

MLS ADMINISTRATOR, COMPLIANCE

Royal Palm Coast Realtor® Association



**From:** Jorge Zea - Broker <deals@bluelighthouserealty.com>
**Sent:** Monday, March 17, 2025 6:17 PM
**To:** Compliance <compliance@rpcra.org>
**Cc:** MLS <mls@rpcra.org>; Amy Newton <amy@rpcra.org>
**Subject:** Re: Buyer agent - potential violation of buyer agent written
agreement

MLS compliance,
Amy kindly guided me to file this with you. (email string below)

I am the listing agent.
I need to validate some information regarding the buyer-agent agreement

I asked for this information from buyer agent(and his transaction coordinator) even
though I know I am not the one to validate or enforce this - the enforcer is the MLS.
The buyer agent prefers to go through MLS compliance (I respect that).

Here are the details needed:

- **Buyer Agent in question**: Hugues J Christian
- **MLS ID**: N638474
- **Brokerage**: Marzucco Real Estate (Brokerage)
- **email**: christianh4210@gmail.com
- **Buyer**: Wisly Dormeus & Wilvens Dormeus

170

- **Property**: 1045 HALBY AVE S LEHIGH ACRES, FL 33974

I only need verification of compliance and enforcement (if needed) in compliance with post August 17th, 2024 rules. So I only need:

- Is there an executed buyer-broker agreement (**yes/no**)
- If yes, what is the executed date of that buyer-broker agreement (**date**)
- What is the amount of compensation negotiated in that agreement (**amount**)

Let me know if you need anything else form my end.

This is the first time I come across this situation, so I am not sure what the process is...

Thanks

### Jorge Zea
Real Estate Professional
Blue Lighthouse Realty INC
Senior Broker
Realtor®

Phone: 855-550-0528
**(but email is always better and faster)**
*deals@bluelighthouserealty.com*

**Address:**
Blue Lighthouse Realty
2234 N Federal Hwy PMB 68073
Boca Raton FL 33431

**Licenses:**
**FL:** Broker Jorge Zea BK3015808; Blue Lighthouse Realty INC: CQ1021361

Amy Newton wrote on 3/17/25 4:52 PM:

Hi Jorge,

Regarding your questions:

I am not sure how this works but I have reason to believe that this buyer agent either:

1 - is working with the buyer without an executed buyer-agent agreement

and/or

2 - negotiated more compensation with seller that what negotiated in the buyer-agent agreement.

What is the process?
How can I verify this?

Item #1: Please report this to the MLS Compliance at Compliance@rpcra.org

171

· Provide: Buyer's Agent Name and Buyer's Name

· The MLS will process the Potential Violation/Compliant with the agent in question

---

Item #2: Please review the MLS Rules and Regulations. You may also call Legal Hotline for more information on this topic.

Legal Hotline: 407-438-1409

**Section 5.2 Disclosure of Compensation:** MLS Participants and Subscribers must: 1. Disclose to prospective sellers and buyers that broker compensation is not set by law and is fully negotiable. This must be included in conspicuous language as part of any listing agreement, buyer written agreement, and pre-closing disclosure documents (if any). 2. Conspicuously disclose in writing to sellers, and obtain the seller's authority, for any payments or offer of payment that the listing Participant or seller will make to another broker, agent, or other representative (e.g. real estate attorney) acting for buyers. This disclosure must include the amount or rate of any such payment and be made in writing in advance of any payment or agreement to pay.

---

Have a Great Day!

*Listing Data Integrity is Everyone's Responsibility*

---

**AMY NEWTON**

MLS ADMINISTRATOR, COMPLIANCE

Royal Palm Coast Realtor® Association



**From:** Jorge Zea - Broker <deals@bluelighthouserealty.com>
**Sent:** Sunday, March 16, 2025 8:49 PM
**To:** Amy Newton <amy@rpcra.org>; Listing Compliance <listingcompliance@rpcra.org>
**Subject:** Buyer agent - potential violation of buyer agent written agreement

Hello,
I am not sure how this works but I have reason to believe that this buyer agent either:

1 - is working with the buyer without an executed buyer-agent

172

agreement

and/or

2 - negotiated more compensation with seller that what negotiated in the buyer-agent agreement.

What is the process?
How can I verify this?

Please advice,

**Jorge Zea**
Real Estate Professional
Senior Broker
Realtor®

Phone: 855-550-0528
**(but email is always better and faster)**
*deals@bluelighthouserealty.com*

**Licenses:**
**FL:** Broker Jorge Zea BK3015808; Blue Lighthouse Realty INC: CQ1021361

*173*

# Exhibit 4.2

174

Subject: re: Re: I really need guidance on this - Buyer Agent Verification and Enforcement
From: "Christopher Harrigan (Member Policy)" <narpolicyquestions@nar.realtor>
Date: 5/2/25, 5:07 PM
To: Jorge Zea / Bue Lighthouse Realty <deals@bluelighthouserealty.com>

##– Please type your reply above this line –##

The following will receive any replies to this ticket:
Requester: Jorge Zea / Bue Lighthouse Realty
Assignee: Christopher Harrigan
(CC: Rodney Gansho)

**Christopher Harrigan** (Member Policy)
May 2, 2025, 4:07PM CDT

Hi Jorge,

Compensation is a matter of negotiation and contract between the parties. The seller negotiates and decides what they are comfortable paying the buyer broker. The buyer broker must ensure they comply with their written buyer agreement which includes an objectively ascertainable amount of compensation, and that they won't receive more compensation than that amount from any other source. If there is a breach of an agreement, then the parties can take appropriate action which includes any proper legal recourse, an ethics complaint, or contacting the appropriate state or local agency.

I trust that this responds to request.

Chris

cc: Rodney Gansho


Christopher Harrigan
Manager, Policy Information | Member Experience, Engagement and Legal Affairs
NATIONAL ASSOCIATION OF REALTORS® | 430 N Michigan Ave | Chicago, IL 60611
Email: NARPolicyQuestions@nar.realtor | Office: 312-329-8399
https://nar.realtor
The NATIONAL ASSOCIATION OF REALTORS® is an unrivaled advocate and resource in the real estate market for its members and their clients, and only members of NAR can call themselves REALTORS®


**Jorge Zea / Bue Lighthouse Realty**
Apr 21, 2025, 5:30PM CDT

175

This is a follow-up to your previous request #76011 "I really need guidance on t..."
Hi Chris, Rodney:

Chris, thanks for your message. I understand and appreciate the offer to connect by phone, but given the importance and implications of the rule at issue—and my responsibility in ensuring I correctly understand it and convey accurate information to the MLSs in question—I must kindly reiterate my request to receive the clarification in writing.

