**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 25-81016-CIV-DIMITROULEAS/MATTHEWMAN

JORGE A. ZEA,

      Plaintiff,

v.

NATIONAL ASSOCIATION OF
REALTORS®, et al.,

      Defendants.

_____/

## **DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................................1

II.  SUMMARY OF ALLEGATIONS .........................................................................................3

III.  LEGAL STANDARD.............................................................................................................8

IV.  ARGUMENT..........................................................................................................................9

    A.  PLAINTIFF FAILS TO PLEAD ARTICLE III OR ANTITRUST STANDING ...9

        1.  Plaintiff Cannot Bring an Individual Claim as a Proxy for Alleged Harm to Plaintiff's Business ..................................................................... 10

        2.  Plaintiff's Conclusory Allegations of Harm to His Business Are Not Plausible Allegations of Harm to Competition......................................... 12

    B.  PLAINTIFF DOES NOT ALLEGE FACTS SUFFICIENT TO SHOW A CONSPIRACY AMONG DEFENDANTS...........................................................14

        1.  Plaintiff's Indiscriminate Group Pleading Is Insufficient to State a Claim..................................................................................................... 15

        2.  Plaintiff Does Not Plausibly Allege a Hub-and-Spoke Conspiracy Because the Alleged Wheel Lacks a Rim ................................................. 18

        3.  Plaintiff Does Not Otherwise Plead Sufficient Facts to Establish a Conspiracy Among Any of the Defendants............................................. 20

    C.  NEITHER THE PER SE NOR QUICK LOOK STANDARDS SHOULD APPLY TO PLAINTIFF'S UNUSUAL ALLEGED CONSPIRACY CLAIMS..29

    D.  PLAINTIFF DOES NOT ALLEGE THAT ANTICOMPETITIVE HARM HAS OCCURRED IN A PROPERLY DEFINED RELEVANT MARKET........35

        1.  Plaintiff Does Not Plead a Plausible Product Market................................ 35

        2.  Plaintiff Does Not Plead a Plausible Geographic Market......................... 37

        3.  Plaintiff Does Not Plead Anticompetitive Effects in Any of the Markets He Alleges................................................................................................ 40

    E.  THE WRITTEN BUYER AGREEMENT RULE THAT PLAINTIFF CHALLENGES, REMAINS UNDER THE JURISDICTION OF THE U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI ...........41

V.  CONCLUSION.....................................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*,
  135 F.3d 740 (11th Cir. 1998) ...............................................................................................30

*Aquatherm Indus., Inc. v. Fla. Power & Light Co.*,
  145 F.3d 1258 (11th Cir. 1998) ............................................................................................13

*Aquatherm Indus. v. Florida Power & Light Co.*,
  971 F. Supp. 1419 (M.D. Fla. 1997)......................................................................................31

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................................8

*Atlanta Fiberglass USA, Ltd. Liab. Co. v. KPI, Co.*,
  911 F. Supp. 2d 1247 (N.D. Ga. 2012)..................................................................................40

*Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.*,
  953 F.3d 707 (11th Cir. 2020) ........................................................................................ passim

*Aventura Cable Corp. v. Rifkin/Narragansett S. Fla. CATV*,
  941 F. Supp. 1189 (S.D. Fla.1996) .......................................................................................38

*BanxCorp v. Bankrate Inc.*,
  No. 07-cv-3398, 2012 WL 3133786 (D.N.J. July 30, 2012),
  *modified on reconsideration*, 2012 WL 3988192 (D.N.J. Sept. 11, 2012).......................20, 32

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................................... passim

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)..............................................................................................................36

*Buc Int'l Corp. v. Int'l Yacht Council Ltd.*,
  No. 02-cv-60772, 2003 WL 27387243 (S.D. Fla. Aug. 28, 2003) .........................................12

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999)..............................................................................................................29

*Capitol Body Shop, Inc. v. State Farm Mut. Auto. Ins. Co.*,
  163 F. Supp. 3d 1229 (M.D. Fla. 2016)................................................................................31

*Comput. v. Uthmeier*,
  No. 24-cv-438, 2025 WL 893403 (N.D. Fla. Mar. 13, 2025)................................................10

*D'Augusta v. Am. Petro. Inst.*,
    117 F.4th 1094 (9th Cir. 2024) ...................................................................................14, 24, 28

*Day v. Taylor*,
    400 F.3d 1272 (11th Cir. 2005) ................................................................................................9

*Dean v. Roku, Inc.*,
    No. 24-cv-2383, 2025 WL 2299403 (M.D. Fla. Aug. 8, 2025)...................................11, 12, 14

*Eytalis v. Realtors*,
    No. 24-cv-147, 2025 WL 2054094 (N.D. Tex. June 9, 2025)
    *R. & R. adopted*, 2025 WL 2053096 (July 22, 2025).............................................................39

*Fin. Sec. Assur., Inc. v. Stephens, Inc.*,
    500 F.3d 1276 (11th Cir. 2007) ...............................................................................................8

*Findling v. Realcomp II, Ltd*,
    No. 17-cv-11255, 2018 WL 1425952 (E.D. Mich. Mar. 22, 2018).........................................14

*Flaa v. Hollywood Foreign Press Ass'n*,
    55 F.4th 680 (9th Cir. 2022) ..................................................................................................39

*GDHI Mktg. LLC v. Antsel Mktg. LLC*,
    416 F. Supp. 3d 1189 (D. Colo. 2019)....................................................................................32

*Gov't Emps. Ins. Co. v. Glassco Inc.*,
    No. 19-cv-1950, 2021 WL 3930508 (M.D. Fla. Sept. 2, 2021).........................................19, 21

*Hogan v. Amazon.Com, Inc.*,
    No. 24-1893, 2025 WL 869202 (9th Cir. Mar. 20, 2025).......................................................40

*Homie Tech., Inc. v. Nat'l Ass'n of Realtors*,
    No. 24-cv-616, 2025 WL 1938975 (D. Utah July 15, 2025)......................................13, 23, 27

*In re Aetna UCR Litig.*,
    No. 07-cv-3541, 2015 WL 3970168 (D.N.J. June 30, 2015)...................................................34

*In re AOL, Inc. Version 5.0 Software Litig.*,
    168 F. Supp. 2d 1359 (S.D. Fla. 2001) ...................................................................................38

*In re Crop Inputs Antitrust Litig.*,
    749 F. Supp. 3d 992 (D. Minn. 2024)................................................................................17, 18

*In re Domestic Air Transp. Antitrust Litig.*,
    148 F.R.D. 297 (N.D. Ga. 1993)............................................................................................21

*In re January 2021 Short Squeeze Trading Litig.*,
    No. 21-md-2989, 2022 WL 1522054 (S.D. Fla. May 12, 2022) .............................................30

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ................................................................................................18

*In re Se. Milk Antitrust Litig.*,
    555 F. Supp. 2d 934 (N.D. Tenn. 2008) ......................................................................15, 22, 26

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
    626 F.3d 1327 (11th Cir. 2010) ...................................................................................... passim

*JES Props., Inc. v. USA Equestrian, Inc.*,
    No. 02-cv-1585, 2005 WL 1126665 (M.D. Fla. May 9, 2005) ..............................................29

*JES Props. v. USA Equestrian, Inc.*,
    253 F. Supp. 2d 1273 (M.D. Fla. 2003)................................................................................37

*Kifle v. Google LLC*,
    No. 22-cv-4204, 2023 WL 5538289 (N.D. Ga. Aug. 28, 2023).......................................12, 14

*L.H. Equity Invs. LLC v. Wade*,
    No. 09-cv-80607, 2010 WL 11505176 (S.D. Fla. Mar. 29, 2010) ....................................35, 36

*Legends Collision Ctr., LLC v. State Farm Mut. Auto. Ins. Co.*,
    No. 14-cv-6006, 2016 WL 7404476 (M.D. Fla. Dec. 22, 2016) ............................................34

*Levine v. Central Fla. Med. Affiliates*,
    72 F.3d 1538 (11th Cir. 1996) ..............................................................................................37

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..............................................................................................................10

*McCullough v. Zimmer, Inc.*,
    No. 08-cv-1123, 2009 WL 775402 (W.D. Pa. Mar. 18, 2009)................................................14

*Midwestern Waffles, Inc. v. Waffle House, Inc.*,
    734 F.2d 705 (11th Cir. 1984) .........................................................................................10, 36

*Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*,
    748 F.2d 602 (11th Cir. 1984) .........................................................................................11, 12

*Odion v. Google Inc.*,
    No. 13-cv-3906, 2014 WL 11281390 (N.D. Ga. May 8, 2014)..............................................11

*Okavage Grp., LLC v. United Wholesale Mortg., LLC*,
    No. 21-cv-448, 2024 WL 982380 (M.D. Fla. Feb. 6, 2024),
    *R. & R. adopted*, 2024 WL 5704993 (Sept. 20, 2024).....................................................19, 20

*Palazzo v. Gulf Oil Corp.*,
    764 F.2d 1381 (11th Cir. 1985) ............................................................................................11

*Perez v. Scotts Co. LLC*,
   No. 24-cv-60516, 2024 WL 5219736 (S.D. Fla. Nov. 14, 2024) ............................................8

*PhantomALERT v. Apple, Inc.*,
   762 F. Supp. 3d 8 (D.D.C. 2025) ...........................................................................................36

*Pierson v. Orlando Reg'l Healthcare Sys.*,
   619 F. Supp. 2d 1260 (M.D. Fla. Apr. 28, 2009).............................................................16, 40

*Prossin v. Int'l Ass'n of Antarctica Tour Operators*,
   No. 23-cv-167, 2024 WL 3850360 (D.R.I. Aug. 16, 2024)....................................................13

*Q Club Resort & Residences Condo. Ass'n v. Q Club Hotel, LLC*,
   No. 09-cv-60911, 2010 WL 11454483 (S.D. Fla. Jan. 5, 2010)......................................38, 39

*Quality Auto Painting Ctr. of Roselle v. State Farm Indem. Co.*,
   917 F.3d 1249 (11th Cir. 2019) .................................................................................21, 30, 31

*Spanish Broad. Sys. of Fla. v. Clear Channel Communs.*,
   376 F.3d 1065 (11th Cir. 2004) ........................................................................................12, 41

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)................................................................................................................10

*St. Paul Fire & Marine Ins. Co. v. Barry*,
   438 U.S. 531 (1978)..........................................................................................................20, 31

*Stoni Med. Staffing v. Ally Fin.*,
   No. 23-cv-0003, 2024 WL 644570 (S.D. Ga. Feb. 15, 2024).................................................11

*T. Harris Young & Assoc., Inc. v. Marquette Elecs., Inc.*,
   931 F.2d 816 (11th Cir. 1991) ...............................................................................................37

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006)....................................................................................................................32

*Thomas v. Pentagon Fed. Credit Union*,
   393 F. App'x 635 (11th Cir. 2010) ...........................................................................................9

*Tucci v. Smoothie King Franchises, Inc.*,
   215 F. Supp. 2d 1295 (M.D. Fla. 2002)..................................................................................27

*United Am. Corp. v. Bitmain, Inc.*,
   530 F. Supp. 3d 1241 (S.D. Fla. 2021) .............................................................................18, 31

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940)..........................................................................................................32, 34

*United States v. Topco Assocs.*,
   405 U.S. 596 (1972) ..................................................................................................32

*YMD Records, LLC v. Ultra Enters., Inc.*,
   361 F. Supp. 3d 1258 (S.D. Fla. 2019) ...................................................................28

## STATUTES AND RULES

Federal Rule of Civil Procedure Rule 12(b)(1) ........................................................8, 10

Federal Rule of Civil Procedure Rule 12(b)(6) ........................................................8, 38

Sherman Act § 1 .................................................................................................... passim

## MISCELLANEOUS

National Association of REALTORS®, The Answer Book: The Source for REALTOR®
   Association Management Leaders (Jan. 2024)
   https://www.nar.realtor/sites/default/files/2024-09/The-Answer-Book-2024-09-05.pdf ..........4

Defendants National Association of REALTORS®; Broward, Palm Beaches and St. Lucie REALTORS®, Inc.; Beaches MLS, Inc.; Miami Association of REALTORS®, Inc.; Orlando Regional REALTOR® Association, Inc.; Space Coast Multiple Listing Service, Inc.; Space Coast Association of REALTORS®, Inc.; Royal Palm Coast REALTOR® Association, Inc.; Florida Gulf Coast Multiple Listing Service, Inc.; Naples Area Board of REALTORS®, Inc.; My Florida Regional MLS, Inc. (d/b/a Stellar MLS); Northeast Florida Multiple Listing Service, Inc. (d/b/a realMLS); Northeast Florida Association of REALTORS®, Inc.; Central Panhandle Association of REALTORS®, Inc.; Connecticut Association of REALTORS®; Smart MLS, Inc.; and West and Southeast REALTORS® of the Valley, Inc. move to dismiss Plaintiff's Complaint (ECF No. 1) pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## I.  INTRODUCTION

Plaintiff and Defendants, professional real estate associations and multiple listing services, share a goal:  to promote pro-consumer and pro-competitive practices in the real estate industry. Plaintiff's Complaint confirms this.   Plaintiff concedes that the National Association of REALTORS® puts mandatory rules in place that are "pro-competitive," "consumer-protective," and specifically aimed at preventing the anticompetitive practice ("steering") that forms the basis of Plaintiff's Complaint.

