# EXHIBIT 1



# 2025 HANDBOOK



# MULTIPLE LISTING POLICY

# Handbook on Multiple Listing Policy

NATIONAL ASSOCIATION OF REALTORS®

430 North Michigan Avenue

Chicago, Illinois 60611-4087

Thirty Sixth Edition: March 2025

The compliance classification category of each item is denoted by the following symbol:

**M**   Mandatory*

**R**   Recommended

**O**   Optional

**I**    Informational

For ease of reference, all amended provisions are shaded to highlight additions.

Prepared for the Multiple Listing Issues and Policies Committee by Board Policy and Programs

---

*Adoption is necessary to ensure compliance with mandatory policies established by the NATIONAL ASSOCIATION OF REALTORS® Board of Directors and coverage under the National Association's master professional liability insurance policy. Local adoption is required by August 17, 2024.

© 2025 NATIONAL ASSOCIATION OF REALTORS®
All Rights Reserved
REALTORS® are members of the National Association of REALTORS®.

# Preface

This *Handbook* is intended to guide member associations of REALTORS® in the operation of multiple listing services consistent with the policies established by the National Association's Board of Directors.

The *Handbook* includes model enabling provisions for insertion in association bylaws authorizing establishment of a multiple listing service and bylaws and rules and regulations for MLSs which will permit optimum service and efficiency.

Association and association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program. Associations are encouraged to review any variance from these policies with their legal counsel so the legal implications and liabilities incident to such variance can be clearly ascertained.

Multiple listing is an evolving concept. For this reason, new procedures, needs, operational facilities, and organizational arrangements must evolve to respond to its role and function. It is not the purpose of the Handbook to arrest this evolution, rather, it is to assure that it proceeds in a manner which satisfies the requirements of the law, the needs of participating REALTORS®, and the interests of the buying and selling public.

This *Handbook* is somewhat residential in focus because most multiple listing services are residentially-oriented. However, policy information related to the operation of all types of multiple listing services and commercial information exchanges is included. Specific governing document provisions related to the establishment and operation of commercial/industrial multiples and exchanges can be found in *the Handbook on Multiple Listing Policy — Commercial/Industrial Supplement*, available on-line at REALTORS.org.

Associations are invited to bring to the attention of the National Association any issues they have concerning the clarification or modification of the policies and other information provided in this *Handbook*.

# Table of Contents

**Preface**

**Chronological Listing of Multiple Listing Policy Statements**

**Purpose**

**Part One:  Key Definitions**

    **Section 1**   Multiple Listing Service (MLS) Defined

    **Section 2**   Definition of MLS Participant

    **Section 3**   Definitions of Various Types of Listing Agreements

    **Section 4**   Listing Content Defined

**Part Two:  Policies**

    **A.   MLS Antitrust Compliance Policy**

    **B.   Structure**

        **Section 1**   Types of Multiple Listing Services

        **Section 2**   Association and MLS Compliance with National Association Policy

        **Section 3**   Multiple Listing Service Reciprocal Agreements between Association Contract Service for Multiple Listing Service, or Other Association Agreements Concerning the Association Multiple Listing Service

        **Section 4**   Relationship of Association with Independent Multiple Listing Service in Association Area

        **Section 5**   Information Related to Listings of Commercial and Industrial Property

        **Section 6**   Jurisdiction of Association Multiple Listing Services

    **C.   Administration**

        **Operational Issues**

        **Section 1**   Procedures to Be Followed by an Association of REALTORS® Upon Demand for Access to the Association's Multiple Listing Service without Association Membership

        **Section 2**   Prerequisites for Participation in or Access to a Commercial/Industrial Multiple Listing Service of an Association of REALTORS®

        **Section 3**   MLS Indoctrination Requirements Relating to Individuals Entitled to Participation without Association Membership

        **Section 4**   Inclusion of Exclusive Agency Listings in MLS Compilations and Databases

        **Section 5**   Effective Date of Changes in Multiple Listing Policy

**Section 6**    Factual Data Submitted by Appraisers

**Section 7**    Names of Multiple Listing Services

**Section 8**    Categorization of MLS Services, Information, and Products

**Section 9**    Changes in MLS Rules and Regulations

**Section 10**   Nonmember Broker/Appraiser Access

**Section 11**   Removal of Listing when Participant Refuses/Fails to Timely Report Status Changes

**Section 12**   Real Estate Transaction Standards (RETS) and RESO Standards

**Section 13**   Orientation and Other Training

**Section 14**   Submission of Photographs or Other Graphic Representations

**Section 15**   Submission of Legally Required Seller Disclosure Information

**Section 16**   Price Change Information

**Section 17**   Days/Time on Market Information

**Section 18**   Need to Disclose if Property is a Foreclosure, is Bank-owned, or is Real Estate Owned ("REO")

**Section 19**   Customer Service and Tech Support

**Section 20**   Fair Housing

**Finance**

**Section 1**    Waivers of MLS Fees, Dues, and Charges

**Section 2**    Assessment of MLS Fees, Dues, and Charges

**Section 3**    Merger or Dissolution of Association or MLS

**Law**

**Postal Regulations**

**Section 1**    Compliance with United States Postal Codes

**Tax Exempt Status of An Association of REALTORS®**

**Section 2**    Limitation on Content of Association Advertising

**Registered Multiple Listing Service Mark of the NATIONAL ASSOCIATION OF REALTORS®**

**Section 3**    Nature of Service Mark and Necessity to Effect License Agreement to Use

**Section 4**    How to Secure Authorization to Use a Service Mark

**Section 5**    Special Note Concerning MLS Service Mark

**Section 6**    Use of MLS Logo by Nonmember Participants

**Other Legal Issues**

**Section 7**    Compliance with Law by Association and MLS

**D.  Data**

**Current Listings**

**Section 1**    Listings

**Section 2**    Termination Dates

**Section 3**    Net Listings

**Section 4**    Open Listing

**Section 5**    Multiple Listing Options for Sellers

**Section 6**    Listing Prices Specified

**Section 7**    Auction Listings

**Section 8**    Limited-Service Listing

**Section 9**    MLS Entry-only Listings

**Section 10**   Listings of Suspended Participants

**Section 11**   Listings of Expelled Participants

**Section 12**   Listings of Resigned Participants

**Section 13**   Submission of Offers

**Section 14**   Reporting Resolutions of Contingencies

**Section 15**   Reporting Cancellation of Pending Sales

**Section 16**   Information Included in Any Association MLS Compilation

**Section 17**   Protection Clauses in Association MLS Standard Listing Contracts

**Section 18**   Compensation Notice

**Section 19**   Reproduction of MLS Information

**Section 20**   Property Addresses

**Section 21**   Non-Filtering of Listings

**Sold/Comparable/Off-market Information**

**Section 1**    Reporting Sales to the MLS

**Section 2**    Withdrawn Listings

**Section 3**    Inclusion of Expired or Withdrawn Listings in an Association's Comparable or Other Report of Statistical Information

**Statistical Reports**

**Section 1**    Statistical Reports

**Section 2**    Statistical Reports Should Be Kept

**Advertising**

**Print and Electronic**

**Section 1**   Internet Data Exchange (IDX) Policy

**Section 2**   Use of MLS Information in Advertising and Other Public Representations

**Section 3**   Transmittal of Participants' Listings to Aggregators

**Section 4**   Electronic Display of Other Participants' Listings

**Homes Magazines**

**Section 5**   Regulation of Advertising in Association or Commercial Publications

**Other Advertising Issues**

**Section 6**   Services Advertised as "free"

**Statewide Data Sharing**

**Section 1**   Statewide Data Share Defined

**E.   Participants' Rights**

**Section 1**   Participation Should be Optional

**Section 2**   Association Membership as Prerequisite to MLS Participation

**Section 3**   Participation in an Association Multiple Listing Service of a Branch Office Manager Who Is Not a Principal of the Real Estate Firm

**Section 4**   MLS Participation by Brokers Acting as Agents of Potential Purchasers

**Section 5**   Deleted

**Section 6**   Immediate Access to MLS by Association Members if Provided to Nonmember

**Section 7**   Presentation of Offers

**Section 8**   Showings and Negotiations

**Section 9**   Right of Cooperating Brokers in Presentation of Offers

**Section 10**   Right of Listing Brokers in Presentation of Counter-offers

**Section 11**   Code of Ethics

**Section 12**   Arbitration

**Section 13**   Lease of MLS Compilations

**Section 14**   Caravans

**Section 15**   Ownership of Listing and Listing Content

**Section 16**   Digital Millennium Copyright Act, Safe Harbor

**Section 17**   Clear Cooperation

**Section 18**   Right of Participant to MLS Data Feed of Listing Content

**Section 19**   One Data Source

**Section 20**   Brokerage Back Office Data Feed

**F.   Enforcement of Rules**

**Section 1**   Appropriate Procedures for Rules Enforcement

**Section 2**   Rules and Regulations

**Section 3**   The Use of Fines as Part of Rules Enforcement

**Section 4**   Financial Penalty Not to Exceed $15,000

**Section 5**   MLS Disciplinary Guidelines

**G.   No Compensation Offers in MLS**

**Section 1**   No Compensation Offers in MLS

**Section 2**   Agency

**Section 3**   Required Consumer Disclosure

**Section 4**   Written Buyer Agreements Required

**H.   Lock Box/Key Repositories**

**Section 1**   Lock Box Security Requirements

**Section 2**   Lock Box Key Deposits

**Section 3**   Centralized Key Repositories

**Section 4**   Minimum Security Measures for Centralized Key Repositories of Association Multiple Listing Services

**I.   Virtual Office Websites: Policy Governing Use of MLS Data in Connection with Internet Brokerage Services Offered by MLS Participants**

**Part Three: Model Governance Provisions**

**A.   Model Association Bylaw Provisions Authorizing MLS as a Committee of an All-REALTOR® Association**

**B.   Model Association Bylaw Provisions Authorizing MLS as a Committee of an Association with REALTORS® and REALTOR-ASSOCIATE® Members**

**C.   Model Rules and Regulations for an MLS Operated as a Committee of an Association of REALTORS®**

**D.   Model Association Bylaws Provisions Authorizing a Multiple Listing Service as a Wholly-owned Subsidiary Corporation of the Association**

**E.   Model Bylaws for a Multiple Listing Service Separately Incorporated but Wholly-owned by an Association of REALTORS®**

**F.   Model Rules and Regulations for an MLS Separately Incorporated but Wholly-owned by an Association of REALTORS®**

**Part Four:   Appendices**

**Appendix 1**
History and Background

**Appendix 2**
Merging an Independent MLS with an Association of REALTORS®

**Appendix 3**
Protecting the Tax-exempt Status of the Association of REALTORS®

**Appendix 4**
MLS Schedule of Fines for Administrative Sanctions

**Appendix 5**
Model Multiple Listing Service Subscription Waiver for Use by Association
Multiple Listing Services, NATIONAL ASSOCIATION OF REALTORS®

**Appendix 6**
NATIONAL ASSOCIATION OF REALTORS® Association Donated Services Record
for Committee Meetings

**Appendix 7**
NATIONAL ASSOCIATION OF REALTORS® Association Donated Services Record,
Miscellaneous

**Appendix 8**
Model Lock Box Authorization Addendum

**Appendix 9**
Select Interpretations from the Official Interpretations of Article I, Section 2 of
the NATIONAL ASSOCIATION OF REALTORS® Bylaws as Referred to in this
Handbook

# Table of Contents

for Chronological Listing of Multiple Listing Policy Statements Approved by the Board of Directors, NATIONAL ASSOCIATION OF REALTORS®

**Statement 7.1**   Lock Boxes—Deleted 05/12. MLS Policy Statement 7.31 is more current and comprehensive.

**Statement 7.2**   Caravans

**Statement 7.3**   Statistical Reports

**Statement 7.4**   Arbitration

**Statement 7.5**   Code of Ethics

**Statement 7.6**   Board Operation of MLS—Deleted 2005

**Statement 7.7**   Association Membership as Prerequisite to MLS Participation

**Statement 7.8**   Services of the Board MLS—Deleted 2005

**Statement 7.9**   Definition of the MLS "Participant"

**Statement 7.10** Compliance with Law by Association and MLS

**Statement 7.11** Agency

**Statement 7.12** Tax-Exempt Status of Board Owned MLS—Deleted 2005

**Statement 7.13** Use of MLS Logo by a Nonmember Participants

**Statement 7.14** Immediate Access to MLS by Association Members if Provided to Nonmember

**Statement 7.15** Compliance with United States Postal Statutes

**Statement 7.16** Revised Interpretation No. 4—Deleted November 1996

**Statement 7.17** Association and MLS Compliance with National Association Policy

**Statement 7.18** MLS Provided to Nonresident Members—Deleted November 1996

**Statement 7.19** Multiple Listing Service Reciprocal Agreements Between Associations, Contract Service for Multiple Listing Service, or Other Association Agreements Concerning the Association Multiple Listing Service

**Statement 7.20** Relationship of Association with Independent Multiple Listing Service in Association Area

**Statement 7.21** Appropriate Procedures for Rules Enforcement

**Statement 7.22** The Use of Fines as Part of Rules Enforcement

**Statement 7.23** Deleted

**Statement 7.24** Participation in an Association Multiple Listing Service of a Branch Office Manager Who is Not a Principal of the Real Estate Firm

**Statement 7.25** Procedures to be Followed by an Association of REALTORS® Upon Demand for Access to the Association's Multiple Listing Service Without Association Membership

**Statement 7.26** Prerequisites for Participation in, or Access to, a Commercial/Industrial Multiple Listing Service of an Association of REALTORS®

**Statement 7.27** Deleted

**Statement 7.28** Statistical Report Including "Comparables" Should be a Board Service—Merged into Policy Statement 7.3 in 2005

**Statement 7.29** Charges for Providing "Comparable Information to Board Members Who Are Not MLS Participants—Merged into Policy Statement 7.3 in 2005

**Statement 7.30** "Comparable" Information to Government Agencies—Merged into Policy Statement 7.3 in 2005

**Statement 7.31** Lock Box Security Requirements

**Statement 7.32** Lock Box Key Deposits

**Statement 7.33** Information Related to Listings of Commercial and Industrial Property

**Statement 7.34** Reports Relating to the Availability of Mortgage Financing—Deleted 2005

**Statement 7.35** Information Included in Any Association MLS Compilation

**Statement 7.36** Inclusion of Expired or Withdrawn Listings in an Association's Comparable Report or Other Report of Statistical Information

**Statement 7.37** Protection Clauses in Association MLS Standard Listing Contracts

**Statement 7.38** MLS Indoctrination Requirements Relating to Individuals Entitled to Participation Without Association Membership

**Statement 7.39** Compensation Notice

**Statement 7.40** MLS Participation by Brokers Acting As Agents of Potential Purchasers

**Statement 7.41** Inclusion of Exclusive Agency Listings in MLS Compilations and Databases

**Statement 7.42** Jurisdiction of Association Multiple Listing Service

**Statement 7.43** Waivers of MLS Fees, Dues, and Charges

**Statement 7.44** Access to Comparable and Statistical Information—Merged into Policy Statement 7.3 in 2005

**Statement 7.45** Assessment of MLS Fees, Dues, and Charges

**Statement 7.46** Centralized Key Repositories

**Statement 7.47** Minimum Security Measures for Centralized Key Repositories of Association Multiple Listing Services 39

**Statement 7.48** MLS May Permit Participants to Establish, Concurrently With the Offer of Subagency, an Offer to Compensate Buyer Agents—Deleted 1993

**Statement 7.49** Use of Property Data Forms to Publish Features of Special Interest to Handicapped or Elderly Individuals—Deleted 2005

**Statement 7.50** Definitions of Various Types of Listing Agreements

**Statement 7.51** Effective Date of Changes in Multiple Listing Policy

**Statement 7.52** Factual Data Supplied by Appraisers

**Statement 7.53** Deleted

**Statement 7.54** Names of Multiple Listing Services

**Statement 7.55** Nonmember Broker/Appraiser Access

**Statement 7.56** MLS Defined—Merged into Definitions Section in 2005

**Statement 7.57** Categorization of MLS Services, Information, and Products

**Statement 7.58** Internet Data Exchange (IDX) Policy

**Statement 7.59** Virtual Office Website (VOW) Policy—Deleted 2005

**Statement 7.60** Listings

**Statement 7.61** Net Listings

**Statement 7.62** Open Listings

**Statement 7.63** Office Exclusive Listings

**Statement 7.64** Withdrawn Listings

**Statement 7.65** Listing Prices Specified

**Statement 7.66** Termination Dates

**Statement 7.67** Listings of Suspended Participants

**Statement 7.68** Listings of Expelled Participants

**Statement 7.69** Listings of Resigned Participants

**Statement 7.70** Showings and Negotiations

**Statement 7.71** Presentation of Offers

**Statement 7.72** Submission of Offers

**Statement 7.73** Rights of Cooperating Brokers and Presentation of Offers

**Statement 7.74** Rights of Cooperating Brokers and Presentation of Counter-offers

**Statement 7.75** Reporting Sales to the MLS

**Statement 7.76** Reporting Resolutions of Contingencies

**Statement 7.77** Reporting Cancellation of Pending Sales

**Statement 7.78** Lease of MLS Compilation

**Statement 7.79** Reproduction of MLS Information

**Statement 7.80** Use of MLS Information in Advertising and Other Public Representations

**Statement 7.81** Changes in MLS Rules and Regulations

**Statement 7.82** Auction Listings

**Statement 7.83** Limited Service Listings

**Statement 7.84** MLS Entry-only Listings

**Statement 7.85** Ownership of Listing and Listing Content

**Statement 7.86** Listing Content Defined

**Statement 7.87** Transmittal of Participants' Listings to Aggregators

**Statement 7.88** Removal of Listings When Participant Refuses/Fails to Timely Report Status Changes

**Statement 7.89** Financial Penalty Not to Exceed $15,000

**Statement 7.90** Real Estate Transaction Standards (RETS) and RESO Standards

**Statement 7.91** Virtual Office Websites: Policy Governing Use of MLS Data in Connection With Internet Brokerage Services Offered by MLS Participants

**Statement 7.92** Orientation and Other Training

**Statement 7.93** Submission of Photographs or Other Graphic Representations

**Statement 7.94** Submission of Legally Required Seller Disclosure Information

**Statement 7.95** Price Change Information

**Statement 7.96** Days/Time on Market Information

**Statement 7.97** Need to Disclose if Property is a Foreclosure, is Bank-owned or is Real Estate Owned ("REO")

**Statement 7.98** Electronic Display of Other Participants' Listings

**Statement 7.99** Digital Millennium Copyright Act, Safe Harbor

**Statement 8.00** Clear Cooperation

**Statement 8.1** Fair Housing

**Statement 8.2** Customer Service and Tech Support

**Statement 8.3** Right of Participant to MLS Data Feed of Listing Content

**Statement 8.4** Services Advertised as "free"

**Statement 8.5** Non-filtering of Listings

**Statement 8.6** One Data Source

**Statement 8.7** Brokerage Back Office Feed

**Statement 8.8** Deleted

**Statement 8.9** Property Addresses

**Statement 8.10** Statewide Data Sharing Defined

**Statement 8.11** No Compensation Offers in MLS

**Statement 8.12** Required Consumer Disclosure

**Statement 8.13** Written Buyer Agreements Required

**Statement 8.14** Multiple Listing Options for Sellers

# Purpose

Through the facility of multiple listing, information concerning individual listings can be made known to all REALTORS® who participate in the activity. In associations of REALTORS® with few members, the actual operation can be very simple. Each REALTOR® can duplicate enough copies of the information concerning his listing to distribute to all other Participants. However, when many REALTORS® are involved, the distribution of information becomes more burdensome and may require reasonable rules of procedure and efficient central office management to expedite the service. Regardless of the method, however, the basis of the multiple listing activity is the creation of a facility whereby REALTORS® may most effectively invite other brokers to enter into cooperative agreements with them for the sale of their listings and provide information necessary to permit such cooperation; by which information is accumulated and disseminated to enable authorized Participants to prepare appraisals and other valuations of real property; and by which Participants engaging in real estate appraisal contribute to common databases. *(Amended 4/92)*

# Part One: Key Definitions

### Section 1  Multiple Listing Service (MLS) Defined

A multiple listing service is:

• a facility for the orderly correlation and dissemination of listing information so Participants may better serve their clients and customers and the public

• a means of enhancing cooperation among Participants

• a means by which information is accumulated and disseminated to enable authorized Participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers

• a means by which Participants engaging in real estate appraisal contribute to common databases **M**

*(Revised 8/24)*

### Section 2  Definition of MLS Participant (Policy Statement 7.9)

Where the term REALTOR® is used in this explanation of policy in connection with the word member or the word Participant, it shall be construed to mean the REALTOR® principal or principals, of this or any other association, or a firm comprised of REALTOR® principals participating in a multiple listing service owned and operated by the board. Participatory rights shall be held by an individual principal broker unless determined by the association or MLS to be held by a firm. It shall not be construed to include individuals other than a principal or principals who are REALTOR® members of this or any other association, or who are legally entitled to participate without association membership. However, under no circumstances is any individual or firm, regardless of membership status, entitled to MLS membership or participation unless they hold a current, valid real estate broker's license and cooperate, or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients.  Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a Participant's licensure(s) or certification and unauthorized uses are prohibited.

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm cooperates  means that the Participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS, shares information on listed property, and makes property available to other brokers for showing to prospective purchasers and tenants when it is in the best interests of their clients. "Actively" means on a continual and ongoing basis during the operation of the Participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a Participant or potential Participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a Participant or potential Participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the Participant or potential Participant as long as the level of service satisfies state law.

The key is that the Participant or potential Participant cooperates with respect to properties of the type that are listed on the MLS in which participation is sought. Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients. This requirement does not permit an MLS to deny participation to a Participant or potential Participant that operates a "Virtual Office Website" (VOW) (including a VOW that the Participant uses to refer customers to other Participants) if the Participant or potential Participant actively endeavors to  cooperate. An MLS may evaluate whether a Participant or potential Participant actively endeavors during the operation of its real estate business to cooperate only if the MLS has a reasonable basis to believe that the Participant or potential Participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all Participants and potential Participants.

Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law. Additionally, the foregoing does not prohibit association multiple listing services, at their discretion, from categorizing non-principal brokers, sales licensees, licensed and certified appraisers and others affiliated with the MLS members or Participants as users or Subscribers and, holding such individuals personally subject to the rules and regulations and any other governing provisions of the MLS and to discipline for violations thereof. MLSs may, as a matter of local determination, limit participatory rights to individual principal brokers, or to their firms, and to licensed or certified appraisers, who maintain an office or Internet presence from which they are available to represent real estate sellers, buyers, lessors or lessees or from which they provide appraisal services.

Where the terms Subscriber or user are used in connection with a multiple listing service owned or operated by an association of REALTORS®, they refer to non-principal brokers, sales licensees, and licensed and certified real estate appraisers affiliated with an MLS Participant and may, as a matter of local option, also include a Participant's affiliated unlicensed administrative and clerical staff, personal assistants, and individuals seeking licensure or certification as real estate appraisers provided that any such individual is under the direct supervision of an MLS Participant or the Participant's licensed designee. If such access is available to unlicensed or uncertified individuals, their access is subject to the rules and regulations, the payment of applicable fees and charges (if any), and the limitations and restrictions of state law. None of the foregoing shall diminish the Participant's ultimate responsibility for ensuring compliance with the rules and regulations of the MLS by all individuals affiliated with the Participant.

Under the Board of Choice policy, MLS participatory rights shall be available to any REALTOR® (principal) or any firm comprised of REALTORS® (principals) irrespective of where they hold primary membership subject only to their agreement to abide by any MLS rules or regulations; agreement to arbitrate disputes with other Participants; and payment of any MLS dues, fees, and charges. Participatory rights granted under Board of Choice do not confer voting privileges or eligibility for office as an MLS committee member, officer, or director, except as granted at the discretion of the local board and/or MLS.

The universal access to services component of Board of Choice is to be interpreted as requiring that MLS participatory rights be available to REALTOR® principals, or to firms comprised of REALTOR® principals, irrespective of where primary or secondary membership is held.

The MLS may charge Participants and Subscribers not holding primary or secondary membership in a REALTOR® association that owns the MLS a different amount than charged to members of the association, provided that such charge is reasonably related to the actual costs of serving those members.

None of the foregoing shall be construed as requiring an association to grant MLS participatory rights, under Board of Choice, where such rights have been previously terminated by action of that association's board of directors. *(Amended 8/24)* **M**

### Section 3  Definitions of Various Types of Listing Agreements  (Policy Statement 7.50)

Except where state law provides otherwise, the following terms shall be defined as follows when used in rules and regulations of any multiple listing service owned or operated by one or more associations of REALTORS®. *(Amended 5/06)*

**Exclusive Right-to-Sell Listing:** A contractual agreement under which the listing broker acts as the agent or as the legally recognized non-agency representative of the seller(s), and the seller(s) agrees to pay a commission to the listing broker, regardless of whether the property is sold through the efforts of the listing broker, the seller(s), or anyone else; and a contractual agreement under which the listing broker acts as the agent or as the legally recognized non-agency representative of the seller(s), and the seller(s) agrees to pay a commission to the listing broker regardless of whether the property is sold through the efforts of the listing broker, the seller(s), or anyone else, except that the seller(s) may name one or more individuals or entities as exemptions in the listing agreement and if the property is sold to any exempted individual or entity, the seller(s) is not obligated to pay a commission to the listing broker. *(Amended 5/06)*

**Exclusive Agency Listing:** A contractual agreement under which the listing broker acts as the agent or as the legally recognized non-agency representative of the seller(s), and the seller(s) agrees to pay a commission to the listing broker if the property is sold through the efforts of any real estate broker. If the property is sold solely through the efforts of the seller(s), the seller(s) is not obligated to pay a commission to the listing broker. *(Amended 5/06)*

**Open Listing:** A contractual agreement under which the listing broker acts as the agent or as the legally recognized non-agency representative of the seller(s), and the seller(s) agrees to pay a commissions to the listing broker only if the property is sold through the efforts of the listing broker**.** *(Amended 5/06)*

**Note:** These definitions are provided to facilitate categorization of listings in MLS compilations. In any area of conflict or inconsistency, state law or regulation takes precedence. If state law permits brokers to list property, on either an exclusive or open basis, without establishing an agency relationship, listings may not be excluded from MLS compilations on the basis that the listing broker is not the seller's agent. *(Adopted 11/93, Amended 5/06)*

## Section 4  Listing Content Defined (Policy Statement 7.86)

"Listing content" as used in the National Association's multiple listing policies, including the model MLS rules and regulations, includes, but is not limited to, photographs, images, graphics, audio and video recordings, virtual tours, drawings, descriptions, remarks, narratives, pricing information, and other details or information related to listed property. *(Adopted 5/06)* **M**

# Part Two: Policies

## A. MLS Antitrust Compliance Policy

The purpose of multiple listing is the orderly correlation and dissemination of listing information to Participants so they may better serve the buying and selling public. Boards and associations of REALTORS® and their multiple listing services shall not enact or enforce any rule which restricts, limits, or interferes with Participants in their relations with each other, in their broker/client relationships, or in the conduct of their business in the following areas.

Boards and associations of REALTORS® and their MLSs shall not:

1.  Fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services (Interpretation 14).

2.  Fix, control, recommend, or suggest the cooperative compensation offered by listing brokers to potential cooperating brokers.

3.  Base dues, fees, or charges on commissions, listed prices, or sales prices. Initial participation fees and charges should directly relate to the costs incurred in bringing services to new Participants.

4.  Modify, or attempt to modify, the terms of any listing agreement; this does not prohibit administrative corrections of property information necessary to ensure accuracy or consistency in MLS compilations.

5.  Refuse to include any listing in an MLS compilation solely on the basis of the listed price.

6.  Prohibit or discourage Participants from taking exclusive agency listings or refusing to include any listing in an MLS compilation solely on the basis that the property is listed on an exclusive agency basis.

7.  Prohibit or discourage Participants from taking "office exclusive" listings; certification may be required from the seller or listing broker that the listing is being withheld from the MLS at the direction of the seller.

8.  Give Participants or Subscribers blanket authority to deal with or negotiate with buyers or sellers exclusively represented by other Participants (Interpretation 10).

9.  Establish, or permit establishment of, any representational or contractual relationship between an MLS and sellers, buyers, landlords, or tenants.

10. Prohibit or discourage cooperation between Participants and brokers that do not participate in the MLS.

11. Prohibit or discourage Participants or Subscribers from participating in political activities (Interpretation 15).

12. Interfere in or restrict Participants in their relationships with their affiliated licensees (Interpretations 16 and 17).

As used in this policy, "rule" includes all rules, regulations, bylaws, policies, procedures, practices, guidelines, or other governance provisions, whether mandatory or not. "Multiple listing service" and "MLS" means multiple listing service committees of boards and associations of REALTORS® and separately-incorporated multiple listing services owned by one or more boards or associations of REALTORS®.

These policy prohibitions are subject to and limited by applicable statutes, ordinances, and governmental regulations, to agreements entered into by an MLS or board or association of REALTORS® and an agency of government, and to final decrees of courts or administrative agencies.

This policy does not prohibit boards or associations of REALTORS® or their MLSs from adopting rules or policies establishing the legitimate uses of MLS information, from prohibiting unauthorized uses of MLS information, or from establishing rules or policies necessary to prevent illegal collective action, including price-fixing and boycotts.

It is the duty and responsibility of all boards and associations of REALTORS® and MLSs owned by or controlled by boards or associations of REALTORS® to ensure that all bylaws, rules, regulations, and other governance provisions comply with all mandatory multiple listing policies of the NATIONAL ASSOCIATION OF REALTORS®. Boards and associations of REALTORS® failing to conform with these policies will be required to show cause why their charters should not be revoked.

The numbered references refer to the official interpretations of Article I, Section 2 of the bylaws of the NATIONAL ASSOCIATION OF REALTORS®. *(Amended 11/04)* **M**

# B. Structure

**Section 1  Types of Multiple Listing Services**
Basically, there are two types of multiple listing activities used by associations of REALTORS®. The essential characteristics of each may be summarized as follows:

1.  A multiple listing activity available for voluntary participation, but requiring members (principals) who participate to submit all listings of designated types of property, is termed "a mandatory listing service."

    The mandatory service permits each REALTOR® to decide whether or not multiple listing is consistent with the REALTOR®'s method of doing business. If a decision is made to participate in the activity, however, then all listings covered by the rules are required to be submitted.

2.  A multiple listing activity available to all members (principals), but the submission of any listing is an option of the member; this is termed "a voluntary listing service."

**Note:** Any multiple listing activity in which it is compulsory that all members of an association of REALTORS® participate and submit information on all designated types of listings would be in direct conflict with the National Association's bylaws, Article I, Section 2, which bans the adoption by associations of REALTORS® of inequitable limitations on membership. On November 15, 1960, the Board of Directors of the National Association officially adopted the following interpretation: "A requirement to participate in a multiple listing service in order to gain or maintain REALTOR® membership is an inequitable limitation on membership." **I**

### Section 2  Association and MLS Compliance with National Association Policy (Policy Statement 7.17)

Those associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not consistent with mandatory policies of the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation. **I**

### Section 3  Multiple Listing Service Reciprocal Agreements Between Associations, Contract Service for Multiple Listing Service, or Other Association Agreements Concerning the Association Multiple Listing Service  (Policy Statement 7.19)

If an agreement is in effect or being considered between associations of REALTORS® or between MLSs for establishment of an MLS cooperative venture of any type, the agreement should be in writing including, but not limited to, the following items:

1. purpose of the agreement

2. geographic territory to be served

3. rights and responsibilities of each association and its members

4. form of governing body

5. method of appointment or election of such governing body

6. responsibilities and accountability of the governing body to the respective associations party to the agreement

7. roles and responsibilities of each association for enforcement of the Code of Ethics and for dispute resolution between MLS Participants

8. intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association

9. terms and procedures for resolving controversies between associations or between the association and the MLS. The agreement should also specify the terms under which the agreement may be terminated

10. rights and responsibilities of recipients of data related to relicensing of data *(Amended 11/04)* **M**

**Section 4  Relationship of Association with Independent Multiple Listing Service in Association Area  (Policy Statement 7.20)**

No association may make or maintain any rule prohibiting a REALTOR® from participating in an independent multiple listing service. Associations shall take every action necessary to avoid responsibility and liability for the policies, practices, conduct and activities of any unaffiliated multiple listing service not owned and operated by it. In this connection the association shall document by letter to such independent multiple listing service that the association has no relationship or agreement with the service, no jurisdiction over the service, and no responsibility for it. *(Amended 2/94)*

This policy statement is not intended to prohibit associations from entering into cooperative relationships with independent multiple listing services (that limit participation to appropriately licensed or certified individuals or firms), including reciprocity agreements, regionalization agreements, and other forms of cooperative venture. *(Adopted 2/94)*

Such agreements may limit coverage under the National Association's blanket errors and omissions insurance policy and associations will want to ascertain the extent of insurance coverage, and the availability of coverage from other sources, prior to entering into such agreements. *(Adopted 2/94)*

**Explanation:** A primary responsibility of an association of REALTORS® is to protect the interests of the association and its members. With respect to an unaffiliated independent multiple listing service not owned or controlled by the association, or that is not party to an agreement with the association, the association has no jurisdiction over such multiple listing service and can, therefore, assume no responsibility for it or its actions. Positive effort should, therefore, be made to establish clearly that there is no relationship between the association of REALTORS® and the independent multiple listing service even though some or all of the multiple listing service Participants may also be members of the association, and that no direct or indirect control is exercised by the association in connection with said independent multiple listing service. Such effort by the association should be documented to provide a basis for extricating the association from any litigation which may be brought against the independent multiple listing service and which may also name the association as a party to such litigation. *(Amended 2/94)* **M**

### Section 5  Information Related to Listings of Commercial and Industrial Property (Policy Statement 7.33)

An association or association MLS may also publish a compilation of commercial and industrial properties listed with association or MLS members so that prospective cooperating brokers will have the opportunity to contact the listing broker to learn the terms of any cooperative relationship the listing broker wishes to establish. Such a mechanism is not a multiple listing service. If an association or association MLS provides this type of informational function (commonly referred to as a commercial information exchange or CIE) to its members, it shall not publish either the total Commission negotiated between the listing broker and the seller or any offers of compensation to cooperating brokers. If a relationship is established between the listing broker and a prospective cooperating broker, it is strongly recommended that the terms and conditions be established in writing prior to the time the cooperating broker commences any efforts to produce a prospective purchaser or lessee. None of the foregoing is intended to preclude a CIE from providing, as a matter of local determination, access to information from CIE compilations to affiliate members of associations or to others engaged in recognized fields of real estate practice or in related fields. *(Revised 11/04)* **M**

CIE fees, dues and charges: CIE Participants must be given the option of a no-cost waiver for any licensee or licensed or certified appraiser who does not use the service and who can demonstrate subscription to a different CIE or MLS where their principal is a Participant. CIEs may, at local discretion, require that broker Participants sign a certification for nonuse of the CIE's services by their licensees, which can include penalties and termination of the waiver if violated. *(Adopted 05/18 and Amended 08/18 [Leadership Team])* **M**

### Section 6  Service Area of Association Multiple Listing Services  (Policy Statement 7.42)

The service area of multiple listing services owned and operated by associations of REALTORS® is not limited to the jurisdiction of the parent association(s) of REALTORS®. Rather, associations are encouraged to establish multiple listing services that encompass natural market areas and to periodically reexamine such boundaries to ensure that they encompass the relevant market area. While associations are encouraged to work cooperatively to establish market area multiple listing services, the absence of such an agreement shall not preclude any association from establishing and maintaining a multiple listing service whose service area exceeds that of the parent association(s) jurisdiction. MLSs may not require other offices of a firm to participate in the MLS if any office of that firm participates in that MLS. *(Revised 11/17)* **M**

# C. Administration

## Operational Issues

### Section 1  Procedures to Be Followed by an Association of REALTORS® Upon Demand for Access to the Association's Multiple Listing Service without Association Membership  (Policy Statement 7.25)

In states other than California, Georgia, Alabama, and Florida, whenever an association is confronted with a request or demand by an individual for access to the association's multiple listing service without membership in the association, member associations are advised that the association should immediately advise both the state association and the Member Policy Department of the National Association, and the recommended procedures will be provided to the member association with any other pertinent information or assistance. It is important that the state association and National Association be advised immediately if such request or demand for access to the association MLS as described is received. **M**

### Section 2  Prerequisites for Participation in or Access to a Commercial/ Industrial Multiple Listing Service of an Association of REALTORS®  (Policy Statement 7.26)

An association may require any applicant for commercial information exchange participation or commercial/industrial MLS participation and any licensee affiliated with the CIE or C/I MLS Participant who has access to and use of CIE or C/I MLS-generated information to complete an orientation program of no more than twelve (12) classroom hours devoted to the CIE or C/I MLS rules and regulations and computer training related to the CIE or C/I MLS information entry and retrieval. *(Amended 11/96)*

**Note:** Associations are not required to establish prerequisites for CIE or C/I MLS participation beyond holding REALTOR® (principal) membership in an association. However, if an association wishes to establish prerequisites for CIE or C/I MLS participation or access to CIE or C/I MLS-generated information, the requirement of attendance at an orientation program is the most rigorous prerequisite that may be required. *(Amended 11/96)* **M**

### Section 3  MLS Indoctrination Requirements Relating to Individuals Entitled to Participation without Association Membership  (Policy Statement 7.38)

In processing the application of an individual entitled by law to MLS participation without REALTOR® membership, the listing information and services shall be promptly provided upon completion of the following:

1.  confirmation applicant has a valid, current, real estate license or certificate

2.  applicant's written application and agreement to abide by the MLS rules and regulations

3.  applicant's completion of any required MLS orientation on MLS bylaws, MLS rules and regulations, other MLS related policies or procedures, and computer training related to MLS information entry and retrieval within a reasonable time not to exceed thirty (30) days, and

4.  payment of all required initial MLS fees or charges

If any examination on the MLS orientation is given, it shall be an open-book, no-pass, no-fail examination for programmed learning purposes only. *(Amended 11/04)* **M**

### Section 4  Inclusion of Exclusive Agency Listings in MLS Compilations and Databases (Policy Statement 7.41)

Multiple listing services shall not establish or maintain any rule or policy prohibiting inclusion of exclusive agency listings that would be otherwise acceptable for inclusion in the compilation of current listing information.

**Explanation:** This policy shall not be construed as requiring Participants to accept exclusive agency listings if they determine acceptance is not in their best interest or the best interest of clients or customers. However, this policy does preclude collective agreements between Participants affiliated with different firms or others to refuse to accept exclusive agency listings This policy contemplates multiple listing services will clearly distinguish between exclusive right-to-sell and exclusive agency listings in multiple listing compilations and databases to prevent confusion about the rights and obligations of brokers who cooperate in the sale of such listings. *(Amended 8/24)* **M**

### Section 5  Effective Date of Changes in Multiple Listing Policy  (Policy Statement 7.51)

To ensure consistent, uniform understanding of and compliance with the multiple listing policies of the National Association, all changes incorporated into the National Association's Handbook on Multiple Listing Policy become effective January 1 of the year following their approval by the Board of Directors of the NATIONAL ASSOCIATION OF REALTORS®. Unless specifically provided otherwise by the National Association's Board of Directors, associations and multiple listing services shall have sixty (60) days from the effective date of new or amended policies to adopt them locally. *(Amended 05/15)* **M**

### Section 6  Factual Data Submitted by Appraisers  (Policy Statement 7.52)

Association multiple listing services should encourage appraiser-Participants to contribute factual data related to properties sold and closed which are not otherwise reported through MLS when the submission of such data is not in violation of the appraiser/client relationship. *(Adopted 2/91)* **M**

### Section 7  Names of Multiple Listing Services  (Policy Statement 7.54)

The names of association owned or operated multiple listing services (including multi-association and regional multiples) should rationally relate to the area served. Challenges by other associations to the appropriateness of any name utilized shall be considered and determined by the board of directors of the state association if attempts to resolve the conflict locally fail. Documentation of the attempt to resolve the conflict shall be forwarded to the state association. Challenges to the names of multiple listing services with multi-state jurisdictions shall be resolved by the National Association. The chairperson of the multiple listing policy committee shall appoint a panel of committee members to hear the challenge, and forward its recommendations to the National Association's Board of Directors for final disposition. Challenges to pre-existing names must be filed within one (1) year following the January 1, 1993 effective date. Existing in-state multiple listing services shall be grandfathered as to their names. Each state association shall have the right to override the grandfather provision by a two-thirds (2/3) vote of its board of directors. *(Amended 4/92)* **M**

**Section 8  Categorization of MLS Services, Information, and Products  (Policy Statement 7.57)**

The services, information, and products that multiple listing services provide to Participants and to Subscribers affiliated with Participants may be categorized as core, as ancillary to the core but included in a basic package of MLS services as determined locally and provided to all MLS Participants and Subscribers automatically or on a discretionary basis, or as optional and available to Participants and Subscribers at their discretion. The following will guide MLSs in categorizing their services, information, and products.

**Core:** Core MLS information, services, and products are essential to the effective functioning of MLS, as defined, and include:

• active listing information

Core services include the mechanisms (print or electronic or both) by which this information is communicated between Participants and the MLS.

Where MLS participation is available to non-member brokers or their firms, either by law or by local decision, the information, services, and products available to such Participants may be limited to those categorized as core.

**Basic:** In addition to core services, an MLS may automatically or on a discretionary basis provide additional information, services, and products substantially related to the purpose and function of MLS such as, but not limited to:

• sold and comparable information

• pending sales information

• expired listings and "off market" information

• tax records

• zoning records/information

• title/abstract information

• mortgage information

• amortization schedules

• mapping capabilities

• statistical information

• public accommodation information (e.g., schools, shopping, churches, transportation, entertainment, recreational facilities, etc.)

• MLS computer training/orientation

• access to affinity programs

• establishment, maintenance, and promotion of public-facing websites

**Optional:** An MLS may not require a Participant to use, participate in, or pay for the following optional information, services, or products:

- lock box equipment including lock boxes (manual or electronic), combination lock boxes, mechanical keys, and electronic programmers or keycards

- advertising or access to advertising (whether print or electronic), including classified advertising, homes-type publications, and electronic compilations, including Participant, Subscriber, or firm homepages or websites

Notwithstanding the foregoing, where permitted by law*, an MLS may treat Optional information, services, or products as Basic provided that the MLS does not receive an economic benefit from the arrangement as demonstrated by satisfying both of the following conditions:

1. The MLS or its shareholder(s) is not the seller, lessor, or licensor of the information, service, or product (i.e., the information, service, or product is sourced from an independent third party); and

2. The MLS does not make a profit or receive a Commission or rebate based on the sale, lease, or license that exceeds the operational costs of providing the information, service, or product.

*MLSs in the following states/territories may not treat Optional information, services, or products as Basic: States within the First, Second, and Eighth United States Circuits that include Arkansas, Connecticut, Iowa, Maine, Massachusetts, Minnesota, Missouri, Nebraska, New Hampshire, New York, North Dakota, Puerto Rico, Rhode Island, South Dakota, and Vermont. *(Adopted 05/13)*

While no Participant can be required to use, participate in, or pay for information, services, or products defined in this policy statement as optional, an MLS may, as a matter of local determination, bill all Participants (or, where appropriate, Subscribers) for optional information, services, or products provided that Participants (or, where appropriate, Subscribers) may decline such information, services, or products and not be charged for them. In such cases, the MLS must make all Participants and Subscribers aware, in advance, of their right to decline any such service, product, or information.

None of the foregoing precludes an association or MLS from utilizing association or MLS reserves, dues, or fees or special assessments (as otherwise provided for in the association or MLS governing documents) to acquire assets (including hardware and software) necessary to make optional information, services, or products available to Participants and Subscribers, provided any funds used to acquire assets or initiate services will be reimbursed out of the proceeds realized from the sale or lease of such information, services, or products. Associations of REALTORS® and MLSs may make nominal administrative expenditures out of reserves, dues, or fees to initiate or maintain optional services and products. *(Amended 8/24)* **M**

### Section 9  Changes in MLS Rules and Regulations  (Policy Statement 7.81)

Amendments to MLS rules and regulations are subject to approval by the board of directors of the parent association(s) of REALTORS®. *(Adopted 11/04)* **M**

### Section 10  Nonmember Broker/Appraiser Access  (Policy Statement 7.55)

MLSs may, as a matter of local discretion, make limited participation in MLS available to all brokers (principals) and firms comprised of brokers (principals) and to licensed or certified real estate appraisers (principals) and firms comprised of licensed or certified real estate appraisers. Limitations on participatory rights, if any, shall be determined locally. *(Amended 11/04)* **O**

### Section 11  Removal of Listings When Participant Refuses/Fails to Timely Report Status Changes  (Policy Statement 7.88)

Notwithstanding the limitations established in the Code of Ethics and Arbitration Manual or in other National Association policy, multiple listing services operated as committees of associations of REALTORS® or as separate, wholly-owned subsidiaries of one or more associations of REALTORS® are authorized to remove any listing from the MLS compilation of current listings where the Participant has refused or failed to timely report status changes. Prior to the removal of any listing from the MLS, the Participant shall be advised of the intended removal so the Participant can advise his or her client(s). *(Adopted 11/07)* **I**

### Section 12  Real Estate Transaction Standards (RETS) and RESO Standards  (Policy Statement 7.90)

The integrity of data is a foundation to the orderly real estate market. The Real Estate Transaction Standards (RETS) provide a vendor neutral, secure approach to exchanging listing information between the broker and the MLS. In order to ensure that the goal of maintaining an orderly marketplace is maintained, and to further establish REALTOR® information as the trusted data source, MLS organizations owned and operated by associations of REALTORS® will implement the RESO Standards including: the RESO Data Dictionary by January 1, 2016; the RESO Web API by June 30, 2016 and will keep current by implementing new releases of RESO Standards within one (1) year from ratification. Compliance with this requirement can be demonstrated using the Real Estate Standards Organization (RESO) compliance Certification Process. Web API data access provided to Participants and Subscribers must have no less than the same data available via data access methods such as RETS or FTP systems, and MLS fields that exist in the RESO Data Dictionary must be delivered in conformance with the standard. *(Amended 11/20)* **M**

### Section 13  Orientation and Other Training  (Policy Statement 7.92)

Multiple listing services may, as a matter or local discretion, require applicants for MLS participation and licensees (including licensed or certified appraisers) affiliated with an MLS Participant who have access to and use of MLS-generated information to complete an orientation program of no more than eight (8) classroom hours devoted to the MLS rules and regulations, computer training related to MLS information entry and retrieval, and the operation of the MLS within thirty (30) days after access has been provided. Participants and Subscribers may also be required, at the discretion of the MLS, to complete additional training of not more than four (4) classroom hours in any (12) twelve month period when deemed necessary by the MLS to familiarize Participants and Subscribers with system changes or enhancements and/or changes to MLS rules or policies. Participants and Subscribers must be given the opportunity to complete any mandated orientation and additional training remotely. *(Amended 11/17)* **M**

### Section 14  Submission of Photographs or Other Graphic Representations (Policy Statement 7.93)

Multiple Listing Services may, as a matter of local discretion, require submission of a reasonable number of photographs or other graphic representations that accurately depict listed property except where sellers expressly direct that photographs of their property not appear in MLS compilations.  *(Adopted 5/10)* **M**

### Section 15  Submission of Legally-required Seller Disclosure Information  (Policy Statement 7.94)

Multiple Listing Services may, as a matter of local discretion, require submission of all legally-required seller disclosure information except where sellers expressly direct that such disclosure documents not be disseminated through MLS.  *(Adopted 5/10)* **M**

### Section 16  Price Change Information  (Policy Statement 7.95)

MLSs are not required to track or report price change information other than the most recent increase or decrease in the price of current listings. If such information (either with respect to a current listing or to prior listings of that property) is tracked by an MLS and made available to Participants and Subscribers, neither it nor any information from which it may be determined shall be classified as confidential nor may Participants be prohibited from making such information available to clients and customers pursuant to the same rules governing dissemination of other non-confidential data fields. Classification as non-confidential permits inclusion of such information in advertisements, including IDX display, of other Participants' listings as a matter of local option. *(Adopted 5/10, Amended 5/11)* **M**

### Section 17  Days/Time on Market Information  (Policy Statement 7.96)

MLSs are not required to track or report days/time on market information (i.e., the length of time a property has been listed for sale pursuant to a current listing agreement or prior listing agreements, whether with the same or different listing brokers or firms). If such information is tracked by an MLS and made available to Participants and Subscribers, neither it nor any information from which it may be determined (such as the current list date, or prior list and expiration dates) shall be classified as confidential, nor may Participants be prohibited from making such information available to clients or customers pursuant to the same rules governing dissemination of other non-confidential data fields. Classification as non-confidential permits inclusion of such information in advertisements, including IDX display, of other Participants' listings as a matter of local option. *(Adopted 5/10, Amended 5/11)* **M**

### Section 18  Need to Disclose if Property is a Foreclosure, Bank-owned, or Real Estate Owned ("REO")  (Policy Statement 7.97)

As a matter of local discretion, Multiple Listing Services may require Participants to disclose if a listed property is a foreclosure, bank-owned, or real estate owned ("REO"). *(Adopted 11/11)* **O**

### Section 19. Customer Service and Tech Support (Policy Statement 8.2)

The MLS must display customer service and technical support contact information on the MLS website. *(Adopted 11/20)* **M**

### Section 20. Fair Housing Policy (Policy Statement 8.1)

Multiple Listing Services are important tools for furthering fair housing because they facilitate the widespread distribution of accurate property information to all consumers. To that end, MLSs must implement a process for identifying potential violations of fair housing laws, advising Participants and Subscribers to remove or correct potential violations. *(Adopted 11/20)* **M**

# Finance

### Section 1  Waivers of MLS Fees, Dues, and Charges  (Policy Statement 7.43)

Recurring MLS fees, dues, and charges may be based upon the total number of real estate brokers, sales licensees, and licensed or certified real estate appraisers affiliated with or employed by an MLS Participant. *(Amended 11/17)*

However, MLSs must provide Participants the option of a no-cost waiver of MLS fees, dues and charges for any licensee or licensed or certified appraiser who can demonstrate subscription to a different MLS or CIE where the principal broker participates. MLSs may, at their discretion, require that broker Participants sign a certification for nonuse of its MLS services by their licensees, which can include penalties and termination of the waiver if violated. *(Amended 5/18 and 8/18)* **M**

### Section 2  Assessment of MLS Fees, Dues, and Charges  (Policy Statement 7.45)

All MLS fees, dues, and charges, including, but not limited to, initial participation fees, recurring participation fees, listing origination fees, subscription fees, etc., may be assessed to MLS Participants or to individual users or Subscribers. This does not preclude an MLS Participant from being reimbursed by affiliated licensees for fees or charges incurred on their behalf pursuant to any in-house agreement that may exist. If direct billing of Subscribers is utilized, the ultimate responsibility for delinquent dues, fees, and charges is that of the Participant, unless an MLS, by adoption of appropriate rules or bylaws, makes Subscribers exclusively responsible for such financial obligations. *(Amended 2/95)* **M**

### Section 3  Merger or Dissolution of Association or MLS

In cases of merger or dissolution of an association of REALTORS® or an MLS, the advice of the organization(s) accountant or tax advisor should be sought. *(Adopted 11/04)* **R**

# Law

## Postal Regulations

### Section 1  Compliance with United States Postal Codes  (Policy Statement 7.15)

Associations of REALTORS® and their multiple listing services should comply with the requirements of the United States postal statutes as they relate to delivery of multiple listing service information, and in particular Volume 39, Code of Federal Regulations, Part 320, Suspension of the Private Express Statutes; Extremely Urgent Letters, found in the Federal Register, Volume 44, Number 207, Wednesday, October 24, 1979, page 61178. **I**

## Tax Exempt Status of an Association of REALTORS®

### Section 2  Limitation on Content of Association Advertising

The tax exempt status of an association of REALTORS® can be jeopardized if it includes the names of REALTORS® in advertisements it places.

Section 501(c)(6) of the Internal Revenue Code provides for the exemption of a real estate association which is not organized for profit provided no part of the net earnings of the association inures to the benefit of any private shareholder or individual.

Revenue Ruling 65-14, C.B. 1965-1, 236 holds that the publication of advertisements containing listings of the names of individual members constitutes advertising for the individuals so advertised and is thus considered the performance of particular services for such individuals rather than an activity aimed at improvement of general business conditions. Section 1.501(c)(6)-l of the Income Tax Regulations confines the activities of a real estate association exempt under Section 501(c)(6) to those directed to the improvement of business conditions of one or more lines of business rather than the performance of particular services for individual persons. *(Amended 11/04)* **I**

## Standard Multiple Listing Service Logo of the NATIONAL ASSOCIATION OF REALTORS®

### Section 3  Nature of the Standard Multiple Listing Service Mark

The NATIONAL ASSOCIATION OF REALTORS® has approved a standard multiple listing service logo (the "Logo") for use by authorized chartered associations of REALTORS®, members of such associations, and multiple listing services solely owned by such association(s) pursuant to the terms set forth herein, and as further described in the Membership Marks Manual.

Downloadable files and additional information about the Logo may be found on nar.realtor. *(Amended 11/20)* **M**

### Section 4  Authorization to Use the Standard Multiple Listing Service Logo

Authorization to use the Logo is limited to the following authorized licensees ("Authorized Licensees"):

a. Associations of REALTORS® that own or control a multiple listing service, wholly owned by REALTOR® associations, and that have certified that their governing documents comply with multiple listing policy of the National Association.

b. Multiple listing services owned and/or controlled solely by an association(s) of REALTORS®, and when the governing documents of the owning or controlling association(s) of REALTORS® and/or the MLS, if a separate legal entity with separate governing documents, have certified that their governing documents comply with multiple listing policy of the National Association.

c. Members of an association of REALTORS® that owns and/or controls a multiple listing service and that has certified that their governing documents comply with multiple listing policy of the National Association.

Authorized Licensees use of the Logo is subject to the following limitations:

• The Logo may not be modified.

• The Logo may not be used as a lapel pin or jewelry.

• The Logo may be used only on stationery, printed forms, websites and within promotional materials regarding multiple listing services.

• Authorized Licensees acknowledge that the National Association is the exclusive owner of the Logo.

• The multiple listing service must cease all use of the Logo in the event it is no longer solely owned and/or controlled by an association(s) of REALTORS®.

- The association(s) of REALTORS® and multiple listing service must cease all use of the Logo in the event any governing documents of the association(s) of REALTORS® or the multiple listing service, if applicable, do not comply with multiple listing policy of the National Association.

- The National Association reserves the right to require Authorized Licensees to adhere to additional limitations on use of the Logo and to cease use of the Logo for any reason within its sole discretion. *(Amended 11/20)* I

**Section 5  Special Notes Concerning the Standard Multiple Listing Service Logo and the National Association's REALTOR® Trademarks**

The NATIONAL ASSOCIATION OF REALTORS® does not permit any variation of the Logo design. Further, the National Association will not review and does not authorize any multiple listing service insignia to be used with the Logo other than the multiple listing service's own logo. Further, the National Association's REALTOR® trademarks may not, in any instance, be used in connection with any multiple listing service not owned and/or controlled solely by an association(s) of REALTORS®. *(Amended 11/20)* M

**Section 6  Use of the Standard Multiple Listing Service Logo by Nonmember Participants (Policy Statement 7.13)**

The Logo may not be used by non-association members of an MLS, including in any state where law requires that brokers (principals) who are not REALTORS® be admitted to the multiple listing service of an association of REALTORS® or in any association which has voluntarily opened its MLS to nonmember brokers and/or appraisers. Such use would be a misrepresentation and would violate the registration rights in the REALTOR® trademarks of the NATIONAL ASSOCIATION OF REALTORS®, the lawful owner of said collective marks. Where such non-association member advertises that they are a member of the multiple listing service of an association of REALTORS®, the multiple listing service may properly require that such Participant of the service include in such advertisement that they are not a member of the association of REALTORS®. *(Amended 11/20)* M

## Other Legal Issues

**Section 7  Compliance with Law by Association and MLS  (Policy Statement 7.10)**

The multiple listing policy of the National Association shall in no instance be interpreted as requiring any constituent member association or association member to adopt or follow any policy which would contravene law applicable to such member association or association member. I

# D. Data

## Current Listings

### Section 1  Standard Forms  (Policy Statement 7.60)
Maintaining accurate listing data is a critical necessity for achieving the defined purpose of the MLS. Participants and Subscribers are required to submit accurate listing data and required to correct any known errors.

Multiple listing services shall not require Participants to enter into listing agreements using a form other than the form a Participant individually chooses to use. Multiple listing services may refuse to accept any listing which fails to adequately protect the interests of the public and other Participants, and shall not accept any listing which establishes a contractual relationship between the MLS and a Participant's client. *(Adopted 11/04)* **M**

### Section 2  Termination Dates  (Policy Statement 7.66)
All listings filed with the multiple listing service shall include the definite and final termination date as negotiated between the Participant and the seller. *(Adopted 11/04)* **M**

### Section 3  Net Listings  (Policy Statement 7.61)
Multiple listing services shall not include net listings in compilations of current listing information. *(Adopted 11/04)* **M**

### Section 4  Open Listings  (Policy Statement 7.62)
Except where required by law, multiple listing services shall not include open listings in MLS compilations since open listings generally do not include authority to cooperate with and compensate other brokers. *(Adopted 11/04)* **M**

### Section 5  Multiple Listing Options for Sellers (Policy Statement 8.14)
Office Exclusive: Is an exempt listing where the seller has directed that their property not be disseminated through the MLS and not be publicly marketed. The office exclusive listing shall be filed with the MLS but not disseminated to other MLS Participants and Subscribers.

Delayed Marketing: Is an exempt listing where the seller has directed the listing broker to delay the public marketing of that listing through IDX and syndication for any period as allowed by the local MLS in its unfettered discretion. A delayed marketing listing shall be filed with the MLS and does not preclude the listing firm from marketing the listing in a manner consistent with their seller's choice.

Exempt Listing Disclosure: The filing of an exempt listing (office exclusive or delayed marketing) with the MLS must be pursuant to a certification obtained by the listing broker from the seller which includes:

- disclosure about the professional relationship between the Participant and the seller;
- acknowledgement that the seller understands the MLS benefits they are waiving or delaying with the exempt listing, such as broad and immediate exposure of their listing through the MLS; and
- confirmation of the seller's decision that their listing not be publicly marketed and disseminated by the MLS as an office exclusive listing or that their listing will not have immediate public marketing through IDX and Syndication as a delayed marketing listing.

Multiple Listing Options for Sellers requirements only apply to listing types that are subject to mandatory submission pursuant to the MLS local rules. *(Amended 5/25)* **M**

### Section 6  Listing Prices Specified  (Policy Statement 7.65)

The full gross listing price stated in each listing agreement will be published in MLS compilations of current listings except where a property is subject to auction and no listed price is specified in the agreement. *(Adopted 11/04)* **M**

### Section 7  Auction Listings  (Policy Statement 7.82)

Multiple listing services may, as a matter of local discretion, accept exclusively-listed property subject to auction. Where listings subject to auction do not include a listed price, they may be published in a separate section of the MLS compilation of current listings. *(Adopted 11/04)* **O**

### Section 8  Limited Service Listings  (Policy Statement 7.83)

MLSs may, as a matter of local discretion, categorize listings as limited service in instances where listing brokers, pursuant to their listing agreements, will not provide one or more of the following services:

a. arrange appointments for cooperating brokers to show listed properties to potential purchaser(s) but instead give cooperating brokers authority to make such appointments directly with seller(s)

b. accept and present to seller(s) offers to purchase procured by cooperating brokers but instead give cooperating brokers authority to present offers directly to seller(s)

c. advise seller(s) as to the merits of offers to purchase

d. assist seller(s) in developing, communicating, or presenting counter-offers

e. participate on seller's(s') behalf in negotiations leading to the sale of the listed property *(Adopted 11/04)* **O**

### Section 9  MLS Entry-only Listings  (Policy Statement 7.84)

Multiple listing services may, as a matter of local discretion, categorize listings as MLS entry-only in instances where listing brokers, pursuant to their listing agreements, will not provide any of the following services:

a. arrange appointments for cooperating brokers to show a listed property to potential purchaser(s) but instead give cooperating brokers authority to make such appointments directly with seller(s)

b. accept and present to seller(s) offers to purchase procured by cooperating brokers but instead give cooperating brokers authority to present offers directly to seller(s)

c. advise seller(s) as to the merits of offers to purchase

d. assist seller(s) in developing, communicating, or presenting counter-offers

e. participate on seller's(s') behalf in negotiations leading to the sale of the listed property *(Adopted 11/04)* **O**

### Section 10  Listings of Suspended Participants  (Policy Statement 7.67)

When an MLS Participant is suspended from the MLS for failing to abide by a membership duty (i.e., violation of the Code of Ethics, association bylaws, MLS bylaws, MLS rules and regulations, or other membership duties except for failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS by the suspended Participant shall, at the Participant's option, be retained in the MLS until sold, withdrawn, or expired. Such listings shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the suspension became effective. If a Participant is suspended from an association of REALTORS® (except where MLS participation without association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, the MLS is not obligated to provide MLS services, including continued inclusion of a suspended Participant's listings in the MLS compilation of current listing information. Prior to removal of a suspended Participant's listings from MLS, the suspended Participant shall be advised in writing of the intended removal so that the suspended Participant's clients can be advised. *(Adopted 11/04)* **M**

### Section 11  Listings of Expelled Participants  (Policy Statement 7.68)

When an MLS Participant is expelled from the MLS for failing to abide by a membership duty (i.e., violation of the Code of Ethics, association bylaws, MLS bylaws, MLS rules and regulations, or other membership duties except for failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS by the expelled Participant shall, at the Participant's option, be retained in the MLS until sold, withdrawn, or expired. Such listings shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the expulsion became effective. If a Participant is expelled from an association of REALTORS® (except where MLS participation without association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, the MLS is not obligated to provide MLS services, including continued inclusion of an expelled Participant's listings in the MLS compilation of current listing information. Prior to removal of an expelled Participant's listings from the MLS, the expelled Participant shall be advised in writing of the intended removal so that the expelled Participant's clients can be advised. *(Adopted 11/04)* **M**

### Section 12  Listings of Resigned Participants   (Policy Statement 7.69)

When a Participant resigns from the MLS, the MLS is not obligated to provide MLS services, including continued inclusion of a resigned Participant's listings in the MLS compilation of current listing information. Prior to removal of a resigned Participant's listings from the MLS, the resigned Participant shall be advised in writing of the intended removal so that the resigned Participant's clients can be advised. *(Adopted 11/04)* **O**

### Section 13  Submission of Offers  (Policy Statement 7.72)

As required by Standard of Practice 1-7, listing brokers will continue to submit written offers to their seller-clients until closing unless precluded by law, government rule or regulation, or unless agreed otherwise in writing between the seller and the listing broker. Except where a subsequent offer is contingent upon termination of an existing contract, listing brokers shall recommend that sellers obtain the advice of legal counsel prior to accepting any subsequent offer. *(Adopted 11/04)* **M**

### Section 14  Reporting Resolutions of Contingencies  (Policy Statement 7.76)

MLS Participants shall report that any contingency on file with the MLS has been fulfilled or renewed, or the agreement cancelled within twenty-four (24) hours. *(Adopted 11/04)* **M**

### Section 15  Reporting Cancellation of Pending Sales  (Policy Statement 7.77)

MLS Participants shall promptly report to MLS that a pending sale has been cancelled and the listing, if still in effect, will be reinstated in the MLS compilation. *(Adopted 11/04)* **M**

### Section 16  Information Included in Any Association MLS Compilation  (Policy Statement 7.35)

The National Association recommends to its associations and their multiple listing services that the information included in any MLS compilation should be limited to information related to the sale of listed property which is objective and capable of being verified by any interested party. The MLS information should not include any subjective impressions or opinions that could be misunderstood or misconstrued. **R**

### Section 17  Protection Clauses in Association MLS Standard Listing Contracts  (Policy Statement 7.37)

Any broker protection clause which is contained in a standard listing form established and recommended by a multiple listing service for the use of MLS Participants shall not contain any specific time period therein, but shall contain a blank space to indicate that the time period of such protection period is negotiable between the property owner and the listing broker. **M**

### Section 18  Compensation Notice (Policy Statement 7.39)

It is recommended that MLSs publish the following notice to their general membership at least annually.

---

*Compensation Notice*

1. A broker's compensation and fees for services are not set by law and are fully negotible.

2. A broker's compensation for services rendered  to a seller or for services rendered to a buyer is solely a matter of negotiation between the broker and their client, and is not fixed, controlled, recommended, or maintained by any persons not a party to the brokerage service agreement.

3.

   *The compensation paid by a listing broker to a cooperating broker in respect to any listing is established by the listing broker and is not fixed, controlled, recommended, or maintained by any persons other than the listing broker. (Amended  8/24)* **M**

---

### Section 19  Reproduction of MLS Information  (Policy Statement 7.79)

Reproduction of MLS-generated information is subject to the following limitations:

**Option #1:** Participants or their affiliated licensees shall not reproduce any MLS compilation or any portion thereof, except in the following limited circumstances:

Participants or their affiliated licensees may reproduce from the MLS compilation and distribute to prospective purchasers a reasonable number of single copies of property listing data contained in the MLS compilation which relate to any properties in which the prospective purchasers are or may, in the judgment of the Participant or their affiliated licensees, be interested.

Reproductions made in accordance with this rule shall be prepared in such a fashion that the property listing data of properties other than that in which the prospective purchaser has expressed interest, or in which the Participant or the affiliated licensees are seeking to promote interest, does not appear on such reproduction.

Nothing contained herein shall be construed to preclude any Participant from utilizing, displaying, distributing, or reproducing property listing sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the Participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the Participant and those licensees affiliated with the Participant who are authorized to have access to such information. Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office, or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers. Any MLS content in data feeds available to Participants for real estate brokerage purposes must also be available to Participants for valuation purposes, including automated valuations. MLSs must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLSs may require execution of a third-party license agreement where deemed appropriate by the MLS. MLSs may require Participants who will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may not be used as supporting documentation. Any other use of such information is unauthorized and prohibited by these rules and regulations. *(Amended 05/14)*

**Option #2:** Participants or their affiliated licensees shall not reproduce any MLS compilation or any portion thereof, except in the following limited circumstances:

Participants or their affiliated licensees may reproduce from the MLS compilation and distribute to prospective purchasers a reasonable number of single copies of property listing data contained in the MLS compilation which relate to any properties in which the prospective purchasers are or may, in the judgment of the Participants or their affiliated licensees, be interested.

Nothing contained herein shall be construed to preclude any Participant from utilizing, displaying, distributing, or reproducing property listing sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the Participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the Participant and those licensees affiliated with the Participant who are authorized to have access to such information. Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office, or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers. Any MLS content in data feeds available to Participants for real estate brokerage purposes must also be available to Participants for valuation purposes, including automated valuations. MLSs must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLSs may require execution of a third-party license agreement where deemed appropriate by the MLS. MLSs may require Participants who will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may not be used as supporting documentation. Any other use of such information is unauthorized and prohibited by these rules and regulations. *(Amended 05/14)* **M**

### Section 20  Property Addresses  (Policy Statement 8.9)

Residential listings filed with the MLS must include a property address where one exists at the time the listing is filed.  If a property address is unavailable, then the parcel identification number must be submitted at the time the listing is filed.  If no address or parcel identification number is available at the time the listing is filed, the listing must, at a minimum, contain a legal description of the property sufficient to describe the location of the property.  This information shall be available to Participants and Subscribers at the time of filing.  *(Adopted 5/21)* **M**

### Section 21 Non-filtering of Listings (Policy Statement 8.5)

MLS Participants and Subscribers must not, and MLSs must not enable the ability to, filter out or restrict MLS listings that are communicated to consumers or clients based on the existence or level of compensation offered to the cooperating broker or the name of a brokerage or agent. *(Amended 8/24)* **M**

## Sold/Comparable/Off-market Information

### Section 1  Reporting Sales to the MLS  (Policy Statement 7.75)

Sales of listed property, including sales prices, shall be reported promptly to the MLS by listing brokers. If negotiations were carried on directly between a cooperating Participant and the seller, the cooperating broker shall report the accepted offer and price to the listing broker, and the listing broker shall report that information to the MLS. Listing agreements should also include provisions expressly granting the listing broker the right to authorize dissemination of sales price information by the MLS to its Participants.

**Note applicable in "disclosure" states:** In disclosure states, if the sale price of a listed property is recorded, then reporting of the sale price may be required by the MLS.

**Note applicable in "nondisclosure" states:** In states where the actual sale prices of completed transactions are not publicly accessible, failure to report sale prices can result in disciplinary action only if the MLS:

1.  categorizes sale price information as confidential and

2.  limits use of sale price information to Participants and Subscribers in providing real estate services, including appraisals and other valuations, to customers and clients; and to governmental bodies and third-party entities only as provided below.

The MLS may provide sale price information to governmental bodies only to be used for statistical purposes (including use of aggregated data for purposes of valuing property) and to confirm the accuracy of information submitted by property owners or their representatives in connection with property valuation challenges; and to third-party entities only to be used for academic research, statistical analysis, or for providing services to Participants and Subscribers. In any instance where a governmental body or third-party entity makes sale price information provided by the MLS available other than as provided for in this provision, a listing Participant may request the sale price information for a specific property be withheld from dissemination for these purposes with written authorization from the seller, and withholding of sale price information from those entities shall not be construed as a violation of the requirement to report sale prices.

**Note regarding confidentiality:** As established in the Virtual Office Website ("VOW") policy, sale prices can only be categorized as confidential in states where the actual sale prices of completed transactions are not accessible from public records. *(Amended 11/11)* **M**

### Section 2  Withdrawn Listings  (Policy Statement 7.64)
Listings may be withdrawn from a multiple listing service by Participants prior to the listing's expiration date. As a matter of local discretion, MLSs may require that a copy of the agreement authorizing withdrawal be submitted. *(Adopted 11/04)* **M**

### Section 3  Inclusion of Expired or Withdrawn Listings in an Association's Comparable Report or Other Report of Statistical Information  (Policy Statement 7.36)
Any information concerning expired or withdrawn listings included in an association's comparable report or other report of statistical information shall be clearly indicated as expired or withdrawn so that the users of such information will be aware of the actual status of such listings. **M**

## Statistical Reports

### Section 1  Statistical Reports  (Policy Statement 7.3)
MLSs may, as a matter of local determination, make statistical reports, sold information, and other informational reports derived from the MLS available to REALTORS® who do not participate in the MLS but who are engaged in real estate brokerage, management, appraising, land development, or building. Additional expenses incurred in providing such information to REALTORS® who do not participate in the MLS may be included in the price charged for such information. Any information provided may not be transmitted, retransmitted, or provided in any manner to any individual, office, or firm, except as otherwise authorized in the MLS rules and regulations.

MLSs may, as a matter of local determination, provide statistical reports, sold information, and other informational reports derived from the MLS to government agencies. MLSs may, as a matter of local discretion, require that such agencies (or representatives of such agencies) hold an appropriate form of membership in the MLS or in the association of REALTORS® as a condition of such access. *(Amended 11/21)* **M**

**Section 2  Statistical Reports Should Be Kept**

The information submitted on listing and sales contracts makes it possible for an association to compile valuable market data. Therefore, an association of REALTORS® should develop and preserve its multiple listing records for that purpose. The resulting information should be available to members and, under some conditions, to interested governmental agencies. The National Association's Department of Real Estate Research can be helpful with advice and suggestions. **R**

# Advertising

## Print and Electronic

**Section 1  Internet Data Exchange (IDX) Policy  (Policy Statement 7.58)**

The IDX policy gives MLS Participants the ability to authorize limited electronic display and delivery of their listings by other Participants via the following authorized mediums under the Participant's control: websites, mobile apps, and audio devices. As used throughout this policy, "display" includes "delivery" of such listings. Associations of REALTORS® and their multiple listing services must enable MLS Participants to display aggregated MLS listing information by specified electronic means in accordance with this policy. Requests for IDX feeds/downloads must be acted on by the MLS within five (5) business days from receipt, barring extenuating circumstances related to an individual's qualification for MLS Participation, and review of the Participant's and vendor's use of the IDX information consistent with the MLS rules, in which case an estimated time of approval or denial must be issued. *(Amended 05/17)*

For purposes of this policy "control" means Participants must have the ability to add, delete, modify and update information as required by this policy. All displays of IDX listings must also be under the actual and apparent control of the Participant and must be presented to the public as being the Participant's display. Actual control requires that the Participant has developed the display, or caused the display to be developed for the Participant pursuant to an agreement giving the Participant authority to determine what listings will be displayed, and how those listings will be displayed. Apparent control requires that a reasonable consumer receiving the Participant's display will understand the display is the Participant's, and that the display is controlled by the Participant. Factors evidencing control include, but are not limited to, clear, conspicuous, written or verbal identification of the name of the brokerage firm under which the Participant operates, except as otherwise provided for in this policy (e.g., displays of minimal information). All electronic display of IDX information conducted pursuant to this policy must comply with state law and regulations, and MLS rules.  Any display of IDX information must be controlled by the Participant, including the ability to comply with this policy and applicable MLS rules. *(Amended 05/17)*

To comply with this requirement MLSs must, if requested by a Participant, promptly provide basic downloading of all active listings, sold* listing data starting from January 1, 2012, non-confidential pending sale listing data, and other listings authorized under applicable MLS rules. MLSs may not exclude any listings from the information which can be downloaded or displayed under IDX except those listings for which a seller has affirmatively directed that their listing or their property address not appear on the Internet or other electronic forms of display or distribution. Associations and MLSs can also offer alternative display options including framing of board, MLS, or other publicly-accessible sites displaying Participants' listings (with permission of the framed site). For purposes of this policy, "downloading" means electronic transmission of data from MLS servers to Participants' servers on a persistent or transient basis, at the discretion of the MLS. The MLS's IDX download must be refreshed to accurately reflect all updates and status changes no less frequently than every twelve (12) hours. *(Amended 5/17)*

***Note:** If "sold" information is not publicly accessible, display of sales price may be prohibited. "Publicly accessible" as used in IDX policy and rules, means data that is available electronically or in hard copy to the public from city, county, state and other government records. MLSs must provide for its Participants' IDX displays publicly accessible sold information maintained by the MLS starting January 1, 2012. *(Amended 05/21)*

MLSs that allow persistent downloading of the MLS database by Participants for display or distribution on the Internet or by other electronic means may require that Participants' websites (1) utilize appropriate security protection, such as firewalls, provided that any security obligations imposed on Participants may not be greater than those employed concurrently by the MLS, and/or (2) maintain an audit trail of consumer activity on Participants' websites and make that information available to the MLS if the MLS has reason to believe that a Participant's IDX website has caused or permitted a breach in the security of the data or a violation of MLS rules related to use by consumers. This policy does not require associations or MLSs to establish publicly accessible sites displaying Participants' listings. *(Amended 05/12)*

Unless state law requires prior written consent from listing brokers, listing brokers' consent for IDX display may be presumed unless a listing broker affirmatively notifies the MLS that the listing broker refuses to permit display (either on a blanket or on a listing-by-listing basis). If a Participant refuses on a blanket basis to permit IDX display of that Participant's listings, then that Participant may not display the aggregated MLS data of other Participants on an IDX site.

Alternatively, MLSs may require that Participants' consent for IDX display of their listings by other Participants be affirmatively established in writing. Even where Participants have given blanket authority for other Participants' IDX display of their listings, such consent may be withdrawn on a listing-by-listing basis as instructed by the seller. *(Amended 05/12)*

Access to MLS databases, or any part of such databases, may not be provided to any person or entity not expressly authorized such access under the MLS rules. *(Amended 11/09)*

Participants' Internet websites and other authorized display mechanisms may also provide other features, information, or services in addition to IDX information (including Virtual Office Website ["VOW"] functions) which are not subject to this policy. *(Amended 05/12)*

## Policies Applicable to Participants' IDX Websites and Displays

1.  Participants must notify the MLS of their intention to display IDX information and give the MLS direct access for purposes of monitoring/ensuring compliance with applicable rules and policies. *(Amended 05/12)*

2.   MLS Participants may not use IDX-provided listings for any purpose other than IDX display. This does not require Participants to prevent indexing of IDX listings by recognized search engines. *(Amended 05/12)*

3.   Listings or property addresses of sellers who have directed their listing brokers to withhold their listing or property address from display on the Internet (including, but not limited to, publicly accessible websites or VOWs) shall not be accessible via IDX display. *(Amended 05/12)*

4.   Participants may select the IDX listings they choose to display based only on objective criteria including, but not limited to, factors such as geography or location ("uptown", "downtown", etc.), list price, type of property (e.g., condominiums, cooperatives, single family detached, multi-family), or type of listing (e.g., exclusive right-to-sell or exclusive agency). Selection of IDX listings to be displayed must be independently made by each Participant. *(Amended 11/21)*

5.   Participants must refresh all MLS downloads and displays automatically fed by those downloads not less frequently than every twelve (12) hours. *(Amended 11/14)*

6.   Except as provided elsewhere in this policy or elsewhere in an MLS's rules and regulations, an IDX display or Participant engaging in IDX display may not distribute, provide, or make any portion of the MLS database available to any person or entity. *(Amended 05/12)*

7.   When displaying listing content, a Participant's or user's IDX display must clearly identify the name of the brokerage firm under which they operate in a readily visible color and typeface. This policy acknowledges that certain required disclosures may not be possible in displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of 200 characters or less) or for audio delivery of listing content. Minimal displays are exempt from the disclosure requirements established in this policy but only when linked directly to a display that includes all required disclosures. Audio delivery of listing content is exempt from the disclosure requirements only when all required disclosures are subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. *(Amended 05/17)*

8.   With respect to any Participant's IDX display that

   a.   allows third-parties to write comments or reviews about particular listings or displays a hyperlink to such comments or reviews in immediate conjunction with particular listings, or

   b.   displays an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing, either or both of those features shall be disabled or discontinued with respect to the seller's listing at the request of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued by all Participants. Except for the foregoing and subject to paragraph 9, a Participant's IDX display may communicate the Participant's professional judgment concerning any listing. Nothing shall prevent an IDX display from notifying customers that a particular feature has been disabled at the request of the seller. *(Amended 05/12)*

9. Participants shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the Participant beyond that supplied by the MLS and that relates to a specific property. The Participant shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for that property explaining why the data or information is false. However, the Participant shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment. *(Amended 05/12)*

10. An MLS Participant (or where permitted locally, an MLS Subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS Participant (or MLS Subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that Participants may display listings from each IDX feed on a single webpage or display. *(Adopted 11/14)*

11. Participants shall not modify or manipulate information relating to other Participants' listings. MLS Participants may augment their IDX displays of MLS data with applicable property information from other sources to appear on the same webpage or display, clearly separated from the data supplied by the MLS. The source(s) of the information must be clearly identified in the immediate proximity to such data. This requirement does not restrict the format of MLS data display or display of fewer than all of the available listings or fewer authorized fields. *(Adopted 05/15)*

12. An MLS Participant's IDX display must identify the listing firm, and the email or phone number provided by the listing Participant in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data. *(Amended 11/21)*

## Policies Applicable to Multiple Listing Services

The following guidelines are recommended but not required to conform to National Association policy. MLSs may:

1. prohibit display of expired or withdrawn listings* *(Amended 5/21)*

**\*Note:** If "sold" information is publicly accessible, display of sales price of completed transactions may be prohibited. *(Amended 5/21)*

2. prohibit display of confidential information fields intended for cooperating brokers rather than consumers including showing instructions and property security information. *(Amended 5/21)*

3. prohibit display of the type of listing agreement, e.g., exclusive right to sell, exclusive agency, etc.

4. prohibit display of seller's(s') and occupant's(s') name(s), phone number(s), and e-mail address(es)

5. require that the identity of listing agents be displayed

6.  require that any display of other Participants' listings indicate the source of the information being displayed

7.  require that other brokers' listings obtained from other sources, e.g., from other MLSs, from non-participating brokers, etc., display the source from which each such listing was obtained

8.  require Participants to indicate on their websites and in any other IDX display that the information being provided is for consumers' personal, non-commercial use and may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing. *(Amended 05/12)*

9.  establish reasonable limits on the amount of data/number of listings that consumers may retrieve or download in response to an inquiry. Such number shall be determined by the MLS, but in no instance may the limit be fewer than five hundred (500) listings or fifty percent (50%) of the listings available for IDX display, whichever is less. *(Amended 11/17)*

10. limit the right to display other Participants' listings to a Participant's office(s) holding participatory rights in the same MLS.

11. require a notice on all MLS data displayed indicating that the data is deemed reliable but is not guaranteed accurate by the MLS. Participants' IDX sites and displays may also include other disclaimers necessary to protect the Participant and/or the MLS from liability. *(Amended 05/12)*

This policy acknowledges that the disclosures required under Subsections 5, 6, 7, 8, and 11 (above) may not be possible in displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of 200 characters or less) or for audio delivery of lising content. Minimal displays are exempt from the disclosure requirements established in this policy but only when linked directly to a display that includes all required disclosures. Audio delivery of listing content is exempt from disclosure requirements only when all required disclosures are subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. *(Amended 5/17)*

## Additional Local Issues/Options

1.  Where MLS participatory rights are available to non-member brokers or firms as a matter of law or local determination, the right to IDX display of listing information may be limited, as a matter of local option, to Participants who are REALTORS®. *(Amended 05/12)*

2.  MLSs may, but are not required to, limit the right to display listing information available pursuant to IDX to MLS Participants licensed as real estate brokers.

3.  MLSs may, but are not required to, limit the right to display listing information pursuant to IDX to MLS Participants engaged in real estate brokerage. *(Amended 11/09)*

4.  MLSs may, but are not required to, allow non-principal brokers and sales licensees affiliated with MLS Participants to use information available through IDX to populate their own websites or to use in other IDX displays.

Even if use of information through IDX is provided to non-principal brokers and sales licensees affiliated with MLS Participants, such use is subject to the affiliated Participants' consent and control and the requirements of state law and/or regulation, and MLS rules. *(Amended 05/12)*

5. MLSs cannot prohibit Participants from downloading and displaying or framing other brokers' listings obtained from other sources, e.g., other MLSs, non-participating brokers, etc., but can, as a matter of local option, require that listings obtained through IDX feeds from REALTOR® Association MLSs be searched separately from listings obtained from other sources*. (Amended 11/14)*

**Note:** An MLS Participant (or where permitted locally, an MLS Subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS Participant (or MLS Subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that Participants may display listings from each IDX feed on a single webpage or display. *(Adopted 11/14)*

6. MLSs may, as a matter of local option, charge the costs of adding or enhancing their downloading capacity to Participants who will download listing information. Assessment of such costs should reasonably relate to the actual costs incurred by the MLS. *(Amended 11/06)*

7. MLSs may prohibit advertising controlled by Participants (including co-branding) on any pages displaying IDX-provided listings. *(Amended 05/12)*

MLSs permitting advertising (including co-branding) on pages displaying IDX-provided listings may prohibit deceptive or misleading advertising (including co-branding).

For purposes of this provision, co-branding will be presumed not to be deceptive or misleading if the Participant's logo and contact information is larger than that of any third party. *(Amended 11/09)* **M**

### Section 2  Use of MLS Information in Advertising and Other Public Representations (Policy Statement 7.80)

Information from MLS compilations of current listing information, from statistical reports, and from any sold or comparable reports may be used by MLS Participants as the basis for aggregated demonstrations of market share or for comparisons of firms in public mass-media advertising and other public representations. MLSs may, as a matter of local determination, prohibit advertising or representations about specific properties which are listed with other Participants or which were sold by other Participants (as either listing or cooperating broker).

Any print or non-print form of advertising or other public representation based in whole or in part on information supplied by the MLS must clearly disclose the source of the information and the period of time over which such claims are based. *(Adopted 11/04)* **M**

**Section 3  Transmittal of Participants' Listings to Aggregators  (Policy Statement 7.87)**
MLSs are not required to transmit Participants' listings to third-party aggregators or to operate a public website displaying listing information. If an MLS transmits Participants' listings to third-party aggregators and/or operates a public website displaying listing information, all exclusive listings, regardless of type, will be included in the data feed (unless a Participant withholds consent for such transmission), except that MLSs may exclude from such data feed any listing where both of the following conditions are present:

a.  the listed property's street address or a graphic display of the property's specific location will be displayed to the public; and

b.  the seller displays on the property a "for sale by owner" sign or other sign or notice indicating that the seller is soliciting direct contact from buyers. *(Adopted 11/06)* **M**

**Section 4  Electronic Display of Other Participants' Listings  (Policy Statement 7.98)**
MLSs may, but are not required to, give Participants the ability to authorize electronic display of their listings by other Participants outside the context of the Internet Data Exchange ("IDX") policy and rules and the Virtual Office Website ("VOW") policy and rules.

Participants may not be required to consent to display or distribution of their listings through non-IDX and non-VOW channels as a condition of participation in MLS or as a condition of participation in IDX, except as otherwise provided for in the IDX rules. Electronic display and distribution pursuant to this policy contemplates, but is not limited to, Short Message Services ("SMS")/texting technologies, and interactive "social media." All electronic displays and/or distribution of other Participants' listings conducted pursuant to this policy must comply with state law and regulations and applicable rules. *(Amended 5/17)*

 Displays addressed by this policy may be subject to technological limitations on disabling/discontinuing third-party comments/reviews, disabling/discontinuing automated displays of market value, "refreshing" displays on a periodic basis, and possibly other issues which should be taken into consideration when developing rules and policies governing such displays. *(Adopted 11/12)* **M**

## Homes Magazines

**Section 5  Regulation of Advertising in Association or Commercial Publications**
It is recommended that associations of REALTORS® discontinue and avoid any association or MLS regulation of advertising placed in a commercial advertising publication published by a commercial publisher and sponsored or endorsed by the association and that further, the association document in writing that it is not responsible for any regulation or regulations of advertising by the commercial publishers.

Further, if an association or its multiple listing service publishes a commercial advertising publication other than the regular MLS books/cards/sheets, it shall not seek to regulate the content of such advertising beyond reserving, with the advice of association legal counsel, the right to reject scurrilous advertising that might create liability to the association. *(Approved 11/77, Reaffirmed 11/85)* **R**

### Other Advertising Issues

### Section 6  Services Advertised as "Free" (Policy Statement 8.4)

MLS Participants and Subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to clients, unless the Participant or Subscriber will receive no financial compensation from any source for those services. **M**

### Section 1  Statewide Data Sharing Defined  (Policy Statement 8.10)

A statewide data share should deliver MLS data through a common technology interface (e.g., API) of all data fields to all Participants of MLSs in the statewide data share. However, the data should not include MLS-only data fields that are viewable only to the listing Participant and the respective local MLS.

**Note:**  Considerations should be given to:

• Inclusion of local data fields (non-RESO Standard fields).

• Individual MLS's "attached document" retention policies and state laws regarding the sharing and retention of documents related to a previous transaction (privacy laws). **R**


# E. Participants' Rights

### Section 1  Participation Should Be Optional

No REALTOR® shall be required to participate. A requirement to participate in a multiple listing service in order to gain and maintain REALTORS® membership is an inequitable limitation on its membership (from Official Interpretation No. 1 of Bylaws, Article I, Section 2, adopted by the Board of Directors of the National Association, November 15, 1960). However, if a REALTOR® chooses to participate in the activity, the REALTOR® should be required to exchange information on the same basis, according to the same rules and costs imposed on all who participate. **M**

### Section 2  Association Membership as Prerequisite to MLS Participation  (Policy Statement 7.7)

To the extent permitted by law, the National Association remains firmly and unequivocally committed to the principle that association membership is a reasonable condition of participation in the association's multiple listing service providing membership in the association is readily available to all eligible and qualified individuals on reasonable and nondiscriminatory terms and conditions. *(Amended 11/04)* **R**

### Section 3  Participation in an Association Multiple Listing Service of a Branch Office Manager Who Is Not a Principal of the Real Estate Firm  (Policy Statement 7.24)

In the event a REALTOR® has a principal office in one and only a branch office in another association, and the branch office manager is a REALTOR® member of the second association but is not a principal of the real estate firm with which he is affiliated, the branch manager shall be considered as standing in the shoes of the principal, and shall be eligible for participation in the multiple listing service of any association's MLS where he qualifies as a Participant. *(Amended 11/96)* **I**

### Section 4  MLS Participation by Brokers Acting as Agents of Potential Purchasers (Policy Statement 7.40)

No association or association MLS may make or maintain a rule which would preclude an individual or firm, otherwise qualified, from participating in an association MLS solely on the basis that the individual or firm functions, to any degree, as the agent of potential purchasers under a contract between the individual (or firm) and the prospective purchaser (client). However, in instances where the Participant is representing the potential purchaser as an agent, the Participant cannot function simultaneously as the subagent of the listing broker without buyer and seller consent or as provided by state law;; and must make his true position clearly known to all interested parties at first contact. *(Amended 8/24)* **M**

### Section 6  Immediate Access to MLS by Association Members if Provided to Nonmember  (Policy Statement 7.14)

Where the multiple listing service of an association of REALTORS® is required by law to provide access to nonmembers and immediate access is provided to such nonmembers, similar immediate access shall be provided to applicants for membership in the association of REALTORS® subject to any required orientation in multiple listing policies and procedures. Otherwise, the application for association membership shall be processed in the normal manner. *(Amended 11/04)*

Such access to MLS shall be provided to applicants for association membership as described, waiving the provisions of Interpretations No. 9 and No. 18, Official Interpretations of Article I, Section 2, Bylaws of the National Association, and of Point 5 of the Membership Qualification Criteria of the National Association for Applicants for REALTOR® Members Who Are Sole Proprietors, Partners, Corporate Officers, or Branch Office Managers in a Real Estate Firm. *(Amended 11/04)*

After providing such access to MLS, the applications of such applicants for association membership should proceed on a normal basis and all association membership qualifications and all Official Interpretations of Article I, Section 2, Bylaws of the National Association have full force and effect. *(Amended 11/04)* **M**

### Section 7  Presentation of Offers  (Policy Statement 7.71)

Consistent with Standard of Practice 1-6, MLSs may require that listing brokers make arrangements for prompt presentation of offers and, where offers cannot be presented promptly, that listing brokers explain to cooperating brokers why offers they procured could not be presented. *(Adopted 11/04)* **M**

### Section 8  Showings and Negotiations  (Policy Statement 7.70)

As established in Official Interpretation No. 10 of the National Association's Bylaws, rules giving cooperating brokers the right to negotiate directly with an exclusively-represented seller are an inequitable limitation on REALTORS®. Appointments for showings and negotiations with sellers for the purchase of listed property published in MLS compilations shall be conducted through the listing broker, except:

1.   where the listing broker gives the cooperating broker specific authority to show and/or negotiate directly, or

2.   after reasonable efforts a cooperating broker cannot contact the listing broker or the listing broker's representative. However, listing brokers, at their discretion, may preclude any direct contact or negotiations by cooperating brokers. *(Adopted 11/04)* **M**

## Section 9  Rights of Cooperating Brokers in Presentation of Offers  (Policy Statement 7.73)

Cooperating Participants or their representatives have the right to participate in the presentation of any offer they secure to purchase or lease to the seller or lessor. They do not have the right to be present at any discussion or evaluation of the offer by the seller or lessor and the listing broker. However, if a seller or lessor gives written instructions to a listing broker that cooperating brokers may not be present when offers they procure are presented, cooperating brokers have the right to a copy of those instructions. This policy is not intended to affect listing brokers' right to control the establishment of appointments for presentation of offers.

Where the cooperating broker is not present during the presentation of the offer, the cooperating broker can request in writing, and the listing broker must provide, written affirmation stating that the offer has been submitted to the seller, or written notification that the seller has waived the obligation to have the offer presented. *(Amended 11/19)* **M**

## Section 10  Rights of Listing Brokers in Presentation of Counter-offers  (Policy Statement 7..74)

Listing Participants or their representatives have the right to participate in the presentation of any counter-offer made by a seller or a lessor. They do not have the right to be present at any discussion or evaluation of a counter-offer by the purchaser or lessee (except where the cooperating broker is a sub-agent). However, if a purchaser or lessee gives written instructions to the cooperating broker that the listing broker may not be present when a counter-offer is presented, the listing broker has a right to a copy of those instructions. *(Adopted 11/04)* **M**

## Section 11  Code of Ethics  (Policy Statement 7.5)

Adherence to the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® shall be a privilege and obligation of REALTORS® and REALTOR-ASSOCIATE®s. *(Amended 11/96)* **I**

## Section 12  Arbitration  (Policy Statement 7.4)

Arbitration facilities of an association of REALTORS® may be invoked by a nonmember Participant in the multiple listing service, who can also be compelled to arbitrate using the association's facilities. *(Amended 11/96)* **M**

## Section 13  Lease of MLS Compilations  (Policy Statement 7.78)

MLS Participants are entitled to lease print or electronic copies of MLS compilations in sufficient number to provide the Participant and each authorized individual affiliated with the Participant with one copy of such compilation subject to payment of applicable fees and charges. *(Adopted 11/04)* **M**

### Section 14  Caravans  (Policy Statement 7.2)

Any facility offered by the multiple listing service for the physical viewing of properties listed and filed with the multiple listing service, including MLS caravans and MLS open houses, must be made available to all Participants in the multiple listing service. Nothing herein shall require an owner to use any particular facility for the viewing of his property, including but not limited to caravans and open houses. **M**

### Section 15  Ownership of Listing and Listing Content  (Policy Statement 7.85)

The listing broker owns the listing agreement. Prior to submitting a listing to the MLS, the listing broker should own, or have the authority to license all listing content (e.g., photographs, images, graphics, audio and video recordings, virtual tours, drawings, descriptions, remarks, narratives, pricing information, and other details or information related to listed property) to be published in the MLS compilation of listing information. *(Amended 5/16)*

Use of listings and listing information by MLSs for purposes other than the defined purposes of MLS requires Participants' consent. Such consent cannot be required as a condition of obtaining or maintaining MLS participatory rights. MLSs may presume such consent provided that listing brokers are given adequate prior notice of any intended use unrelated to the defined purpose of MLS, and given the opportunity to affirmatively withhold consent for that use.

Participants cannot be required to transfer any rights (including intellectual property rights) in their listings or listing content to MLS to obtain or maintain participatory rights except that MLSs may require Participants to grant the licenses necessary for storage, reproduction, compiling, and distribution of listings and listing information to the extent necessary to fulfill the defined purposes of MLS. MLSs may also require Participants to warrant that they have the rights in submitted information necessary to grant these rights to MLS. *(Adopted 5/05, Amended 5/16)* **M**

### Section 16  Digital Millennium Copyright Act, Safe Harbor  (Policy Statement 7.99)

The Digital Millennium Copyright Act (DMCA) is a federal copyright law that enhances the penalties for copyright infringement occurring on the Internet. The law provides exemptions or "safe harbors" from copyright infringement liability for online service providers (OSP) that satisfy certain criteria. Courts construe the definition of "online service provider" broadly, which would likely include MLSs as well as Participants and Subscribers hosting an IDX display.

One safe harbor limits the liability of an OSP that hosts a system, network or website on which Internet users may post user-generated content. If an OSP complies with the provisions of this DMCA safe harbor, it cannot be liable for copyright infringement if a user posts infringing material on its website. This protects an OSP from incurring significant sums in copyright infringement damages, as statutory damages are as high as $150,000 per work. For this reason, it is highly recommended that MLSs, Participants and Subscribers comply with the DMCA safe harbor provisions discussed herein.

To qualify for this safe harbor, the OSP must:

1. Designate on its website and register with the Copyright Office an agent to receive takedown requests. The agent could be the MLS, Participant, Subscriber, or other individual or entity.

2. Develop and post a DMCA-compliant website policy that addresses repeat offenders.

3.  Comply with the DMCA takedown procedure. If a copyright owner submits a takedown notice to the OSP, which alleges infringement of its copyright at a certain location, then the OSP must promptly remove allegedly infringing material. The alleged infringer may submit a counter-notice that the OSP must share with the copyright owner. If the copyright owner fails to initiate a copyright lawsuit within ten (10) days, then the OSP may restore the removed material.

4.  Have no actual knowledge of any complained-of infringing activity.

5.  Not be aware of facts or circumstances from which complained-of infringing activity is apparent.

6.  Not receive a financial benefit attributable to complained-of infringing activity when the OSP is capable of controlling such activity.

Full compliance with these DMCA safe harbor criteria will mitigate an OSP's copyright infringement liability. For more information see 17 U.S.C. §512. *(Adopted 11/15)* **I**

### Section 17 Clear Cooperation (Policy Statement 8.0)
Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS Participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public. *(Adopted 11/19)* **M**

### Section 18. Right of Participant to MLS Data Feed of Listing Content (Policy Statement 8.3)
A Multiple Listing Service must, upon request, promptly provide an MLS Participant (or the Participant's designee) a data feed containing, at minimum, all active MLS listing content input into the MLS by or on behalf of the Participant and all of the Participant's off-market listing content available in the MLS system. The delivery charges for the Participant's listing content shall be reasonably related to the actual costs incurred by the MLS. The data feed must be in compliance with RESO Standards as provided for in MLS Policy Statement 7.90.

**Note:** MLSs will not limit the use of the Participant's listing content by the Participant or the Participant's designee. *(Adopted 5/20)* **M**

### Section 19 One Data Source (Policy Statement 8.6)
MLSs must offer a Participant a single data feed in accordance with a Participant's licensed authorized uses.

At the request of a Participant, MLS must provide the single data feed for that Participant's licensed uses to that Participant's designee.  The designee may use the single data feed only to facilitate that Participant's licensed uses on behalf of that Participant. *(Amended 11/21)* **M**

### Section 20 Brokerage Back Office Feed (Policy Statement 8.7)

That Participants are entitled to use, and MLSs must provide to Participants, the BBO Data, for BBO Use subject to the Terms below:

"BBO Data" means all real property listing and roster information in the MLS database, including all listings of all Participants, but excludes (i) MLS only fields (those fields only visible to MLS staff and the listing Participant), and (ii) fields and content to which MLS does not have a sufficient license for use in the Brokerage Back Office Feed.

"BBO Use" means use of BBO Data by Participant and Subscribers affiliated with the Participant for the following purposes:

- Brokerage management systems that only expose BBO Data to Participant and Subscribers affiliated with Participant.

- Customer relationship management (CRM) and transaction management tools that only expose the BBO Data to Participant, Subscribers affiliated with Participant, and their bona fide clients as established under state law.

- Agent and brokerage productivity and ranking tools and reports that only exposes BBO Data to Participant and Subscribers affiliated with Participant.

- Marketplace statistical analysis and reports in conformance with NAR MLS Policy Statement 7.80, which allows for certain public distribution.

BBO Use may only be made by Participant and Subscriber affiliated with Participant, except that at the request of a Participant, MLS must provide BBO Data to that Participant's designee. The designee may use the BBO Data only to facilitate the BBO Use on behalf of that Participant and its affiliated Subscribers.

There is no option for Participants to opt-out their listings from the Brokerage Back Office Feed Use as defined.

"Terms" mean the following:

- MLSs may impose reasonable licensing provisions and fees related to Participant's license to use Brokerage Back Office Feed Data. MLSs may require the Participant's designee to sign the same or a separate and different license agreement from what is signed by the Participant. Such provisions in a license agreement may include those typical to the MLS's data licensing practices, such as security requirements, rights to equitable relief, and dispute resolution terms. (The foregoing examples are not a limitation on the types of provisions an MLS may have in a license agreement.)

- Use of roster information may be limited by the MLS participation agreement and license agreements.

- Brokerage Back Office Feed Use is subject to other NAR MLS policies and local rules.

- MLSs in their reasonable discretion may expand the definition of Brokerage Back Office Feed Use in conformance with other NAR MLS policies, such as Policy Statement 7.85, which provides that "Use of listings and listing information by MLSs for purposes other than the defined purposes of MLS requires Participants' consent." *(Adopted 11/21)* M

# F. Enforcement of Rules

### Section 1. Appropriate Procedures for Rules Enforcement (MLS Policy Statement 7.21)

**Filing Complaints**

When requested by a complainant, MLSs must provide a process for processing complaints without revealing the complainant's identity. If the complaint is forwarded to hearing, then the MLS Committee, Grievance Committee, MLS staff or other representative must serve as the complainant when the original complainant does not consent to participating in the process or the disclosure of his or her name.

**Administrative Sanctions**

In any instance where a Participant in an association multiple listing service is charged with violation of the MLS bylaws or rules and regulations of the service, and such charge does not include alleged violations of the Code of Ethics or the Standards of Conduct for MLS Participants, or a request for arbitration, the MLS may impose administrative sanctions. Recipients of an administrative sanction may request a hearing before the professional standards committee of the association.

MLS Participants and Subscribers can receive no more than three (3) administrative sanctions in a calendar year before they are required to attend a hearing for their actions and potential violations of MLS rules, except that the MLS may allow more administrative sanctions for violations of listing information provided by Participants and Subscribers before requiring a hearing. The MLS must send a copy of all administrative sanctions against a Subscriber to the Subscriber's Participant and the Participant is required to attend the hearing of a Subscriber who has received more than three (3) administrative sanctions within a calendar year.

**Appeals**

If the Participant refuses to accept any sanction or discipline proposed, the circumstances and the discipline proposed shall be appealed to the board of directors of the association of REALTORS® which shall, if it deems the finding of violation proper and the sanction appropriate to the offense, delay the effective date of sanction until final entry by a court of competent jurisdiction in a suit filed by the association for declaratory relief, except in those states where declaratory relief is not available, declaring that the disciplinary action and proposed sanction violates no rights of the multiple listing service Participant.

If the MLS committee has a procedure established to conduct hearings, the decision of the MLS committee may be appealed to the board of directors of the association of REALTORS®. If a separately incorporated MLS has an established procedure for the conduct of hearings, the decisions of the hearing tribunal shall be appealable to the board of directors of the MLS.

**Complaints of Unethical Conduct**

Alleged violations of the Code of Ethics or the Standards of Conduct for MLS Participants shall be referred to the association's grievance committee for processing in accordance with the professional standards procedures of the association. If the charge alleges a refusal to arbitrate, such charge shall be referred directly to the board of directors of the association of REALTORS®. *(Amended 11/20)* **M**

### Section 2  Rules and Regulations

The rules and regulations should be designed to guide Participants but must avoid arbitrary restrictions on business practices. They should be based on experience and not be restrictive upon the personal rights of participating individuals. (Rules and regulations are provided elsewhere in this Handbook for association of REALTORS®' review and adoption.) **R**

### Section 3  The Use of Fines as Part of Rules Enforcement  (Policy Statement 7.22)

Generally, warning, censure, and the imposition of a moderate fine is sufficient to constitute a deterrent to violation of the rules and regulations of the multiple listing service. Suspension or termination is an extreme sanction to be used in cases of extreme or repeated violation of the rules and regulations of the service. **I**

### Section 4  Financial Penalty Not to Exceed $15,000  (Policy Statement 7.89)

Notwithstanding the limitations established in the NATIONAL ASSOCIATION OF REALTORS® Code of Ethics and Arbitration Manual or in other National Association policy, multiple listing services operated as committees of associations of REALTORS® or as separate, wholly-owned subsidiaries of one or more associations of REALTORS® are authorized to impose financial penalties on Participants or Subscribers as discipline for violations of MLS rules or other MLS governance provisions not greater than fifteen thousand ($15,000) dollars. *(Adopted 11/07)* **M**

### Section 5  MLS Disciplinary Guidelines

Associations of REALTORS® and their multiple listing services have the responsibility of fostering awareness, understanding, and appreciation for the duties and responsibilities of MLS Participants and Subscribers, and of receiving and resolving complaints alleging violations of the rules and regulations. The REALTOR® organization is firmly committed to vigorous, fair, and uniform enforcement. Enforcement achieves a number of goals. Where Participants or Subscribers are wrongly or mistakenly charged with violations, the hearing process provides personal and professional vindication. Where violations are determined, enforcement process educates Participants and Subscribers about their duties and obligations, and serves as a meaningful deterrent of future violations.

Allegations of conduct inconsistent with the rules are often viewed by respondents as threats to their professional and personal reputations. This can result not only in their mounting vigorous defenses but also, at times, to threats of legal challenge should a violation be determined and discipline imposed. Given that MLS participation can have significant economic value, associations and their MLSs need to strictly adhere to their established procedures when considering potential violations. This caution ensures that the rights of the parties will be observed, and legal exposure of associations and their MLSs will be minimized.

At the same time, well-founded caution should not be confused with reservation, reluctance, or hesitancy. Rules become aspirations at best, and potentially meaningless, if not enforced with vigor and determination.

Fundamental to fair and consistent enforcement is reasonable and judicious use of discipline, as both an educational device and as punishment. Associations and their MLSs have a wide variety of sanctions available to them that may be imposed for violations. These range from simple letters of warning to termination of MLS rights and privileges. Between these extremes are mandatory attendance at remedial education sessions, financial penalties, probation, and suspension.

The National Association does not recommend specific penalties for certain offenses or for violations of particular rules. This is in deference to the wisdom and autonomy of the hearing panel privy to the details of complaints coming before them; in recognition of the fact that no two complaints are identical; and in view of the facts that the details of each hearing, including the experience of respondents, their history of prior violations, and mitigating or extenuating circumstances, may all come into play in determining an appropriate penalty. At the same time, there are key points to be considered with respect to imposition of discipline.

- Discipline that can be imposed is strictly limited to those forms authorized in the NATIONAL ASSOCIATION OF REALTORS® Code of Ethics and Arbitration Manual and to any additional form authorized by the National Association's board of directors.

- Discipline should be commensurate with the offense. Unintentional or inadvertent violations should result in penalties designed to educate respondents about the conduct expected of them. Only authorized forms of discipline may be utilized.

- Discipline should be progressive. The disciplinary emphasis on violations by new members or by long-standing members with no history of prior violations should be primarily educational. Repeated or subsequent violations should be addressed with more serious forms of discipline, including substantial fines, suspension, and termination of MLS rights and privileges.

- A gray area can exist with respect to "first time violations" that are clearly not the result of ignorance or mistake but rather demonstrate flagrant disregard for the rules. While the educational aspect of enforcement cannot be disregarded, the fact that the rules exist to protect clients and customers, the public, and to ensure effective, efficient functioning of the MLS, must also be considered in determining commensurate discipline.

- Mitigating or extenuating circumstances should be considered in determining appropriate discipline. The fact that a respondent recognizes or acknowledges inappropriate conduct or took steps to remediate or minimize harm or injury, should be considered in determining appropriate discipline.

- Respondent's records of earlier violations or, conversely, the fact that they have not violated the rules in the past, can be considered in determining appropriate discipline. Hearing panels cannot consider past violations in deciding whether the conduct currently complained of violates the rules.

Crafting appropriate, meaningful discipline can challenge panels that have concluded the rules have been violated. This discussion is offered as guidance, rather than as a hard and fast template, to assist panels in meeting their responsibility in ensuring the rules' viability and vitality through vigorous and evenhanded enforcement.

## Progressive Discipline

Discipline imposed for violation of the rules should be progressive. The severity of discipline should increase incrementally for subsequent violations. The disciplinary emphasis where first time violations occur should be primarily educational. Repeated or subsequent violations should result in more serious forms of discipline being utilized, including substantial fines, suspension, and termination of MLS rights and privileges. At the same time, a gray area can exist where a first-time violation is not attributable to ignorance or oversight, but rather to blatant disregard for the rules. While the educational emphasis of enforcement cannot be disregarded, the fact the rules exist to protect clients and customers, the public, and to ensure the effective, efficient functioning of the MLS must be carefully considered in determining appropriate discipline.

Factors hearing panels should consider in determining appropriate discipline include, but are not necessarily limited to:

• The nature of the violation

• Harm caused by the violation. Was the violation a minor mistake causing little or no harm or, alternatively, was a client, customer, member of the public, or another Participant harmed?

• Was the violation inadvertent or unintentional or, conversely, was it the result of knowing disregard for the obligations of MLS Participants and Subscribers?

• How much real estate experience did the violator have? Did he, or should he, have known better?

• Has the violator been found in violation of the rules previously? How often? How recently? Is the current violation related or similar to earlier violations?

• Are there mitigating or extenuating circumstances that should be considered in determining appropriate discipline?

• Did the violator acknowledge the violation? Did the violator express remorse or contrition?

• Are there other factors that ought to be considered? *(Adopted 11/07)* l

## Administrative Sanctions

The following is guidance for issuing administrative sanctions for MLS rule violations:

• **Category 1** violation means a rule violation relating to listing information provided by a Participant or Subscriber.

• **Category 2** violation means a rule violation relating to IDX and VOW displays.

• **Category 3** violation means a rule violation relating to cooperation with a fellow Participant or Subscriber, and mandatory submission of listings to the service

**First Category 1 violation** (or first violation within three [3] years):

Possible discipline:
• Letter of warning
• Fine of $500 or less
• Attendance at relevant education session
Any combination of the above

**Repeat Category 1 violation** (within three [3] years):

Possible discipline:
• Attendance at relevant education session(s) or course
• Fine of $2,000 or less
Any combination of the above

**First Category 2 violation** (or first violation within three [3] years):

Possible discipline
• Letter of reprimand
• Fine of $2,000 or less
• Attendance at relevant education session(s)
Any combination of the above

**Repeat Category 2 violation** (within three [3] years):

Possible discipline:
• Attendance at relevant education session(s) or course
• Fine of $10,000 or less
• Suspension from the MLS or from the MLS' lockbox key access for three (3) months or less
Any combination of the above

**First Category 3 violation** (or first violation within three [3] years):

Possible discipline:
• Letter of reprimand
• Fine of $10,000 or less
• Attendance at relevant education session(s)
• Suspension from MLS or from use of the MLS' lockbox key access for ninety (90) days or less
Any combination of the above

**Repeat Category 3 violation** (within three [3] years):

Possible discipline:
• Attendance at relevant education session(s) or course
• Fine of $15,000 or less
• Suspension from MLS or from use of the MLS' lockbox key access for six (6) months or less
• Termination from MLS or from use of the MLS' lockbox key access for 1 to 3 years
Any combination of the above

MLSs are encouraged to use the MLS Schedule of Fines Table provided in Appendix 4 to establish standardized administrative sanctions for violations of the MLS rules.

## Scope of MLS Handbook for addressing MLS Rule Violations

Potential violations of the MLS rules will be processed in accordance with MLS Policy Statement 7.21, and under the process provided for in Section 9 of the NAR model MLS Rules and Regulations. Potential violations of a data license agreement are not governed by NAR policy and will thus follow the terms for resolution in the agreement itself. *(Amended 11/20)* I

# G. No Compensation Offers in MLS

**Section 1 No Offers of Compensation in MLS (Policy Statement 8.11)**

The MLS must not accept listing containing an offer of compensation in the MLS to other MLS Participants and Subscribers.  Further, the MLS may not create, facilitate, or support any non-MLS mechanism (including by providing listing information to an internet aggregator's website for such purpose) for Participants, Subscribers, or sellers to make offers of compensation to buyer brokers or other buyer representatives.

Use of MLS data or data feeds to directly or indirectly establish or maintain a platform of offers of compensation from multiple brokers to buyer brokers or other buyer representatives is prohibited and must result in the MLS terminating that Participant's access to any MLS data and data feeds.

The multiple listing service must not have a rule requiring the listing broker to disclose the amount of total negotiated commission in his listing contract, and the multiple listing service must not publish the total negotiated commission on a listing which has been submitted to the MLS by a Participant. The multiple listing service must prohibit disclosing in any way the total commission negotiated between the seller and the listing broker, or total broker compensation (i.e. combined compensation to both listing broker and buyer brokers).

**Note 1:**

Multiple listing services must give Participants the ability to disclose to other Participants any potential for a short sale. As used in MLS rules, short sales are defined as a transaction where title transfers, where the sales price is insufficient to pay the total of all liens and costs of sale, and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies. Multiple listing services may, as a matter of local discretion, require Participants to disclose short sales when Participants know a transaction is a potential short sale.  (*Amended 8/24*) **M**

**Section 2  Agency  (Policy Statement 7.11)**
In the multiple listing service of an association of REALTORS®, the cooperating broker in a cooperative real estate transaction is the subagent of the listing broker, the agent of the buyer, or is acting in another recognized agency or nonagency capacity. Such relationships must be fully disclosed to all parties to the contract and to all brokers involved. *(Amended 11/96)* **I**

**Section 3  Required Consumer Disclosure (Policy Statement 8.12)**

**Disclosure of Compensation: MLS Participants and Subscribers must:**

1. Disclose to prospective sellers and buyers that broker compensation is not set by law and is fully negotiable. This must be included in conspicuous language as part of any listing agreement, buyer written agreement, and pre-closing disclosure documents (if any).

2. Conspicuously disclose in writing to sellers, and obtain the seller's authority, for any payments or offer of payment that the listing Participant or seller will make to another broker, agent, or other representative (e.g. real estate attorney) acting for buyers. This disclosure must include the amount or rate of any such payment and be made in writing in advance of any payment or agreement to pay. *(Adopted 8/24)* **M**

**Section 4  Written Buyer Agreements Required (Policy Statement 8.13)**

Unless inconsistent with state or federal law or regulation, all MLS Participants working with a buyer must enter into a written agreement with the buyer prior to touring a home. The written agreement must include:

a. a specific and conspicuous disclosure of the amount or rate of compensation the Participant will receive or how this amount will be determined, to the extent that the Participant will receive compensation from any source.
b. the amount of compensation in a manner that is objectively ascertainable and not open-ended.
c. a term that prohibits the Participant from receiving compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer; and
d. a conspicuous statement that broker fees and commissions are not set by law and are fully negotiable. *(Adopted 8/24)* **M**

# H. Lock Box/Key Repositories

### Section 1  Lock Box Security Requirements  (Policy Statement 7.31)

Eligibility for coverage under NAR's blanket errors and omissions insurance program is contingent on compliance with the following security measures whether the system is operated by the association, its MLS, or by a recognized lock-box vendor on behalf of an association or MLS: *(Amended 5/17)*

1. **Types of keys.** Any physical or electronic key, programmer, or other device (hereinafter referred to as key) by which a lockbox can be opened, must be non-duplicative. Being non-duplicative means that it cannot be readily copied in the manner that other types of keys ordinarily are. *(Amended 5/17)*

A mobile device (such as, a smart phone, tablet, fob, etc.) can transmit a key to access a lockbox using standard protocols, including, Bluetooth, ZigBee, infrared technology, and others. The applications and software used by mobile devices must contain security controls to allow only authorized users access to the lockbox. *(Adopted 5/17)*

As a matter of local discretion, the listing broker or agent can issue temporary codes/access to the lockbox and property on terms and conditions agreed to in advance by the seller. Temporary codes/access must expire within seventy-two (72) hours after being issued or must be under the control of the listing broker or agent. Temporary codes must be a minimum field size of five (5) characters. *(XX,XXX) (Adopted 5/17)*

2. **Security protocols.** Keys must be obtained from the original manufacturer, from a recognized vendor of lockbox systems or from any other legitimate source. Prior to utilizing previously used keys, lids, or boxes, associations and MLSs must obtain sufficient information from the original manufacturer and surrounding associations and MLSs in order to determine whether the key's pattern, code, or configuration is already in use. *(Amended 5/17)*

Electronic lockboxes and electronic keys running on mobile devices must incorporate security protocols to prevent the following types of cyber-attacks:

- where an unauthorized user can override or escalate their security credentials

- where the communication session between the electronic lockbox and key are recorded and played back later to gain unauthorized access

- forging of electronic credentials that could allow an unauthorized user the ability to masquerade as an authorized user

- digitally signed updates to electronic keys running on mobile devices or electronic lockbox firmware plus a secured update process to prevent unauthorized software from being introduced into the lockbox system

- transmission(s) of frequencies to deceive the lockbox electronics into opening *(Adopted 5/17)*

3. **Availability of lockbox system and keys.** Any lockbox system must be designated as either an activity of an association of REALTORS® or an association-owned and operated MLS. *(Amended 5/17)*

If the lockbox system is an activity of an association of REALTORS®, then every REALTOR® and REALTOR-ASSOCIATE® and every non-principal broker, sales licensee and licensed or certified appraiser affiliated with a REALTOR®, shall be eligible to hold a key subject to their execution of a lease agreement with the association. *(Amended 11/96)*

If the lockbox system is an activity of an association-owned and operated MLS, then every MLS Participant and every non-principal broker, sales licensee and licensed or certified appraiser who is affiliated with an MLS Participant and who is legally eligible for MLS access shall be eligible to hold a key subject to their execution of a lease agreement with the MLS. *(Amended 5/17)*

As a matter of local discretion, associations and MLSs can determine that key lease agreements executed by non-principal brokers, sales licensees, unlicensed personal assistants, administrative and clerical staff, and licensed, certified, or those seeking to be licensed or certified as appraisers, must also be cosigned by the designated REALTOR® or the office's broker of record. Lease agreements shall spell out the responsibilities of the parties and shall incorporate by reference any applicable rules or regulations or other governing provisions of the association or MLS that relate to the operation of the lockbox system. The lease agreement shall also provide that keys may not be used under any circumstances by anyone other than the keyholder, except as provided elsewhere in this statement of policy. *(Amended 5/17)*

Associations and MLSs may, at their discretion, lease keys to affiliate members of associations who are actively engaged in a recognized field of real estate practice or in related fields. In such instances, the lease agreement shall be signed by the keyholder and by a principal, partner, or corporate officer of the keyholder's firm. *(Adopted 5/17)*

Individuals may be required to pay lockbox costs as part of association dues or as part of MLS participation fees pursuant to MLS Policy Statement 7.57, Categorization of MLS Services, Information, and Products and pursuant to NAR Bylaws Official Interpretation #32. No one shall be required to lease a key from the association except on a voluntary basis. *(Adopted 5/17)*

Associations and MLSs may refuse to sell or lease lockbox keys, may terminate existing key lease agreements, and may refuse to activate or reactivate any key held by an individual who has been convicted of a crime within the past seven (7) years under the following circumstances: *(Amended 5/17)*

A. The association or MLS determines that the conviction(s) relates to the real estate business or puts clients, customers, other real estate professionals, or property at risk, for example through dishonest, deceptive, or violent acts; and *(Amended 5/17)*

B. The association or MLS gives the individual an opportunity to provide and the association or MLS must consider mitigating factors related to the individual's criminal history, including, but not limited to, factors such as:

   i)    the individual's age at the time of the conviction(s)

   ii)    nature and seriousness of the crim

   iii)   extent and nature of past criminal activity

   iv)   time elapsed since criminal activity was engaged in

   v)    rehabilitative efforts undertaken by the applicant since the conviction(s)

    vi)  facts and circumstances surrounding the conviction(s) and

    vii)  evidence of current fitness to practice real estate *(Amended 5/17)*

Associations and MLSs should be sure to evaluate individuals uniformly, and avoid making exceptions for one individual while denying an exception to another individual with a similar criminal history. *(Amended 5/17)*

Associations or MLSs may suspend the right of lockbox keyholders to use lockbox keys following their arrest and prior to a final determination on any such charge if, in the determination of the association or MLS, the charge relates to a crime that relates to the real estate business or puts clients, customers, other real estate professionals, or property at risk. *(Amended 5/17)*

4.   **Audit requirement.** Associations or MLSs shall maintain current records as to all keys issued and in inventory, including registered users accessing lockboxes through applications and software used by mobile devices. There shall be an audit, at least annually, of all keys, whether issued or in inventory. This requirement may be satisfied by a physical inventory or by receipt of a statement signed by the keyholder and the designated REALTOR®, broker of record, or, in the case of an affiliate member, by a principal, partner, or corporate officer of the keyholder's firm, attesting that the key is currently in possession of the keyholder. *(Amended 5/17)*

5.   **Seller authority required.** Lockboxes may not be placed on a property without written authority from the seller. This authority may be established in the listing contract or any other written document. Inclusion in MLS compilations cannot be required as a condition of placing lockboxes on listed property. *(Amended 5/17)*

6.   **Reporting missing keys.** Associations or MLSs must charge keyholders and their cosignatories with the joint obligation of immediately reporting lost, stolen, or otherwise unaccountable for keys to the association or MLS. Upon receipt of notice, the association or MLS must take any steps deemed necessary to resecure the system. *(Amended 5/17)*

7.   **Rules and procedures governing lockbox systems.** Associations or MLSs must adopt written, reasonable, and appropriate rules and procedures for administration of lockbox systems which may include appropriate fines, not to exceed $15,000. Any issuing fees, recurring fees, or other administrative costs shall be established at the discretion of the association or MLS and set forth in the rules and procedures. All keyholders, whether or not they are association members or MLS Participants, shall agree, as a condition of the key lease agreement, to be bound by the rules and procedures governing the operation of the lockbox system. *(Amended 5/17)*

Key lease agreements may contain a liquidated damages provision to offset some or all of the costs in reestablishing the security of the system if it is determined that the security has been compromised through the negligence or fault of the keyholder. *(Amended 11/97)*

8. **Issuing electronic programmers or keypads on temporary basis.** In the event electronic lockbox programmers or keypads are sold or leased, a designated REALTOR® principal or an office's broker of record may purchase or lease additional programmers or keypads to be issued on a temporary basis to other keyholders in the same office in the event their programmer or keypad becomes non-functional outside normal business hours or under circumstances where a replacement programmer or keypad is not reasonably available from the issuing association or MLS. When a programmer or keypad is issued on a temporary basis, it shall be the responsibility of the REALTOR® principal or the broker of record to advise the association or MLS in writing that the programmer or keypad has been issued, to whom, and the date and time of issuance within forty-eight (48) hours. It shall also be the responsibility of the REALTOR® principal or the broker of record to advise the association or MLS in writing within two (2) business days after possession of the previously issued programmer or keypad has been reassumed. *(Amended 5/17)*

9. **Requiring "approved" lockbox systems.** As a matter of local discretion, associations and MLSs may require placement of an "approved" lockbox on listed properties if any device giving access to real estate professionals or service providers is authorized by the seller and occupant and is placed on the property. The purpose of this requirement, if adopted by an association or MLS, is to ensure cooperating Participants and Subscribers have timely access to listed properties. Requiring that a lockbox or other access device be "approved" does not limit the devices that satisfy the requirement to lockboxes leased or sold by an association or MLS. The association or MLS may require that the devices be submitted in advance for approval, and the access device may be any lockbox or other access device that provides reasonable, timely access to listed property. The association or MLS also may revoke the approval or subject the Participant to discipline if the device is used in a manner that fails to continue to satisfy this requirement. *(Amended 05/17)*

## Section 2  Lock Box Key Deposits  (Policy Statement 7.32)

Any funds accepted by a member association or association MLS as deposits for lock box keys shall be retained by the association or its MLS in a separate account so that the funds will be available to be refunded to depositors upon return of the lock box key to the association or its MLS. The funds deposited are to be retained for this purpose only and are not to be utilized in any other manner. The separate fund may be an interest bearing account with the interest retained by the association or association MLS unless as a requirement of law, or at the discretion of the association or association MLS, such interest shall be paid to the depositors. **M**

## Section 3  Centralized Key Repositories  (Policy Statement 7.46)

A centralized key repository is defined as a system operated by an association multiple listing service which enables an MLS Participant to place keys to listed properties in a central location to be made available to other Participants and their affiliated licensees to facilitate the showing of listed properties. Under certain circumstances and subject to strict operational rules and regulations, an association multiple listing service may choose to operate a centralized key repository in lieu of a lock box system and still be eligible for coverage under the errors and omissions insurance program of the NATIONAL ASSOCIATION OF REALTORS®. *(Approved 2/86)* **I**

**Section 4  Minimum Security Measures for Centralized Key Repositories of Association Multiple Listing Services (Policy Statement 7.47)**

1.  A centralized key repository is defined as a system operated by a multiple listing service which enables a Participant to place keys to listed property in a central location to be made available to other Participants and their affiliated sales licensees to facilitate the showing of listed property.

2.  Use of the system must be strictly limited to Participants and their affiliated sales licensees.

3.  Keys to listed property may not be submitted unless the property is exclusively listed by the Participant and the listing agreement includes a provision whereby the seller specifically authorizes the listing Participant to place keys in the system. In lieu of such authorization in the listing agreement, the MLS may require the seller's authorization be provided on a separate document prepared by the MLS.

4.  All keys to listed property must be stored in a locked, secure area in the association or MLS office.

5.  All keys become the property of the association or MLS.

6.  No key may be issued without the consent of the listing office. Any individual requesting a key must indicate, in writing, who in the listing office has authorized the showing.

7.  All keys must be coded in a manner which prevents their identification with a particular property until issued by an authorized representative of the association or MLS.

8.  Lost or stolen keys must be reported to the association or MLS as quickly as possible.

9.  A police report must be filed as quickly as possible whenever a key is lost or stolen.

10. Any person losing a key must immediately advise the property owner and the listing broker and offer to have all necessary locks changed as quickly as possible.

11. The issuance of keys must be discontinued immediately upon request of the seller.

12. Keys must be issued for a specified period of time and failure to return a key within the allotted time shall be considered as a violation of the rules or procedures. When a key is more than twenty-four (24) hours overdue, the association or MLS must contact the person to whom the key was issued and the principal broker or branch manager of the firm to confirm the key has not been lost or stolen and to request its immediate return.

13. Keys must be destroyed upon expiration of the listing or upon closing (whichever occurs first) or earlier at the direction of the listing Participant.

14. All rules and procedures for the operation of any centralized key repository must be in writing and be submitted to the National Association for review and approval prior to implementation.

15. Any association member or employee involved in the administration or operation of the system shall be bonded. **M**

# I. Virtual Office Websites: Policy Governing Use of MLS Data in Connection with Internet Brokerage Services Offered by MLS Participants

**Virtual Office Websites (VOW) Policy (Policy Statement 7.91)**

## I. Definitions and Scope of Policy

1. For purposes of this policy, the term "Virtual Office Website" (VOW) refers to a Participant's Internet website, or a feature of a Participant's Internet website, through which the Participant is capable of providing real estate brokerage services to consumers with whom the Participant has first established a broker-consumer relationship (as defined by state law) where the consumer has the opportunity to search MLS data, subject to the Participant's oversight, supervision, and accountability.

   a. A Participant may designate an "Affiliated VOW Partner" (AVP) to operate a VOW on behalf of the Participant, subject to the Participant's supervision and accountability and the terms of this policy.

   b. A non-principal broker or sales licensee affiliated with a Participant may, with the Participant's consent, operate a VOW or have a VOW operated on its behalf by an AVP. Such a VOW is subject to the Participant's supervision and accountability and the terms of this policy.

   c. Each use of the term "Participant" in this policy shall also include a Participant's non-principal brokers and sales licensees (with the exception of references in this section to the "Participant's consent" and the "Participant's supervision and accountability," and in Section III.10.a., below, to the "Participant acknowledges"). Each reference to VOW or VOWs herein refers to all VOWs, whether operated by a Participant, by a non-principal broker or sales licensee, or by an AVP.

2. The right to display listings in response to consumer searches is limited to display of MLS data supplied by the MLS(s) in which the Participant has participatory rights. This does not preclude a firm with offices participating in different MLSs from operating a master website with links to such offices' VOWs.

3. Participants' Internet websites, including those operated for Participants by AVPs, may also provide other features, information, or services, in addition to VOWs (including the "Internet Data Exchange" [IDX] function).

4. The display of listing information on a VOW does not require separate permission from the Participant whose listings will be available on the VOW.

5. Except as permitted in Sections III. and IV., MLSs may not adopt rules or regulations that conflict with this policy or that otherwise restrict the operation of VOWs by Participants.

## II. Policies Applicable to Participants' VOWs

1. A Participant may provide brokerage services via a VOW that include making MLS active listing data available, but only to consumers with whom the Participant has first established a lawful consumer-broker relationship, including completion of all actions required by state law in connection with providing real estate brokerage services to clients and customers (hereinafter "Registrants"). Such actions shall include, but are not limited to, satisfying all applicable agency, non-agency, and other disclosure obligations, and execution of any required agreement(s).

2. A Participant's VOW must obtain the identity of each Registrant and obtain each Registrant's agreement to terms of use of the VOW, as follows.

   a. A Registrant must provide his or her name and a valid e-mail address. The Participant must send an e-mail to the address provided by the Registrant confirming that the Registrant has agreed to the terms of use (described in Subsection c., below). The Registrant may be permitted to access the VOW only after the Participant has verified that the e-mail address provided is valid and that Registrant received the terms of use confirmation.

   b. The Registrant must supply a user name and a password, the combination of which must be different from those of all other Registrants on the VOW, before being permitted to search and retrieve information from the MLS database via the VOW. The user name and password may be established by the Registrant or may be supplied by the Participant, at the option of the Participant. An e-mail address may be associated with only one user name and password. The Registrant's password and access must expire on a date certain, but may be renewed. The Participant must, at all times, maintain a record of the name and e-mail address supplied by the Registrant, and the user name and current password of each Registrant. Such records must be kept for not less than one hundred eighty (180) days after the expiration of the validity of the Registrant's password. If the MLS has reason to believe that a Participant's VOW has caused or permitted a breach in the security of the data or a violation of MLS rules related to use by one or more Registrants, the Participant shall, upon request, provide to the MLS a copy of the record of the name, e-mail address, user name, current password, and audit trail, if required, of any Registrant identified by the MLS to be suspected of involvement in the violation.

   c. The Registrant must be required affirmatively to express agreement to a "terms of use" provision that requires the Registrant to open and review an agreement that provides at least the following:

      i. that the Registrant acknowledges entering into a lawful consumer-broker relationship with the Participant

      ii. that all data obtained from the VOW is intended only for the Registrant's personal, non-commercial use

      iii. that the Registrant has a bona fide interest in the purchase, sale, or lease of real estate of the type being offered through the VOW

     iv.    that the Registrant will not copy, redistribute, or retransmit any of the data or information provided, except in connection with the Registrant's consideration of the purchase or sale of an individual property

     v.    that the Registrant acknowledges the MLS' ownership of and the validity of the MLS' copyright in the MLS database

After the Registrant has opened for viewing the terms of use agreement, a mouse click is sufficient to acknowledge agreement to those terms. The terms of use agreement may not impose a financial obligation on the Registrant or create any representation agreement between the Registrant and the Participant.

The terms of use agreement shall also expressly authorize the MLS and other MLS Participants or their duly authorized representatives to access the VOW for the purposes of verifying compliance with MLS rules and monitoring display of Participants' listings by the VOW.

    d.    An agreement entered into at any time between the Participant and Registrant imposing a financial obligation on the Registrant or creating representation of the Registrant by the Participant must be established separately from the terms of use, must be prominently labeled as such, and may not be accepted solely by mouse click.

3.    A Participant's VOW must prominently display an e-mail address, telephone number, or specific identification of another mode of communication (e.g., live chat) by which a consumer can contact the Participant to ask questions or get more information about properties displayed on the VOW. The Participant or a non-principal broker or sales licensee licensed with the Participant must be willing and able to respond knowledgeably to inquiries from Registrants about properties within the market area served by that Participant and displayed on the VOW.

4.    A Participant's VOW must protect the MLS data from misappropriation by employing reasonable efforts to monitor for and prevent scraping or other unauthorized accessing, reproduction, or use of the MLS database.

5.    A Participant's VOW must comply with the following additional requirements.

    a.    No VOW shall display the listing or property address of any seller who has affirmatively directed its listing broker to withhold its listing or property address from display on the Internet. The listing broker or agent shall communicate to the MLS that a seller has elected not to permit display of the listing or property address on the Internet. Notwithstanding the foregoing, a Participant who operates a VOW may provide to consumers via other delivery mechanisms, such as e-mail, fax, or otherwise, the listing or property address of a seller who has determined not to have the listing or address for its property displayed on the Internet.

    b.    A Participant who lists a property for a seller who has elected not to have the property listing or the property address displayed on the Internet shall cause the seller to execute a document that conforms to the form attached to this policy as Appendix A. The Participant shall retain such forms for at least one (1) year from the date they are signed.

    c.    With respect to any VOW that:

     i.    allows third parties to write comments or reviews about particular listings or displays a hyperlink to such comments or reviews in immediate conjunction with particular listings, or

     ii.   displays an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing, the VOW shall disable or discontinue either or both of those features as to the seller's listing at the request of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all Participants' websites. Except for the foregoing and subject to Subsection d., below, a Participant's VOW may communicate the Participant's professional judgment concerning any listing. Nothing shall prevent a VOW from notifying its customers that a particular feature has been disabled at the request of the seller.

   d.   A VOW shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the VOW operator beyond that supplied by the MLS and that relates to a specific property displayed on the VOW. The VOW operator shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for that property explaining why the data or information is false. However, the VOW operator shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment.

   e.   Each VOW shall refresh MLS data available on the VOW not less frequently than every three (3) days.

   f.   Except as provided elsewhere in this policy or in MLS rules and regulations, no portion of the MLS database may be distributed, provided, or made accessible to any person or entity.

   g.   Every VOW must display a privacy policy that informs Registrants of the ways in which information obtained from them will be used.

   h.   A VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, or type of property. *(Amended 11/21)* **O**

6.   A Participant who intends to operate a VOW must notify the MLS of its intention to establish a VOW and must make the VOW readily accessible to the MLS and to all MLS Participants for purposes of verifying compliance with this policy and any other applicable MLS rules or policies.

7.   A Participant may operate more than one VOW itself or through an AVP. A Participant who operates a VOW itself shall not be precluded from also operating VOWs in conjunction with AVPs.

## III. Policies Applicable to Multiple Listing Services

1.  A multiple listing service shall permit MLS Participants to operate VOWs or to have VOWs operated for them by AVPs, subject to the requirements of state law and this policy.

2.  An MLS shall, if requested by a Participant, provide basic downloading of all MLS non-confidential listing data, including, without limitation, address fields, listing types, photographs, and links to virtual tours. Confidential data includes only that which Participants are prohibited from providing to customers orally and by all other delivery mechanisms. They include fields containing the information described in Section IV.1. of this policy, provided that sales prices may be deemed confidential and withheld from display. For purposes of this policy, downloading means electronic transmission of data from MLS servers to a Participant's or AVP's server on a persistent basis. An MLS may also offer a transient download. In such case, it shall also, if requested, provide a persistent download, provided that it may impose on users of such download the approximate additional costs incurred by it to do so. *(Amended 5/21)*

3.  This policy does not require an MLS to establish publicly accessible sites displaying Participants' listings.

4.  If an MLS provides a VOW-specific feed, that feed must include all of the non-confidential data included in the feed described in Subsection 2., above, except for listings or property addresses of sellers who have elected not to have their listings or addresses displayed on the Internet.

5.  An MLS may pass on to those Participants who will download listing information the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity to enable such Participants to operate VOWs.

6.  An MLS may require that Participants:

    a.  utilize appropriate security protection, such as firewalls, as long as such requirement does not impose security obligations greater than those employed concurrently by the MLS, and/or

    b.  maintain an audit trail of Registrants' activity on the VOW and make that information available to the MLS if the MLS has reason to believe that any VOW has caused or permitted a breach in the security of the data or a violation of applicable MLS rules.

7.  An MLS may not prohibit or regulate display of advertising or the identification of entities on VOWs (branding or co-branding), except to prohibit deceptive or misleading advertising or co-branding. For purposes of this provision, co-branding will be presumed not to be deceptive or misleading if the Participant's logo and contact information (or that of at least one Participant, in the case of a VOW established and operated by or for more than one Participant) is displayed in immediate conjunction with that of every other party, and the logo and contact information of all Participants displayed on the VOW is as large as the logo of the AVP and larger than that of any third party.

8. Except as provided in this policy, an MLS may not prohibit Participants from enhancing their VOWs by providing information obtained from sources other than the MLS, additional technological services (such as mapping functionality), or information derived from non-confidential MLS data (such as an estimated monthly payment derived from the listed price), or regulate the use or display of such information or technological services on any VOW.

9. Except as provided in generally applicable rules or policies (such as the REALTORS® Code of Ethics), an MLS may not restrict the format of data display on a VOW or regulate the appearance of VOWs.

10. Subject to the provisions below, an MLS shall make MLS listing data available to an AVP for the exclusive purpose of operating a VOW on behalf of a Participant. An MLS shall make MLS listing data available to an AVP under the same terms and conditions as those applicable to Participants. No AVP has independent participation rights in the MLS by virtue of its right to receive data on behalf of a Participant or the right to use MLS data, except in connection with operation of a VOW for a Participant. AVP access to MLS data is derivative of the rights of the Participant on whose behalf the AVP is downloading data.

   a. A Participant, non-principal broker or sales licensee, or AVP may establish the AVP's right to receive and use MLS data by providing to the MLS a writing in which the Participant acknowledges its or its non-principal broker's or sales licensee's selection of the AVP to operate a VOW on its behalf.

   b. An MLS may not charge an AVP, or a Participant on whose behalf an AVP operates a VOW, more than a Participant that chooses to operate a VOW itself (including any fees or costs associated with a license to receive MLS data, as described in Subsection g., below), except to the extent that the MLS incurs greater costs in providing listing data to the AVP than the MLS incurs in providing listing data to a Participant.

   c. An MLS may not place data security requirements or restrictions on use of MLS listing data by an AVP that are not also imposed on Participants.

   d. An MLS must permit an AVP to download listing information in the same manner (e.g., via a "Real Estate Transaction Standard" [RETS] feed or via a "File Transfer Protocol" [FTP] download), at the same times and with the same frequency that the MLS permits Participants to download listing information.

   e. An MLS may not refuse to deal directly with an AVP in order to resolve technical problems with the data feed. However, the MLS may require that the Participant on whose behalf the AVP is operating the VOW participate in such communications if the MLS reasonably believes that the involvement of the Participant would be helpful in order to resolve the problem.

   f. An MLS may not condition an AVP's access to a data feed on the financial terms on which the AVP provides the site for the Participant.

   g. An MLS may require Participants and AVPs to execute license or similar agreements sufficient to ensure that Participants and AVPs understand and agree that data provided by the MLS may be used only to establish and operate a VOW on behalf of the Participant and not for any other purpose.

h.  An MLS may not:

    i.  prohibit an AVP from operating VOWs on behalf of more than one Participant, and several Participants may designate an AVP to operate a single VOW for them collectively,

    ii.  limit the number of entities that Participants may designate as AVPs for purposes of operating VOWs, or

    iii.  prohibit Participants from designating particular entities as AVPs, except that, if an AVP's access has been suspended or terminated by an MLS, that MLS may prevent an entity from being designated an AVP by another Participant during the period of the AVP's suspension or termination.

i.  Except as stated below, an MLS may not suspend or terminate an AVP's access to data:

    i.  for reasons other than those that would allow an MLS to suspend or terminate a Participant's access to data, or

    ii.  without giving the AVP and the associated Participant(s) prior notice and the process set forth in the applicable provisions of the MLS rules for suspension or termination of a Participant's access.

Notwithstanding the foregoing, an MLS may immediately terminate an AVP's access to data:

    i.  if the AVP is no longer designated to provide VOW services to any Participant,

    ii.  if the Participant for whom the AVP operates a VOW ceases to maintain its status with the MLS,

    iii.  if the AVP has downloaded data in a manner not authorized for Participants and that hinders the ability of Participants to download data, or

    iv.  if the associated Participant or AVP has failed to make required payments to the MLS in accordance with the MLS' generally applicable payment policies and practices.

11.  An MLS may not prohibit, restrict, or impede a Participant from referring Registrants to any person or from obtaining a fee for such referral.

# IV. Requirements that MLSs May Impose on the Operation of VOWs and Participants

1. An MLS may impose any, all, or none of the following requirements on VOWs, but may impose them only to the extent that equivalent requirements are imposed on Participants' use of MLS listing data in providing brokerage services via all other delivery mechanisms.

   a. A Participant's VOW may not make available for search by or display to Registrants the following data, intended exclusively for other MLS Participants and their affiliated licensees:

      i. expired, withdrawn, or pending listings

      ii. sales price on sold data if the actual sales price of completed transactions is not accessible from public records *(Amended 5/21)*

      iii. the type of listing agreement, i.e., exclusive-right-to-sell or exclusive agency

      iv. the seller(s) and occupant(s) name(s), phone number(s) and e-mail address(es), where available

      v. instructions or remarks intended for cooperating brokers only, such as those regarding showing or security of the listed property

   b. The content of MLS data that is displayed on a VOW may not be changed from the content as it is provided in the MLS. MLS data may be augmented with additional data or information not otherwise prohibited from display as long as the source of such other data or information is clearly identified. This requirement does not restrict the format of MLS data display on VOWs or display of fewer than all of the listings or fewer authorized data fields.

   c. There shall be a notice on all MLS data displayed indicating that the data is deemed reliable, but is not guaranteed accurate by the MLS. A Participant's VOW may also include other appropriate disclaimers necessary to protect the Participant and/or the MLS from liability.

   d. Any listing displayed on a VOW shall identify the name of the listing firm, and the email or phone number provided by the listing Participant in a readily visible color, and reasonably prominent location, and in typeface not smaller than the median typeface used in the display of listing data. *(Amended 11/21)*

   e. The number of current or, if permitted, sold listings that Registrants may view, retrieve, or download on or from a VOW in response to an inquiry may be limited to a reasonable number. Such number shall be determined by the MLS, but in no event may the limit be fewer than five hundred (500) listings or fifty percent (50%) of the listings in the MLS, whichever is less. *(Amended 11/17)*

   f. Any listing displayed on a VOW shall identify the name of the listing agent.

2. An MLS may also impose the following other requirements on the operation of VOWs.

a.  Participants displaying other brokers' listings obtained from other sources, e.g., other MLSs, non-participating brokers, etc., shall display the source from which each such listing was obtained.

b.  A maximum period, no shorter than ninety (90) days and determined by the MLS, during which Registrants' passwords are valid, after which such passwords must be changed or reconfirmed.

3.  An MLS may not prohibit Participants from downloading and displaying or framing listings obtained from other sources, e.g., other MLSs or from brokers not participating in that MLS, etc., but may require either:

a.  that such information be searched separately from listings obtained from other sources, including other MLSs, or

b.  if such other sources are searched in conjunction with searches of the listings available on the VOW, that any display of listings from other sources identify such other source.

## V. Effective Date

MLSs have until not later than February 16, 2009 to adopt rules implementing the foregoing policies and to comply with the provisions of Section III., above, and Participants shall have until not later than one hundred eighty (180) days following adoption and implementation of rules by an MLS in which they participate to cause their VOW to comply with such rules.

See Appendix A for Seller Opt-out Form.

<p style="color:red; text-align:center"><b>Appendix A</b></p>

<p style="text-align:center"><b>Seller Opt-out Form</b></p>

## Seller Opt-out Form

1.   Check one.

     a.   ☐ I have advised my broker or sales agent that I do not want the listed property to be displayed on the Internet.

     b.   ☐ I have advised my broker or sales agent that I do not want the address of the listed property to be displayed on the Internet.

2.   I understand and acknowledge that if I have selected Option a., consumers who conduct searches for listings on the Internet will not see information about the listed property in response to their searches.

_____
Initials of Seller

# Part Three: Model Governance Provisions

## A. Model Association Bylaw Provisions Authorizing MLS as a Committee of an All-REALTOR® Association

### Section 1  Authority

The association of REALTORS® shall maintain for the use of its members a multiple listing service, which shall be subject to the bylaws of the association of REALTORS® and such rules and regulations as may be hereinafter adopted. **M**

### Section 2  Purpose

A multiple listing service is a means by which cooperation among Participants is enhanced; by which information is accumulated and disseminated to enable authorized Participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; by which Participants engaging in real estate appraisal contribute to common databases; and is a facility for the orderly correlation and dissemination of listing information so Participants may better serve their clients and the public. *(Amended 8/24)* **M**

### Section 3  Participation

Any REALTOR® of this or any other association who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these bylaws, shall be eligible to participate in multiple listing upon agreeing in writing to conform to the rules and regulations thereof and to pay the costs incidental thereto.* However, under no circumstances is any individual or firm, regardless of membership status, entitled to multiple listing service membership or participation unless they hold a current, valid real estate broker's license and cooperate, or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property.** Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients.   Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a Participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law.

---

*Optional qualifications which may be adopted at the local association's discretion: Any applicant for MLS participation and any licensee (including licensed or certified appraisers) affiliated with an MLS Participant who has access to and use of MLS-generated information shall complete an orientation program of no more than eight (8) classroom hours devoted to the MLS rules and regulations and computer training related to MLS information entry and retrieval within thirty (30) days after access has been provided.

Associations are not required to establish prerequisites for MLS participation beyond holding REALTOR® (principal) membership in an association. However, if the association wishes to establish these requirements for MLS participation or for access to MLS-generated information, the requirement of attendance at an orientation program is the most rigorous requirement that may be established.

**Generally, associations of REALTORS®, when there is more than one principal in a real estate firm, define the chief principal officer of the firm as the MLS Participant. If each principal is defined as a Participant, then each shall have a separate vote on MLS matters. Brokers or salespersons other than principals are not considered Participants in the service, but have access to and use of the service through the principal(s) with whom they are affiliated.

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm cooperates means that the Participant actively endeavor during the operation of its real estate business to list real property of the type listed on the MLS, share information on listed property and make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interests of their client(s). "Actively" means on a continual and ongoing basis during the operation of the Participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a Participant or potential Participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a Participant or potential Participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the Participant or potential Participant as long as the level of service satisfies state law.

The key is that the Participant or potential Participant actively endeavors to cooperate with respect to properties of the type that are listed on the MLS in which participation is sought. Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients.   This requirement does not permit an MLS to deny participation to a Participant or potential Participant that operates a "Virtual Office Website" (VOW) (including a VOW that the Participant uses to refer customers to other Participants) if the Participant or potential Participant actively endeavors to cooperate. An MLS may evaluate whether a Participant or potential Participant actively endeavors during the operation of its real estate business to cooperate only if the MLS has a reasonable basis to believe that the Participant or potential Participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all Participants and potential Participants.

**<span style="color:red">Optional Provision for Establishing Nonmember Participatory Rights (Open MLS)\*</span>** A nonmember applicant for MLS participation who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, shall supply evidence satisfactory to the membership committee that he has no record of recent or pending bankruptcy; has no record of official sanctions involving unprofessional conduct; agrees to complete a course of instruction (if any) covering the MLS rules and regulations and computer training related to MLS information entry and retrieval, and shall pass such reasonable and non-discriminatory written examination thereon as may be required by the MLS; and shall agree that if elected as a Participant, he will abide by such rules and regulations and pay the MLS fees and dues, including the nonmember differential (if any), as from time to time established. Under no circumstances is any individual or firm entitled to MLS Participation or membership unless they hold a current, valid real estate broker's license and cooperate, or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a Participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law.

*Only adopt the following paragraphs if the association's MLS is open to nonmember Participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere).

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm cooperates means that the Participant actively endeavor during the operation of its real state business to list real property of the type listed on the MLS, share information on listed property and make property available to other brokers for showing to prospective puchasers and tenants when it is in the best interests of their client. "Actively" means on a continual and ongoing basis during the operation of the Participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a Participant or potential Participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a Participant or potential Participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the Participant or potential Participant as long as the level of service satisfies state law.

The key is that the Participant or potential Participant  cooperate with respect to properties of the type that are listed on the MLS in which participation is sought. Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients. This requirement does not permit an MLS to deny participation to a Participant or potential Participant that operates a "Virtual Office Website" (VOW) (including a VOW that the Participant uses to refer customers to other Participants) if the Participant or potential Participant actively endeavors to cooperate. An MLS may evaluate whether a Participant or potential Participant actively endeavors during the operation of its real estate business to cooperate only if the MLS has a reasonable basis to believe that the Participant or potential Participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all Participants and potential Participants.

**Note 1:** The requirements of (1) no record of recent or pending bankruptcy; (2) no record of official sanctions involving unprofessional conduct; and (3) completion of a course of instruction on the MLS rules and regulations and computer training related to MLS information entry and retrieval may be deleted from this section at the option of each association. In states where law requires non-association members be admitted to the MLS of an association of REALTORS®, any limitations or restrictions imposed on participation or membership shall be no more stringent than permissible under the National Association's membership qualification criteria. However, in states where non-association member access to the MLS is not a requirement of state law, associations may, at their discretion, establish additional qualifications for non-association member participation and membership in the MLS.

**Note 2:** An association may also choose to have the membership committee consider the following in determining a nonmember applicant's qualifications for MLS participation or membership:

- all final findings of Code of Ethics violations and violations of other membership duties in any other association within the past three (3) years

- pending ethics complaints (or hearings)

- unsatisfied discipline pending

- pending arbitration requests (or hearings)

- unpaid arbitration awards or unpaid financial obligations to this or any other association or association MLS.  *(Amended 8/24)* **M**

### Section 4  Supervision
The activity shall be operated under the supervision of the multiple listing committee in accordance with the rules and regulations, subject to the approval of the board of directors of the association of REALTORS®. **R**

### Section 5  Appointment of Committee
The president shall appoint, subject to confirmation by the board of directors, a multiple listing committee of REALTOR® members. All members of the committee shall be Participants in multiple listing except, at the option of the local association, REALTORS® affiliated with Participants may be appointed to serve in such numbers as determined by the local association. The committee members so named shall serve two-year staggered terms.* The committee shall select its chairperson from among the members thereof. (The chairperson may be designated by the president.) **R**

---

*Associations have the option to establish a longer or shorter term for service on the committee and need not provide for staggered terms for committee appointments. *(Adopted 11/96)*

### Section 6  Vacancies
Vacancies in unexpired terms shall be filled as in the case of original appointees. **R**

### Section 7  Attendance
Any committee member who fails to attend three (3) consecutive regular or special meetings of the committee, without excuse acceptable to the chairperson of the committee, shall be deemed to have resigned from the committee and the vacancy shall be filled as herein provided for original appointees. **R**

### Section 8  Subscribers
Subscribers (or users) of the MLS include non-principal brokers, sales associates, and licensed and certified appraisers affiliated with Participants. (Optional provision: Subscribers also include affiliated unlicensed administrative and clerical staff, personal assistants, and individuals seeking licensure or certification as real estate appraisers who are under the direct supervision of an MLS Participant or the Participant's licensed designee.) *(Adopted 4/92)* **R**

# B. Model Association Bylaw Provisions Authorizing MLS as a Committee of an Association with REALTOR® and REALTOR-ASSOCIATE® Members

### Section 1  Authority

The association of REALTORS® shall maintain for the use of its members a multiple listing service, which shall be subject to the bylaws of the association of REALTORS® and such rules and regulations as may be hereinafter adopted. **M**

### Section 2  Purpose

A multiple listing service is a means by which cooperation among Participants is enhanced; by which information is accumulated and disseminated to enable authorized Participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; by which Participants engaging in real estate appraisal contribute to common databases; and is a facility for the orderly correlation and dissemination of listing information so Participants may better serve their clients and the public. *(Amended 8/24)* **M**

### Section 3  Participation

Any REALTOR® of this or any other association who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these bylaws, shall be eligible to participate in multiple listing upon agreeing in writing to conform to the rules and regulations thereof and to pay the costs incidental thereto.* However, under no circumstances is any individual or firm, regardless of membership status, entitled to multiple listing service membership or participation unless they hold a current, valid real estate broker's license and cooperate, or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property.** Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a Participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law.

---

*Optional qualifications which may be adopted at the local association's discretion: Any applicant for MLS participation and any licensee (including licensed or certified appraisers) affiliated with an MLS Participant who has access to and use of MLS-generated information shall complete an orientation program of no more than eight (8) classroom hours devoted to the MLS rules and regulations and computer training related to MLS information entry and retrieval within thirty (30) days after access has been provided.

Associations are not required to establish prerequisites for MLS participation beyond holding REALTOR® (principal) membership in an association. However, if the association wishes to establish these requirements for MLS participation or for access to MLS-generated information, the requirement of attendance at an orientation program is the most rigorous requirement that may be established.

**Generally, associations of REALTORS®, when there is more than one principal in a real estate firm, define the chief principal officer of the firm as the MLS Participant. If each principal is defined as a Participant, then each shall have a separate vote on MLS matters. Brokers or salespersons other than principals are not considered Participants in the service, but have access to and use of the service through the principal(s) with whom they are affiliated.

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm cooperates means that the Participant actively endeavor during the operation of its real estate business to list real property of the type listed on the MLS, share information on listed property and make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interests of their client(s). "Actively" means on a continual and ongoing basis during the operation of the Participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a Participant or potential Participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a Participant or potential Participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the Participant or potential Participant as long as the level of service satisfies state law.

The key is that the Participant or potential Participant actively endeavors to cooperate with respect to properties of the type that are listed on the MLS in which participation is sought. Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients. This requirement does not permit an MLS to deny participation to a Participant or potential Participant that operates a "Virtual Office Website" (VOW) (including a VOW that the Participant uses to refer customers to other Participants) if the Participant or potential Participant actively endeavors to cooperate. An MLS may evaluate whether a Participant or potential Participant actively endeavors during the operation of its real estate business to cooperate only if the MLS has a reasonable basis to believe that the Participant or potential Participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all Participants and potential Participants.

**Optional Provision for Establishing Nonmember Participatory Rights (Open MLS)*** A nonmember applicant for MLS participation who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, shall supply evidence satisfactory to the membership committee that he has no record of recent or pending bankruptcy; has no record of official sanctions involving unprofessional conduct; agrees to complete a course of instruction (if any) covering the MLS rules and regulations and computer training related to MLS information entry and retrieval, and shall pass such reasonable and non-discriminatory written examination thereon as may be required by the MLS; and shall agree that if elected as a Participant, he will abide by such rules and regulations and pay the MLS fees and dues, including the nonmember differential (if any), as from time to time established. Under no circumstances is any individual or firm entitled to MLS Participation or membership unless they hold a current, valid real estate broker's license and cooperate or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients.   Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a Participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law.

*Only adopt the following paragraphs if the association's MLS is open to nonmember Participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere).

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm cooperates means that the Participant actively endeavor during the operation of its real state business to list real property of the type listed on the MLS, share information on listed property and make property available to other brokers for showing to prospective puchasers and tenants when it is in the best interests of their client. "Actively" means on a continual and ongoing basis during the operation of the Participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a Participant or potential Participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a Participant or potential Participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the Participant or potential Participant as long as the level of service satisfies state law.

The key is that the Participant or potential Participant  cooperate with respect to properties of the type that are listed on the MLS in which participation is sought. . Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients.   This requirement does not permit an MLS to deny participation to a Participant or potential Participant that operates a "Virtual Office Website" (VOW) (including a VOW that the Participant uses to refer customers to other Participants) if the Participant or potential Participant actively endeavors to cooperate. An MLS may evaluate whether a Participant or potential Participant actively endeavors during the operation of its real estate business to cooperate only if the MLS has a reasonable basis to believe that the Participant or potential Participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all Participants and potential Participants.

**Note 1:** The requirements of (1) no record of recent or pending bankruptcy; (2) no record of official sanctions involving unprofessional conduct; and (3) completion of a course of instruction on the MLS rules and regulations and computer training related to MLS information entry and retrieval may be deleted from this section at the option of each association. In states where law requires non-association members be admitted to the MLS of an association of REALTORS®, any limitations or restrictions imposed on participation or membership shall be no more stringent than permissible under the National Association's membership qualification criteria. However, in states where non-association member access to the MLS is not a requirement of state law, associations may, at their discretion, establish additional qualifications for non-association member participation and membership in the MLS.

**Note 2:** An association may also choose to have the membership committee consider the following in determining a nonmember applicant's qualifications for MLS participation or membership:

- all final findings of Code of Ethics violations and violations of other membership duties in any other association within the past three (3) years

- pending ethics complaints (or hearings)

- unsatisfied discipline pending

- pending arbitration requests (or hearings)

- unpaid arbitration awards or unpaid financial obligations to this or any other association or association MLS. *(Amended 8/24)* **M**

### Section 4  Supervision

The activity shall be operated under the supervision of the multiple listing committee in accordance with the rules and regulations, subject to the approval of the board of directors of the association of REALTORS®. **R**

### Section 5  Appointment of Committee

The president shall appoint, subject to confirmation by the board of directors, a multiple listing committee of _____ REALTOR® members. All members of the committee shall be Participants in multiple listing except, at the option of the local association, REALTOR® or REALTOR-ASSOCIATE®s affiliated with Participants may be appointed to serve in such numbers as determined by the local association. The committee members so named shall serve two-year staggered terms.* The committee shall select its chairperson from among the members thereof. (The chairperson may be designated by the president.) **R**

---

*Associations have the option to establish a longer or shorter term for service on the committee and need not provide for staggered terms for committee appointments. *(Adopted 11/96)*

### Section 6  Vacancies

Vacancies in unexpired terms shall be filled as in the case of original appointees. **R**

### Section 7  Attendance

Any committee member who fails to attend three (3) consecutive regular or special meetings of the committee, without excuse acceptable to the chairperson of the committee, shall be deemed to have resigned from the committee and the vacancy shall be filled as herein provided for original appointees. **R**

### Section 8  Subscribers

Subscribers (or users) of the MLS include non-principal brokers, sales associates, and licensed and certified appraisers affiliated with Participants. (Optional provision: Subscribers also include affiliated unlicensed administrative and clerical staff, personal assistants, and individuals seeking licensure or certification as real estate appraisers who are under the direct supervision of an MLS Participant or the Participant's licensed designee.) *(Adopted 4/92)* **R**

# C. Model Rules and Regulations for an MLS Operated as a Committee of an Association of REALTORS®

## Listing Procedures

### Section 1  Listing Procedures

Listings of real or personal property of the following types, which are listed subject to a real estate broker's license, and are located within the service area of the multiple listing service, and are taken by Participants on *(indicate form[s] of listing[s] accepted by the Service — See Notes 1 and 2)* shall be delivered to the multiple listing service within _____ (usually 48) hours after all necessary signatures of seller(s) have been obtained:

a.  single family homes for sale or exchange

b.  vacant lots and acreage for sale or exchange

c.  two-family, three-family, and four-family residential buildings for sale or exchange

**Note 1:** The multiple listing service shall not require a Participant to submit listings on a form other than the form the Participant individually chooses to utilize provided the listing is of a type accepted by the service, although a property data form may be required as approved by the multiple listing service. However, the multiple listing service, through its legal counsel:

- may reserve the right to refuse to accept a listing form which fails to adequately protect the interests of the public and the Participants

- assure that no listing form filed with the multiple listing service establishes, directly or indirectly, any contractual relationship between the multiple listing service and the client (buyer or seller)

The multiple listing service shall accept exclusive right-to-sell listing contracts and exclusive agency listing contracts, and may accept other forms of agreement which make it possible for the listing broker to cooperate with other Participants of the multiple listing service acting as subagents, buyer agents, or both.

The listing agreement must include the seller's written authorization to submit the agreement to the multiple listing service.

The different types of listing agreements include:

- exclusive right-to-sell          • open

- exclusive agency          • net

The service may not accept **net listings** because they are deemed unethical and, in most states, illegal. **Open listings** are not accepted, except where required by law, because the inherent nature of an open listing.  Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients.

The **exclusive right-to-sell** listing is the form of listing where the seller authorizes exclusive authorization to the listing broker to cooperate with other brokers in the sale of the property.

The **exclusive agency** listing also authorizes the listing broker, as exclusive agent, to cooperate with other brokers in the sale of the property, but also reserves to the seller the general right to sell the property on an unlimited or restrictive basis. Exclusive agency listings and exclusive right-to-sell listings with named prospects exempt should be clearly distinguished by a simple designation such as a code or symbol from exclusive right-to-sell listings with no named prospects exempt, since they can present special risks of procuring cause controversies and administrative problems not posed by exclusive right-to- sell listings with no named prospects exempt. Care should be exercised to ensure that different codes or symbols are used to denote exclusive agency and exclusive right-to-sell listings with prospect reservations.

**Note 2:** A multiple listing service does not regulate the type of listings its members may take. This does not mean that a multiple listing service must accept every type of listing. The multiple listing service shall decline to accept open listings (except where acceptance is required by law) and net listings, and it may limit its service to listings of certain kinds of property. But, if it chooses to limit the kind of listings it will accept, it shall leave its members free to accept such listings to be handled outside the multiple listing service.

**Note 3:** A multiple listing service may, as a matter of local option, accept exclusively listed property that is subject to auction. If such listings do not show a listed price, they may be included in a separate section of the MLS compilation of current listings. *(Amended 8/24)* **M**

## Section 1.01  Clear Cooperation

Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS Participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public. *(Adopted 11/19)*

**Note:** Exclusive listing information for required property types must be filed and distributed to other MLS Participants for cooperation under the Clear Cooperation Policy. This applies to listings filed under Section 1 and listings exempt from distribution under Section 1.3 of the NAR model MLS rules, and any other situation where the listing broker is publicly marketing an exclusive listing that is required to be filed with the service and is not currently available to other MLS Participants. **M**

### Section 1.1  Types of Properties

Following are some of the types of properties that may be published through the service, including types described in the preceding paragraph that are required to be filed with the service and other types that may be filed with the service at the Participant's option provided, however, that any listing submitted is entered into within the scope of the Participant's licensure as a real estate broker: *(Amended 11/91)* **O**

- residential
- residential income
- subdivided vacant lot
- land and ranch
- business opportunity
- motel-hotel
- mobile homes
- mobile home parks
- commercial income
- industrial

### Section 1.1.1  Listings Subject to Rules and Regulations of the Service

Any listing taken on a contract to be filed with the multiple listing service is subject to the rules and regulations of the service upon signature of the seller(s). **R**

### Section 1.2  Detail on Listings Filed with the Service

A listing agreement or property data form, when filed with the multiple listing service by the listing broker, shall be complete in every detail which is ascertainable as specified on the property data form. **R**

### Section 1.2.0. Accuracy of Listing Data

Participants and Subscribers are required to submit accurate listing data and required to correct any known errors. **M**

### Section 1.2.1  Limited Service Listings

Listing agreements under which the listing broker will not provide one, or more, of the following services:

a. arrange appointments for cooperating brokers to show listed property to potential purchasers but instead gives cooperating brokers authority to make such appointments directly with the seller(s)

b. accept and present to the seller(s) offers to purchase procured by cooperating brokers but instead gives cooperating brokers authority to present offers to purchase directly to the seller(s)

c. advise the seller(s) as to the merits of offers to purchase

d. assist the seller(s) in developing, communicating, or presenting counter-offers

e. participate on the seller's(s') behalf in negotiations leading to the sale of the listed property

will be identified with an appropriate code or symbol (e.g., LR or LS) in MLS compilations so potential cooperating brokers will be aware of the extent of the services the listing broker will provide to the seller(s), and any potential for cooperating brokers being asked to provide some or all of these services to listing brokers' clients, prior to initiating efforts to show or sell the property.

**Note:** Adoption of Section 1.2.1, Limited Service Listings, is optional and a matter to be determined by each MLS. *(Adopted 5/01)* **O**

### Section 1.2.2  MLS Entry-only Listings
Listing agreements under which the listing broker will not provide any of the following services:

a.  arrange appointments for cooperating brokers to show listed property to potential purchasers but instead gives cooperating brokers authority to make such appointments directly with the seller(s)

b.  accept and present to the seller(s) offers to purchase procured by cooperating brokers but instead gives cooperating brokers authority to present offers to purchase directly to the seller(s)

c.  advise the seller(s) as to the merits of offers to purchase

d.  assist the seller(s) in developing, communicating, or presenting counter-offers

e.  participate on the seller's(s') behalf in negotiations leading to the sale of the listed property

will be identified with an appropriate code or symbol (e.g., EO) in MLS compilations so potential cooperating brokers will be aware of the extent of the services the listing broker will provide to the seller(s), and any potential for cooperating brokers being asked to provide some or all of these services to listing brokers' clients, prior to initiating efforts to show or sell the property.

**Note:** Adoption of Section 1.2.2, MLS Entry-only Listings, is optional and a matter to be determined by each MLS. *(Adopted 5/01)* **O**

### Section 1.3  Multiple Listing Options for Sellers
Office Exclusive: Where the seller has directed the listing broker to not publicly market their property and to not disseminate it through the MLS to other MLS Participants and Subscribers, the Participant may then take the listing as an office exclusive exempt listing and such listing shall be filed with the MLS, subject to its local filing rules, but not disseminated to other MLS Participants and Subscribers.

Delayed Marketing: Where the seller has directed the listing broker to delay the public marketing of their property through IDX and syndication for [insert local delayed period as set my MLS's unfettered local discretion]. A delayed marketing exempt listing shall be filed with the MLS, subject to its local filing rules, and disseminated to other MLS Participants and Subscribers. The listing broker shall not be precluded from marketing the delayed marketing exempt listing in a matter consistent with the seller's choice.

Exempt Listing Disclosure: The filing of an exempt listing (office exclusive or delayed marketing) with the MLS must be pursuant to a certification, signed by the seller, obtained by the listing broker which includes:

- disclosure about the professional relationship between the Participant and the seller;

- acknowledgement that the seller understands the MLS benefits they are waiving or delaying with the exempt listing, such as broad and immediate exposure of their listing through the MLS; and

- confirmation of the seller's decision that their listing not be publicly marketed and disseminated by the MLS to other MLS Participants and Subscribers as an office exclusive listing or that their listing will not have immediate public marketing through IDX and Syndication as a delayed marketing listing.

Multiple Listing Options for Sellers requirements only apply to listing types that are subject to mandatory submission pursuant to the MLS local rules.

**Note 1:** The Multiple Listing Options for Sellers policy is designed to give consumers greater choice and flexibility in marketing their homes for sale.  Each MLS has the unfettered local discretion in determining what is most suitable for their marketplace regarding a Delayed Marketing Exempt listing which includes adopting "0" days or to not implement the Delayed Marketing aspects of the Multiple Listing Options for Sellers policy.

**Note 2:** MLS Participants must distribute Office Exclusive Exempt listings through the MLS to other MLS Participants and Subscribers within (1) one business day after the listing has been publicly marketed. *See Section 1.01, Clear Cooperation. (Amended 5/25)* **M**

### Section 1.4  Change of Status of Listing
Any change in listed price or other change in the original listing agreement shall be made only when authorized in writing by the seller and shall be filed with the service within twenty-four (24) hours (excepting weekends, holidays, and postal holidays) after the authorized change is received by the listing broker. **R**

### Section 1.5  Withdrawal of Listing Prior to Expiration
Listings of property may be withdrawn from the multiple listing service by the listing broker before the expiration date of the listing agreement, provided notice is filed with the service, including a copy of the agreement between the seller and the listing broker which authorizes the withdrawal.

Sellers do not have the unilateral right to require an MLS to withdraw a listing without the listing broker's concurrence. However, when a seller(s) can document that his or her exclusive relationship with the listing broker has been terminated, the multiple listing service may remove the listing at the request of the seller. *(Adopted 11/96)* **M**

### Section 1.6  Contingencies Applicable to Listings
Any contingency or conditions of any term in a listing shall be specified and noticed to the Participants. **R**

### Section 1.7  Listing Price Specified
The full gross listing price stated in the listing contract will be included in the information published in the MLS compilation of current listings, unless the property is subject to auction. *(Amended 11/92)* **M**

### Section 1.8  Listing Multiple Unit Properties

All properties which are to be sold or which may be sold separately must be indicated individually in the listing and on the property data form. When part of a listed property has been sold, proper notification should be given to the multiple listing service. **O**

### Section 1.9  No Control of Commission Rates or Fees Charged by Participants

The multiple listing service shall not fix, control, recommend, suggest, or maintain Commission rates or fees for services to be rendered by Participants. Further, the multiple listing service shall not fix, control, recommend, suggest, or maintain the division of commissions or fees between cooperating Participants or between Participants and non-Participants. **M**

### Section 1.10  Expiration of Listings

Listings filed with the multiple listing service will automatically be removed from the compilation of current listings on the expiration date specified in the agreement, unless prior to that date the MLS receives notice that the listing has been extended or renewed. *(Amended 11/01)*

If notice of renewal or extension is received after the listing has been removed from the compilation of current listings, the extension or renewal will be published in the same manner as a new listing. Extensions and renewals of listings must be signed by the seller(s) and filed with the service. *(Amended 11/01)* **M**

### Section 1.11  Termination Date on Listings

Listings filed with the service shall bear a definite and final termination date, as negotiated between the listing broker and the seller. **M**

### Section 1.12  Service Area

Only listings of the designated types of property located within the Service Area of the MLS are required to be submitted to the service. Listings of property located outside the MLS's Service Area will (or will not) be accepted if submitted voluntarily by a Participant, but cannot be required by the service. *(Amended 11/17)*

**Note:** Associations must choose whether the service will accept listings from beyond its service area into the MLS compilation. *(Amended 11/17)* **M**

### Section 1.13  Listings of Suspended Participants

When a Participant of the service is suspended from the MLS for failing to abide by a membership duty (i.e., violation of the Code of Ethics, association bylaws, MLS bylaws, MLS rules and regulations, or other membership obligations except failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS by the suspended Participant shall, at the Participant's option, be retained in the service until sold, withdrawn or expired, and shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the suspension became effective. If a Participant has been suspended from the association (except where MLS participation without association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, an association MLS is not obligated to provide MLS services, including continued inclusion of the suspended Participant's listings in the MLS compilation of current listing information. Prior to any removal of a suspended Participant's listings from the MLS, the suspended Participant should be advised, in writing, of the intended removal so that the suspended Participant may advise his clients. **M**

### Section 1.14  Listings of Expelled Participants

When a Participant of the service is expelled from the MLS for failing to abide by a membership duty (i.e., violation of the Code of Ethics, association bylaws, MLS bylaws, MLS rules and regulations, or other membership obligations except failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS by the expelled Participant shall, at the Participant's option, be retained in the service until sold, withdrawn, or expired, and shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the expulsion became effective. If a Participant has been expelled from the association (except where MLS participation without association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, an association MLS is not obligated to provide MLS services, including continued inclusion of the expelled Participant's listings in the MLS compilation of current listing information. Prior to any removal of an expelled Participant's listings from the MLS, the expelled Participant should be advised, in writing, of the intended removal so that the expelled Participant may advise his clients. **M**

### Section 1.15  Listings of Resigned Participants

When a Participant of the service resigns from the MLS, the MLS is not obligated to provide services, including continued inclusion of the resigned Participant's listings in the MLS compilation of current listing information. Prior to any removal of a resigned Participant's listings from the MLS, the resigned Participant should be advised, in writing, of the intended removal so that the resigned Participant may advise his clients. **O**

### Section 1.16, Property Addresses

At the time of filing a listing, Participants and Subscribers must include a property address available to other Participants and Subscribers, and if an address doesn't exist, a parcel identification number can be used.  Where an address or parcel identification number are unavailable, the information filed with the MLS must include a legal description of the property sufficient to describe its location. (*Amended 05/21*) **M**

## Selling Procedures

### Section 2  Showings and Negotiations

Appointments for showings and negotiations with the seller for the purchase of listed property filed with the multiple listing service shall be conducted through the listing broker, except under the following circumstances:

a.  the listing broker gives the cooperating broker specific authority to show and/or negotiate directly, or

b.  after reasonable effort, the cooperating broker cannot contact the listing broker or his representative; however, the listing broker, at his option, may preclude such direct negotiations by cooperating brokers. *(Amended 4/92)* **M**

### Section 2.1  Presentation of Offers

The listing broker must make arrangements to present the offer as soon as possible, or give the cooperating broker a satisfactory reason for not doing so. (Amended 4/92) **M**

### Section 2.2  Submission of Written Offers and Counter-offers

The listing broker shall submit to the seller all written offers until closing unless precluded by law, government rule, regulation, or agreed otherwise in writing between the seller and the listing broker. Unless the subsequent offer is contingent upon the termination of an existing contract, the listing broker shall recommend that the seller obtain the advice of legal counsel prior to acceptance of the subsequent offer.

Participants representing buyers or tenants shall submit to the buyer or tenant all offers and counter-offers until acceptance, and shall recommend that buyers and tenants obtain legal advice where there is a question about whether a pre-existing contract has been terminated. *(Amended 11/05)* **M**

### Section 2.3  Right of Cooperating Broker in Presentation of Offer

The cooperating broker (subagent or buyer agent) or his representative has the right to participate in the presentation to the seller or lessor of any offer he secures to purchase or lease. He does not have the right to be present at any discussion or evaluation of that offer by the seller or lessor and the listing broker. However, if the seller or lessor gives written instructions to the listing broker that the cooperating broker not be present when an offer the cooperating broker secured is presented, the cooperating broker has the right to a copy of the seller's or lessor's written instructions. None of the foregoing diminishes the listing broker's right to control the establishment of appointments for such presentations. *(Amended 4/92)* **M**

Where the cooperating broker is not present during the presentation of the offer, the cooperating broker can request in writing, and the listing broker must provide, as soon as practical, written affirmation stating that the offer has been submitted to the seller, or written notification that the seller has waived the obligation to have the offer presented. *(Adopted 11/19)* **M**

### Section 2.4  Right of Listing Broker in Presentation of Counter-offer

The listing broker or his representative has the right to participate in the presentation of any counter-offer made by the seller or lessor. He does not have the right to be present at any discussion or evaluation of a counter-offer by the purchaser or lessee (except when the cooperating broker is a subagent). However, if the purchaser or lessee gives written instructions to the cooperating broker that the listing broker not be present when a counter- offer is presented, the listing broker has the right to a copy of the purchaser's or lessee's written instructions. *(Adopted 11/93)* **M**

### Section 2.5  Reporting Sales to the Service

Status changes, including final closing of sales and sales prices, shall be reported to the multiple listing service by the listing broker within ___ hours after they have occurred. If negotiations were carried on under Section 2 a. or b. hereof, the cooperating broker shall report accepted offers and prices to the listing broker within ___ hours after occurrence and the listing broker shall report them to the MLS within ___ hours after receiving notice from the cooperating broker. *(Amended 11/11)*

**Note 1:** The listing agreement of a property filed with the MLS by the listing broker should include a provision expressly granting the listing broker authority to advertise; to file the listing with the MLS; to provide timely notice of status changes of the listing to the MLS; and to provide sales information including selling price to the MLS upon sale of the property. If deemed desirable by the MLS to publish sales information prior to final closing (settlement) of a sales transaction, the listing agreement should also include a provision expressly granting the listing broker the right to authorize dissemination of this information by the MLS to its Participants. *(Amended 11/01)*

**Note 2:** In disclosure states, if the sale price of a listed property is recorded, the reporting of the sale price may be required by the MLS.

In states where the actual sale prices of completed transactions are not publicly accessible, failure to report sale prices can result in disciplinary action only if the MLS:

1.   categorizes sale price information as confidential and

2.   limits use of sale price information to Participants and Subscribers in providing real estate services, including appraisals and other valuations, to customers and clients; and to governmental bodies and third-party entities only as provided below.The MLS may provide sale price information to governmental bodies only to be used for statistical purposes (including use of aggregated data for purposes of valuing property) and to confirm the accuracy of information submitted by property owners or their representatives in connection with property valuation challenges; and to third-party entities only to be used for academic research, statistical analysis, or for providing services to Participants and Subscribers. In any instance where a governmental body or third-party entity makes sale price information provided by the MLS available other than as provided for in this provision, a listing Participant may request the sale price information for a specific property be withheld from dissemination for these purposes with written authorization from the seller, and withholding of sale price information from those entities shall not be construed as a violation of the requirement to report sale prices. *(Adopted 11/11)*

**Note 3:** As established in the Virtual Office Website ("VOW") policy, sale prices can only be categorized as confidential in states where the actual sale prices of completed transactions are not accessible from public records. *(Adopted 11/11)*  **M**

## Section 2.6 Reporting Resolutions of Contingencies
The listing broker shall report to the multiple listing service within twenty-four (24) hours that a contingency on file with the multiple listing service has been fulfilled or renewed, or the agreement cancelled. **M**

## Section 2.7  Advertising of Listings Filed with the Service
A listing shall not be advertised by any Participant other than the listing broker without the prior consent of the listing broker. **M**

## Section 2.8  Reporting Cancellation of Pending Sale
The listing broker shall report immediately to the multiple listing service the cancellation of any pending sale, and the listing shall be reinstated immediately. **M**

### Section 2.9  Disclosing the Existence of Offers

Listing brokers, in response to inquiries from buyers or cooperating brokers shall, with the seller's approval, disclose the existence of offers on the property. Where disclosure is authorized, the listing broker shall also disclose if asked whether offers were obtained by the listing licensee, by another licensee in the listing firm, or by a cooperating broker. *(Amended 11/08)* **O**

### Section 2.10  Availability of Listed Property

Listing brokers shall not misrepresent the availability of access to show or inspect listed property. *(Adopted 11/05)* **O**

## Refusal to Sell

### Section 3  Refusal to Sell

If the seller of any listed property filed with the multiple listing service refuses to accept a written offer satisfying the terms and conditions stated in the listing, such fact shall be transmitted immediately to the service and to all Participants. **R**

## Prohibitions

### Section 4  Information for Participants Only

Any listing filed with the service shall not be made available to any broker or firm not a member of the MLS without the prior consent of the listing broker. **M**

### Section 4.1  For Sale Signs

Only the for sale sign of the listing broker may be placed on a property. *(Amended 11/89)* **M**

### Section 4.2  Sold Signs

Prior to closing, only the sold sign of the listing broker may be placed on a property, unless the listing broker authorizes the cooperating (selling) broker to post such a sign. *(Amended 4/96)* **M**

### Section 4.3  Solicitation of Listing Filed with the Service

Participants shall not solicit a listing on property filed with the service unless such solicitation is consistent with Article 16 of the REALTORS®' Code of Ethics, its Standards of Practice, and its Case Interpretations.

**Note:** This section is to be construed in a manner consistent with Article 16 of the Code of Ethics and particularly Standard of Practice 16-4. This section is intended to encourage sellers to permit their properties to be filed with the service by protecting them from being solicited, prior to expiration of the listing, by brokers and salespersons seeking the listing upon its expiration.

Without such protection, a seller could receive hundreds of calls, communications, and visits from brokers and salespersons who have been made aware through MLS filing of the date the listing will expire and desire to substitute themselves for the present broker.

This section is also intended to encourage brokers to participate in the service by assuring them that other Participants will not attempt to persuade the seller to breach the listing agreement or to interfere with their attempts to market the property. Absent the protection afforded by this section, listing brokers would be most reluctant to generally disclose the identity of the seller or the availability of the property to other brokers.

This section does not preclude solicitation of listings under the circumstances otherwise recognized by the Standards of Practice related to Article 16 of the Code of Ethics. **M**

### Section 4.4  Use of the Terms MLS and Multiple Listing Service

No MLS Participant, Subscriber or licensee affiliated with any Participant shall, through the name of their firm, their URLs, their e-mail addresses, their website addresses, or in any other way represent, suggest, or imply that the individual or firm is an MLS, or that they operate an MLS. Participants, Subscribers and licensees affiliated with Participants shall not represent, suggest, or imply that consumers or others have direct access to MLS databases, or that consumers or others are able to search MLS databases available only to Participants and Subscribers. This does not prohibit Participants and Subscribers from representing that any information they are authorized under MLS rules to provide to clients or customers is available on their websites or otherwise. *(Adopted 11/07)* **O**

### Section 4.5  Services Advertised as "Free"

MLS Participants and Subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the Participant or Subscriber will receive no financial compensation from any source for those services. *(Amended 11/21)* **M**

### Section 4.6  No Filtering of Listings

Participants and Subscribers must not filter out or restrict MLS listings that are communicated to consumers or clients based on the existence or level of compensation offered to the cooperating broker or the name of a brokerage or agent. *(Adopted 8/24)* **M**

### Section 5  No Compensation Specified on MLS Listings

**No Compensation Specified on MLS Listings** Participants, Subscribers, or their sellers may not make offers of compensation to buyer brokers and other buyer representatives in the MLS.

Use of MLS data or data feeds to directly or indirectly establish or maintain a platform to make offers of compensation from multiple brokers to buyer brokers or other buyer representatives is prohibited and must result in the MLS terminating that Particpant's access to any MLS data or data feeds.

**Note 1:** The multiple listing service must not have a rule requiring the listing broker to disclose the amount of total negotiated commission in his listing contract, and the multiple listing service must not publish the total negotiated commission on a listing which has been submitted to the MLS by a Participant. The multiple listing service must prohibit disclosing in any way the total commission negotiated between the seller and the listing broker, or total broker compensation (i.e. combined compensation to both listing brokers and buyer brokers.

**Note 2:** The multiple listing service shall make no rule on the division of commissions between Participants and nonParticipants. This should remain solely the responsibility of the listing broker.

**Note 3:** Multiple listing services must give Participants the ability to disclose to other Participants any potential for a short sale. As used in these rules, short sales are defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale, and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies. Multiple listing services may, as a matter of local discretion, require Participants to disclose potential short sales when Participants know a transaction is a potential short sale. *(Amended8/24)* **M**

### Section 5.0.0  Required Consumer Disclosure

Disclosure of Compensation: MLS Participants and Subscribers must:

1. Disclose to prospective sellers and buyers that broker compensation is not set by law and is fully negotiable. This must be included in conspicuous language as part of any listing agreement, buyer written agreement, and pre-closing disclosure documents (if any).

2. Conspicuously disclose in writing to sellers, and obtain the seller's authority, for any payments or offer of payment that the listing Participant or seller will make to another broker, agent, or other representative (e.g. real estate attorney) acting for buyers. This disclosure must include the amount or rate of any such payment and be made in writing in advance of any payment or agreement to pay. *(Adopted 8/24)* **M**

### Section 5.0.1  Disclosing Potential Short Sales

**Note:** Select one of the following two options. **M**

**Option #1:** Multiple listing services that permit, but do not require, Participants to disclose potential short sales should adopt the following rule.

Participants may, but are not required to, disclose potential short sales (defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies) to other Participants and Subscribers. *(Amended 5/09)*

**Option #2:** Alternatively, multiple listing services that require Participants to disclose potential short sales should adopt the following rule.

Participants must disclose potential short sales (defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies) when reasonably known to the listing Participants. *(Amended 8/24)*

### Section 5.0.2 Written Buyer Agreement

Unless inconsistent with state or federal law or regulation, all MLS Participants working with a buyer must enter into a written agreement with the buyer prior to touring a home. The written agreement must include:

   a. a specific and conspicuous disclosure of the amount or rate of compensation the
      Participant will receive or how this amount will be determined, to the extent that the
      Participant will receive compensation from any source.
   b. the amount of compensation in a manner that is objectively ascertainable and not open-
      ended.
   c. a term that prohibits the Participant from receiving compensation for brokerage
      services from any source that exceeds the amount or rate agreed to in the agreement
      with the buyer; and
   d. a conspicuous statement that broker fees and commissions are not set by law and are
      fully negotiable. *(Adopted 8/24)* **M**

### Section 5.1  Participant as Principal

If a Participant or any licensee (or licensed or certified appraiser) affiliated with a Participant has
any ownership interest in a property, the listing of which is to be disseminated through the
multiple listing service, that person shall disclose that interest when the listing is filed with the
multiple listing service and such information shall be disseminated to all multiple listing service
Participants. **M**

### Section 5.2  Participant as Purchaser

If a Participant or any licensee (including licensed and certified appraisers) affiliated with a
Participant wishes to acquire an interest in property listed with another Participant, such
contemplated interest shall be disclosed, in writing, to the listing broker not later than the time
an offer to purchase is submitted to the listing broker. *(Adopted 2/92)* **M**

# Service Charges

### Section 6  Service Fees and Charges

The following service charges for operation of the multiple listing service are in effect to defray
the costs of the service and are subject to change from time to time in the manner prescribed:

**Initial Participation Fee:** An applicant for participation in the service shall pay an application fee
of $_____ with such fee to accompany the application.

**Note:** The initial participation fee shall approximate the cost of bringing the service to the
Participant.

**Recurring Participation Fee:** The annual participation fee of each Participant shall be an amount
equal to $_____ times each salesperson and licensed or certified appraiser who has access to
and use of the service, whether licensed as a broker, sales licensee, or licensed or certified
appraiser who is employed by or affiliated as an independent contractor with such Participant.
Payment of such fees shall be made on or before the first day of the fiscal year of the multiple
listing service. Fees shall be prorated on a monthly basis.

However, MLSs must provide Participants the option of a no-cost waiver of MLS fees, dues, and charges for any licensee or licensed or certified appraiser who can demonstrate subscription to a different MLS or CIE where the principal broker participates. MLSs may, at their discretion, require that broker Participants sign a certification for nonuse of its MLS services by their licensees, which can include penalties and termination of the waiver if violated.* *(Amended 5/18 and 8/18)* **M**

**Note 1:** A multiple listing service may elect to have such fees payable on a quarterly or even on a monthly basis. However, added administrative services are necessitated by increased frequency of such payments.

**Note 2:** Multiple listing services that choose to include affiliated unlicensed administrative and clerical staff, personal assistants, and/or individuals seeking licensure or certification as real estate appraisers among those eligible for access to and use of MLS information as Subscribers may, at their discretion, charge recurring fees. *(Amended 11/17)*

**Listing Fee:** A Participant shall pay a monthly listing fee in an amount equal to the number of listings he filed with the service during the previous month, multiplied by the listing fee of $_____ per listing.

**Note:** An alternative provision for the listing fee is: "For filing a new listing or renewal of a listing with the service, a fee of $_____ shall accompany each listing when filed with the service."

*(Amended 8/24)*

---

*Note: Mandatory waiver provision is effective no later than July 1, 2018.

## Compliance with Rules

### Section 7  Compliance with Rules—Authority to Impose Discipline
By becoming and remaining a Participant or Subscriber in this MLS, each Participant and Subscriber agrees to be subject to the rules and regulations and any other MLS governance provision. The MLS may, through the administrative and hearing procedures established in these rules, impose discipline for violations of the rules and other MLS governance provisions. Discipline that may be imposed may only consist of one or more of the following:

a.  letter of warning

b.  letter of reprimand

c.  attendance at MLS orientation or other appropriate courses or seminars which the Participant or Subscriber can reasonably attend taking into consideration cost, location, and duration

d.  appropriate, reasonable fine not to exceed $15,000

e.  suspension of MLS rights, privileges, and services for not less than thirty (30) days nor more than one (1) year

f.  termination of MLS rights, privileges, and services with no right to reapply for a specified period not to exceed three (3) years. *(Revised 11/14)* **M**

**Note 1:** A Participant (or user/Subscriber, where appropriate) can be placed on probation. Probation is not a form of discipline. When a Participant (or user/Subscriber, where appropriate) is placed on probation the discipline is held in abeyance for a stipulated period of time not longer than one (1) year. Any subsequent finding of a violation of the MLS rules during the probationary period may, at the discretion of the Board of Directors, result in the imposition of the suspended discipline. Absent any subsequent findings of a violation during the probationary period, both the probationary status and the suspended discipline are considered fulfilled, and the individual's record will reflect the fulfillment. The fact that one or more forms of discipline are held in abeyance during the probationary period does not bar imposition of other forms of discipline which will not be held in abeyance. *(Revised 05/14)* **M**

**Note 2:** MLS Participants and Subscribers can receive no more than three (3) administrative sanctions in a calendar year before they are required to attend a hearing for their actions and potential violations of MLS rules, except that the MLS may allow more administrative sanctions for violations of listing information provided by Participants and Subscribers before requiring a hearing. The MLS must send a copy of all administrative sanctions against a Subscriber to the Subscriber's Participant and the Participant is required to attend the hearing of a Subscriber who has received more than three (3) administrative sanctions within a calendar year. *(Adopted 11/20)* **M**

## Section 7.1  Compliance with Rules

The following action may be taken for noncompliance with the rules:

a.  for failure to pay any service charge or fee within one (1) month of the date due, and provided that at least ten (10) days' notice has been given, the service shall be suspended until service charges or fees are paid in full

b.  for failure to comply with any other rule, the provisions of Sections 9 and 9.1 shall apply

**Note:** Generally, warning, censure, and the imposition of a moderate fine are sufficient to constitute a deterrent to violation of the rules and regulations of the multiple listing service. Suspension or termination is an extreme sanction to be used in cases of extreme or repeated violation of the rules and regulations of the service. If the MLS desires to establish a series of moderate fines, they should be clearly specified in the rules and regulations. *(Amended 11/88)* **R**

## Section 7.2  Applicability of Rules to Users and/or Subscribers

Non-principal brokers, sales licensees, appraisers, and others authorized to have access to information published by the MLS are subject to these rules and regulations and may be disciplined for violations thereof provided that the user or Subscriber has signed an agreement acknowledging that access to and use of MLS information is contingent on compliance with the rules and regulations. Further, failure of any user or Subscriber to abide by the rules and/or any sanction imposed for violations thereof can subject the Participant to the same or other discipline. This provision does not eliminate the Participant's ultimate responsibility and accountability for all users or Subscribers affiliated with the Participant. *(Adopted 4/92)*

**Note:** Adoption of Section 7.2 is optional and should be adopted by multiple listing services desiring to establish authority to impose discipline on non-principal users or Subscribers affiliated with MLS members or Participants. *(Adopted 4/92)* **O**

## Meetings

### Section 8  Meetings of MLS Committee
The multiple listing service committee shall meet for the transaction of its business at a time and place to be determined by the committee or at the call of the chairperson. **R**

### Section 8.1  Meetings of MLS Participants
The committee may call meetings of the Participants in the service to be known as meetings of the multiple listing service. **R**

### Section 8.2  Conduct of Meetings
The chairperson or vice chairperson shall preside at all meetings or, in their absence, a temporary chairperson from the membership of the committee shall be named by the chairperson or, upon his failure to do so, by the committee. **R**

## Enforcement of Rules or Disputes

### Section 9  Consideration of Alleged Violations
The committee shall give consideration to all written complaints having to do with violations of the rules and regulations. By becoming and remaining a Participant, each Participant agrees to be subject to these rules and regulations, the enforcement of which are at the sole discretion of the Committee (Board of Directors).

When requested by a complainant, the MLS will process a compliant without revealing the complainant's identity.  If a complaint is subsequently forwarded to a hearing, and the original complainant does not consent to participating in the process, the MLS will appoint a representative to serve as the complainant. *(Amended 11/20)* **M**

### Section 9.1  Violation of Rules and Regulations
If the alleged offense is a violation of the rules and regulations of the service and does not involve a charge of alleged unethical conduct or request for arbitration, it may be administratively considered and determined by the multiple listing service committee, and if a violation is determined, the committee may direct the imposition of sanction, provided the recipient of such sanction may request a hearing before the professional standards committee of the association in accordance with the bylaws and rules and regulations of the association of REALTORS® within twenty (20) days following receipt of the committee's decision. *(Amended 11/96)*

If, rather than conducting an administrative review, the multiple listing committee has a procedure established to conduct hearings, the decision of the multiple listing committee may be appealed to the board of directors of the association of REALTORS® within twenty (20) days of the tribunal's decision being rendered. Alleged violations involving unethical conduct shall be referred to the association's grievance committee for processing in accordance with the professional standards procedures of the association. If the charge alleges a refusal to arbitrate, such charge shall be referred directly to the board of directors of the association of REALTORS®. *(Amended 2/98)* **M**

**Optional Provision for Establishing Nonmember Participatory Rights (Open MLS)\*** If the alleged offense is a violation of the rules and regulations of the service and does not involve a charge of alleged violation of one or more of the provisions of Section 16 of the rules and regulations or a request for arbitration, it may be administratively considered and determined by the MLS committee and if a violation is determined, the MLS committee may direct the imposition of sanction provided that the recipient of such sanction may request a hearing by the professional standards committee of the association in accordance with the bylaws of the association of REALTORS®. *(Amended 2/98)*

\*Only adopt this provision if the association's MLS is open to nonmember Participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere).

If, rather than conducting an administrative review, the MLS committee has a procedure established to conduct hearings, the decision of the hearing tribunal may be appealed to the board of directors of the association of REALTORS®. Alleged violations of Section 16 of the rules and regulations shall be referred to the association's grievance committee for processing in accordance with the professional standards procedures of the association, except that if the charge alleges a refusal to arbitrate, such charge shall be referred directly to the board of directors of the association. *(Amended 2/98)* **M**

## Section 9.2  Complaints of Unethical Conduct
All other complaints of unethical conduct shall be referred by the committee to the Professional Standards Administrator of the association of REALTORS® for appropriate action in accordance with the professional standards procedures established in the association's bylaws. *(Amended 11/88)* **M**

## Section 9.3  Complaints of Unauthorized Use of Listing Content
Any Participant who believes another Participant has engaged in the unauthorized use or display of listing content, including photographs, images, audio or video recordings, and virtual tours, shall send notice of such alleged unauthorized use to the MLS. Such notice shall be in writing, specifically identify the allegedly unauthorized content, and be delivered to the MLS not more than sixty (60) days after the alleged misuse was first identified. No Participant may pursue action over the alleged unauthorized use and display of listing content in a court of law without first completing the notice and response procedures outlined in this Section 9.3 of the MLS rules.

Upon receiving a notice, the Committee (Board of Directors) will send the notice to the Participant who is accused of unauthorized use. Within ten (10) days from receipt, the Participant must either: 1) remove the allegedly unauthorized content, or 2) provide proof to the Committee (Board of Directors) that the use is authorized. Any proof submitted will be considered by the Committee (Board of Directors), and a decision of whether it establishes authority to use the listing content will be made within thirty (30) days.

If the Committee (Board of Directors) determines that the use of the content was unauthorized, the Committee (Board of Directors) may issue a sanction pursuant to Section 7 of the MLS rules, including a request to remove and/or stop the use of the unauthorized content within ten (10) days after transmittal of the decision.  If the unauthorized use stems from a violation of the MLS rules, that too will be considered at the time of establishing an appropriate sanction.

If after ten (10) days following transmittal of the Committee's (Board of Director's) determination the alleged violation remains uncured (i.e. the content is not removed or the rules violation remains uncured), then the complaining party may seek action through a court of law. *(Adopted 5/18)* **M**

### Section 9.4  MLS Rules Violations
MLS Participants may not take legal action against another Participant for alleged rules violation(s) unless the complaining Participant has first exhausted the remedies provided in these rules. *(Adopted 5/18)* **M**

**Note:** Adoption of Sections 9.3 and 9.4 are not required if the MLS has adopted alternative procedures to address alleged misuse of listing content that includes notice to the alleged infringer.

## Confidentiality of MLS Information

### Section 10  Confidentiality of MLS Information
Any information provided by the multiple listing service to the Participants shall be considered official information of the service. Such information shall be considered confidential and exclusively for the use of Participants and real estate licensees affiliated with such Participants and those Participants who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property and licensed or certified appraisers affiliated with such Participants. *(Amended 4/92)* **M**

### Section 10.1  MLS Not Responsible for Accuracy of Information
The information published and disseminated by the service is communicated verbatim, without change by the service, as filed with the service by the Participant. The service does not verify such information provided and disclaims any responsibility for its accuracy. Each Participant agrees to hold the service harmless against any liability arising from any inaccuracy or inadequacy of the information such Participant provides. **R**

## Ownership of MLS Compilation* and Copyright

### Section 11
By the act of submitting any property listing content to the MLS, the Participant represents and warrants that he or she is fully authorized to license the property listing content as contemplated by and in compliance with this section and these rules and regulations, and also thereby does grant to the MLS license to include the property listing content in its copyrighted MLS compilation and also in any statistical report on comparables. Listing content includes, but is not limited to, photographs, images, graphics, audio and video recordings, virtual tours, drawings, descriptions, remarks, narratives, pricing information, and other details or information related to the listed property. *(Amended 5/18)* **M**

Each Participant who submits listing content to the MLS agrees to defend and hold the MLS and every other Participant harmless from and against any liability or claim arising from any inaccuracy of the submitted listing content or any inadequacy of ownership, license, or title to the submitted listing content. *(Adopted 5/18)* **M**

**Note:** The Digital Millennium Copyright Act (DMCA) is a federal copyright law that enhances the penalties for copyright infringement occurring on the Internet. The law provides exemptions or "safe harbors" from copyright infringement liability for online service providers (OSP) that satisfy certain criteria. Courts construe the definition of "online service provider" broadly, which would likely include MLSs as well as Participants and Subscribers hosting an IDX display.

*The term MLS compilation, as used in Sections 11 and 12 herein, shall be construed to include any format in which property listing data is collected and disseminated to the Participants, including but not limited to bound book, loose-leaf binder, computer database, card file, or any other format whatsoever.

One safe harbor limits the liability of an OSP that hosts a system, network or website on which Internet users may post user-generated content. If an OSP complies with the provisions of this DMCA safe harbor, it cannot be liable for copyright infringement if a user posts infringing material on its website. This protects an OSP from incurring significant sums in copyright infringement damages, as statutory damages are as high as $150,000 per work. For this reason, it is highly recommended that MLSs, Participants and Subscribers comply with the DMCA safe harbor provisions discussed herein.

To qualify for this safe harbor, the OSP must:

1. Designate on its website and register with the Copyright Office an agent to receive takedown requests. The agent could be the MLS, Participant, Subscriber, or other individual or entity.

2. Develop and post a DMCA-compliant website policy that addresses repeat offenders.

3. Comply with the DMCA takedown procedure. If a copyright owner submits a takedown notice to the OSP, which alleges infringement of its copyright at a certain location, then the OSP must promptly remove allegedly infringing material. The alleged infringer may submit a counter-notice that the OSP must share with the copyright owner. If the copyright owner fails to initiate a copyright lawsuit within ten (10) days, then the OSP may restore the removed material.

4. Have no actual knowledge of any complained-of infringing activity.

5. Not be aware of facts or circumstances from which complained-of infringing activity is apparent.

6. Not receive a financial benefit attributable to complained-of infringing activity when the OSP is capable of controlling such activity.

Full compliance with these DMCA safe harbor criteria will mitigate an OSP's copyright infringement liability. For more information see 17 U.S.C. §512. *(Adopted 11/15)* **I**

## Section 11.1
All right, title, and interest in each copy of every multiple listing compilation created and copyrighted by the _____ Association of REALTORS® and in the copyrights therein, shall at all times remain vested in the _____ Association of REALTORS®. **R**

### Section 11.2  Display

Each Participant shall be entitled to lease from the _____ Association of REALTORS® a number of copies of each MLS compilation sufficient to provide the Participant and each person affiliated as a licensee (including licensed or certified appraisers) with such Participant with one copy of such compilation. The Participant shall pay for each such copy the rental fee set by the association.*

Participants shall acquire by such lease only the right to use the MLS compilation in accordance with these rules. **M**

---

*This section shall not be construed to require the Participant to lease a copy of the MLS compilation for any licensee (or licensed or certified appraiser) affiliated with the Participant who is engaged exclusively in a specialty of the real estate business other than listing, selling, or appraising the types of properties which are required to be filed with the MLS and who does not, at any time, have access to or use of the MLS information or MLS facility of the association.

## Use of Copyrighted MLS Compilation

### Section 12  Distribution

Participants shall, at all times, maintain control over and responsibility for each copy of any MLS compilation leased to them by the association of REALTORS®, and shall not distribute any such copies to persons other than Subscribers who are affiliated with such Participant as licensees, those individuals who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property, and any other Subscribers as authorized pursuant to the governing documents of the MLS. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a Participant's licensure(s) or certification, and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed or published by an association multiple listing service where access to such information is prohibited by law. *(Amended 4/92)* **R**

### Section 12.1  Display

Participants and those persons affiliated as licensees with such Participants shall be permitted to display the MLS compilation to prospective purchasers only in conjunction with their ordinary business activities of attempting to locate ready, willing, and able buyers for the properties described in said MLS compilation. **M**

---

*It is intended that the Participant be permitted to provide prospective purchasers with listing data relating to properties which the prospective purchaser has a bona fide interest in purchasing or in which the Participant is seeking to promote interest. The term reasonable, as used herein, should therefore be construed to permit only limited reproduction of property listing data intended to facilitate the prospective purchaser's decision-making process in the consideration of a purchase. Factors which shall be considered in deciding whether the reproductions made are consistent with this intent and thus reasonable in number, shall include, but are not limited to, the total number of listings in the MLS compilation, how closely the types of properties contained in such listings accord with the prospective purchaser's expressed desires and ability to purchase, whether the reproductions were made on a selective basis, and whether the type of properties contained in the property listing data is consistent with a normal itinerary of properties which would be shown to the prospective purchaser.

**Section 12.2  Reproduction**

**Option #1:** Participants or their affiliated licensees shall not reproduce any MLS compilation or any portion thereof, except in the following limited circumstances:

Participants or their affiliated licensees may reproduce from the MLS compilation and distribute to prospective purchasers a reasonable* number of single copies of property listing data contained in the MLS compilation which relate to any properties in which the prospective purchasers are or may, in the judgment of the Participant or their affiliated licensees, be interested.

Reproductions made in accordance with this rule shall be prepared in such a fashion that the property listing data of properties other than that in which the prospective purchaser has expressed interest, or in which the Participant or the affiliated licensees are seeking to promote interest, does not appear on such reproduction.

Nothing contained herein shall be construed to preclude any Participant from utilizing, displaying, distributing, or reproducing property listing sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the Participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the Participant and those licensees affiliated with the Participant who are authorized to have access to such information. Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office, or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers. Any MLS content in data feeds available to Participants for real estate brokerage purposes must also be available to Participants for valuation purposes, including automated valuations. MLSs must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLSs may require execution of a third-party license agreement where deemed appropriate by the MLS. MLSs may require Participants who will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may not be used as supporting documentation. Any other use of such information is unauthorized and prohibited by these rules and regulations. *(Amended 05/14)*

**Option #2:** Participants or their affiliated licensees shall not reproduce any MLS compilation or any portion thereof, except in the following limited circumstances:

Participants or their affiliated licensees may reproduce from the MLS compilation and distribute to prospective purchasers a reasonable* number of single copies of property listing data contained in the MLS compilation which relate to any properties in which the prospective purchasers are or may, in the judgment of the Participants or their affiliated licensees, be interested.

---

*It is intended that the Participant be permitted to provide prospective purchasers with listing data relating to properties which the prospective purchaser has a bona fide interest in purchasing or in which the Participant is seeking to promote interest. The term reasonable, as used herein, should therefore be construed to permit only limited reproduction of property listing data intended to facilitate the prospective purchaser's decision-making process in the consideration of a purchase. Factors which shall be considered in deciding whether the reproductions made are consistent with this intent and thus reasonable in number, shall include, but are not limited to, the total number of listings in the MLS compilation, how closely the types of properties contained in such listings accord with the prospective purchaser's expressed desires and ability to purchase, whether the reproductions were made on a selective basis, and whether the type of properties contained in the property listing data is consistent with a normal itinerary of properties which would be shown to the prospective purchaser.

Nothing contained herein shall be construed to preclude any Participant from utilizing, displaying, distributing, or reproducing property listing sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the Participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the Participant and those licensees affiliated with the Participant who are authorized to have access to such information. Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office, or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers. Any MLS content in data feeds available to Participants for real estate brokerage purposes must also be available to Participants for valuation purposes, including automated valuations. MLSs must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLSs may require execution of a third-party license agreement where deemed appropriate by the MLS. MLSs may require Participants who will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may not be used as supporting documentation. Any other use of such information is unauthorized and prohibited by these rules and regulations. *(Amended 05/14)* **M**

# Use of MLS Information

### Section 13  Limitations on Use of MLS Information

**Option #1:** Use of information from MLS compilation of current listing information, from the association's statistical report, or from any sold or comparable report of the association or MLS for public mass-media advertising by an MLS Participant or in other public representations, may not be prohibited.

However, any print or non-print forms of advertising or other forms of public representations based in whole or in part on information supplied by the association or its MLS must clearly demonstrate the period of time over which such claims are based and must include the following, or substantially similar, notice:

Based on information from the association of REALTORS® (alternatively, from the _____ MLS) for the period (date) through (date). *(Amended 11/93)*

**Option #2:** Information from MLS compilations of current listing information, from statistical reports, and from any sold or comparable report of the association or MLS may be used by MLS Participants as the basis for aggregated demonstrations of market share or comparisons of firms in public mass-media advertising or in other public representations. This authority does not convey the right to include in any such advertising or representation information about specific properties which are listed with other Participants, or which were sold by other Participants (as either listing or cooperating broker).

However, any print or non-print forms of advertising or other forms of public representations based in whole or in part on information supplied by the association or its MLS must clearly demonstrate the period of time over which such claims are based and must include the following, or substantially similar, notice:

Based on information from the association of REALTORS® (alternatively, from the _____ MLS) for the period (date) through (date). *(Amended* 11/97)

**Note:** Associations are advised to select one rule for the two (2) alternatives above. **M**

# Changes in Rules and Regulations

### Section 14  Changes in Rules and Regulations

Amendments to the rules and regulations of the service shall be by a _____ vote of the members of the multiple listing service committee, subject to approval by the board of directors of the association of REALTORS®.

**Note:** Some associations may prefer to change the rules and regulations by a vote of the Participants, subject to approval by the board of directors of the association of REALTORS®. **M**

## Arbitration of Disputes*

### Section 15  Arbitration of Disputes

By becoming and remaining a Participant, each Participant agrees to arbitrate disputes involving contractual issues and questions, and specific non-contractual issues and questions defined in Standard of Practice 17-4 of the Code of Ethics with MLS Participants in different firms arising out of their relationships as MLS Participants subject to the following qualifications.

a. If all disputants are members of the same association of REALTORS® or have their principal place of business within the same association's territorial jurisdiction, they shall arbitrate pursuant to the procedures of that association of REALTORS®.

b. If the disputants are members of different associations of REALTORS® or if their principal place of business is located within the territorial jurisdiction of different associations of REALTORS®, they remain obligated to arbitrate in accordance with the procedures of the _____ (state association of REALTORS®). *(Amended 11/97)*

---

*Only adopt Section 15 if the association's MLS is open to nonmember Participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere). If adopted, this section may not be modified.

**Interboard Arbitration Procedures:** Arbitration shall be conducted in accordance with any existing interboard agreement or, alternatively, in accordance with the interboard arbitration procedures in the Code of Ethics and Arbitration Manual of the NATIONAL ASSOCIATION OF REALTORS®. Nothing herein shall preclude Participants from agreeing to arbitrate the dispute before a particular association of REALTORS®. *(Amended 11/98)*

**Awards:** The obligation to arbitrate includes the duty to either 1) pay an award to the party(ies) named in the award or 2) deposit the funds with the Professional Standards Administrator or Executive Officer to be held in an escrow or trust account maintained for this purpose. Failure to satisfy the award or deposit the funds with the association within ten (10) days may be considered a violation of the MLS rules and may subject the Participant to disciplinary action at the sole discretion of the MLS. *(Adopted 11/15)* **O**

### Section 16
## Standards of Conduct for MLS Participants*

### Standard 16.1

MLS Participants shall not engage in any practice or take any action inconsistent with exclusive representation or exclusive brokerage relationship agreements that other MLS Participants have with clients. *(Amended 1/04)* **O**

---

*Only adopt the standards of conduct if the association's MLS is open to nonmember Participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere). Any of the standards of conduct, if adopted, may not be modified.

### Standard 16.2

Signs giving notice of property for sale, rent, lease, or exchange shall not be placed on property without consent of the seller/landlord. **O**

### Standard 16.3

Deleted August 2024

**Standard 16.4**

MLS Participants shall not solicit a listing currently listed exclusively with another broker. However, if the listing broker, when asked by the MLS Participant, refuses to disclose the expiration date and nature of such listing (i.e., an exclusive right-to-sell, an exclusive agency, open listing, or other form of contractual agreement between the listing broker and the client) the MLS Participant may contact the owner to secure such information and may discuss the terms upon which the MLS Participant might take a future listing or, alternatively, may take a listing to become effective upon expiration of any existing exclusive listing. **O**

**Standard 16.5**

MLS Participants shall not solicit buyer/tenant agreements from buyers/tenants who are subject to exclusive buyer/tenant agreements. However, if asked by an MLS Participant, the broker refuses to disclose the expiration date of the exclusive buyer/tenant agreement, the MLS Participant may contact the buyer/tenant to secure such information and may discuss the terms upon which the MLS Participant might enter into a future buyer/tenant agreement or, alternatively, may enter into a buyer/tenant agreement to become effective upon the expiration of any existing exclusive buyer/tenant agreement. *(Amended 1/98)* **O**

**Standard 16.6**

MLS Participants shall not use information obtained from listing brokers through offers to cooperate made through multiple listing services or through other offers of cooperation to refer listing brokers' clients to other brokers or to create buyer/tenant relationships with listing brokers' clients, unless such use is authorized by listing brokers. *(Amended 11/01)* **O**

**Standard 16.7**

The fact that an agreement has been entered into with an MLS Participant shall not preclude or inhibit any other MLS Participant from entering into a similar agreement after the expiration of the prior agreement. *(Amended 1/98)* **O**

**Standard 16.8**

The fact that a prospect has retained an MLS Participant as an exclusive representative or exclusive broker in one or more past transactions does not preclude other MLS Participants from seeking such prospect's future business. *(Amended 1/04)* **O**

**Standard 16.9**

MLS Participants are free to enter into contractual relationships or to negotiate with sellers/landlords, buyers/tenants or others who are not subject to an exclusive agreement but shall not knowingly obligate them to pay more than one Commission except with their informed consent. *(Amended 1/98)* **O**

**Standard 16.10**

When MLS Participants are contacted by the client of another MLS Participant regarding the creation of an exclusive relationship to provide the same type of service, and MLS Participants have not directly or indirectly initiated such discussions, they may discuss the terms upon which they might enter into a future agreement or, alternatively, may enter into an agreement which becomes effective upon expiration of any existing exclusive agreement. *(Amended 1/98)* **O**

**Standard 16.11**

Deleted August 2024

### Standard 16.12

MLS Participants are not precluded from making general announcements to prospects describing their services and the terms of their availability even though some recipients may have entered into agency agreements or other exclusive relationships with another MLS Participant. A general telephone canvass, general mailing, or distribution addressed to all prospects in a given geographical area or in a given profession, business, club, or organization, or other classification or group is deemed general for purposes of this rule. *(Amended 1/04)*

The following types of solicitations are prohibited:

Telephone or personal solicitations of property owners who have been identified by a real estate sign, multiple listing compilation, or other information service as having exclusively listed their property with another MLS Participant; and mail or other forms of written solicitations of prospects whose properties are exclusively listed with another MLS Participant when such solicitations are not part of a general mailing but are directed specifically to property owners identified through compilations of current listings, for sale or for rent signs, or other sources of information intended to foster cooperation with MLS Participants. *(Amended 1/04)* **O**

### Standard 16.13

MLS Participants, prior to entering into a representation agreement, have an affirmative obligation to make reasonable efforts to determine whether the prospect is subject to a current, valid exclusive agreement to provide the same type of real estate service. *(Amended 1/04)* **O**

### Standard 16.14

MLS Participants, acting as buyers or tenants representatives or brokers, shall disclose that relationship to the seller/landlord's representative or broker at first contact and shall provide written confirmation of that disclosure to the seller/landlord's representative or broker not later than execution of a purchase agreement or lease. *(Amended 1/04)* **O**

### Standard 16.15

On unlisted property, MLS Participants acting as buyer/tenant representatives or brokers shall disclose that relationship to the seller/landlord at first contact for that buyer/tenant and shall provide written confirmation of such disclosure to the seller/landlord not later than execution of any purchase or lease agreement. *(Amended 8/24)*

### Standard 16.16

MLS Participants, acting as representatives or brokers of sellers/landlords or as subagents of listing brokers, shall disclose that relationship to buyers/tenants as soon as practicable, and shall provide written confirmation of such disclosure to buyers/tenants not later than execution of any purchase or lease agreement. *(Amended 1/04)* **O**

### Standard 16.17

MLS Participants are not precluded from contacting the client of another broker for the purpose of offering to provide, or entering into a contract to provide, a different type of real estate service unrelated to the type of service currently being provided (e.g., property management as opposed to brokerage) or from offering the same type of service for property not subject to other brokers' exclusive agreements. However, information received through a multiple listing service or any other offer of cooperation may not be used to target clients of other MLS Participants to whom such offers to provide services may be made. *(Amended 1/04)* **O**

**Standard 16.19**
All dealings concerning property exclusively listed or with buyer/tenants who are subject to an exclusive agreement shall be carried on with the client's representative or broker, and not with the client, except with the consent of the client's representative or broker or except where such dealings are initiated by the client. *(Amended 1/04)*

Before providing substantive services (such as writing a purchase offer or presenting a CMA) to prospects, MLS Participants shall ask prospects whether they are a party to any exclusive representation agreement. MLS Participants shall not knowingly provide substantive services concerning a prospective transaction to prospects who are parties to exclusive representation agreements, except with the consent of the prospects' exclusive representatives or at the direction of prospects. *(Adopted 1/03, Amended 1/04)* **O**

**Standard 16.20**
Participants, users, and Subscribers, prior to or after their relationship with their current firm is terminated, shall not induce clients of their current firm to cancel exclusive contractual agreements between the client and that firm. This does not preclude Participants from establishing agreements with their associated licensees governing assignability of exclusive agreements. *(Adopted 1/98, Amended 1/10)* **O**

**Standard 16.21**
Deleted August 2024

**Standard 16.22**
MLS Participants shall not knowingly or recklessly make false or misleading statements about other real estate professionals, their businesses, or their business practices. *(Amended 01/12)* **O**

**Standard 16.23**
MLS Participants' firm websites shall disclose the firm's name and state(s) of licensure in a reasonable and readily apparent manner.

Websites of licensees affiliated with a Participant's firm shall disclose the firm's name and the licensee's state(s) of licensure in a reasonable and readily apparent manner. *(Adopted 11/07)* **O**

**Standard 16.24**
MLS Participants shall present a true picture in their advertising and representations to the public, including Internet content, images, and the URLs and domain names they use, and Participants may not:

a.  engage in deceptive or unauthorized framing of real estate brokerage websites;

b.  manipulate (e.g., presenting content developed by others) listing and other content in any way that produces a deceptive or misleading result;

c.  deceptively use metatags, keywords or other devices/methods to direct, drive, or divert Internet traffic;

d.  present content developed by others without either attribution or without permission; or

e.  otherwise mislead consumers, including use of misleading images. *(Adopted 1/18)* **O**

**Standard 16.25**
The services which MLS Participants provide to their clients and customers shall conform to the standards of practice and competence which are reasonably expected in the specific real estate disciplines in which they engage; specifically, residential real estate brokerage, real property management, commercial and industrial real estate brokerage, land brokerage, real estate appraisal, real estate counseling, real estate syndication, real estate auction, and international real estate.

MLS Participants shall not undertake to provide specialized professional services concerning a type of property or service that is outside their field of competence unless they engage the assistance of one who is competent on such types of property or service, or unless the facts are fully disclosed to the client. Any persons engaged to provide such assistance shall be so identified to the client and their contribution to the assignment should be set forth. *(Adopted 11/09)* **O**

# Orientation

### Section 17  Orientation
Any applicant for MLS participation and any licensee (including licensed or certified appraisers) affiliated with an MLS Participant who has access to and use of MLS-generated information shall complete an orientation program of no more than eight (8) classroom hours devoted to the MLS rules and regulations and computer training related to MLS information entry and retrieval and the operation of the MLS within thirty (30) days after access has been provided. *(Amended 11/04)* **M**

Participants and Subscribers may be required, at the discretion of the MLS, to complete additional training of not more than four (4) classroom hours in any twelve (12) month period when deemed necessary by the MLS to familiarize Participants and Subscribers with system changes or enhancements and/or changes to MLS rules or policies. Participants and Subscribers must be given the opportunity to complete any mandated orientation and additional training remotely. *(Amended 11/17)*

# Internet Data Exchange (IDX)

### Section 18  IDX Defined
IDX affords MLS Participants the ability to authorize limited electronic display and delivery of their listings by other Participants via the following authorized mediums under the Participant's control: websites, mobile apps, and audio devices. As used throughout these rules, "display" includes "delivery" of such listing. *(Amended 5/17)* **M**

### Section 18.1  Authorization
**Note:** Select one of the following two options. **M**

**Option #1:** Participants' consent for display of their listings by other Participants pursuant to these rules and regulations is presumed unless a Participant affirmatively notifies the MLS that the Participant refuses to permit display (either on a blanket or on a listing-by-listing basis). If a Participant refuses on a blanket basis to permit the display of that Participant's listings, that Participant may not download, frame or display the aggregated MLS data of other Participants.*

**Option #2:** Participants' consent for display of their listings by other Participants pursuant to these rules and regulations must be established in writing. If a Participant withholds consent on a blanket basis to permit the display of that Participant's listings, that Participant may not download, frame  or display the aggregated MLS data of other Participants.*

---

*Even where Participants have given blanket authority for other Participants to display their listings through IDX, such consent may be withdrawn on a listing-by-listing basis where the seller has prohibited all Internet display or other electronic forms of display or distribution. *(Amended 05/17)*

### Section 18.2  Participation
**Note:** Select one of the following four options. Participation in IDX may be limited to MLS Participants engaged in real estate brokerage by adopting Option #3 or Option #4. **M**

**Option #1:** Participation in IDX is available to all MLS Participants who consent to display of their listings by other Participants.

**Option #2:** Participation in IDX is available to all MLS Participants who are REALTORS® and who consent to display of their listings by other Participants.

**Option #3:** Participation in IDX is available to all MLS Participants engaged in real estate brokerage who consent to display of their listings by other Participants. *(Amended 11/09)*

**Option #4:** Participation in IDX is available to all MLS Participants who are REALTORS® who are engaged in real estate brokerage and who consent to display of their listings by other Participants. *(Amended 11/09)*

### Section 18.2.1
Participants must notify the MLS of their intention to display IDX information and must give the MLS direct access for purposes of monitoring/ensuring compliance with applicable rules and policies. *(Amended 05/12)* **M**

### Section 18.2.2
MLS Participants may not use IDX-provided listings for any purpose other than display as provided for in these rules. This does not require Participants to prevent indexing of IDX listings by recognized search engines. *(Amended 05/12)* **M**

### Section 18.2.3
Listings, including property addresses, can be included in IDX displays except where a seller has directed their listing broker to withhold their listing or the listing's property address from all display on the Internet (including, but not limited to, publicly-accessible websites or VOWs) or other electronic forms of display or distribution. *(Amended 05/17)* **M**

### Section 18.2.4
Participants may select the listings they choose to display through IDX based only on objective criteria including, but not limited to, factors such as geography or location ("uptown," "downtown," etc.), list price, type of property (e.g., condominiums, cooperatives, single-family detached, multi-family), or type of listing (e.g., exclusive right-to-sell or exclusive agency). Selection of listings displayed through IDX must be independently made by each Participant. *(Amended 11/21)* **M**

### Section 18.2.5
Participants must refresh all MLS downloads and IDX displays automatically fed by those downloads at least once every twelve (12) hours. *(Amended 11/14)* **M**

### Section 18.2.6
Except as provided in the IDX policy and these rules, an IDX site or a Participant or user operating an IDX site or displaying IDX information as otherwise permitted may not distribute, provide, or make any portion of the MLS database available to any person or entity. *(Amended 05/12)* **M**

### Section 18.2.7
Any IDX display controlled by a Participant must clearly identify the name of the brokerage firm under which they operate in a readily visible color and typeface. For purposes of the IDX policy and these rules, "control" means the ability to add, delete, modify and update information as required by the IDX policy and MLS rules. *(Amended 05/12)* **M**

### Section 18.2.8
Any IDX display controlled by a Participant or Subscriber that

a. allows third-parties to write comments or reviews about particular listings or displays a hyperlink to such comments or reviews in immediate conjunction with particular listings, or

b. displays an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing, either or both of those features shall be disabled or discontinued for the seller's listings at the request of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all displays controlled by Participants. Except for the foregoing and subject to Section 18.2.9, a Participant's IDX display may communicate the Participant's professional judgment concerning any listing. Nothing shall prevent an IDX display from notifying its customers that a particular feature has been disabled at the request of the seller. *(Adopted 05/12)* **M**

### Section 18.2.9
Participants shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the Participant beyond that supplied by the MLS and that relates to a specific property. Participants shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for the property explaining why the data or information is false. However, Participants shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment. *(Amended 05/12)* **M**

### Section 18.2.10

An MLS Participant (or where permitted locally, an MLS Subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS Participant (or MLS Subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that Participants may display listings from each IDX feed on a single webpage or display. *(Adopted 11/14)* **M**

### Section 18.2.11

Participants shall not modify or manipulate information relating to other Participants listings. MLS Participants may augment their IDX display of MLS data with applicable property information from other sources to appear on the same webpage or display, clearly separated by the data supplied by the MLS. The source(s) of the information must be clearly identified in the immediate proximity to such data. This requirement does not restrict the format of MLS data display or display of fewer than all of the available listings or fewer authorized fields. *(Adopted 05/15)* **M**

### Section 18.2.12

All listings displayed pursuant to IDX shall identify the listing firm, and the email or phone number provided by the listing Participant in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data.* *(Amended 11/21*) **M**

### Section 18.3  Display

Display of listing information pursuant to IDX is subject to the following rules:

**Note:** All of the following rules are optional but, if adopted, cannot be modified. Select those rules which apply to your IDX program and number the sections accordingly.

### Section 18.3.1

Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS Participants and users (e.g., showing instructions, and property security information) may not be displayed. *(Amended 11/21)* **O**

### Section 18.3.1.1

The type of listing agreement (e.g., exclusive right to sell, exclusive agency, etc.) may not be displayed. *(Amended 05/12)* **O**

### Section 18.3.2

Deleted May 2015.

### Section 18.3.3

Deleted May 2017; moved to 18.2.12 May 2017.

### Section 18.3.4

All listings displayed pursuant to IDX shall identify the listing agent. **O**

### Section 18.3.5

Non-principal brokers and sales licensees affiliated with IDX Participants may display information available through IDX on their own websites subject to their Participant's consent and control and the requirements of state law and/or regulation. **O**

### Section 18.3.6

Deleted November 2006.

### Section 18.3.7

All listings displayed pursuant to IDX shall show the MLS as the source of the information.* *(Amended 05/17)* **O**

### Section 18.3.8

Participants (and their affiliated licensees, if applicable) shall indicate on their websites that IDX information is provided exclusively for consumers' personal,  non-commercial use, that it may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing, and that the data is deemed reliable but is not guaranteed accurate by the MLS. The MLS may, at its discretion, require use of other disclaimers as necessary to protect Participants and/or the MLS from liability.* *(Amended 05/17)* **O**

---

*Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. *(Amended 5/17)*

### Section 18.3.9

The data consumers can retrieve or download in response to an inquiry shall be determined by the MLS but in no instance shall be limited to fewer than five hundred (500) listings or fifty percent (50%) of the listings available for IDX display, whichever is fewer. *(Amended 11/17)* **O**

### Section 18.3.10

The right to display other Participants' listings pursuant to IDX shall be limited to a Participant's office(s) holding participatory rights in this MLS. **O**

### Section 18.3.11

Listings obtained through IDX feeds from REALTOR® Association MLSs where the MLS Participant holds participatory rights must be displayed separately from listings obtained from other sources. Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained.* *(Amended 05/17)* **O**

**Note:** An MLS Participant (or where permitted locally, an MLS Subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS Participant (or MLS Subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that Participants may display listings from each IDX feed on a single webpage or display. *(Adopted 11/14)*

### Section 18.3.12

Display of expired, and withdrawn listings is prohibited. *(Amended 5/21)* O

---

*Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. *(Amended 05/17)*

### Section 18.3.13

Display of seller's(s') and/or occupant's(s') name(s), phone number(s), and e-mail address(es) is prohibited. O

**Note:** The following Sections 18.3.14 and 18.3.15 may be adopted by MLSs that provide Participants with a "persistent" download (i.e., where the MLS database resides on Participants' servers) of the MLS database.

### Section 18.3.14

Participants are required to employ appropriate security protection such as firewalls on their websites and displays, provided that any security measures required may not be greater than those employed by the MLS. *(Amended 05/12)* O

### Section 18.3.15

Participants must maintain an audit trail of consumer activity on their website and make that information available to the MLS if the MLS believes the IDX site has caused or permitted a breach in the security of the data or a violation of MLS rules related to use by consumers. *(Amended 05/12)* O

### Section 18.3.16

**Note:** Select one of the following two options.

**Option #1:** Advertising (including co-branding) on pages displaying IDX-provided listings is prohibited.

**Option #2:** Deceptive or misleading advertising (including co-branding) on pages displaying IDX-provided listings is prohibited. For purposes of these rules, co-branding will be presumed not to be deceptive or misleading if the Participant's logo and contact information is larger than that of any third party. *(Adopted 11/09)* O

### Section 18.4  Service Fees and Charges

Service fees and charges for participation in IDX shall be as established annually by the Board of Directors. *(Adopted 11/01, Amended 5/05)* O

**Section 19**

# Virtual Office Websites (VOWs)

**Note:** Adoption of Sections 19.1 through 19.14 is mandatory.

### Section 19.1  VOW Defined

a. A "Virtual Office Website" (VOW) is a Participant's Internet website, or a feature of a Participant's website, through which the Participant is capable of providing real estate brokerage services to consumers with whom the Participant has first established a broker-consumer relationship (as defined by state law) where the consumer has the opportunity to search MLS listing information, subject to the Participant's oversight, supervision, and accountability. A non-principal broker or sales licensee affiliated with a Participant may, with his or her Participant's consent, operate a VOW. Any VOW of a non-principal broker or sales licensee is subject to the Participant's oversight, supervision, and accountability. **M**

b. As used in Section 19 of these rules, the term "Participant" includes a Participant's affiliated non-principal brokers and sales licensees—except when the term is used in the phrases "Participant's consent" and "Participant's oversight, supervision, and accountability". References to "VOW" and "VOWs" include all Virtual Office Websites, whether operated by a Participant, by a non-principal broker or sales licensee, or by an "Affiliated VOW Partner" (AVP) on behalf of a Participant. **M**

c. "Affiliated VOW Partner" (AVP) refers to an entity or person designated by a Participant to operate a VOW on behalf of the Participant, subject to the Participant's supervision, accountability, and compliance with the VOW policy. No AVP has independent participation rights in the MLS by virtue of its right to receive information on behalf of a Participant. No AVP has the right to use MLS listing information, except in connection with operation of a VOW on behalf of one or more Participants. Access by an AVP to MLS listing information is derivative of the rights of the Participant on whose behalf the AVP operates a VOW. **M**

d. As used in Section 19 of these rules, the term "MLS listing information" refers to active listing information and sold data provided by Participants to the MLS and aggregated and distributed by the MLS to Participants. **M**

### Section 19.2

a. The right of a Participant's VOW to display MLS listing information is limited to that supplied by the MLS(s) in which the Participant has participatory rights. However, a Participant with offices participating in different MLSs may operate a master website with links to the VOWs of the other offices. **M**

b. Subject to the provisions of the VOW policy and these rules, a Participant's VOW, including any VOW operated on behalf of a Participant by an AVP, may provide other features, information, or functions, e.g., "Internet Data Exchange" (IDX). **M**

c. Except as otherwise provided in the VOW policy or in these rules, a Participant need not obtain separate permission from other MLS Participants whose listings will be displayed on the Participant's VOW. **M**

**Section 19.3**

a.  Before permitting any consumer to search for or retrieve any MLS listing information on his or her VOW, the Participant must take each of the following steps.

    i.  The Participant must first establish with that consumer a lawful broker-consumer relationship (as defined by state law), including completion of all actions required by state law in connection with providing real estate brokerage services to clients and customers (hereinafter, "Registrants"). Such actions shall include, but are not limited to, satisfying all applicable agency, non-agency, and other disclosure obligations, and execution of any required agreements.

    ii.  The Participant must obtain the name of and a valid e-mail address for each Registrant. The Participant must send an e-mail to the address provided by the Registrant confirming that the Registrant has agreed to the terms of use (described in Subsection d., below). The Participant must verify that the e-mail address provided by the Registrant is valid and that the Registrant has agreed to the terms of use.

    iii.  The Participant must require each Registrant to have a user name and a password, the combination of which is different from those of all other Registrants on the VOW. The Participant may, at his or her option, supply the user name and password or may allow the Registrant to establish its user name and password. The Participant must also assure that any e-mail address is associated with only one user name and password. **M**

b.  The Participant must assure that each Registrant's password expires on a date certain, but may provide for renewal of the password. The Participant must at all times maintain a record of the name, e-mail address, user name, and current password of each Registrant. The Participant must keep such records for not less than one hundred eighty (180) days after the expiration of the validity of the Registrant's password. **M**

c.  If the MLS has reason to believe that a Participant's VOW has caused or permitted a breach in the security of MLS listing information or a violation of MLS rules, the Participant shall, upon request of the MLS, provide the name, e-mail address, user name, and current password, of any Registrant suspected of involvement in the breach or violation. The Participant shall also, if requested by the MLS, provide an audit trail of activity by any such Registrant. **M**

d.  The Participant shall require each Registrant to review and affirmatively to express agreement (by mouse click or otherwise) to a terms of use provision that provides at least the following:

    i.  that the Registrant acknowledges entering into a lawful consumer-broker relationship with the Participant

    ii.  that all information obtained by the Registrant from the VOW is intended only for the Registrant's personal, non-commercial use

    iii.  that the Registrant has a bona fide interest in the purchase, sale, or lease of real estate of the type being offered through the VOW

iv.  that the Registrant will not copy, redistribute, or retransmit any of the information provided, except in connection with the Registrant's consideration of the purchase or sale of an individual property

v.  that the Registrant acknowledges the MLS' ownership of and the validity of the MLS' copyright in the MLS database **M**

e.  The terms of use agreement may not impose a financial obligation on the Registrant or create any representation agreement between the Registrant and the Participant. Any agreement entered into at any time between the Participant and Registrant imposing a financial obligation on the Registrant or creating representation of the Registrant by the Participant must be established separately from the terms of use, must be prominently labeled as such, and may not be accepted solely by mouse click. **M**

f.  The terms of use agreement shall also expressly authorize the MLS and other MLS Participants or their duly authorized representatives to access the VOW for the purposes of verifying compliance with MLS rules and monitoring display of Participants' listings by the VOW. The agreement may also include such other provisions as may be agreed to between the Participant and the Registrant. **M**

## Section 19.4

A Participant's VOW must prominently display an e-mail address, telephone number, or specific identification of another mode of communication (e.g., live chat) by which a consumer can contact the Participant to ask questions or get more information about any property displayed on the VOW. The Participant or a non-principal broker or sales licensee licensed with the Participant must be willing and able to respond knowledgeably to inquiries from Registrants about properties within the market area served by that Participant and displayed on the VOW. **M**

## Section 19.5

A Participant's VOW must employ reasonable efforts to monitor for and prevent misappropriation, scraping, and other unauthorized uses of MLS listing information. A Participant's VOW shall utilize appropriate security protection such as firewalls as long as this requirement does not impose security obligations greater than those employed concurrently by the MLS. **M**

**Note:** MLSs may adopt rules requiring Participants to employ specific security measures, provided that any security measure required does not impose obligations greater than those employed by the MLS.

## Section 19.6

a.  A Participant's VOW shall not display the listings or property addresses of any seller who has affirmatively directed the listing broker to withhold the seller's listing or property address from display on the Internet. The listing broker shall communicate to the MLS that the seller has elected not to permit display of the listing or property address on the Internet. Notwithstanding the foregoing, a Participant who operates a VOW may provide to consumers via other delivery mechanisms, such as e-mail, fax, or otherwise, the listings of sellers who have determined not to have the listing for their property displayed on the Internet. **M**

b. A Participant who lists a property for a seller who has elected not to have the property listing or the property address displayed on the Internet shall cause the seller to execute a document that includes the following (or a substantially similar) provision. **M**

## Seller Opt-out Form

1. Check one.

   a. ☐ I have advised my broker or sales agent that I do not want the listed property to be displayed on the Internet.

   b. ☐ I have advised my broker or sales agent that I do not want the address of the listed property to be displayed on the Internet.

2. I understand and acknowledge that if I have selected Option a., consumers who conduct searches for listings on the Internet will not see information about the listed property in response to their searches.

_____
Initials of Seller

c. The Participant shall retain such forms for at least one (1) year from the date they are signed or one (1) year from the date the listing goes off the market, whichever is greater. **M**

**Section 19.7**
a. Subject to Subsection b., below, a Participant's VOW may allow third-parties:

   i. to write comments or reviews about particular listings or display a hyperlink to such comments or reviews in immediate conjunction with particular listings, or

   ii. to display an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing. **M**

b. Notwithstanding the foregoing, at the request of a seller, the Participant shall disable or discontinue either or both of those features described in Subsection a. as to any listing of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all Participants' websites. Subject to the foregoing and to Section 19.8, a Participant's VOW may communicate the Participant's professional judgment concerning any listing. A Participant's VOW may notify its customers that a particular feature has been disabled at the request of the seller. **M**

**Section 19.8**
A Participant's VOW shall maintain a means (e.g., e-mail address, telephone number) to receive comments from the listing broker about the accuracy of any information that is added by or on behalf of the Participant beyond that supplied by the MLS and that relates to a specific property displayed on the VOW. The Participant shall correct or remove any false information relating to a specific property within forty-eight (48) hours following receipt of a communication from the listing broker explaining why the data or information is false. The Participant shall not, however, be obligated to correct or remove any data or information that simply reflects good faith opinion, advice, or professional judgment. **M**

**Section 19.9**

A Participant shall cause the MLS listing information available on its VOW to be refreshed at least once every three (3) days. **M**

**Section 19.10**

Except as provided in these rules, in the NATIONAL ASSOCIATION OF REALTORS®' VOW policy, or in any other applicable MLS rules or policies, no Participant shall distribute, provide, or make accessible any portion of the MLS listing information to any person or entity. **M**

**Section 19.11**

A Participant's VOW must display the Participant's privacy policy informing Registrants of all of the ways in which information that they provide may be used. **M**

**Section 19.12**

A Participant's VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, or type of property. *(Amended 11/21)* **M**

**Section 19.13**

A Participant who intends to operate a VOW to display MLS listing information must notify the MLS of its intention to establish a VOW and must make the VOW readily accessible to the MLS and to all MLS Participants for purposes of verifying compliance with these rules, the VOW policy, and any other applicable MLS rules or policies. **M**

**Section 19.14**

A Participant may operate more than one VOW himself or herself or through an AVP. A Participant who operates his or her own VOW may contract with an AVP to have the AVP operate other VOWs on his or her behalf. However, any VOW operated on behalf of a Participant by an AVP is subject to the supervision and accountability of the Participant. **M**

**Note:** Adoption of Sections 19.15 through 19.19 is at the discretion of the MLS. However, if any of the following sections are adopted, an equivalent requirement must be imposed on Participants' use of MLS listing information in providing brokerage service through all other delivery mechanisms.

**Section 19.15**

A Participant's VOW may not make available for search by or display to Registrants any of the following information:

a.  expired and withdrawn listings

**Note:** Due to the 2015 changes in IDX policy and the requirement that Participants be permitted to make MLS listing information available to Registrants of VOW sites where such information may be made available via other delivery mechanisms, MLSs can no longer prohibit the display of pending ("under contract") listings on VOW sites.

b.  the type of listing agreement, i.e., exclusive right-to-sell or exclusive agency

c.  the seller's and occupant's name(s), phone number(s), or e-mail address(es)

d.  instructions or remarks intended for cooperating brokers only, such as those regarding showings or security of listed property

e. Sales price if sold information is not publicly accessible in the jurisdiction of the MLS *(Amended 11/21)* **O**

**Note:** If sold information is publicly accessible in the jurisdiction of the MLS, Subsection 19.15e. must be omitted. *(Revised 11/21)* **M**

### Section 19.16
A Participant shall not change the content of any MLS listing information that is displayed on a VOW from the content as it is provided in the MLS. The Participant may, however, augment MLS listing information with additional information not otherwise prohibited by these rules or by other applicable MLS rules or policies, as long as the source of such other information is clearly identified. This rule does not restrict the format of display of MLS listing information on VOWs or the display on VOWs of fewer than all of the listings or fewer than all of the authorized information fields. **O**

### Section 19.17
A Participant shall cause to be placed on his or her VOW a notice indicating that the MLS listing information displayed on the VOW is deemed reliable, but is not guaranteed accurate by the MLS. A Participant's VOW may include other appropriate disclaimers necessary to protect the Participant and/or the MLS from liability. **O**

### Section 19.18
A Participant shall cause any listing that is displayed on his or her VOW to identify the name of the listing firm, the listing broker or agent, and the email or phone number provided by the listing Participant in a readily visible color, in a reasonably prominent location, and in typeface not smaller than the median typeface used in the display of listing data. *(Amended 11/21)* **O**

### Section 19.19
A Participant shall limit the number of listings that a Registrant may view, retrieve, or download to not more than ___ current listings and not more than ___ sold listings in response to any inquiry. **O**

**Note:** The number of listings that may be viewed, retrieved, or downloaded should be specified by the MLS in the context of this rule, but may not be fewer than five hundred (500) listings or fifty percent (50%) of the listings in the MLS, whichever is less. *(Amended 11/17)* **M**

**Note:** Adoption of Sections 19.20 through 19.25 is at the discretion of the MLS. It is not required that equivalent requirements be established related to other delivery mechanisms.

### Section 19.20
A Participant shall require that Registrants' passwords be reconfirmed or changed every _____ days. **O**

**Note:** The number of days passwords remain valid before being changed or reconfirmed must be specified by the MLS in the context of this rule and cannot be shorter than ninety (90) days. Participants may, at their option, require Registrants to reconfirm or change passwords more frequently. **M**

**Section 19.21**
A Participant may display advertising and the identification of other entities ("co-branding") on any VOW the Participant operates or that is operated on his or her behalf. However, a Participant may not display on any such VOW deceptive or misleading advertising or co-branding. For purposes of this section, co-branding will be presumed not to be deceptive or misleading if the Participant's logo and contact information (or that of at least one Participant, in the case of a VOW established and operated on behalf of more than one Participant) is displayed in immediate conjunction with that of every other party, and the logo and contact information of all Participants displayed on the VOW is as large as the logo of the AVP and larger than that of any third party. **O**

**Section 19.22**
A Participant shall cause any listing displayed on his or her VOW obtained from other sources, including from another MLS or from a broker not participating in the MLS, to identify the source of the listing. **O**

**Section 19.23**
A Participant shall cause any listing displayed on his or her VOW obtained from other sources, including from another MLS or from a broker not participating in the MLS, to be searched separately from listings in the MLS. **O**

**Section 19.24**
Participants and the AVPs operating VOWs on their behalf must execute the license agreement required by the MLS. **O**

**Section 19.25**
Where a seller affirmatively directs his or her listing broker to withhold either the seller's listing or the address of the seller's listing from display on the Internet, a copy of the seller's affirmative direction shall be provided to the MLS within forty-eight (48) hours. **O**

# D. Model Association Bylaw Provisions Authorizing a Multiple Listing Service as a Wholly-owned Subsidiary Corporation of the Association

## Subsidiary Multiple Listing Corporation

### Section 1  Authority
The association of REALTORS® shall maintain for the use of its members a multiple listing service which shall be a lawful corporation of the state of _____, all the stock of which shall be owned by this association of REALTORS®. **M**

### Section 2  Purpose
A multiple listing service is a means by which cooperation among Participants is enhanced; by which information is accumulated and disseminated to enable authorized Participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; by which Participants engaging in real estate appraisal contribute to common databases; and is a facility for the orderly correlation and dissemination of listing information so Participants may better serve their clients and the public. *(Amended 8/24)* **M**

### Section 3  Governing Documents
The board of directors shall cause any multiple listing service established by it pursuant to this article to conform its corporate charter, constitution, bylaws, rules, regulations, policies, practices, and procedures at all times to the constitution, bylaws, rules, regulations, and policies of the NATIONAL ASSOCIATION OF REALTORS®. **M**

### Section 4  Participation
Any REALTOR® of this or any other association who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these bylaws, shall be eligible to participate in multiple listing upon agreeing in writing to conform to the rules and regulations thereof and to pay the costs incidental thereto.* However, under no circumstances is any individual or firm, regardless of membership status, entitled to multiple listing service membership or participation unless they hold a current, valid real estate broker's license and cooperate, or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property.** Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a Participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law.

---

*Optional qualifications which may be adopted at the local association's discretion: Any applicant for MLS participation and any licensee (including licensed or certified appraisers) affiliated with an MLS Participant who has access to and use of MLS-generated information shall complete an orientation program of no more than eight (8) classroom hours devoted to the MLS rules and regulations and computer training related to MLS information entry and retrieval within thirty (30) days after access has been provided.

Associations are not required to establish prerequisites for MLS participation beyond holding REALTOR® (principal) membership in an association. However, if the association wishes to establish these requirements for MLS participation or for access to MLS-generated information, the requirement of attendance at an orientation program is the most rigorous requirement that may be established.

\*\*Generally, associations of REALTORS®, when there is more than one principal in a real estate firm, define the chief principal officer of the firm as the MLS Participant. If each principal is defined as a Participant, then each shall have a separate vote on MLS matters. Brokers or salespersons other than principals are not considered Participants in the service, but have access to and use of the service through the principal(s) with whom they are affiliated.

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm cooperates means that the Participant actively endeavor during the operation of its real estate business to list real property of the type listed on the MLS, share information on listed property and make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interests of their client(s). "Actively" means on a continual and ongoing basis during the operation of the Participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a Participant or potential Participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a Participant or potential Participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the Participant or potential Participant as long as the level of service satisfies state law.

The key is that the Participant or potential Participant actively endeavors to cooperate with respect to properties of the type that are listed on the MLS in which participation is sought. Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients.   This requirement does not permit an MLS to deny participation to a Participant or potential Participant that operates a "Virtual Office Website" (VOW) (including a VOW that the Participant uses to refer customers to other Participants) if the Participant or potential Participant actively endeavors to cooperate. An MLS may evaluate whether a Participant or potential Participant actively endeavors during the operation of its real estate business to cooperate only if the MLS has a reasonable basis to believe that the Participant or potential Participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all Participants and potential Participants.

**Optional Provision for Establishing Nonmember Participatory Rights (Open MLS)\*** A nonmember applicant for MLS participation who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, shall supply evidence satisfactory to the membership committee that he has no record of recent or pending bankruptcy; has no record of official sanctions involving unprofessional conduct; agrees to complete a course of instruction (if any) covering the MLS rules and regulations and computer training related to MLS information entry and retrieval, and shall pass such reasonable and non-discriminatory written examination thereon as may be required by the MLS; and shall agree that if elected as a Participant, he will abide by such rules and regulations and pay the MLS fees and dues, including the nonmember differential (if any), as from time to time established. Under no circumstances is any individual or firm entitled to MLS Participation or membership unless they hold a current, valid real estate broker's license and cooperate or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients.   Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a Participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law.

_____

\*Only adopt the following paragraphs if the association's MLS is open to nonmember Participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere).

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm cooperates means that the Participant actively endeavor during the operation of its real state business to list real property of the type listed on the MLS, share information on listed property and make property available to other brokers for showing to prospective puchasers and tenants when it is in the best interests of their client. "Actively" means on a continual and ongoing basis during the operation of the Participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a Participant or potential Participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a Participant or potential Participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the Participant or potential Participant as long as the level of service satisfies state law.

The key is that the Participant or potential Participant  cooperate with respect to properties of the type that are listed on the MLS in which participation is sought. . Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients.   This requirement does not permit an MLS to deny participation to a Participant or potential Participant that operates a "Virtual Office Website" (VOW) (including a VOW that the Participant uses to refer customers to other Participants) if the Participant or potential Participant actively endeavors to cooperate. An MLS may evaluate whether a Participant or potential Participant actively endeavors during the operation of its real estate business to cooperate only if the MLS has a reasonable basis to believe that the Participant or potential Participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all Participants and potential Participants.

**Note 1:** The requirements of (1) no record of recent or pending bankruptcy; (2) no record of official sanctions involving unprofessional conduct; and (3) completion of a course of instruction on the MLS rules and regulations and computer training related to MLS information entry and retrieval may be deleted from this section at the option of each association. In states where law requires non-association members be admitted to the MLS of an association of REALTORS®, any limitations or restrictions imposed on participation or membership shall be no more stringent than permissible under the National Association's membership qualification criteria. However, in states where non-association member access to the MLS is not a requirement of state law, associations may, at their discretion, establish additional qualifications for non-association member participation and membership in the MLS.

**Note 2:** An association may also choose to have the membership committee consider the following in determining a nonmember applicant's qualifications for MLS participation or membership:

- all final findings of Code of Ethics violations and violations of other membership duties in any other association within the past three (3) years

- pending ethics complaints (or hearings)

- unsatisfied discipline pending

- pending arbitration requests (or hearings)

- unpaid arbitration awards or unpaid financial obligations to this or any other association or association MLS.  *(Amended 8/24)* **M**

## Section 5  Subscribers
Subscribers (or users) of the MLS include non-principal brokers, sales associates, and licensed and certified appraisers affiliated with Participants. (Optional provision: Subscribers also include affiliated unlicensed administrative and clerical staff, personal assistants, and individuals seeking licensure or certification as real estate appraisers who are under the direct supervision of an MLS Participant or the Participant's licensed designee.) *(Adopted 4/92)* **M**

**Section 6  Removal of Officers and Directors**

In the event that an officer or director of the multiple listing service is deemed to be incapable of fulfilling the duties for which elected, but will not resign from office voluntarily, the officer or director may be removed from office under the following procedure:

1.  A petition requiring the removal of an officer or director and signed by not less than one-third of the Participants or a majority of all directors of the MLS shall be filed with the president of the MLS, or if the president is the subject of the petition, with the next-ranking officer, and shall specifically set forth the reasons the individual is deemed to be disqualified from further service.

2.  Upon receipt of the petition, and not less than twenty (20) days or more than forty-five (45) days thereafter, a special meeting of the Participants of the MLS shall be held, and the sole business of the meeting shall be to consider the charge against the officer or director, and to render a decision on such petition.

3.  The special meeting shall be noticed to all Participants at least ten (10) days prior to the meeting, and shall be conducted by the president of the MLS unless the president's continued service in office is being considered at the meeting. In such case, the next-ranking officer will conduct the meeting or the hearing by the Participants. Provided a quorum is present, a three-fourths vote of Participants present and voting shall be required for removal from office.

4.  Any vote taken by the Participants to remove an officer or director must ultimately be confirmed by a majority vote of the directors of the shareholder(s). Notwithstanding the foregoing, the shareholder(s) may remove an officer or director by a majority vote of the directors of the shareholder(s). *(Adopted 11/96)* **R**

# E. Model Bylaws for a Multiple Listing Service Separately Incorporated but Wholly-owned by an Association of REALTORS®*

### Article 1  Name

The name of this organization shall be the Multiple Listing Service of the _____ Association of REALTORS®, Inc., hereinafter referred to as the service, all the shares of stock of which are solely and wholly-owned by the _____ Association of REALTORS®. **M**

### Section 2  Purpose

A multiple listing service is a means by which cooperation among Participants is enhanced; by which information is accumulated and disseminated to enable authorized Participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; by which Participants engaging in real estate appraisal contribute to common databases; and is a facility for the orderly correlation and dissemination of listing information so Participants may better serve their clients and the public. *(Amended 8/24)* **M**

### Article 3  Service Area

The service area of the MLS shall be determined by the MLS Board of Directors.

**Note:** MLSs are encouraged to establish service areas that encompass natural markets and to periodically reexamine such boundaries. An MLS is not precluded from establishing and maintaining an MLS service area that exceeds the parent association(s) jurisdiction. *(Amended 11/17)* **M**

---

*These model bylaws for a multiple listing service, separately incorporated but wholly-owned by an association of REALTORS®, should not be adopted without review and consultation with association legal counsel to ensure that they comply with applicable state law pertaining to corporations within the state, or are appropriately modified to comply with the law.

### Section 4  Participation

Any REALTOR® of this or any other association who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these bylaws, shall be eligible to participate in multiple listing upon agreeing in writing to conform to the rules and regulations thereof and to pay the costs incidental thereto.* However, under no circumstances is any individual or firm, regardless of membership status, entitled to multiple listing service membership or participation unless they hold a current, valid real estate broker's license and cooperate, or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property.** Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a Participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law.

 *Optional qualifications which may be adopted at the local association's discretion: Any applicant for MLS participation and any licensee (including licensed or certified appraisers) affiliated with an MLS Participant who has access to and use of MLS-generated information shall complete an orientation program of no more than eight (8) classroom hours devoted to the MLS rules and regulations and computer training related to MLS information entry and retrieval within thirty (30) days after access has been provided.

Associations are not required to establish prerequisites for MLS participation beyond holding REALTOR® (principal) membership in an association. However, if the association wishes to establish these requirements for MLS participation or for access to MLS-generated information, the requirement of attendance at an orientation program is the most rigorous requirement that may be established.

**Generally, associations of REALTORS®, when there is more than one principal in a real estate firm, define the chief principal officer of the firm as the MLS Participant. If each principal is defined as a Participant, then each shall have a separate vote on MLS matters. Brokers or salespersons other than principals are not considered Participants in the service, but have access to and use of the service through the principal(s) with whom they are affiliated.

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm cooperates means that the Participant actively endeavor during the operation of its real estate business to list real property of the type listed on the MLS, share information on listed property and make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interests of their client(s). "Actively" means on a continual and ongoing basis during the operation of the Participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a Participant or potential Participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a Participant or potential Participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the Participant or potential Participant as long as the level of service satisfies state law.

The key is that the Participant or potential Participant actively endeavors to cooperate with respect to properties of the type that are listed on the MLS in which participation is sought. Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients. This requirement does not permit an MLS to deny participation to a Participant or potential Participant that operates a "Virtual Office Website" (VOW) (including a VOW that the Participant uses to refer customers to other Participants) if the Participant or potential Participant actively endeavors to cooperate. An MLS may evaluate whether a Participant or potential Participant actively endeavors during the operation of its real estate business to cooperate only if the MLS has a reasonable basis to believe that the Participant or potential Participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all Participants and potential Participants.

**Optional Provision for Establishing Nonmember Participatory Rights (Open MLS)\*** A nonmember applicant for MLS participation who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, shall supply evidence satisfactory to the membership committee that he has no record of recent or pending bankruptcy; has no record of official sanctions involving unprofessional conduct; agrees to complete a course of instruction (if any) covering the MLS rules and regulations and computer training related to MLS information entry and retrieval, and shall pass such reasonable and non-discriminatory written examination thereon as may be required by the MLS; and shall agree that if elected as a Participant, he will abide by such rules and regulations and pay the MLS fees and dues, including the nonmember differential (if any), as from time to time established. Under no circumstances is any individual or firm entitled to MLS Participation or membership unless they hold a current, valid real estate broker's license and cooperate, or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients.   Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a Participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law.

---

\*Only adopt the following paragraphs if the association's MLS is open to nonmember Participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere).

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm cooperates means that the Participant actively endeavor during the operation of its real state business to list real property of the type listed on the MLS, share information on listed property and make property available to other brokers for showing to prospective puchasers and tenants when it is in the best interests of their client. "Actively" means on a continual and ongoing basis during the operation of the Participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a Participant or potential Participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a Participant or potential Participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the Participant or potential Participant as long as the level of service satisfies state law.

The key is that the Participant or potential Participant cooperate with respect to properties of the type that are listed on the MLS in which participation is sought. . Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients.   This requirement does not permit an MLS to deny participation to a Participant or potential Participant that operates a "Virtual Office Website" (VOW) (including a VOW that the Participant uses to refer customers to other Participants) if the Participant or potential Participant actively endeavors to . An MLS may evaluate whether a Participant or potential Participant actively endeavors during the operation of its real estate business to cooperate only if the MLS has a reasonable basis to believe that the Participant or potential Participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all Participants and potential Participants.

**Note 1:** The requirements of (1) no record of recent or pending bankruptcy; (2) no record of official sanctions involving unprofessional conduct; and (3) completion of a course of instruction on the MLS rules and regulations and computer training related to MLS information entry and retrieval may be deleted from this section at the option of each association. In states where law requires non-association members be admitted to the MLS of an association of REALTORS®, any limitations or restrictions imposed on participation or membership shall be no more stringent than permissible under the National Association's membership qualification criteria. However, in states where non-association member access to the MLS is not a requirement of state law, associations may, at their discretion, establish additional qualifications for non-association member participation and membership in the MLS.

**Note 2:** An association may also choose to have the membership committee consider the following in determining a nonmember applicant's qualifications for MLS participation or membership:

- all final findings of Code of Ethics violations and violations of other membership duties in any other association within the past three (3) years

- pending ethics complaints (or hearings)

- unsatisfied discipline pending

- pending arbitration requests (or hearings)

- unpaid arbitration awards or unpaid financial obligations to this or any other association or association MLS. *(Amended 8/24)* **M**

## Article 4.1  Application for Participation

Application for participation shall be made in such manner and form as may be prescribed by the board of directors of the service and made available to any REALTOR® principal of this or any other association requesting it. The application form shall contain a signed statement agreeing to abide by these bylaws and any other applicable rules and regulations of the service as from time to time amended or adopted. *(Amended 2/94)* **M**

### Article 4.2  Discontinuance of Service

Participants of the service may discontinue the service by giving the service _____ days' written notice and may reapply to the service after _____ months by making formal application in the manner prescribed for new applicants for participation provided all past dues and fees are fully paid. **M**

### Article 4.3  Subscribers

Subscribers (or users) of the MLS include non-principal brokers, sales associates, and licensed and certified appraisers affiliated with Participants. (Optional provision: Subscribers also include affiliated unlicensed administrative and clerical staff, personal assistants, and individuals seeking licensure or certification as real estate appraisers who are under the direct supervision of an MLS Participant or the Participant's licensed designee.) *(Adopted 4/92)* **M**

### Article 5  Service Charges

The charges made for participation in the service shall be as determined, and as amended from time to time by the board of directors of the service, and specified in the rules and regulations of the service. **R**

### Article 6  Government of the Service

The government of the service shall be vested in a board of directors comprised of the elected officers and directors nominated and elected as described in this article. **M**

### Article 6.1  Officers of the Service

The officers of the service, who shall also be directors, shall be a president, a vice president, and a secretary-treasurer, and shall have such duties as described in this article. **M**

### Article 6.2  Board of Directors

There shall be a total of _____ elected directors, including the president, vice president, and secretary-treasurer of the service, to be elected from among the Participants of the service, except that not more than _____ directors may be elected from among REALTORS® other than Participants or from REALTOR-ASSOCIATE®s who are affiliated with Participants and serve with consent of the Participants as representatives of the Participants with whom they are affiliated. In addition to the elected directors, the current president of the _____ Association of REALTORS® or a person appointed by the president, and the immediate past president of the service shall serve as directors, ex-officio, with full voting privileges. **M**

### Article 6.3  Nomination and Election of Officers and Directors

The officers and directors of the service shall be nominated by a vote of the Participants in the service in accordance with the provisions of Article 7, meetings, of these bylaws and as set forth below.

1.  **Nominating Committee:** The president of the service shall appoint a nominating committee each year, which committee shall be comprised of _____ Participants of the service. The appointment of the nominating committee shall be made by such a date as to enable the committee to meet and select a proposed slate of officers and directors of the service not more than _____ nor less than _____ days prior to the date of the meeting of the Participants of the service at which nominees shall be selected by vote of the Participants. The proposed slate of officers and directors shall be reported to the president and Secretary of the service.

2. **Notice of Proposed Nominees:** The president shall cause a list of the proposed nominees selected by the nominating committee to be forwarded to the Participants of the service, setting forth the time, place, and other pertinent conditions of the meeting to select the final list of nominees by vote of the Participants of the service. The notice to the Participants of the service concerning the meeting to select nominees for officers and directors shall be mailed on a date at least _____ days prior to the proposed meeting.

3. **Rights of Participants to Select Additional Nominees:** The names of additional proposed nominees may be added to the list selected by the nominating committee by a petition submitted to the Secretary of the service by _____% of the Participants of the service, with said petition received not less than _____ days prior to the date of meeting of the Participants to select nominees for officers and directors. The names contained in such petition, if duly received and certified, shall be presented in writing to the Participants at the meeting to select nominees as additional nominees for consideration for such office as specified in the petition. In addition, nominations may be made from the floor at the duly noticed meeting of the Participants to select nominees for officers and directors and, if seconded, shall be added to the list of proposed nominees.

4. **Voting by Written Secret Ballot:** Voting for selection of nominees, if other than on a motion to cast a unanimous vote for the original proposed slate shall be by secret ballot, and said ballot shall contain blank spaces for writing in additional names proposed by petition or from the floor at the meeting to select nominees.

5. **Vote to Select Nominees:** Voting shall be in accordance with provisions of Article _____ of these bylaws.

6. **Nominees Submitted to Shareholder for Election:** When nominees for officers and directors of the service for the forthcoming fiscal year have been selected by vote of the Participants of the service, such nominees shall be submitted to the board of directors of the _____ Association of REALTORS® (shareholder) for election. Upon election by the board of directors of the _____ Association of REALTORS® (shareholder), the individuals so elected shall be considered officers-elect and directors-elect and shall assume their respective offices on (date office is effective).

The term of office for officers and directors of the service shall be on a calendar year basis. In the event one (1) or more nominee(s) is/are not elected by the board of directors of the _____ Association of REALTORS® (shareholder), and upon notice of such failure of election, the president of the service shall select a proposed Participant or Participants, as required, subject to confirmation by the board of directors, for submission as nominee(s) to the board of directors of the _____ Association of REALTORS® (shareholder) to be considered for election to fill the vacancy or vacancies existing.

In the event that nominees are not duly and timely provided by the service to the board of directors of the _____ Association of REALTORS®, as provided in these bylaws, then the board of directors of the _____ Association of REALTORS® shall exercise rights as sole and exclusive shareholder to elect a Participant or Participants of the service to fill any existing vacancy or vacancies as officers or directors of the service. **M**

### Article 6.4  Terms of Office

The officers shall serve for a one-year term. The elected directors shall serve for staggered three-year terms with one-third of the terms expiring each year. Officers and directors shall take office upon the effective date of their offices and shall continue until their successors are elected, qualified, and installed. No officer or director shall be nominated and elected to the same office for more than two consecutive terms. **M**

### Article 6.5  Duties of Officers and Directors

The duties of the officers and directors are as follows:

1. The president shall be the chief executive officer of the service and shall preside at its meetings and those of the board of directors, and shall perform all the duties of the president subject to declared policies and, as required, subject to confirmation of the board of directors.

2. The vice president shall, in the absence of the president, perform all of the duties of the president.

3. The secretary-treasurer shall be the custodian of the funds of the service and shall keep an accurate record of all receipts and disbursements. The secretary-treasurer shall provide to all members of the board of directors a quarterly statement of all accounts and financial affairs for the service, and shall have charge of the corporate seal and affix the name to all documents properly requiring such seal.

4. The board of directors of the service shall be the governing body of the service and shall have control of all the affairs of the service and shall authorize all expenditures of funds. The board of directors shall, prior to the end of each fiscal year, prepare a budget reflecting projected costs and expenses of the service for the next fiscal year, indicating projected income from all sources. The budget shall be submitted to the Participants of the service for approval on a date not less than _____ days prior to the first day of the next fiscal year. The board of directors shall not incur an obligation in excess of $_____ over the total budget without the authorization by vote of a two-thirds majority of REALTOR® Participants of the service present and voting unless such excess is the result of an increase in the volume of listings processed by the service over that projected in preparing the annual budget. The board of directors shall employ such executive, legal, and office personnel it deems necessary to care for and maintain the properties of the service and otherwise conduct the administrative business of the service. The board of directors shall have the right to make an audit of all books and accounts at any time without notice. The board of directors shall have the power from time-to-time to adopt such rules and regulations that they may deem appropriate subject to final approval of the board of directors of the _____ Association of REALTORS® (shareholder). Except as otherwise provided in these bylaws and rules and regulations, the action of the board of directors shall be final. **M**

### Article 6.6  Removal of Officers and Directors

In the event that an officer or director of the multiple listing service is deemed to be incapable of fulfilling the duties for which elected, but will not resign from office voluntarily, the officer or director may be removed from office under the following procedure: *(Adopted 11/96)*

1.  A petition requiring the removal of an officer or director and signed by not less than one-third of the Participants or a majority of all directors of the MLS shall be filed with the president of the MLS, or if the president is the subject of the petition, with the next-ranking officer, and shall specifically set forth the reasons the individual is deemed to be disqualified from further service. *(Adopted 11/96)*

2.  Upon receipt of the petition, and not less than twenty (20) days or more than forty-five (45) days thereafter, a special meeting of the Participants of the MLS shall be held, and the sole business of the meeting shall be to consider the charge against the officer or director, and to render a decision on such petition. *(Adopted 11/96)*

3.  The special meeting shall be noticed to all Participants at least ten (10) days prior to the meeting, and shall be conducted by the president of the MLS unless the president's continued service in office is being considered at the meeting. In such case, the next-ranking officer will conduct the meeting or the hearing by the Participants. Provided a quorum is present, a three-fourths vote of Participants present and voting shall be required for removal from office. *(Adopted 11/96)*

4.  Any vote taken by the Participants to remove an officer or director must ultimately be confirmed by a majority vote of the directors of the shareholder(s). Notwithstanding the foregoing, the shareholder(s) may remove an officer or director by a majority vote of the directors of the shareholder(s). *(Adopted 11/96)* **R**

## Article 7  Annual Meetings
The annual meeting of Participants of the service shall be held during the month of _____ at the time and place specified by the board of directors. **M**

## Article 7.1  Special Meetings of the Service
Special meetings of Participants of the service may be called from time to time by the president, the board of directors, or by _____ of the Participants of the service. Written notice stating the day, place, and hour of the meeting, the purpose or purposes for which the meeting is called, shall be delivered to all REALTORS® who are Participants in the service not less than _____ days prior to said meeting. **M**

## Article 7.2  Quorum and Voting at Meetings of the Service
For the transaction of business, _____% of the Participants of the service shall be considered a quorum. A majority vote by such Participants present and voting at a meeting attended by a quorum shall be required for passage of motions. **M**

## Article 7.3  Meetings of the Board of Directors
The board of directors may meet at any time it deems advisable on the call of the president or any _____ members of the board of directors. _____ directors shall constitute a quorum. A majority vote by the directors present and voting at a meeting attended by a quorum shall be required for passage of motions. **M**

### Article 7.4  Presiding Officer

At all meetings of the Participants of the service, or of the board of directors, the president or, in the absence of the president, the vice president shall serve as presiding officer. In the absence of the president and vice president, the president shall name a temporary chairperson or, upon the president's failure to do so, the board of directors of the service shall appoint a temporary chairperson. **M**

### Article 8  Committees

The president, with the approval of the board of directors, shall create such standing or ad hoc committees as the president deems desirable and shall appoint their members. Each committee shall consist of not less than _____ Participants in the service, but may also include REALTORS® or REALTOR-ASSOCIATE®s, employed by or affiliated as independent contractors with a REALTOR® Participant serving as representatives of said REALTOR® Participants and with their consent, and who may serve either as a chairperson or member of a committee. **M**

### Article 9  Fiscal Year

The fiscal year of the service shall commence on _____ and shall end on _____. **M**

### Article 10  Amendments to Bylaws

Amendments to these bylaws shall be by the Participants of the service, and shall be determined at an annual meeting or special meeting of the service in accordance with the provisions of Article _____, concerning meetings of the service. Amendments to the bylaws of the service approved by the Participants shall further be subject to approval of the board of directors of the _____ Association of REALTORS® (shareholder).

When amendments to the bylaws of the service have been approved by the board of directors of the _____ Association of REALTORS® (shareholder), said amendments shall be effective immediately or as stated in the amending resolution.

If the proposed amendments to the bylaws of the multiple listing service fail approval of the board of directors of the shareholder, the board of directors of the multiple listing service shall be informed, and advised that the proposed amendment or amendments to the bylaws be further considered and resubmitted to the shareholder as approved by the Participants of the multiple listing service. **M**

### Article 10.1  Amendments to Rules and Regulations

Amendments to the rules and regulations of the service shall be by consideration and approval of the board of directors of the multiple listing service in accordance with the provisions of Article _____, Section _____, concerning meetings of the board of directors, subject to final approval by the board of directors of the _____ Association of REALTORS® (shareholder).

When approved by the board of directors of the _____ Association of REALTORS® (shareholder) as described, the amendments to the rules and regulations of the multiple listing service shall be effective immediately or as stated in the amending resolution.

If the proposed amendments of the multiple listing service rules and regulations fail approval by the board of directors of the shareholder, the board of directors of the multiple listing service shall be informed, and advised that the proposed amendment or amendments must be further considered and resubmitted as approved by the board of directors of the multiple listing service to the board of directors of _____ Association of REALTORS® (shareholder). **M**

**Article 11  Dissolution**

In the event this service shall at any time terminate its activities, the board of directors of the service shall consider and adopt a plan of liquidation and dissolution with the approval of the Participants thereof and of the board of directors of the _____ Association of REALTORS® (shareholder). Said plan shall provide for the collection of all assets, the payment of all liabilities, and that the remaining portions thereof be assigned to the parent corporation, namely, _____ Association of REALTORS®. **M**

# F. Model Rules and Regulations for an MLS Separately Incorporated but Wholly-owned by an Association of REALTORS®

## Listing Procedures

**Section 1  Listing Procedures**

Listings of real or personal property of the following types, which are listed subject to a real estate broker's license, and are located within the service area of the multiple listing service, and are taken by Participants on *(indicate form[s] of listing[s] accepted by the service—See Notes 1 and 2)* shall be delivered to the multiple listing service within (usually 48) hours after all necessary signatures of seller(s) have been obtained:

a.  single family homes for sale or exchange

b.  vacant lots and acreage for sale or exchange

c.  two-family, three-family, and four-family residential buildings for sale or exchange

**Note 1:** The multiple listing service shall not require a Participant to submit listings on a form other than the form the Participant individually chooses to utilize provided the listing is of a type accepted by the service, although a property data form may be required as approved by the multiple listing service. However, the multiple listing service, through its legal counsel:

- may reserve the right to refuse to accept a listing form which fails to adequately protect the interests of the public and the Participants

- assure that no listing form filed with the multiple listing service establishes, directly or indirectly, any contractual relationship between the multiple listing service and the client (buyer or seller)

The multiple listing service shall accept exclusive right-to-sell listing contracts and exclusive agency listing contracts, and may accept other forms of agreement which make it possible for the listing broker to cooperate with other Participants of the multiple listing service acting as subagents, buyer agents, or both.

The listing agreement must include the seller's written authorization to submit the agreement to the multiple listing service.

The different types of listing agreements include:

- exclusive right-to-sell        • open

- exclusive agency              • net

The service may not accept net listings because they are deemed unethical and, in most states, illegal. Open listings are not accepted except where required by law because the inherent nature of an open listing.  Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients.

The exclusive right-to-sell listing is the form of listing where the seller authorizes exclusive authorization to the listing broker to cooperate with other brokers in the sale of the property.

The exclusive agency listing also authorizes the listing broker, as exclusive agent, tocooperate with other brokers in the sale of the property  but also reserves to the seller the general right to sell the property on an unlimited or restrictive basis. Exclusive agency listings and exclusive right-to-sell listings with named prospects exempt should be clearly distinguished by a simple designation such as a code or symbol from exclusive right-to-sell listings with no named prospects exempt, since they can present special risks of procuring cause controversies and administrative problems not posed by exclusive right-to- sell listings with no named prospects exempt. Care should be exercised to ensure that different codes or symbols are used to denote exclusive agency and exclusive right-to-sell listings with prospect reservations.

**Note 2:** A multiple listing service does not regulate the type of listings its members may take. This does not mean that a multiple listing service must accept every type of listing. The multiple listing service shall decline to accept open listings (except where acceptance is required by law) and net listings, and it may limit its service to listings of certain kinds of property. But, if it chooses to limit the kind of listings it will accept, it shall leave its members free to accept such listings to be handled outside the multiple listing service.

**Note 3:** A multiple listing service may, as a matter of local option, accept exclusively listed property that is subject to auction. If such listings do not show a listed price, they may be included in a separate section of the MLS compilation of current listings. *(Amended 8/24)* **M**

## Section 1.01  Clear Cooperation

Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS Participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public. *(Adopted 11/19)*

**Note:** Exclusive listing information for required property types must be filed and distributed to other MLS Participants for cooperation under the Clear Cooperation Policy. This applies to listings filed under Section 1 and listings exempt from distribution under Section 1.3 of the NAR model MLS rules, and any other situation where the listing broker is publicly marketing an exclusive listing that is required to be filed with the service and is not currently available to other MLS Participants. **M**

## Section 1.1  Types of Properties

Following are some of the types of properties that may be published through the service, including types described in the preceding paragraph that are required to be filed with the service and other types that may be filed with the service at the Participant's option provided, however, that any listing submitted is entered into within the scope of the Participant's licensure as a real estate broker: *(Amended 11/91)* **O**

• residential                                    • motel-hotel

- residential income
- subdivided vacant lot
- land and ranch
- business opportunity

- mobile homes
- mobile home parks
- commercial income
- industrial

### Section 1.1.1  Listings Subject to Rules and Regulations of the Service

Any listing taken on a contract to be filed with the multiple listing service is subject to the rules and regulations of the service upon signature of the seller(s). **R**

### Section 1.2  Detail on Listings Filed with the Service

A listing agreement or property data form, when filed with the multiple listing service by the listing broker, shall be complete in every detail which is ascertainable as specified on the property data form. **R**

### Section 1.2.0. Accuracy of Listing Data

Participants and Subscribers are required to submit accurate listing data and required to correct any known errors. **M**

### Section 1.2.1  Limited Service Listings

Listing agreements under which the listing broker will not provide one, or more, of the following services:

a. arrange appointments for cooperating brokers to show listed property to potential purchasers but instead gives cooperating brokers authority to make such appointments directly with the seller(s)

b. accept and present to the seller(s) offers to purchase procured by cooperating brokers but instead gives cooperating brokers authority to present offers to purchase directly to the seller(s)

c. advise the seller(s) as to the merits of offers to purchase

d. assist the seller(s) in developing, communicating, or presenting counter-offers

e. participate on the seller's(s') behalf in negotiations leading to the sale of the listed property

will be identified with an appropriate code or symbol (e.g., LR or LS) in MLS compilations so potential cooperating brokers will be aware of the extent of the services the listing broker will provide to the seller(s), and any potential for cooperating brokers being asked to provide some or all of these services to listing brokers' clients, prior to initiating efforts to show or sell the property.

**Note:** Adoption of Section 1.2.1, limited service listings, is optional and a matter to be determined by each MLS. *(Adopted 05/01)* **O**

### Section 1.2.2  MLS Entry-only Listings

Listing agreements under which the listing broker will not provide any of the following services:

a.  arrange appointments for cooperating brokers to show listed property to potential purchasers but instead gives cooperating brokers authority to make such appointments directly with the seller(s)

b.  accept and present to the seller(s) offers to purchase procured by cooperating brokers but instead gives cooperating brokers authority to present offers to purchase directly to the seller(s)

c.  advise the seller(s) as to the merits of offers to purchase

d.  assist the seller(s) in developing, communicating, or presenting counter-offers

e.  participate on the seller's(s') behalf in negotiations leading to the sale of the listed property

will be identified with an appropriate code or symbol (e.g., EO) in MLS compilations so potential cooperating brokers will be aware of the extent of the services the listing broker will provide to the seller(s), and any potential for cooperating brokers being asked to provide some or all of these services to listing brokers' clients, prior to initiating efforts to show or sell the property.

**Note:** Adoption of Section 1.2.2, MLS Entry-only Listings, is optional and a matter to be determined by each MLS. *(Adopted 05/01)* **O**

## Section 1.3  Multiple Listing Options for Sellers

Office Exclusive: Where the seller has directed the listing broker to not publicly market their property and to not disseminate it through the MLS to other MLS Participants and Subscribers, the Participant may then take the listing as an office exclusive exempt listing and such listing shall be filed with the MLS, subject to its local filing rules, but not disseminated to other MLS Participants and Subscribers.

Delayed Marketing: Where the seller has directed the listing broker to delay the public marketing of their property through IDX and syndication for [insert local delayed period as set my MLS's unfettered local discretion]. A delayed marketing exempt listing shall be filed with the MLS, subject to its local filing rules, and disseminated to other MLS Participants and Subscribers. The listing broker shall not be precluded from marketing the delayed marketing exempt listing in a matter consistent with the seller's choice.

Exempt Listing Disclosure: The filing of an exempt listing (office exclusive or delayed marketing) with the MLS must be pursuant to a certification, signed by the seller, obtained by the listing broker which includes:

• disclosure about the professional relationship between the Participant and the seller;
• acknowledgement that the seller understands the MLS benefits they are waiving or delaying with the exempt listing, such as broad and immediate exposure of their listing through the MLS; and
• confirmation of the seller's decision that their listing not be publicly marketed and disseminated by the MLS to other MLS Participants and Subscribers as an office exclusive listing or that their listing will not have immediate public marketing through IDX and Syndication as a delayed marketing listing.

Multiple Listing Options for Sellers requirements only apply to listing types that are subject to mandatory submission pursuant to the MLS local rules.

**Note 1:** The Multiple Listing Options for Sellers policy is designed to give consumers greater choice and flexibility in marketing their homes for sale.  Each MLS has the unfettered local discretion in determining what is most suitable for their marketplace regarding a Delayed Marketing Exempt listing which includes adopting "0" days or to not implement the Delayed Marketing aspects of the Multiple Listing Options for Sellers policy.

**Note 2:** MLS Participants must distribute Office Exclusive Exempt listings through the MLS to other MLS Participants and Subscribers within (1) one business day after the listing has been publicly marketed. *See Section 1.01, Clear Cooperation. (Amended 5/25)* **M**

## Section 1.4  Change of Status of Listing
Any change in listed price or other change in the original listing agreement shall be made only when authorized in writing by the seller and shall be filed with the service within twenty-four (24) hours (excepting weekends, holidays, and postal holidays) after the authorized change is received by the listing broker. **R**

## Section 1.5  Withdrawal of Listing Prior to Expiration
Listings of property may be withdrawn from the multiple listing service by the listing broker before the expiration date of the listing agreement, provided notice is filed with the service, including a copy of the agreement between the seller and the listing broker which authorizes the withdrawal.

Sellers do not have the unilateral right to require an MLS to withdraw a listing without the listing broker's concurrence. However, when a seller(s) can document that his exclusive relationship with the listing broker has been terminated, the multiple listing service may remove the listing at the request of the seller. *(Adopted 11/96)* **M**

## Section 1.6  Contingencies Applicable to Listings
Any contingency or conditions of any term in a listing shall be specified and noticed to the Participants. **R**

## Section 1.7  Listing Price Specified
The full gross listing price stated in the listing contract will be included in the information published in the MLS compilation of current listings, unless the property is subject to auction. *(Amended 11/92)* **M**

## Section 1.8  Listing Multiple Unit Properties
All properties which are to be sold or which may be sold separately must be indicated individually in the listing and on the property data form. When part of a listed property has been sold, proper notification should be given to the multiple listing service. **O**

## Section 1.9  No Control of Commission Rates or Fees Charged by Participants
The multiple listing service shall not fix, control, recommend, suggest, or maintain Commission rates or fees for services to be rendered by Participants. Further, the multiple listing service shall not fix, control, recommend, suggest, or maintain the division of commissions or fees between cooperating Participants or between Participants and nonParticipants. **M**

### Section 1.10  Expiration of Listings

Listings filed with the multiple listing service will automatically be removed from the compilation of current listings on the expiration date specified in the agreement, unless prior to that date the MLS receives notice that the listing has been extended or renewed. *(Amended 11/01)*

If notice of renewal or extension is received after the listing has been removed from the compilation of current listings, the extension or renewal will be published in the same manner as a new listing. Extensions and renewals of listings must be signed by the seller(s) and filed with the service. *(Amended 11/01)* **M**

### Section 1.11  Termination Date on Listings

Listings filed with the service shall bear a definite and final termination date, as negotiated between the listing broker and the seller. **M**

### Section 1.12  Service Area

Only listings of the designated types of property located within the Service Area of the MLS are required to be submitted to the service. Listings of property located outside the MLS's Service Area will (or will not) be accepted if submitted voluntarily by a Participant, but cannot be required by the service. *(Amended 11/17)*

**Note:** Associations must choose whether the service will accept listings from beyond its service area into the MLS compilation. *(Amended 11/17)* **M**

### Section 1.13  Listings of Suspended Participants

When a Participant of the service is suspended from the MLS for failing to abide by a membership duty (i.e., violation of the Code of Ethics, association bylaws, MLS bylaws, MLS rules and regulations, or other membership obligation except failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS by the suspended Participant shall, at the Participant's option, be retained in the service until sold, withdrawn or expired, and shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the suspension became effective. If a Participant has been suspended from the association (except where MLS participation without association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, an association MLS is not obligated to provide MLS services, including continued inclusion of the suspended Participant's listings in the MLS compilation of current listing information. Prior to any removal of a suspended Participant's listings from the MLS, the suspended Participant should be advised, in writing, of the intended removal so that the suspended Participant may advise his clients. **M**

### Section 1.14  Listings of Expelled Participants

When a Participant of the service is expelled from the MLS for failing to abide by a membership duty (i.e., violation of the Code of Ethics, association bylaws, MLS bylaws, MLS rules and regulations, or other membership obligations except failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS by the expelled Participant shall, at the Participant's option, be retained in the service until sold, withdrawn, or expired, and shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the expulsion became effective. If a Participant has been expelled from the association (except where MLS participation without association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, an association MLS is not obligated to provide MLS services, including continued inclusion of the expelled Participant's listings in the MLS compilation of current listing information. Prior to any removal of an expelled Participant's listings from the MLS, the expelled Participant should be advised, in writing, of the intended removal so that the expelled Participant may advise his clients. **M**

### Section 1.15  Listings of Resigned Participants

When a Participant resigns from the MLS, the MLS is not obligated to provide services, including continued inclusion of the resigned Participant's listings in the MLS compilation of current listing information. Prior to any removal of a resigned Participant's listings from the MLS, the resigned Participant should be advised, in writing, of the intended removal so that the resigned Participant may advise his clients. **O**

## Selling Procedures

### Section 2  Showings and Negotiations

Appointments for showings and negotiations with the seller for the purchase of listed property filed with the multiple listing service shall be conducted through the listing broker, except under the following circumstances:

a.  the listing broker gives the cooperating broker specific authority to show and/or negotiate directly, or

b.  after reasonable effort, the cooperating broker cannot contact the listing broker or his representative; however, the listing broker, at his option, may preclude such direct negotiations by cooperating brokers. *(Amended 4/92)* **M**

### Section 2.1  Presentation of Offers

The listing broker must make arrangements to present the offer as soon as possible, or give the cooperating broker a satisfactory reason for not doing so. *(Amended 4/92)* **M**

### Section 2.2  Submission of Written Offers and Counter-offers

The listing broker shall submit to the seller all written offers until closing unless precluded by law, government rule, regulation, or agreed otherwise in writing between the seller and the listing broker. Unless the subsequent offer is contingent upon the termination of an existing contract, the listing broker shall recommend that the seller obtain the advice of legal counsel prior to acceptance of the subsequent offer.

Participants representing buyers or tenants shall submit to the buyer or tenant all offers and counter-offers until acceptance, and shall recommend that buyers and tenants obtain legal advice where there is a question about whether a pre-existing contract has been terminated. *(Amended 11/05)* **M**

### Section 2.3  Right of Cooperating Broker in Presentation of Offer

The cooperating broker (subagent or buyer agent) or his representative has the right to participate in the presentation to the seller or lessor of any offer he secures to purchase or lease. He does not have the right to be present at any discussion or evaluation of that offer by the seller or lessor and the listing broker. However, if the seller or lessor gives written instructions to the listing broker that the cooperating broker not be present when an offer the cooperating broker secured is presented, the cooperating broker has the right to a copy of the seller's or lessor's written instructions. None of the foregoing diminishes the listing broker's right to control the establishment of appointments for such presentations. *(Amended 4/92)* **M**

Where the cooperating broker is not present during the presentation of the offer, the cooperating broker can request in writing, and the listing broker must provide, as soon as practical, written affirmation stating that the offer has been submitted to the seller, or written notification that the seller has waived the obligation to have the offer presented. *(Adopted 11/19)* **M**

### Section 2.4  Right of Listing Broker in Presentation of Counter-offer

The listing broker or his representative has the right to participate in the presentation of any counter-offer made by the seller or lessor. He does not have the right to be present at any discussion or evaluation of a counter-offer by the purchaser or lessee (except when the cooperating broker is a subagent). However, if the purchaser or lessee gives written instructions to the cooperating broker that the listing broker not be present when a counter- offer is presented, the listing broker has the right to a copy of the purchaser's or lessee's written instructions. *(Adopted 11/93)* **M**

### Section 2.5  Reporting Sales to the Service

Status changes, including final closing of sales and sales prices, shall be reported to the multiple listing service by the listing broker within ___ hours after they have occurred. If negotiations were carried on under Section 2 a. or b. hereof, the cooperating broker shall report accepted offers and prices to the listing broker within ___ hours after occurrence and the listing broker shall report them to the MLS within ___ hours after receiving notice from the cooperating broker. *(Amended 11/11)*

**Note 1:** The listing agreement of a property filed with the MLS by the listing broker should include a provision expressly granting the listing broker authority to advertise; to file the listing with the MLS; to provide timely notice of status changes of the listing to the MLS; and to provide sales information including selling price to the MLS upon sale of the property. If deemed desirable by the MLS to publish sales information prior to final closing (settlement) of a sales transaction, the listing agreement should also include a provision expressly granting the listing broker the right to authorize dissemination of this information by the MLS to its Participants. *(Amended 11/01)*

**Note 2:** In disclosure states, if the sale price of a listed property is recorded, the reporting of the sale price may be required by the MLS.

In states where the actual sale prices of completed transactions are not publicly accessible, failure to report sale prices can result in disciplinary action only if the MLS:

1. categorizes sale price information as confidential and

2. limits use of sale price information to Participants and Subscribers in providing real estate services, including appraisals and other valuations, to customers and clients; and to governmental bodies and third-party entities only as provided below.

The MLS may provide sale price information to governmental bodies only to be used for statistical purposes (including use of aggregated data for purposes of valuing property) and to confirm the accuracy of information submitted by property owners or their representatives in connection with property valuation challenges; and to third-party entities only to be used for academic research, statistical analysis, or for providing services to Participants and Subscribers. In any instance where a governmental body or third-party entity makes sale price information provided by the MLS available other than as provided for in this provision, a listing Participant may request the sale price information for a specific property be withheld from dissemination for these purposes with written authorization from the seller, and withholding of sale price information from those entities shall not be construed as a violation of the requirement to report sale prices. *(Adopted 11/11)*

**Note 3:** As established in the Virtual Office Website ("VOW") policy, sale prices can only be categorized as confidential in states where the actual sale prices of completed transactions are not accessible from public records. *(Adopted 11/11)* **M**

## Section 2.6  Reporting Resolutions of Contingencies
The listing broker shall report to the multiple listing service within twenty-four (24) hours that a contingency on file with the multiple listing service has been fulfilled or renewed, or the agreement cancelled. **M**

## Section 2.7  Advertising of Listings Filed With the Service
A listing shall not be advertised by any Participant other than the listing broker without the prior consent of the listing broker. **M**

## Section 2.8  Reporting Cancellation of Pending Sale
The listing broker shall report immediately to the multiple listing service the cancellation of any pending sale, and the listing shall be reinstated immediately. **M**

## Section 2.9  Disclosing the Existence of Offers
Listing brokers, in response to inquiries from buyers or cooperating brokers, shall, with the seller's approval, disclose the existence of offers on the property. Where disclosure is authorized, the listing broker shall also disclose, if asked, whether offers were obtained by the listing licensee, by another licensee in the listing firm, or by a cooperating broker. *(Amended 11/08)* **O**

## Section 2.10  Availability of Listed Property
Listing brokers shall not misrepresent the availability of access to show or inspect listed property. *(Adopted 11/05)* **O**

# Refusal to Sell

### Section 3  Refusal to Sell

If the seller of any listed property filed with the multiple listing service refuses to accept a written offer satisfying the terms and conditions stated in the listing, such fact shall be transmitted immediately to the service and to all Participants. **R**

## Prohibitions

### Section 4  Information for Participants Only

Any listing filed with the service shall not be made available to any broker or firm not a member of the MLS without the prior consent of the listing broker. **M**

### Section 4.1  For Sale Signs

Only the for sale sign of the listing broker may be placed on a property. *(Amended 11/89)* **M**

### Section 4.2  Sold Signs

Prior to closing, only the sold sign of the listing broker may be placed on a property, unless the listing broker authorizes the cooperating (selling) broker to post such a sign. *(Amended 4/96)* **M**

### Section 4.3  Solicitation of Listing Filed with the Service

Participants shall not solicit a listing on property filed with the service unless such solicitation is consistent with Article 16 of the REALTORS®' Code of Ethics, its Standards of Practice, and its Case Interpretations.

**Note:** This section is to be construed in a manner consistent with Article 16 of the Code of Ethics and particularly Standard of Practice 16-4. This section is intended to encourage sellers to permit their properties to be filed with the service by protecting them from being solicited, prior to expiration of the listing, by brokers and salespersons seeking the listing upon its expiration.

Without such protection, a seller could receive hundreds of calls, communications, and visits from brokers and salespersons who have been made aware through MLS filing of the date the listing will expire and desire to substitute themselves for the present broker.

This section is also intended to encourage brokers to participate in the service by assuring them that other Participants will not attempt to persuade the seller to breach the listing agreement or to interfere with their attempts to market the property. Absent the protection afforded by this section, listing brokers would be most reluctant to generally disclose the identity of the seller or the availability of the property to other brokers.

This section does not preclude solicitation of listings under the circumstances otherwise recognized by the Standards of Practice related to Article 16 of the Code of Ethics. **M**

### Section 4.4  Use of the Terms MLS and Multiple Listing Service

No MLS Participant, Subscriber, or licensee affiliated with any Participant shall, through the name of their firm, their URLs, their e-mail addresses, their website addresses, or in any other way represent, suggest, or imply that the individual or firm is an MLS, or that they operate an MLS. Participants, Subscribers and licensees affiliated with Participants shall not represent, suggest, or imply that consumers or others have direct access to MLS databases, or that consumers or others are able to search MLS databases available only to Participants and Subscribers. This does not prohibit Participants and Subscribers from representing that any information they are authorized under MLS rules to provide to clients or customers is available on their websites or otherwise. *(Adopted 11/07)* **O**

### Section 4.5 Services Advertised as "Free"

MLS Participants and Subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the Participant or Subscriber will receive no financial compensation from any source for those services. (Amended 11/21) **M**

### Section 4.6 No Filtering of Listings

Participants and Subscribers must not filter out or restrict MLS listings that are communicated to customers and clients based on the existence or level of compensation offered to the cooperating broker or the name of a brokerage or agent. **M**

## No Compensation Specified on MLS Listings

### Section 5  No Compensation Specified on MLS Listings

Participants, Subscribers, or their sellers may not make offers of compensation to buyer brokers and other buyer representatives in the MLS.

Use of MLS data or data feeds to directly or indirectly establish or maintain a platform to make offers of compensation from multiple brokers to buyer brokers or other buyer representatives is prohibited and must result in the MLS terminating that Particpant's access to any MLS data or data feeds.

**Note 1:** The multiple listing service must not have a rule requiring the listing broker to disclose the amount of total negotiated Commission in his listing contract, and the multiple listing service shall not publish the total negotiated Commission on a listing which has been submitted to the MLS by a Participant. The multiple listing service must prohibit disclosing in any way the total Commission negotiated between the seller and the listing broker, or total broker compensation (i.e. combined compensation to both listing brokers and buyer brokers.

**Note 2:** The multiple listing service shall make no rule on the division of commissions between Participants and nonParticipants. This should remain solely the responsibility of the listing broker.

**Note 3:** Multiple listing services must give Participants the ability to disclose to other Participants any potential for a short sale. As used in these rules, short sales are defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies. Multiple listing services may, as a matter of local discretion, require Participants to disclose potential short sales when Participants know a transaction is a potential short sale. *(Amended 8/24)* **M**

### Section 5.0.0 Required Consumer Disclosure

Disclosure of Compensation: MLS Participants and Subscribers must:

1. Disclose to prospective sellers and buyers that broker compensation is not set by law and is fully negotiable. This must be included in conspicuous language as part of any listing agreement, buyer written agreement, and pre-closing disclosure documents (if any).

2. Conspicuously disclose in writing to sellers, and obtain the seller's authority, for any payments or offer of payment that the listing Participant or seller will make to another broker, agent, or other representative (e.g. real estate attorney) acting for buyers. This disclosure must include the amount or rate of any such payment and be made in writing in advance of any payment or agreement to pay. *(Adopted 8/24)* **M**

### Section 5.0.1  Disclosing Potential Short Sales

Note: Select one of the following two options. **M**

**Option #1:** Multiple listing services that permit, but do not require, Participants to disclose potential short sales should adopt the following rule.

Participants may, but are not required to, disclose potential short sales (defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies) to other Participants and Subscribers. *(Amended 5/09)*

**Option #2:** Alternatively, multiple listing services that require Participants to disclose potential short sales should adopt the following rule.

Participants must disclose potential short sales (defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies) when reasonably known to the listing Participants. *(Amended 5/09)*

### Section 5.0.2 Written Buyer Agreement

Unless inconsistent with state or federal law or regulation, all MLS Participants working with a buyer must enter into a written agreement with the buyer prior to touring a home. The written agreement must include:

   a. a specific and conspicuous disclosure of the amount or rate of compensation the Participant will receive or how this amount will be determined, to the extent that the Participant will receive compensation from any source.
   b. the amount of compensation in a manner that is objectively ascertainable and not open-ended.
   c. a term that prohibits the Participant from receiving compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer; and
   d. a conspicuous statement that broker fees and commissions are not set by law and are fully negotiable. *(Adopted 8/24)* **M**

### Section 5.1  Participant as Principal

If a Participant or any licensee (or licensed or certified appraiser) affiliated with a Participant has any ownership interest in a property, the listing of which is to be disseminated through the multiple listing service, that person shall disclose that interest when the listing is filed with the multiple listing service and such information shall be disseminated to all multiple listing service Participants. **M**

### Section 5.2  Participant as Purchaser

If a Participant or any licensee (including licensed and certified appraisers) affiliated with a Participant wishes to acquire an interest in property listed with another Participant, such contemplated interest shall be disclosed, in writing, to the listing broker not later than the time an offer to purchase is submitted to the listing broker. *(Adopted 2/92)* **M**

## Service Charges

### Section 6  Service Fees and Charges

The following service charges for operation of the multiple listing service are in effect to defray the costs of the service and are subject to change from time to time in the manner prescribed:

**Initial Participation Fee:** An applicant for participation in the service shall pay an application fee of $_____ with such fee to accompany the application.

**Note:** The initial participation fee shall approximate the cost of bringing the service to the Participant.

**Recurring Participation Fee:** The annual participation fee of each Participant shall be an amount equal to $_____ times each salesperson and licensed or certified appraiser who has access to and use of the service, whether licensed as a broker, sales licensee, or licensed or certified appraiser who is employed by or affiliated as an independent contractor with such Participant. Payment of such fees shall be made on or before the first day of the fiscal year of the multiple listing service. Fees shall be prorated on a monthly basis.

However, MLSs must provide Participants the option of a no-cost waiver of MLS fees, dues, and charges for any licensee or licensed or certified appraiser who can demonstrate subscription to a different MLS or CIE where the principal broker participates. MLSs may, at their discretion, require that broker Participants sign a certification for nonuse of its MLS services by their licensees, which can include penalties and termination of the waiver if violated.* *(Amended 5/18 and 8/18)* **R**

**Note 1:** A multiple listing service may elect to have such fees payable on a quarterly or even on a monthly basis. However, added administrative services are necessitated by increased frequency of such payments.

**Note 2:** Multiple listing services that choose to include affiliated unlicensed administrative and clerical staff, personal assistants, and/or individuals seeking licensure or certification as real estate appraisers among those eligible for access to and use of MLS information as Subscribers may, at their discretion, charge recurring fees. *(Amended 11/17)* **R**

**Listing Fee:** A Participant shall pay a monthly listing fee in an amount equal to the number of listings he filed with the service during the previous month, multiplied by the listing fee of $_____ per listing.

**Note:** An alternative provision for the listing fee is: "For filing a new listing or renewal of a listing with the service, a fee of $_____ shall accompany each listing when filed with the service."

## Compliance with Rules

### Section 7  Compliance with Rules—Authority to Impose Discipline
By becoming and remaining a Participant or Subscriber in this MLS, each Participant and Subscriber agrees to be subject to the rules and regulations and any other MLS governance provision. The MLS may, through the administrative and hearing procedures established in these rules, impose discipline for violations of the rules and other MLS governance provisions. Discipline that may be imposed may only consist of one or more of the following:

a. letter of warning

b. letter of reprimand

c. attendance at MLS orientation or other appropriate courses or seminars which the Participant or Subscriber can reasonably attend taking into consideration cost, location, and duration

d. appropriate, reasonable fine not to exceed $15,000

e. suspension of MLS rights, privileges and services for not less than thirty (30) days nor more than one (1) year

f. termination of MLS rights, privileges, and services with no right to reapply for a specified period not to exceed three (3) years. *(Revised 11/14)* **M**

**Note 1:** A Participant (or user/Subscriber, where appropriate) can be placed on probation. Probation is not a form of discipline. When a Participant (or user/Subscriber, where appropriate) is placed on probation the discipline is held in abeyance for a stipulated period of time not longer than one (1) year. Any subsequent finding of a violation of the MLS rules during the probationary period may, at the discretion of the Board of Directors, result in the imposition of the suspended discipline. Absent any subsequent findings of a violation during the probationary period, both the probationary status and the suspended discipline are considered fulfilled, and the individual's record will reflect the fulfillment. The fact that one or more forms of discipline are held in abeyance during the probationary period does not bar imposition of other forms of discipline which will not be held in abeyance. *(Revised 05/14)* **M**

**Note 2:** MLS Participants and Subscribers can receive no more than three (3) administrative sanctions in a calendar year before they are required to attend a hearing for their actions and potential violations of MLS rules, except that the MLS may allow more administrative sanctions for violations of listing information provided by Participants and Subscribers before requiring a hearing. The MLS must send a copy of all administrative sanctions against a Subscriber to the Subscriber's Participant and the Participant is required to attend the hearing of a Subscriber who has received more than three (3) administrative sanctions within a calendar year. *(Adopted 11/20)* **M**

## Section 7.1  Compliance with Rules

The following action may be taken for noncompliance with the rules:

a. for failure to pay any service charge or fee within one (1) month of the date due, and provided that at least ten (10) days' notice has been given, the service shall be suspended until service charges or fees are paid in full

b. for failure to comply with any other rule, the provisions of Sections 9 and 9.1 shall apply

**Note:** Generally, warning, censure, and the imposition of a moderate fine are sufficient to constitute a deterrent to violation of the rules and regulations of the multiple listing service. Suspension or termination is an extreme sanction to be used in cases of extreme or repeated violation of the rules and regulations of the service. If the MLS desires to establish a series of moderate fines, they should be clearly specified in the rules and regulations. *(Amended 11/88)*

## Section 7.2  Applicability of Rules to Users and/or Subscribers

Non-principal brokers, sales licensees, appraisers, and others authorized to have access to information published by the MLS are subject to these rules and regulations and may be disciplined for violations thereof provided that the user or Subscriber has signed an agreement acknowledging that access to and use of MLS information is contingent on compliance with the rules and regulations. Further, failure of any user or Subscriber to abide by the rules and/or any sanction imposed for violations thereof can subject the Participant to the same or other discipline. This provision does not eliminate the Participant's ultimate responsibility and accountability for all users or Subscribers affiliated with the Participant. *(Adopted 4/92)*

**Note:** Adoption of Section 7.2 is optional and should be adopted by multiple listing services desiring to establish authority to impose discipline on non-principal users or Subscribers affiliated with MLS members or Participants. *(Adopted 4/92)* **O**

# Meetings

### Section 8  Meetings
The meetings of the Participants in the service or the board of directors of the multiple listing service for the transaction of business of the service shall be held in accordance with the provisions of Article 7, bylaws of the service. **R**

# Enforcement of Rules or Disputes

### Section 9  Consideration of Alleged Violations
The committee shall give consideration to all written complaints having to do with violations of the rules and regulations. By becoming and remaining a Participant, each Participant agrees to be subject to these rules and regulations, the enforcement of which are at the sole discretion of the Committee (Board of Directors).

When requested by a complainant, the MLS will process a compliant without revealing the complainant's identity.  If a complaint is subsequently forwarded to a hearing, and the original complainant does not consent to participating in the process, the MLS will appoint a representative to serve as the complainant. *(Amended 11/20)* **M**

### Section 9.1  Violations of Rules and Regulations
If the alleged offense is a violation of the rules and regulations of the service and does not involve a charge of alleged unethical conduct or request for arbitration, it may be administratively considered and determined by the board of directors of the service, and if a violation is determined, the board of directors may direct the imposition of sanction, provided the recipient of such sanction may request a hearing before the professional standards committee of the association in accordance with the bylaws and rules and regulations of the association of REALTORS® within twenty (20) days following receipt of the directors' decision. *(Amended 11/96)*

If, rather than conducting an administrative review, the MLS has a procedure established to conduct hearings, any appeal of the decision of the hearing tribunal may be appealed to the board of directors of the MLS within twenty (20) days of the tribunal's decision. Alleged violations involving unethical conduct shall be referred to the professional standards committee of the association of REALTORS® for processing in accordance with the professional standards procedures of the association. If the charge alleges a refusal to arbitrate, such charge shall be referred directly to the board of directors of the association of REALTORS®. *(Amended 2/98)* **M**

**Optional Provision for Establishing Nonmember Participatory Rights (Open MLS)\*** If the alleged offense is a violation of the rules and regulations of the service and does not involve a charge of alleged violation of one or more of the provisions of Section 16 of the rules and regulations or a request for arbitration, it may be administratively considered and determined by the board of directors of the MLS and if a violation is determined, the board of directors may direct the imposition of sanction provided that the recipient of such sanction may request a hearing by the professional standards committee of the association in accordance with the bylaws of the association of REALTORS®. Alleged violations of Section 16 of the rules and regulations shall be referred to the association's grievance committee for processing in accordance with the professional standards procedures of the association. *(Amended 2/98)*

*Only adopt this provision if the association's MLS is open to nonmember Participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere).

If, rather than conducting an administrative review, the MLS has a procedure established to conduct hearings, any appeal of the decision of the hearing tribunal may be appealed to the board of directors of the MLS within twenty (20) days of the tribunal's decision. Alleged violations involving unethical conduct shall be referred to the professional standards committee of the association of REALTORS® for processing in accordance with the professional standards procedures of the association. If the charge alleges a refusal to arbitrate, such charge shall be referred directly to the board of directors of the association of REALTORS®. *(Adopted 2/98)*

### Section 9.2  Complaints of Unethical Conduct
All other complaints of unethical conduct shall be referred by the board of directors of the service to the association of REALTORS® for appropriate action in accordance with the professional standards procedures established in the association's bylaws. *(Amended 11/88)* **M**

### Section 9.3  Complaints of Unauthorized Use of Listing Content
Any Participant who believes another Participant has engaged in the unauthorized use or display of listing content, including photographs, images, audio or video recordings, and virtual tours, shall send notice of such alleged unauthorized use to the MLS. Such notice shall be in writing, specifically identify the allegedly unauthorized content, and be delivered to the MLS not more than sixty (60) days after the alleged misuse was first identified. No Participant may pursue action over the alleged unauthorized use and display of listing content in a court of law without first completing the notice and response procedures outlined in this Section 9.3 of the MLS rules.

Upon receiving a notice, the committee (Board of Directors) will send the notice to the Participant who is accused of unauthorized use. Within ten (10) days from receipt, the Participant must either: 1) remove the allegedly unauthorized content, or 2) provide proof to the committee (Board of Directors) that the use is authorized. Any proof submitted will be considered by the Committee (Board of Directors), and a decision of whether it establishes authority to use the listing content will be made within thirty (30) days.

If the Committee (Board of Directors) determines that the use of the content was unauthorized, the Committee (Board of Directors) may issue a sanction pursuant to Section 7 of the MLS rules, including a request to remove and/or stop the use of the unauthorized content within ten (10) days after transmittal of the decision.  If the unauthorized use stems from a violation of the MLS rules, that too will be considered at the time of establishing an appropriate sanction.

If after ten (10) days following transmittal of the Committee's (Board of Director's) determination the alleged violation remains uncured (i.e. the content is not removed or the rules violation remains uncured), then the complaining party may seek action through a court of law. *(Adopted 5/18)* **M**

### Section 9.4  MLS Rules Violations
MLS Participants may not take legal action against another Participant for alleged rules violation(s) unless the complaining Participant has first exhausted the remedies provided in these rules. *(Adopted 5/18)* **M**

**Note:** Adoption of Sections 9.3 and 9.4 are not required if the MLS has adopted alternative procedures to address alleged misuse of listing content that includes notice to the alleged infringer.

# Confidentiality of MLS Information

### Section 10  Confidentiality of MLS Information
Any information provided by the multiple listing service to the Participants shall be considered official information of the service. Such information shall be considered confidential and exclusively for the use of Participants and real estate licensees affiliated with such Participants and those Participants who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property and licensed or certified appraisers affiliated with such Participants. *(Amended 4/92)* **R**

### Section 10.1  MLS Not Responsible for Accuracy of Information
The information published and disseminated by the service is communicated verbatim, without change by the service, as filed with the service by the Participant. The service does not verify such information provided and disclaims any responsibility for its accuracy. Each Participant agrees to hold the service harmless against any liability arising from any inaccuracy or inadequacy of the information such Participant provides. **R**

# Ownership of MLS Compilation* and Copyright

### Section 11
By the act of submitting any property listing content to the MLS, the Participant represents and warrants that he or she is fully authorized to license the property listing content as contemplated by and in compliance with this section and these rules and regulations, and also thereby does grant to the MLS license to include the property listing content in its copyrighted MLS compilation and also in any statistical report on comparables. Listing content includes, but is not limited to, photographs, images, graphics, audio and video recordings, virtual tours, drawings, descriptions, remarks, narratives, pricing information, and other details or information related to the listed property. *(Amended 5/18)* **M**

Each Participant who submits listing content to the MLS agrees to defend and hold the MLS and every other Participant harmless from and against any liability or claim arising from any inaccuracy of the submitted listing content or any inadequacy of ownership, license, or title to the submitted listing content. *(Adopted 5/18)* **M**

---

*The term MLS compilation, as used in Sections 11 and 12 herein, shall be construed to include any format in which property listing data is collected and disseminated to the Participants, including but not limited to bound book, loose-leaf binder, computer database, card file, or any other format whatsoever.

**Note:** The Digital Millennium Copyright Act (DMCA) is a federal copyright law that enhances the penalties for copyright infringement occurring on the Internet. The law provides exemptions or "safe harbors" from copyright infringement liability for online service providers (OSP) that satisfy certain criteria. Courts construe the definition of "online service provider" broadly, which would likely include MLSs as well as Participants and Subscribers hosting an IDX display.

One safe harbor limits the liability of an OSP that hosts a system, network or website on which Internet users may post user-generated content. If an OSP complies with the provisions of this DMCA safe harbor, it cannot be liable for copyright infringement if a user posts infringing material on its website. This protects an OSP from incurring significant sums in copyright infringement damages, as statutory damages are as high as $150,000 per work. For this reason, it is highly recommended that MLSs, Participants and Subscribers comply with the DMCA safe harbor provisions discussed herein.

To qualify for this safe harbor, the OSP must:

1. Designate on its website and register with the Copyright Office an agent to receive takedown requests. The agent could be the MLS, Participant, Subscriber, or other individual or entity.

2. Develop and post a DMCA-compliant website policy that addresses repeat offenders.

3. Comply with the DMCA takedown procedure. If a copyright owner submits a takedown notice to the OSP, which alleges infringement of its copyright at a certain location, then the OSP must promptly remove allegedly infringing material. The alleged infringer may submit a counter-notice that the OSP must share with the copyright owner. If the copyright owner fails to initiate a copyright lawsuit within ten (10) days, then the OSP may restore the removed material.

4. Have no actual knowledge of any complained-of infringing activity.

5. Not be aware of facts or circumstances from which complained-of infringing activity is apparent.

6. Not receive a financial benefit attributable to complained-of infringing activity when the OSP is capable of controlling such activity.

Full compliance with these DMCA safe harbor criteria will mitigate an OSP's copyright infringement liability. For more information see 17 U.S.C. §512. *(Adopted 11/15)* **I**

### Section 11.1
All right, title, and interest in each copy of every multiple listing compilation created and copyrighted by the _____ Association of REALTORS® and in the copyrights therein, shall at all times remain vested in the _____ Association of REALTORS®. **R**

### Section 11.2  Display
Each Participant shall be entitled to lease from the _____ Association of REALTORS® a number of copies of each MLS compilation sufficient to provide the Participant and each person affiliated as a licensee (including licensed or certified appraisers) with such Participant with one copy of such compilation. The Participant shall pay for each such copy the rental fee set by the association.*

---

*This section should not be construed to require the Participant to lease a copy of the MLS compilation for any licensee (or licensed or certified appraiser) affiliated with the Participant who is engaged exclusively in a specialty of the real estate business other than listing, selling, or appraising the types of properties which are required to be filed with the MLS and who does not, at any time, have access to or use of the MLS information or MLS facility of the association.

Participants shall acquire by such lease only the right to use the MLS compilation in accordance with these rules. **M**

# Use of Copyrighted MLS Compilation

### Section 12  Distribution
Participants shall, at all times, maintain control over and responsibility for each copy of any MLS compilation leased to them by the association of REALTORS®, and shall not distribute any such copies to persons other than Subscribers who are affiliated with such Participant as licensees, those individuals who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property, and any other Subscribers as authorized pursuant to the governing documents of the MLS. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a Participant's licensure(s) or certification, and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed or published by an association multiple listing service where access to such information is prohibited by law. *(Amended 4/92)* **R**

### Section 12.1  Display
Participants and those persons affiliated as licensees with such Participants shall be permitted to display the MLS compilation to prospective purchasers only in conjunction with their ordinary business activities of attempting to locate ready, willing, and able buyers for the properties described in said MLS compilation. **M**

### Section 12.2  Reproduction
**Option #1:** Participants or their affiliated licensees shall not reproduce any MLS compilation or any portion thereof, except in the following limited circumstances:

Participants or their affiliated licensees may reproduce from the MLS compilation and distribute to prospective purchasers a reasonable* number of single copies of property listing data contained in the MLS compilation which relate to any properties in which the prospective purchasers are or may, in the judgment of the Participant or their affiliated licensees, be interested.

---

*It is intended that the Participant be permitted to provide prospective purchasers with listing data relating to properties which the prospective purchaser has a bona fide interest in purchasing or in which the Participant is seeking to promote interest. The term reasonable, as used herein, should therefore be construed to permit only limited reproduction of property listing data intended to facilitate the prospective purchaser's decision-making process in the consideration of a purchase. Factors* which shall be considered in deciding whether the reproductions made are consistent with this intent and thus reasonable in number, shall include, but are not limited to, the total number of listings in the MLS compilation, how closely the types of properties contained in such listings accord with the prospective purchaser's expressed desires and ability to purchase, whether the reproductions were made on a selective basis, and whether the type of properties contained in the property listing data is consistent with a normal itinerary of properties which would be shown to the prospective purchaser.

Reproductions made in accordance with this rule shall be prepared in such a fashion that the property listing data of properties other than that in which the prospective purchaser has expressed interest, or in which the Participant or the affiliated licensees are seeking to promote interest, does not appear on such reproduction.

Nothing contained herein shall be construed to preclude any Participant from utilizing, displaying, distributing, or reproducing property listing sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the Participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the Participant and those licensees affiliated with the Participant who are authorized to have access to such information. Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office, or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers. Any MLS content in data feeds available to Participants for real estate brokerage purposes must also be available to Participants for valuation purposes, including automated valuations. MLSs must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLSs may require execution of a third-party license agreement where deemed appropriate by the MLS. MLSs may require Participants who will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may not be used as supporting documentation. Any other use of such information is unauthorized and prohibited by these rules and regulations. *(Amended 05/14)*

**Option #2:** Participants or their affiliated licensees shall not reproduce any MLS compilation or any portion thereof, except in the following limited circumstances:

Participants or their affiliated licensees may reproduce from the MLS compilation and distribute to prospective purchasers a reasonable\* number of single copies of property listing data contained in the MLS compilation which relate to any properties in which the prospective purchasers are or may, in the judgment of the Participants or their affiliated licensees, be interested.

*Only adopt this section if the association's MLS is open to nonmember Participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere). If adopted, Section 15 may not be modified.

Nothing contained herein shall be construed to preclude any Participant from utilizing, displaying, distributing, or reproducing property listing sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the Participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the Participant and those licensees affiliated with the Participant who are authorized to have access to such information. Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office, or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers. Any MLS content in data feeds available to Participants for real estate brokerage purposes must also be available to Participants for valuation purposes, including automated valuations. MLSs must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLSs may require execution of a third-party license agreement where deemed appropriate by the MLS. MLSs may require Participants who will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may not be used as supporting documentation. Any other use of such information is unauthorized and prohibited by these rules and regulations*. (Amended 05/14)* **M**

## Use of MLS Information

### Section 13  Limitations on Use of MLS Information

Option #1: Use of information from MLS compilation of current listing information, from the association's statistical report, or from any sold or comparable report of the association or MLS for public mass-media advertising by an MLS Participant or in other public representations, may not be prohibited.

However, any print or non-print forms of advertising or other forms of public representations based in whole or in part on information supplied by the association or its MLS must clearly demonstrate the period of time over which such claims are based and must include the following, or substantially similar, notice:

> Based on information from the association of REALTORS® (alternatively, from the _____ MLS) for the period (date) through (date). *(Amended 11/93)*

**Option #2:** Information from MLS compilations of current listing information, from statistical reports, and from any sold or comparable report of the association or MLS may be used by MLS Participants as the basis for aggregated demonstrations of market share or comparisons of firms in public mass-media advertising or in other public representations. This authority does not convey the right to include in any such advertising or representation information about specific properties which are listed with other Participants, or which were sold by other Participants (as either listing or cooperating broker).

However, any print or non-print forms of advertising or other forms of public representations based in whole or in part on information supplied by the association or its MLS must clearly demonstrate the period of time over which such claims are based and must include the following, or substantially similar, notice:

> Based on information from the association of REALTORS® (alternatively, from the _____ MLS) for the period (date) through (date). *(Amended 11/97)*

**Note:** Associations are advised to select one rule for the two (2) alternatives above. **M**

# Changes in Rules and Regulations

### Section 14  Changes in Rules and Regulations

Amendments to the rules and regulations of the service shall be by consideration and approval of the board of directors of the multiple listing service, subject to final approval by the board of directors of the _____ Association of REALTORS® (shareholder).

**Note:** Some associations may prefer to change the rules and regulations by a vote of the Participants of the service, subject to approval of the board of directors of the service, with final approval by the board of directors of the association of REALTORS® which is the sole and exclusive shareholder of the stock of the service corporation. **M**

# Arbitration of Disputes*

### Section 15  Arbitration of Disputes

By becoming and remaining a Participant, each Participant agrees to arbitrate disputes involving contractual issues and questions, and specific non-contractual issues and questions defined in Standard of Practice 17-4 of the Code of Ethics with MLS Participants in different firms arising out of their relationships as MLS Participants, subject to the following qualifications.

*Only adopt this section if the association's MLS is open to nonmember Participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere). If adopted, Section 15 may not be modified.

a.  If all disputants are members of the same association of REALTORS® or have their principal place of business within the same association's territorial jurisdiction, they shall arbitrate pursuant to the procedures of that association of REALTORS®.

b.  If the disputants are members of different associations of REALTORS® or if their principal place of business is located within the territorial jurisdiction of different associations of REALTORS®, they remain obligated to arbitrate in accordance with the procedures of the _____ (state association of REALTORS®). *(Amended 11/97)*

**Interboard Arbitration Procedures:** Arbitration shall be conducted in accordance with any existing interboard agreement or, alternatively, in accordance with the interboard arbitration procedures in the Code of Ethics and Arbitration Manual of the NATIONAL ASSOCIATION OF REALTORS®. Nothing herein shall preclude Participants from agreeing to arbitrate the dispute before a particular association of REALTORS®. *(Amended 11/98)* **O**

**Awards:** The obligation to arbitrate includes the duty to either 1) pay an award to the party(ies) named in the award or 2) deposit the funds with the Professional Standards Administrator to be held in an escrow or trust account maintained for this purpose. Failure to satisfy the award or deposit the funds with the association within ten (10) days may be considered a violation of the MLS rules and may subject the Participant to disciplinary action at the sole discretion of the MLS. *(Adopted 11/15)* **O**

## Section 16
# Standards of Conduct for MLS Participants*

**Standard 16.1**
MLS Participants shall not engage in any practice or take any action inconsistent with exclusive representation or exclusive brokerage relationship agreements that other MLS Participants have with clients. *(Amended 1/04)* **O**

---

*Only adopt the following standards of conduct if the association's MLS is open to nonmember Participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere). Any of the standards of conduct, if adopted, may not be modified.

**Standard 16.2**
Signs giving notice of property for sale, rent, lease, or exchange shall not be placed on property without consent of the seller/landlord. **O**

**Standard 16.3**
Deleted August 2024

**Standard 16.4**
MLS Participants shall not solicit a listing currently listed exclusively with another broker. However, if the listing broker, when asked by the MLS Participant, refuses to disclose the expiration date and nature of such listing (i.e., an exclusive right-to-sell, an exclusive agency, open listing, or other form of contractual agreement between the listing broker and the client) the MLS Participant may contact the owner to secure such information and may discuss the terms upon which the MLS Participant might take a future listing or, alternatively, may take a listing to become effective upon expiration of any existing exclusive listing. **O**

**Standard 16.5**
MLS Participants shall not solicit buyer/tenant agreements from buyers/tenants who are subject to exclusive buyer/tenant agreements. However, if asked by an MLS Participant, the broker refuses to disclose the expiration date of the exclusive buyer/tenant agreement, the MLS Participant may contact the buyer/tenant to secure such information and may discuss the terms upon which the MLS Participant might enter into a future buyer/tenant agreement or, alternatively, may enter into a buyer/tenant agreement to become effective upon the expiration of any existing exclusive buyer/tenant agreement. *(Amended 1/98)* **O**

**Standard 16.6**
MLS Participants shall not use information obtained from listing brokers through offers to cooperate made through multiple listing services or through other offers of cooperation to refer listing brokers' clients to other brokers or to create buyer/tenant relationships with listing brokers' clients, unless such use is authorized by listing brokers. *(Amended 11/01)* **O**

**Standard 16.7**
The fact that an agreement has been entered into with an MLS Participant shall not preclude or inhibit any other MLS Participant from entering into a similar agreement after the expiration of the prior agreement. *(Amended 1/98)* **O**

**Standard 16.8**
The fact that a prospect has retained an MLS Participant as an exclusive representative or exclusive broker in one or more past transactions does not preclude other MLS Participants from seeking such prospect's future business. *(Amended 1/04)* **O**

**Standard 16.9**
MLS Participants are free to enter into contractual relationships or to negotiate with sellers/landlords, buyers/tenants or others who are not subject to an exclusive agreement but shall not knowingly obligate them to pay more than one Commission except with their informed consent. *(Amended 1/98)* **O**

**Standard 16.10**
When MLS Participants are contacted by the client of another MLS Participant regarding the creation of an exclusive relationship to provide the same type of service, and MLS Participants have not directly or indirectly initiated such discussions, they may discuss the terms upon which they might enter into a future agreement or, alternatively, may enter into an agreement which becomes effective upon expiration of any existing exclusive agreement. *(Amended 1/98)* **O**

**Standard 16.11**
Deleted

**Standard 16.12**
MLS Participants are not precluded from making general announcements to prospects describing their services and the terms of their availability even though some recipients may have entered into agency agreements or other exclusive relationships with another MLS Participant. A general telephone canvass, general mailing, or distribution addressed to all prospects in a given geographical area or in a given profession, business, club, or organization, or other classification or group is deemed general for purposes of this rule. *(Amended 1/04)*

The following types of solicitations are prohibited:

Telephone or personal solicitations of property owners who have been identified by a real estate sign, multiple listing compilation, or other information service as having exclusively listed their property with another MLS Participant; and mail or other forms of written solicitations of prospects whose properties are exclusively listed with another MLS Participant when such solicitations are not part of a general mailing but are directed specifically to property owners identified through compilations of current listings, for sale or for rent signs, or other sources of information intended to foster cooperation with MLS Participants. *(Amended 1/04)* **O**

**Standard 16.13**
MLS Participants, prior to entering into a representation agreement, have an affirmative obligation to make reasonable efforts to determine whether the prospect is subject to a current, valid exclusive agreement to provide the same type of real estate service. *(Amended 1/04)* **O**

**Standard 16.14**
MLS Participants, acting as buyer or tenant representatives or brokers, shall disclose that relationship to the seller/landlord's representative or broker at first contact and shall provide written confirmation of that disclosure to the seller/landlord's representative or broker not later than execution of a purchase agreement or lease. *(Amended 1/04)* **O**

**Standard 16.15**

On unlisted property, MLS Participants acting as buyer/tenant representatives or brokers shall disclose that relationship to the seller/landlord at first contact for that buyer/tenant and shall provide written confirmation of such disclosure to the seller/landlord not later than execution of any purchase or lease agreement. *(Amended 5/24)*

**Standard 16.16**

MLS Participants, acting as representatives or brokers of sellers/landlords or as subagents of listing brokers, shall disclose that relationship to buyers/tenants as soon as practicable, and shall provide written confirmation of such disclosure to buyers/tenants not later than execution of any purchase or lease agreement. *(Amended 1/04)* **O**

**Standard 16.17**

MLS Participants are not precluded from contacting the client of another broker for the purpose of offering to provide, or entering into a contract to provide, a different type of real estate service unrelated to the type of service currently being provided (e.g., property management as opposed to brokerage) or from offering the same type of service for property not subject to other brokers' exclusive agreements. However, information received through a multiple listing service or any other offer of cooperation may not be used to target clients of other MLS Participants to whom such offers to provide services may be made. *(Amended 1/04)* **O**

**Standard 16.18**

Deleted

**Standard 16.19**

All dealings concerning property exclusively listed or with buyer/tenants who are subject to an exclusive agreement shall be carried on with the client's representative or broker, and not with the client, except with the consent of the client's representative or broker or except where such dealings are initiated by the client. *(Amended 1/04)*

Before providing substantive services (such as writing a purchase offer or presenting a CMA) to prospects, MLS Participants shall ask prospects whether they are a party to any exclusive representation agreement. MLS Participants shall not knowingly provide substantive services concerning a prospective transaction to prospects who are parties to exclusive representation agreements, except with the consent of the prospects' exclusive representatives or at the direction of prospects. *(Adopted 1/03, Amended 1/04)* **O**

**Standard 16.20**

Participants, users, and Subscribers, prior to or after their relationship with their current firm is terminated, shall not induce clients of their current firm to cancel exclusive contractual agreements between the client and that firm. This does not preclude Participants from establishing agreements with their associated licensees governing assignability of exclusive agreements. *(Adopted 1/98, Amended 1/10)* **O**

**Standard 16.21**

Deleted August 2024

**Standard 16.22**

MLS Participants shall not knowingly or recklessly make false or misleading statements about other real estate professionals, their businesses, or their business practices. *(Amended 01/12)* **O**

**Standard 16.23**

MLS Participants' firm websites shall disclose the firm's name and state(s) of licensure in a reasonable and readily apparent manner.

Websites of licensees affiliated with a Participant's firm shall disclose the firm's name and the licensee's state(s) of licensure in a reasonable and readily apparent manner. *(Adopted 11/07)* **O**

**Standard 16.24**

MLS Participants shall present a true picture in their advertising and representations to the public, including Internet content, images, and the URLs and domain names they use, and Participants may not:

a.  engage in deceptive or unauthorized framing of real estate brokerage websites;

b.  manipulate (e.g., presenting content developed by others) listing and other content in any way that produces a deceptive or misleading result;

c.  deceptively use metatags, keywords or other devices/methods to direct, drive, or divert Internet traffic;

d.  present content developed by others without either attribution or without permission; or

e.  otherwise mislead consumers, including use of misleading images. *(Amended 1/18)* **O**

**Standard 16.25**

The services which MLS Participants provide to their clients and customers shall conform to the standards of practice and competence which are reasonably expected in the specific real estate disciplines in which they engage; specifically, residential real estate brokerage, real property management, commercial and industrial real estate brokerage, land brokerage, real estate appraisal, real estate counseling, real estate syndication, real estate auction, and international real estate.

MLS Participants shall not undertake to provide specialized professional services concerning a type of property or service that is outside their field of competence unless they engage the assistance of one who is competent on such types of property or service, or unless the facts are fully disclosed to the client. Any persons engaged to provide such assistance shall be so identified to the client and their contribution to the assignment should be set forth. *(Adopted 11/09)*

# Orientation

### Section 17  Orientation

Any applicant for MLS participation and any licensee (including licensed or certified appraisers) affiliated with an MLS Participant who has access to and use of MLS-generated information shall complete an orientation program of no more than eight (8) classroom hours devoted to the MLS rules and regulations and computer training related to MLS information entry and retrieval and the operation of the MLS within thirty (30) days after access has been provided. *(Amended 11/04)* **M**

Participants and Subscribers may be required, at the discretion of the MLS, to complete additional training of not more than four (4) classroom hours in any twelve (12) month period when deemed necessary by the MLS to familiarize Participants and Subscribers with system changes or enhancements and/or changes to MLS rules or policies. Participants and Subscribers must be given the opportunity to complete any mandated additional training remotely. *(Adopted 11/09)*

# Internet Data Exchange (IDX)

### Section 18  IDX Defined
IDX affords MLS Participants the ability to authorize limited electronic display and delivery of their listings by other Participants via the following authorized mediums under the Participant's control: websites, mobile apps, and audio devices. As used throughout these rules, "display" includes "delivery" of such listing. *(Amended 5/17)* **M**

### Section 18.1  Authorization
**Note:** Select one of the following two options. **M**

**Option #1:**  Participants' consent for display of their listings by other Participants pursuant to these rules and regulations is presumed unless a Participant affirmatively notifies the MLS that the Participant refuses to permit display (either on a blanket or on a listing-by-listing basis). If a Participant refuses on a blanket basis to permit the display of that Participant's listings, that Participant may not download, frame or display the aggregated MLS data of other Participants.*

**Option #2:**  Participants' consent for display of their listings by other Participants pursuant to these rules and regulations must be established in writing. If a Participant withholds consent on a blanket basis to permit the display of that Participant's listings, that Participant may not download, frame or display the aggregated MLS data of other Participants.*

*Even where Participants have given blanket authority for other Participants to display their listings through IDX, such consent may be withdrawn on a listing-by-listing basis where the seller has prohibited all Internet display or other electronic forms of display or distribution. *(Amended 05/17)*

### Section 18.2  Participation
**Note:** Select one of the following four options. Participation in IDX may be limited to MLS Participants engaged in real estate brokerage by adopting Option #3 or Option #4. M

**Option #1:** Participation in IDX is available to all MLS Participants who consent to display of their listings by other Participants.

**Option #2:** Participation in IDX is available to all MLS Participants who are REALTORS® and who consent to display of their listings by other Participants.

**Option #3:** Participation in IDX is available to all MLS Participants engaged in real estate brokerage who consent to display of their listings by other Participants. *(Amended 11/09)*

**Option #4:** Participation in IDX is available to all MLS Participants who are REALTORS® who are engaged in real estate brokerage and who consent to display of their listings by other Participants. *(Amended 11/09)*

### Section 18.2.1

Participants must notify the MLS of their intention to display IDX information and must give the MLS direct access for purposes of monitoring/ensuring compliance with applicable rules and policies. *(Amended 05/12)* **M**

### Section 18.2.2

MLS Participants may not use IDX-provided listings for any purpose other than display as provided for in these rules. This does not require Participants to prevent indexing of IDX listings by recognized search engines. *(Amended 05/12)* **M**

### Section 18.2.3

Listings, including property addresses, can be included in IDX displays except where a seller has directed their listing broker to withhold their listing or the listing's property address from all display on the Internet (including, but not limited to, publicly-accessible websites or VOWs) or other electronic forms of display or distribution. *(Amended 05/17)* **M**

### Section 18.2.4

Participants may select the listings they choose to display through IDX based only on objective criteria including, but not limited to, factors such as geography or location ("uptown," "downtown," etc.), list price, type of property (e.g., condominiums, cooperatives, single-family detached, multi-family), or type of listing (e.g., exclusive right-to-sell or exclusive agency). Selection of listings displayed through IDX must be independently made by each Participant. *(Amended 11/21)* **M**

### Section 18.2.5

Participants must refresh all MLS downloads and IDX displays automatically fed by those downloads at least once every twelve (12) hours. *(Amended 11/14)* **M**

### Section 18.2.6

Except as provided in the IDX policy and these rules, an IDX site or a Participant or user operating an IDX site or displaying IDX information as otherwise permitted may not distribute, provide, or make any portion of the MLS database available to any person or entity. *(Amended 05/12)* **M**

### Section 18.2.7

Any IDX display controlled by a Participant must clearly identify the name of the brokerage firm under which they operate in a readily visible color and typeface. For purposes of the IDX policy and these rules, "control" means the ability to add, delete, modify and update information as required by the IDX policy and MLS rules. *(Amended 05/12)* **M**

### Section 18.2.8

Any IDX display controlled by a Participant or Subscriber that

a. allows third-parties to write comments or reviews about particular listings or displays a hyperlink to such comments or reviews in immediate conjunction with particular listings, or

b. displays an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing,

either or both of those features shall be disabled or discontinued for the seller's listings at the request of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all displays controlled by Participants. Except for the foregoing and subject to Section 18.2.9, a Participant's IDX display may communicate the Participant's professional judgment concerning any listing. Nothing shall prevent an IDX display from notifying its customers that a particular feature has been disabled at the request of the seller. *(Adopted 05/12)* **M**

### Section 18.2.9
Participants shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the Participant beyond that supplied by the MLS and that relates to a specific property. Participants shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for the property explaining why the data or information is false. However, Participants shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment. *(Amended 05/12)* **M**

### Section 18.2.10
An MLS Participant (or where permitted locally, an MLS Subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS Participant (or MLS Subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that Participants may display listings from each IDX feed on a single webpage or display. *(Adopted 11/14)* **M**

### Section 18.2.11
Participants shall not modify or manipulate information relating to other Participants listings. MLS Participants may augment their IDX display of MLS data with applicable property information from other sources to appear on the same webpage or display, clearly separated by the data supplied by the MLS. The source(s) of the information must be clearly identified in the immediate proximity to such data. This requirement does not restrict the format of MLS data display or display of fewer than all of the available listings or fewer authorized fields. *(Adopted 05/15)* **M**

### Section 18.2.12
All listings displayed pursuant to IDX shall identify the listing firm, and the email or phone number provided by the listing Participant in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data.* *(Amended 11/21)* **M**

### Section 18.3  Display
Display of listing information pursuant to IDX is subject to the following rules:

**Note:** All of the following rules are optional but, if adopted, cannot be modified. Select those rules which apply to your IDX program and number the sections accordingly.

### Section 18.3.1

Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS Participants and users (e.g., showing instructions, and property security information) may not be displayed. *(Amended 11/21)* **O**

### Section 18.3.1.1

The type of listing agreement (e.g., exclusive right to sell, exclusive agency, etc.) may not be displayed. *(Amended 05/12)* **O**

### Section 18.3.2

Deleted May 2015.

### Section 18.3.3

Deleted May 2017; moved to 18.2.12 May 2017.

### Section 18.3.4

All listings displayed pursuant to IDX shall identify the listing agent. **O**

### Section 18.3.5

Non-principal brokers and sales licensees affiliated with IDX Participants may display information available through IDX on their own websites subject to their Participant's consent and control and the requirements of state law and/or regulation. **O**

### Section 18.3.6

Deleted November 2006.

### Section 18.3.7

All listings displayed pursuant to IDX shall show the MLS as the source of the information.* *(Amended 05/17)* **O**

---

*Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. *(Amended 5/17)*

### Section 18.3.8

Participants (and their affiliated licensees, if applicable) shall indicate on their websites that IDX information is provided exclusively for consumers' personal, non-commercial use, that it may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing, and that the data is deemed reliable but is not guaranteed accurate by the MLS. The MLS may, at its discretion, require use of other disclaimers as necessary to protect Participants and/or the MLS from liability.* *(Amended 05/17)* **O**

### Section 18.3.9

The data consumers can retrieve or download in response to an inquiry shall be determined by the MLS but in no instance shall be limited to fewer than five hundred (500) listings or fifty percent (50%) of the listings available for IDX display, whichever is fewer. *(Amended 11/17)* **O**

### Section 18.3.10

The right to display other Participants' listings pursuant to IDX shall be limited to a Participant's office(s) holding participatory rights in this MLS. **O**

### Section 18.3.11

Listings obtained through IDX feeds from REALTOR® Association MLSs where the MLS Participant holds participatory rights must be displayed separately from listings obtained from other sources. Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained.* *(Amended 05/17)* **O**

**Note:** An MLS Participant (or where permitted locally, an MLS Subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS Participant (or MLS Subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that Participants may display listings from each IDX feed on a single webpage or display. *(Adopted 11/14)*

### Section 18.3.12

Display of expired, and withdrawn listings is prohibited. *(Amended 5/21)* **O**

---

*The MLS may, at its discretion, require use of other disclaimers as necessary to protect Participants and/or the MLS from liability. Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. *(Amended 05/17)*

### Section 18.3.13

Display of seller's(s') and/or occupant's(s') name(s), phone number(s), and e-mail address(es) is prohibited. **O**

**Note:** The following Sections 18.3.14 and 18.3.15 may be adopted by MLSs that provide Participants with a "persistent" download (i.e., where the MLS database resides on Participants' servers) of the MLS database.

### Section 18.3.14

Participants are required to employ appropriate security protection such as firewalls on their websites and displays, provided that any security measures required may not be greater than those employed by the MLS. *(Amended 05/12)* **O**

### Section 18.3.15

Participants must maintain an audit trail of consumer activity on their website and make that information available to the MLS if the MLS believes the IDX site has caused or permitted a breach in the security of the data or a violation of MLS rules related to use by consumers. *(Amended 05/12)* **O**

### Section 18.3.16

**Note:** Select one of the following two options.

**Option #1:**   Advertising (including co-branding) on pages displaying IDX-provided listings is prohibited.

**Option #2:**   Deceptive or misleading advertising (including co-branding) on pages displaying IDX-provided listings is prohibited. For purposes of these rules, co-branding will be presumed not to be deceptive or misleading if the Participant's logo and contact information is larger than that of any third party. *(Adopted 11/09)* **O**

### Section 18.4  Service Fees and Charges

Service fees and charges for participation in IDX shall be as established annually by the Board of Directors. *(Adopted 11/01, Amended 5/05)* **O**

**Section 19**
# Virtual Office Websites (VOWs)

**Note:** Adoption of Sections 19.1 through 19.14 is mandatory.

### Section 19.1  VOW Defined

a. A "Virtual Office Website" (VOW) is a Participant's Internet website, or a feature of a Participant's website, through which the Participant is capable of providing real estate brokerage services to consumers with whom the Participant has first established a broker-consumer relationship (as defined by state law) where the consumer has the opportunity to search MLS listing information, subject to the Participant's oversight, supervision, and accountability. A non-principal broker or sales licensee affiliated with a Participant may, with his or her Participant's consent, operate a VOW. Any VOW of a non-principal broker or sales licensee is subject to the Participant's oversight, supervision, and accountability. **M**

b. As used in Section 19 of these rules, the term "Participant" includes a Participant's affiliated non-principal brokers and sales licensees—except when the term is used in the phrases "Participant's consent" and "Participant's oversight, supervision, and accountability". References to "VOW" and "VOWs" include all Virtual Office Websites, whether operated by a Participant, by a non-principal broker or sales licensee, or by an "Affiliated VOW Partner" (AVP) on behalf of a Participant. **M**

c. "Affiliated VOW Partner" (AVP) refers to an entity or person designated by a Participant to operate a VOW on behalf of the Participant, subject to the Participant's supervision, accountability, and compliance with the VOW policy. No AVP has independent participation rights in the MLS by virtue of its right to receive information on behalf of a Participant. No AVP has the right to use MLS listing information, except in connection with operation of a VOW on behalf of one or more Participants. Access by an AVP to MLS listing information is derivative of the rights of the Participant on whose behalf the AVP operates a VOW. **M**

d. As used in Section 19 of these rules, the term "MLS listing information" refers to active listing information and sold data provided by Participants to the MLS and aggregated and distributed by the MLS to Participants. **M**

### Section 19.2

a. The right of a Participant's VOW to display MLS listing information is limited to that supplied by the MLS(s) in which the Participant has participatory rights. However, a Participant with offices participating in different MLSs may operate a master website with links to the VOWs of the other offices. **M**

b. Subject to the provisions of the VOW policy and these rules, a Participant's VOW, including any VOW operated on behalf of a Participant by an AVP, may provide other features, information, or functions, e.g., "Internet Data Exchange" (IDX). **M**

c. Except as otherwise provided in the VOW policy or in these rules, a Participant need not obtain separate permission from other MLS Participants whose listings will be displayed on the Participant's VOW. **M**

**Section 19.3**

a. Before permitting any consumer to search for or retrieve any MLS listing information on his or her VOW, the Participant must take each of the following steps.

    i. The Participant must first establish with that consumer a lawful broker-consumer relationship (as defined by state law), including completion of all actions required by state law in connection with providing real estate brokerage services to clients and customers (hereinafter, "Registrants"). Such actions shall include, but are not limited to, satisfying all applicable agency, non-agency, and other disclosure obligations, and execution of any required agreements.

    ii. The Participant must obtain the name of and a valid e-mail address for each Registrant. The Participant must send an e-mail to the address provided by the Registrant confirming that the Registrant has agreed to the terms of use (described in Subsection d., below). The Participant must verify that the e-mail address provided by the Registrant is valid and that the Registrant has agreed to the terms of use.

    iii. The Participant must require each Registrant to have a user name and a password, the combination of which is different from those of all other Registrants on the VOW. The Participant may, at his or her option, supply the user name and password or may allow the Registrant to establish its user name and password. The Participant must also assure that any e-mail address is associated with only one user name and password. **M**

b. The Participant must assure that each Registrant's password expires on a date certain, but may provide for renewal of the password. The Participant must at all times maintain a record of the name, e-mail address, user name, and current password of each Registrant. The Participant must keep such records for not less than one hundred eighty (180) days after the expiration of the validity of the Registrant's password. **M**

c. If the MLS has reason to believe that a Participant's VOW has caused or permitted a breach in the security of MLS listing information or a violation of MLS rules, the Participant shall, upon request of the MLS, provide the name, e-mail address, user name, and current password, of any Registrant suspected of involvement in the breach or violation. The Participant shall also, if requested by the MLS, provide an audit trail of activity by any such Registrant. **M**

d. The Participant shall require each Registrant to review and affirmatively to express agreement (by mouse click or otherwise) to a terms of use provision that provides at least the following:

    i. that the Registrant acknowledges entering into a lawful consumer-broker relationship with the Participant

    ii. that all information obtained by the Registrant from the VOW is intended only for the Registrant's personal, non-commercial use

    iii. that the Registrant has a bona fide interest in the purchase, sale, or lease of real estate of the type being offered through the VOW

    iv.  that the Registrant will not copy, redistribute, or retransmit any of the information provided, except in connection with the Registrant's consideration of the purchase or sale of an individual property

    v.  that the Registrant acknowledges the MLS' ownership of and the validity of the MLS' copyright in the MLS database. **M**

e.  The terms of use agreement may not impose a financial obligation on the Registrant or create any representation agreement between the Registrant and the Participant. Any agreement entered into at any time between the Participant and Registrant imposing a financial obligation on the Registrant or creating representation of the Registrant by the Participant must be established separately from the terms of use, must be prominently labeled as such, and may not be accepted solely by mouse click. **M**

f.  The terms of use agreement shall also expressly authorize the MLS and other MLS Participants or their duly authorized representatives to access the VOW for the purposes of verifying compliance with MLS rules and monitoring display of Participants' listings by the VOW. The agreement may also include such other provisions as may be agreed to between the Participant and the Registrant. **M**

### Section 19.4

A Participant's VOW must prominently display an e-mail address, telephone number, or specific identification of another mode of communication (e.g., live chat) by which a consumer can contact the Participant to ask questions or get more information about any property displayed on the VOW. The Participant or a non-principal broker or sales licensee licensed with the Participant must be willing and able to respond knowledgeably to inquiries from Registrants about properties within the market area served by that Participant and displayed on the VOW. **M**

### Section 19.5

A Participant's VOW must employ reasonable efforts to monitor for and prevent misappropriation, scraping, and other unauthorized uses of MLS listing information. A Participant's VOW shall utilize appropriate security protection such as firewalls as long as this requirement does not impose security obligations greater than those employed concurrently by the MLS. **M**

**Note:** MLSs may adopt rules requiring Participants to employ specific security measures, provided that any security measure required does not impose obligations greater than those employed by the MLS.

### Section 19.6

a.  A Participant's VOW shall not display the listings or property addresses of any seller who has affirmatively directed the listing broker to withhold the seller's listing or property address from display on the Internet. The listing broker shall communicate to the MLS that the seller has elected not to permit display of the listing or property address on the Internet. Notwithstanding the foregoing, a Participant who operates a VOW may provide to consumers via other delivery mechanisms, such as e-mail, fax, or otherwise, the listings of sellers who have determined not to have the listing for their property displayed on the Internet. **M**

b. A Participant who lists a property for a seller who has elected not to have the property listing or the property address displayed on the Internet shall cause the seller to execute a document that includes the following (or a substantially similar) provision. **M**

---

## Seller Opt-out Form

1. Check one.

   a. ☐ I have advised my broker or sales agent that I do not want the listed property to be displayed on the Internet.

   b. ☐ I have advised my broker or sales agent that I do not want the address of the listed property to be displayed on the Internet.

2. I understand and acknowledge that if I have selected Option a., consumers who conduct searches for listings on the Internet will not see information about the listed property in response to their searches.


_____
Initials of Seller

---

c. The Participant shall retain such forms for at least one (1) year from the date they are signed or one (1) year from the date the listing goes off the market, whichever is greater. **M**

### Section 19.7
a. Subject to Subsection b., below, a Participant's VOW may allow third-parties:

   i. to write comments or reviews about particular listings or display a hyperlink to such comments or reviews in immediate conjunction with particular listings, or

   ii. to display an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing. **M**

b. Notwithstanding the foregoing, at the request of a seller, the Participant shall disable or discontinue either or both of those features described in Subsection a. as to any listing of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all Participants' websites. Subject to the foregoing and to Section 19.8, a Participant's VOW may communicate the Participant's professional judgment concerning any listing. A Participant's VOW may notify its customers that a particular feature has been disabled at the request of the seller. **M**

**Section 19.8**
A Participant's VOW shall maintain a means (e.g., e-mail address, telephone number) to receive comments from the listing broker about the accuracy of any information that is added by or on behalf of the Participant beyond that supplied by the MLS and that relates to a specific property displayed on the VOW. The Participant shall correct or remove any false information relating to a specific property within forty-eight (48) hours following receipt of a communication from the listing broker explaining why the data or information is false. The Participant shall not, however, be obligated to correct or remove any data or information that simply reflects good faith opinion, advice, or professional judgment. **M**

**Section 19.9**
A Participant shall cause the MLS listing information available on its VOW to be refreshed at least once every three (3) days. **M**

**Section 19.10**
Except as provided in these rules, in the NATIONAL ASSOCIATION OF REALTORS®' VOW policy, or in any other applicable MLS rules or policies, no Participant shall distribute, provide, or make accessible any portion of the MLS listing information to any person or entity. **M**

**Section 19.11**
A Participant's VOW must display the Participant's privacy policy informing Registrants of all of the ways in which information that they provide may be used. **M**

**Section 19.12**
A Participant's VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, type of property. *(Amended 11/21)* **M**

**Section 19.13**
A Participant who intends to operate a VOW to display MLS listing information must notify the MLS of its intention to establish a VOW and must make the VOW readily accessible to the MLS and to all MLS Participants for purposes of verifying compliance with these rules, the VOW policy, and any other applicable MLS rules or policies. **M**

**Section 19.14**
A Participant may operate more than one VOW himself or herself or through an AVP. A Participant who operates his or her own VOW may contract with an AVP to have the AVP operate other VOWs on his or her behalf. However, any VOW operated on behalf of a Participant by an AVP is subject to the supervision and accountability of the Participant. **M**

**Note:** Adoption of Sections 19.15 through 19.19 is at the discretion of the MLS. However, if any of the following sections are adopted, an equivalent requirement must be imposed on Participants' use of MLS listing information in providing brokerage service through all other delivery mechanisms.

**Section 19.15**
A Participant's VOW may not make available for search by or display to Registrants any of the following information:

a.  expired and withdrawn listings

**Note:** Due to the 2015 changes in IDX policy and the requirement that Participants be permitted to make MLS listing information available to Registrants of VOW sites where such information may be made available via other delivery mechanisms, MLSs can no longer prohibit the display of pending ("under contract") listings on VOW sites.

b.  the type of listing agreement, i.e., exclusive right-to-sell or exclusive agency

c.  the seller's and occupant's name(s), phone number(s), or e-mail address(es)

d.  instructions or remarks intended for cooperating brokers only, such as those regarding showings or security of listed property

e.  sales price if sold information is not publicly accessible in the jurisdiction of the MLS *(Amended 11/21)* **O**

Note: If sold information is publicly accessible in the jurisdiction of the MLS, Subsection 19.15e. must be omitted. *(Revised 11/21)* **M**

## Section 19.16
A Participant shall not change the content of any MLS listing information that is displayed on a VOW from the content as it is provided in the MLS. The Participant may, however, augment MLS listing information with additional information not otherwise prohibited by these rules or by other applicable MLS rules or policies, as long as the source of such other information is clearly identified. This rule does not restrict the format of display of MLS listing information on VOWs or the display on VOWs of fewer than all of the listings or fewer than all of the authorized information fields. **O**

## Section 19.17
A Participant shall cause to be placed on his or her VOW a notice indicating that the MLS listing information displayed on the VOW is deemed reliable, but is not guaranteed accurate by the MLS. A Participant's VOW may include other appropriate disclaimers necessary to protect the Participant and/or the MLS from liability. **O**

## Section 19.18
A Participant shall cause any listing that is displayed on his or her VOW to identify the name of the listing firm and the listing broker or agent, and the email or phone number provided by the listing Participant in a readily visible color, in a reasonably prominent location, and in typeface not smaller than the median typeface used in the display of listing data. *(Amended 11/21)* **O**

## Section 19.19
A Participant shall limit the number of listings that a Registrant may view, retrieve, or download to not more than ____ current listings and not more than ____ sold listings in response to any inquiry. **O**

**Note:** The number of listings that may be viewed, retrieved, or downloaded should  be specified by the MLS in the context of this rule, but may not be fewer than five hundred (500) listings or fifty percent (50%) of the listings in the MLS, whichever is less. *(Amended 11/17)* **M**

**Note:** Adoption of Sections 19.20 through 19.25 is at the discretion of the MLS. It is not required that equivalent requirements be established related to other delivery mechanisms.

**Section 19.20**
A Participant shall require that Registrants' passwords be reconfirmed or changed every ___ days. **O**

**Note:** The number of days passwords remain valid before being changed or reconfirmed must be specified by the MLS in the context of this rule and cannot be shorter than ninety (90) days. Participants may, at their option, require Registrants to reconfirm or change passwords more frequently. **M**

**Section 19.21**
A Participant may display advertising and the identification of other entities ("co-branding") on any VOW the Participant operates or that is operated on his or her behalf. However, a Participant may not display on any such VOW deceptive or misleading advertising or co-branding. For purposes of this section, co-branding will be presumed not to be deceptive or misleading if the Participant's logo and contact information (or that of at least one Participant, in the case of a VOW established and operated on behalf of more than one Participant) is displayed in immediate conjunction with that of every other party, and the logo and contact information of all Participants displayed on the VOW is as large as the logo of the AVP and larger than that of any third party. **O**

**Section 19.22**
A Participant shall cause any listing displayed on his or her VOW obtained from other sources, including from another MLS or from a broker not participating in the MLS, to identify the source of the listing. **O**

**Section 19.23**
A Participant shall cause any listing displayed on his or her VOW obtained from other sources, including from another MLS or from a broker not participating in the MLS, to be searched separately from listings in the MLS. **O**

**Section 19.24**
Participants and the AVPs operating VOWs on their behalf must execute the license agreement required by the MLS. **O**

**Section 19.25**
Where a seller affirmatively directs his or her listing broker to withhold either the seller's listing or the address of the seller's listing from display on the Internet, a copy of the seller's affirmative direction shall be provided to the MLS within forty-eight (48) hours. **O**

# Part Four: Appendices

# Appendix 1

### Section 1  History and Background

Multiple listing, in one form or another, dates back into the nineteenth century. The first boards of REALTORS® were established as real estate exchanges. On certain appointed days, the members of a board of REALTORS® gathered at the board offices and exchanged information about their listings. They, in effect, carried on an auction, as they frequently came prepared to purchase certain property desired by their principals but listed by another broker. This practice was common in the 1880s and 1890s. Shortly after the end of the nineteenth century the term multiple listing came into use. It is mentioned as an activity of boards of REALTORS® as early as 1907.

By the 1920s, multiple listing had become widely accepted. The expansion of this function continued through succeeding years and spread throughout the country with the result that today hundreds of local associations of REALTORS® provide multiple listing services, in one form or another, to their members. I

### Section 2  National Association's Interest

The interest of the National Association in multiple listing is in assuring the proper operation of such an activity so that it furthers the objectives of the Code of Ethics, encourages cooperation between REALTORS®, and avoids practices which may be contrary to public policy or the law.

The recommendations of the National Association are in support of the following principles:

1.  An association of REALTORS® should be representative of those engaged in the real estate business in the area which it serves. As a trade association, it should open its activities to all qualified persons and invite them to join in voluntary association for the good of the public.

2.  Eligibility for association of REALTORS® membership should not require participation in a multiple listing activity if, in the opinion of the individual, such activity does not lend itself to his particular method of doing business.

3.  Participation in any activity should be subject to rules that do not conflict with the public interest.

4.  The association of REALTORS® should maintain its position as an organization serving a public interest and sustain its tax-exempt status.

5.  Activities and services offered to REALTORS® should be under the direct supervision of the association of REALTORS® subject to the governing body of the association of REALTORS® and should not be conducted by a separate or independent group. In an instance where, in order to preserve the tax-exempt status of the association, it is necessary to organize the multiple listing service as a separate, for profit corporation, such corporation should be wholly owned by the association of REALTORS® and as such is ultimately accountable to the association of REALTORS®. I

### Section 3  Reasons for Association Ownership

An association of REALTORS® exists to provide the real estate services desired and needed by members to assist them in serving the real estate needs and interests of their clients, their customers, and the community.

The association is dedicated to the promotion of continuing real estate education and to the establishment and enforcement of high standards of professional conduct in all real estate transactions. As association members, REALTOR® and REALTOR-ASSOCIATE®s are committed to the strict Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® which obligates REALTORS® to cooperate in real estate transactions whenever it is in the interest of their clients.

The concept of cooperation in real estate transactions can be enhanced by a mechanism such as the multiple listing service which enables a REALTOR® to cooperate with other REALTORS®. . Cooperation is the obligation to share information on listed property and to make property available to other brokers for showing to prospective purchasers and tenants when it is in the best interest of their clients. **I**

The MLS should be an association service or function for the following reasons:

The association exists. This means the service can be established less expensively and more quickly and should result in a fuller utilization of the association's personnel and equipment.

Every MLS, whether or not association affiliated, requires certain functions to be performed, including management, rule making and enforcement, and arbitration of disputes. Associations of REALTORS® have the existing organization and capacity to fulfill all these functions, and by doing so, are able to minimize the cost and improve the quality of the performance. *(Revised 11/96)*

Since REALTORS® are bound to a Code of Ethics and other obligations of association membership, it is desirable that such obligations be consistent with the obligations imposed by the MLS. This can only be assured if the MLS is subject to the control of the association, since the association cannot legally control an independent organization. Association control is especially important to avoid situations where the association is held responsible, at least in the minds of the public, for the conduct of an MLS not under its control simply because REALTORS® are members of such an MLS.

REALTORS® have worked hard to establish a reputation for integrity and professionalism; and they carry that image with them in all their transactions. If their cooperative transactions are through an association MLS, the association can better assure compliance with the applicable legal obligations and better defend the legitimate and essential rights of REALTORS® to do business.

In sum, a multiple listing service is just one of many services offered by an association of REALTORS®, but it is a useful and beneficial service to the members, their clients and customers, and the community. The association MLS offers efficiency, effectiveness, and economy of operation. It avoids duplication of effort and of cost. The community looks to the association for leadership in matters affecting real estate and hence would expect a multiple listing service to be operated by the association of REALTORS®. The association has the respect and confidence of the community it serves. Association members are committed to the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® and to its enforcement, including disciplinary proceedings and arbitration proceedings to resolve real estate complaints and disputes consistent with state law. The association MLS promotes harmony and cooperation among association members and remains, in proper perspective, an association service. **I**

**Section 4  How to Organize a Multiple Listing Service**

If a substantial number of members show an interest in the subject of multiple listing, it is prudent for the association of REALTORS® to show leadership by appointing a committee to investigate. It can be a mistake for the association of REALTORS® to ignore interest on the part of even a limited number of members, lest they undertake to establish a service outside the association.

The committee should sponsor a full discussion of the subject at one or several membership meetings. Members from nearby associations of REALTORS® with multiple listing activities should be invited to give their view and answer questions. However, their answers should be verified in terms of this Handbook and the policies of the National Association.

The committee should make on-site visits to various associations with multiple listing activities to learn what costs are involved and to decide on the equipment needed. Many associations find it desirable to contract all or most processing. Others do a complete processing job themselves.

If processing is done outside the association, the initial equipment needed is minor and there should be no need for a large initial participation fee.

If the association does the complete processing, it will be necessary to purchase duplicating and photographic equipment. The initial cost of starting the operation may be higher, but long-term costs and control advantages may be greater.

After the committee has made a thorough investigation of all factors involved, it should make its report and recommendations to a membership meeting. If the report favors adoption of the activity, the association should amend the bylaws to authorize the operation of the activity and to set up the machinery for operation. (See bylaw provisions located elsewhere in this Handbook.)

The name of association owned or operated multiple listing services (including multi- association and regional multiples) should rationally relate to the area served. (See Part Two, C., Operational Issues, Section 7, Challenges to the Names of Multiple Listing Services, for more information.)

The committee authorized to be created by the amended bylaws then should adopt supplemental rules and regulations which will outline the operating procedures of the activity. The rules and regulations, as adopted, should be submitted to the board of directors. A copy should be provided to the state association for its records and a copy should be forwarded to Board Policy and Programs, National Association, so that the rules and regulations can be reviewed to determine their compliance with applicable policy. (See the National Association's MLS Antitrust Compliance Policy, located in Part Two of this Handbook.) *(Amended 8/24)* **R**

# Appendix 2

**Merging an Independent MLS with an Association of REALTORS®**

Why should a multiple listing service which functions efficiently, yet is neither owned nor operated by an association of REALTORS®, seek association affiliation This question is one which is posed repeatedly to the National Association and one for which there is no simplistic answer. However, among the considerations which have prompted such affiliation in the past are the following:

1. The unification strengthens the position of the association in the community and contributes to harmony among REALTORS® since all are in the "same house" working together.

2. Associations are most knowledgeable on a continuing basis as to policy of the National Association (Code of Ethics, official interpretations of bylaws, MLS Antitrust Compliance Policy). In this regard, an association MLS can have its governing documents reviewed by the National Association and can obtain policy guidance as to proposed amendments. Thus, they benefit from the National Association's experience on a nationwide basis as to actions brought against multiple listing services, the interest of the Justice Department, provisions of consent decrees and, in general, evaluation on a continuing basis. This service is not provided to multiple listing services which are not owned and operated by associations of REALTORS®.

3. The association MLS can deal with MLS rule violations, or if deemed desirable, may refer violations to the professional standards committee of the association and must refer all allegations of unethical conduct to the association's professional standards committee and must refer all arbitration cases to an arbitration panel of the professional standards committee. An outside MLS must duplicate these facilities only at considerable additional cost, and in no event can enforce the Code of Ethics of the National Association to which it does not and cannot subscribe.

4. If litigation arises against an MLS under association auspices, the protection of the errors and omissions insurance provided by the National Association is available. The association MLS also may have, under appropriate circumstances, access to the legal action fund of the National Association as a back-up to the errors and omissions insurance.

5. The association MLS offers the economy of the same facilities and same staff as utilized by the association.

6. In an association MLS there is no vested interest in any one or limited group of Participants. The common interest without vested individual interest is an assurance to all who participate and contributes to harmony and best operation.

7. The association MLS leaves no doubt that the service is a service and not merely a business enterprise. Policy of the National Association precludes an association-owned- and-operated MLS from functioning as an agent.

Once the numerous benefits of association affiliation are recognized and accepted, the next step is the merger itself. The National Association cannot specifically advise as to the procedural steps of combining a multiple listing service with an association without first reviewing the bylaws and constitution of the existing multiple listing service as well as the details of its financial operation. Review of such an outside multiple's governing documents may be accomplished only after a specific request by the association president or executive officer when consideration is being given to a merger. Generally, the suggested procedure for merging an MLS operation into a service of an association of REALTORS® is somewhat as follows:

1.  The association should appoint a committee to study MLS as a service of the association and work jointly with the committee from the multiple listing service.

2.  The multiple listing committee should appoint a group to study the methods of dissolving the independent operation and to work with the committee of the association. One way this can be done is to transfer the equipment which is owned by the multiple listing service and needed to operate the service to the association. In return, the association can agree to admit, without payment of initiation fee, all of the shareholders of the multiple listing service (provided they are REALTOR® principals) and the remaining assets of the service can be paid to the shareholders or transferred to the association on the same basis as the furniture and equipment. In any event, when all of the assets of the multiple listing service are either transferred to the shareholders or to the association, then the multiple listing service would cause itself to be dissolved.

3.  After due study, the recommendations of the joint committee should be made to the two respective groups.

4.  When the recommendations favor a merger, the board of directors of both groups should take appropriate action to secure membership approval for the merger.

5.  Where appropriate, the membership of the association of REALTORS® should adopt the association bylaw amendment suggested in the Handbook, authorizing the service and a method of supervision.

6.  A committee should be appointed to study rules and regulations for operating the service. The verbatim adoption of the model rules and regulations in the Handbook will bring automatic compliance with the policy of the National Association.

7.  The proposed rules and regulations should be referred to the board of directors of the association of REALTORS® for approval.

8.  When approved as described in the preceding paragraph, the service may begin operation as a service of the association. However, to obtain the coverage of the errors and omissions insurance program of the National Association with respect to the operation of the MLS, it is necessary that the National Association review the rules and regulations adopted by the service for compliance with the multiple listing policy of the National Association. It is important that this step be taken promptly following adoption of the MLS rules and regulations. (If desired by the association, the proposed rules and regulations may be forwarded to the National Association for review and critique prior to adoption by the board of directors of the local association.)

9.  An attorney should be retained to effect the dissolution of the outside service, and under counsel's direction, the assets, tangible and intangible, should be dispersed in accordance with the merger agreement.

Inquiries regarding the merger procedure should be directed to Board Policy and Programs, NATIONAL ASSOCIATION OF REALTORS®. *(Amended 8/24)* |

# Appendix 3

**Protecting the Tax-exempt Status of the Association of REALTORS®**

Section 501(c)(6) of the Internal Revenue code provides for the exemption of nonprofit real estate associations whose earnings do not inure to the benefit of any private shareholders or individuals. Pursuant to Section 1.501(c)(6)-1 of the income tax regulations, a real estate association will not be entitled to an exemption unless it:

> . . . is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. . . . Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular service for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self sustaining, is not a business league.

It should be noted that this regulation does not preclude a real estate association from engaging in a regular business of a kind ordinarily carried on for profit, as long as such business does not constitute the primary purpose for the organization's existence. In fact, the regulation strongly suggests that a real estate association could engage in some business activities without loss of exemption by providing that organizations otherwise exempt from tax under this section are taxable upon their unrelated business taxable income.

Thus, the purpose of this discussion is to consider whether real estate associations operating multiple listing services can qualify for a Section 501(c)(6) exemption.

This inquiry involves two separable questions:

1. Is the operation of an MLS ordinarily a not-for-profit activity?

2. Will the operation of a profitable MLS cause the real estate association to forfeit its Section 501(c)(6) exemption?

The position of the Internal Revenue Service with respect to the first of these questions is clear. Revenue Ruling 59-234, 1959-2 C.B. 149 holds that an MLS is a business ordinarily carried on for profit and inherently designed to render particular services to individual members. The service reached this conclusion notwithstanding that the purpose of an MLS, generally, in the service's own words, is:

> (a) to assist members of the board in rendering better service to the public by creating a broader and more active market for real estate; (b) to stimulate and facilitate the transaction of business between members of the board through cooperation and exchange of exclusive listings; (c) to provide a medium through which real estate may be merchandised more efficiently and expeditiously to the advantage of both buyer and seller; and (d) to encourage REALTORS® to uphold high standards of business practice and to further educate them in adhering to the principles of the REALTORS® Code of Ethics.

The Court of Claims, in Evanston–North Shore Board of REALTORS® v. U.S., 162 Ct. Cl. 682, 320 F.2d 375 (1963), cert. den. 376 U.S. 931 (1964), followed Rev. Rule. 59-234 in denying exempt status to a real estate association with a mandatory multiple listing service. While the court specifically found that Evanston–North Shore's MLS was operated primarily for the benefit of its members, there is dictum which suggests that a real estate association might escape the application of Rev. Rule. 59-234, given the right circumstances.

Assuming that a multiple listing service is a business ordinarily carried on for profit, it does not follow that the operation of an MLS should cause a real estate association to forfeit its Section 501(c)(6) exemption. Arguably, the operation of an MLS qualifies as a business activity ancillary to the primary purpose of a real estate association which, as required by Reg. Section 1.501(c)(6)-1, is ". . . to promote (a) common interest and . . . (improve) business conditions . . . distinguished from the performance of particular services for individual persons," rather than constituting the primary purpose for the association's existence. Thus, if the primary purpose of a real estate association is to improve business conditions as opposed to operating an MLS, the association should be eligible for a Section 501(c)(6) exemption.

The basic problem facing a real estate association operating an MLS is demonstrating that the primary purpose for its existence is to conduct activities dedicated to the improvement of local business conditions (within the meaning of Reg. Section 1.501(c)(6)-1) and that any other financial activities, including the MLS, are ancillary to such purpose.

A summary of specific methods and procedures that should be followed and adequately documented by the association to demonstrate entitlement to tax exemption is presented as follows:

1. **Association to Document Its Overall Program of Activity:** The leadership of the association should ensure that the objects of the association, as set forth in the bylaws, establish a clear and articulate picture of what the association is and what the purposes and objectives of the association are considered to be. In addition to the description found in the bylaws of the association, the leadership should ensure that it documents, in some further form, any and all participation by association members in the programs, activities, and projects of the local association, as well as those of the state association and of the National Association.

2. **Multiple Listing Service to Be Operated as Incidental Activity of the Association:** The leadership of the association should ensure that it is clearly understood by all of the association members, and particularly by those who participate in the multiple listing service, that the multiple listing service is owned and operated by the association as just one of the many activities of the association and is of an incidental nature rather than being of a predominant nature as an activity of the association.

The articles of the bylaws of the association of REALTORS® should clearly delineate the multiple listing service as being a service of the association, should describe whether it will be operated as a committee of the association or as a wholly-owned subsidiary corporation with all of the stock owned by the association of REALTORS®, and should indicate that any bylaws and/or rules and regulations of the MLS will be subject to final approval by the board of directors of the association of REALTORS®. It is important that the authorizing article in the association's bylaws spell out all of the details clearly as to the association's multiple listing service, and it is recommended to associations of REALTORS® that they adopt Article XVIII of the model bylaws recommended to member associations by the NATIONAL ASSOCIATION OF REALTORS®. The adoption of this article will ensure the appropriate authorization and implementation of an association MLS.

Whether the multiple listing service should be operated as a committee of the association or as a wholly-owned subsidiary, is a matter to be determined by the local association with advice of its accountant and its association legal counsel. In this connection, there are a variety of considerations which must be reviewed, including, of course, the differential in the tax rate applicable to unrelated business income of an association and the income of a for-profit corporation. Generally, it is recommended by the National Association that a multiple listing service be operated as a committee of the association and that all the necessary effort be made to ensure that the association maintains its tax-exempt status. However, as indicated, it is necessary for the association and its members to be completely aware of the special effort that must be made to maintain the proper perspective of the multiple listing service as compared to overall association activity. Generally speaking, the association must be able to demonstrate that the annual budget of the MLS as compared to the overall annual budget of the association of REALTORS® is less than 50% and preferably less than 30%. Lawrence B. Jerome, a former Chief of the Exempt Organizations Branch of the Internal Revenue Service, is now retired from the Internal Revenue Service, and served as a consultant to the National Association on tax matters. Mr. Jerome, in an article published in The Executive Officer, September, 1974, states, "The IRS has never published a position on how significant particular services must be to cause loss of exemption," but that he generally believed that, "fairly sound guidelines" are that loss of exemption is clearly indicated if the performance of particular services exceeds 50% of an association's total activities. He further expressed an opinion that tax exemption for the association is likely to be challenged and revocation of the tax exemption becomes a strong possibility if particular services (i.e., MLS) are more than 30% of an association's activities, unless there are other issues or mitigating circumstances. Mr. Jerome warned that, "the foregoing guidelines can change drastically if the IRS modifies its interpretations or if the courts begin to take a harder or softer stand in this area." In summary, however, the safest position that an association can take is to ensure that the unrelated business income represented by funds received from the MLS operation bears the smallest feasible percentage ratio to the overall budget of an association as possible. This is the most convincing proof that a multiple listing service is, in fact, just one of the many worthwhile activities of an association of REALTORS®.

If, however, the association concludes with advice of its accountant and association legal counsel that it cannot sustain the necessary relationship of an incidental activity as a committee of the association and still preserve its tax-exempt status as an association, or if the tax consequences of such a relationship are seriously adverse, then it should consider the alternative method of operating the MLS as a wholly-owned subsidiary of the association, with all stock of the subsidiary corporation owned by the association of REALTORS® and with any bylaws and/or regulations subject to final approval by the board of directors of the association. Operated as a wholly-owned subsidiary, the multiple would maintain its own budget, separate and apart from the association, and would pay taxes on any surplus accruing at the end of its fiscal year. The operation of the multiple as a taxable, for-profit corporation would be similar in certain respects to the operation of a nonprofit corporation—for example, the multiple could still accrue and maintain a reasonable surplus for continued operation in times of economic downswings or to maintain and improve the facilities required to operate the multiple listing service.

It is specifically noted that the taxes are due and payable on any surplus of funds accruing to the MLS at the end of the fiscal year, irrespective of whether the multiple listing service is operated as a committee of the association or as a wholly-owned subsidiary. This is true because of the determination by IRS that a multiple listing service is the type of business ordinarily carried on for profit and that it provides a particular service to the member Participants and, as such, the income derived is classified as unrelated business income. Hence, it is emphasized that an association must always pay tax on its MLS operation providing unrelated business income irrespective of how the MLS is structured.

In either case, whether as a committee or as a wholly-owned subsidiary corporation, action should be taken by the multiple listing service to ensure that it operates basically on a break even basis. Whenever a reasonable operating reserve has been accumulated, it is time to reduce income being generated by the MLS to a point close to break even. The multiple listing policy of the National Association establishes that charges for multiple listing in an association service will approximate the cost incurred in providing the service to the member Participants. The MLS should not be a primary source of funding for an association of REALTORS®, at least while its membership is limited exclusively or primarily to association members. Reduction or elimination of service fees, listing fees, or subscription charges should be made as necessary to operate the MLS at or close to the desirable break even point.

3. **Documentation of Staff Time Devoted to the Multiple Listing Service:** The association should be prepared to demonstrate the number of staff personnel whose time is utilized in the operation of the multiple as opposed to the total number of staff involved in the overall operations of the association. The records maintained to document this should also establish the type of personnel operating the multiple. For example, the successful effort of one association to maintain its tax-exempt status cited the fact that only three members of a staff of ten were assigned to full-time work with the multiple listing service and that these personnel were clerical type employees. The remaining members of staff had only incidental duties related to MLS, and it was indicated that minimal duties of the executive vice president of the association related to the operation of the service. This served to clearly demonstrate that a major portion of the staff's efforts were related to the overall operation of the association and that the MLS operation required only approximately 30% of staff for its operation.

4.   **Value Analysis of Noncompensated Services of Members of the Association:** The association should prepare and maintain, as a continuing documentation, a comprehensive value analysis of the noncompensated time and service provided by members of the association to conduct the many and varied activities, programs, and projects of the association. In any association of REALTORS®, association activities are primarily conducted through the efforts of association members donating many valuable hours of their time. To purchase such services as are donated by the members of the association of REALTORS® would be prohibitive for most associations. These services represent value contributed by the members and value received by the association, and careful documentation can serve to establish the considerable monetary value of such activities. When the total monetary value is determined by calculation of the hours of such service provided and the establishment of a reasonable value for such services, this value can be added to the overall gross income of the association, and if appropriately verified, should prove acceptable to the Internal Revenue Service should a challenge arise to the tax-exempt status of the association. Appropriate forms for documenting this type of noncompensated time and service by association members are attached as Appendices 6 and 7 of this Handbook.

5.   **Committees of the Association:** The multiple listing committee (if MLS is operated as a committee of the association) is only one of the many committees of the association of REALTORS®. The association should document and be prepared to demonstrate at any time the total number of committees and total number of members serving on these committees. An appropriate listing of all of the committees of the association, with attendant statement of organization and procedure, will document that in addition to multiple listing, the association provides a broad and myriad program of activity, including effective orientation programs, continuing educational programs to improve and elevate the professional status and competency of its members, community affairs programs, legislative action programs, professional standards and arbitration proceedings, equal opportunity programs, affirmative marketing programs, membership recruitment programs, and many other such activities. Similar comparative documentation can be made when the MLS is a wholly-owned subsidiary of the association and is governed by a board of directors, subject to approval of the board of directors of the association of REALTORS®.

6.   **Analysis of Agenda of Board of Directors:** A ready source of authoritative documentation is available to any association of REALTORS® to substantiate the fact that it has a broad spectrum of programs and activities, of which the multiple listing service is only a part. This documentation source is the minutes of the board of directors of the association. These minutes reflect the ongoing business of the association, as discussed by the directors, and the number of times any item appears in the minutes in ratio to the number of times other items are discussed, which reflects its proportionate importance. Therefore, in most cases, it can be readily shown that such minutes reflect the discussion of many and varied items in overwhelming proportion to the times the multiple listing service is discussed. In the documentation provided to the Internal Revenue Service by one association of REALTORS®, an analysis of this type reflected that the MLS of the association was discussed 31 times in a given period of time, whereas other items of association activity were discussed 396 times. This served eloquently to reflect the fact that MLS was an incidental activity of the association in a well-rounded program of activity.

7. **Time for Association Plan to Attain or Maintain Tax-Exempt Status**: Now is the time. It has been demonstrated in several instances cited in the preceding paragraphs that careful and comprehensive documentation is essential and can be successful in obtaining and/or maintaining the tax-exempt status of an association of REALTORS® operating a multiple listing service. Compiling such records requires both planning and careful execution to ensure that they accurately demonstrate a true picture of the multiple's position as an incidental activity of the association. These records do not appear spontaneously. If your association possesses tax-exempt status as an association, or plans to apply for such exempt status in the future, the time to begin the essential record-keeping is now. It can be done and should be done on a continuing basis with advice of the association's accountant and legal counsel.

Further questions or information concerning tax-exempt status of your association should be directed to Board Policy and Programs of the National Association. Any successful effort by an association to obtain or maintain tax-exempt status is welcomed by the National Association.

It is also recommended to associations of REALTORS® having lost tax-exempt status at some point that every effort be made to regain such exempt status at the earliest possible time. **I**

# Appendix 4, 5, 6, 7 and 8

**Note:** Appendices 4, 5, 6, 7 and 8 found in the published version of The Handbook on Multiple Listing Policy on pages 148-152 are not reproduced in this electronic version of the book. The Specimen Forms may be downloaded, printed or completed on-line at REALTOR.org

# Appendix 9

## Select Interpretations from the Official Interpretations of Article I, Section 2 of the NATIONAL ASSOCIATION OF REALTORS® Bylaws as Referred to in this Handbook

### INTERPRETATION NO. 1 *(Adopted November 15, 1960)*

**"A requirement to participate in a Multiple Listing Service in order to gain and maintain REALTOR® membership is an inequitable limitation on its membership."**

When a Multiple Listing Service is available, is well operated and properly organized, it is the duty of the REALTOR® to consider thoroughly whether he can serve the best interests of his clients by participating in it. The decision, however, must be his own. As a REALTOR®, it is possible for him to conduct his business in an ethical and efficient manner without participating in a Multiple Listing Service. Therefore, his participation must not be a requirement of REALTOR® membership.

### INTERPRETATION NO. 2 *(Adopted January 24, 1961)*

**"An initiation fee in excess of three times the amount of the annual rates of dues is an inequitable limitation on its membership."**

Member Boards must not place unreasonable burdens on applicants for membership. The requirements for membership must be reasonable and nondiscriminatory.

The initiation fee, if any, charged by a Board must not constitute an unreasonable barrier to membership of a person otherwise qualified. Nor should a Board seek to finance its activities and operations from initiation fees.

The National Association deems any initiation fee in excess of three times the amount of the annual rates of dues, including state and national, to be unreasonable and therefore inequitable.

Since under Interpretation No. 1, participation in a Board Multiple Listing Service is not mandatory, the Board initiation fee, if any, must be separate from any participation fee which may be charged for the Multiple Listing Service.

### INTERPRETATION NO. 6 *(Adopted January 24, 1961)*

**"Any regulation restricting or limiting the practice of a REALTOR® in the conduct of his business, unless it concerns ethical practice, is an inequitable limitation on its membership."**

This Interpretation establishes a rather general guide to the type of rules which a Board may adopt, i.e., in furtherance and support of the Code of Ethics, but guards against the type of rules which unreasonably restrict the Member in the conduct of his business on a basis other than related to the Code of Ethics.

The intent of this Interpretation is to avoid the necessity of the Board of Directors passing upon innumerable details about which Boards constantly inquire. The administrative staff is under instruction to advise a Member Board, upon inquiry, as to whether a practice or proposed rule appears to be inconsistent with, or in violation of, the Bylaw against inequitable rules. If the Member Board then wishes to request an official interpretation by the Board of Directors, it may do so.

Any Member also is entitled to an interpretation upon request. However, as a matter of policy, the National Association prefers that inquiries come from Member Boards. It cannot, however, deny any Member the right to request an interpretation.

### INTERPRETATION NO. 9 *(Adopted January 24, 1961, Revised May 8, 1973)*

**"Requirement of a 'Waiting Period' before being considered for REALTOR® membership is not an inequitable limitation on its membership if related to the period of time necessary to process the application, not to exceed six months."**

It is consistent with assurance of ethical business practice for a Board of REALTORS® to require that an applicant for membership submit an application detailing past history. The National Association, as a matter of policy, urges thorough investigation into the background of applicants for membership. This affords the Board an opportunity to investigate the individual's business conduct and record.

An applicant is entitled to prompt consideration of his application and final disposition of such application must be made within six months.

### INTERPRETATION NO. 10 *(Adopted May 9, 1961, Revised November 12, 1988)*

**"A Board rule purporting to require a REALTOR® who holds an exclusive listing to give blanket consent to either subagents or cooperating brokers representing buyers to arrange appointments to show listed property directly with the owner or to negotiate the purchase of listed property directly with the owner, rather than through the listing broker, obstructs observance of Article 3, and thereby is an inequitable limitation on its membership."**

This Interpretation affirms the basic agency relationship between the listing broker and his principal as defined in the listing contract. A Board or MLS rule may not properly interfere with or supersede the relationship established by the terms of the agreement between the broker and his principal.

The cooperating broker as a subagent of the listing broker or as an agent of the buyer enjoys only such rights to show or sell the listing as are granted to him by the listing broker who is ultimately responsible to the principal.

### INTERPRETATION NO. 11 *(Adopted May 9, 1961)*

**"A rule of a Member Board prohibiting the acceptance of open listings by Members is an inequitable limitation on its membership."**

Although the Preamble of the Code of Ethics places upon the REALTOR® the aspirational ideal that he "urge the exclusive listing of property . . . ," it does not provide that a nonexclusive listing should not be accepted.

The REALTOR® must be free to enter into any form of listing contract mutually agreeable to the REALTOR® and the client.

### INTERPRETATION NO. 14 *(Adopted May 9, 1961, Revised January 26, 1971)*

**"A Member Board rule or practice which requires Members to adhere to a schedule of fees or commissions, or which authorizes or includes the preparation or publication of a recommended schedule of fees or commissions, is contrary to the Code of Ethics and to the policy of the NATIONAL ASSOCIATION OF REALTORS® and is an inequitable limitation on its membership."**

### INTERPRETATION NO. 15 *(Adopted May 9, 1961)*

**"A Board rule prohibiting REALTORS® or their salesmen from accepting elective or appointive public office, or requiring their resignation if they accept such office, is an inequitable limitation on its membership."**

### INTERPRETATION NO. 16 *(Adopted May 9, 1961)*

**"A Board rule prohibiting employment of married women as salespersons is an inequitable limitation on its membership."**

This Interpretation is a specific application of the general policy of Interpretation No. 20.

### INTERPRETATION NO. 17 *(Adopted November 16, 1961)*

**"A Board rule imposing an age limit upon applicants for membership is an inequitable limitation on its membership."**

Age is not a reasonable criterion for membership.

### INTERPRETATION NO. 21 *(Adopted November 12, 1962)*

**"A Board rule regulating the number of married women that may be employed is an inequitable limitation and comes within Interpretation No. 16."**

### INTERPRETATION NO. 25 *(Adopted May 11, 1965)*

**"A Board rule which prevents the participation of a REALTOR® Member, on equal terms with other REALTOR® Members, in a Multiple Listing Service sponsored, organized or sanctioned by the Board, and which is available to REALTOR® Members throughout the Board's jurisdiction, is an inequitable limitation on its membership."**

A Board rule which makes services available to some REALTOR® Members, but not to other REALTOR® Members, when such services are available generally throughout the Board's jurisdiction, is an inequitable limitation upon the membership.

### INTERPRETATION NO. 26 *(Adopted May 10, 1966, Revised November 16, 1977)*

**"A Board rule prohibiting the posting by members of 'for sale' or other similar signs on property for which the member is agent is an inequitable limitation on its membership."**

The right to display "for sale" or other similar signs reasonably designed to inform the public is protected by the First Amendment to the United States Constitution. Thus, any rule prohibiting the posting of such signs would be an unconstitutional infringement of the freedom of speech of the REALTOR® and his client. Similarly, a Board owned or operated Multiple Listing Service may not endorse any programs by municipalities, civic groups or civil rights organizations to ban or curtail signs, even if such programs are "voluntary," because of the "chilling effect" such endorsement might have on the exercise of First Amendment rights.

### INTERPRETATION NO. 29 *(Adopted May 8, 1973)*

**"Application and entrance fees for participation in an Multiple Listing Service, owned by, operated by or affiliated with a Board of REALTORS®, in excess of the approximate cost, including the accumulation and maintenance of reasonable reserves, of developing, maintaining, or improving the organization as a going concern, is an inequitable limitation on the membership."**

All services of a Board of REALTORS®, including Multiple Listing Service, should be available to all REALTOR® Members without restrictive entrance and application fees. Such fees should be related to the approximate costs of bringing the Service to the member and must not be computed on the basis of the number of listings of a Multiple Listing Service or on the basis of a pro rata share of its assets.

### INTERPRETATION NO. 30 *(Adopted May 8, 1973)*

**"Enforcement of the Code of Ethics by any group, within or without the Board of REALTORS®, other than the Professional Standards Committee and the Board of Directors of the Board of REALTORS®, is an inequitable limitation on its Members."**

Member Boards are required by Article IV of the Bylaws of the National Association to enforce membership compliance with the Code of Ethics. This obligation is properly fulfilled by the Professional Standards Committee and the Board of Directors of the Board. Delegations of this function by the Board to any other body, such as a Multiple Listing Committee, is not appropriate.

### INTERPRETATION NO. 31 *(Adopted May 8, 1973, Revised January 31, 1977)*

**"A Board rule or a rule of a Multiple Listing Service owned by, operated by or affiliated with a Board, which establishes, limits or restricts the REALTOR® in his relations with a potential purchaser, affecting recognition periods or purporting to predetermine entitlement to any award in arbitration is an inequitable limitation on its membership."**

In essence, this is a specific interpretation of the general rule established in Interpretation No. 6 that a Board may not have a rule which restricts or limits the REALTOR® in the conduct of his business unless it concerns ethical practice. Thus, a rule of a Board or Multiple Listing Service which would determine a protection period in reference to a prospective purchaser is an inequitable limitation. Further, the Board or its MLS may not establish a rule or regulation which purports to predetermine entitlement to any awards in a real estate transaction. If controversy arises as to entitlement to any awards, it shall be determined by a hearing in arbitration on the merits of all ascertainable facts in the context of the specific case of controversy.

### INTERPRETATION NO. 32 *(Adopted May 8, 1973, Revised November 11, 2013)*

**"The inclusion in the dues payable by Board Members of costs of services, products or activities of the Board which properly should be optional is an inequitable limitation on its membership."**

The dues payable by Board Members should represent the allocable costs of the services, products and facilities which are available to and benefit the Members generally, either directly or indirectly. It should not include the costs of those services, products or facilities which can be identified as optional. Thus, for example, the cost of participating in the Board's MLS should not be included as part of Board dues since whether a Member determines to participate in such an activity will depend upon the Member's particular method or type of business. The reasonable cost of meals at general membership meetings held pursuant to the Board's Bylaws may be included in Board dues since such meetings are necessary to the operation of the Board as a whole provided that no more than 35% of the local allocation of the Board's annual dues revenue may be utilized for this purpose. Associations may, at their discretion, include the costs of lockboxes and lockbox keys, programmers, fobs, smart cards, and other access devices in the association dues.

### INTERPRETATION NO. 33 *(Adopted February 5, 1974)*

**"It is an inequitable limitation to deny membership to an applicant who maintains an office for the conduct of a real estate business which is open for business during the normal business hours, recognized in the community, and who holds himself out to the public as being actively engaged in real estate business solely upon the grounds the applicant is not so engaged."**

This Interpretation does not contemplate that the broker must devote all or even a majority of his time to his real estate business or derive any particular percentage of his income from such business. It does not contemplate that the licensee shall have no other job or occupation. It does contemplate that the licensee shall actively seek real estate business; that he shall maintain and adequately supervise a real estate office.

Where question arises as to whether or not a licensee is "actively engaged" in the real estate business, he shall be given the opportunity to present evidence concerning the actual and intended nature and scope of his business activities.

### INTERPRETATION NO. 34 *(Adopted November 12, 1974)*

**"It shall be an inequitable limitation for a Board to require a separate office in each Multiple Listing Service area where there is more than one Multiple Listing Service owned or controlled by the Board within the jurisdiction of the Board in order to participate in each such Multiple Listing Service."**

A REALTOR® is entitled to participate in any and all services and programs sponsored by the Board of REALTORS®. A Board rule which circumscribes the right to such participation restricts and limits the conditions of Board membership in violation of Article I, Section 2, of the Bylaws of the NATIONAL ASSOCIATION OF REALTORS®.

To institute a divisional Multiple Listing Service based on geographic lines within a Board's jurisdictional area limits access to Board services and activities in a way which could be deemed and adjudged arbitrary and unreasonable.

As such, it is merely an extension of Interpretation No. 25 in that it refers specifically to the right of a REALTOR® to participate in a Board-owned-and-controlled Multiple Listing Service and any geographic division thereof without the necessity of having an office within said geographic division.