IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | |
|---|---|
| Jorge A. Zea (Pro Se) <br><br> Plaintiff, <br><br> V. <br><br> National Association of REALTORS®, et, al. <br><br> Defendants. | FILED BY ⲱ S  D.C. <br> OCT 15 2025 <br> ANGELA E. NOBLE <br> CLERK U.S. DIST. CT. <br> S.D. OF FLA. – W.P.B. <br><br> Case No. 25-cv-81016-WPD |

**PLAINTIFF'S REPLY TO DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION, IN SUPPORT OF GRANTING THE INJUNCTION**

Plaintiff, pro se, respectfully submits this Reply to Defendants' Consolidated Opposition (ECF No. 62). Defendants' own filings confirm—rather than refute—the urgent need for injunctive relief.

I. **ARGUMENT ON LIKELIHOOD OF SUCCESS**

A. **Defendants' Incorporation by Reference is Procedurally Defective.**

Instead of a self-contained argument, they incorporate by reference over seventy pages from their Motions to Dismiss, forcing the Court to "hunt for truffles buried in briefs." See U.S. v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991); see also Miller UK Ltd. v. Caterpillar, Inc.,

292 F.R.D. 590, 595 (S.D. Fla. 2013). Plaintiff therefore confines this Reply to the four corners of their filing.

        **B.**    **Defendants' Own Admissions Eliminate Any Genuine Issue of Fact**:

Defendants' own sworn declarations and exhibits eliminate any genuine dispute of material fact.

*First*: The declaration submitted by SmartMLS's Chief Executive Officer (see Defs.' Ex. 60-3, ECF No. 60-3 at 1-6) is materially incomplete and misleading at best. It asserts that SmartMLS's Rules "include" the IDX display requirement but omits the dispositive fact that this language was inserted on October 6, 2025 - just 2 days before Defendants filed their opposition and nearly 4 years after NAR mandated it. (*See* Exhibit 1: side-by-side comparison of the pre-litigation against October 2025 versions). By failing to disclose this last-minute addition, the declaration creates the false impression of long-standing compliance and wrongly suggests Plaintiff's allegations were mistaken. Such omission in sworn testimony demonstrates a lack of candor with the Court and an attempt to conceal the timing of SmartMLS's corrective action.

*Second,* the declaration of Stellar MLS's CEO confirms - rather than refutes - Plaintiff's showing. It quotes Article 19.22 of Stellar's rules as proof of compliance, yet that rule omits NAR's mandatory requirement that the listing firm's phone number or e-mail appear in a reasonably prominent location. Instead, it merely requires display of the broker's name adjacent to the property information. *See* Decl. of Shayne Fairley ¶¶ 1–4, attached to Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj., ECF No. 62-20; *See* Pl.'s Reply Ex. 3 at 2, re-attached for the Court's convenience. This is the same truncated wording Plaintiff documented in his initial filing. See Pl.'s Ex. 2.5, ECF No. 9-1 at 75.

Defendants' declarations therefore concede non-compliance on its face, confirming that its rules remain incomplete and inconsistent with NAR's mandatory policy.

2

Knowing that these provisions are mandatory and that NAR annually certifies each MLS's rulebook, this record demonstrates not only non-compliance by both Stellar and SmartMLS, but also NAR's failure to enforce its own certification standards. (*See* Pl.'s Ex. 6.1, ECF No. 9-1 at 32).

*Third*: Defendants' own evidence vividly proves the deception at the heart of this case and how the architects of the scheme fell victims themselves. Exhibit I and J (*See* Pl.'s Reply Ex. 4, re-attached for the Court's convenience) to the Dickens Declaration (ECF No. 62-1). The initial Exhibit I shows a property listing page on Stratwell.com where no phone number or email for the listing firm appears (an evident violation in and of itself). It displays, though, a call-to-action button labeled "Contact Eddie Blanco". Clicking it opens, as depicted in Exhibit J, a prominent pop-up window displaying Mr. Blanco's email and phone number prominently. Defendants, with this claim that this IDX-fed website is in compliance with the IDX display rule.

The problem is that Realtor® Blanco is not the listing agent for this property (and has never been); *See* Exhibit 2, pg 2 for the actual listing agent (Realtor® Mariela Roman). Mr Dickens inadvertently fell victim to the restraint subject of the complaint that he even declared under penalty of perjury that "*Exhibit I is a true and correct copy of a real estate listing by REALTOR® Eddie Blanco*" (*see* Dickens Decl. ¶ 10, ECF No. 62-1). If 17 Associations of Realtors and their MLSs and a large team of highly trained lawyers, specialized in antitrust, and dedicated - in this instance - to gathering evidence of a very specific targeted rule, trying to disprove Plaintiff factual narration, fell victims to the scheme Defendants collectively maintain, and that counsel is trying to defend, what chance does a consumer have at a fair chance of a market free of restraints?

