## IN THE UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

FILED BY _____ D.C.

OCT 2 2 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

Jorge A. Zea (Pro Se)      )
                           )
                           )
        Plaintiff,         )
                           )
                           )
        V.                 )
                           )
                           )
National Association of    )      Case No. 25-cv-81016-WPD
REALTORS®, et, al.         )
                           )
                           )
                           )
        Defendants.        )
_____  )


## PLAINTIFF OPPOSITION TO DEFENDANTS' JOINT
## MOTION TO DISMISS PLAINTIFF'S COMPLAINT

## I.    INTRODUCTION

Defendants' Motion to Dismiss attacks a fictionalized version of the Complaint—misidentifying the Plaintiff, recasting facts as "allegations," and refuting positions never pled. It seeks dismissal under Rules 12(b)(1) and 12(b)(6), but fails under both. Plaintiff Jorge A. Zea, an individual real estate professional, alleges and demonstrates a direct, concrete injury caused by Defendants' collective non-enforcement of mandatory rules. The Complaint plausibly—and now, through Defendants' own evidence, convincingly—shows a concerted, per se unreasonable restraint of trade under § 1 of the Sherman Act. The Motion should be denied in its entirety.

## II.    THE MOTION ATTACKS A FICTIONALIZED COMPLAINT

Defendants' Motion does not engage with the Complaint filed in this Court. Instead, it constructs and attacks a fictionalized version built on demonstrably flawed premises: (A) that the Plaintiff is a corporate entity, (B) that the alleged conspiracy requires proof of a secret "side agreement" between the Defendant associations and (C) the structure and characteristics of the brief are rife with assumptions, circular repetitions, and redundant patterns suspect of carelessness. These foundational errors render their entire legal analysis irrelevant.

### A. The "Corporate Plaintiff" is a Fiction Contradicted by Defendants' Own Filings.

Defendants' Motion's cornerstone is the false assertion (and uncorrected assumption) that Plaintiff's injury belongs to a "business entity," not to him personally.

This is legally and factually wrong, contradicted by their own pleadings, and misunderstands the structure they have created.

*The Complaint Names an Individual.* The Complaint identifies one Plaintiff: "Jorge A. Zea (Pro Se)". The domain *SnapFlatFee.com*® is his personal and individual professional brand, and the ownership of both the Domain Name and the properly Registered Trademark belong to Plaintiff individually — facts easily verifiable through public records that Defendants ignored.

*Defendants' Own Filings Admit Plaintiff's Individual Capacity.* In their separately filed Motion to Dismiss for Lack of Personal Jurisdiction, Defendants explicitly and correctly state: "*Plaintiff, a real estate broker in Florida, brings antitrust claims in his individual capacity...*" (ECF No. 60 at 6). They cannot, in one motion, affirm Plaintiff's individual status to advance a jurisdictional defense, and in this Motion, deny that same individual status to attack standing. This is a direct, irreconcilable contradiction that proves their standing argument is a disingenuous diversion.

*Injury is Inherently Personal in Defendants' System.* Even assuming (as an exercise) the existence of an unidentified entity, the alleged antitrust injury is direct and personal to Plaintiff. All rules, ethics standards, membership obligations, and disciplinary actions mandated by Defendants are imposed upon individual REALTORS®. NAR's system is built on cultivating individual professional brands, a fact underscored by Defendants' abundant advocacy, resources, education and training encouraging individual Realtors® to build and strengthen their *personal brand.*

*Plaintiff is the business;* his personal service, goodwill, reputation, personal brand recognition, and client relationships are *the assets directly impaired* by the restraint — a point made evident by the fact that if Plaintiff changed brokerages, his name, brand, reputation and goodwill would move with him. Defendants' attempt to redirect this injury to a phantom corporation is therefore incorrect as a matter of law and fact.

Plaintiff's injury is direct and personal: the loss of clients, income, and the goodwill attached to his name and professional service and reputation. This is a classic antitrust injury to an individual, and their standing argument is a disingenuous diversion.

