UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 25-cv-81016-DIMITROULEAS/MATTHEWMAN

JORGE A. ZEA,

      Plaintiff,

v.

NATIONAL ASSOCIATION OF
REALTORS®, *et al.*,

      Defendants.

_____/

**<u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S COMPLAINT [DE 59]</u>**

THIS CAUSE is before the Court upon Defendants National Association of

REALTORS®; Broward, Palm Beaches and St. Lucie REALTORS®, Inc.; Beaches MLS, Inc.;

Miami Association of REALTORS®, Inc.; Orlando Regional REALTOR® Association, Inc.;

Space Coast Multiple Listing Service, Inc.; Space Coast Association of REALTORS®, Inc.; Royal

Palm Coast REALTOR® Association, Inc.; Florida Gulf Coast Multiple Listing Service, Inc.;

Naples Area Board of REALTORS®, Inc.; My Florida Regional MLS, Inc. (d/b/a Stellar MLS);

Northeast Florida Multiple Listing Service, Inc. (d/b/a realMLS); Northeast Florida Association

of REALTORS®, Inc.; Central Panhandle Association of REALTORS®, Inc.; Connecticut

Association of REALTORS®; Smart MLS, Inc.; and West and Southeast REALTORS® of the

Valley, Inc.'s (collectively, "Defendants") Motion to Dismiss Plaintiff's Complaint ("Motion")

[DE 59].[1] This matter was referred to the Undersigned Chief United States Magistrate Judge by

---

[1] Plaintiff has represented that he voluntarily dismisses Defendant Midwest Real Estate Data LLC, from this lawsuit
[DE 24]. The remaining Defendants in the case are all movants for this Motion. However, Defendants Connecticut
Association of Realtors®, Inc. ("CT Realtors"), West and Southeast Realtors® of the Valley ("WeSERV"), and Smart

the Honorable William P. Dimitrouleas, United States District Judge. *See* DE 14. Defendant Naples Area Board of Realtors and Association of Real Estate Professionals, Inc. ("NABOR"), has also filed a Supplement to the Motion. [DE 61]. The Motion is fully briefed and is ripe for review. *See* DEs 68, 70**.**

<h3 style="text-align:center">I.    <u>BACKGROUND</u></h3>

Plaintiff Jorge A. Zea, a realtor and licensed real estate broker proceeding *pro se*, filed a 122-page Complaint [DE 1] on August 15, 2025. He brought suit against Defendants, which include the National Association of Realtors® ("NAR") and various listing services and realtor associations. The Complaint alleges six counts, all based on antitrust violations brought under the Sherman Act, 15 U.S.C. § 1.

More specifically, Plaintiff alleges that he operates a "real estate brokerage service" through an online platform (www.snapflatfee.com®) that allows home sellers to pay a low listing fee for "limited brokerage services." Compl. ¶ 19. These services include listing exposure on the corresponding multiple listing service ("MLS"), "as well as syndication of the listing data through the MLS-enabled data feed and data sharing technologies … to participating brokerages and individual REALTORS® who operate MLS-fed (IDX) websites. Listings are also syndicated to major real estate portals." *Id*. ¶ 20.

According to Plaintiff, the National Association of REALTORS® ("NAR") is a non-profit trade organization that "promulgates and enforces mandatory policies, including the Code of Ethics and MLS/IDX rules which, when mandatory, bind all member REALTOR® associations and affiliated MLSs." *Id.* ¶ 28. Plaintiff's Complaint is based on the implementation of rules promulgated by NAR and enforced by the other Defendant Associations and MLSs—rules and

---

MLS, Inc.'s ("Smart MLS") filed a Motion to Dismiss the Complaint for Lack of Personal Jurisdiction and Forum Non Conveniens [DE 60] contemporaneously with the Motion, which was granted. [DEs 81, 82].

policies that Plaintiff concedes are "very pro-competitive." *Id.* ¶¶ 3–4. NAR maintains a Code of Ethics and Arbitration Manual, which contains the principles that NAR requires its member REALTOR® associations to enforce upon NAR members and information on enforcement. *Id.* ¶¶ 28, 146–48. Plaintiff also challenges the alleged lack of enforcement of the 2025 MLS Antitrust Compliance Policy that NAR established in its MLS Handbook. *Id.* ¶¶ 316–17.