Since this is a compliance-related question tied to a published rule and public-facing FAQs, it's essential that I rely on a written explanation to avoid miscommunication and ensure accountability. I sincerely appreciate your time and cooperation and will look forward to receiving the written clarification as you mentioned.

Best regards,

Jorge Zea
Real Estate Broker
Realtor®
305-244-7242

Christopher Harrigan (Member Policy) wrote on 4/17/25 12:57PM:

This email is a service from Member Policy. Delivered by Zendesk

[VZ1NLY-L0XJZ]

176

Subject: re: I really need guidance on this - Buyer Agent Verification and Enforcement
From: "Christopher Harrigan (Member Policy)" <narpolicyquestions@nar.realtor>
Date: 4/10/25, 2:25 PM
To: Jorge Zea / Bue Lighthouse Realty <deals@bluelighthouserealty.com>

##- Please type your reply above this line -##

The following will receive any replies to this ticket:
Requester: Jorge Zea / Bue Lighthouse Realty
Assignee: Christopher Harrigan
(CC: )

---

**Christopher Harrigan** (Member Policy)
Apr 10, 2025, 1:25PM CDT

Hi Jorge and thank you for the follow up email.

In response to #1 near the bottom of your email, your understanding is correct that "any source" would include compensation/money remitted by the seller/listing broker. In reflecting upon our conversation, I can see that the example I gave didn't make that clear. I had the opportunity this morning to discuss your questions with several others on our MLS team and we'd like to connect with you again by telephone to discuss some of these points, as well as what you bring up in #2. My colleague has a number of meetings today, but we plan to give a call later this afternoon.

Sincerely,

Chris

Christopher Harrigan
Manager, Policy Information | Member Experience, Engagement and Legal Affairs
NATIONAL ASSOCIATION OF REALTORS® | 430 N Michigan Ave | Chicago, IL 60611
Email: NARPolicyQuestions@nar.realtor | Office: 312-329-8399
https://nar.realtor
The NATIONAL ASSOCIATION OF REALTORS® is an unrivaled advocate and resource in the real estate market for its members and their clients, and only members of NAR can call themselves REALTORS®

---

**Jorge Zea / Bue Lighthouse Realty**
Apr 9, 2025, 12:03PM CDT

Hi Christopher,

Thank you again for taking the time to speak with me earlier today, I really appreciate it. I

177

wanted to follow up with a summary of our discussion to ensure everything is clearly documented and to assist you in conveying my concerns accurately to your team.

As we discussed, one of the central goals of the Burnett settlement was to protect consumers—specifically by reducing or eliminating steering based on broker compensation. In that context, NAR's own FAQ #93 outlines the purpose of the buyer–broker agreement as a mechanism to ensure transparency and prevent brokers from selectively showing listings based on commission offers:

*"Written buyer agreements… will also outline that MLS Participants may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer."*

*"Since a broker working with a buyer cannot receive more compensation than the buyer has agreed to in that agreement, the amount of any offer of compensation is irrelevant…"*

To me, and to any reasonable reader, the phrase **"any source"** would include compensation from **listing agents and sellers**—not just unrelated third parties like title companies or inspectors. That's the only interpretation that would truly neutralize the incentive to steer buyers toward higher-commission listings.

However, during our conversation, you indicated that NAR's interpretation is that "any source" **does not include listing brokers or sellers**—which directly contradicts the plain language and defeats the rule's purpose. If brokers can simply enter into an agreement for a nominal amount and then chase higher offers from sellers, the steering problem is not only preserved, but potentially **repackaged as a compliant practice** under the settlement framework. This creates a significant enforcement gap.

You mentioned that I was the only one raising this concern. I understand you may not have received similar complaints yet, but I sincerely doubt I am the only broker or participant questioning this. The broader implications affect:

- •Class members (who are supposed to benefit from the reforms),
- •The defendants (who are bound by the settlement's spirit and letter),
- •And consumers at large—both buyers and sellers—who will continue to face a distorted market if steering is not truly addressed.

So, with all due respect, this issue is not about a single member's interpretation. It's about whether a central component of the settlement is being **interpreted, enforced, and monitored in a way that fulfills its stated purpose**.

Accordingly, I respectfully request:

1. A formal clarification as to whether "any source" includes **sellers and listing brokers**, as it plainly should;
2. Information on how this rule is being **monitored or enforced**, if at all.

Please don't hesitate to reach out by phone if a conversation would be helpful—I'm always available.

Best regards,
**Jorge Zea**
Real Estate Professional
Broker, Realtor®

Private: 305-244-7242

178

Christopher Harrigan (Member Policy) wrote on 4/7/25 5:41PM:

**Jorge Zea / Bue Lighthouse Realty**
Apr 9, 2025, 9:34AM CDT

Chris hello.
Thanks for your call this morning... sorry I didn't get to it right away; nevertheless I will give you a call around 11:00 AM your time.
Thanks,
Jorge Zea

Christopher Harrigan (Member Policy) wrote on 4/7/25 5:41PM:

**Jorge Zea / Bue Lighthouse Realty**
Apr 7, 2025, 6:15PM CDT

Christopher, we are on the same page and your link further reinforce my question. Concretely: "Buyer agents can't receive more (from any source) than what they agreed in their buyer agent agreement."

From your link:
https://www.nar.realtor/the-facts/homebuyers-what-the-nar-settlement-means
> No. 3: "A term that prohibits the agent from receiving compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer."

Even Lesley Muchow has explained this ... you can check her explanation on minute 11:56 of this video:
https://www.youtube.com/watch?v=NxPK5KyIT9Q

**As an Example**: If the buyer agent negotiated X% with his buyer (via the buyer-broker agreement; that is the maximum amount the buyer agent can receive. ... So if my seller decides to pay that buyer agent X%+Y%, the buyer agent can't receive the y% extra.

It is rule born out of the settlement and MLS says that they have no mechanism to enforce it ... so I am looking for guidance because I have to look after my sellers best interest and if the buyer agent can't receive X%+y%, I will not allow my seller to pay the excess amount because the buyer agent can't receive it.

**Are we on the same page up to here Christopher?**

179

re: I really need guidance on this - Buyer Agent Verification and E...

Case 9:25-cv-81016-WM   Document 9-1   Entered on FLSD Docket 08/27/2025   Page 180 of 221

**Simple question**: how is this being monitored and enforced? -- The MLS has no idea, they have no procedure, no protocol to look into this even though the FACTS page says that it is the MLS who must enforce the new rules.
What I am looking for is for information as to how can I as listing agent (or NAR, or the MLS) ascertain that what my seller is paying (x%+y%) is inside that buyer agent agreement limit of x%.

This is set to close soon and I don't want to get to hit a wall at closing.