Plaintiff does not allege that Defendants themselves have engaged in the practice of "steering" (the practice of real estate agents diverting buyers towards or away from properties, based on commission to the buyer's representative) or any other anticompetitive practice that has allegedly harmed his business.  Of course, this makes sense, because Defendants—state, local, and national REALTOR® associations and multiple listing services—cannot engage in such practices because they are not in the business of buying and selling real estate.  So, Plaintiff takes the unusual and legally baseless path of conjuring a grand antitrust conspiracy where each Defendant

supposedly has agreed *not to enforce its own rules* to disadvantage Plaintiff's business and others like it. And Plaintiff goes beyond underenforcement, alleging that Defendants should have more rules, or interpret their current rules differently, in order to achieve (in Plaintiff's view) better outcomes.

The deficiencies in Plaintiff's approach of pursuing his preferred outcomes by bringing an antitrust case are myriad but can be summed up by one overarching problem—Plaintiff's disparate and anecdotal concerns do not fit any antitrust framework.

*First*, Plaintiff has not alleged any injury. Plaintiff, an individual, has not pleaded facts showing he suffered harm necessary to establish Article III standing or antitrust injury based on harms that occurred to his business. And even if the harms to his business were relevant here, Plaintiff has pleaded no plausible facts that show harm to competition rather than harm to Plaintiff's business individually.

*Second*, Plaintiff solely brings claims for conspiracy but does not allege that Defendants as a whole, or any group of them, agreed not to enforce the very rules they put in place to achieve pro-competitive ends.

*Third*, Plaintiff cannot shoehorn his bizarre conspiracy claims into existing frameworks to shortcut the antitrust analysis. Plaintiff's claims cannot be evaluated under the per se standard.

*Fourth*, Plaintiff does not articulate the relevant product and geographic markets in which the alleged harm occurs—mistakenly focusing on the products and services the Defendants provide rather than any market in which the alleged underenforcement caused harm.

*Finally*, Plaintiff cannot use this Court as an end-run around another federal court that is overseeing some of the same conduct Plaintiff challenges here.

Enforcement mechanisms to address Plaintiff's concerns *already exist*. But even if they did not, Plaintiff cannot find the remedy he seeks from this unsupported case.

## II.   SUMMARY OF ALLEGATIONS

Plaintiff Jorge Zea alleges that he operates a "real estate brokerage service" through an online platform (www.snapflatfee.com®) that allows home sellers to pay a fee for "limited brokerage services." Compl. ¶ 19. These services include listing exposure on the corresponding multiple listing service ("MLS"), which is a database where real estate brokers and agents share information and listing of properties for sale as well as the provision of data sharing technologies to participating brokerages and individual REALTORS® who operate MLS-fed websites. *Id.* ¶ 20.

The National Association of REALTORS® ("NAR") is a national trade organization that provides support to its members (including real estate brokers, agents, and others in the real estate industry), throughout the United States. *Id.* ¶ 28. Plaintiff's Complaint is based on the implementation of rules promulgated by NAR and enforced by the other Defendant Associations and MLSs—rules and policies that Plaintiff concedes are "very pro-competitive." *Id.* ¶¶ 3–4. NAR maintains a Code of Ethics and Arbitration Manual, which contains the principles that NAR requires its member REALTOR® associations to enforce upon NAR members and information on enforcement. *Id.* ¶¶ 28, 146–48. Plaintiff also challenges the alleged lack of enforcement of the 2025 MLS Antitrust Compliance Policy NAR established in its MLS Handbook. *Id.* ¶¶ 316–17.

Plaintiff names nine local REALTOR® Association Defendants: Broward, Palm Beaches and St. Lucie REALTORS®, Inc.; Orlando Regional REALTOR® Association, Inc.; Miami Association of REALTORS®, Inc.; Royal Palm Coast REALTOR® Association, Inc.; Naples Area Board of REALTORS®, Inc. (NABOR); Space Coast Association of REALTORS®, Inc.; Northeast Florida Association of REALTORS®, Inc.; Central Panhandle Association of REALTORS®, Inc.; and West and Southeast REALTORS® of the Valley, Inc. (WeSERV).

Plaintiff names one REALTOR® association that operates at the state level, the Connecticut Association of REALTORS®.  *Id.* ¶¶ 29–45.[1]  NAR grants the state and local associations the ability to use the REALTOR® trademark, and the state and local associations facilitate members' ability to actively participate in the REALTOR® network and also uphold and enforce the NAR Code of Ethics.  *Id.* ¶¶ 50, 54.[2]

Plaintiff also names six MLS Defendants:  Beaches MLS, Inc.; Florida Gulf Coast Multiple Listing Service, Inc.; My Florida Regional MLS, Inc. (d/b/a Stellar MLS); Space Coast Multiple Listing Service, Inc.; Northeast Florida Multiple Listing Service, Inc. (d/b/a realMLS); and Smart MLS, Inc.  *Id.* ¶¶ 29–45.  Relevant to the MLS Defendants named in this litigation, MLSs must adopt and enforce certain rules in NAR's MLS Handbook.  *Id.* ¶ 51.

**"Steering."**  Plaintiff alleges that steering happens when "buyer agents divert clients away from properties that offer reduced or no buyer-agent commissions, by filtering them out, omitting them from recommendations, or actively disparaging them."  *Id.* ¶ 93.  Plaintiff does not allege that the rules and policies he challenges are themselves anticompetitive.  He alleges the opposite— that Defendants have issued guidance and enacted rules that "are pro-competitive and specifically aimed at preventing steering."  *Id.* ¶ 137.

Even so, Plaintiff includes allegations concerning various anecdotes from his experience where he alleges brokers have taken action to steer clients away from certain properties.  *Id.* ¶¶ 102, 115–19.  But Plaintiff did not bring this case against the actors that engaged in the alleged steering.

---

[1] Connecticut Association of REALTORS® and Smart MLS operate exclusively in Connecticut and WeServ operates exclusively in Arizona.  Accordingly, these Defendants are also separately moving to dismiss for lack of personal jurisdiction.

[2] *See also* National Association of REALTORS®, *The Answer Book: The Source for REALTOR® Association Management Leaders* 262 (2024), https://www.nar.realtor/sites/default/files/2024-09/The-Answer-Book-2024-09-05.pdf (cited in Complaint at 20 n.17).

Plaintiff points to NAR's own statements to conclude that based on "this direct public guidance, it is not a matter of interpretation:  steering is unequivocally an ethics violation, at the very least."  *Id*. ¶ 136.  Plaintiff's issue is that "none of the Defendants have acted to implement or enforce a binding and direct prohibition consistent with their premises."  *Id*. ¶ 140.  Plaintiff alleges that even with mechanisms in place through the Code of Ethics, buyer-broker agreement rule, the Internet Data Exchange ("IDX") display rule, and the MLS non-filtering rule, Defendants have collectively failed to enforce the rules.  *Id.* ¶¶ 183, 152, 315.

**The Buyer-Broker Agreement Rule.**  This rule requires that before touring a property, a buyer-agent must have an executed buyer-broker agreement that meets four requirements: (1) discloses the rate of any compensation that the MLS participants will receive; (2) ensures that the amount of compensation is objectively ascertainable and not open-ended; (3) includes a statement that MLS participants may not receive compensation from any source that exceeds the amount agreed to with the buyer; and (4) discloses in conspicuous language that broker commissions are not set by law and are negotiable.  *Id.* ¶ 179; *see also* Corrected Settlement Agreement ¶ 58(vi), *Burnett et al. v. Nat'l Ass'n of REALTORS® et al.*, No. 19-cv-332 (W.D. Mo. Apr. 19, 2024), ECF No. 1458-1 ("*Burnett* Settlement Agreement").  This rule was implemented as part of a final settlement of class action litigation.  *See* Order at 87, *Burnett et al. v. Nat'l Ass'n of REALTORS® et al.*, No. 19-cv-332 (W.D. Mo. Nov. 27, 2024), ECF No. 1622 ("*Burnett* Final Approval Order").

This rule is incorporated as a mandatory rule in NAR's MLS Handbook and is supervised and enforced by MLSs.  Compl. ¶ 182.  Plaintiff alleges that MLS Defendants have "collectively failed to enforce this rule, rendering it ineffective in practice."  *Id.*  Plaintiff alleges that he has submitted multiple verification requests to Defendants regarding whether agents showing his

listings had a proper buyer-broker agreement in place at the time of the showing and that his emails were ignored, apart from one response which Plaintiff deemed "conclusory and unsubstantiated." *Id.* ¶¶ 184–85.  Plaintiff does not plead any additional details about these inquiries or responses.

Plaintiff also alleges that the rule operates to "cap the total compensation a buyer broker may receive from any source, to the amount set in that agreement with their buyer."  *Id.* ¶ 186. Plaintiff alleges that "Defendants neither monitor compliance with this cap nor have or provide any guidance or enforcement mechanism."  *Id.* ¶ 192.  Yet Plaintiff does not allege any rule that requires NAR or any other Defendant to monitor compliance with the compensation offered.  And moreover, Plaintiff's other allegations contradict this assertion—NAR informed Plaintiff that "[i]f there is a breach of an agreement, then the parties can take appropriate action which includes any proper legal recourse, an ethics complaint, or contacting the appropriate state or local agency."  *Id.* And as NABOR informed Plaintiff, MLSs confirm that the correct documentation is in place, in accordance with the rule.  *Id.* ¶ 194.

Plaintiff also alleges that buyer agents (*not Defendants*) "knowingly manipulate" the written buyer agreement requirement.  *Id.* ¶ 204.  Plaintiff alleges that Defendants "tolerate" this conduct.  *Id.* ¶¶ 204, 206–08.  Plaintiff offers two anecdotes: one where he claims to not have received a response from Beaches MLS and one where Central Panhandle Association of REALTORS® "processed and heard . . . an ethics complaint," but Plaintiff disagreed with the outcome.  *Id.*

Finally, Plaintiff alleges that a non-defendant, Florida REALTORS®, is "an active co-conspirator" because it promulgates forms that Plaintiff alleges are "intentionally designed to obscure who is responsible for paying the buyer-agent's fee."  *Id.* ¶¶ 212–237.  Plaintiff does not allege that any Defendant conspired with Florida REALTORS® about these forms.