Defendants' narrative with the example they chose is not a defense at all, it is the confession by the Defendants of the market restraint they created and continue to support; and how it effectively and efficiently operates in the real world. It is a live demonstration of the restraint itself leaving no factual matter to dispute. Plaintiff understands the ethical obligation to defend the client Counsel has, but this is indefensible.

Defendants dismiss Plaintiff's argument as an "assumption that non-compliance is systematic, pervasive, and the result of a grand conspiracy" (Opp. at 12, ECF No. 62) yet is self-defeating.. In the very example they chose - *Mr. Eddie Blanco - is not merely a REALTOR® but the Chairman of the Miami Association of REALTORS®*, a Defendant. Another example of non-compliance involves Lamacchia Realty, (*see* Pl.'s Mot. Prelim. Inj. Ex. 6.9, ECF No. 9-1 at 119) whose associate broker, *Kevin Sears, is the current President of NAR.*

Defendants' remaining exhibits (provided as supposedly proof of compliance) come from Realtor.com and Zillow.com - the two largest national real-estate portals, which together receive over 480 million monthly visitors - both plainly violating the IDX rule by burying listing-agent information at the bottom of long scrolling pages or in an inconspicuous location. When the presidents of the nation's largest REALTOR® organizations and the industry's dominant portals all participate in the same design, Defendants cannot credibly argue that the restraint is isolated rather than systemic, pervasive and coordinated.

Therefore, through Defendants' own sworn declarations and exhibits, Defendants have done more than just admit the core factual premises of the Complaint; *they have provided a live demonstration of the very anticompetitive restraint and resulting harm that this suit challenges.* This is proven on two independent levels:

4

a) Procedurally, they admit the rules were non-compliant when Complaint and this Motions were filed (SmartMLS) and remain insufficient (Stellar MLS); and

b) Operationally, Defendants' 'Blanco' exhibit proves the consequence of this sham regime: market-wide deception where even their own counsel was unable to identify the correct listing agent, precisely as alleged in the Complaint.

This is not a mere admission; it is a functional test of the restraint by the Defendants, and it worked exactly as Plaintiff described it. Because Defendants themselves have provided the concrete, undisputed facts that prove both the defective rules and their deceptive operation in the market, there is no genuine dispute of material fact. The Court may thus rule on the merits without a trial. Under *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016), such conclusive factual support satisfies the 'substantial likelihood of success' prong. The record is ripe for disposition.

**C.    Defendants' "Vagueness" Defense is a Confession of Intentional Non-Enforcement:** Defendants claim that the rules underlying Plaintiff's requested injunction - including the IDX display rule - are "too vague to be enforced" or "impossible to apply." That argument fails on its face. The rules are clear: the listing firm's contact information must be clearly identified and displayed at least as prominently as any other contact information or lead form on the site. Nothing about that standard is uncertain or discretionary. The only ambiguity that exists is the one Defendants have created through years of intentional non-enforcement.

If Defendants now insist these rules cannot be enforced, they are effectively admitting that they promulgated rules they never intended to apply - rules designed for public display, not actual compliance. That is not vagueness; it is deliberate avoidance. NAR's own advisory board and published guidance already resolved any interpretive question, confirming

5

that the rules are specific, enforceable, and measurable. The claimed "impossibility of enforcement" is simply a refusal to enforce.

**D. Plaintiff Has Clearly Demonstrated a Substantial Likelihood of Standing**: Defendants briefly import their standing argument from their Motions to Dismiss (Opp. at 10, ECF No. 62), but the issue is misplaced here. Standing at the preliminary-injunction stage requires only a substantial likelihood, not final proof. *See Warth v. Seldin,* 422 U.S. 490, 518 n.10 (1975); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) ("A plaintiff need only show a substantial likelihood of standing when seeking preliminary relief."). Plaintiff - himself a REALTOR® and the listing agent for the properties he services, personally bound by Defendants' mandatory rules - suffers a concrete injury each time those rules are ignored or left unenforced: his listings are hidden, clients are diverted, and his professional reputation and ability to compete are directly impaired. These harms are traceable to Defendants' coordinated non-enforcement and redressable by the requested injunction, which would compel compliance and restore fair market access. This is not hypothetical; it is demonstrated by Defendants' own exhibits and declarations - most notably, the "Blanco" example - where Defendants and their counsel team fell victims of the same deceptive mechanism. The injury is direct, ongoing, and undeniable.