### B. The "Secret Side-Agreement" Conspiracy is a Straw Man.

The Motion misrepresents the core legal basis of the Complaint. Defendants spend multiple pages arguing that Plaintiff must allege a "conspiracy" or "agreement between the Defendants", and use this through the Motion (more than 40 times) to attempt to dismiss every argument. This is a straw man. The Complaint alleges no such thing.

The complaint's concerted action arises from the admitted structure of the Defendants themselves. As associations of horizontal competitors, their collective adoption of, and deliberate collective not-compliance with, and non-enforcement of *mandatory rules* is the concerted action.

The Sherman Act requires only concerted action among competitors, and the Supreme Court has repeatedly held that a trade association's collective decision satisfies this requirement without the need for a separate secret agreement. *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 500 (1988) (the association itself is the "combination" contemplated by § 1); *American Needle, Inc. v. Nat'l Football League,*

560 U.S. 183, 195 (2010) (horizontal competitors acting jointly through a trade association constitute concerted action). The Eleventh Circuit applies the same rule: "An association of competitors is a combination under § 1, and its coordinated conduct satisfies the concerted-action requirement." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1000 (11th Cir. 1993). See also *Relevant Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 310 (2d Cir. 2023) (holding that concerted action exists where a federation composed of competing entities collectively adopts rules restricting members' conduct).

Thus, Defendants' repeated attacks on a fictional, unnecessary "inter-defendant conspiracy" are legally irrelevant. The Complaint plausibly alleges—and Defendants' own governance structure confirms—the kind of intra-association concerted action the Sherman Act squarely prohibits. By assuming that a conspiracy requires proof of a secret side agreement, Defendants misstate the law and avoid addressing the actual, legally sufficient theory of concerted conduct pleaded against them. A motion to dismiss must be evaluated based on the complaint that was filed, not on a version Defendants wish had been.

Because the Motion rests on two fundamental fictions—a nonexistent corporate plaintiff and an imagined requirement of a side-agreement among defendants—its arguments collapse for lack of a factual or legal foundation. The Court should not expend judicial resources analyzing arguments directed at a phantom pleading. These threshold defects alone warrant denial of the Motion.

### C. The Motion's Pattern of Careless Repetition and Factual Disconnect Undermines Its Credibility.

A review of the Motion reveals a pattern of arguments that are not only legally out of place but are advanced with a striking carelessness that reflects lack of factual review. These patterns render the Motion's analysis fundamentally unreliable and must be read with skepticism.

*Circular and Template-Driven Arguments:* The Motion relies on a highly repetitive, circular structure. Critical aspects like the conspiracy argument loops throughout the entire Brief incessantly on the need for an "agreement between Defendants" without ever engaging the Complaint's actual theory of collusion within each association. This creates the impression of a pre-fabricated argument being mechanically applied, regardless of its fit.

*Uncorrected Factual Errors:* The Motion's foundational premise — that Plaintiff is a business/corporate entity — is a demonstrable error contradicted by the Complaint, Defendants Motion to Dismiss on Jurisdictional Grounds (ECF No. 60, at 6.) and public records (easy cross reference with domain registrars and the United States Patent and Trademark Office). That this error is repeated throughout the brief and used as basis for the dismissal, without correction, indicates a profound disconnect from the factual record and a lack of the diligent review expected in federal litigation.

*Failure to Confront the Pleaded Theory:* The Motion seems programmed to attack a standard (by-the-book definition) "inter-defendant conspiracy" claim. It displays an inability to grapple with the novel, but legally sound, fact that for a professional

6

association, the collective action of its member-competitors is itself the concerted action. It consequently cites a blizzard of irrelevant case law that misses the point entirely (though they might support their fictionalized version); as if an initial assumption was made and followed throughout automatically without anybody correcting the initial incorrect assertion.

*Disconnect Between Counsel and Clients*: The most incomprehensible example of this careless approach is the "Blanco Exhibit" and Corresponding Declaration (ECF No. 62-1, Dickens Decl. ¶ 10, Exs. I–J) from the related Preliminary Injunction proceeding. It is inconceivable that the Miami Association of REALTORS®—a named Defendant—would have knowingly authorized its own Chairman's IDX-fed website to be presented as a model of compliance in an exhibit that, upon inspection, demonstrated the exact opposite. The episode reflects, at minimum, a possible disconnect between counsel's evidentiary submissions and the oversight or awareness of the clients they represent.