Plaintiff names nine local REALTOR® Association Defendants and one REALTOR® association that operates at the state level, the Connecticut Association of REALTORS®. *Id.* ¶¶ 29–45. NAR issues mandatory rules, regulations, policies, and standards, which the affiliated REALTOR® associations and MLSs are required to comply with, implement, and enforce; however, the Associations are also encouraged to adopt additional local rules that do not conflict with NAR's mandatory provisions. *Id.* ¶¶ 50, 54. Plaintiff also names six MLS Defendants. *Id.* ¶¶ 29–45. Relevant to the MLS Defendants named in this litigation, MLSs must adopt and enforce certain rules in NAR's MLS Handbook. *Id.* ¶ 51.

Counts I and II pertain to "steering." Plaintiff alleges that steering happens when "buyer agents divert clients away from properties that offer reduced or no buyer-agent commissions, by filtering them out, omitting them from recommendations, or actively disparaging them." *Id.* ¶ 93. He further alleges that Defendants have issued guidance and enacted rules that "are pro-competitive and specifically aimed at preventing steering." *Id.* ¶ 137. The Complaint also includes allegations concerning various instances where he alleges brokers have taken action to steer clients away from certain properties. *Id.* ¶¶ 102, 115–19. Plaintiff also points to NAR's own statements to conclude that, based on "this direct public guidance, it is not a matter of interpretation: steering is unequivocally an ethics violation, at the very least." *Id.* ¶ 136. Plaintiff's issue is that "none of the Defendants have acted to implement or enforce a binding and direct prohibition consistent with

their premises." *Id*. ¶ 140. Plaintiff alleges that, even with mechanisms in place through the Code of Ethics, buyer-broker agreement rule, the Internet Data Exchange ("IDX") display rule, and the MLS non-filtering rule, Defendants have collectively failed to enforce the rules. *Id*. ¶¶ 152,, 183, 315.

Counts II and III pertain to the Buyer-Broker Agreement Rule, which requires that before touring a property, a buyer-agent must have an executed buyer-broker agreement that meets four requirements: (1) discloses the rate of any compensation that the MLS participants will receive; (2) ensures that the amount of compensation is objectively ascertainable and not open-ended; (3) includes a statement that MLS participants may not receive compensation from any source that exceeds the amount agreed to with the buyer; and (4) discloses in conspicuous language that broker commissions are not set by law and are negotiable. *Id*. ¶ 179.[2] The rule is incorporated as a mandatory rule in NAR's MLS Handbook and is supervised and enforced by MLSs. *Id*. ¶ 182. Plaintiff alleges that MLS Defendants have "collectively failed to enforce this rule, rendering it ineffective in practice." *Id*. Plaintiff further alleges that he has submitted multiple verification requests to Defendants regarding whether agents showing his listings had a proper buyer-broker agreement in place at the time of the showing, and that his emails were ignored, apart from one response, which Plaintiff deemed "conclusory and unsubstantiated." *Id*. ¶¶ 184–85.

Plaintiff also alleges that the rule operates to "cap the total compensation a buyer broker may receive from any source, to the amount set in that agreement with their buyer." *Id*. ¶ 186. Plaintiff alleges that "Defendants neither monitor compliance with this cap nor have or provide any guidance or enforcement mechanism." *Id*. ¶ 192. The Complaint further alleges that NAR

---

[2] This rule was implemented as part of a final settlement of class action litigation. *See* Order at 87, *Burnett et al. v. Nat'l Ass'n of REALTORS® et al.*, No. 19-cv-332 (W.D. Mo. Nov. 27, 2024), ECF No. 1622 ("*Burnett* Final Approval Order").

4

informed Plaintiff that "[i]f there is a breach of an agreement, then the parties can take appropriate action which includes any proper legal recourse, an ethics complaint, or contacting the appropriate state or local agency." *Id*. And as NABOR informed Plaintiff, MLSs only verify that the proper documentation is in place but do not "verify the compensation." *Id*. ¶ 194. Plaintiff also alleges that buyer agents, which are not Defendants, "knowingly manipulate" the written buyer agreement requirement. *Id*. ¶ 204. Plaintiff alleges that Defendants "tolerate" this conduct. *Id*. ¶¶ 204, 206–08. Finally, Plaintiff alleges that a non-defendant, Florida REALTORS®, is "an active co-conspirator" because it promulgates forms that Plaintiff alleges are "intentionally designed to obscure who is responsible for paying the buyer-agent's fee." *Id*. ¶¶ 212–37.