If there is not actual enforcement mechanism, just let me know and I will figure it out on my own... but I need guidance and concrete answers please Christopher.
Thanks once again,

**Jorge Zea**
Real Estate Professional
Broker
Realtor®

Christopher Harrigan (Member Policy) wrote on 4/7/25 5:41PM:

**Christopher Harrigan** (Member Policy)
Apr 7, 2025, 4:41PM CDT

Hi Jorge,

The verbiage that you ask about refers to the compensation one REALTOR® has agreed to with their own client.

If you haven't viewed (or used with your clients), here are some good resources that explain the practice changes and address compensation. https://www.nar.realtor/the-facts/homebuyers-what-the-nar-settlement-means
https://www.nar.realtor/the-facts/home-sellers-what-the-nar-settlement-means

Best,

Chris

180

Christopher Harrigan

Manager, Policy Information | Member Experience, Engagement and Legal Affairs

NATIONAL ASSOCIATION OF REALTORS® | 430 N Michigan Ave | Chicago, IL 60611

Email: NARPolicyQuestions@nar.realtor | Office: 312-329-8399

https://nar.realtor

The NATIONAL ASSOCIATION OF REALTORS® is an unrivaled advocate and resource in the real estate market for its members and their clients, and only members of NAR can call themselves REALTORS®

---

**Jorge Zea / Bue Lighthouse Realty**

Apr 4, 2025, 12:04PM CDT

Christopher, Thanks for your prompt response.

Nevertheless regarding the statement:
> "*So you are aware, there is nothing in the settlement agreement that dictates that the compensation paid by a listing broker to a buyer broker be equal to or greater/less than the amount a buyer broker will earn by representing their buyer.* ":

This statement directly contradicts (from the link you sent me (https://www.nar.realtor/the-facts/nar-settlement-faqs) :

1-FAQ 86, in the Written Buyer agreements section
> *MLS Participants **may not receive compensation for services from any source that exceeds the amount or rate agreed to in the buyer agreement.***

2-FAQ 93 in the Anti-Steering section:

> • *Written buyer agreements, required by the NAR practice changes that will be implemented on August 17, 2024, will also outline that **MLS Participants may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer***

> • *Since a broker working with a buyer **cannot receive more compensation than the buyer has agreed to in that agreement**, the amount of any offer of compensation is irrelevant to the buyer-broker's compensation.*

3-It also **contradicts the terms of the settlement agreement itself**, which mirrors these FAQ from NAR.

I really appreciate a formal clarification to this contradiction and information as to what is the enforcing mechanism ... the MLSs appears to have no guidance or information on this. If there is no enforcement or monitoring mechanics, just let me know as well...so I understand where we are

Respectfully,

JORGE ZEA
REALTOR®
305-244-7242

181

Christopher Harrigan (Member Policy) wrote on 4/4/25 10:57AM:

**Christopher Harrigan** (Member Policy)
Apr 4, 2025, 9:57AM CDT

Hi Jorge and thank you for writing to NAR.

The compensation arrangement that a buyer has entered into with their buyer broker is properly a matter of privacy between those two parties. Said another way, listing brokers should not attempt to seek that information, nor should the MLS seek buyer broker compensation information. So you are aware, there is nothing in the settlement agreement that dictates that the compensation paid by a listing broker to a buyer broker be equal to or greater/less than the amount a buyer broker will earn by representing their buyer. Our FAQ #8 addresses BBAs and can be viewed here: https://www.nar.realtor/the-facts/nar-settlement-faqs"

Jorge, we appreciated the opportunity to serve you today, and I hope this information is helpful. If there's any other way I can assist, please let me know.

Thanks,
Chris

Christopher Harrigan
Manager, Policy Information | Member Experience, Engagement and Legal Affairs
NATIONAL ASSOCIATION OF REALTORS® | 430 N Michigan Ave | Chicago, IL 60611
Email: NARPolicyQuestions@nar.realtor | Office: 312-329-8399
https://nar.realtor
The NATIONAL ASSOCIATION OF REALTORS® is an unrivaled advocate and resource in the real estate market for its members and their clients, and only members of NAR can call themselves REALTORS®

**Jorge Zea / Bue Lighthouse Realty**
Apr 2, 2025, 9:02AM CDT

Hello. - good morning:

This is the first time I run into this situation.

182

I am moving towards closing on a transaction (as listing broker).

I requested verification of buyer-broker agreement from MLS and they tell me that the buyer agent is in

compliance (with this part of the rule) by having a buyer-agent agreement in place prior to showing the property ... no problem there.

I further requested verification that the amount that my seller agreed to pay is less then or equal to the fee he agreed on his buyer-broker agreement.

We run into an issue here, because apparently there is no mechanism or protocol in place to assure that the commission paid is in compliance. Initial the MLS sent me to the title Company, who sent me back to the MLS, who now sends me to the Board..

How does this work and how is this being verified and enforced?

I need guidance and advice.

Cordially,

**Jorge Zea**
Real Estate Professional
Realtor®
Blue Lighthouse Realty

This email is a service from Member Policy. Delivered by Zendesk

[4YE92N-GVK1Y]

183

# Exhibit 4.3

184

Subject: Re: Verification of Compliance buyer broker agreement - Quan Diep
From: Ellie Ovilma <eovilma@rworld.com>
Date: 8/19/25, 9:56 AM
To: Jorge Zea - Broker <deals@bluelighthouserealty.com>, Compliance <compliance@rworld.com>,
Compliance <compliance@rworld.com>, Compliance <compliance@rworld.com>
CC: BMLS Management <BMLSMgt@Rworld.com>

Greetings,

Thank you for your message.

We have received the requested documentation from the agent, and it has been reviewed and found to be valid and in compliance. We apologize for the delay in our response, and we appreciate your patience. Should you have any further questions, please don't hesitate to reach out. Have a nice day!

Best regards,

**Ellie Ovilma**
MLS Compliance Coordinator
Broward, Palm Beaches & St. Lucie Realtors®
561-353-9170



---

**From:** Jorge Zea - Broker <deals@bluelighthouserealty.com>
**Sent:** Monday, July 14, 2025 2:42 PM
**To:** Compliance <compliance@rworld.com>; Compliance <compliance@rworld.com>; Compliance <compliance@rworld.com>
**Cc:** BMLS Management <BMLSMgt@Rworld.com>
**Subject:** Verification of Compliance buyer broker agreement - Quan Diep

Hello.

**An answer after validation is requested.**

I have reason to believe that the following agent dose not have a valid buyer-broker agreement or the terms contained in it are in violation of the rule. I **am particularly concern with the commisison she is getting paid by the seller is higher than what she agreed with the buyer in the buyer-broker agreement; or the terms might be in violation of the rule.**

Could you be so kind and verify that the agreement exists and that the terms are in compliance with the rule and its intent? 185

Realtor: Quan Diep
MLS ID: 276539429
License: 3352746
Brokerage: eXp Realty

Property transaction: 521 W Perry ST, Lantana, FL, 33462
Buyer: Mytherline Pierre & Marie C Thogene

Your prompt attention to this matter is greatly appreciated.