**IDX Display Rule.**  This is a mandatory rule in NAR's MLS Handbook that was enacted in November 2021.  *Id.* ¶ 247.  The rule requires websites displaying feeds from MLSs ("IDXs") to "identify the listing firm, and the email or phone number provided by the listing Participant in a reasonably prominent location . . . ."  *Id.*  NAR enacted this rule so consumers could get in contact with the listing broker and have their questions answered.  *Id.* ¶¶ 248, 254–55.  Plaintiff alleges that this rule "is a pro-competitive and consumer protection rule, designed to promote transparency, ensure fair access to information, and allow the consumer to choose who to contact when inquiring about a property."  *Id.* ¶ 249.

Plaintiff alleges that violation of this rule is "widespread, systemic, and plainly visible across the market" and that few, if any, IDX-fed websites are in compliance with it.  *Id.* ¶¶ 253, 262.  Plaintiff alleges that third-party real estate portals, brokerages, and individual agents fail to apply the rule.  *Id.* ¶¶ 255–58.  Plaintiff alleges that "[s]ome Defendant MLSs" themselves provide free IDX feeds and are not in compliance but does not allege any specifics.  *Id.* ¶ 258.

Plaintiff also alleges that he has engaged in extensive communications with Defendants to request enforcement of the rule and that Defendants have failed to act.  *Id.* ¶¶ 259–261, 265–268.  But the communication from the CEO of Space Coast Association of REALTORS® confirms that that Association did take action by submitting an urgent email to all vendors and committing to investigate further.  *Id.* ¶ 266.  Plaintiff also alleges a "vertical conspiracy" with IDX vendors but does not provide facts supporting the statement that "[v]endors admit to colluding with MLS-Responsible Defendant[s]" to violate the rule.  *Id.* ¶¶ 274–85.

**MLS Non-Filtering Rule.**  This is a mandatory rule in NAR's MLS Handbook that was enacted in 2021.  *Id.* ¶ 310.  This rule states that "MLS participants and subscribers must not, and MLSs must not enable the ability to, *filter out or restrict MLS listings that are searchable and*

*displayed to consumers* based on the level of compensation offered to the cooperating broker or *the name of a brokerage or agent*." *Id*. (emphasis added). Plaintiff concedes this rule is "pro-competitive." *Id*. ¶ 438. Plaintiff alleges that any REALTOR® can log in to an MLS and search using the filters prohibited by the rule, "nullifying the pro-competitive purpose of the rule and enabling persistent, unmonitored steering," which Plaintiff claims suggests that NAR has taken no action to enforce the rule. *Id*. ¶¶ 313–14. Plaintiff does not cite examples of non-compliant MLSs or any other party.

**Commissions.** Plaintiff alleges that the 2025 MLS Antitrust Compliance Policy established by NAR in its MLS Handbook—that prevents MLSs from fixing commissions, fees, or cooperative compensation—is not enforced and that NAR promotes a standardized commission and pricing structure. *Id.* ¶ 317. Plaintiff supports this allegation with publications he found on REALTOR.COM, a website he concedes is owned and operated by Move, Inc., a third party, not NAR. *Id.* ¶ 255; *id.* at 58 n.39.

## III.   LEGAL STANDARD

If a complaint fails to plead Article III standing, it will be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction. *Perez v. Scotts Co. LLC*, No. 24-cv-60516, 2024 WL 5219736, at *2, 5 (S.D. Fla. Nov. 14, 2024). To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), there must be sufficient "specificity in pleading before allowing a potentially massive factual controversy to proceed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). A plaintiff must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff must allege more than "labels and conclusions." *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007) (citing *Twombly*, 550 U.S. at 554–55). On a motion to dismiss, a court can consider documents cited in a complaint when such documents are central to the plaintiff's claim

and are undisputed.  *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

Although pro se pleadings are given greater leniency than those drafted by lawyers, such leniency "does not require or allow courts to rewrite an otherwise deficient pleading in order to sustain an action."  *Thomas v. Pentagon Fed. Credit Union*, 393 F. App'x 635, 637 (11th Cir. 2010) (affirming dismissal of pro se complaint where the plaintiff failed to present any specific allegations of the defendants' conduct to sustain its claim).

## IV.   ARGUMENT

Plaintiff alleges violations of only one law:  Section 1 of the Sherman Act.  To state any claim in federal court, Plaintiff must have Article III standing, and to state a claim under Section 1 of the Sherman Act, Plaintiff must have antitrust standing.  Plaintiff pleads neither.

As to the merits of his claims, Plaintiff must plausibly plead a conspiracy among the Defendants he names in his Complaint.  But Plaintiff does not plead a single fact that supports his assertion that there is a conspiracy among the various Defendants and MLSs not to enforce the rules he admits are pro-competitive.  Nor does Plaintiff plausibly plead facts supporting the additional essential element of an antitrust claim:  a relevant market.  Plaintiff's misguided attempts to frame his allegations as conduct giving rise to per se violations of antitrust law—group boycotts, market allocation, and price fixing—evidence a fundamental misunderstanding of the nature of the conspiracy he alleges.

Plaintiff's Complaint is internally inconsistent, conclusory, and should be dismissed under Federal Rules of Civil Procedure Rule 12(b)(1) and 12(b)(6).

### A.   PLAINTIFF FAILS TO PLEAD ARTICLE III OR ANTITRUST STANDING

The "irreducible constitutional minimum" of Article III standing has three elements: (1) an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is

likely to be redressed by a favorable decision of the court.  *Lujan v. Defenders of Wildlife*, 504
U.S. 555, 560–61 (1992).  "[T]he injury-in-fact requirement requires a plaintiff to allege an injury
that is both 'concrete and particularized.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 334 (2016)
(vacating judgment where the court failed to independently consider the concreteness of an alleged
injury).  On a Rule 12(b)(1) motion, the plaintiff bears the burden of establishing he has Article III
standing to assert each claim.  *Comput. v. Uthmeier*, No. 24-cv-438, 2025 WL 893403, at *1 (N.D.
Fla. Mar. 13, 2025) (dismissing complaint for lack of Article III standing).

To state an antitrust claim, a plaintiff must also have antitrust standing, which requires
allegations showing he suffered an antitrust injury.  *Midwestern Waffles, Inc. v. Waffle House, Inc.*,
734 F.2d 705, 710 (11th Cir. 1984).  Antitrust injury is an injury of the type that the antitrust laws
were designed to prevent and that flows from that which makes the defendant's acts unlawful.  *Id.*

Plaintiff does not plead Article III standing or antitrust injury because he cannot personally
bring claims as a proxy for harm allegedly suffered by his business.  And even if Plaintiff's
allegations of harm to his business were credited in this lawsuit brought by Plaintiff individually,
those allegations are conclusory statements that are often irrelevant to harm to competition because
they reflect only harm to Plaintiff's business and not to competition generally.

### 1.   Plaintiff Cannot Bring an Individual Claim as a Proxy for Alleged Harm to Plaintiff's Business

Plaintiff alleges a series of harms and injuries that are not "injur[ies] to Plaintiff," but are
rather injuries to Plaintiff's *business*, which means that Plaintiff lacks both Article III and antitrust
standing to bring this case.  Compl. ¶¶ 486–91.  Plaintiff alleges that "[a]s the immediate victim
of market exclusion, *Plaintiff* is in the best position to vindicate the harm to competition."  *Id.* ¶ 18
(emphasis added).  But Plaintiff's allegations on their face show that *Plaintiff* was not harmed:
rather, Plaintiff's "innovative, non-traditional, low-cost real estate brokerage service through its

10

trademarked platform, www.snapflatfee.com®" (*id.* ¶ 19), was allegedly excluded from the market.  Consistently, Plaintiff claims injuries that could only be experienced by his business rather than by Plaintiff in his individual capacity.  For example, he alleges:  "Lost Income and Profit, Constrained Growth, Restriction to Gain Market Share, and Diminished Business Value, as Plaintiff is denied equal access to the marketplace . . . devaluing the business's 'good will.'" *Id.* ¶ 490.  Plaintiff's request for monetary damages is based on damages to his business:  "lost profits, lost business opportunities, and loss of business value."  *See id.* at 120.

A pro se plaintiff cannot represent an entity in a lawsuit.  *Dean v. Roku, Inc.*, No. 24-cv-2383, 2025 WL 2299403, at *4 (M.D. Fla. Aug. 8, 2025) ("Neither an officer nor an employee of a corporation has standing to bring an action in his own right for an antitrust violation causing injury to the corporation and its business." (quoting *Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984))); *Odion v. Google Inc.*, No. 13-cv-3906, 2014 WL 11281390, at *1 n.1 (N.D. Ga. May 8, 2014) (rejecting claims by an individual plaintiff on behalf of two businesses because "both companies are considered to be artificial entities and, therefore, cannot appear in federal court pro se" (citing *Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385 (11th Cir. 1985))).  And Plaintiff may not substitute himself as a proxy for his corporation. *Dean*, 2025 WL 2299403, at *4 (holding a pro se plaintiff and the corporation he owned were "not interchangeable plaintiffs").

Because Plaintiff attempts to bring claims on behalf of his business but has not himself suffered any injury, his claims must be dismissed for lack of *Article III standing*.  *See Stoni Med. Staffing v. Ally Fin.*, No. 23-cv-0003, 2024 WL 644570, at *4–5 (S.D. Ga. Feb. 15, 2024) (dismissing individual plaintiff attempting to bring claims on behalf of a business for lack of Article III standing because the plaintiff could not show independent injury of their own); *see also*

*In re UBS Auction Rate Sec. Litig.*, No. 08-cv-2967, 2009 WL 860812, at \*6 (S.D.N.Y. Mar. 30, 2009) (dismissing claims for lack of standing since the plaintiffs "failed to allege any injury they personally suffered").

Plaintiff also lacks antitrust standing where he is "not the target of the anticompetitive practices." *See Nat'l Indep. Theatre Exhibitors, Inc*, 748 F.2d at 608; *see also Dean*, 2025 WL 2299403, at \*4, 5 (dismissing claims and holding allegations of "lost revenue, . . . market share and business opportunities" indicate harm to pro se plaintiff's business rather than plaintiff himself).  Since Plaintiff cannot be a proxy for his business, his claims should be dismissed for lack of antitrust standing.  *Dean*, 2025 WL 2299403, at \*6 (holding that the plaintiff simply "cannot rely on the alleged harm to [his business] as if it belonged to him individually"); *Kifle v. Google LLC*, No. 22-cv-4204, 2023 WL 5538289, at \*6 (N.D. Ga. Aug. 28, 2023) (dismissing claims where the pro se plaintiff failed to show antitrust injury where the alleged harms were to his business).

### 2. Plaintiff's Conclusory Allegations of Harm to His Business Are Not Plausible Allegations of Harm to Competition

Even assuming Plaintiff could bring claims reflecting harm to his business rather than to him (or if such allegations are construed as harm to him), Plaintiff's allegations are insufficient to allege antitrust injury "because antitrust law protects competition, not individual competitors." *See Dean*, 2025 WL 2299403, at \*5; *Buc Int'l Corp. v. Int'l Yacht Council Ltd.*, No. 02-cv-60772, 2003 WL 27387243, at \*3–4 (S.D. Fla. Aug. 29, 2003) (dismissing case for failure to establish antitrust injury where only harms to the plaintiff, and not competition, were alleged); *see also Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns*, 376 F.3d 1065, 1069 (11th Cir. 2004) ("[A]n antitrust plaintiff must show harm to competition in general, rather than merely damage to an individual competitor.").