**E. Defendants' Coordinated Defense Itself Evidences Concerted Action.**

On one hand, they claim to be independent entities with separate enforcement mechanisms; on the other, they appear before this Court jointly - represented by shared counsel, advancing identical arguments, and filing a single consolidated opposition. If these organizations were truly independent, each would be standing before the Court defending its own compliance record and enforcement practices. Their coordinated defense is itself evidence of coordination.

Defendants mischaracterize Plaintiff's position. Plaintiff argues that the collusion arises by definition within each association's structure, where competing brokers collectively adopt, implement, and enforce (or decide not to) binding rules through joint decision-making. The restraint does not depend on coordination between associations for the conspiracy to exist. All Defendants are bound together by NAR's mandatory policies, shared governance, and overlapping membership - an arrangement that, by definition, constitutes concerted action among horizontal competitors. *See Relevant Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 310 (11th Cir. 2023) ("When competitors join together in a trade association and make binding decisions restricting members' conduct, concerted action exists by definition.").

So widely accepted is this concept by NAR's that its own published training materials confirm that association rulemaking and enforcement are collective acts governed by the Sherman Act - a fact Defendants simply ignore. Pretending independence while acting in lockstep does not erase the collective conduct; it proves it.

Defendants' opposition does not engage with any of Plaintiff's detailed factual or legal arguments establishing concerted action. Instead, they simply declare—without analysis—that "there is no collusion." By failing to address Plaintiff's showing, Defendants have left the factual record and legal application of *Relevant Sports* unrebutted.

F. **Jurisdictional Defenses are Waived and Meritless**: Defendants again import by reference the arguments from their Motions to Dismiss—spanning more than seventy pages—instead of addressing them here. Courts in this District, including this one, have repeatedly rejected such briefing tactics, noting that parties must present their arguments within the four corners of the motion before the Court. Even if considered, those defenses fail: Defendants have already invoked this Court's jurisdiction by filing sworn declarations,

submitting evidence, and seeking dispositive relief. Having availed themselves of this forum, they cannot now deny it. These procedural diversions only heighten the urgency of judicial intervention—the ongoing restraint and deception occur here and now, within this District, and demand immediate correction.

G. **The Buyer-Broker Agreement Rule is a Sham, and the Burnett Settlement is Irrelevant**: Defendants mislead the Court by implying that merely verifying the existence of a buyer-broker agreement satisfies NAR's mandatory rule. It does not. The rule imposes specific, mandatory provisions governing timing, disclosure, and compensation limits - none of which are verified under Defendants' current process. Their own cited evidence shows that MLSs only check whether an agreement exists, not whether it complies with the rule's required terms. This is not enforcement; it is a box-checking exercise that defeats the rule's purpose and confirms Plaintiff's claim that the rule was adopted for appearance, not application.

Defendants' reliance on the Burnett settlement is a red herring. Plaintiff is not a party to that case and seeks no modification of its terms. The injunction here addresses Defendants' own, ongoing duty to enforce NAR's mandatory Handbook rules - rules they voluntarily adopted and continue to promote as binding nationwide. The compliance and enforcement with all rules in the Handbook remains squarely in Defendant's responsibility regardless of why they were created. That responsibility lies with Defendants, who have chosen to ignore it. Their argument therefore concedes the very point at issue: the rule exists, is mandatory, and remains unenforced—the precise restraint this action seeks to remedy.

II. **IRREPARABLE HARM IS PROVEN BY THE RECORD**

Defendants' own evidence proves the ongoing, irreparable harm they deny. In the "Blanco" example, Defendants and counsel themselves misidentified a non-listing agent as the

listing agent - demonstrating the restraint in action. The same deception repeats across the market: buyers are steered, listing agents lose clients, and sellers lose visibility. The Lamacchia Realty example as well as Zillow and Realtor.com confirms that this suppression is systemic, not isolated.

With every such diversion, the synergistic momentum of a lead collapses: referrals vanish exponentially, the agent's personal brand value erodes, income streams extending far beyond the lost transaction disappear, and personal goodwill and reputation are irreparably damaged. These cascading harms destroy future business opportunities - the very type of injury the Eleventh Circuit recognizes as being incalculable and irreparable. *See BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs.*, LLC, 425 F.3d 964, 970 (11th Cir. 2005)..