Taken together, these patterns — the circular reasoning, repetitive inference of an incorrect assumption, the uncorrected factual errors, and the failure to engage the actual case pleaded — reveal a document that was not crafted with the careful, fact-specific scrutiny this Court expects. The Motion's arguments should therefore be viewed with caution, as they appear untethered from the reality of the record and the Complaint.

## III.   PLAINTIFF HAS STANDING  (ARTICLE III AND ANTITRUST)

To the extent Defendants blur these two standards, Plaintiff satisfies both. Article III standing requires only a concrete injury traceable to Defendants' conduct and likely to

be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Antitrust standing under the Sherman Act adds the prudential inquiry of *Associated Gen. Contractors v. Cal. State Council of Carpenters,* 459 U.S. 519 (1983) - whether the injury is the type the Act was designed to prevent and flows directly from the anticompetitive restraint.

Here, Plaintiff's injury — loss of clients, income, profits, goodwill, reputation and the ability to compete on equal terms — flows directly from Defendants' collective noncompliance with and non-enforcement of mandatory rules. This causal link is apparent not only from the Complaint but from Defendants' own filings, which illustrate how systemic non-enforcement enables steering — the controlling mechanism that drives the group boycott, market allocation, and price-fixing effects described. Defendants themselves supplied a real-time example of this restraint in operation, confirming precisely how it functions and how its consequences (traceable injury and harm) flow directly to Plaintiff and consumers alike.

It is precisely the kind of competitive harm the Sherman Act was designed to remedy. Because the injury is direct, ongoing, traceable to Defendants' conduct, and redressable through injunctive and monetary relief, satisfying Antitrust standing necessarily satisfies Article III.

## IV.    THE COMPLAINT GOES BEYOND A MERE PLAUSABILITY - FACT PROVEN BY DEFENDANTS' OWN EVIDENCE

The Motion to Dismiss argues that Plaintiff's allegations are implausible. The record proves otherwise. Under *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the Court must accept well-pled facts as true and draw all reasonable inferences in Plaintiff's favor. *The most powerful inference here is that when a party's own evidence proves its opponent's case, the case is not merely plausible — it is compelling.*

Plausibility under Twombly involves two inquiries: (A) whether the alleged concerted action or conspiracy is plausible — meaning the facts support a reasonable inference that Defendants acted in concert rather than independently; and (B) whether the alleged restraint of trade is plausible — meaning that the concerted conduct plausibly and unreasonably restricts competition. Both elements are met here, and both are confirmed by Defendants' own admissions and evidence, *leaving no material fact in dispute.*

**A. Concerted Action is Admitted and Demonstrated.**

Defendants concede that NAR promulgates mandatory policies and that local associations and MLSs are contractually bound to adopt and enforce them upon their members (Defs.' PI Opp., ECF No. 62, at 8–9). This admitted structure — NAR as the central hub, associations and MLSs as the spokes, and the mandatory obligations connecting them as their rim — constitutes concerted action as a matter of law. *See American Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 195 (2010) ("Concerted action exists when separate economic actors pursuing separate economic interests join together to restrain trade."); *Relevant Sports, LLC v. U.S. Soccer Fed'n, Inc.,* 61 F.4th 299, 310 (11th Cir. 2023) (same).

The concerted element of Sherman is established by definition, not inference, and is directly acknowledged by Defendants themselves. NAR's management training guide,

the Answer Book removes any ambiguity (Pl.'s Mot. for Prelim. Inj., ECF No. 9-1, Ex. 1.4.):

> "Antitrust laws are violated when competitors act collectively to restrain competition. By definition, a trade association consists of a group of competitors acting in a collective fashion. When a trade association acts, the key antitrust question is whether that action limits or restrains competition in some way, and if so, whether it does so unreasonably."

### B. The "Blanco Exhibit" is a Judicial Admission of the Unreasonable Restraint.

Defendants' own "Blanco Exhibit" functions as a live demonstration of the restraint alleged. It shows precisely how non-enforcement of mandatory rules misleads consumers, restricts their choices, and sustains steering that directly and unreasonably restrains trade. Far from disproving Plaintiff's position, it validates it—proving that the restraint is not merely plausible under Twombly, but compellingly established by Defendants' own evidence and ongoing conduct.