Count V pertains to the IDX Display Rule, a mandatory rule in NAR's MLS Handbook that was enacted in November 2021. *Id*. ¶ 247. The rule requires websites displaying feeds from MLSs ("IDXs") to "identify the listing firm, and the email or phone number provided by the listing Participant in a reasonably prominent location . . . ." *Id.* NAR enacted this rule so consumers could get in contact with the listing broker and have their questions answered. *Id*. ¶¶ 248, 254–55. Plaintiff alleges that this rule "is a pro-competitive and consumer protection rule, designed to promote transparency, ensure fair access to information, and allow the consumer to choose who to contact when inquiring about a property." *Id*. ¶ 249. Plaintiff further alleges that violation of this rule is "widespread, systemic, and plainly visible across the market" and that few, if any, IDX-fed websites comply with it. *Id*. ¶¶ 253, 262. He also alleges that third-party real estate portals, brokerages, and individual agents fail to apply the rule. *Id*. ¶¶ 255–58. Further, "[s]ome Defendant MLSs" themselves provide free IDX feeds and are not in compliance. *Id*. ¶ 258. Plaintiff additionally alleges that he has engaged in extensive communications with Defendants to request

5

enforcement of the rule and that Defendants have failed to act. *Id.* ¶¶ 259–61, 265–68. Plaintiff finally alleges a "vertical conspiracy" with IDX vendors *Id.* ¶¶ 274–85.

Count VI pertains to the MLS Non-Filtering Rule, which is a mandatory rule in NAR's MLS Handbook that was enacted in 2021. *Id.* ¶ 310. This rule states that "MLS participants and subscribers must not, and MLSs must not enable the ability to, filter out or restrict MLS listings that are searchable and displayed to consumers based on the level of compensation offered to the cooperating broker or the name of a brokerage or agent." *Id.* Plaintiff concedes this rule is "pro-competitive." *Id.* ¶ 438. Plaintiff alleges that any REALTOR® can log in to an MLS and search using the filters prohibited by the rule, "nullifying the pro-competitive purpose of the rule and enabling persistent, unmonitored steering," and Plaintiff claims that NAR has taken no action to enforce the rule. *Id.* ¶¶ 313–14.

Finally, with regard to commissions, Plaintiff alleges that the 2025 MLS Antitrust Compliance Policy established by NAR in its MLS Handbook—that prevents MLSs from fixing commissions, fees, or cooperative compensation—is not enforced and that NAR promotes a standardized commission and pricing structure. *Id.* ¶ 317.

Defendants have filed their Motion, alleging that the Complaint is due to be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## II.    LEGAL STANDARDS

"Challenges to a party's standing are properly raised under Rule 12(b)(1). Where Article III standing is lacking, a complaint shall be dismissed under Rule 12(b)(1) for a lack of subject matter jurisdiction." *Perez v. Scotts Co. LLC*, No. 24-60516-CIV-WPD, 2024 WL 5219736, at *2 (S.D. Fla. Nov. 15, 2024) (citing *Elend v. Basham*, 471 F.3d 1199, 1205, 1208 (11th Cir. 2006)).

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663. Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Pleadings, because they are no more than conclusions, are not entitled to the assumption of truth. *Id.* at 680-681 (citations omitted). The Court must review the "well-pleaded factual allegations" and, assuming their veracity, "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. A plaintiff must, under *Twombly*'s construction of Rule 8, cross the line "'from conceivable to plausible.'" *Id.* at 680 (citation omitted). When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted. *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

However, the Court need not accept as true allegations that are "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663. "Mere labels and conclusions or a formulaic recitation of the elements of a cause of action will not do, and a plaintiff cannot rely on naked assertions devoid of further factual enhancement." *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013). "[I]f allegations are indeed more conclusory than factual, then the court does not have to assume their truth." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012).

### III.   <u>DISCUSSION</u>

Initially, the Court notes that Plaintiff is *pro se*. "*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) (citation omitted). "Although *pro se* pleadings are held to a less stringent standard and construed liberally, *see Hughes v. Lott*, 350 F.3d 1157, 1160 (11th Cir. 2003), a pro se complaint must satisfy the basic pleading requirements of applicable law and the Federal Rules of Civil Procedure." *Casper v. United States*, No. 23-24804-CV, 2024 WL 516959, at *1 (S.D. Fla. Jan. 23, 2024), *appeal dismissed,* No. 24-10398-C, 2024 WL 1984626 (11th Cir. Feb. 28, 2024) (citing *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989)).