Looking forward for your information.

Cordially,

Jorge Zea
Real Estate Professional
Senior Broker
Realtor®

Phone: 855-550-0528
(but email is always better and faster)
deals@bluelighthouserealty.com

Address:
Blue Lighthouse Realty
2234 N Federal Hwy PMB 68073
Boca Raton FL 33431

Licenses:
FL: Broker Jorge Zea BK3015808; Blue Lighthouse Realty INC: CQ1021361
CT: Broker: Jorge Zea REB.0190508;  Blue Lighthouse Realty INC:. REB.0790521
MA: Broker: Jorge Zea 10000016
WA: Managing Broker: Jorge Zea 21020609/ Firm 21024014
IL: Managing Broker: Jorge Zea 471.021295
CO: Broker:  Jorge Zea EI.100094281 (Employing Level)
MD: Broker: Jorge Zea 01-5007935
DC: Broker: Jorge Zea IBF40000011
CA: Broker: Jorge Zea 1986168

— Attachments:

image.png                                                                 0 bytes

186

# Exhibit 4.4

187

Subject: Re: Buyer Broker agreement verification
From: ".Stellar MLS Compliance" <Compliance@stellarmls.com>
Date: 8/19/25, 8:26 AM
To: Jorge Zea <deals@bluelighthouserealty.com>

Good morning,

We have received and processed the report.

Please refer to the email sent by the Compliance Department on August 5, 2025, at 2:45 PM.

Best,

AB



**.Stellar MLS Compliance**
Toll-Free: 800-686-7451
*StellarMLS.com*

  

---

**From:** Jorge Zea <deals@bluelighthouserealty.com>
**Sent:** Thursday, August 14, 2025 03:44 PM
**To:** .Stellar MLS Compliance <Compliance@stellarmls.com>
**Subject:** Re: Buyer Broker agreement verification

Thanks.
And regarding this particular case I submitted for you verification?
I never got any response

Jorge Zea
Managing Broker
Realtor

From my iPhone

On Aug 14, 2025, at 11:17 AM, .Stellar MLS Compliance <Compliance@stellarmls.com> wrote:

Good morning,

Thank you for reaching out to the Compliance Department.

188

Stellar MLS ensures that the Broker's Exclusive Buyer Agreement (BBA) form is signed prior to any showings  if we receive a report that the agent did not have the form a fine would issued.  However, if there are discrepancies regarding the commission being offered, please note that Stellar MLS is not responsible for enforcing commission payments between offices. This matter falls outside our jurisdiction.

For further assistance, we recommend contacting the Professional Standards Department at your Local Service Center (LSC) for guidance on how to proceed.

 **D'yanni**
**Stellar MLS Compliance**
Toll-Free: 800-686-7451
*StellarMLS.com*

<image.png>  <image.png>  <image.png>

---

**From:** Jorge Zea <deals@bluelighthouserealty.com>
**Sent:** Tuesday, August 5, 2025 03:32 PM
**To:** .Stellar MLS Compliance <Compliance@stellarmls.com>
**Subject:** Re: Buyer Broker agreement verification

I am under the understanding that it was the MLS who enforces the rule.

So how is the entire rule being enforced (if at all).

I still don't know if the buyer broker may collect the amount my seller is paying him and How can I be sure that the BBA was in place prior to showing.

What guidance has NAR given..  there appears to a void.

Thanks,

Jorge Zea
Managing Broker
Realtor

From my iPhone

On Aug 5, 2025, at 2:45 PM, .Stellar MLS Compliance <Compliance@stellarmls.com> wrote:

Good afternoon,

189

Thank you for alerting us to this potential violation. We've received your report and will look into the matter further.

Please note that the only action we are able to take is to confirm the existence of a fully executed BBA.  If you feel there is a conflict with the compensation being offered please reach out to the Professional Standards Department at your LSC  for further guidance.

Best,

 **.Stellar MLS Compliance**

Toll-Free: 800-686-7451
***StellarMLS.com***

<image125588.png>   <image328210.png>   <image928362.png>

---

**From:** Jorge Zea - Broker <deals@bluelighthouserealty.com>
**Sent:** Monday, August 4, 2025 01:29 PM
**To:** .Stellar MLS Compliance <Compliance@stellarmls.com>
**Subject:** Buyer Broker agreement verification

Good Afternoon:

**I cordially request an answer after validation.**

I just filled out the violation for for Buyer Broker agreement

I have reason to believe that the agent reported  does not have a valid buyer-broker agreement or the terms contained in it are in violation of the rule.

**I am particularly concern with the commisison buyer broker is getting paid  by the seller might be higher than what he agreed with the buyer in the buyer-broker agreement.**

Could you be so kind and verify that the agreement exists and that the terms are in compliance with the rule and its intent?

Cordially,

**Jorge Zea**
Real Estate Professional
Senior Broker
Blue Lighthouse Realty INC

Phone: 305-244-7242
**(but email is always better and faster)**
***deals@bluelighthouserealty.com***

190

**Address:**
Blue Lighthouse Realty
2234 N Federal Hwy PMB 68073
Boca Raton FL 33431

**Disclaimer**
The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, you are hereby notified that any use, dissemination, distribution or reproduction of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify us by telephone at (407) 960-5300 and delete the transmission from your system. Thank you. This email has been scanned for viruses and malware, and may have been automatically archived.

**Disclaimer**
The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, you are hereby notified that any use, dissemination, distribution or reproduction of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify us by telephone at (407) 960-5300 and delete the transmission from your system. Thank you. This email has been scanned for viruses and malware, and may have been automatically archived.

**Disclaimer**
The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, you are hereby notified that any use, dissemination, distribution or reproduction of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify us by telephone at (407) 960-5300 and delete the transmission from your system. Thank you. This email has been scanned for viruses and malware, and may have been automatically archived.

─ Attachments: ─

| | |
|---|---|
| image202211.png | 0 bytes |
| image499215.png | 0 bytes |
| image033320.png | 0 bytes |
| image538606.png | 0 bytes |

191

8/23/25, 9:55 PM

# Exhibit 5

192

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

RHONDA BURNETT, JEROD BREIT,
HOLLEE ELLIS, FRANCES HARVEY, and
JEREMY KEEL, on behalf of themselves and
all others similarly situated,

                Plaintiffs,

     v.