Plaintiff's allegation that "Defendants' coordinated scheme harms competition itself by targeting and suppressing Plaintiff's pro-competitive brokerage model, restricting consumer choice, and maintaining supracompetitive prices" lacks factual allegations to support such statements.  Compl. ¶ 16.  As Plaintiff acknowledges (*id*. ¶ 470), he must plead injury to competition in the market as a whole, but he maintains that it is *his* business model being targeted, and that injury to Plaintiff's business alone is harm to competition.  *See id*. ¶ 485.  Not so. *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1263 (11th Cir. 1998) (finding no antitrust injury where the plaintiff did not show that the defendants' actions harmed competition, and the plaintiff's only claim was that the defendants' anticompetitive conduct harmed the plaintiff's business, which was insufficient); *Prossin v. Int'l Ass'n of Antarctica Tour Operators*, No. 23-cv-167, 2024 WL 3850360, at *4 (D.R.I. Aug. 16, 2024) (holding no antitrust injury existed where the plaintiffs failed to clearly allege what impact their exclusion from a trade association had "or could have had on price, output, or quality" of the relevant market).  Indeed, if anything, Plaintiff's Complaint alleges that under his business model, Plaintiff gets the same flat fee regardless of whether a listing ultimately sells (Compl. ¶ 19), rendering Plaintiff's allegations of injury insufficient.  *See Homie Tech., Inc. v. Nat'l Ass'n of Realtors*, No. 24-cv-616, 2025 WL 1938975, at *9 (D. Utah July 15, 2025) (holding that low-cost brokerage could not allege antitrust injury because "a plaintiff cannot suffer an antitrust injury caused by a conspiracy among its competitors to raise prices").

While the Complaint contains passing references to market foreclosure (*e.g.*, Compl. ¶ 432), Plaintiff's allegations about suppression of "innovative" business models are conclusory and lack factual support (*e.g.*, *id.* ¶¶ 94, 480), and apparently relate only to Plaintiff's business, because Plaintiff pleads no facts about other innovative businesses or any of his

competitors.  *See, e.g.*, *Findling v. Realcomp II, Ltd*, No. 17-cv-11255, 2018 WL 1425952, at *2 (E.D. Mich. Mar. 22, 2018) (rejecting vague allegations about injuries to unidentified actors where the plaintiff did not allege facts about who the competitors were); *McCullough v. Zimmer, Inc.*, No. 08-cv-1123, 2009 WL 775402, at *10 (W.D. Pa. Mar. 18, 2009) (finding no anticompetitive effects where the plaintiff made "vague references to 'unnamed competitors'").

And any harm that either Plaintiff (or his business) suffered personally would be indirect injuries that are too attenuated from the alleged anticompetitive conduct to establish antitrust injury.  *Kifle*, 2023 WL 5538289, at *6 (dismissing pro se plaintiff's claims and holding "personal harms" are "indirect harms [that] cannot establish antitrust injury); *Dean*, 2025 WL 2299403, at *4 (finding owner's "wasted development costs and resources" and "lost revenue" were insufficient to show antitrust injury).

Plaintiff fails to adequately plead antitrust injury.  His allegations are conclusory, focus on impact only to his own business rather than harm to competition, and are insufficient to confer antitrust standing on a pro se plaintiff bringing claims on behalf of his business.  Without antitrust standing, Plaintiff's Complaint must be dismissed.

### B.   PLAINTIFF DOES NOT ALLEGE FACTS SUFFICIENT TO SHOW A CONSPIRACY AMONG DEFENDANTS

A conspiracy under Section 1 requires a plaintiff to allege "facts that plausibly suggest an agreement or conspiracy" among the defendants.  *Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020).  To analyze such allegations, the "crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."  *Id*. (quoting *Twombly*, 550 U.S. at 553); *see also D'Augusta v. Am. Petro. Inst.*, 117 F.4th 1094, 1104 (9th Cir. 2024) ("[T]o support such a plausible inference [of conspiracy], a plaintiff must plead 'who, did what, to whom (or with whom), where, and

14

when.'"); *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 942 (N.D. Tenn. 2008) ("To allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin.").

Allegations of parallel conduct alone are insufficient to establish a conspiracy. *Auto. Alignment & Body Serv.*, 953 F.3d at 726. Claims based on parallel conduct alone must include allegations of sufficient "plus factors" to support a conspiracy claim. *Id.* Plus factors that would support a plausible inference of conspiracy include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties;" conduct indicating "the sort of restricted freedom of action and sense of obligation that one generally associates with agreement;" or "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Twombly*, 550 U.S. at 556 n.4.

Plaintiff has not alleged facts that plausibly establish a conspiracy among any of the Defendants and all of Plaintiff's six conspiracy counts should be dismissed.

### 1.    Plaintiff's Indiscriminate Group Pleading Is Insufficient to State a Claim

Plaintiff continuously refers to "Defendants" throughout the Complaint without specifying how each Defendant engaged in the conduct he complains of. *See, e.g.*, Compl. ¶ 60 ("Defendants routinely exercise this enforcement authority . . . ."); ¶ 99 ("Defendants have developed a multi-pronged, multilevel, enterprise-like structure . . . ."); ¶ 137 ("Defendants have effectively admitted that steering exists . . . ."); ¶ 211 ("Defendants go to deliberate lengths to preserve the anticompetitive restraints by ensuring that buyers remain dissociated from any clear obligation to

pay their own agents."). But Plaintiff must plead specific allegations for each Defendant. *See Pierson v. Orlando Reg'l Healthcare Sys.*, 619 F. Supp. 2d 1260, 1271–74 (M.D. Fla. Apr. 28, 2009) (rejecting antitrust claims as impermissible group pleading where the plaintiff's "extensive reliance" on a group term for the defendants, "without differentiation among individual defendants," meant that "the reader [wa]s left to wonder about the identifies of the parties involved" in the alleged conduct).

Putting aside Plaintiff's lists of the Defendants to which each count applies (*see, e.g.*, Compl. ¶ 388), six out of seventeen Defendants are mentioned by name *only* in the "Defendants" and/or the "Relevant Markets and Defendants' Market Power" sections of the Complaint. Neither section contains allegations of conduct underlying Plaintiff's allegations. *See* Compl. at 6–10, 16–20 (mentioning, for the only time in the Complaint, Defendants Connecticut Association of REALTORS®, Florida Gulf Coast Multiple Listing Service, Inc., Miami Association of REALTORS®, Inc., Northeast Florida Association of REALTORS®, Inc., realMLS, and Orlando Regional REALTOR® Association, Inc.). And Defendant WeSERV is mentioned only with respect to its intervention in a Connecticut ethics matter. *Id*. ¶¶ 14, 82.

For the remaining Defendants other than NAR, the only allegations in the Complaint are sporadic and not suggestive whatsoever of a conspiracy. *See, e.g.*, *id.* ¶ 206 ("Plaintiff submitted a request to Defendant Beaches MLS to verify whether the [buyer-broker] agreement complied with the rule (which it evidently does not). No response was ever received."); *id.* ¶¶ 142, 144 (alleging that "Plaintiff emailed Defendants NAR and the Broward, Palm Beaches and St. Lucie Realtors, Inc. on January 8, 2025, to ask why *no direct anti-steering rule has ever been enacted*" and that "Plaintiff sent an additional email to Broward, Palm Beaches and St. Lucie Realtors®, Inc.'s legal counsel (on January 15th 2025)."); *id.* ¶ 207 ("During an ethics Proceeding, Defendant

Central Panhandle Association of REALTORS®, Inc., processed and heard (on February 10, 2025) an ethics complaint where the respondent (REALTOR®) provided the buyer-broker agreement in support of her defense against the steering allegation filed against her."); *id.* ¶¶ 279–80 (alleging that Stellar MLS was part of a "sample" of "not compliant" MLSs with respect to the IDX display rule based on a response Plaintiff received from a "large IDX-vendor" to Plaintiff's inquiry); *id.* ¶ 194 (alleging that NABOR wrote, presumably in response to an inquiry from Plaintiff about the buyer-broker agreement rule, that "NAR has stated that the MLS only verifies that the proper documentation is in place.  We do not verify the compensation"); *id.* ¶ 96 ("Defendant Royal Palm REALTOR® Association openly acknowledged in an email on December 16, 2024 that providing buyers with access to a seller's contact information '. . . can lead someone to bypass their own contracted agent to seek out the listing agent.'"); *id.* ¶¶ 247 n.36, 268, 272 (alleging that Smart MLS "has never adopted" the IDX display rule; claiming that in response to an inquiry from Plaintiff, responded that ". . . *MLS is not enforcing these rules because they need to be voted into our rules and regulations*;" and including an image of Smart MLS's rules as an example of "omission of contact information requirement"); *id.* ¶ 266 (alleging response from Space Coast Association of REALTORS® on behalf of Space Coast Multiple Listing Service, Inc. to an inquiry from Plaintiff on IDX display rule violations).

Such minimal references that include no facts connecting these Defendants to an agreement of any kind do not suffice to plausibly plead allegations of conspiracy by any of the Defendants. *See, e.g.*, *In re Crop Inputs Antitrust Litig.*, 749 F. Supp. 3d 992, 1012–13 (E.D. Mo. 2024) (dismissing complaint where the plaintiffs "made anemic allegations against only a few individual defendants, while the rest [of the defendants had] been lumped into an undifferentiated amalgam

of [categories] . . . and [were] only summarily alleged to have taken part in the conspiracy" (citation modified)).

Nor does Plaintiff's chart listing the counts that apply to each Defendant (Compl. ¶ 448), suffice as *facts* supporting Plaintiff's claims against those Defendants. *In re Crop Inputs Antitrust Litig.*, 749 F. Supp. 3d at 1009 (dismissing antitrust conspiracy claims where the plaintiff generally asserted that groups of the defendants conspired and failed to offer specific allegations as to each defendant because "[s]uch generic pleading lacks the requisite specificity needed to plausibly allege a conspiracy"). Plaintiff's group-based approach to pleading a conspiracy is insufficient.

### 2. Plaintiff Does Not Plausibly Allege a Hub-and-Spoke Conspiracy Because the Alleged Wheel Lacks a Rim

Plaintiff alleges that for each of his six counts, Defendants engaged in a hub-and-spoke conspiracy whereby NAR acts as the hub and the other Associations and MLSs act as the spokes. *See, e.g.*, Compl. ¶¶ 56, 379, 391–92, 404–06, 428. In order to plausibly plead a hub-and-spoke conspiracy to state a claim under Section 1, Plaintiff must plead: "(1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes." *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1256 n.15 (S.D. Fla. 2021) (quoting *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015)). Absent a horizontal agreement among the spokes, a hub-and-spoke conspiracy cannot exist—what otherwise remains is "a collection of vertical agreements," which would be analyzed under the rule of reason. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d at 1193 n.3 (observing that "a rimless hub-and-spoke conspiracy is not a hub-and-spoke conspiracy at all (for what is a wheel without a rim?)").

Plaintiff claims that "[e]ach MLS and Association operates as a *spoke-turned-sub-hub*,

composed of independent direct horizontal competitors (REALTORS® and/or licensed real estate agent)." Compl. ¶¶ 56–57. But Plaintiff fails to allege a horizontal agreement because he does not allege that any Association or MLS Defendant *are themselves competitors* or that they agreed amongst each other. *See id.* ¶¶ 87–92. Plaintiff alleges that Defendants are "collectives of horizontal competitors operating through their associations." *Id.* ¶ 55. Plaintiff also vaguely alleges that "[e]ach Defendant is, in itself, a trade organization composed of direct horizontal competitors - licensed real estate professionals." *Id.* ¶ 27. Thus, according to Plaintiff, only Defendants' (unspecified) *members* are horizontal competitors with *other members*. However, to plead a hub-and-spoke conspiracy, Plaintiff must allege that the Defendant spokes are direct horizontal competitors; the competitive relationship among Defendants' members is irrelevant to determining whether Defendants themselves are competitors for assessing any agreement among them. *See Gov't Emps. Ins. Co. v. Glassco Inc.*, No. 19-cv-1950, 2021 WL 3930508, at *3 (M.D. Fla. Sept. 2, 2021) (dismissing allegations of a per se horizontal antitrust violation where allegations that the conspirators were competitors were "notably absent").