As REALTORS®, we are ethically bound to place the consumer's welfare above our own interests. The same example that demonstrates harm to agents also exposes the irreparable injury suffered by buyers and sellers. In the scenario Defendants themselves provided, the buyer - like Mr. Dickens in Defendants' own exhibit - was unknowingly diverted to a buyer's agent he neither sought nor needed. His freedom to choose direct representation, or none at all, was taken from him. That buyer will now pay a higher price, either by compensating the buyer's agent directly or through pressure on the seller to fund the commission. If the offered compensation is too low, the agent may steer the buyer elsewhere, leaving the seller forced to raise commissions or lose the sale entirely.

Defendants' claim that Plaintiff "waited too long" fails because the harm is not historical - it recurs with every search and click under Defendants' unenforced rules and will continue absent judicial intervention. Their own exhibits show the violation unfolding in real

time. Monetary damages cannot restore lost personal reputation and goodwill, agent brand recognition, or consumer trust - each essential to survival in a personal-service profession and central to real estate brokerage. The injury is continuous, market-wide, and irreparable until compliance and enforcement begin.

### III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST OVERWHELMINGLY FAVOR AN INJUNCTION

Defendants' opposition is silent on the public interest and makes only a perfunctory gesture at the equitable balance. Their claim of hardship amounts to an assertion that being compelled to enforce their own mandatory rules would "inconvenience" them. This is not a cognizable hardship. "A court does not abuse its discretion by ordering a party to do what that party ... is legally obligated to do." *Securities & Exchange Comm'n v. Smyth*, 420 F.3d 1225, 1233 n.14 (11th Cir. 2005). An injunction imposes no new duties; it simply compels Defendants to honor their existing obligations. The only hardship they allege is being forced to cease the very misconduct that constitutes the antitrust violation, which is not a legally cognizable injury.

By contrast, each day of non-enforcement perpetuates consumer deception and deprives the public of transparent choice. The harm to consumers and the market is enormous and indisputable. The Federal Reserve estimates that anticompetitive commission structures cost U.S. consumers over $100 million per day—a cost the public bears for every day of delay. The Court's intervention will not disrupt a functioning system; it will correct one already operating in violation of its own rules. The balance of equities and the public interest thus weigh decisively in favor of immediate injunctive relief.

### IV. PLAINTIFF'S REQUEST FOR BOND SHOULD BE WAIVED

Defendants cannot credibly claim they would suffer any cognizable harm from being compelled to comply with and enforce rules that they themselves enacted as mandatory.

Any minimal cost of compliance is a direct result of their own decision to enact sham, unenforceable rules in the first place. Having now conceded through their own response the pro-competitive benefits these rules would provide to the public, they are not entitled to a substantial bond for being ordered to cease their unlawful conduct. Accordingly, under the Court's broad discretion to set a nominal bond where the defendant shows no likelihood of compensable harm, Plaintiff requests that the bond requirement be waived or, in the alternative, set at a nominal amount of one dollar ($1.00). *See BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005); *Complete Angler, LLC v. City of Clearwater*, No. 8:07-cv-344-T-23TGW, 2008 WL 2567767, at *2 (M.D. Fla. June 25, 2008).

## IV.  CONCLUSION

Defendants now request that this Court condone their conduct by allowing a proven restraint to persist—"seeking to continue their operations without judicial intervention" (Opp. at 17, ECF No. 62). This is both astonishing and telling. The record leaves no room for doubt: Defendants' own declarations and exhibits are admissions - clear, self-authenticating proof that the restraint exists, operates, and continues unchecked. The violations are visible, the harm ongoing, and the deception documented in Defendants' own filings. Immediate judicial intervention is therefore essential - not only to halt the continuing injury to Plaintiff and consumers, but to preserve the integrity of the record and ensure the evidence remains intact for the jury that will ultimately decide this case. The restraint has been proven in real time; what remains is for the Court to enjoin it. Hence, Plaintiff respectfully reiterates his request that the Court grant the injunction urgently.

Respectfully submitted on October 15th, 2025,

/s/ Jorge A Zea,
Plaintiff, Pro Se

2234 N Federal Hwy PMB 68073
Boca Raton FL 33431
Phone: 305-244-7242

antitrust@jorgezea.com

## Certificate of Service

I HEREBY CERTIFY that on October 15, 2025, a true and correct copy of the foregoing was hand-delivered to the Clerk of the United States District Court for the Southern District of Florida, West Palm Beach Division, for electronic filing through the CM/ECF system, which will automatically serve notice of this filing to all counsel of record.

Jorge A Zea,

Plaintiff, Pro Se

2234 N Federal Hwy PMB 68073
Boca Raton FL 33431
Phone: 305-244-7242

antitrust@jorgezea.com