## V.   THE RESTRAINT IS A PER SE VIOLATION (AND UNLAWFUL UNDER ANY OTHER STANDARD)

The alleged conduct is plainly unlawful under the per se concept or under any applicable standard of Sherman Act § 1 analysis.

### A. The Alleged Conduct Constitutes a Per Se Unlawful Restraint.

An association of competitors collectively refusing to enforce its own competition fostering and consumer protecting rules, is a classic per se unreasonable restraint of trade because it directly enables price fixing, group boycott and market allocation. *FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 433 (1990); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 212 (1959).

The "Blanco Exhibit" demonstration is a live enactment of this boycott's anticompetitive effect. For per se violations, "no showing of so-called market power" is required, and the Court need not "define the relevant market." *United States v. Socony-Oil Co.*, 310 U.S. 150, 218 n.59 (1940). Defendants' entire "relevant market" argument (Mot. at 19-22) is therefore legally irrelevant to this claim.

## B. In the Alternative, the Conduct is Unlawful Under a "Quick-Look" Analysis.

Defendants correctly note that "quick look" analysis applies where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999) (Mot. at 29). Their own standard is satisfied here. Any such observer—upon seeing that an entire industry collectively maintains yet refuses to enforce rules expressly designed to prevent consumer deception and steering—would immediately recognize the conduct as anticompetitive.

Indeed, in attempting to disprove Plaintiff's claims, defense counsel Dickens effectively became that "*unsuspecting observer.*" His own declaration and the "Blanco Example" illustrate, in real time, how non-enforcement of mandatory rules deceives consumers, coerces sellers, and sustains unreasonable restraint. What Defendants presented as exculpatory evidence instead operates as a practical confirmation of the restraint's existence and effect.

11

No pro-competitive justification could plausibly outweigh or explain the plainly visible harm their own example revealed. Under the *quick-look* doctrine, when the restraint's market impact is self-evidently harmful, extended analysis is unnecessary—the conduct is per se unreasonable.

### C. As a Final Alternative (even though not necessary), the Complaint Plausibly Describes an Unreasonable Restraint Under the Rule of Reason.

Even under the Rule of Reason, the Complaint describes abundant "plus factors" that plausibly demonstrate an unreasonable restraint. These include: (1) the uniform adoption of identical mandatory rules; (2) parallel and very similar non-enforcement across the industry; (3) actions contrary to Defendants' self-interest, as their refusal to enforce their own procompetitive, consumer-protecting rules betrays their stated public mission and transparency messaging; (4) a shared motive to preserve supra-competitive commissions; and (5) overlapping and interlocking governance dependency amongst all defendants. Taken together, these factors create a powerful inference of an anticompetitive agreement, and Defendants have alleged no plausible procompetitive justification for their collective non-enforcement.

## VI.    DEFENDANTS' REMAINING ARGUMENTS ARE MERITLESS

### A. The "Group Pleading" Objection is Disingenuous and Contradicted by Defendants' Own Litigation Conduct, and the Systemic Nature of the Restraint Makes Greater Specificity Impossible.

Defendants' claim of being "unable to ascertain the claims against them" is refuted by their record and misunderstands the nature of the alleged violation.

*First*, Defendants' own conduct demonstrates their perfect understanding of the allegations towards each as follows:

*Tailored Jurisdictional Challenges:* Defendants Connecticut Association of REALTORS®, West and Southeast REALTORS® of the Valley, and Smart MLS, Inc. filed a separate motion specifically addressing their unique roles and arguing why the Court lacks personal jurisdiction over them. (ECF No. 60). They would be incapable of filing such a targeted motion if the Complaint had not adequately identified their individual conduct.

*Individual Supplemental Briefing*: Defendant Naples Area Board of REALTORS® (NABOR) filed its own separate supplemental brief in support of this Motion to Dismiss. (ECF No. 61). NABOR's ability to isolate the arguments relevant to it alone proves the Complaint's clarity.