### a.   <u>Standing</u>

Defendants argue that "Plaintiff does not plead Article III standing or antitrust injury because he cannot personally bring claims as a proxy for harm allegedly suffered by his business." [DE 59 at 17]. Further, "even if Plaintiff's allegations of harm to his business were credited in this lawsuit brought by Plaintiff individually, those allegations are conclusory statements that are often

irrelevant to harm to competition because they reflect only harm to Plaintiff's business and not to competition generally." [DE 59 at 17].

Plaintiff claims that Defendants' Motion is based on a "false assertion (and uncorrected assumption) that Plaintiff's injury belongs to a 'business entity,' not to him personally. This is legally and factually wrong, contradicted by their own pleadings, and misunderstands the structure they have created." [DE 68 at 2–3]. He further argues that the "alleged antitrust injury is direct and personal to Plaintiff." *Id.* at 3. Plaintiff contends that he "is the business" and that his "personal service, goodwill, reputation, personal brand recognition, and client relationships are the assets directly impaired by the restraint." *Id.* Further, "Plaintiff's injury is direct and personal: the loss of clients, income, and the goodwill attached to his name and professional service and reputation. This is a classic antitrust injury to an individual, and their standing argument is a disingenuous diversion." *Id.* at 4.

In reply, Defendants maintain that "it does not matter that Plaintiff brought this lawsuit in his own name—that formality does not give an individual standing when the alleged harm is injury to his business." [DE 70 at 1]. They also argue that "[e]very alleged injury in the Complaint belongs to Plaintiff's brokerage—not Plaintiff personally." *Id.* at 2. According to Defendants, "harm to consumers—no matter how lacking—does not establish that Plaintiff has Article III standing." *Id.* at 3. And, "[s]ince Plaintiff cannot be a proxy for his business, the Sherman Act claims should be dismissed for lack of antitrust standing as well." *Id.* Defendants further maintain that, "[e]ven assuming Plaintiff could bring claims for harm to his business, they still fail" since "the Complaint pleads no facts about other innovative businesses or any of Plaintiff's competitors." *Id.*

9

#### i. **Article III Standing**

"Article III standing requires that 1) the plaintiff has experienced an injury that is concrete and particularized and actual or imminent, 2) the defendant's conduct is the cause of the plaintiff's injury, and 3) a decision by the court would likely redress the plaintiff's injury." *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 889 (11th Cir. 2023) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, (1992)). "For purposes of the concrete injury analysis under Article III, we have recognized three kinds of harm: 1) tangible harms, like 'physical or monetary harms'; 2) intangible harms, like 'injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts'; and, finally, 3) a 'material risk of future harm' when a plaintiff is seeking injunctive relief." *Green-Cooper*, 73 F.4th at 889 (citing *TransUnion LLC v. Ramirez*, —— U.S. ——, 141 S. Ct. 2190, 2204, 2210 (2021)). A "mere risk of future harm, without more, does not give rise to Article III standing for recovery of damages, even if it might give rise to Article III standing for purposes of injunctive relief. *Id.*

The Court has carefully considered the parties' arguments and the relevant law. Plaintiff claims he has filed this lawsuit on his own behalf, and that he himself has suffered. Defendants, on the other hand, assert that Plaintiff, who is proceeding *pro se*, is trying to circumvent the prohibition on *pro se* plaintiffs bringing claims on behalf of companies or businesses. In his Response, Plaintiff acknowledges that "Plaintiff is the business; his personal service, goodwill, reputation, personal brand recognition, and client relationships are the assets directly impaired by the restraint—a point made evident by the fact that if Plaintiff changed brokerages, his name, brand, reputation and goodwill would move with him." [DE 68 at 4]. Neither party has cited any binding law that is directly on point regarding this Article III standing issue.

10

The Court has also carefully reviewed the Complaint. Plaintiff alleges that he personally has been injured by Defendants' conduct and continues to be injured. *See, e.g.*, Compl. ¶¶ 9, 15, 16, 17, 18, 386, 399, 412, 422, 434, 445, 459, 461, 486, 487, 488, 489, 490, 491, 494, 495. Plaintiff also asserts in his Response that he and his business are one and the same, and Plaintiff is injured when his business is. However, Plaintiff cannot file a *pro se* lawsuit on behalf of his business, especially when no information has been provided or alleged about the business structure of the business, www.snapflatfee.com®. Since the Court is recommending dismissal on other grounds, the Court instructs Plaintiff to make clearer allegations as to his own Article III standing in any future amended complaint.