THE NATIONAL ASSOCIATION OF
REALTORS, REALOGY HOLDINGS
CORP., HOMESERVICES OF AMERICA,
INC., BHH AFFILIATES, LLC, HSF
AFFILIATES, LLC, RE/MAX LLC, and
KELLER WILLIAMS REALTY, INC.,

                Defendants.

Case No. 19-CV-00332-SRB

**PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT
WITH THE NATIONAL ASSOCIATION OF REALTORS,
CERTIFICATION OF SETTLEMENT CLASS, AND APPOINTMENT OF CLASS
REPRESENTATIVES AND SETTLEMENT CLASS COUNSEL**

working with buyers, (b) restraining negotiation of those offers, (c) denying buyers information on the commissions being offered, (d) allowing buyer agents to represent that their services are "free," and (e) incentivizing and facilitating steering by brokers towards high commission listings and away from discounted listings (together, the "Challenged Rules"). Plaintiffs claimed that the Challenged Rules are anticompetitive and caused them to pay artificially inflated broker commissions when they sold their homes. Defendants have denied Plaintiffs' allegations.

Defendants filed motions to dismiss the *Burnett* action on August 5, 2019, and this Court denied their motions on October 16, 2019. (Burnett Doc. 131). Similarly, Defendants filed motions to dismiss the *Moehrl* action on August 9, 2019, and the Court in that action denied their motions on October 2, 2020. (Moehrl Doc. 184). The parties proceeded with discovery.

On April 22, 2022, this Court granted the *Burnett* Plaintiffs' motion for class certification; appointed Scott and Rhonda Burnett, Jerod Breit, Ryan Hendrickson, Jeremy Keel, and Scott Trupiano as class representatives; and appointed Ketchmark & McCreight, Boulware Law LLC, and Williams Dirks Dameron LLC as co-lead class counsel. (Burnett Doc. 741). Hollee Ellis and Frances Harvey joined as class representatives in the *Burnett* action with the Third Amended Complaint (Burnett Doc. 759).

On March 29, 2023, Judge Wood granted the plaintiffs' motion for class certification in the *Moehrl* action, appointed Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, and Jane Ruh as class representatives, and appointed Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, and Susman Godfrey LLP as co-lead class counsel. (Moehrl Doc. 403).

The parties in both actions completed over four years of extensive fact and expert discovery, including propounding and responding to multiple sets of interrogatories and requests

194

NAR must also generally "prohibit REALTORS® and REALTOR® MLS Participants from representing to a client or customer that their brokerage services are free or available at no cost to their clients" and must generally require them to "disclose to prospective sellers and buyers in conspicuous language that broker commissions are not set by law and are fully negotiable" including in listing agreements, buyer representation agreements, and pre-closing disclosure documents. (Agreement ¶ 58(ix)).

NAR must also adopt, for the first time, rules expressly and directly prohibiting steering by REALTORS® and REALTOR® MLS Participants, including that they "must not filter out or restrict MLS listings communicated to their customers or clients based on the existence or level of compensation offered . . . ." (Agreement ¶ 58(x)).

Moreover, the Agreement includes several monitoring and enforcement mechanisms and incentives. As a condition for obtaining releases under the Settlement, REALTORS®, REALTOR® Member Boards, and REALTOR® MLSs must not only comply with the relevant practice changes, but they must also "agree[] to provide *proof* of such compliance if requested by Co-Lead Counsel" (Agreement ¶ 18(b), (c), (d)). In addition, the Settlement Agreement requires NAR to track whether certain of its affiliates have satisfied the conditions for obtaining a relief. It affords "[a]ny Settlement Class Member . . . the right to inquire of [NAR] as to whether a Person is a REALTOR®, REALTOR-Associate® Member, or REALTOR® Member Board and has satisfied the conditions for being a 'Released Party,'" and requires NAR to "promptly provide this information." (Agreement ¶ 18(b)). It also requires NAR to "develop educational materials" consistent with "each provision in these practice changes, and to eliminate any contrary materials." (Agreement ¶ 58(xiii)).

These practice changes have been cited as changes that will "drive down housing costs."

195

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX, LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>        Defendants. | Case No. 19-cv-00332-SRB |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, JACK RAMEY, DANIEL UMPA and JANE RUH on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX, LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>        Defendants. | Case No. 1:19-cv-01610-ARW |

**CORRECTED SETTLEMENT AGREEMENT**

196

by law and are fully negotiable (a) in their listing agreement if it is not a government-specified form, (b) in their agreement with buyers if it is not a government-specified form, and (c) in pre-closing disclosure documents if there are any and they are not government-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a government form, then REALTORS® and REALTOR® MLS Participants must include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable. NAR also shall require that REALTOR® Member Boards and REALTOR® MLSs, to the extent they publish form listing agreements, buyer representation agreements, and pre-closing disclosure documents for use by REALTORS®, Participants, and/or subscribers, must conform those documents to this Paragraph 58(ix).

x.       require that REALTORS® and REALTOR® MLS Participants and subscribers must not filter out or restrict MLS listings communicated to their customers or clients based on the existence or level of compensation offered to the buyer broker or other buyer representative assisting the buyer;

xi.      rescind or modify any existing rules that are inconsistent with the practice changes reflected in this Settlement Agreement; and

xii.     develop educational materials that reflect and are consistent with each provision in these practice changes, and eliminate educational materials, if any, that are contrary to it.

xiii.    the practice changes in Paragraph 58 of this Settlement Agreement shall not prevent (a) offers of compensation to buyer brokers or other buyer representatives off of the multiple listing service; or (b) sellers from offering buyer concessions on a REALTOR® MLS (e.g., for buyer closing costs), so long as such concessions are not limited to or

197

# Exhibit 6

198

# Exhibit 6.1

# Exhibit 6.2

200



©2025 Beaches MLS. Inc.
Matrix v12.4. Copyright © 2025 CoreLogic. All rights reserved. Terms of Use.