In *Okavage Group v. United Wholesale Mortgage*, *LLC*, the plaintiff alleged a group boycott where a wholesale residential mortgage lender, UWM, (the "hub") required its 10,000 mortgage brokers (the "spokes") to refuse do business with competing wholesale residential mortgage lenders. *See* No. 21-cv-448, 2024 WL 982380, at *7 (M.D. Fla. Feb. 6, 2024), *R. & R. adopted*, 2024 WL 5704993 (Sept. 24, 2024). When the plaintiff mortgage broker refused, the hub ceased doing business with him. *Id.* at *8. The court determined that the plaintiff failed to "plausibly allege any horizontal agreement between each spoke (the brokers); only a hub (UWM) and vertical agreements between it and each spoke (the brokers)." *Id.* at *27. While various spokes "express[ed] [] enthusiasm and encouragement" for the potential boycott, these were individual

actions that were "inadequate to plausibly suggest 'concerted action'" that would form the rim of a conspiracy. *Id.* at \*27–28. Additionally, the fact that each spoke knew that other spokes were accepting the deal "was insufficient to establish an agreement." *Id.* at \*28–29. Accordingly, these individual actions were not "conscious commitment[s] to a common scheme," but individual actions by each spoke. *Id*. The court also found that the plaintiff failed to establish the "plus factors to adequately plead" the existence of an agreement. *Id.* at \*30. Similarly, Plaintiff has not alleged sufficient facts to establish a hub-and-spoke conspiracy.

### 3.   Plaintiff Does Not Otherwise Plead Sufficient Facts to Establish a Conspiracy Among Any of the Defendants

Each of Plaintiff's six counts alleges a conspiracy related to specific "underenforcement" conduct. Plaintiff attempts to frame the conduct underlying each of his six counts as group boycotts, market allocation, *and* price-fixing conspiracies.

To plead a group boycott, a plaintiff must present, "as a prerequisite[,] sufficient allegations of an agreement or conspiracy" and allegations of "pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *Auto. Alignment & Body Serv.*, 953 F.3d at 727 (quoting *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978)).

To plead a market allocation conspiracy, a plaintiff must plead "(1) the existence of an agreement to engage in the alleged scheme, here, market division/customer allocation, and (2) that the conspiracy imposed an unreasonable restraint on trade." *BanxCorp v. Bankrate Inc.*, No. 07-cv-3398, 2012 WL 3133786, at \*6 (D.N.J. July 30, 2012) (quoting 12 Herbert Hovenkamp, Antitrust Law ¶ 2030 at 210, 214 (2d ed. 2005)), *modified on reconsideration*, 2012 WL 3988182 (D.N.J. Sept. 11, 2012).

To plead a price-fixing conspiracy, a plaintiff must establish that the defendants "had a

conscious commitment or common design or understanding to achieve [the] unlawful objective" of fixing prices. *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 315 (N.D. Ga. 1993). "A vertical agreement consists of an agreement between 'businesses operating at different levels of the same product's production chain or distribution chain.'" *Gov't Emps. Ins. Co.*, 2021 WL 3930508, at *2 n.2 (M.D. Fla. Sept. 2, 2021).

Actual allegations establishing a conspiracy under Plaintiff's kitchen-sink approach are lacking. Even crediting Plaintiff's faulty group pleading, Plaintiff fails to allege a conspiracy on any of his six counts.

*Count I.* In Count I, Plaintiff alleges that Defendants engaged in a conspiracy *not to adopt* an explicit anti-steering rule. *See, e.g.*, Compl. ¶ 379. Plaintiff acknowledges that it is Defendants' position that there are, in fact, rules in place that prevent steering and that Defendants consider steering a prohibited practice. *Id.* ¶¶ 106, 148. Nonetheless, Plaintiff alleges that Defendants engaged in an unlawful conspiracy not to adopt a better (in Plaintiff's view) rule.

Plaintiff alleges that "Defendants have never issued any rule that expressly and directly prohibits steering." *Id.* ¶ 134. But Plaintiff pleads no facts suggesting any *agreement* among Defendants not to enact such a rule. Plaintiff alleges that "each Defendant is liable for its failure to enact their own regulation to address known antitrust conduct" and that this "uniform omission and non-enforcement . . . demonstrates more than mere parallel conduct. It reflects concerted inaction by collectives of horizontal competitors . . . ." *Id.* ¶ 55. But this conclusory allegation focuses on Defendants' *members*; there is no allegation that Defendants engaged with other Defendants. At most, this establishes parallel conduct by Defendants. *See Auto. Alignment & Body Serv.*, 953 F.3d at 726 (finding allegations of parallel conduct "insufficient standing alone to raise an inference of conspiracy"); *Quality Auto Painting Ctr. of Roselle v. State Farm Indem. Co.*,

917 F.3d 1249, 1272 (11th Cir. 2019) (same).  Nor does Plaintiff allege any plus factors sufficient to move the parallel conduct over the line to plausible conspiracy.  *Auto. Alignment & Body Serv.*, 953 F.3d at 726 (explaining that conspiracy claims based on allegations of parallel conduct must allege sufficient "plus factors").

Nor does Plaintiff explain the contours of the agreement not to enact an "explicit" no-steering rule, such as when the agreement was communicated, who was involved, or what it entailed, as is necessary to plausibly plead a conspiracy.  *See In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d at 942 ("To allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin.").

**Count II.**  In Count II, Plaintiff alleges that "Defendants systematically frame steering as an ethical violation under Article I of the Code of Ethics, deflecting responsibility from NAR and shifting the burden to local associations' ethics procedures."  Compl. ¶ 148.  Plaintiff then lists myriad alleged deficiencies with the ethics process, including its structure, evidentiary barriers, lack of enforcement, conflicts of interest and biases, lack of due process, and lack of enforcement in MLSs.  *See id.* ¶¶ 146–77.

Fundamentally, Count II is based on Plaintiff's dissatisfaction with the ethics process in general, and features of that process specifically.  But none of his allegations regarding these purported deficiencies explain how any Defendant formed *any* agreement with any other Defendant, let alone to engage in the conduct he complains of—i.e., an agreement to have unsatisfactory ethics procedures.  For example, Plaintiff complains that ethics committee members are "not trained in any legal, antitrust or contract basics," and that in one ethics proceeding, "the hearing chairperson openly acknowledged that it was her first time presiding over such a

proceeding." *Id.* ¶¶ 153, 155.  Plaintiff says that "[t]his absence of legal understanding and formal procedures further discredits the ethics enforcement process as a meaningful remedy for practices with broad anticompetitive consequences regulated under federal law." *Id.* ¶ 155.  But Plaintiff offers no facts plausibly suggesting a *conspiracy* among Defendants to have deficiencies in their ethics proceedings.  Plaintiff does not explain which Defendants entered into such an agreement, when, or what the agreement entailed.  Plaintiff also complains that "[i]n the ethics complaint process, the complainant (Plaintiff) carries the full burden of proof . . . . [which] creates a structurally flawed process." *Id.* ¶ 156–57.  Even taking these allegations as true, there is no suggestion of an agreement among Defendants to have a "structurally flawed process."

Plaintiff also alleges anecdotal examples of ethics proceedings that he claims are flawed or deficient.  *See id.* ¶¶ 154–55, 163, 171–72.  But Plaintiff pleads no facts about the ethics proceedings, such as when they occurred and what issue they involved, let alone facts sufficient to establish a conspiracy about the ethics proceedings when Plaintiff does not even identify which Defendants were involved.  This alone requires dismissal of Plaintiff's claim.  *Homie Tech., Inc.*, 2025 WL 1938975, at *12–13 (dismissing Section 1 claims and finding no existence of a conspiracy where conduct was done by third-parties affiliated with the defendants).

Plaintiff claims that "each Defendant is liable for its . . . failure to enforce existing [] rules" and that this "uniform omission and non-enforcement . . . demonstrates more than mere parallel conduct.  It reflects concerted inaction by collectives of horizontal competitors."  Compl. ¶ 55.  Again, parallel conduct is insufficient to establish a conspiracy.  And Plaintiff's mention of "collectives of horizontal competitors" is a distraction because Plaintiff does not allege any facts about who comprises these "collectives" or any other facts about alleged agreements among them.  Like Count I, Plaintiff's conspiracy claim fails because he does not allege any plus factors.  *See*

*Auto. Alignment & Body Serv.*, 953 F.3d at 726 (finding allegations of parallel conduct "insufficient standing alone to raise an inference of conspiracy").

**Count III.**   In Count III, Plaintiff alleges that the "deliberate non-enforcement [of the buyer-broker agreement rule] enables and perpetuates the very steering behavior the rule was intended to prevent."  Compl. ¶ 183.  Plaintiff claims that Defendants do not enforce the buyer-broker agreement rule and do not monitor whether compensation exchanged between brokers under these agreements comply with the rule.  *Id.* ¶¶ 186–202.

In support of his allegations of conspiracy involving this alleged deficiency, Plaintiff alleges that after emailing several Defendants asking about a buyer-broker agreement being in place for an *agent* at the time of the showing, he received only a deficient response from one of the Defendants, though he did not specify which Defendant allegedly provided the response.  *Id.* ¶ 185.  Plaintiff alleges that Beaches MLS and Central Panhandle Association of REALTORS®, Inc. took insufficient enforcement action against allegedly improper buyer-broker agreements.  *See id.* ¶¶ 206–08.  Plaintiff further takes issue with the fact certain buyer-broker agreements attempt to take discounts for sellers by prefacing that they expect the seller to cover the compensation of the buyer's agent.  *Id.* ¶¶ 205–08.  Plaintiff claims, with no facts in support, that "[t]hese [agreements] are not genuine, arms-length agreements."  *Id.* ¶ 209.

Regardless of the merits of Plaintiff's complaints (if any), Plaintiff again cites no facts suggesting that these allegations, even if accepted as true, were the result of agreements among Defendants.  *D'Augusta*, 117 F.4th at 1104 (holding that "bare allegations" are not enough to establish a conspiracy and dismissing case where no direct or "circumstantial evidence of any parallel conduct" was pleaded (citation modified)).  Even the allegedly deficient email response that Plaintiff received does not indicate the existence of a conspiracy.  Plaintiff states that

Defendant NABOR, when asked about a potential violation of the rule—a potential violation which Plaintiff does not specify—responded that the "MLS only verifies that the proper documentation is in place.  We do not verify the compensation."  Compl.  ¶ 194.  First, this response undermines Plaintiff's claim of non-enforcement:  NABOR confirmed that there *is* enforcement—by the MLS.  Second, Plaintiff has shown nothing improper based on his own allegations—the buyer-broker agreement rule itself requires "an executed buyer-broker agreement"—there is no requirement that an Association audit or inspect a broker's compensation. *See id.* ¶¶ 179–80.  Without more, these allegations "do[] not suggest a conspiracy." *Twombly*, 550 U.S. at 556–57.

**Count IV.**  In Count IV, Plaintiff alleges a conspiracy to restrain trade by "By Permitting, Recommending, Suggesting and Encouraging Inflated Buyer-Broker Commission Offers and the Status Quo Commission Structure."  Compl. ¶ 413.