*Admission of Divisions of Responsibility*: In the very Motion now before the Court, Defendants explicitly distinguish their own roles, identifying which Defendants are responsible for enforcing MLS rules and which are charged with ethics enforcement. (Mot. at 10—11). They cannot claim confusion in one section while displaying precise understanding of their divisions of responsibility in another.

*Second,* the systemic and continuous nature of the restraint makes it impossible—and legally unnecessary—to identify discrete, episodic instances of non-enforcement. The law does not require antitrust plaintiffs to allege "the specific time, place, or person" involved in every act of the conspiracy; it is enough to allege "the general contours of the conspiracy and supporting facts that make it plausible." Quality

Auto Painting Ctr. v. State Farm Indem. Co., 917 F.3d 1269, 1280 (11th Cir. 2019) (en banc). Nor must each defendant's role be detailed at this stage—"[a]ntitrust claims may properly rest on the totality of the alleged conduct and interdependence." Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962); Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226 (1939). The violation alleged here is the ongoing operation of that system itself, which continuously misleads consumers, enables steering, and suppresses competition.

The Complaint provides representative examples of this systemic failure, including Plaintiff's own attempts to seek compliance, which were met with the uniform inaction with no resolution. Defendants do not and cannot argue that these reported instances were actually enforced; they merely ignored them, dismissed them or sidestepped the issue. This coordinated, industry-wide inaction is the very essence of the concerted refusal to comply and enforce, and it is pleaded with more than sufficient clarity to provide notice and state a claim.

This coordinated (yet individuated defense strategy attempt) is the best evidence that the "group pleading" objection is a transparent, bad-faith attempt to avoid the substantive allegations of their collective, structural conspiracy. The objection should be rejected.

## B. Defendants Mischaracterizes Sherman's Concept of Competition and Distorts Plaintiff's service model.

The Sherman Act protects not individual competitors, but the competitive process itself—the interplay of supply and demand, the freedom of choice, and the welfare of

14

consumers who depend on an open market. The restraint before the court distorts those

very forces. *See Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 695 (1978)

("The Sherman Act is designed to protect competition, not competitors."); *Spanish*

*Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.,* 376 F.3d 1065, 1073 (11th Cir.

2004) (Act protects "competition itself, not individual competitors").

Plaintiff's Complaint makes this distinction clear: it seeks to restore the

consumer's right to engage in an unrestrained market where transparent information and

genuine price competition prevail. The Complaint details, at length, how consumers

suffer and how market dynamics are distorted. Defendants' Motion simply ignores these

well-pled facts and the economic framework that supports them. Having failed to engage

with the Complaint's central theory—that the restraint injures competition as a whole, not

merely one competitor—Defendants' arguments must be taken as unopposed.

It is telling that Defendants dismiss every allegation of consumer harm—central

to the Complaint and to the Act itself—as if consumers were somehow outside the scope

of competition.

Defendants next argue that Plaintiff's injury is only "harm to his business," not

"harm to competition," relying on *Homie Tech., Inc. v. National Association of*

*REALTORS®,* No. 24-cv-616, 2025 WL 1938975 (D. Utah July 15, 2025). That

argument again depends on distortion and a fundamental misunderstanding of what

"competition" means under the Sherman Act. Defendants'' own citation from this case is

dramatically incomplete.

In *Homie*, the plaintiff brokerage, also represented buyers and therefore profited from the very inflated commissions it challenged.  As the *Homie* court held:

> "As a threshold matter, *Homie* cannot claim it has suffered an antitrust injury flowing from higher prices allegedly caused by the Challenged NAR Rules.  Courts, including the Supreme Court, have consistently reasoned that *a plaintiff cannot suffer an antitrust injury caused by a conspiracy among its competitors to raise prices*.  In such circumstances, the plaintiff stands to benefit from the alleged reduction in competition (higher prices) because it can make more money by unilaterally raising its own prices or lowering its prices to increase its own sales volume." Id. at 9. (emphasis added to show the only portion quoted by Defendants)

That reasoning does not apply here. Plaintiff does not represent buyers and does not benefit from inflated prices (he offers a flat fee service). Once again, Defendants simply assume Plaintiff operates like a traditional brokerage that represents both buyers and sellers and charges percentage commissions. Instead of examining Plaintiff's business model — which would have clarified the opposite — they relied on inference and ran with it, either genuinely believing their own distortion or intentionally misleading the Court.