### ii.  Antitrust Standing

"For a court to find that a plaintiff has standing to bring an antitrust claim, more than constitutional standing must exist; the court must find a close relationship between the plaintiff's injury and the alleged antitrust violation." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1493 (11th Cir. 1985). According to the Eleventh Circuit, "[a]ntitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991) (citing *Cargill, Inc. v. Monfort, Inc.*, 479 U.S. 104, 110 n.5 (1986)). "A two-pronged approach has slowly developed to examine whether a plaintiff is a proper party and thus should be afforded antitrust standing. First, a court should determine whether the plaintiff suffered 'antitrust injury'; second, the court should determine whether the plaintiff is an efficient enforcer of the antitrust laws, which requires some analysis of the directness or remoteness of the plaintiff's injury." *Todorov*, 921 F.2d at 1449. "Critically, under both sections, an antitrust plaintiff must show harm to competition in general, rather than merely damage to an individual competitor." *Spanish Broad.*

*Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 (11th Cir. 2004); *see also*

*Homie Tech., Inc. v. Nat'l Ass'n of Realtors*, No. 2:24-CV-00616 DAK-JCB, 2025 WL 1938975,

at *11 (D. Utah July 15, 2025) ("As a matter of law, injury to a single competitor, standing alone,

is not enough to prove antitrust injury."). "The aim of the Sherman Act 'is not to protect businesses

from the working of the market; it is to protect the public from the failure of the market.'"

*Adeduntan v. Hosp. Auth. of Clarke Cnty.*, No. 3:04-CV-65 (CDL), 2005 WL 2074248, at *8 (M.D.

Ga. Aug. 25, 2005) (citing *Spanish Broad Sys. of Fla.*, *Inc.*, 376 F.3d at 1069).

> For purposes of antitrust standing, Plaintiff alleges:
>
> 15. Plaintiff has standing to seek damages and injunctive relief under the Clayton Act, having suffered direct economic injury from Defendants' anticompetitive conduct and being the proper party to enforce the antitrust law.
>
> 16. First, Plaintiff has suffered an antitrust injury of the type the antitrust laws are designed to prevent. Defendants' coordinated scheme harms competition itself by targeting and suppressing Plaintiff's pro-competitive business model, restricting consumer choice, and maintaining supracompetitive prices. Plaintiff's injury is the direct and intended result of this distortion of the competitive process, not the result of legitimate competition.
>
> 17. Second, under the generally recognized "efficient enforcer" factors, Plaintiff is best positioned to bring this action. As a licensed real estate broker and REALTOR® who directly purchases Defendants' MLS services and association memberships, and whose pro-competitive brokerage model is targeted by Defendants' unlawful actions, Plaintiff's injury is neither remote nor derivative. The causal connection between Defendants' scheme and Plaintiff's harm is direct and unbroken.
>
> 18. Finally, Plaintiff's harm is concrete, current, ongoing, and distinct from any claims released in prior litigation, and has not been remedied by any settlement or other proceeding. As the immediate victim of market exclusion, Plaintiff is in the best position to vindicate the harm to competition. The relief sought, particularly injunctive relief requiring compliance with Defendants' own pro-competitive rules, addresses harms for which there has been no redress and cannot result in any duplicative recovery.

Compl. ¶¶ 15–18.

Defendant argues that these allegations are "conclusory, focus on impact only to his own business rather than harm to competition, and are insufficient to confer antitrust standing on a pro se plaintiff bringing claims on behalf of his business." [DE 59 at 21]. The Court agrees. The above allegations do not focus on harm to competition; rather, they only allude to the impact on Plaintiff and his business. Further, "[n]either an officer nor an employee of a corporation has standing to bring an action in his own right for an antitrust violation causing injury to the corporation and its business." *Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984). "While an officer or shareholder of a company may suffer 'indirect' or 'secondary' financial injury from antitrust violations, these individuals are not the target of any alleged anticompetitive practices." *Dean v. Roku, Inc.*, No. 8:24-CV-2383-WFJ-TGW, 2025 WL 2299403, at *4 (M.D. Fla. Aug. 8, 2025) (citing *Nat'l Indep. Theatre Exhibitors, Inc.*, 748 F.2d at 608). While Plaintiff has not sufficiently alleged antitrust standing in the Complaint, he should be permitted an opportunity to file an amended complaint if he has a good-faith basis to do so and in full compliance with the above law.