Powered By CoreLogic

Matrix



200
201

Document title: Matrix
Capture URL: https://matrix.southfloridamls.com/Matrix/Search/CrossProperty/Quick
Capture timestamp (UTC): Mon, 30 Jun 2025 16:46:18 GMT

Page 1 of 8



Document title: Matrix
Capture URL: https://matrix.swflamls.com/Matrix/Results.aspx?…
Capture timestamp (UTC): Mon, 30 Jun 2025 17:20:36 GMT

Page 1 of 2

# Exhibit  6.3



204

# Exhibit 6.4

Stellar Support: 800-686-7451 | Logout

**Stellar** MLS°    MY MATRIX | SEARCH | STATS | TAX | LINKS | FINANCE | ADD/EDIT | MARKET REPORTS | MORE   (Aa)  ⌄   Hello, Jorge ▾

❓ 🔍 | ACT                                              ✕ | 🔍 ✔ Include other criteria          Recent Searches ↺

⧉ Criteria | 🗺 Map | ⊞ Results

⠿ **Quick**                                                                                  ⚙

**Status - Date or Range**
Select All  Select None
☑ Active
☐ Pending
☐ Temporarily Off-Market
☐ Canceled (WDN-U)
☐ Withdrawn Conditional
☐ Sold
☐ Expired
☐ Leased

**Contract Status**                    ⑦
Appraisal
Financing
Inspections
Kick Out Clause
Letter Of Intent
○ And ◉ Or ○ Not

**Property Type**                      ⑦
Residential
Rental
Commercial Sale
Commercial Lease
Business Opportunity
Income
Vacant Land
◉ Or ○ Not

**Property Style**                     ⑦
1/2 Duplex
Agriculture
Apartment
Assembly Building
Billboard Site
◉ Or ○ Not

**Property Description**               ⑦
Corner Unit
Studio/Efficiency
Elevated
End Unit
Garage Apartment
○ And ◉ Or ○ Not

**Ownership**                          ⑦
Co-op
Condominium
Corporation
Fee Simple
Fractional
○ And ◉ Or ○ Not

**Map Search:** *No Map Selected* ⑦
Within [      ] ( ✓ miles of [              ]   My Location

St # [    ] Dir Pfx  Street Name   St Type   Dir Sfx  Unit #
[    ]    ⌄                         ⌄        ⌄    [    ]
                                                    More

**State**
Florida                ✕ 🖶 ⑦
◉ Or ○ Not

**County**                ⑦
Alachua
Baker
Bay
Bradford
Brevard
◉ Or ○ Not

**City**                  ⑦
[              ]
◉ Or ○ Not

**Development**           ⑦
[              ]
◉ Or ○ Not

**MLS Zip**               ⑦
32616 - Alachua
32615 - Alachua
32420 - Alford
32716 - Altamonte Springs
32715 - Altamonte Springs
◉ Or ○ Not

**Legal Subdivision Name**  ⑦
[                    ]

**Subdivision/Condo Name**  ⑦
[                    ]

**ML #**                  ⑦
[              ]

**Price**                 ⑦
[         ] ☑ (000s)

**Year Built**            ⑦
[              ]

**Sq Ft Heated**          ⑦
[              ]

**Sq M Heated**           ⑦
[              ]

**Total Acreage**         ⑦
0 to less than 1/4
1/4 to less than 1/2
1/2 to less than 1
1 to less than 2
2 to less than 5
◉ Or ○ Not

🔄 Clear  5000+ matches  🗺 Map  ⊞ Results

▦ Additional Fields  Add/Remove

| List Agent | [          ] ⑦ |
| List/Sell Office | [          ] 🖶 ⑦ |
| Listing Type | Exclusive Agency ⑦<br>Exclusive Right To Lease<br>Exclusive Right To Sell<br>Net<br>Open<br>◉ Or ○ Not |
| Listing Service Type | Sold Data/Entry Only ⑦<br>Full Service<br>Limited Service<br>◉ Or ○ Not<br>No Brokerage Relationship ⑦<br>Single Agent |

206

Document title: Matrix
Capture URL: https://stellar.mlsmatrix.com/Matrix/Results.aspx?...
Capture timestamp (UTC): Mon, 25 Aug 2025 01:15:22 GMT

Page 1 of 16

# Exhibit 6.5

BlueLighthouse | My MLS | Search ▾ | Reports ▾ | Add/Edit ▾ | Forms ▾ | SmartBar - find listings and more... | Transactions | Clients | Prospecting ▾ Favorites | Partners | Help | ··· More | JZ

**Search** | Show Map

Map Results | View Results | **11,242 Matches** | ⬇ Download Results | 💾 Save Search

| Search Type: | Cross Property ⌄ |
| --- | --- |

**Map Boundaries:** *<none>* Click here to draw or select boundaries

| **List Agent Name:** | First | Last |
| --- | --- | --- |
| **List Office Name:** | | |
| **Listing Contract Type:** | Select/Type to Narrow... | |

| Property Type: | Select/Type to Narrow... |
| --- | --- |
| Property Sub Type: | Select/Type to Narrow... |

**Proximity:** Within [distance] Miles My Location

For Street suffix use abbreviations (st. ave. etc)

Type an Address

| Status: | Active, Coming Soon ⌄ |
| --- | --- |
| Price: | (min) ,000    (max) ,000 |
| State: | Connecticut ✕  Select/Type to Narrow... |
| County: | Select/Type to Narrow... |
| City: | Select/Type to Narrow... |
| Address: | St. #  Pre. Dir. ⌄  Street Name |
| | Street Type ⌄  Post Dir. ⌄  Unit  Zip Code |
| Property Info: | Select/Type to Narrow... |
| Team#(s) - for Team's Combined Listing & Sales Activity: | | 🔍 Lookup |

⊙ Show Advanced Options

**connectMLS** *Connecting Your Real Estate Community*

---

⌄ **3 Filters applied**   ✕ Clear All   ⚙ Defaults

**Search Type**
Cross Property
**Status**
Active, Coming Soon
**State**
Connecticut ✕

**My Searches**

Previous Searches   Saved Searches

Jun 29, 11:20 PM - Cross Property
Status: Active, Coming Soon
State: Connecticut
🏃 Run

Jun 29, 11:17 PM - Cross Property
Status: Active, Coming Soon
State: Connecticut
🏃 Run

May 14, 09:57 PM - Cross Property
Status: All Active; All Off-Market
MLS Number: 170246691
🏃 Run

Mar 3, 01:05 PM - Cross Property
Status: All Active; All Off-Market
MLS Number: 24071082
🏃 Run

Jan 29, 12:34 PM - Single Family & Condo
Status: Active, Coming Soon
State: Connecticut
🏃 Run

Dec 26, 06:45 PM - Cross Property
Status: Active, Coming Soon
State: Connecticut
List Office Name: blue lighthouse realty
🏃 Run

Dec 12, 08:00 PM - Single Family & Condo
Status: Active, Coming Soon; All Off-Market
State: Connecticut (Equals Any)
Status Dates: Last Change Timestamp between 365 and 0, Last Change Timestamp between 365 and 0, Last Change Timestamp between 365 and 0, Last Change Timestamp between 365 and 0, Last Change Timestamp between 365 and 0
List Agent MLS ID: JONESDAVI
Property Subtype: Single Family, Condominium, Cooperative
🏃 Run

Dec 12, 07:57 PM - Single Family & Condo
Status: All Active; All Off-Market
State: Connecticut
Status Dates: Last Change Timestamp between 365 and 0, Last Change Timestamp between 365 and 0, Last Change Timestamp between 365 and 0, Last Change Timestamp between 365 and 0, Last Change Timestamp between 365 and 0
List Agent Name: dave jones
Property Subtype: Single Family, Condominium, Cooperative
🏃 Run