Plaintiff admits that NAR's own rules state that "Boards and associations of REALTORS® and their MLSs shall not 1. Fix, control, *recommend, or suggest* the commissions or fees charged for real estate brokerage services . . . [or for] cooperative compensations offered by listing brokers." *Id.* ¶ 316.  Even so, Plaintiff claims that "NAR continues to affirmatively promote a standardized commission and pricing structure through its own publications" since the REALTOR.com website (operated by Move, Inc.—*not* NAR (*id.* ¶ 318)) has articles discussing commissions and that "MLS participants and subscribers must not represent their brokerage services to a client or customer are free or available at no cost to their clients." *Id.* ¶¶ 321–24, 326.

Plaintiff cannot rely on articles that, according to his own allegations, are not attributable to NAR but to a website operated by a third party. *Id*. ¶¶ 255, 317–26.  And Plaintiff's statement that "the messages (by the leader [NAR]) are amplified and echoed by brokers, agents, and media

outlets" (*id.* ¶ 333) is not supported by factual allegations and Plaintiff identifies no facts about the remaining Defendants or allegations that they engaged in such conduct. Plaintiff claims that the "public understands" NAR's messaging to encourage "avoid[ing] any brokerage service (including Plaintiff's) that deviates from the NAR-supported standards," and that this messaging "operates as a constructive group boycott." *Id.* ¶¶ 336, 338. And Plaintiff claims that NAR "continues to affirmatively promote a standardized commission and pricing structure" (*id.* ¶ 317), and that NAR continues to provide "deliberate price guidance . . . for 1.5 million members" (*id.* ¶ 331). But even taken as true, NAR's conduct alone or the number of people NAR's guidance reaches is not enough to allege *a conspiracy*; Plaintiff must provide details of the conspiracy, such as which Defendants agreed on commission structure. *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d at 942 ("To allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a specific time, place, or person involved in the alleged conspiracies." (citation modified)). Plaintiff's Complaint contains no such allegations.

Nor is it sufficient that Plaintiff baldly alleges that Defendants "refus[e] to enact and mandate a rule prohibiting this practice [of blanket seller-offered buyer-broker commissions]" and asserts that they "collectively decide not to do it." Compl. ¶ 417. Again, this assertion, without facts making it plausible, is insufficient to state a claim. *Twombly*, 550 U.S. at 556–57.

**Count V.** In Count V, Plaintiff alleges that members of NAR and each respective Association and MLS Defendant have agreed, combined, and conspired through the formal mechanisms of their associations to "engage in practices that result in the widespread non-compliance, violation of, and collective refusal to enforce, the IDX Display Rule." Compl. ¶ 427. Plaintiff claims that he received unsatisfactory responses from Space Coast Association of REALTORS® (*id.* ¶ 266) and Smart MLS (*id.* ¶ 268) to his inquiries about their IDX compliance.

Additionally, Plaintiff alleges that he believed that Stellar MLS, Beaches MLS, and an unspecified entity called "Miami" to be "non-compliant" and that they were guiding vendors to violate the IDX display rule.  *Id.* ¶¶ 279–81.  Plaintiff also alleges that there is an "industry-wide noncompliance" that shows a "deep scheme coordinated to undermine the pro-competitive stance Defendants publicly advocate."  *Id.* ¶ 292.

Plaintiff claims that Defendants' failure to enforce the IDX display rule is both a horizontal and vertical agreement.  *Id.* ¶ 293.  As to the horizontal agreement, Plaintiff says that it is among "direct competitors - members of the Association or MLS - who collectively decide to instruct the IDX vendor to violate the rule and/or simply decide not to enforce it."  *Id.* ¶ 293.  As to the vertical arrangement, Plaintiff says it is "vertical coordination with a separate entity at a different level of the structure – the vendor itself . . . . [who] knowingly complies with the instruction in violation of both the IDX rule and its executed legal data licensing agreement."  *Id.* ¶ 293.  But neither vertical nor horizontal arrangement Plaintiff describes involves any Defendant.  Defendants are not *members* of Associations or MLSs; Defendants are not vendors; and Defendants are not alleged to have "instruct[ed]" vendors not to comply with the IDX display rule.  Plaintiff again describes conduct that *does not involve Defendants*.  *See Tucci v. Smoothie King Franchises, Inc.*, 215 F. Supp. 2d 1295, 1300 (M.D. Fla. 2002) (granting motion to dismiss where plaintiff failed to allege any agreement between the defendants); *see also Homie Tech., Inc.*, 2025 WL 1938975, at *12–13 (dismissing Section 1 Sherman Act claims and finding no existence of a conspiracy where conduct was by third-parties affiliated with the defendants).

Moreover, Plaintiff makes only conclusory allegations about the IDX display rule and does not identify any details about Defendants' "agreements" to violate the rule.  Plaintiff alleges that the non-party vendors are "guided by the MLS-Responsible Defendants" (Compl. ¶ 281), and that

the "[v]endors admit to colluding with MLS-Responsible Defendant[s] to omit and/or hide a valuable piece of information in direct violations of a mandatory, pro-competitive rule" (*id.* ¶ 285). In addition to failing to identify, and put on notice, the "MLS-Responsible Defendant," the facts do not indicate that the Defendants worked *with each other* in a conspiracy to engage in these alleged violations.  *D'Augusta*, 117 F.4th at 1104 (requiring allegations of "who, did what, to whom (or with whom), where, and when," support a plausible inference of conspiracy).  Plaintiff's theory is not about a conspiracy between Defendants and the vendors, but about an agreement *between the Defendants* to restrain trade, which he has not pleaded, requiring the dismissal of his claims. *YMD Records, LLC v. Ultra Enters., Inc.*, 361 F. Supp. 3d 1258, 1264–65 (S.D. Fla. 2019) (granting motion to dismiss where the plaintiff failed to allege the "when and where" of the alleged agreement or plead any facts tending to show an agreement between the defendants).

**Count VI.**  In Count VI, Plaintiff alleges that Defendants "systematically violated" the MLS non-filtering rule by "continuing to provide their subscribers with the technological functionality to filter MLS searches based on the identity of the listing brokerage and listing agent." Compl. ¶ 439.  Plaintiff claims this constitutes a group boycott conspiracy "against disfavored competitors."  *Id.* ¶ 442.  Plaintiff alleges that NAR has "adopted and disseminated" the non-filtering rule, which prohibited MLSs from filtering property searches "based on offer[s] of compensation, the name of the listing broker or agent" (*id.* ¶ 310), and claims that certain MLS Defendants violate this rule (*id.* ¶ 313).  Plaintiff also notes that this rule is specific to MLSs, but claims the Association Defendants "engaged in a broader conspiracy" and says, with no facts plead in support, that the "associations . . . provide the technological tools that directly violate the Non-Filtering Rule."  *Id.* ¶ 441.  But Plaintiff's conclusory allegations of a "broader conspiracy" lack factual support. *Twombly*, 550 U.S. at 564 (holding "a few stray statements speak[ing] directly of

agreement" that read as "legal conclusions" were insufficient to state a claim of conspiracy). Additionally, Plaintiff fails to plead an agreement between NAR and each Defendant; he simply states that certain Defendants are violating the "Non-Filtering Rule" and that "NAR has taken no action" against them. Compl. ¶ 313. Plaintiff does not explain which Defendants agreed not to enforce the non-filtering rule; preventing any inference that there was any agreement establishing a conspiracy.

### C. NEITHER THE PER SE NOR QUICK LOOK STANDARDS SHOULD APPLY TO PLAINTIFF'S UNUSUAL ALLEGED CONSPIRACY CLAIMS

Plaintiff alleges that the conduct giving rise to his Section 1 conspiracy claims should be treated as per se unlawful. *See* Compl. ¶¶ 107, 111. Without any allegations supporting a conspiracy, analysis of Plaintiff's substantive claims is unnecessary. In any event, per se treatment is reserved for a small number of antitrust restraints "whose character is well understood and that almost always harm competition." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1334 (11th Cir. 2010); *JES Props., Inc. v. USA Equestrian, Inc.*, No. 02-cv-1585, 2005 WL 1126665, at *14 (M.D. Fla. May 9, 2005) ("Since under a per se analysis there is no inquiry into possible justifications for the challenged restraint, the per se doctrine should not be extended to restraints that are of ambiguous effect."). Such conduct includes "business relationships that, in the courts' experience, virtually always stifle competition." *Jacobs*, 626 F.3d at 1334. Plaintiff has not pleaded any such conduct.

Plaintiff argues that Defendants also violated the Sherman Act under the "quick look" analysis. *See, e.g.*, Compl. ¶¶ 108, 383, 396. But the quick look analysis is proper only where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). Thus, the quick look standard is inappropriate

here for the same reasons the per se standard is inappropriate—Plaintiff has not alleged conduct that has clear anticompetitive effects and/or almost always harms competition. *See In re January 2021 Short Squeeze Trading Litig.*, No. 21-md-2989, 2022 WL 1522054, at *25 (S.D. Fla. May 13, 2022) (refusing to apply quick look or per se standard in an "unusual" case where the "features of the arrangements are unique" (citation modified)).

Plaintiff alleges that steering is per se unlawful conduct. Compl. ¶¶ 107, 111. But putting Plaintiff's allegations in context, even assuming that steering could be considered per se anticompetitive conduct, *steering is not the conduct at issue in Plaintiff's Complaint*. Plaintiff has not alleged that *Defendants* engaged in steering; instead, he alleges they have not done enough to stop it. *See, e.g.*, *id.* ¶¶ 113–21, 128. This convoluted allegation is so far removed from the type of conduct that is treated as per se unlawful because the economic impacts are clear and tested. Per se treatment is not appropriate here because Plaintiff has not, and cannot, establish that the character of the challenged conduct is "well understood" and "almost always harm[s] competition." *Jacobs*, 626 F.3d at 1334.

And, as discussed above, Plaintiff has not plausibly pleaded a conspiracy at all, let alone group boycott, market allocation, and price-fixing conspiracies. Plaintiff's attempts to force the conduct at issue into an antitrust claim should be rejected. *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 746 (11th Cir. 1998).

***Plaintiff's allegations do not constitute a group boycott.*** A group boycott exists when a group of competitors agrees to withhold "patronage or services from the target." *Quality Auto Painting Ctr. of Roselle*, 917 F.3d at 1271. The target "can be either a competitor or 'a customer of some or all of the [boycotters] who is being denied access to desired goods or services because of a refusal to accede to particular terms set by some or all of the [boycotters]." *Id.*

Plaintiff alleges that Defendants' actions amount to a group boycott of "low-commission listings and the brokers who facilitate them."  Compl. ¶ 382.  But Plaintiff does not allege that Defendants are withholding from him any "patronage or services" or that Defendants have enlisted others from withholding any "patronage or services."  Without such allegations, Plaintiff has not pleaded a boycott of any kind.  *See Aquatherm Indus. v. Florida Power & Light Co.*, 971 F. Supp. 1419, 1431 (M.D. Fla. 1997) (granting motion to dismiss where the plaintiff failed to state a claim for group boycott because he failed to allege "withholding, or enlisting [of] others to withhold, patronage or services" (quoting *St. Paul Fire & Marine Ins. Co.*, 438 U.S. at 541)); *see also United Am. Corp.*, 530 F. Supp. 3d at 1273–74 (granting motion to dismiss where the conduct that the plaintiff alleged did "not fit the category of a group boycott").

Plaintiff's theory is also internally inconsistent.  For example, as to the IDX display rule, Plaintiff alleges that the "non-compliance" is market-wide and indiscriminate of business model: "From small brokerages to national franchises to high-traffic portals, noncompliance with the IDX rule is widespread and entrenched."  Compl. ¶ 262.  Plaintiff's allegation negates the notion that "noncompliance" with this rule—even accepting as true that noncompliance exists—is a boycott of any specific business model, if all business models are apparently excluded.  *See Quality Auto Painting Ctr. of Roselle*, 917 F.3d at 1271 (a group boycott must "withhold patronage or services from the target" (citation modified)); *Capitol Body Shop, Inc. v. State Farm Mut. Auto. Ins. Co.*, 163 F. Supp. 3d 1229, 1240 (M.D. Fla. 2016) (dismissing group boycott claim where there were no allegations that any of the defendants "ever refused to do business with any of the Plaintiffs" even though the individual defendants had steered patrons away).