## C.  Defendants' "Relevant Market" Argument Misstates the Law and the Claim

Defendants' Argument that Plaintiff "fails to plead a properly defined relevant market" misstates both the law and the Complaint.  Plaintiff alleges a *per se* violation of § 1 of the Sherman Act, not a monopolization claim under § 2, which would require the identification of the "Relevant Market".

Additionally, the Supreme Court has long held that per se restraints — such as collective agreements that predictably restrict competition — are unlawful without inquiry into market power or market definition. *FTC v. Superior Court Trial Lawyers*

*Ass'n*, 493 U.S. 411, 433 (1990) ("Per se rules eliminate the need to study the reasonableness of an individual restraint or to define the relevant market."); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940) (once conduct is per se unlawful, "no showing of so-called market power" is required); *National Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679, 692 (1978) (same). The Eleventh Circuit applies the same rule. *Quality Auto Painting Ctr. v. State Farm Indem. Co.*, 917 F.3d 1269, 1280 (11th Cir. 2019) (en banc) (per se violations require "no elaborate industry analysis").

Because Plaintiff challenges a mandatory, industry-wide framework that suppresses competition (exactly what the Act is enacted to prohibit) through collective rulemaking and non-enforcement, this case falls squarely within the per se category. The need to define "products," "substitutes," or "geographic boundaries" therefore never arises.

Even assuming, arguendo, that a rule-of-reason analysis applied, the Complaint already identifies the relevant markets with precision. The product market is the real estate brokerage services market, which includes all models of brokerage representation, from traditional full-commission to flat-fee and self-represented services. Within that market, the Complaint identifies: (1) the national market for NAR policy-making, in which NAR alone controls the rules governing all REALTOR® associations and MLSs; (2) the local markets for MLS data feeds and listing exposure, each controlled exclusively by a single MLS defendant; and (3) the local REALTOR® association markets, each administered by a single chartered NAR affiliate with responsibility over the Code of Ethics.

Federal courts have already recognized this same nationwide structure as the operative framework through which NAR's rules shape local market behavior. *See Burnett v. Nat'l Ass'n of REALTORS®, No. 19-cv-00332, 2023 WL 6827443 (W.D. Mo. Oct. 31, 2023)* (finding that NAR's mandatory rules exert nationwide control and uniform effects across local MLS markets).

Accordingly, Defendants' "relevant market" argument is legally misplaced and factually contradicted by their own filings. Market definition pleading is unnecessary for a per se § 1 claim, and even if it were required, the Complaint satisfies it. Defendant's argument provides no basis for dismissal.

### D. The *Burnett* Settlement is Irrelevant.

Defendants' reliance on the *Burnett* settlement is a red herring. First, the settlement resolved private claims and has no preclusive effect here. *United States v. Int'l Bldg. Co.*, 345 U.S. 502, 505 (1953). Second, and decisively, Plaintiff does not challenge the existence of the rules settled in *Burnett*; he challenges Defendants' ongoing, post-settlement collective refusal to enforce the mandatory policies of the NAR Handbook — a separate, independent obligation that falls squarely on Defendants irrespective of *Burnett*.

The *Burnett* court retained jurisdiction to enforce the settlement agreement upon the defendants in that case. Plaintiff's claim here is different: it is about Defendants' derivative responsibility to enforce the NAR Handbook mandates onto their own associations and members, a duty they voluntarily adopted and continue to shirk. The

18

settlement does not immunize this subsequent, unlawful conduct of systemic non-enforcement.

Furthermore, this issue has already been explored and foreclosed. Plaintiff previously filed a motion for clarification in the Burnett case, which NAR did not even oppose. The Burnett court denied the motion for lack of standing, as Plaintiff is not a class member in that suit. Burnett, No. 4:19-cv-00332-SRB (W.D. Mo.), (ECF No. 1691). This denial confirms that Burnett provides no avenue for Plaintiff to seek redress for the precise wrongs alleged here. This independent action is therefore his only remaining recourse.