### b. <u>Whether Plaintiff Has Alleged Sufficient Facts About Conspiracy Among Defendants</u>

Section 1 of the Sherman Act provides that "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "[T]o plead a § 1 claim, a plaintiff must show that defendants had a (1) conspiracy that (2) unreasonably restrained trade." *In re Jan. 2021 Short Squeeze Trading Litig.*, 105 F.4th 1346, 1354 (11th Cir. 2024) (citing *Quality Auto Painting Ctr. Of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019)). For a claim brought under § 1 of the Sherman Act, "[t]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553–54

(cleaned up) (citing *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). "While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense." *Id.* (cleaned up).

Section 1 of the Sherman Act prohibits "only *unreasonable* restraints [of trade]." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (emphasis in original) (quotations omitted). "Restraints [of trade] can be unreasonable in one of two ways." *Id.* First, "[a] small group of restraints are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output." *Id.* (quotations omitted). Second, "[r]estraints [of trade] that are not unreasonable *per se* are judged under the 'rule of reason.'" *Id.* at 541. (quotations omitted). Nearly every vertical restraint—"restraints imposed by agreement between firms at different levels of distribution"—is evaluated under "the rule of reason." *Id.* (quotations omitted). Under the "rule of reason" approach, courts must ask whether the plaintiff "has shown that the alleged restraint has had an anticompetitive effect on the market." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016). *Per se* restraints are typically horizontal restraints, while vertical restraints are generally evaluated under the "rule of reason." *In re Jan. 2021 Short Squeeze Trading Litig.*, 105 F.4th at 1355.

Defendants make several arguments as to why the Complaint is insufficient: (1) Plaintiff's indiscriminate group pleading fails to state a claim; (2) Plaintiff does not plausibly allege a hub-and-spoke conspiracy because the alleged wheel lacks a rim; (3) Plaintiff does not otherwise plead sufficient facts to establish a conspiracy among any of Defendants; (4) neither the *per se* nor quick look standards should apply to Plaintiff's conspiracy claims; (5) Plaintiff does not allege that anticompetitive harm has occurred in a properly defined relevant market or plead anticompetitive

effects in any of the markets he does allege; and (6) the Written Buyer Agreement Rule remains under the jurisdiction of the U.S. District Court for the Western District of Missouri. However, this Court need only reach the first three issues.

### i.      Plaintiff's Improper Use of AI and Fake Legal Concepts

The Court has carefully reviewed Plaintiff's Response in opposition to all of Defendants' arguments. As noted in Defendants' Reply, Plaintiff has cited in large part to artificial intelligence ("AI")-hallucinated law. While the cases Plaintiff relies on do exist, the quotations, and even most of the legal concepts, are fake. Plaintiff filed a Notice of Spoliation in which he apologizes to the court, Defendants, and Defendants' counsel for his AI-related mistakes. [DE 71 at 3]. However, Plaintiff only acknowledges that one citation was incorrectly included in his Response and that "two drafting errors in which quotation marks were mistakenly used around paraphrased statements rather than direct quotations." *Id.* at 2. The hallucination issue is more prevalent than Plaintiff admits. The Court has determined that hallucinated law appears on pages 5, 9, 10, 11, 13, 14, 15, and 17 of the Response. Therefore, while Plaintiff has conceded that he made a mistake, and sanctions are likely not appropriate, the Court simply cannot trust the legal arguments of Plaintiff. And, Plaintiff is doing himself a great disfavor by relying on fake legal arguments, which further weaken his position. The Court will further discuss the hallucinated law below.

### ii.      Plaintiff's Indiscriminate Group Pleading

Defendants argue in part:

Putting aside Plaintiff's lists of the Defendants to which each count applies (*see, e.g.*, Compl. ¶ 388), six out of seventeen Defendants are mentioned by name *only* in the "Defendants" and/or the "Relevant Markets and Defendants' Market Power" sections of the Complaint. Neither section contains allegations of conduct underlying Plaintiff's allegations. *See* Compl. at 6–10, 16–20 (mentioning, for the only time in the Complaint, Defendants Connecticut Association of REALTORS®, Florida Gulf Coast Multiple Listing Service, Inc., Miami Association of

REALTORS®, Inc., Northeast Florida Association of REALTORS®, Inc., realMLS, and Orlando Regional REALTOR® Association, Inc.).