Sep 10, 08:59 PM - Cross Property
Status: Active, Coming Soon; Closed, Under Contract
State: Connecticut (Equals Any)
Status Dates: Close Date between 365 and 0, Pending Date between 365 and 0
Agent ID(s) - for Agent's Combined Listing & Sales
🏃 Run

Add/Remove Fields

208

# Exhibit 6.6



Document title: 1 - Residential | flexmls Web
Capture URL: https://real.flexmls.com/?quick_search
Capture timestamp (UTC): Thu, 03 Jul 2025 23:44:33 GMT

Page 1 of 1

# Exhibit  6.7

211



Document title: 1 - Residential | flexmls Web
Capture URL: https://spa.flexmls.com/
Capture timestamp (UTC): Thu, 03 Jul 2025 23:51:07 GMT

Page 1 of 1

Exhibit 6.8

213

**MRED** Midwest Real Estate Data | My MLS | Search ▾ | Listings ▾ | Reports ▾ | Forms ▾ | SmartBar - find listings and more...

Search | Map:Off

**19,080 Matches** | ⬇ Download Results | 🗒 Save Search

| Field | Value |
|---|---|
| **Property Type:** | Detached Single ⌄ |
| **Map Boundaries:** | *<none>* Click here to draw or select boundaries |
| **Status:** | All Active except Active (Private), Contingent (Private); All Contingencies ⌄ |
| **Area:** | Select/Type to Narrow... 🔍 Lookup |
| **City:** | Select/Type to Narrow... |
| **Search Price:** | (min) ,000    (max) ,000 |
| **Bedrooms:** | (min)    (max) ❓ |
| **Total Full/Half Baths:** | (min)    (max) |
| **More Agent Contact Info:** | |
| **Listing Type:** | Select/Type to Narrow... |
| **List Broker Name:** | First    Last |

⮟ **2 Filters applied**                                    ⚙ Defaults

**Property Type**
Detached Single

**Status**
All Active except Active (Private), Contingent (Private); All Contingencies

**My Searches**

Previous Searches   Saved Searches

Jun 21, 04:58 PM - Cross Property (All)
Status: All Active; All Off-Market
MLS #: 12400068
⟋ Run

May 12, 07:35 PM - Cross Property (All)
Status: All Active; All Off-Market
MLS #: 12362951
⟋ Run

Mar 11, 12:59 PM - Cross Property (All)
Status: All Active; All Off-Market
MLS #: 12309078
⟋ Run

Feb 21, 08:45 PM - Cross Property (All)
Status: All Active; All Off-Market
MLS #: 12291721
⟋ Run

Jan 14, 11:11 AM - Cross Property (All)
Status: All Active; All Off-Market
MLS #: 12270603
⟋ Run

Aug 23, 09:35 PM - Cross Property (All)
Status: All Active; All Off-Market
MLS #: 12146636
⟋ Run

Jul 29, 03:23 PM - Cross Property (All)
Status: All Active; All Off-Market
MLS #: 11847750
⟋ Run

Jul 27, 01:43 PM - Cross Property (All)
Status: All Active except Active (Private), Contingent (Private)
List Broker Name: jorge zea
⟋ Run

Apr 19, 08:03 PM - Attached Single
Status: Active, Auction, Back on Market, Contingent, New, Price Change, Re-activated, Temporarily No Showings, Active (Private), Contingent (Private), Cancelled, Closed, Expired, Pending, Rented, Pending (Private), Expired (Private), Cancelled (Private)
Address: Street #: 2452, Compass Point: W, Street Name: ardmore
Months Back: 24 Months
⟋ Run

Apr 19, 08:03 PM - Detached Single
Status: Active, Auction, Back on Market, Contingent, New, Price Change, Re-activated, Temporarily No Showings, Active (Private), Contingent (Private), Cancelled, Closed, Expired, Pending, Rented, Pending (Private), Expired (Private), Cancelled (Private)
Address: Street #: 2452, Compass Point: W, Street Name: ardmore
Months Back: 24 Months
⟋ Run

Apr 19, 08:02 PM - Detached Single
Status: Active, Auction, Back on Market, Contingent, New, Price Change, Re-activated, Temporarily No Showings, Active (Private), Contingent (Private),

ⅠShow Advanced Options          Add/Remove Fields

214

Document title: Jorge Zea | connectMLS
Capture URL: https://connectmls12.mredllc.com/mls/search/search.jsp?uniqueURL=800123751&amp;&amp;switch_class=DE
Capture timestamp (UTC): Sun, 27 Jul 2025 01:37:48 GMT

Page 1 of 2

# Exhibit 7

215

PUBLIC/OFFICIAL RELEASE // EXTERNAL

# Working Paper Series

# **Real Estate Commissions and Homebuying**

**WP 24-01R**

Borys Grochulski
Federal Reserve Bank of Richmond

Zhu Wang
Federal Reserve Bank of Richmond

216

This paper can be downloaded without charge
from: http://www.richmondfed.org/publications/



**FEDERAL RESERVE BANK
OF RICHMOND®**

Richmond ▪ Baltimore ▪ Charlotte

# Real Estate Commissions and Homebuying[*]

Borys Grochulski[†]and Zhu Wang[‡]

First version: February 28, 2024

This version: June 8, 2025

## Abstract

We study home search and buying in the U.S. housing market, focusing on the structure and level of buyer agent commissions. In our model, as in practice, homebuyers receive free house showings while buyers' agents earn a 3% commission from the seller upon a home purchase. We show this structure deviates from a cost-based model, resulting in excessive agent profits and inefficient searches. Adopting a cost-based commission system could raise social welfare by nearly $40 billion annually through improved home search efficiency and reduced rent-seeking by agents. We discuss policy implications of our findings, including for the recent NAR settlement.

**Keywords**: Real estate commissions, Real estate agents, Housing market, Search and matching

**JEL Classification**: D4, L1, L8, R3

---

[*]The authors thank Mark Bils, Hugo Hopenhayn, Chang-Tai Hsieh, Boyan Jovanovic, Benjamin Keys, Adriano Rampini, Esteban Rossi-Hansberg, Horacio Sapriza and the participants at the 2024 Duke/UVA/FRB Richmond Workshop, the 2024 International Industrial Organization Conference, the 2024 North American Summer Meeting of the Econometric Society, the 2025 American Economic Association Annual Meeting for helpful comments, and Brennan Merone and Vinh Phan for excellent research assistance. The views expressed herein are solely those of the authors and do not necessarily reflect the views of the Federal Reserve Bank of Richmond or the Federal Reserve System.

[†]Research Department, Federal Reserve Bank of Richmond. Email: borys.grochulski@rich.frb.org.