***Plaintiff's allegations do not constitute market allocation.***  Market allocation is a "[horizontal] agreement between competitors at the same level of the market structure to allocate

territories in order to minimize competition." *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972); *GDHI Mktg. LLC v. Antsel Mktg. LLC*, 416 F. Supp. 3d 1189, 1207 (D. Colo. 2019) (dismissing claims "because there are insufficient allegations that the Defendants are competitors at the same market level"). To allege a "market allocation," Plaintiff must allege that the Defendants have agreed to "refrain from selling in one another's territories, soliciting or selling to one another's customers, or expanding into a market in which another participant is an actual or potential rival." *BanxCorp.*, 2012 WL 3133786, at *7 (citation modified).

Plaintiff alleges that Defendants' actions result in "market allocation that favors traditional, high-commission brokerage models" (Compl. ¶ 382) and "market allocation that forecloses buyer-to-listing agent (or buyer-to-seller) negotiation and channels consumers into high-commission, buyer-broker service model[s]" (*id.* ¶ 430). But none of the conduct in each of Plaintiff's six counts states a successful claim for market allocation because Plaintiff fails to allege facts that the Defendants have agreed with each other (or with anyone else) not to sell in each other's territories, solicit each other's customers, or expand into each other's markets. *See BanxCorp.*, 2012 WL 3133786, at *7.

**Plaintiff's allegations do not constitute price fixing.** Price fixing is defined as any "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity" or service. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (reversing finding of per se horizontal price fixing agreement because the defendants "did not compete with one another in the relevant market"). The challenged conduct must therefore relate to the *price* of some commodity or service.

Yet none of the counts, other than Count IV, contains allegations connecting the challenged

conduct to price.  And Count IV is also deficient.  In Count IV, Plaintiff alleges that "NAR continues to affirmatively promote a standardized commission and pricing structure through its own publications."  Compl. ¶ 317.  Plaintiff cites examples of instances when an organization, not NAR, indicated, for example, that "[s]ellers typically pay all real estate agents' commissions, which amount to 4% to 7% of the home's sales price."  *Id.* ¶ 321.  But these allegations fail to state a price fixing claim because even if the Complaint itself did not debunk the notion that *NAR* (rather than a website that uses its trademark) advocated for a typical commission structure, NAR does not *set* or *fix* the price.  And the publications that Plaintiff quotes clearly indicate what is "typical," "on average," or provide a range of commission percentages.  *See, e.g.*, *id.* ¶¶ 321, 323.  As Plaintiff acknowledges, it is the agents and home buyers who determine the ultimate commission. *See, e.g.*, *id.* ¶¶ 102, 179.  NAR does not determine commissions.

Plaintiff claims that "[t]he direct and recurring price specificity and commission structure that NAR instructs is self evident."  *Id.* ¶ 324.  But Plaintiff does not allege that NAR sets the price of any individual agent's commission—or even make non-conclusory statements that such "typical" or "average" commissions are followed.  And even if NAR were to "instruct" on commission percentages, that still does not amount to NAR having influence over the actual price, because NAR is not involved in individual real estate transactions.  Finally, even if NAR could influence commission, Plaintiff has not alleged that any other Defendant conspired to do so.

The remaining five counts challenge conduct that does not relate to the price of anything. Plaintiff fails to explain how, for example, Defendants' purported failure to enact a prohibition on steering or to enforce a prohibition on steering as a violation of the Code of Ethics even whiffs at a conspiracy to fix prices—or relates to price at all.  Plaintiff does not allege how—even if Defendants did enter into some sort of agreement regarding underenforcement—that agreement

involves the price of a commodity or service.  *See In re Aetna UCR Litig.*, No. 07-cv-3541, 2015 WL 3970168, at \*24 (D.N.J. June 30, 2015) ("But while labelling such conduct as an agreement to fix price, plaintiffs actually fail to allege that the price of any product or service has been fixed or restrained.").  The same failing exists as to Plaintiff's challenge of the buyer-broker agreement rule.  *See* Compl. ¶¶ 178–83.  Plaintiff references examples of forms (which he proffers as evidence of a failure to enforce the rule) from only a single state REALTOR® association that he did not name as a defendant.  *Id.* ¶¶ 212–37.  Plaintiff does not connect the named Defendants' alleged failure to enforce the buyer-broker agreement rule to prices at all, let alone to prices that were fixed by such conduct.  *Jacobs*, 626 F.3d at 1343 (affirming dismissal of price fixing claims where the complaint lacked allegations of any signaling regarding price).  Plaintiff does not allege that such an agreement was made "for the purpose and with the effect of raising, depressing, fixing, or stabilizing the price of a commodity."  *Socony-Vacuum Oil Co.*, 310 U.S. at 223.

Plaintiff similarly does not connect his allegations about the IDX display rule to price at all—let alone to a price for a specific commodity.  *Jacobs*, 626 F.3d at 1343.  Plaintiff proceeds into a litany of "evidence" that he apparently collected by reaching out to MLSs and other vendors showing that the IDX display rule is not enforced.  *See, e.g.*, Compl. ¶¶ 258–61.  But none of this "evidence" describes conduct by Defendants that influences price.  And Defendants are not liable for the conduct of other parties outside of their control.

Plaintiff's assertion that every type of challenged conduct constitutes a price fixing conspiracy reflects the indiscriminate and undiscerning nature of his Complaint.  Plaintiff fails to plead any facts about any Defendant agreeing to fix prices, as discussed *supra* § IV.B, and substantively, the sole count that connects its allegations to price—Count IV—fails.  None of Plaintiff's claims can stand as a price-fixing claim.  *See Legends Collision Ctr., LLC v. State Farm*

*Mut. Auto. Ins. Co.*, No. 14-cv-6006, 2016 WL 7404476, at \*3, 6–7 (M.D. Fla. Dec. 22, 2016) (dismissing price fixing claims where allegations of direct evidence "ha[d] nothing to do with price fixing," and the plaintiff otherwise failed to plead a price-fixing conspiracy).

### D.   PLAINTIFF DOES NOT ALLEGE THAT ANTICOMPETITIVE HARM HAS OCCURRED IN A PROPERLY DEFINED RELEVANT MARKET

Because Plaintiff has failed to plead any claim warranting of per se treatment, *supra* § IV.C, his claims should be assessed under the rule of reason, whereby "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Jacobs*, 626 F.3d at 1333 (citation modified).  Plaintiff has additional burdens under this standard:  in addition to pleading facts sufficient to establish a conspiracy under Section 1, *supra* § IV.B, to survive dismissal under a rule-of-reason analysis, Plaintiff must plead that Defendants have market power in a properly defined relevant market, which includes a product component and a geographic component.  *Id.* at 1339.  Plaintiff must also allege that anticompetitive effects occurred in those markets.  Plaintiff has done neither.

#### 1.     Plaintiff Does Not Plead a Plausible Product Market

A properly pleaded product market must comprise products that are reasonably interchangeable for the purposes for which they are produced.  *L.H. Equity Invs. LLC v. Wade*, No. 09-cv-80607, 2010 WL 11505176, at \*3 (S.D. Fla. Mar. 29, 2010).  Plaintiff's attempt to define a product market is flawed and legally insufficient.

Plaintiff says that the relevant product market is the "real estate brokerage services market," and that "for purposes of this action . . . [he] alleges three interrelated relevant product markets:"  (1) the "national market for NAR policy-making;" (2) the "local markets for MLS data feeds and listing exposure;" and (3) the "local markets for REALTOR® association services."

35

Compl. ¶¶ 69–70.  The relationship between these markets is unclear.

Plaintiff's "real estate brokerage services market" fails because he does not define it at all. Plaintiff does not explain what products it contains or the reasonable interchangeability of such products.  Indeed, Plaintiff pleads no allegations about how the www.snapflatfee.com® business model, under which sellers received leads and "assume[] responsibility for showings, communications, negotiations and overall coordination of the transaction," operates in the same market as other business models.  *See id.* ¶¶ 22–23.  Every product market must be defined; Plaintiff's attempt to define additional markets (or submarkets) does not obviate the need to define the "real estate brokerage services market."  *Jacobs*, 626 F.3d at 1336 (explaining that every Section 1 plaintiff must define the product market); *PhantomALERT v. Apple, Inc.*, 762 F. Supp. 3d 8, 22 (D.D.C. 2025) (explaining that both sub product markets and broader product markets must be defined (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962))).  But Plaintiff's other markets, even if construed as submarkets, also fail.

Plaintiff's first enumerated market, the "national market for NAR policy-making" is too narrow because it is a single-brand product market, which courts consistently reject.  *See Midwestern Waffles*, 734 F.2d at 713–14 (holding single chain of restaurants too narrow to constitute a relevant product market); *L.H. Equity Invs. LLC*, 2010 WL 11505176, at *3 (granting motion to dismiss because the plaintiff failed to allege a plausible basis for the narrow product market that it asserted and recognizing that "[c]ases in which dismissal on the pleadings is appropriate frequently involve failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity").  Plaintiff's national market for NAR policy making is also too broad when read with Plaintiff's allegations, which state that each local association has their own rules and enforcement mechanisms.  Compl. ¶ 73.  Accordingly, a purported national market for

rulemaking is not—nor does Plaintiff allege it to be—interchangeable with local markets.  Finally, Plaintiff makes no attempt to allege that there are any substitutes for the product—"NAR Policy"—and thus has failed to define this product market.  *JES Props.*, 253 F. Supp. 2d at 1282 ("Where an antitrust plaintiff fails to define its proposed relevant market with reference to rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, relevant market is legally insufficient and a motion to dismiss may be granted.").

Plaintiff's second and third proposed markets are "each Local MLS market in this complaint, [where] there is only one MLS service available and participation in the sole available MLS is essential for brokers to compete," and "the Local REALTOR® association market, [where] only the local chartered NAR-affiliated association holds authority to provide REALTOR® membership."  Compl. ¶¶ 72–73.  Yet Plaintiff's claims have nothing to do with the MLS and association markets—Plaintiff is not alleging, for instance, that he has been denied access to these services because of his alternative business model.  Plaintiff has not sufficiently defined each market he proposes and his claims should be dismissed.

### 2.      Plaintiff Does Not Plead a Plausible Geographic Market

Because Plaintiff failed to plead a product market, it is not necessary to assess whether Plaintiff pleaded a geographic market.  *Levine v. Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1553 n.17 (11th Cir. 1996) (declining to reach whether the plaintiff pleaded a proper geographic market where they "failed to adequately define the relevant product market").  Regardless, Plaintiff also did not plead a plausible geographic market.

The geographic market "is the area in which the product or its reasonably interchangeable substitutes are traded."  *T. Harris Young & Assoc., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816,

823 (11th Cir. 1991). Although "the definition of the relevant market is essentially a factual question," *Aventura Cable Corp. v. Rifkin/Narragansett S. Fla. CATV*, 941 F. Supp. 1189, 1193 (S.D. Fla. 1996), Rule 12(b)(6) dismissal is appropriate where a plaintiff's description of the geographic market is legally inadequate and/or wholly conclusory. *See In re AOL, Inc. Version 5.0 Software Litig.*, 168 F. Supp. 2d 1359, 1375 (S.D. Fla. 2001) (granting motion to dismiss where the plaintiff failed to adequately describe the geographic scope of the relevant market); *see also Q Club Resort & Residences Condo. Ass'n v. Q Club Hotel, LLC*, No. 09-cv-60911, 2010 WL 11454483, at *2 (S.D. Fla. Jan. 6, 2010) (rejecting geographic market that did not "correspond to the commercial realities of the industry").