### E. NABOR'S Supplemental Brief Demonstrates Nonenforcement, Supports the Restraint and Amplifies the Harm and Injury

NABOR's supplemental filing (ECF No. 61) adds nothing new and instead reinforces the collective anticompetitive conduct alleged. By expressly adopting and supporting all other Defendants' arguments, NABOR confirms the very coordination it seeks to deny. Its cited email—acknowledging that "NAR has stated that the MLS only verifies that the proper documentation is in place [and] we do not verify the compensation"—is not exculpatory but confirmatory. The rule requires verification of specific, itemized elements, *including the compensation cap*. NABOR's admission that such verification is intentionally omitted shows conscious non-enforcement of a mandatory rule pursuant to NAR's directive.

This intra-defendant coordination—NAR's instruction, NABOR's obedience, and the shared abandonment of enforcement—illustrates the collective structure of the

restraint. It also defeats the rule's stated purpose to "*eliminate steering*", as articulated by NAR itself:

> "Written buyer agreements… will outline that MLS Participants may not receive compensation… that exceeds the amount agreed to in the agreement with the buyer… Under these practice changes, NAR has eliminated any theoretical steering…" (*NAR Settlement FAQs, quoted in Compl. ¶ 180; PI Mot. Ex. 1.8, ECF No. 9-1 at 39.*)

Thus, NAR's directive to avoid verifying compensation—"we do not verify the compensation"—nullifies its own rule and perpetuates the very steering it claims to have eliminated. If no verification is ever made, compliance with the compensation cap is impossible to confirm. Such a statement is not a good-faith enforcement effort but a deliberate abdication of responsibility—an acknowledgment that the rule exists only as form without substance.

What NAR and NABOR present as compliance is in fact a façade, a smoke screen concealing the same unchecked steering the rule was ostensibly meant to prevent.

## VII. CONCLUSION

The material facts are undisputed. The rules exist; they are mandatory; NAR imposes them upon all association and MLS defendants, who in turn impose them upon their members.

These rules are neither followed, complied with, nor enforced, allowing the restraint to operate openly and continuously — as shown by Defendants' own "Blanco Exhibit example," which demonstrated that non-enforcement misleads consumers, coerces sellers, and distorts and suppresses competition.

These are per se violations of § 1 of the Sherman Act. Defendants acknowledge that such conduct admits no legitimate defense. As associations of horizontal competitors, their collective rulemaking and coordinated inaction constitute concerted action by definition.

*No factual controversy remains — only the legal question of whether Defendants may continue to disregard their own binding rules.*

Defendants' Motion to Dismiss should therefore be *denied in its entirety.*

Plaintiff respectfully requests that the Court:

1. Deny Defendants' Motion to Dismiss in full;

2. Recognize that Defendants' own admissions and examples establish the factual existence of the alleged restraint;

3. Allow this matter to proceed to discovery and hearing on the merits;

4. Promptly rule on the pending Motion for Preliminary Injunction on the papers, or alternatively schedule it for expedited hearing; and

5. Grant such other and further relief as the Court deems just and proper.

All briefing on all motions will be complete within seven (7) days of this filing, and the issues will then be fully joined and ready for disposition on the papers. Plaintiff stands ready for any hearing the Court may order and reiterates his readiness for a live, in-person presentation demonstrating the ongoing violations in real time.

Respectfully Submitted on October 22, 2025, by

Jorge A Zea,
Plaintiff, Pro Se

2234 N Federal Hwy PMB 68073
Boca Raton FL 33431
Phone: 305—244—7242

antitrust@jorgezea.com

## Certificate of Service

I HEREBY CERTIFY that on October 22, 2025, a true and correct copy of the foregoing was hand—delivered to the Clerk of the United States District Court for the Southern District of Florida, West Palm Beach Division, for electronic filing through the CM/ECF system, which will automatically serve notice of this filing to all counsel of record.

Jorge A Zea,
Plaintiff, Pro Se

2234 N Federal Hwy PMB 68073
Boca Raton FL 33431
Phone: 305—244—7242

antitrust@jorgezea.com