[DE 59 at 16]. They also assert that, "[f]or the remaining Defendants other than NAR, the only allegations in the Complaint are sporadic and not suggestive whatsoever of a conspiracy." *Id.* In Defendant Naples Area Board of Realtors and Association of Real Estate Professional, Inc.'s ("NABOR") Supplement to the Motion, NABOR similarly points out that "[t]here is only one substantive reference to NABOR in the 122-page Complaint. That reference is wholly inadequate to allege that NABOR participated in an antitrust conspiracy to encourage steering or inflated Buyer-Broker commissions—or any conspiracy at all." [DE 61 at 1]. Counts I and IV are asserted against NABOR, yet Plaintiff solely alleges paragraph 194 specific to NABOR. *Id.* at 2. The Court agrees that Plaintiff has improperly grouped together Defendants in a manner and deems the Complaint deficient under Rule 8. Based on the foregoing, the Court finds that the allegations against NABOR, Connecticut Association of REALTORS®[3], Florida Gulf Coast Multiple Listing Service, Inc., Miami Association of REALTORS®, Inc., Northeast Florida Association of REALTORS®, Inc., realMLS, and Orlando Regional REALTOR® Association, Inc., are clearly insufficient. The Court rejects all of Plaintiff's arguments to the contrary. [DE 68 at 12–14].

### iii.    Plaintiff's Failure to Plead a Conspiracy or Agreement and Failure to Address Defendants' Arguments on This Issue

Additionally, and most importantly, Plaintiff has failed to properly respond to Defendants' lengthy argument that the Complaint fails to allege a conspiracy. [DE 59 at 20–29]. Instead, Plaintiff claims in his Response that the Complaint does not allege a conspiracy, but rather "[t]he complaint's concerted action arises from the admitted structure of the Defendants themselves. As associations of horizontal competitors, their collective adoption of, and deliberate non-compliance

---

[3] CT Realtors has been dismissed for lack of personal jurisdiction.

with, and non-enforcement of mandatory rules is the concerted action." [DE 68 at 4]. He further

argues that the

> Sherman Act requires only concerted action among competitors, and the Supreme
> Court has repeatedly held that a trade association's collective decision satisfies this
> requirement without the need for a separate secret agreement. *Allied Tube &
> Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988) (association itself is
> the "combination" contemplated by § 1); *American Needle, Inc., v. Nat'l Football
> League*, 560 U.S. 183, 195 (2010) (horizontal competitors acting jointly through a
> trade association constitute concerted action). The Eleventh Circuit applies the
> same rule: "An association of competitors is a combinational under § 1, and its
> coordinated conduct satisfies the concerted-action requirement." *U.S. Anchor Mfg.,
> Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1000 (11th Cir. 1993). *See also Relevant
> Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 310 (2d Cir. 2023) (holding
> that concerted action exists where a federation composed of competing entities
> collectively adopts rules restricting members' conduct).

[DE 68 at 4–5].

Plaintiff acknowledges that *U.S. Anchor Manufacturing* was "incorrectly included in

support of the concerted-action argument." [DE 71 at 2]. The Court finds that the remaining cases

also do not stand for the premises listed. In *American Needle, Inc.*, the Supreme Court explained

"[t]he relevant inquiry, therefore, is whether there is a contract, combination …, or conspiracy

amongst separate economic actors pursuing separate economic interests, such that the agreement

deprives the marketplace of independent centers of decision-making, … and therefore of diversity

of entrepreneurial interests, and thus of actual or potential competition." *Am. Needle, Inc.*, 560

U.S. at 195 (cleaned up). In *Allied Tube & Conduit Corporation*, the Supreme Court explained

that "[t]here is no doubt that the members of such associations often have economic incentives to

restrain competition and that the product standards set by such associations have a serious potential

for anticompetitive harm." *Allied Tube & Conduit Corp*, 486 U.S. at 500. The Supreme Court

further found that "private standard-setting associations have traditionally been objects of antitrust

17

scrutiny" and that "it is this potential for procompetitive benefits that has led most lower courts to apply rule-of-reason analysis to product standard-setting by private associations." *Id.* at 500–01.