[‡]Research Department, Federal Reserve Bank of Richmond. Email: zhu.wang@rich.frb.org.

PUBLIC/OFFICIAL RELEASE // EXTERNAL

age industry has declined over the last 30 years: the number of real estate transactions during the 2010s has been moderately higher than during the 1990s, but the number of agents and firms has nearly doubled. Compared with the United Kingdom, where real estate commissions are much lower, the United States has around six times more housing transactions annually but employs twenty-six times more agents.

Taking this misallocation into account, redistribution of agent profits into consumer welfare is not social-welfare neutral, as we treat it in our model, but rather it enhances social welfare by limiting the misallocation of agent labor and resource use. As shown in Posner (1975), with free entry, the amount of resources wasted on competition for rents can be as high as the rents themselves. In our calibration, switching to cost-based pricing implies a transfer of about $38.04 billion per year ($38.52 billion less $479.84 million) from agents' profits to consumers. This amount can therefore be regarded as an upper-bound estimate on annual social surplus gains from removing rent seeking.

In fact, results obtained in Barwick and Wong (2019) indicate our estimate may be a tight upper bound on the welfare gains from removing rent seeking. Barwick and Wong (2019) report that if real estate agent productivity remained the same as it was in the 1990s, the number of agents working in real estate would be nearly one million fewer than what it is now. This one million workers would be available to work in other, more productive sectors. Assuming half of these individuals work now as buyer agents, our estimate of buyer agent extra profits, $38.04 billion a year, implies that each of these agents foregoes $76,080 a year they could make working in another industry, which matches closely the current salary levels of salespeople in other industries.

In sum, taking into account the reduction in rent-seeking behavior, the estimate of consumer welfare gains from our model—$38.52 billion per year—can be regarded as a reasonable estimate of social surplus gains from both the improvement in home search efficiency and the reduction in rent-seeking-induced misallocation of resources.

# 6   Policy discussion

In this section, we discuss policy interventions through which an efficient, cost-based commission system could be implemented in practice. We first discuss interventions regulating

PUBLIC/OFFICIAL RELEASE // EXTERNAL

the level of buyer agent commissions without fundamentally changing their structure. We then discuss implementing an efficient commission system via structural reforms. We conclude with some remarks on the recent NAR settlement.

In the current commission system, homebuyers do not directly compensate their agents. Instead, sellers attach an offer of buyer agent compensation to their home's listing and gross up the home's price to recover this amount. Buyers end up compensating their agent through a circular system, where money goes from the buyer to the seller to the buyer's agent.

This circular compensation system stifles competition and preserves the pricing distortions identified in our analysis (i.e., excess agent profits and unpriced buyer services) via the following mechanism. First, buyer agents offer free services to capture potential buyers so that sellers are willing to work with them to reach buyers. Second, sellers are forced to offer excessive commissions in their listings as they are concerned that buyer agents would steer clients away from their properties unless they offer the prevailing commission rate.[31] Finally, buyers pay for the excessive commissions through higher house prices, and they do not have easy means to negotiate for lower commissions because they are offered ex ante by the sellers.

Without reforming this circular compensation structure, policy options to remedy the pricing distortions are limited and less effective. Our Regime I characterizes a theoretical paradigm where zero-profit caps are used to eliminate excess agent profits in all home value segments $z$. However, these caps depend on agent service costs as well as on buyers' search behavior, and are not uniform across $z$, so the implementation does not appear practical. In Appendix C, we discuss introducing a uniform percentage cap in the existing commission system. A uniform cap is practically implementable, but it would not fully remove excess agent profits in high-$z$ house segments, and like Regime I, it does not address the problem of free house showings.

We are then led to believe that a fundamental change of the circular compensation structure for buyer agents is needed to achieve market efficiency. In theory, policymakers can cap the payment from sellers to buyer agents at $k_a$ or below. This amount would

---

[31]Empirical studies (e.g., Barwick et al., 2017 and Barry et al., 2024) provide strong evidence that steering helps substain high commission fees.

219

PUBLIC/OFFICIAL RELEASE // EXTERNAL

The recent NAR settlement helps raise the consumers' awareness of the excessive commission rates, and it bans posting commissions offered to buyers' agents on the MLS. However, the settlement does not go as far in reforming the system as our analysis suggests. Specifically, because the settlement does not ban payments from sellers to buyer agents outright, buyer agents can still receive commission offers from sellers through off-MLS channels. As a result, the settlement could still preserve the circular structure of buyer agent compensation. Moreover, with buyer agents learning their compensation offer privately, the removal of this information from the MLS may reintroduce the asymmetry of information between buyers and buyer agents that the Department of Justice fought to remove as recently in 2020.[32] While the full impact of the settlement remains to be seen, these limitations could hinder the effectiveness of the reform.[33]

# 7   Conclusion

In this paper, we construct a model of home search and buying to evaluate real estate commissions prevalent in the U.S. residential housing market. In the model, as in practice, homebuyers receive free house showings without having to pay their agents. A buyer's agent earns a 3% commission from the seller upon the home purchase. We show this compensation structure deviates from cost basis, leading to excessive agent profits and inefficient home searches.

Based on the model, we conduct quantitative analyses. The results show that switching to a cost-based commission system for buyer agents could increase consumer welfare by nearly $40 billion a year. This annual increase in consumer welfare can also be regarded

---

[32] In 2020, the U.S. Department of Justice settled with the NAR for anticompetitive violations including the NAR's Commission Concealment Rules that prohibit an MLS from disclosing to prospective buyers the amount of commission that the buyer broker will earn if the buyer purchases a home listed on the MLS.

[33] A recent New York Times article reports that "One year after the National Association of Realtors agreed, as part of a legal settlement, to change a key rule on real estate commissions, little has changed...Though average commissions appear to be slipping, industry watchdogs say that Realtors and their brokerages have used workarounds and pressure on sellers to subvert the settlement...Average commissions dropped from 5.64 percent to 4.96 percent in the months that followed, according to a survey of 1,300 agents conducted by RISMedia, a real estate media company...Two other studies, conducted by the online brokerage Redfin and the cloud-based real estate accounting firm AccountTech, found commissions have not changed." — See "Home Sellers and Buyers Accuse Realtors of Blocking Lower Fees," *New York Times*, March 15, 2025.

*220*

as a reasonable estimate of broad social surplus gains from both the improvement in home search efficiency and the reduction in rent-seeking-induced misallocation of resources.

In terms of policy implications, we discuss implementing a cost-based à la carte commission system. Such a system requires that sellers and buyers each pay their agents directly, and buyers can pay their agents for each task separately, independent of the home's price. By fostering competition among agents and removing pricing distortions, the à la carte system can help achieve efficiency in the critically important U.S. housing market.

221.