Plaintiff's three enumerated markets each have a geographic component: a national market for NAR policy, local markets for MLS services, and local markets for REALTOR® association services. Compl. ¶ 70. Yet it is impossible to evaluate these markets because Plaintiff's "products" do not align with Plaintiff's claims. Accordingly, there is no mechanism or pleaded facts to evaluate the area of competition for a product market that has not been articulated.

Regardless, it is clear from the face of the Complaint that Plaintif's national market is overly broad as it does not reflect Plaintiff's own allegations about the commercial realities of the industry: Plaintiff alleges that each local MLS and REALTOR® Association has its own rules and enforcement mechanisms, which are not interchangeable with the alleged national market for NAR policy making. *Id.* ¶ 73; *Jacobs*, 626 F.3d at 1337 ("The market is composed of products that have reasonable interchangeability."). Thus, Plaintiff's national market does not reflect the commercial realities of the industry as he pleads them. *Q Club Resort & Residences*, 2010 WL 11454483, at *2.

This issue is compounded by Plaintiff's additional contradictory allegations: as to the local

associations, Plaintiff alleges that each local area is its own "market," but then alleges that "REALTOR® associations do not operate as siloed, local entities" to justify naming "Arizona-based WeSERV" in this litigation. Compl. ¶ 82. Plaintiff's own lack of clarity about how or why each local area is a geographic market underpins the deficiencies of the Complaint. *See Q Club Resort & Residences*, 2010 WL 11454483, at *2 ("A plaintiff may not employ 'pleading maneuvers' to 'artificially narrow a broader economic market' creating [a] 'fictitious market.'").

Finally, Plaintiff's conclusory allegations can simply not be accepted as true. Plaintiff tries to shortcut his burden by alleging that "[e]ach local Defendant exercises exclusive and absolute control over MLS data, listing exposure, and IDX feeds within its territory." Compl. ¶ 85. But Plaintiff does not allege that "each Defendant" has any involvement with each of MLS data, listing exposure, and IDX feeds. Furthermore, Plaintiff pleads no allegations concerning the contours of the local markets to evaluate the impact of "control over" these items. For example, consider Plaintiff's allegation about Defendants Miami Association of REALTORS® (SEFMLS), Beaches MLS, and Broward, Palm Beaches & St. Lucie REALTORS®. Compl. ¶ 75. Plaintiff alleges that these three entities control MLS listings and IDX fees in Miami-Dade, Broward, Palm Beach, and St. Lucie Counties. *Id*. Do they share market power in all four? Are these four counties one geographic market? If not, why not? Plaintiff's allegations do not provide the answer to these questions (and others) and must be dismissed. *See, e.g.*, *Q Club Resort & Residences*, 2010 WL 11454483, at *2 ("[T]he uniqueness of the . . . product's location is not a valid consideration in determining the geographic market"); *Eytalis v. Realtors*, No. 24-cv-147, 2025 WL 2054094, at *5 (N.D. Tex. June 9, 2025) (noting the uniqueness of the MLS system was not sufficient to ignore the required geographic pleadings), *R & R adopted*, 2025 WL 2053096 (July 22, 2025); *see also Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 692 (9th Cir. 2022) (affirming dismissal of

claim where the product market failed because the plaintiff's defined geographic market meant that the defendant trade association's members competed in different product markets); *Pierson*, 619 F. Supp. at 1280 (rejecting the plaintiff's attempt to define product and geographic market in such a way to include only one entity—the defendant).

### 3. Plaintiff Does Not Plead Anticompetitive Effects in Any of the Markets He Alleges

Further, Plaintiff's injury must have occurred in the alleged geographic or product market, yet Plaintiff fails to explain which associations or MLSs he is a member of or *where* his alleged injury occurred. *Atlanta Fiberglass USA, Ltd. Liab. Co. v. KPI, Co.*, 911 F. Supp. 2d 1247, 1261 (N.D. Ga. 2012) ("[T]o state a claim under [Section 1 of the Sherman Act], a claimant must allege a relevant geographic market . . . *in which* harm to competition is occurring or will occur." (emphasis added)). Plaintiff fails to tie any of his allegations of anticompetitive harm to the product markets he alleges—nor can he. Generally, Plaintiff alleges that there is harm because other brokers are at liberty to "steer" potential homebuyers away from properties that are listed using Plaintiff's service. This harm does not occur in the markets for "NAR rulemaking" or for MLS services. And because he does not allege that MLS or associations are excluding him, he has not alleged any harm or injury suffered in the antitrust markets he alleges are being restrained. *See Hogan v. Amazon.Com, Inc.*, No. 24-1893, 2025 WL 869202, at *1 (9th Cir. Mar. 20, 2025) (affirming dismissal of complaint where the plaintiffs failed to allege antitrust injury in the relevant market because "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained"). If anything, Plaintiff alleges harm to the real estate brokerage services market, but these allegations of harm cannot be properly evaluated because Plaintiff does not define that market. *See supra* § IV.D.1. Moreover, even if Plaintiff had adequately pleaded a "real estate brokerage services market," and even if Plaintiff had alleged that

Defendants participate in that market (which he has not, and cannot, because Defendants are REALTOR® associations and MLSs), Plaintiff's own allegations negate any finding of anticompetitive effects in that market because he alleges that "a growing number of MLS subscribers are licensed real estate professionals who are *not members of NAR* . . . ." Compl. ¶ 174. And taking Plaintiff's allegations concerning the vague and fragmented geographic markets as true, Plaintiff does not allege a *single fact* evaluating anticompetitive harm in any particular county or geographic area.

By omitting allegations as to which geographic or product markets were harmed by any purported anticompetitive effects, Plaintiff has failed to properly allege a relevant market. *Spanish Broad. Sys. of Fla.*, 376 F.3d at 1074 ("Under Section One, this 'relevant market' must have been harmed by an unreasonable restraint on trade").

* * *

Given Plaintiff's failure to adequately define the relevant market, the Complaint should be dismissed for failure to plead this fundamental element of an antitrust claim.

### E.  THE WRITTEN BUYER AGREEMENT RULE THAT PLAINTIFF CHALLENGES, REMAINS UNDER THE JURISDICTION OF THE U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI

Count III challenges the purported "collective refusal to enforce" the written buyer-broker agreement rule.  Plaintiff also seeks injunctive relief related to the rule.  Compl. at 119.  This includes injunctive relief that goes far beyond the requirements of the rule itself, including monitoring and enforcing compliance with the "intended application" of the rule, ordering Defendants "to implement and maintain comprehensive education and training programs" concerning the rule, ordering Defendants to "expressively prohibit vague wording and/or self-steering clauses built into the buyer-broker agreement rule or any indication or [insinuation] that the seller will pay any compensation," and to order Defendants "to require specific wording in the

buyer-broker agreement stating the buyer will pay the buyer agent compensation." *Id.*

In addition to there being no basis for this relief in Plaintiff's deficient Complaint, the relief sought is particularly improper because the rule is governed by the settlement agreement reached in the *Sitzer/Burnett* case in the U.S. District Court for the Western District of Missouri resolving claims between NAR and home sellers related to broker compensation. Plaintiff already attempted to challenge the settlement in the Western District of Missouri. Order at 2, *Burnett et al. v. Nat'l Ass'n of REALTORS® et al.*, No. 19-cv-332 (W.D. Mo. Apr. 22, 2025), ECF No. 1691 ("Mr. Zea requests 'declaratory relief confirming that steering remains unlawful under both the Settlement Agreement and Section 1 of the Sherman Act,' among other things."). The court rejected Mr. Zea's challenge, holding that he did not have standing to seek relief in that action because he did not move to intervene and that he did not have standing to object to the settlement because he did not claim to be a class member. *Id.* at 1–2.

Furthermore, the *Sitzer/Burnett* Court (and *Sitzer/Burnett* plaintiffs) "have authority to enforce the Settlement Agreement directly against the vast majority of MLSs in the United States," which have opted in and "agree[d] to submit to the Court's jurisdiction, including for purposes of enforcing the settlement." *Sitzer* Final Approval Order at 21–22. The Court explicitly rejected an objection that there was no enforcement mechanism under the NAR settlement because "the NAR Settlement Agreement expressly provides that 'the Court shall retain jurisdiction over the implementation and *enforcement of* the Settlement Agreement, including its practice change provisions.'" *Id.* at 21 (citation modified); *see also id.* at 87 ("The Court retains continuing and exclusive jurisdiction over all matters relating to the administration and consummation of the Settlements and to interpret, implement, administer, and enforce the Settlements."). Plaintiff's

attempt to circumvent that court's order is improper and outside of this Court's jurisdiction. Count III should be dismissed on these grounds alone.

## V.   CONCLUSION

For the reasons set forth above, the Complaint should be dismissed in its entirety with prejudice.

Dated:  October 8, 2025

Respectfully Submitted,

**WHITE & CASE LLP**

*/s/ Zachary B. Dickens*
Zachary B. Dickens
Florida Bar No. 98935

Southeast Financial Center
200 South Biscayne Blvd., Ste. 4900
Miami, FL 33131-2352
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: zdickens@whitecase.com

*Counsel for Defendants National Association of REALTORS®, Beaches MLS, Inc., Broward, Palm Beaches and St. Lucie REALTORS®, Inc., Miami Association of REALTORS®, Orlando Regional REALTOR® Association, Inc., Florida Gulf Coast Multiple Listing Service, Inc., Royal Palm Coast REALTOR® Association, Inc., Space Coast Multiple Listing Service, Inc., Space Coast Association of REALTORS®, Inc., Northeast Florida Multiple Listing Service, Inc. (d/b/a realMLS), Inc., Northeast Florida Association of REALTORS®, Inc., Central Panhandle Association of REALTORS®, Inc., Connecticut Association of REALTORS®, and West and Southeast REALTORS® of the Valley, Inc.*

**GRAY | ROBINSON, P.A.**

*/s/ John A. Boudet*
John A. Boudet
Florida Bar No. 515670

301 East Pine Street, Suite 1400
Orlando, FL 32801
Telephone: (407) 843-8880
Facsimile: (407) 244-5690
Email: john.boudet@gray-robinson.com

*Counsel for Defendant My Florida Regional
MLS, Inc. d/b/a Stellar MLS*

**BILZIN SUMBERG BAENA PRICE &
AXELROD, LLP**

*/s/ Lori P. Lustrin*
Lori P. Lustrin, Esq.
Florida Bar No. 59228
Robert W. Turken, Esq.
Florida Bar No. 306355
Scott N. Wagner, Esq.
Florida Bar No.: 51662

1450 Brickell Avenue
Suite 2300
Miami, Florida 33131
Telephone: (305) 374-7580
Facsimile: (305) 351-2265
E-mail: rturken@bilzin.com
E-mail: swagner@bilzin.com
E-mail: llustrin@bilzin.com
E-mail: stapanes@bilzin.com
E-mail: ekravets@bilzin.com
E-mail: eservice@bilzin.com

*Counsel for Defendant Naples Area Board
of REALTORS® and Association of Real
Estate Professionals, Inc. (NABOR)*

**MANATT, PHELPS & PHILLIPS, LLP**

*/s/ Bezalel Adin Stern*
Bezalel Adin Stern

Florida Bar No. 110447
Dylan M. Carson (*pro hac vice*)
1050 Connecticut Ave NW
Ste 600
Washington, DC 20036
Telephone: 301-922-5039
E-mail: bstern@manatt.com
E-mail: dcarson@manatt.com

Annie K. Nguyen (*pro hac vice*)
7 Times Square
New York, NY 10036
Telephone: (212) 790-4500
Email: anguyen@manatt.com

*Counsel for Defendant Smart MLS, Inc.*