The law does state that "[d]espite the different terminology, there is no magic unique to each term in [section] 1; the terms 'contract,' 'combination,' and 'conspiracy' are used interchangeably to capture the concept of concerted action, that is an 'agreement.'" *Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*, 989 F.3d 1224, 1233 (11th Cir. 2021) (alteration added; some quotation marks and citation omitted). However, "[s]tanding alone, parallel conduct is inconclusive, as it is consistent with an unlawful conspiracy, as well as rational and competitive business strategy prompted by common perceptions of the market." *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1258–59 (S.D. Fla. 2021) (citing *Twombly*, 550 U.S. at 554). In other words, the term "concerted action" has never replaced the conspiracy or agreement requirement. Plaintiff has taken that phrase out of context and invented law that states that an association of competitors' coordinated conduct satisfies the concerted-action requirement. There is, in fact, no such law.

Thus, Plaintiff, who also cited hallucinated law about concerted action later in his Response, DE 68 at 9–10, has attempted to rewrite the law regarding Sherman Act claims in arguing that he is not required to plead a conspiracy, or even an agreement, and has supported his argument with law invented by AI.[4] Plaintiff's Complaint is therefore due to be dismissed. Plaintiff

---

[4] Federal Rule of Civil Procedure 11 states in relevant part: "**Representations to the Court**. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney *or unrepresented party* certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: ... (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]" Fed. R. Civ. P. 11(b)(2) (emphasis added). "It is well-settled that Rule 11 of the Federal Rules of Civil Procedure 'applies equally to pro se litigants.'" *Grimshaw v. Metro. Life Ins. Co.*, No. 11-14165-CIV, 2011 WL 13319575, at *1 (S.D. Fla. Aug. 2, 2011) (citing *Meidinger v. Healthcare Indus. Oligopoly*, 391 F. App'x 777, 778 (11th Cir. 2010)); *Button v. McCawley*, No. 0:24-CV-60911, 2026 WL 292150, at *2 (S.D. Fla. Feb. 4, 2026).

is hereby admonished for using fake legal arguments and citations. Should this conduct continue in any manner, the Court will consider the imposition of much more serious sanctions upon Plaintiff.

Further, Defendants argue that Plaintiff does not plausibly allege a hub-and-spoke conspiracy because the alleged wheel lacks a rim. [DE 59 at 18–20]. Plaintiff's sole response is "[t]his admitted structure—NAR at the central hub, associations and MLSs as the spokes, and the mandatory obligations connecting them at the rim—constitutes concerted action as a matter of law." [DE 68 at 9]. This is a wholly conclusory argument, and Plaintiff has waived any further argument as to this issue. In sum, Plaintiff's Complaint is deficiently pled, and, furthermore, Plaintiff has failed to properly respond to the Motion. Plaintiff's Response is rife with hallucinated case law, and Plaintiff has waived any responsive arguments supported by real law.

The Court need not consider the "unreasonably restrained trade" requirement under the Sherman Act at this juncture in light of its foregoing analysis and conclusions. The Court does note, however, that the law cited by Plaintiff on this issue is rife with hallucinated law. [DE 68 at 10–12]. If Plaintiff has a good-faith basis to file an amended complaint, he should review the applicable law on this issue and ensure that any amended complaint is in full compliance.

## IV.    CONCLUSION

Plaintiff's Complaint should be dismissed based on the reasons stated above. However, because Plaintiff is proceeding *pro se* and because amendment would not necessarily be futile, the Undersigned recommends that Plaintiff be provided with an opportunity to file an amended complaint if he has a good-faith basis to do so in full compliance with the applicable Rules, case law, and this Report and Recommendation. Thus, the Undersigned **RECOMMENDS** that

Defendants' Motion to Dismiss Plaintiff's Complaint [DE 59] be **GRANTED**, and the Complaint [DE 1] be **DISMISSED WITHOUT PREJUDICE**.

The Undersigned also **RECOMMENDS** that Plaintiff be admonished over his improper use of artificial intelligence and concomitant misrepresentations to the Court and warned that more severe sanctions may be imposed if such behavior continues.

## V.      NOTICE OF RIGHT TO OBJECT

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with United States District Judge William P. Dimitrouleas. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation. See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**RESPECTFULLY SUBMITTED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 24th day of March 2026.

WILLIAM MATTHEWMAN
Chief United States Magistrate Judge

20