UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No. 25-cv-81016-DIMITROULEAS/MATTHEWMAN

Jorge A. Zea

           Plaintiff, pro se,      )
                                 )
               v.                  )

National Association of REALTORS® (NAR), )
Beaches MLS, Inc., )
Broward, Palm Beaches and St. Lucie REALTORS®, Inc., )
Miami Association of REALTORS®, Inc., )
Orlando Regional REALTOR® Association, Inc., )
Florida Gulf Coast Multiple Listing Service, Inc., )
Royal Palm Coast REALTOR® Association, Inc., )
Naples Area Board of REALTORS® and Association of Real Estate Professionals, Inc. (NABOR®), )
My Florida Regional MLS, Inc. (d/b/a Stellar MLS), )
Space Coast Multiple Listing Service, Inc., )
Space Coast Association of REALTORS®, Inc., )
Northeast Florida Multiple Listing Service, Inc. (d/b/a RealMLS), )
Northeast Florida Association of REALTORS®, Inc., )
Central Panhandle Association of REALTORS®, INC. )
)
              Defendants. )
)
)
)
)
_____ )



**FIRST AMENDED COMPLAINT**

TRIAL BY JURY REQUESTED

FILED BY_____CD S_____ D.C.

APR 27 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

# TABLE OF CONTENT

I. INTRODUCTION.................................................................................................1

II. JURISDICTION AND VENUE........................................................................2

III. STANDING......................................................................................................3

IV. PLAINTIFF AND SERVICE MODEL...........................................................4

V. DEFENDANTS.................................................................................................8

VI. INDUSTRY STRUCTURE AND GOVERNANCE......................................12

VII. CONCERTED ACTION................................................................................18

VIII. RELEVANT MARKET................................................................................20

IX. RELEVANT RULES......................................................................................23

    A.  Rule 1 - Commission-Based Steering Prohibition......................................23

    B. Rule 2 - MLS Rule Prohibiting Commission Filtering...............................24

    C. Rule 3 - Mandatory Buyer-Broker Agreement..........................................25

    D. Rule 4 - Mandatory IDX Display Rule (Broker Attribution).....................26

    E. Rule 5 - MLS Antitrust Compliance Policy................................................27

X. FACTUAL ALLEGATIONS............................................................................27

    A. National Association of REALTORS® (NAR)...........................................28

    B. Broward, Palm Beaches and St. Lucie REALTORS®, Inc.........................37

    C. Beaches MLS, Inc.......................................................................................38

    D.  Miami Association of REALTORS®, Inc..................................................40

    E. Orlando Regional REALTOR® Association, Inc........................................43

    F. My Florida Regional MLS, Inc. (d/b/a  Stellar MLS)................................44

    G. Naples Area Board of REALTORS® and Association of Real Estate Professionals, Inc. (NABOR®),.................................................................................................47

    H. Northeast Florida Association of REALTORS®, Inc..................................50

    I. Northeast Florida Multiple Listing Service, Inc. (d/b/a RealMLS)............51

    J. Royal Palm Coast REALTOR® Association, Inc. (RPCRA)......................52

    K. Florida Gulf Coast Multiple Listing Service, Inc. (FGCMLS)..................53

    L. Central Panhandle Association of REALTORS®, INC. (CPAR)...............53

    M. Space Coast Association of REALTORS®, Inc..........................................55

    N. Space Coast Multiple Listing Service, Inc.................................................56

    O. NON-DEFENDANTS ASSOCIATION AND MLS ACTIONS.................59

XI. HARM TO COMPETITION AND PLAINTIFF'S DIRECT INJURY...............63

    A. Aggregate Harm to Plaintiff's Service Model............................................64

B. Harm to Similarly-Situated Competitors..................................................................... 65

C. Harm to Competition and Market Restraint.................................................................. 66

D. Causal Link and Lack of Pro-Competitive Justification............................................. 67

**XII. THE RESTRAINTS ARE UNLAWFUL PER SE............................................... 68**

**XIII. "PLUS FACTORS" SUPPORTING THE INFERENCE OF CONSPIRACY 69**

A. Actions Contrary to Economic Self-Interest.............................................................. 69

B. Circular Governance and Structural Interdependence................................................ 71

C. Structural Bias in Local Adjudicatory Bodies............................................................ 72

D. Competitors Judging Competitors:............................................................................. 72

E. Conflicting Fiduciary Duties:..................................................................................... 72

F. The "Institutional Capture" of Oversight:.................................................................. 73

G. Motive and Opportunity to Conspire.......................................................................... 73

    1. Motive..................................................................................................................... 73

    2. Opportunity............................................................................................................ 73

H. Public Signaling and Coordinated Market Messaging................................................ 74

    1. The DANGER Report:............................................................................................ 74

    2. Targeted "Anti-DIY" Campaigns:......................................................................... 75

    3. The "5-6%" Price Signaling:.................................................................................. 75

    4. Steering And Model Encouragement...................................................................... 75

    5. The "Nod and a Wink": Signaling the Non-Enforcement of Pro-Competitive
    Rules.......................................................................................................................... 76

I. Historically Unprecedented Uniformity....................................................................... 77

**XIV. THE RESTRAINTS FAIL UNDER ANY LEVEL OF SCRUTINY................. 77**

**XV. CONCLUSION.................................................................................................... 78**

**XVI. COUNTS............................................................................................................. 79**

COUNT I - Violation of Section 1 of the Sherman Act (Concerted Refusal to Enforce
the Code of Ethics in the Prohibition of Commission Steering)................................... 79

COUNT II - Violation of Section 1 of the Sherman Act (Concerted Non-Enforcement
of the No Commission Filtering Rule).......................................................................... 81

COUNT III - Violation of Section 1 of the Sherman Act (Concerted Non-Enforcement
of the Buyer-Broker Agreement Rule).......................................................................... 83

COUNT IV - Violation of Section 1 of the Sherman Act (Concerted Non-Enforcement
of the IDX Listing Broker Contact Display Rule)......................................................... 85

COUNT V - Violation of Section 1 of the Sherman Act (Direct Violation of the MLS
Antitrust Compliance Policy - Price Signaling, Group Boycott and Market Allocation)
87

**XVII. PRAYER FOR RELIEF...................................................................................... 89**

A.  Injunctive Relief...................................................................................... 90

   1. Steering Prohibition Enforcement.................................................... 90

   2. Buyer-Broker Agreement Rule Compliance.................................... 92

   3. IDX Listing Broker Contact Display Compliance........................... 92

   4. Immediate Cessation of Enabling Conduct, Price Signaling and  Commission and Transaction Structure............................................................. 93

B.  Monetary Relief..................................................................................... 93

   1. Compensatory Damages.................................................................. 93

   2. Treble Damages.............................................................................. 94

   3. Prejudgment Interest...................................................................... 94

   4. Post-Judgment Interest................................................................... 94

   5. Costs and Fees................................................................................ 94

C. Other Relief as Just and Proper............................................................. 94

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### I. INTRODUCTION

1. This is an action brought by Plaintiff Jorge Zea, acting pro se, under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), arising from alleged contracts, combinations, or concerted actions in restraint of trade involving Defendants' adoption and implementation of Rules, related policies, guidance, statements, and other conduct, which Plaintiff alleges have restrained competition, caused injury to competition and to competitors, including Plaintiff, and reduced transparency and consumer choice in residential real estate brokerage.

2. The allegations in this Complaint are based substantially on Defendants' own Rules, policies, publications, statements, decisions, communications, and documented conduct, including materials issued or adopted by Defendants or their members acting within Defendants' governance structures. Plaintiff relies principally on those materials as factual support for the claims alleged herein.

3. Defendants - trade associations and multiple listing services composed of competing real estate professionals (horizontal competitors) — collectively adopted mandatory rules expressly designed to prevent anticompetitive practices, and then collectively declined to enforce those same rules. That pattern of non-enforcement, occurring across Defendants simultaneously and through shared governance structures, is the conduct challenged in this Complaint.

4. Plaintiff is a licensed real estate broker offering low cost listing services. The conduct challenged here has caused ongoing harm to Plaintiff's ability to compete, to generate income, and to operate in the relevant market. Plaintiff seeks injunctive relief and damages under the Sherman Act.

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff brings claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. The conduct alleged herein occurs in, or substantially affects, interstate commerce.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) and 15 U.S.C. § 22 because a substantial part of the events giving rise to the claims occurred within this District, and because Defendants may be found, have agents, or transact business within this District.

7. The conduct alleged caused injury to Plaintiff and affected interstate commerce within the Southern District of Florida. Plaintiff resides and operates from Palm Beach County, Florida.

8. This Court has personal jurisdiction over Defendants because Defendants transact business in Florida, operate directly within Florida's residential real estate market, and participated in the conduct challenged herein within this District.

9. All Defendants, except NAR, are organized under the laws of Florida and maintain operations in Florida. NAR purposefully directs and applies mandatory policies and rules through affiliated entities operating within this District and derives substantial

2

revenue from members residing and transacting business herein. NAR's mandatory policies - including the REALTOR® Code of Ethics and the Handbook on Multiple Listing Policy - are not mere suggestions; they are enforceable requirements that dictate the daily business operations of the Florida Defendants and the competitive conditions of the market within this District.

## III.   STANDING

10.     Defendants' coordinated actions with respect to five mandatory NAR Rules and Policies suppress competition through four mechanisms: (1) steering directs buyers away from properties listed by alternative-model brokers; (2)  IDX display violations prevent consumers from identifying and directly contacting the listing agent, diverting them toward unrelated brokers; (3) the BBA Rule and Steering Prohibition eliminate the downward pricing pressure that alternative-model brokers exert on commission structures and (4) coordinated public messaging - including the DANGER Report, anti-DIY campaigns, commission price signaling, specific representation level and commission split structures - reinforces the exclusionary scheme through group boycott and market allocation conduct. Each mechanism restricts consumer choice and operates across all markets where Defendants function.

11.     The restraints apply categorically to all flat-fee, limited-service, and alternative-model brokers that attempt to compete outside the traditional compensation structure or different representation level in each relevant market - not just to Plaintiff individually. The alleged market-wide competitive effects are direct, ongoing, and unremedied by any prior litigation or settlement, as set forth in Section XI below

12. Plaintiff has antitrust standing under the two-pronged test. First, the suppression of Plaintiff's SnapFlatFee.com® personal service is the direct and intended result of Defendants' actions regarding enforcement (or lack thereof) of mandatory Rules against the class of non-traditional service providers to which Plaintiff belongs - not the result of legitimate competition.

13. Second, Plaintiff is the efficient enforcer: Plaintiff holds a personal Florida Broker License No. BK3015804, directly purchases MLS and Association memberships from each Defendant, and operates in each geographic market where Defendants operate. No intermediary stands between Defendants' conduct and Plaintiff's injury.

14. Plaintiff's harm has not been remedied by any prior litigation, settlement, or regulatory proceeding. The Burnett/Sitzer settlement addressed buyer-broker commission disclosure in traditional transactions; it did not address the steering, IDX filtering, and alternative-model suppression mechanisms alleged herein.

## IV.   PLAINTIFF AND SERVICE MODEL

15. Under Florida law, a real estate broker license is issued to the individual. Plaintiff holds Florida Broker License No. BK3015804 - since November 2001 - in his personal name. That license is the legal authority to practice real estate brokerage in Florida. Plaintiff's obligations, rights, and professional standing flow from that individual license.

16. A broker license (BK) authorizes the holder to operate independently and practice real estate brokerage in their own right. This is distinct from a salesperson

4

license (SL), which requires the holder to work under and through a licensed broker and does not confer independent authority to practice.

17. Plaintiff is a Realtor® and is subject to compliance with the same Rules, Regulations, Policies and Code of Ethics as all other Realtors® (and specifically as those Realtor® members in each Defendant organization). These obligations fall upon him personally.

18. Plaintiff offers Real Estate listing service to sellers through a competitive pricing service where the seller pays a flat fee at time of listing and in return Plaintiff provides a limited service by listing the property in the MLS, and syndicates it (via MLS IDX and Syndication feeds) to Real Estate Portals and all participants in IDX/Syndication feeds.

The seller takes on the responsibilities of coordinating showings, showing the property, negotiating offer, and coordination towards an eventual closing.

19. The service is referred to in the real estate industry as "Limited Service" "enhanced For Sale by Owner (FSBO)," "assisted Do-It-Yourself (DIY),", "Flat Fee" or "Entry Only" listing service.

20. The seller receives the exposure to the general market for the property while being listed in the MLS by a Realtor® (the Plaintiff). Realtors® have the direct contact information and instructions to contact the seller directly in the MLS. Any other lead that is routed to the Plaintiff is forwarded to the seller.

21.    Plaintiff competes in the Real Estate Brokerage service market in which each of the Defendants operate and where its members directly compete with Plaintiff. Competition is for sellers (listings inventory) and for buyers for those listings.

22.    Plaintiff is a member (subscriber) of Defendants Associations and MLSs and as such competes in the same geographical market in which each defendant and its members operate.

23.    Plaintiff entered into Participation and Membership Agreements with each Defendant under the same terms, conditions, rights and obligations of all other Realtor® members of each Defendant.

24.    Plaintiff provides personal service to his clients through his website www.SnapFlatFee.com.

25.    SnapFlatFee.com® is a registered trademark under the United States Patent and Trademark Office (USPTO) and is registered to, and owned by the Plaintiff under his personal name.

26.    Plaintiff owns under his personal name the Domain SnapFlatFee.com, and is registered accordingly.

27.    Plaintiff is the qualifying broker of Blue Lighthouse Realty, Inc. (entity that holds its own separate Brokerage License) under Florida law. Florida real estate license law requires Plaintiff, as qualifying broker, to include Blue Lighthouse Realty, Inc.'s name in real estate advertisements,in the SnapFlatFee.com® website, and MLS listings.

28. This regulatory requirement does not reflect the business structure under which the SnapFlatFee.com® service operates. The SnapFlatFee.com® service is operated by Plaintiff under his individual BK license No. BK3015804.

29. Blue Lighthouse Realty, Inc. as a business entity conducts at most one to two real estate transactions per year, outside the SnapFlatFee.com® service model.

30. The SnapFlatFee.com® trademark, domain name, website, service model, client relationships, and associated goodwill are not assets of Blue Lighthouse Realty, Inc. and would not convey in any sale, transfer, or dissolution of that entity.

31. All SnapFlatFee.com® listings, client interactions, and market participation are conducted by Plaintiff in his individual professional capacity.

32. The appearance of Blue Lighthouse Realty, Inc.'s name in Plaintiff's advertising and MLS listings reflects a Florida regulatory compliance obligation, not an attribution of the SnapFlatFee.com® service to Blue Lighthouse Realty, Inc. as a business entity.

33. Plaintiff personally and directly operates the service, the website, interactions with clients and relations with MLSs and Associations.

34. Plaintiff's income, goodwill, reputation, and the value of the SnapFlatFee.com® mark flow directly from his personal delivery of the service. The brand represents what Plaintiff individually does, how he does it, and the trust clients place in him personally (and/or through his brand). Every client relationship, every listing, and every transaction is a direct product of Plaintiff's individual professional conduct.

35.     Every client relationship, listing, and transaction under the SnapFlatFee.com® brand is Plaintiff's personal work product, not an asset of Blue Lighthouse Realty, Inc.

## V.     DEFENDANTS

36.     Each Defendant is a trade organization composed of licensed real estate professionals, the vast majority of whom are direct competitors with one another and with Plaintiff in the relevant market.

37.     **Defendant National Association of REALTORS® (NAR)** is a non-profit trade association organized under the laws of Illinois, with its principal place of business at 430 North Michigan Avenue, Chicago, Illinois 60611. NAR is the national trade association for real estate professionals in the United States. It promulgates and enforces mandatory policies upon its member Associations (Defendants in this case), including the Code of Ethics and MLS/IDX rules which, when mandatory, bind all member Realtor® associations and affiliated MLSs.

38.     **Defendant Beaches MLS, Inc. (BeachesMLS)** is a for-profit corporation organized under the laws of the State of Florida, with its principal place of business at One Harvard Circle, Suite 102, West Palm Beach, Florida 33409. Beaches MLS operates a multiple listing service in South East Florida (Miami-Dade, Broward, Palm Beach and St Lucie Counties (FL)). Beaches MLS is controlled by Broward, Palm Beaches and St. Lucie REALTOR®s, Inc.

39.     **Defendant Broward, Palm Beaches and St. Lucie REALTOR®s, Inc. (RWorld)** is a not-for-profit corporation organized under the laws of the State of Florida,

8

with its principal place of business at One Harvard Circle, Suite 102, West Palm Beach, Florida 33409. It is a regional Realtor® association affiliated to NAR. It provides Realtor® membership service in Miami-Dade, Broward, Palm Beach and St Lucie Counties (FL)

40. **Defendant Miami Association of REALTORS®, Inc. (MiamiRealtors)** is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 700 South Royal Poinciana Boulevard, Suite 400, Miami, Florida 33166. It is a local REALTOR® association member of NAR. It operates its own MLS (aka: Southeast Florida MLS - SEFMLS) which has datashare with Beaches MLS. Primary coverage is Miami Dade, Broward and Palm Beach Counties (FL).

41. On April 20, 2026, Defendant Miami Association of REALTORS® and Defendant Broward, Palm Beaches and St. Lucie REALTORS® publicly announced a proposed merger, subject to approval by their respective Boards of Directors and other applicable approvals. Public reports state that, if approved, the surviving entity would be known as Miami and South Florida REALTORS®, would cover Miami-Dade, Broward, Palm Beach and St. Lucie counties, and would comprise approximately 93,000 members. This allegation is included solely to reflect a change in the organizational structure of these Defendants and, if consummated, references in this Complaint to these Defendants include their successor or surviving entity.

42. Public reports further state that Beaches MLS will be included as part of the proposed merger and that the resulting structure is intended to include one unified MLS under the new entity. This allegation is included solely to reflect the reported scope of the

9

proposed organizational integration and, if consummated, references in this Complaint to these Defendants include their successor or surviving entity and its MLS operations.

43.     **Defendant Orlando Regional REALTOR® Association, Inc. (ORRA)** is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 1330 Lee Road, Orlando, Florida 32810. It is a local NAR-chartered REALTOR® association serving Greater Orlando (Orange County, FL). ORRA is a shareholder with decision-making capacities of StellarMLS.

44.     **Defendant My Florida Regional MLS, Inc., d/b/a Stellar MLS (STELLAR),** is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 247 Maitland Avenue, Altamonte Springs, Florida 32701. Stellar MLS is owned and controlled by 17 local and regional Realtor® Associations, of which only ORRA is a named defendant. Stellar has coverage through most of central Florida from east to west coast. Stellar MLS serves the following counties: Alachua, Charlotte, DeSoto, Flagler, Hernando, Hillsborough, Lake, Manatee, Marion, Okeechobee, Orange, Osceola, Pasco, Pinellas, Polk, Sarasota, Seminole, Sumter, and Volusia.

45.     **Defendant Florida Gulf Coast Multiple Listing Service, Inc., (FGCMLS, aka Southwest Florida MLS - SWFLMLS) (FGCMLS)** is a for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 12381 S Cleveland Ave Suite 502, Fort Myers, FL 33907. Defendant operates the MLS through control of defendants: Royal Palm Coast REALTOR® Association, Inc.

10

and Naples Area Board of REALTOR®s, Inc. (NABOR®). The Defendant coverage includes: Lee, Hendry, Collier and Glades counties (FL).

46.     **Defendant Royal Palm Coast REALTOR® Association, Inc. (RPCRA)** is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 12381 S Cleveland Ave Suite 502, Fort Myers, FL 33907. It is a local REALTOR® association recognized by NAR. It provides service in the Southwest Florida region Lee, Hendry, Collier and Glades counties (FL))

47.     **Defendant Naples Area Board of REALTORS® and Association of Real Estate Professionals, Inc. (NABOR®)** is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 1455 Pine Ridge Road, Naples, Florida 34109. It is a local NAR-affiliated REALTOR® association and provides service in the Naples (FL) area (Collier County).

48.     **Defendant Space Coast Association of REALTORS®, Inc. (SPACE Assn.)** is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 950 Pineda Plaza Way, Melbourne, Florida 32940. It is a local REALTOR® association covering Brevard County (FL).

49.     **Defendant Space Coast Multiple Listing Service, Inc. (SPACE MLS)** is a for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 2950 Pineda Plaza Way, Melbourne, Florida 32940. It operates the local MLS and is directly under control of the Space Coast Association of REALTORS®, INC servicing Brevard county (FL).

50.     **Defendant Northeast Florida Multiple Listing Service, Inc., d/b/a RealMLS (RealMLS)** is a for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 7801 Deercreek Club Road, Jacksonville, Florida 32256. RealMLS operates a regional multiple listing service in Florida's Northeast region (Clay, Duval, Putnam and Baker counties).

51.     **Defendant Northeast Florida Association of REALTORS®, Inc. (NEFAR)** is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 7801 Deercreek Club Road, Jacksonville, Florida 32256. It is a local REALTOR® association operating in the greater Jacksonville (FL) and Northeast Florida Region (Clay, Duval, Putnam and Baker counties (FL) and is the direct controlling entity for the Defendant RealMLS.

52.     **Defendant Central Panhandle Association of REALTORS®, Inc.(CPAR)** is a not-for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 4952-B US Highway 98, Santa Rosa Beach, Florida 32459. It is a local REALTOR® Association covering the Florida Central Panhandle region (Bay, Calhoun, Washington, Holmes, Jackson & Liberty Counties (FL)). In addition, it individually operates its own MLS system.

## VI.    INDUSTRY STRUCTURE AND GOVERNANCE

53.     The National Association of Realtors (NAR) is a professional association made up of real estate professionals. The vast majority of its members are direct competitors with one another in the residential real estate brokerage market. They compete for the same listings, the same buyers, and the same transactions.

54.   NAR is the national-level association governed by its by-laws and constitution. Its decision-making process provides that proposed amendments to its services, policies, rules, regulations and Code of Ethics (collectively "Rules") are recommended at a Committee (or Forum or Council) level and are ultimately approved by the Board of Directors after approval by the Executive Committee.

55.   These decision-making groups are composed of Realtors®, the vast majority of whom compete for buyers and sellers to provide real estate brokerage services, and/or are directors or managers of real estate organizations (primarily brokerages) that provide these services.

56.   The Defendant Regional and Local Associations of Realtors® (Associations) and Multiple Listing Services (MLSs) are affiliated with NAR. Their members are, in the vast majority, Realtors® who compete with each other for buyers and sellers to provide real estate brokerage services.

57.   The decision-making process and actions of each Defendant are determined by its respective Board of Directors, whose members are elected to represent the interests of the Association's or MLS's members.

58.   NAR issues and enacts Rules, which are included in documents that become the mandate for its members and its member Associations and MLSs (e.g., the MLS Handbook (including the IDX Rules), the Code of Ethics and Standards of Practice (COE), the Code of Ethics and Arbitration Manual (COEAM), and Ethics Case Interpretations, among other guides, publications and policy communications).

13

59.     Some of these Rules are enacted as Mandatory ("M"), meaning that each member Association and MLS must incorporate them into its own Rules and Regulations, comply with them, supervise its members for compliance, and enforce them. All Rules relevant to this action are *Mandatory*.

60.     The Board of Directors of NAR is a representative body composed of member representatives of Local and Regional Associations, as well as representatives of large real estate firms and major franchises. MLSs are represented through the Association representatives to which they are affiliated to or owned by.

61.     The structure is interdependent among Local and Regional Associations, MLSs, large real estate brokerages, and NAR. Representation flows upwards from individual Realtors® through Local and Regional Associations and brokerage firms to the decision-making bodies at NAR.

62.     The resulting Rules, particularly Mandatory Rules, flow downwards from NAR's Board of Directors to Regional and Local Associations, MLSs, and individual Realtor® members.

63.     At each level there are compliance and enforcement mechanisms intended to ensure *uniformity* in compliance and enforcement.

64.     When a *Mandatory* Rule is added or amended at the NAR level, each member Association and MLS must recertify its Rules (through NAR) to verify compliance with the mandated amendment.

65.     The structure includes control mechanisms to ensure compliance. NAR may enforce compliance of mandated Rules upon Associations and MLSs through

mechanisms that include withdrawal of NAR-provided liability and E&O insurance, cease and desist efforts, and, if unresolved, revocation of the NAR charter.

66.     Associations and MLSs respectively have  compliance and enforcement mandates, resources and mechanisms to ensure that their individual members abide by Mandatory Rules and COE.

67.     MLSs enforce compliance with MLS and IDX Rules through warnings, reprimands, fines, hearings, and, where warranted, membership termination.

68.     Associations are responsible for monitoring and enforcing their members' compliance with the Code of Ethics.

69.     Where an Association directly operates or controls an MLS, or where both are the same entity, those obligations (enforcement of MLS/IDX rule and COE) are combined within that Defendant.

70.     Disciplinary decisions and actions to address violations and non-compliance are made within each Association's governance structure by Realtor® members, where all — including the complainant and respondent — are themselves competitors for the same service in the same market.

71.     All participating members, as well as Associations and MLSs, operate under a set of defined rights and obligations through participation or membership agreements.

72.     These agreements include obligations to comply with its terms and to abide by applicable Rules and Regulations, including MLS and IDX Rules, and define the relationship between participant members and the Associations and/or MLSs.

73. MLSs provide data feeds (IDX or syndication) containing MLS data for participants to display on their own websites.

74. Members who receive IDX data enter into data licensing agreements with the MLS. MLSs also provide this data IDX feed to third-party *vendors* who provide products and services to Association members, including websites with integrated IDX display, lead capture tools, marketing tools, and CRM systems.

75. Members who use vendors enter into multi-party data licensing agreements involving the member, the MLS, and the *vendor* providing the service. These agreements require compliance with MLS Rules, including IDX Rules, and include mechanisms to address non-compliance.

76. Participation agreements and data licensing agreements establish a uniform framework under which members, vendors, and Associations operate, with an expectation of consistent application and enforcement.

77. Individuals serving on NAR's committees and boards, as well as those of affiliated Associations and MLSs, are real estate professionals or executives of brokerage firms who participate in the market. In those roles, they may have responsibilities to their own firms while also serving in governance roles with responsibilities to the Association or MLS.

78. Within this structure, these individuals may encounter situations in which a decision that advances the interests or policies (or legal risks) of the Association or MLS could have a different or adverse impact on their own firm or personal business interests.

16

This arises from the coexistence of their roles as market participants, organizational decision-makers, and enforcers.

79.     In summary, at the local and regional level, each Defendant is a collective of real estate professionals who operate within the same market, and whose decisions and actions are taken through their governance structures under their Rules and Regulations.

80.     Association Defendants, and MLSs through their affiliated Associations, participate in NAR's governance structure through representation in the Board of Directors, committees, and related bodies. NAR is composed of real estate professionals and representatives of Associations and brokerage firms that participate in the same market. Its governance structure includes representatives from Local, Regional, and State Associations, as well as large real estate organizations.

81.     This complaint addresses two levels of conduct. The first is at the Association or MLS level, where decisions and actions are taken under their respective Rules and Regulations, including those mandated by NAR. The second is at the NAR level, where representatives of those Associations and brokerage firms participate together within the same governance bodies in the decision-making process and adoption of Rules that are applied across Associations and MLSs.

82.     Plaintiff recognizes that a trade association necessarily acts through the collective decision-making of its members, and that not all collective decisions or joint actions by a trade association are anticompetitive or actionable.

83.     Liability arises where these collective decisions by horizontal market participants unreasonably restraint trade.

17

84. In Particular, Defendants promulgated mandatory rules expressly designed to mitigate anticompetitive practices, including commission-based steering, suppression of listing agent contact, and unfair barriers to alternative service models. Defendants then collectively — through their established governance processes — declined to implement or enforce those same safeguards.

85. That governance structure is the mechanism through which the concerted action occurred. The collective decision not to enforce (both at the Association and MLS level and at NAR level) - additionally occurring identically across multiple Defendants, under the same rules, at the same time - constitutes the concerted action challenged here.

## VII. CONCERTED ACTION

86. The concerted action alleged in this Complaint occurs at several distinct but related levels.

87. At the first level, each Association and MLS is itself a collective body composed of competing real estate professionals. When an Association's board decides not to investigate, not to pursue a complaint, or not to enforce a Rule, that decision is not the act of a single person. It is a collective decision made through the Association's governance structure by members who compete with each other and with Plaintiff in the same market.

88. The same is true for each MLS. Every enforcement decision — including the decision not to enforce — is a concerted action among the members who govern that body.

89.     At the second level, the Associations and MLSs participate jointly in NAR's governance structure. Through that structure, they collectively adopt Rules, collectively vote on amendments, and collectively determine enforcement policy at the national level.

90.     When NAR decides not to enforce a Mandatory Rule — or not to act against Associations that fail to enforce — that decision is made by a body composed of representatives of the same Associations and MLSs that are also failing to enforce at the local level. It is an additional concerted action among those Associations acting through their shared national organization.

91.     These two levels are not independent. A decision by NAR not to enforce flows downward and enables non-enforcement at the local level. A pattern of non-enforcement at the local level, reported to and known by NAR, that NAR then declines to address, constitutes a second layer of concerted inaction.

92.     Individual Associations do not need to have communicated directly with one another for concerted action to exist. Their joint participation in NAR's governance — where they sit together, vote together, and collectively set the rules and enforcement standards that govern all of them — is itself the mechanism of coordination.

93.     Each enforcement decision within Defendants' governance structures - including the decision not to enforce or to dismiss direct steering cases - is the product of a formal collective deliberative process. Complaints are filed, committees convene, deliberations occur, and a decision is reached through the governance structure. *There is no passive inaction.*

19

94.     Every instance of non-enforcement or dismissal is a decision that was made collectively, through an established process, with knowledge of what was alleged and what the Rules required. *That is a meeting of minds* consistent with concerted action - reached through the governance structures of organizations composed of direct competitors operating in the same market.

95.     The fact that the decision reached was consistently not to enforce, across multiple Defendants, under the same Rules, over the same period, and against the same category of conduct targeting a competing non-traditional service model, is what makes the decision not to act and the pattern actionable.

96.     The parallel and substantially identical pattern of non-enforcement across all Defendants, under the same Mandatory Rules, at the same time, and with knowledge of the same violations, is additional evidence consistent with concerted action. Each Defendant enforces the same rules the same way — or fails to — not because of coincidence, but because they operate within and through the same governance structure.

## VIII.  RELEVANT MARKET

97.     The *relevant product* market *is* residential *real estate brokerage services* for sellers seeking to list and sell residential properties and buyers looking to purchase those properties.

98.     Defendants and their members compete for sellers - for the listing inventory - and for buyers of those listings. Plaintiff competes in that same market, offering a limited-service at an affordable price point. The type or scope of service offered does not

20

change the market. Whether full-service or limited-service, all participants compete for the same sellers and the same buyers.

99.     *The relevant geographic market for each Defendant is the geographic area served by the applicable Defendant MLS and Association*, as identified in the Defendants section of this Complaint in Section IV. Residential brokerage competition is inherently local, and the service area of each Defendant MLS constitutes the area of effective competition in which brokers compete for listings and buyers and consumers seek brokerage services.

100.     Within each relevant geographic market, access to the MLS controlled by the applicable Defendant is indispensable to effective participation and for providing professional brokerage services. There is no practical substitute. Defendants exercise market power through that control, and no participant can compete effectively for the same sellers and buyers outside the structure Defendants govern.

101.     Entry into residential real estate brokerage as a licensed agent operating under the traditional full-service commission model is relatively straightforward. The barriers are low precisely because that model is what Defendants' structure is designed to accommodate and protect.

102.     Entry into the same market with a differentiated, lower-cost, or limited-service model is a different matter. Those barriers are high - not because of licensing requirements or capital costs, but because of the conduct challenged in this Complaint.

103. Non-enforcement of the rules addressed in this complaint diverts leads away from listing agents who operate outside the traditional structure. Messaging and publications by NAR and its members signal to consumers and participants alike that alternative models are inferior, risky, or disfavored. The combined effect is that a participant who enters the market with a differentiated service model faces structural disadvantages that a traditional full-service broker does not.

104. These are not natural market forces. They are the product of rules that Defendants adopted and then declined to enforce - rules that, if enforced, would have protected competition from alternative models.

105. The result is that the market remains tilted toward the traditional commission level and deal structure (double representation where sellers pays both sides of the commission) not because consumers prefer it, but because the conditions necessary for genuine competition from alternative models are systematically suppressed.

106. The absence of practical substitutes and dependence on MLS access further limit the ability of competitors or consumers to shift meaningfully away from these structures in response to normal unrestrained market forces

107. At the national level, Defendant NAR exercises substantial control over the structure, rulemaking, and mandatory policies governing affiliated Associations and MLSs. No practical substitute exists for participation within that structure for professionals seeking to compete effectively in the markets defined above.

22

## IX.   RELEVANT RULES

108.   All Rules addressed in this complaint are Mandatory, meaning that each Defendant must include them in its own Rules and Regulations, comply with them, and enforce them; and that each Defendants' members are required to comply with them and are subject to enforcement mechanisms in cases of non-compliance or violations.

109.   NAR has stated that its Rules are intended to foster a fair, transparent, and competitive real estate marketplace.

110.   For a Rule to achieve this intended function, it must be adopted by the rule-making body, complied with by the participants to whom it applies, and enforced by the entity responsible for enforcement.

111.   Commission steering is when a buyer's agent guides clients toward or away from specific homes based on the amount of commission offered by the seller to the buyer agent, rather than the client's stated preferences and needs.

112.   NAR states that commission steering is prohibited under Article 1 of the Code of Ethics and constitutes a violation under MLS Rules. The combination of an ethics provision and a rule is designed to curtail and prevent commission-based steering through their adoption, compliance, and enforcement.

### A.   Rule 1 - Commission-Based Steering Prohibition

113.   NAR's Code of Ethics, Article 1, requires Realtors® to protect the client's interests. Commission steering includes restricting access to properties that otherwise meet the buyer's stated criteria based on the level of compensation offered. NAR's publication "Get the Facts, NAR Settlement FAQs" clearly explains:

23

"-Under NAR's Code of Ethics, steering buyers based on the amount of broker compensation is prohibited.

-REALTORS® MUST pledge themselves to protect and promote the interests of their client, putting their client's best interests before their own. A REALTOR® must never put broker compensation before their client's interests …

-If a REALTOR® does anything to put their own (or another broker's) compensation before her client's interests, they are violating this primary code of ethics and potentially violating the broker's fiduciary duties to their client (depending on the broker-buyer relationship and state law). (Added 5/29/24)"[1]

114.   NAR's Code of Ethics applies to all Realtors® and is enforced by the Local and Regional Association to which the member belongs. The ethics enforcement process begins with the filing of a complaint, followed by a preliminary evaluation by a Grievance Committee, composed of Realtor® members, which determines whether the complaint is advanced to a hearing or dismissed.

115.   The Grievance Committee may request clarifications from the parties, may add or remove cited Articles, and may refer allegations that involve MLS rule violations to the MLS compliance structure.

116.   If the complaint is advanced, a Professional Standards Hearing Panel, composed of Realtor® members and presided over by a Realtor® member, conducts a hearing and renders a decision. The complainant may appeal the Panel's decision to the Association's BOD only for procedural deficiencies.

## B.   Rule 2 - MLS Rule Prohibiting Commission Filtering

117.   Section 21 of the 2024 MLS Handbook has the following Mandatory rule as Section 8.5:

---

[1] National Association of REALTORS®, *Settlement FAQs* (FAQ No 92) https://www.nar.realtor/the-facts/nar-settlement-faqs (last visited Apr. 24, 2026).

"MLS participants and subscribers must not, and MLSs must not enable the ability to, filter out or restrict MLS listings that are communicated to consumers or clients based on the existence or level of compensation offered to the cooperating broker or the name of a brokerage or agent. (Adopted 11/21, Amended 8/24) *M" (emphasis in red in the original)*[2]

118.   The MLSs are responsible for monitoring and enforcing compliance with the MLS Rules.

## C.   Rule 3 - Mandatory Buyer-Broker Agreement

119.   NAR's 2024 MLS Handbook includes as *mandatory* the following rule under Section 4, Written Buyer Agreements Required (Policy Statement 8.13),

> "Section 4 Written Buyer Agreements Required (Policy Statement 8.13) Unless inconsistent with state or federal law or regulation, all MLS Participants working with a buyer must enter into a written agreement with the buyer prior to touring a home. The written agreement must include:
> a. a specific and conspicuous disclosure of the amount or rate of compensation the Participant will receive or how this amount will be determined, to the extent that the Participant will receive compensation from any source.
> b. the amount of compensation in a manner that is objectively ascertainable and not open-ended.
> c. a term that prohibits the Participant from receiving compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer; and
> d. a conspicuous statement that broker fees and commissions are not set by law and are fully negotiable. *M" (emphasis in red in the original)*[3]

120.   NAR further rationalizes and represents how this rule would make commissions offered by sellers (or listing agents) irrelevant and how it eliminates steering:

---

[2] National Association of REALTORS®, *2024 Multiple Listing Policy Handbook*, § 21, Non-Filtering of Listings (Policy Statement 8.5), at 39 (Aug. 2024)
[3] National Association of REALTORS®, *2024 Multiple Listing Policy Handbook*, § 4, Written Buyer Agreements Required (Policy Statement 8.13), at 60 (Aug. 2024)

"Since a broker working with a buyer cannot receive more compensation than the buyer has agreed to in that agreement, the amount of any offer of compensation is irrelevant to the buyer-broker's compensation.
Under these practice changes, NAR has eliminated any theoretical steering because a broker will not make more compensation by steering a buyer to a particular listing because it has a 'higher' offer of compensation." (Added 5/29/24)[4]

121. This rule is monitored for compliance and enforced by the Local and Regional MLSs.

### D. Rule 4 - Mandatory IDX Display Rule (Broker Attribution)

122. This rule mandates specific information and prominence to be displayed by all IDX-fed websites. The rule reads:

"12. An MLS participant's IDX display must identify the listing firm, and the email or phone number provided by the listing Participant in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data." (Amended 11/21)[5]

123. NAR further describes the rule's intention as a consumer interest and transparency measure:

"The rule previously required that the listing broker needed to be identified. Now MLS participants will also have to display an email or phone number provided by the listing participant along with that brokerage name. The reasoning behind that is that some consumers have expressed concerns about their ability to get the questions answered and to get more information about the property, so rather than having the public hunt for information, contact information for the listing brokerage is going to have to be part of the display so as a last resource consumers have a way to contact the listing broker to get their specific questions answered."[6]

---

[4] National Association of REALTORS®, *Settlement FAQs* (FAQ No 93) https://www.nar.realtor/the-facts/nar-settlement-faqs (last visited Apr. 24, 2026).
[5] National Association of REALTORS®, *2024 Multiple Listing Policy Handbook, Policies Applicable to Participants' IDX Websites and Displays,* § 12 at 44. (August 2024)
[6] National Association of REALTORS®, *The MLS Hour* (Aug. 2022) (video), transcript at 32:47, https://www.nar.realtor/videos/the-mls-hour/the-mls-hour-august-2022 (last visited June 25, 2025, at 10:51 PM EST) (video no longer publicly available).

124. This rule must be monitored for compliance and enforced by the Regional and Local MLSs.

### E.   Rule 5 - MLS Antitrust Compliance Policy

125. The 2024 MLS Antitrust Compliance Policy in NAR's Multiple Listing Policy Handbook (2024), states in Part Two, Section A:

> "Boards and associations of Realtors® and their MLSs shall not: 1. Fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services. 2. Fix, control, recommend, or suggest the cooperative compensation offered by listing brokers to potential cooperating brokers."[7]

## X.   FACTUAL ALLEGATIONS

126. The following section sets forth factual allegations organized by Defendant and by Matter. Each Matter addresses a discrete set of facts, including, where applicable, conduct presented by Plaintiff to the relevant Association or MLS, the Rule implicated, and the resulting process, response, or decision. Certain Matters consist of statements, guidance, or public communications relevant to the conduct challenged herein.

127. These are not isolated incidents but representative matters for which Plaintiff filed complaints, made reports, or otherwise documented conduct and Defendants' responses, decisions, or inaction within their compliance and enforcement structures. Each *Matter* is pleaded individually to identify the specific Defendant, the specific Rule at issue, and the specific response or non-response that caused injury.

128. In each *Matter* below, the decision to dismiss or the decision to take no action was made by a body composed of the Plaintiff's direct horizontal competitors, who

---

[7] National Association of REALTORS®, *2024 Multiple Listing Policy Handbook*, Part Two: Policies, A. MLS Antitrust Compliance Policy, at 20 (August 2024)

share a common economic interest in suppressing the low-cost, flat-fee or limited service competition represented by the Plaintiff.

## A.    National Association of REALTORS® (NAR)

### Matter A.1   NAR Compensation and Transaction Structure Signaling. (MLS Antitrust Compliance Policy

129.    The NAR 2024 MLS Antitrust Compliance Policy, published in Part Two, Section A of the Multiple Listing Policy Handbook, states: "Boards and Associations of Realtors® and their MLSs shall not: "1. Fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services. 2. Fix, control, recommend, or suggest the cooperative compensation offered by listing brokers to potential cooperating brokers."[8]

130.    A Realtor.com® consumer article titled "How Much Are Closing Costs? Plus: How To Avoid Closing Costs", states: "...sellers typically pay all real estate agents' commissions, which amount to 4% to 7% of the home's sales price."[9] The article is copyrighted by NAR and published on Realtor.com®,

131.    All Realtor.com's content (mentioned in these factual allegations) contains the following Copyright disclosure as footer on every page"© 1995–2025 *National Association of REALTORS®* and Move, Inc. All rights reserved.".

---

[8] National Association of REALTORS®, *2024 Multiple Listing Policy Handbook*, Part Two: Policies, A. MLS Antitrust Compliance Policy, at 20 (August 2024)
[9] Realtor.com, How Much Are Closing Costs? Unpack Fees and Hidden Charges, (November 13, 2024) , https://www.realtor.com/advice/buy/reduce-closing-costs/ (last visited April 24, 2026)

28

132.    A Realtor.com® article titled: "While the standard commission is often between 5% and 6% of the sale price (split between buyer's and seller's agents), the actual rate depends on: Local market conditions, Agent experience, Scope of services."[10]

133.    A Realtor.com® article, titled "How Much Does It Cost to Sell a House?" states: "On average, home sellers pay their listing agent a commission amounting to about 6% of the price of their home (although that percentage can vary). On a $250,000 house sale, this amounts to roughly $15,000."[11]

134.    An eBook titled "First-time Homebuying 101," published by the editors at Realtor.com® and available for free download in English and Spanish, linked directly from NAR's own website (nar.realtor) through a Realtor® Magazine article titled "Realtor.com® Aims to Close the Gap in Homeownership," states: "As a homebuyer, you're in luck: Usually, the seller pays the real estate commission. Here's how it usually works: The commission is split at the settlement table between the seller's agent and the buyer's agent. So, let's say you're a home seller, and your agent charges you a 6% commission to sell your $200,000 home. The agent then has to split that 6% ($12,000) with the buyer's agent. If the split is 50/50, this would leave the buyer's agent with 3% ($6,000)." The Spanish-language version of the eBook contains the same translated commission structure and pricing.[12]

---

[10] Realtor.com, Who Pays the Real Estate Commission and Closing Costs (November 3, 2025), https://www.realtor.com/advice/finance/realtor-fees-closing-costs/ (Last visited April 24, 2026)

[11] Realtor.com, How Much Does It Cost to Sell a House? (July 27, 2022), https://www.realtor.com/advice/sell/how-much-does-it-cost-to-sell-a-house/ (last visited April 25, 2026)

[12] *First-time Homebuying 101*, Realtor.com® editors, https://www.realtor.com/ebook/ (English PDF: https://b2cdata.marketing.moveaws.com/mk/images/ebook/FTHB-101-ebook.pdf; Spanish PDF: https://b2cdata.marketing.moveaws.com/mk/images/ebook/FTHB-101-libro.pdf); linked from Realtor® Magazine, *Realtor.com® Aims to Close the Gap in Homeownership*, linked via: https://www.nar.realtor/magazine/real-estate-news/law-and-ethics/realtorcom-aims-to-close-the-gap-in-ho

29

135.    A video published by Realtor.com® under the series "House Rules, Advice from real estate pros" titled: "Just how Much and Closing Costs - and Who Pays for Them" at minute 2:30 it states "Keep in mind that sellers typically pay all real estate agents commissions, which amounts to 4% to 7% of the home sales price"[13]

136.    The NAR 2024 Multiple Listing Policy Handbook, at page 30, contains a mandatory rule enacted in November 2021 following a Department of Justice antitrust inquiry, which states: "MLS participants and subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the participant or subscriber will receive no financial compensation from any source for those services." M[14]

137.    A NAR-published article titled "Home Sellers: What the NAR Settlement Means," available on nar.realtor, states that sellers should offer buyer-agent compensation "as a way of marketing your home or making your listing more attractive to buyers."[15]

138.    An Op-Ed authored by NAR President Kevin Sears, published in the Dallas Morning News, states: "If you bought a home in the past, you probably didn't pay out of pocket for your agent's services. The seller's agent likely shared their commission with the buyer's agent to compensate them for the value they brought to the transaction. In the industry, these are known as 'offers of compensation,' and at the National Association of

---

meownership (last visited April 24, 2026) and linked from: https://mediaroom.realtor.com/2022-04-07-Realtor-com-R-Drives-to-Close-the-Gap-of-Homeownership-in-America (last visited April 24, 2026)

[13] Realtor.com, *Just How Much Are Closing Costs—and Who Pays for Them* (YouTube video May 3, 2021), YouTube, at 2:30, https://www.youtube.com/watch?v=ncz_Jb9dEz8 (last visited Apr. 24, 2026)

[14] NAR, *2022 Multiple Listing Policy Handbook*, Other Advertising Issues Section 6 Services Advertised as "Free" (Policy Statement 8.4) at 47 (August 2024),

[15] NAR, *Home Sellers: What the NAR Settlement Means*, https://www.nar.realtor/the-facts/home-sellers-what-the-nar-settlement-means (last visited Apr. 24, 2026).

REALTORS®, we believe these remain an important option for agents, buyers and sellers. At their core, these offers of compensation provide access. Some buyers, especially first-time or lower-income buyers, may not have the upfront cash to compensate a real estate professional… Offers of compensation have clear benefits for sellers as well. By expanding access to a greater number of prospective buyers, they drive competition and help sellers get the best offer for their property."[16]

139.    NAR Chief Economist Lawrence Yun stated in a publicly released podcast interview: "…if the buyer have to pay out of their pocket to their agent, essentially you are denying the people in more moderate wealth circumstances, which in the U.S. is substantially minority homebuyers." During the same interview, Yun stated: "The real estate profession is one of the most competitive out there. It's almost like, economic textbook definition of perfect competition... I thought the market was competitive, but I guess the lawyers can always convince few people to get the verdict they want."[17]

140.    The D.A.N.G.E.R. Report (Definitive Analysis of Negative Game-Changers Emerging in Real Estate), Commissioned by NAR, Sections B5 ("New Business Models Go Mainstream") and B8 ("FSBO Develops into a Do-It-Yourself

---

[16] Kevin Sears, Op-Ed, Dallas Morning News (Sept. 5, 2024), https://www.dallasnews.com/opinion/commentary/2024/09/05/buying-a-house-new-changes-will-bring-transparency-and-choice (last accessed at: https://www.removepaywall.com/search?url=https://www.dallasnews.com/opinion/commentary/2024/09/05/buying-a-house-new-changes-will-bring-transparency-and-choice on April 26, 2026).
[17] Freakonomics Radio, *Are Realtors Having an Existential Crisis?,* (Episode 618, January 17, 2025), https://freakonomics.com/podcast/are-realtors-having-an-existential-crisis/ (statement by Lawrence Yun, Chief Economist, NAR) (Last visited on April 26, 2026).

Model"), at pages 53 and 58 (2015), identifies flat-fee business models and enhanced For

Sale By Owner alternatives as threats and dangers to the industry.[18]

141.    On March 10, 2025, NAR launched a national consumer advertising

campaign titled "Right by You,"[19], it has two 30-second television spots under the theme

"Don't DIY"  - one depicting a residential transaction[20], one a **commercial** transaction -

airing across broadcast, streaming, radio, and audio platforms nationwide.

142.    **Matter A.2   NAR concerning Buyer-Broker Agreements.**

143.    On April 2, 2025, Plaintiff contacted NAR Member Policy asking how the

buyer-broker compensation cap is monitored and enforced. Plaintiff was approaching

closing on a transaction and had been unable to obtain verification from the MLS that the

compensation the seller agreed to pay did not exceed the buyer agent's agreed cap. The

MLS sent Plaintiff to the title company. The title company sent Plaintiff back to the MLS.

The MLS sent Plaintiff to the Board. No entity had a procedure in place.

144.    On April 4, 2025, NAR's Manager of Policy Information, Christopher

Harrigan, responded in writing that the buyer-broker compensation arrangement is "a

matter of privacy between those two parties" and that "there is nothing in the settlement

agreement that dictates that the compensation paid by a listing broker to a buyer broker

---

[18] *D.A.N.G.E.R. Report: Definitive Analysis of Negative Game-Changers Emerging in Real Estate* §§ B5, B8, at 53, 58 (2015).
https://www.dangerreport.com/wp-content/uploads/2024/07/Danger-Report-ItemE135-107.pdf (Last Visited on April 26, 2026)
[19] NAR Magazine, *NAR's New 'Right by You' Campaign: How Hard Could It Be?*, (March 10, 2025) https://www.nar.realtor/magazine/real-estate-news/nar-new-right-by-you-campaign-how-hard-could-it-be
[20] NAR, *"Right by You"* – Don't DIY, YouTube, https://www.youtube.com/watch?v=HQufP-SUDp0; (YouTube video Mar 24, 2025) (Last visited April 26, 2026),

be equal to or greater/less than the amount a buyer broker will earn by representing their buyer."

145.    On April 4, 2025, Plaintiff replied citing NAR's own FAQ #86 and FAQ #93, which state that "MLS Participants may not receive compensation for brokerage services from any source that exceeds the amount or rate agreed to in the agreement with the buyer." Plaintiff noted that NAR's written response directly contradicted NAR's own published FAQs and the terms of the settlement, and requested a formal clarification and information on the enforcement mechanism.

146.    On April 7, 2025, Harrigan responded without addressing the contradiction or the enforcement question.

147.    On April 9, 2025, Plaintiff and Harrigan spoke by phone. Following the call, Plaintiff sent a written summary noting that during the call Harrigan had stated that NAR's interpretation of "any source" does not include listing brokers or sellers — again contradicting NAR's own FAQs. Plaintiff formally requested in writing: (1) clarification as to whether "any source" includes sellers and listing brokers; and (2) information on how the rule is being monitored or enforced.

148.    On April 10, 2025, Harrigan confirmed in writing that "any source" does include compensation from sellers and listing brokers, acknowledging his prior example had not made that clear. Harrigan did not address the monitoring or enforcement question.

149.    On April 14, 2025, Plaintiff followed up in writing, adding Rodney Gansho, Senior Director of Engagement at National Association of REALTORS®, to the thread,

33

and reiterated the outstanding question on monitoring and enforcement protocols issued to Associations and MLSs.

150. On April 17, 2025, Harrigan responded requesting a phone call before providing a written response.

151. On April 21, 2025, Plaintiff declined and reiterated the request for a written response, citing the need for accountability and accuracy in communications with the MLSs.

152. On May 2, 2025, Harrigan provided NAR's final written response: "Compensation is a matter of negotiation and contract between the parties... If there is a breach of an agreement, then the parties can take appropriate action which includes any proper legal recourse, an ethics complaint, or contacting the appropriate state or local agency."

153. NAR provided no information about any monitoring protocol, enforcement mechanism, or guidance issued to Associations or MLSs for verifying compliance with the buyer-broker compensation cap.

**Matter A.3   Concerning Commission Steering.**

154. On August 25, 2024, Plaintiff contacted NAR Member Policy to report an instance of steering and request action. Plaintiff had offered 1.75% compensation to a buyer agent on one of his listings. The buyer agent responded: "They are not interested in paying me as buyers broker and with your compensation program I don't work for nothing but I do appreciate you getting back to me and sharing your information. Good Luck with your properties." Plaintiff notified NAR that this conduct directly undermines

34

forwarded to the Professional Standards department for further assistance with the ethics complaint process. No specific anti-steering rule was identified.

**Matter C.2    Concerning IDX Display**

172.    September 2, 2024: Plaintiff contacted BeachesMLS IDX Department reporting that the IDX feed generated via Matrix did not display the listing firm's name and email or phone number as required by IDX rules, and asked how to comply if using the iDX feed provided if the feed itself did not include this information.

173.    September 4, 2024, BeachesMLS (Sarah Chenoweth) acknowledged the issue, stated the basic display should be "courtesy of listing brokerage," and forwarded the matter to their vendor for research.

174.    September 4, 2024, Chenoweth clarified that if Plaintiff's concern was a compliance violation on BeachesMLS-hosted data, BeachesMLS would not file a complaint against Plaintiff.

175.    September 4, 2024, Plaintiff clarified that the concern was not about his own compliance - Plaintiff was reporting that BeachesMLS was not providing or enforcing the listing firm contact disclosure on participant websites as required by NAR and the MLS's own rules, and requested to be advised when the issue would be addressed.

176.    September 4, 2024, 5:07 PM: BeachesMLS confirmed a ticket had been opened with Matrix and escalated.

177.    No further response was ever received.

**D.**      **Miami Association of REALTORS®, Inc.**

**Matter D.1   Concerning Commission Steering**

178.   December 8, 2024: Plaintiff contacted Miami Association of REALTORS Professional Standards reporting multiple instances of buyer agents steering buyers away from Plaintiffs listings due to low or no commission offered. Plaintiff requested identification of the specific, explicit rule or Article prohibiting commission-based steering so he could cite it in ethics complaints, noting that the settlement Facts page confirmed steering was prohibited but could not itself serve as the citation for an ethics complaint.

179.   December 9, 2024, 10:19 AM: Miami REALTORS Professional Standards (Maggie Curiel) responded that Professional Standards cannot provide advice and must remain neutral. Directed Plaintiff to NAR's Code of Ethics and NAR's Case Interpretations generally. Did not identify any specific Article or Rule prohibiting steering. Required Plaintiff to complete the Ombudsman Process before any ethics complaint could be filed.

180.   December 9, 2024, 12:59 PM: Plaintiff replied clarifying he was not seeking advice and was not asking about the settlement. He knew steering was prohibited but needed the specific Article or Rule citation to file a complaint and could not locate it. He again asked to be pointed to the specific rule.

181.   December 10, 2024: Miami REALTORS (Maggie Curiel) again responded that Professional Standards cannot provide advice and must remain neutral. Again directed Plaintiff to NAR's Code of Ethics and NAR's Case Interpretations without

40

identifying any specific provision. Reiterated that Ombudsman completion was required before any ethics complaint could be filed.

182. No specific anti-steering rule was identified and no enforcement action was taken.

**Matter D.2   Concerning Buyer-Broker Agreement**

183. December 14, 2025: **Plaintiff** submitted a complaint to Miami Association of REALTORS (violations@miamire.com and MLS@miamire.com) reporting a Buyer-Broker Agreement violation.

184. A buyer agent had voluntarily provided a copy of a signed BBA while scheduling a showing on one of Plaintiff's listings. The attached agreement - an Exclusive Buyer Brokerage Agreement (Florida Realtors Form EBBA-7tb, Rev. 7/24) between consumer (buyer) and Respondent's Firm, had the compensation fields in Section 7 left blank, with no specific dollar amount or percentage specified for the buyer agent's compensation. The only compensation figure appearing in the agreement was a $580.00 administrative fee in Section 7(e). Section 13 further stated that commission would be "negotiated between consumer and broker" on properties where sellers did not offer it. Plaintiff requested that Miami Association review the agreement and advise what corrective action would be taken.

185. No response was received. On January 2, 2026, Plaintiff re-sent the notice of violation to the same recipients, referencing the prior December 14 submission and again requesting to be advised of any action taken.

186. No response was ever received.

41

**Matter D.3**

187.   March 16, 2025: Plaintiff contacted BeachesMLS/RWorld Compliance reporting that a specific buyer agent may have been working with buyers without an executed BBA, or alternatively had negotiated seller compensation exceeding the amount agreed with the buyer in the BBA. Plaintiff requested verification of the BBA execution date and the compensation amount agreed between buyer and agent.

188.   March 17, 2025: BeachesMLS/RWorld Compliance (Chelsea Kent, VP MLS Policy) requested agent and transaction details. Plaintiff provided the agent's full name, MLS ID, and license number, and reiterated the request for confirmation of BBA execution date and agreed compensation amount. BeachesMLS Compliance (Ellie Ovilma, MLS Compliance Coordinator) determined the agent was a member of the Miami Association - not BeachesMLS - and transferred the matter to Miami Association of REALTORS, copying Plaintiff.

189.   March 18, 2025: Miami Association MLS Director Ivette Sostre responded that she would contact the agent and office per MLS protocols and provide an update within two business days, and directed Plaintiff to Professional Standards if he wished to file an ethics complaint. Later the same day, Sostre confirmed in an update to Request that she had contacted the office and requested documentation.

190.   No response to the follow-up was received.

**Matter D.4   Ethics Complaint - Commission Steering**

191.   December 21, 2024: Plaintiff filed an ethics complaint after Respondent conditioned showing Plaintiffs property upon upfront commission offer. Plaintiff asked

whether the seller was offering buyer-agent compensation. The plaintiff replied: "Juan hello. There might be a commission offered, but how would the offering of a commission influence you showing this property to your seller?" Mejía responded: "You can represent a buyer who asks you not to show properties that do not offer compensation. This is how it influences. If you would like to have a more detailed conversation. Feel free to contact me anytime. Good Luck."

192.    January 9, 2025: Grievance Committee dismissed the complaint, finding the allegations did not demonstrate a possible violation of the Code of Ethics. No referral to the MLS for MLS filtering Rule violation or Buyer Broker agreement Violation.

E.    **Orlando Regional REALTOR® Association, Inc.**

**Matter E.1   Ethics Complaint Concerning Commission Steering**

193.    September 17, 2024: Plaintiff filed an ethics complaint under Article 1. Respondent, after learning of the commission offered, emailed Plaintiff: "I don't work for 1.75% sorry take care!"

194.    October 14, 2024: Grievance Committee dismissed the complaint, finding the allegations did not demonstrate a possible violation. No referral was made to the MLS for violation of Commission Filtering Prohibition rule.

195.    October 19, 2024: Plaintiff appealed. The Board of Directors granted the appeal, reversed the Grievance Committee's dismissal, and referred the matter for a ethics hearing.

196.    October 30th, 2024: Respondent waived the right to a hearing and acknowledged the conduct alleged in the complaint.

197. November 13, 2025: Ethics Hearing Panel found Respondent in violation of Article 1 of the Code of Ethics for "failing to have the best interest of their client by considering their own financial interest before the client's interest." The Panel found the violation "relatively minor" and issued: a letter of warning to remain on record for one year, a mandatory 4-hour education course on professionalism and customer service, and a fine of $250 plus an administrative fee of $500.

198. No referral to the MLS for the parallel MLS rule violation was made.

**Matter E.2   Ethics Complaint - Commission Steering**

199. January 9, 2025: Plaintiff filed an ethics complaint under Article 1. Ferngren emailed Plaintiff: "Commission offered not enough to meet the buyer/broker agreement we have with our buyer." Plaintiff replied: "What do you mean? Isn't your buyer paying you?" Ferngren explained: "They have asked to only pursue homes where the seller is paying the commission (like it's been since forever)."

200. January 15, 2025: Grievance Committee dismissed the complaint. No referral to the MLS.

**F.     My Florida Regional MLS, Inc. (d/b/a  Stellar MLS)**

**Matter F.1   Concerning Buyer Broker Agreement**

201. December 9, 2024, 3:48 PM: Plaintiff contacted Stellar MLS Compliance reporting that Stellar MLS member was attempting to negotiate a transaction on Plaintiff's listing, while requesting seller-paid buyer-agent compensation without a pre-executed Buyer-Broker Agreement (BBA). Plaintiff requested urgent confirmation that the BBA had been executed prior to buyer engagement and that the compensation

amount requested from the seller did not exceed the amount negotiated with the buyer, as required..

202.  December 9, 2024, 4:46 PM: Stellar MLS (Connie Kazakowitz, Sr. Manager, Admin & Data Integrity) responded that the buyer's agent was not required to provide a copy of the BBA to the listing agent or broker — that information could only come directly from the list agent or broker. Stellar MLS offered a complaint filing process but stated all information received would be kept confidential from both parties

203.  No verification of BBA pre-execution was provided and no enforcement action was taken in response to the reported violation.

**Matter F.2   Concerning Uneven enforcement and IDX Display Rule**

204.  September 26, 2024: Stellar MLS issued Plaintiff a compliance notice, citing a violation of Article 4.6 for including contact information in the public remarks field, with a fine threatened if not corrected.

205.  Plaintiff immediately corrected removed the information to avoid the fine but simultaneously wrote to Stellar MLS Compliance raising the disparity in enforcement: Stellar MLS had promptly and repeatedly cited Plaintiff for including contact information in an internal MLS field, while taking no action on Plaintiff's prior reports that Stellar MLS was not enforcing the IDX display rule requiring that same contact information to be prominently displayed on participant websites. Plaintiff asked Stellar MLS to explain why the IDX display rule was not being enforced as strictly as the rule for which Plaintiff was cited.

206. October 2, 2024: Plaintiff followed up asking for a response. Stellar MLS (Data Integrity Team) responded that Stellar MLS does not control what is placed on participant websites and that what appears on a company's own website is outside its jurisdiction.

207. No enforcement action on the IDX display rule was taken and no explanation for the enforcement disparity was provided.

**Matter F.3  Concerning IDX Rule**

208. September 12, 2024: Plaintiff contacted Stellar MLS Data Services reporting that Stellar MLS participants using the IDX feed were not displaying the listing firm's name and email or phone number as required by MLS Grid and NAR IDX rules, and requested a contact for prompt resolution.

209. September 13, 2024, 7:30 AM: Stellar MLS (Christopher Hilson, Data Services Administrator) responded that Plaintiff could report specific non-compliant websites to Data Services for individual investigation and correction. September 13, 2024, 8:08 AM: Plaintiff replied that the non-compliance was widespread — almost none of the members using the IDX feed were complying.

210. September 13, 2024, 8:46 AM: Stellar MLS (Hilson) responded that due to the number of sites carrying IDX they may not have audited them yet, and again offered to conduct site-by-site audits upon individual reports.

211. October 2, 2024: Stellar emailed: "Thank you for contacting Compliance. We understand your concerns in regard to IDX feeds. Stellar MLS does not control what is put on the websites of a company . Our rules state that in the MLS you cannot

46

212. have your contact information which is why you received a fine. However, If you have, your own website and put contact information on it is out of our jurisdiction.

213. Plaintiff replied to Stellar MLS's "outside our jurisdiction" response, clarifying that Stellar MLS had misunderstood his concern. Plaintiff acknowledged his own violation was corrected, and re-stated that his concern was selective enforcement: Stellar MLS was actively and automatically citing and fining Plaintiff for internal MLS rule violations while taking no action on the IDX display rule, for which enforcement obligation rested with Stellar MLS regardless of what participants put on their own websites. Plaintiff specifically identified Realtor.com, Zillow, and Trulia as examples of high-traffic sites displaying Stellar MLS-sourced IDX feeds without the required listing firm contact information, and demanded equal enforcement across all members.

214. October 7, 2024: Stellar MLS responded that Plaintiff's email had been escalated to management for clarification on IDX rules.

215. No further response or enforcement action followed.

**G.    Naples Area Board of REALTORS® and Association of Real Estate Professionals, Inc. (NABOR®),**

**Matter G.1   Concerning Buyer-Broker agreement and Commission Filtering**

216. March 16, 2025: Plaintiff contacted Royal Palm Coast Realtor Association, Inc. (RPCRA) MLS Compliance reporting that a buyer agent may have been working without an executed BBA or may have negotiated seller-paid compensation exceeding the amount agreed with the buyer. Plaintiff asked for the process to verify compliance.

47

217. March 17, 2025: RPCRA MLS Administrator Amy Newton directed Plaintiff to file with MLS Compliance, quoting Section 5.2 of the MLS Rules on Disclosure of Compensation, and suggested consulting the legal hotline (of Florida Association of Realtors) for questions about whether the compensation received exceeded the BBA amount.

218. March 17, 2025: Plaintiff filed a formal compliance request with RPCRA MLS, identifying the buyer agent by name, MLS ID, brokerage, and email, and the buyers and property. Plaintiff requested three specific data points: (1) whether an executed BBA existed; (2) the execution date; and (3) the compensation amount agreed in the BBA.

219. March 18, 2025: RPCRA Compliance identified Respondent as a member of the Naples Area Board of REALTORS (NABOR), not RPCRA, and transferred the matter to NABOR MLS, copying mls@nabor.com. Newton clarified that although they share the same MLS, the associations are separate boards, and MLS violations are reported to the board of which the participant is a member.

220. April 1, 2025: Plaintiff — approaching closing date for the same transaction at issue - separately contacted title company Premier Reputation Title Agency (Brenda Burdier, Director of Sales and Marketing), copying NABOR MLS, asking how the title company verifies that the buyer agent does not receive compensation from the seller exceeding the amount agreed in the buyer-broker agreement, as required under NAR's post-settlement rules. Plaintiff cited NAR FAQ directly: "MLS Participants may

not receive compensation for services from any source that exceeds the amount or rate agreed to in the buyer agreement."

221.   April 1, 2025: The title company responded: "We don't determine or verify compensation compliance under the new NAR rules. NAR has indicated that broker-to-broker compensation agreements may be reflected in closing documents - like the executed Settlement Statement. Our role as Title and Escrow is to follow the Compensation Disbursement Authorization (CDA) forms provided by the brokers." The title company directed further questions to NABOR.

222.   April 2, 2025: NABOR MLS Director Cindy Cornman responded: "*We don't determine or verify compensation compliance under the new NAR rules... It is broker to broker*." NABOR directed Plaintiff back to the title company and to his own board for guidance.

223.   April 2, 2025: Plaintiff replied noting the circularity - NABOR said the title company verifies; the title company said it does not - and asked directly whether the compensation cap rule was therefore unenforceable.

224.   Plaintiff stated that the MLS, as the entity bound by NAR's rules, was the appropriate body to seek clarification from NAR on compliance, verification, and enforcement protocols.

225.   April 2, 2025: Cornman replied: "As I said in the previous email, I am not going to discuss this any further. We are following the guidelines set by NAR. You can take any further questions to the legal hotline, as we will not comment on compensation."

49

226.    No verification of BBA compliance was conducted, no enforcement action was taken, and no entity identified a mechanism by which the compensation cap could be verified or enforced at closing.

**H.    Northeast Florida Association of REALTORS®, Inc.**

**Matter H.1   Concerning Commission Steering, Buyer Broker Agreement**

227.    January 10, 2025: Plaintiff filed an ethics complaint under Articles 1, 3, and 12.

228.    Via text message exchange, Respondent wrote: "The compensation is a joke...I'll see if my buyers want to see it but I will be requesting more compensation if my buyers put in an offer" ... "Seller paying compensation is standard in Florida" ... "My question is what did you do prior to August 17th? Did you put 0% in the mls lol" ... "I have sold 5 houses in the last month and sellers paid commission in all of them."

229.    When Plaintiff asked whether she had a buyer-agent agreement, Mattingly replied: "Yes but that's between my buyer and I. I am allowed to ask what the seller is paying and they may not even want to see it if knowing they would have to come out of pocket." ... "By standard I meant typical as far as I have seen here in Jacksonville since Aug 17th."

230.    February 14, 2025: Grievance Committee dismissed the complaint. The Committee wrote: "The Committee did not find, according to their interpretation, that the allegations, and/or facts given, demonstrated a possible violation of the Code of Ethics and dismissed the complaint."

231. No referral to the MLS for No Commission Filtering rule or Buyer-Broker Agreement violation..

## I.    Northeast Florida Multiple Listing Service, Inc. (d/b/a RealMLS)

### Matter I.1    Concerning IDX Display Violation

232. September 17, 2024: Plaintiff contacted realMLS (Joe Balla, IDX Administrator) reporting widespread non-enforcement of the mandatory IDX listing firm contact display rule, noting NAR had referred him back to the MLS. Balla responded asking Plaintiff to send specific non-compliant sites.

233. September 18, 2024: Plaintiff replied identifying Coldwell Banker, Keller Williams, Redfin, Zillow, Berkshire, Better Homes, and Century 21 as non-compliant, noting that realMLS's own IDX-feed Lite Link tool (provided to members for IDX display in their own websites) did not include the required information.

234. September 27, 2024, 11:26 AM: realMLS COO Kimberly Wiggins responded characterizing the rule as requiring only display of brokerage or agent name, and stating that the 2022 NAR change only required MLSs to provide a voluntary "Broker Attribution" opt-in tool - with enforcement conditioned on brokers choosing to participate. Only 11 brokerages had opted in.

235. September 27, 2024, 1:19 PM: Plaintiff corrected Wiggins directly, citing the NAR 2024 Handbook and realMLS's own August 17, 2024 Rules and Regulations (page 26), all of which mandated display of listing firm email or phone number with no opt-in condition.

236.   September 27, 2024, 1:47–2:12 PM: Wiggins maintained the opt-in position, said vendors would be given a few days to resynch data, and stated webmaster notifications would be sent if the display did not appear.

237.   No enforcement action was confirmed.

## J.   Royal Palm Coast REALTOR® Association, Inc. (RPCRA)

### Matter J.1   Ethics Complaint Concerning Commission Steering and BUyer Broker Agreement Violation

238.   December 20, 2024: Plaintiff filed an ethics complaint under Article 1.

239.   A Realtor inquired about a property listed by Plaintiff. When Plaintiff asked when Respondent wanted to show the property, Respondent replied that his buyers had signed an agreement with a clause stating they do not wish to view properties where the seller or seller's brokerage is not offering buyer-agent compensation, and that he needed "at least 2.5%.".

240.   Plaintiff explained that seller might help with commission but could not commit to a specific amount without seeing the full offer terms, and again asked when Bonacolta wanted to show.

241.   Bonacolta replied: "It sounds like this is going to be a difficult process. There are lots of other homes out there."

242.   December 31, 2024: Grievance Committee dismissed the complaint, finding the allegations did not demonstrate a possible violation of the Code of Ethics.

243.   No referral to the MLS for Commission Filtering or Buyer-Broker Agreement rules violations.

244. January 7, 2025: Plaintiff appealed. The Board of Directors denied the appeal and upheld the Grievance Committee's dismissal. Case dismissed.

**K.    Florida Gulf Coast Multiple Listing Service, Inc. (FGCMLS)**

**Matter K.1   Concerning IDX display Rule Violation**

245. September 6, 2024: Plaintiff contacted RPCRA MLS reporting that the IDX feed generated via Matrix did not display the listing firm's email or phone number as required by NAR IDX rules, and asked how to comply.

246. September 9, 2024: RPCRA MLS Tech/Data Administrator Luis Espinoza responded that IDX displays show "Courtesy of [listing office]" - not the email or phone number required by NAR's IDX rule.

247. Plaintiff replied acknowledging the response but noting that "Courtesy of" alone did not satisfy the NAR IDX requirement for a prominently displayed email or phone number, and again asked for guidance.

248. September 11, 2024: Plaintiff followed up noting he had received no response to his prior reply and again requested a contact to resolve the compliance issue.

249. September 12, 2024: RPCRA (Espinoza) acknowledged that the MLS Director was aware and someone would follow up shortly.

250. No further response was ever received.

**L.    Central Panhandle Association of REALTORS®, INC. (CPAR)**

**Matter L.1   Concerning Commission Steering**

251. On December 8, 2024, Plaintiff contacted Kaydee Albritton, Chief Executive Officer of Central Panhandle Association of REALTORS® (CPAR), and Rain

Pickle, Director of MLS and Member Services, reporting multiple instances of buyer agents steering buyers away from Plaintiff's listings due to low or no upfront commission. Plaintiff requested that CPAR identify the specific rule that expressly prohibits commission-based steering so Plaintiff could cite it in ethics complaints.

252. On December 9, 2024, Albritton forwarded the message to Rain Pickle. On the same date, Pickle, Director of MLS and Member Services, responded: "As of right now, there is no direct verbiage in the code that talks about steering, but this issue may fall under Articles 1 and 3."

253. No corrective action was taken.

**Matter L.2   Concerning Commission steering**

254. August 30, 2024: Plaintiff contacted CPAR MLS Director Rain Pickle asking whether a specific complaint mechanism existed for steering violations under the NAR settlement and whether NAR had issued directives for handling such violations.

255. CPAR directed Plaintiff to file a standard ethics complaint through the existing ethics process and provided a link to the NAR Settlement FAQ. No separate enforcement mechanism for steering violations was identified.

**Matter L.3   Ethics Concerning Commission Steering and Buyer Broker agreement**

256. December 20, 2024: Plaintiff filed an ethics complaint under Article 1.

257. On November 29, 2024, Respondent emailed Plaintiff regarding one of his listed properties: "Is the seller offering buyer's brokerage compensation? If so, what is the amount please?"

54

258. Plaintiff responded that the owner might consider co-brokerage depending on the full terms of the offer but was not offering any compensation upfront, and asked when Abbott would like to show.

259. Abbott replied the same day: "We have decided not to show it since they don't offer any compensation. Good luck."

260. January 16, 2025: Grievance Committee recommended the case be referred for a hearing and added Article 3 as an additional count.

261. February 28, 2025: Hearing Panel found no violation. Respondent presented a buyer-broker agreement containing an added clause reading: "Buyer Broker compensation will be paid by the Seller. Buyers Realtor will show properties that meet the search criteria for the buyer and or on their list that seller offers Buyer Broker Compensation."

262. The Hearing Panel accepted Respondent's position that this was a buyer instruction.

263. No sanction was issued and no referral to the MLS for Commission Filtering of buyer-Broker Agreement violation.

## M. Space Coast Association of REALTORS®, Inc.

### Matter M.1 Ethics Complaint Concerning Commission Steering and Buyer Broker Agreement Violation

264. August 29, 2024: Plaintiff filed an ethics complaint under Article 1.

265. After discussing property details (for a property listed by Plaintiff) via email, Respondent wrote: "Jorge. They are not interested in paying me as buyers broker

and with your compensation program I don't work for nothing but I do appreciate you getting back to me and sharing your information. Good Luck with your properties."

266. October 30, 2024: Hearing Panel - to which Respondent waived his right to a hearing - found no violation. The Panel wrote: "The standard of proof, defined as clear, strong, and convincing evidence, was not provided by the Complainant. There was no proof submitted stating the Respondent 'refused' to show the property due to the compensation package as stated in the allegations. The evidence submitted does not reveal what the compensation was nor why the property was not shown."

267. Case dismissed. No referral to MLS for Buyer-Broker agreement violation or Commission Filtering Rule Violation

**N.     Space Coast Multiple Listing Service, Inc.**

**Matter H.1   Concerning IDX Display Rule**

268. On September 4, 2024, Plaintiff contacted NAR Member Policy regarding IDX feed issues observed across multiple MLSs - specifically that IDX-fed websites were not displaying the listing broker's contact information as required by the IDX display rule.

269. On September 5, 2024, NAR's Christopher Harrigan responded that local MLSs own and operate their MLSs and are solely responsible for providing feeds to participants. NAR took no action and directed Plaintiff to raise the issue with the local MLS directly, copying Space Coast Association staff on the reply.

270. On September 6, 2024, Karen Tabet, MLS Specialist at Space Coast Association of REALTORS®, asked Plaintiff how she could help with the IDX feed.

56

271. Plaintiff replied the same day explaining that the IDX link generated through Flex does not display the listing firm's email or phone number in a prominent location as required by NAR's IDX rules. Plaintiff noted that IDX-fed sites are structured to generate buyer leads for buyer agents - in part by not prominently displaying listing firm contact information - causing buyers to be steered away from Plaintiff's lower-commission listings. Plaintiff stated his business model depends on compliance with this rule and that non-enforcement was directly harming his business.

272. Karen Tabet replied, referring the matter to CEO Lindsey Ruschak.

273. On September 11, 2024, Plaintiff submitted a formal complaint to NAR documenting that many websites using MLS IDX data feeds do not display the listing broker's phone number or email address as required, and that some MLS systems do not even include this information in the IDX feed itself. Plaintiff requested NAR enforce the rule and address the competitive harm to alternative service models.

274. On September 12, 2024, Harrigan responded that NAR encourages anyone with evidence of non-compliance to file a complaint with the local MLS, and reproduced the model MLS Section 9 complaint procedure. NAR took no direct enforcement action and again deferred to the local MLS, copying Lindsey Ruschak, CEO of Space Coast Association.

275. On September 12, 2024, Lindsey Ruschak, Chief Executive Officer of Space Coast Association of REALTORS®, responded acknowledging that upon checking the public-facing MLS site and testing a member permalink, the listing broker contact information had disappeared from display. Ruschak stated she was not sure when this

occurred. Ruschak confirmed an urgent ticket had been submitted to the MLS vendor and that an urgent email had been sent to all vendors receiving an API or RETS feed from Space Coast MLS to ensure proper display. Ruschak committed to following up once she heard from the vendor.

276. No follow-up response from Space Coast MLS or its CEO was ever received by Plaintiff

277. Violation continues (last checked April 25th, 2026)

278. September 12, 2024, 5:01 PM: Plaintiff replied to NAR that the non-compliance was not isolated to one MLS or association - it was widespread across multiple MLS systems, associations, and participants. Plaintiff stated that NAR, as the rule-promulgating entity, should have its own compliance and enforcement mechanism rather than referring complainants back to individual MLSs, and that NAR's inaction made it complicit in the non-enforcement.

279. September 13, 2024: NAR (Harrigan) responded that Plaintiff's feedback had been shared with others at NAR for their information and consideration.

280. No enforcement action was taken and no systemic remedy was offered.

**Matter H.2   Concerning Commission Steering**

December 8, 2024: Plaintiff contacted Space Coast Association of REALTORS CEO Lindsey Ruschak reporting multiple instances of buyer agents steering buyers away from his listings due to low or no commission offered, and requesting identification of the specific rule expressly prohibiting commission-based steering to cite in ethics complaints.

281. December 9, 2024: Space Coast Association (Lindsey Ruschak, CEO) responded directing Plaintiff to the standard ethics complaint process and provided the NAR Settlement FAQ on anti-steering.

282. No separate enforcement mechanism for steering violations was identified. Plaintiff was directed to contact the Space Coast MLS department to report agents working without a written buyer agreement, and to contact Professional Standards Director Cindi Hintz to file an ethics complaint or obtain assistance from the Grievance Committee.

## O.    NON-DEFENDANTS ASSOCIATION AND MLS ACTIONS

### Matter O.1   Concerning IDX Rule Violation

On September 17, 2024, Plaintiff contacted SmartMLS (Connecticut) reporting that the most recent version of SmartMLS Rules and Regulations available to members was from 2017 and was missing mandatory NAR updates, specifically the IDX display rule requiring prominent display of the listing firm's name and email or phone number. Plaintiff noted that almost no participant was abiding by the rule, that NAR had referred him back to the MLS, and that the non-compliance was enabling buyer agents to steer buyers away from lower-commission listings and directly harming Plaintiff's business model.

283. On September 18, 2024, Jacquie Germain of the SmartMLS Compliance Team responded that the rules had been adopted in 2017 with numerous updates since, and that Plaintiff's NAR question had been escalated for additional review.

284. On September 18, 2024, Francisco Garcia of SmartMLS responded: "SmartMLS is not enforcing these rules because they need to be voted into our rules and regulations."

285. On September 18, 2024, Plaintiff replied that the IDX display rule had been issued by NAR effective January 1, 2022 — more than two and a half years prior — following a DOJ settlement, and that implementing the rule was not optional. Plaintiff stated that SmartMLS's failure to implement the rule had enabled buyer agents to steer buyers away from lower-commission listings and to boycott non-traditional brokerage models, and asked when SmartMLS planned to vote the rule into its regulations.

286. On September 29, 2024, Kathy Elson of SmartMLS, Inc. responded acknowledging the issue and stating that SmartMLS was "in the process of creating a mechanism to add email and telephone information to IDX listings" and would add the language to its rules and regulations once vendors provided the mechanism.

287. On December 12, 2024, Francisco Garcia informed Plaintiff that listing data attribution had been implemented and that SmartMLS was notifying brokers and vendors to complete the process.

288. On December 12, 2024, Garcia added that SmartMLS was waiting for the bulk of participants to act, and estimated mid-January 2025 for full implementation across participants.

289. SmartMLS confirmed in writing that it had not enforced the mandatory IDX display rule for more than two and a half years after its effective date, and began the implementation process only after Plaintiff's complaint. This matter involves a

non-named defendant association and while the rule was included around October 2025, it remains unenforced.

### Matter O.2 Ethics Concerning Commission Steering (potential Pre-Judgement and Due Process Violation

September 7, 2024: Plaintiff filed an ethics complaint with the Connecticut Association of REALTORS under Articles 1 and 3.

After Respondent showed interest in one of Plaintiff's listed properties, Plaintiff followed up twice for feedback. Respondent replied: "do not work for less than 2.5."

290. October 23, 2024: The Connecticut Association transferred the case to the West and Southwest REALTOR Association (Arizona) for processing.

291. December 13, 2024: Hearing held via Zoom starting at *10:01 MST and ending at 10:26 MST* . Respondent claimed there was no steering because he was personally interested in buying the property for himself as an investor - not representing a buyer client. Respondent admitted he never communicated this to Plaintiff.

292. Respondent presented no documentation; the Hearing Panel requested none.

293. As per the NAR's Ethics and Arbitration Manual, after an Ethics hearing is adjourned, the panel members should meet at an executive meeting (without parties), discuss the facts and evidence and come to a decision; after which the decision is written, signed (eSigned in this case) and delivered to the parties session

294. *According to the eSignature Audit Trail, the Decision of the Ethics Hearing Panel of the Professional Standards Committee was created by Tonya Deskins at*

*10:21:46 AM MST and electronically signed by the Panel Members between 10:27:08*

*AM and 10:27:29 AM MST.*

295. Case dismissed.

### Matter O.3   Ethics, Concerning Commission Steering and other ethics Concerns

December 21, 2024: Plaintiff filed an ethics complaint under Articles 1, 3, and 15. Article 15: ( which prohibits REALTORS® from knowingly or recklessly making false or misleading statements about other real estate professionals, their businesses, or their business practices. .

Facts of the Case: Respondent wrote: "We're going to pass on this property due to commission structure my client prefers a property that offers reasonable buyer agent commission."

Plaintiff challenged this as steering and noted the buyer had already agreed in the BBA to pay the buyer agent's commission. Respondent replied: "I'm not steering them by any means first thing that I do is I look up how compensation is split. I then let them know that this is a discount broker be one of them that they will have to pay my commission and they respectfully decline seeing the property as the 5 other properties we are going to see offer buyers compensation. I'm very familiar with your brokerage and you're honestly doing a disservice to our industry and your clients."

Plaintiff responded: "I completely disagree; your description is the definition of steering and looking after your interest instead of your buyer's. The buyer 'respectfully declined to see the property' ONLY after you disparaged my business model and told

him/her they had to pay your commission (which was already agreed in writing in your buyer-agent agreement); this is not only steering but an anticompetitive behavior with potential federal antitrust laws implications."

296. January 7, 2025: Grievance Committee removed Article 3 but forwarded Articles 1 and 15 for a hearing.

297. March 21, 2025: Hearing Panel found no violation and did not refer the matter to the MLS for Buyer-Broker agreement Violation or Commission Filtering.

298. The Panel wrote: "The hearing panel determined they were not presented with sufficient evidence to find that the Respondent had made any false or misleading statements to the Buyers or others about the Complainant, his brokerage or his business model" and "the ultimate decision not to pursue the property at 119 Watson Road was made by the Buyers based on their financial position and that the Respondent had not affirmatively steered them away from that property." Case dismissed.

## XI.   HARM TO COMPETITION AND PLAINTIFF'S DIRECT INJURY

299. The injury challenged in this action arises from Defendants' concerted decision to not ensure compliance with and enforcement of Mandatory Rules they themselves adopted and represented as intended to prevent conduct harmful to competition. This injury is not based on isolated acts of individual market participants, but on Defendants' collective decisions and inaction that permit anticompetitive conduct to occur, persist, and recur without restraint.

63

### A.    Aggregate Harm to Plaintiff's Service Model

300.    Plaintiff alleges that the cumulative effect of Defendants' actions and inaction is not limited to isolated injury but operates to impair Plaintiff's service model within the competitive structure in which Plaintiff and Defendants' members participate. This harm is compounded and aggregates through multiple behaviors addressed in this Complaint:

301.    *Commission Steering*: Where steering is not sanctioned, buyers are consistently guided away from Plaintiff's listings, depriving Plaintiff of transactions and stigmatizing the "Limited Service" model.

302.    *Non-Enforcement of Buyer-Broker Agreements*: By failing to meaningfully verify the mandatory conditions of the Buyer-Broker Agreement mandate, Defendants permit compensation to continue functioning as a factor influencing agent conduct, sustaining the very steering incentives the Rules were purportedly designed to eliminate.

303.    *IDX Display and Lead Diversion*: The non-enforcement of mandatory IDX display requirements permits the omission or disguising of the listing firm's contact information. This diverts consumer inquiries away from Plaintiff and toward buyer-agent intermediation, reinforcing traditional commission structures.

304.    *Stigmatization of Alternative Models*: Coordinated messaging—including the DANGER Report, advertising campaigns, and official publications - operates to stigmatize or marginalize innovative, lower-cost approaches like SnapFlatFee.com as "inferior" or "risky".

305.    As an example: The "Right by You" / "Don't DIY"[22] campaign, funded by dues collected from all NAR members including Plaintiff and other limited-service brokers, depicts full-service brokerage as the only REALTOR® offering, reinforcing to consumers that alternative service models fall outside the REALTOR® standard.

## B.    Harm to Similarly-Situated Competitors

306.    The restraints described in this Complaint are not targeted particularly at Plaintiff individually. They operate as structural conditions applicable to any market participant who deviates from the traditional full-service commission model.

307.    Any listing broker, seller, or agent who offers reduced, flat-fee, or no buyer-agent compensation will encounter the identical set of restraints: their listings will be eligible for steering by buyer agents whose compensation incentive remains operative because the Buyer-Broker Agreement Rule is not enforced; their listings will be filterable by commission level because the Non-Filtering Rule is not enforced; their contact information will be suppressed on IDX-fed platforms because the IDX Display Rule is not enforced; and their service model will be stigmatized through coordinated messaging that Defendants disseminate and fund.

308.    Plaintiff's injury is representative of the injury that any competitor offering an alternative pricing model necessarily sustains within each market that Defendants

---

[22] NAR, "Right by You" – Don't DIY, Spot 1 (residential), YouTube, https://www.youtube.com/watch?v=HQufP-SUDp0; Spot 2 (commercial), YouTube, https://www.youtube.com/watch?v=whkKEFrDE5k; NAR Magazine, NAR's New 'Right by You' Campaign: How Hard Could It Be?, https://www.nar.realtor/magazine/real-estate-news/nar-new-right-by-you-campaign-how-hard-could-it-be.

govern. The restraints do not discriminate among individual competitors - they apply uniformly to the conduct, not the person.

## C.   Harm to Competition and Market Restraint

309.   Plaintiff alleges that a restraint of trade exists where conduct interferes with competitive forces and causes market conditions to operate in a manner not determined by ordinary competitive pressures.

310.   *Price Stabilization and Control*: By permitting steering to persist unchecked, Defendants sustain a market in which real estate brokerage compensation is maintained near historic "standard" levels. This creates upward price pressure that is not the result of genuine market competition but of tolerated anticompetitive conduct.

311.   *Market Exclusion (Group Boycott)*: The practical effect of Defendants' concerted non-enforcement is the exclusion of Plaintiff's service model from meaningful competition. The market is allocated toward traditional providers while alternative pricing models are functionally "boycotted" through steering, lead diversion and public messaging.

312.   *Indispensability of the MLS (Essential Facility)*: Defendants control access to the overwhelming majority of residential listings. This access is indispensable; no practical substitute exists. Defendants have converted this essential infrastructure into a tool for exclusion by declining to enforce rules designed to protect competing service models.

313.   *Evidence of Market Effects*: The competitive harm caused by compensation steering and the selective non-enforcement of MLS rules is well-documented and widely

recognized within the legal and economic communities. Plaintiff's allegations are supported by a substantial body of legal actions, empirical economic studies and scholarly papers demonstrating that such conduct systematically distorts market structures, inflates consumer costs, and stifles innovation.

314.    Furthermore, Plaintiff cites the findings of the federal jury in Burnett v. Nat'l Ass'n of Realtors, No. 19-cv-00332-SRB (W.D. Mo. jury verdict Oct. 31, 2023), regarding steering-related competitive effects. Those findings provide contextual support for the claims herein and for the competitive effects alleged.

**D.    Causal Link and Lack of Pro-Competitive Justification**

315.    Plaintiff alleges that the injuries described herein are caused by Defendants' decisions not to ensure compliance with and enforcement of Rules adopted to prevent the conduct at issue.

316.    By permitting steering, diversion, and related conduct to persist through non-enforcement, Defendants cause the competitive harms and Plaintiff injuries challenged in this Complaint. If those Rules were enforced, such injuries would be prevented, reduced, or deterred.

317.    Notwithstanding notice of alleged violations through formal complaints, direct communications, and the filing of this action, Defendants have not undertaken corrective action sufficient to prevent the continued persistence of the conduct described.

318.    Defendants' non-enforcement does not promote competition, increase efficiency, or benefit consumers. Rather, it permits conduct Defendants represented as

harmful to competition to persist, including conduct that protects prevailing compensation structures from ordinary price competition.

## XII.   THE RESTRAINTS ARE UNLAWFUL PER SE

319.   Plaintiff alleges that the concerted actions and inactions of the Defendants constitute a "per se" violation of Section 1 of the Sherman Act. The Supreme Court has long held that certain categories of restraint have such a "predictable and pernicious anticompetitive effect" that they are deemed illegal without the need for an exhaustive market analysis.

320.   Defendants' conduct falls squarely within three categories historically recognized as per se illegal:

321.   *Group Boycott (Concerted Refusal to Deal)*: By collectively permitting steering and lead diversion while ignoring mandatory rules meant to prevent such behavior, Defendants facilitate a horizontal group boycott. This concerted inaction functions to exclude "Limited Service" models like SnapFlatFee.com® from an unrestrained free competitive market, denying them the ability to compete on equal terms.

322.   *Horizontal Price Stabilization:* Defendants' concerted failure to enforce non-filtering, non-steering, and IDX display rules, together with repeated signaling concerning customary commission levels, seller-paid compensation, and transaction structures, operates to reduce downward price pressure from lower-cost or alternative service offerings and to reinforce prevailing compensation structures at artificial levels. Plaintiff challenges this conduct as part of the horizontal restraint alleged herein.

68

323. *Market Allocation through Stigmatization:* By not enforcing the Ant steering rules and by using the DANGER Report and other coordinated communications to marginalize alternative models, Defendants have engaged in a concerted effort to allocate the market exclusively to "traditional" providers, effectively carving out and excluding innovative competitors from the competitive structure.

324. Defendants' own internal literature and rulebooks characterize these very behaviors as "egregious" violations of the competitive process. By failing to enforce rules they themselves designated as mandatory and essential, Defendants have entered into a "meeting of the minds" to maintain a restraint that is manifestly anticompetitive by its very nature.

## XIII.  "PLUS FACTORS" SUPPORTING THE INFERENCE OF CONSPIRACY

325. Additionally Plaintiff alleges that the parallel decisions not to enforce of the Defendants is not the result of independent individual business decisions, but a concerted "meeting of the minds" additionally supported by the following "plus factors" that tend to exclude the possibility of independent action:

### A.    Actions Contrary to Economic Self-Interest

326. Each Defendant Association has a direct economic and reputational interest in the integrity of its own MLS and the upholding of its own name and good standing. Gaining and maintaining trust is paramount for each defendant and its members.

327. StellaMLS, as an example, acknowledges the *"trust crisis"* and advocates for transparency as part of the solution. On November 7th, 2025 StellarMLS published an

article titled "Rebuilding Trust in Real Estate Through Transparency". Here it clearly states:

> "Stellar MLS believes that the answer to this trust crisis is transparency. Transparency means ensuring that all details agents rely on are verified and accurate. It means open communication when policies change and accountability when something needs correction."[23]

328.    NAR, at a national level, describes its Standards of Practices as a "strict Code of Ethics" and in its recent Strategic Plan to Strengthen Member Value and Modernize the Association, it makes commitments to consumers such as to "Cultivate trust in the REALTOR® brand. Position the REALTOR® brand as a trusted symbol of expertise, integrity and reliable service for consumers."[24]

329.    Nevertheless their systematic failure to enforce their own Rules stands in direct contradiction to their stated purpose and economic interests. NAR has repeatedly affirmed its commitment to a competitive market, stating:

> "As we have previously stated, the National Association of REALTORS® fosters a fair, transparent and competitive real estate marketplace. Steering is a prohibited practice under NAR policy and the REALTOR® Code of Ethics. The Code of Ethics is enforced by state and local REALTOR® associations, and the enforcement of MLS rules are handled by each MLS."[25]

330.    Independent, rational behavior would dictate that an Association - acting in its own stated best interest - would vigorously enforce these Rules to protect the integrity of its data and the transparency of its marketplace.

---

[23] https://www.stellarmls.com/rebuilding-trust-in-real-estate-through-transparency
[24] https://www.nar.realtor/newsroom/nar-adopts-new-strategic-plan-to-strengthen-member-value-and-modernize-the-association
[25]
https://www.nar.realtor/magazine/real-estate-news/law-and-ethics/nar-succeeds-in-florida-court-gaining-dismissal-of-antitrust-lawsuit

331.   However, Defendants' actions directly contradict this interest. By choosing to permit widespread rule violations and refusing to sanction known steering or IDX omissions, Defendants allow their own platforms to be corrupted and their public mandates to be undermined.

332.   Such a departure from their stated objective is economically irrational for a trade association who is supposed to make decisions to protect the integrity of the market, to purposefully weaken its own mandatory rules (like anti-steering) unless the members on those panels (representing the Association) have a conflicting motive to protect their personal economic interests or those of the companies they represent.

333.   This collective decision to not enforce these rules serves as a shield for traditional commission levels and structures, prioritizing the protection of traditional providers over the very transparency and competition the Defendants claim to foster.

**B.      Circular Governance and Structural Interdependence**

334.   The parallel inaction of the Defendants is further explained by a governance structure that creates a "closed-loop" system, precluding independent competitive action.

335.   The NAR Board of Directors is largely composed of representatives from the very state and local Associations and MLSs named as Defendants herein.

336.   This structural overlap creates a "fox guarding the henhouse" scenario by:

337.   *Self-Policing Failure:* The entity charged with the national mandate to enforce the Rules (NAR) is governed by the same local representatives who benefit from their non-enforcement.

71

338. *The Incentive to Look Away:* No rational Association representative would vote at the national level to sanction their own local board for non-enforcement.

339. *Unified Front*: This circularity ensures that any challenge to the traditional commission model - like the Plaintiff's - is met with a unified wall of silence. The "Enforcer" and the "Violator" are structurally merged, making the concerted failure to enforce "compliance unto itself" a predictable and intended outcome of the Defendants' agreement.

## C. Structural Bias in Local Adjudicatory Bodies

340. This circularity extends down to the local level, where the "Grievance Committees" and "Professional Standards Hearings" - the bodies responsible for enforcing Rule compliance - are comprised entirely of active market participants.

## D. Competitors Judging Competitors:

341. The individuals tasked with hearing Plaintiff's complaints are horizontal competitors who possess a direct financial interest in maintaining the traditional commission structure SnapFlatFee.com® challenges.

342. While an association is one legal entity, it is a "combination of competitors". Its committees, boards or panels are made of Plaintiffs direct rivals, their collective decision to ignore a pro competitive rule is an agreement between those rivals to restrain trade on behalf of the Association.

## E. Conflicting Fiduciary Duties:

343. These committee members often hold leadership roles in the largest traditional brokerages (who also sit on NAR's Board of Directors) . They are bound by a

72

fiduciary duty to their own firms to maximize profit - a duty that is fundamentally at odds with an unbiased enforcement of rules that would facilitate a lower-cost, innovative competitor.

**F.     The "Institutional Capture" of Oversight:**

344.    Because the largest firms also hold permanent or influential seats on the NAR Board of Directors, a "vertical and horizontal" lock is maintained. The same dominant firms that influence national policy also control the local procedures where rule violations are judged.

345.    This ensures that any complaint filed by the Plaintiff is systematically dismissed by the adjudicators who themselves are the primary beneficiaries of the non-enforcement.

**G.     Motive and Opportunity to Conspire**

346.    Defendants operate in a highly interdependent market where the "Limited Service" model - represented by the Plaintiff - poses a direct threat to the status quo compensation structures.

**1.     Motive**

347.    Defendants and its members have a clear financial motive to protect the 5-6% commission "norm".

**2.     Opportunity**

348.    Defendants share a common governance structure and meet regularly at regional and national events (e.g., NAR Board of Directors meetings, MLS Committee

Sessions, Ethics Hearing Panels, Grievance Committees). These venues provide the perfect "setting" for signaling and reaching an agreement on selective non-enforcement.

### H.   Public Signaling and Coordinated Market Messaging

349.   The Defendants' parallel inaction is reinforced by a continuous stream of public signaling that identifies innovative models as a "threat" and encourages the maintenance of historic compensation norms and traditional deal structure.

350.   While NAR's written mandates require Associations to adopt anti-steering rules, the Defendants engage in coordinated signaling that ensures these rules are never meaningfully enforced against traditional high-commission brokers.

351.   This signaling is achieved through "continued messaging" and "concerted inaction" rather than formal rule changes. By maintaining the appearance of a rule while ensuring a practice of non-enforcement, the Defendants create a "paper tiger" that satisfies regulators while protecting the high-commission status quo.

352.   It strongly infers a "meeting of the minds" to prioritize the economic interests of the horizontal competitors over the legal mandates of the Association.

353.   This "thematic glue" ensures a unified front that would be impossible through independent action. This messaging includes:

### 1.   The DANGER Report:

354.   The publication of the *D.A.N.G.E.R. Report* serves as an industry-wide warning, explicitly identifying lower-cost or "Limited Service" models as an existential threat to the industry's survival. This creates a shared motive for collective non-enforcement of rules that would otherwise protect such competitors.

### 2.    Targeted "Anti-DIY" Campaigns:

355.    Defendants have funded and executed national advertising campaigns and "consumer guides" specifically designed to marginalize and stigmatize self-directed or "DIY" service models. These campaigns signal to the Defendants' members that such models (which are provided by Realtors®) are not "legitimate" participants in the competitive structure.

### 3.    The "5-6%" Price Signaling:

356.    Despite recent legal settlements, Defendants continue to publish "guides" and educational materials (many available online today) that reference "typical," "standard," or "traditional" compensation at historical 5-6% levels. By continuing to anchor the market to these numbers, Defendants signal a collective commitment to Price Stabilization.

### 4.    Steering And Model Encouragement

357.    Defendants publicly maintain that sellers should offer buyer-agent commissions to make properties "more attractive," effectively coaching the market to perpetuate the very steering mechanisms their Mandatory Rules were purportedly designed to prevent.

358.    The impact of this signaling cannot be equated to the independent speech of a third party or a single market participant.

359.    Because NAR is positioned as the "Voice of Real Estate" for over 1.5 million members, its messaging carries the weight of an industry-wide mandate.

360.    When the dominant, all-knowledgeable entity in the market signals a specific pricing norm or identifies a competitor as a "threat," it does not merely suggest behavior - it establishes a de facto code of conduct for the entire industry.

361.    This top-down signaling ensures that the Defendants' parallel non-enforcement is not a series of isolated choices, but a coordinated adherence to a singular, collective strategy designed to protect the dominant market structure from the discipline of price competition.

### 5.    The "Nod and a Wink": Signaling the Non-Enforcement of Pro-Competitive Rules.

362.    While Defendants maintain a veneer of antitrust compliance by adopting NAR's mandatory, pro-competitive anti-steering rules, they have collectively adopted a "nod and a wink" protocol of non-enforcement.

363.    This mechanism allows Defendants to publicly champion market integrity while privately signaling to their members - and the horizontal competitors sitting on their adjudicatory panels - that these rules will not be used to disrupt the traditional high-commission status quo.

364.    This signaling occurs not through formal rule changes, but through a consistent and coordinated culture of collective inaction. By systematically dismissing well-documented steering violations, the Defendants send a clear, unwritten message to the market that these conduct (described in this complaint) are "permitted" and will face no meaningful sanction.

365. This gap between the *written* pro-competitive rule and the *actual* coordinated non-enforcement demonstrates a *meeting of the minds* to subvert Defendants' own stated mandates in favor of a shared economic interest: the suppression of price-competitive and exclusion of service models like the Plaintiff's.

## I. Historically Unprecedented Uniformity

366. The simultaneous failure of multiple local and state associations to act on identical, well-documented complaints of steering and lead diversion is statistically improbable as a result of independent action. This "uniformity of inaction" across disparate geographic markets (represented by the various Defendants) strongly suggests a coordinated policy rather than a series of coincidental administrative failures.

## XIV. THE RESTRAINTS FAIL UNDER ANY LEVEL OF SCRUTINY

367. Even if the Court declines to apply the *per se* standard, the challenged conduct is unlawful under the "Quick Look" doctrine, as even a person with a rudimentary understanding of economics could conclude that these restraints have an anticompetitive effect on customers and markets.

368. Furthermore, even under a full Rule of Reason analysis, Defendants' actions cannot be justified. There is no legitimate, pro-competitive justification for a concerted failure to enforce mandatory rules designed to ensure market transparency and fair dealing.

369. Any purported benefits are outweighed by the systemic harm to competition, reduced consumer choice, and the artificial maintenance of high commission costs.

370.    Defendants' conduct fails to support any pro-competitive effect and serves only to protect the dominant market participants from the discipline of a truly competitive market.

## XV.   CONCLUSION

371.    The Rules at issue were adopted and described by Defendants as intended to protect competition, consumer choice, transparency, and fair market conditions.

372.    The conduct addressed by those Rules - including compensation steering and related practices - has been recognized in Defendants' own Rules and statements, as well as in broader public analysis, as conduct harmful to competition, capable of distorting competitive conditions, and of a type the Rules were adopted to prevent.

373.    These Rules are mandatory and include compliance and enforcement mechanisms available to all Defendants.

374.    The conduct described in this Complaint concerns repeated violations of those Rules, Defendants' knowledge of such violations, and decisions by Defendants not to ensure compliance with and enforcement of the Rules.

375.    The structure through which those decisions occur includes local and regional collectives of real estate professionals acting through Associations and MLSs, participation and control between Associations and MLSs, and joint Association participation in decision-making and rule enforcing at the NAR level.

376.    All decisions within these structures are collective in nature. Not all such decisions are anticompetitive, and not all are actionable under the Sherman Act.

377. Only those collective decisions or actions that unreasonably restrain trade are actionable under the Sherman Act and are challenged in this Complaint.

378. The conduct challenged herein creates the type of unreasonable restraint the Sherman Act was enacted to prevent.

379. Because of the continued collective decision to not correct these conditions, Plaintiff has no other choice than to bring this action to the courts only after many attempts to see compliance and enforcement.

## XVI. COUNTS

### COUNT I - Violation of Section 1 of the Sherman Act (Concerted Refusal to Enforce the Code of Ethics in the Prohibition of Commission Steering)

380. This count is against the following Defendants: National Association of REALTORS® (NAR), Broward, Palm Beaches and St. Lucie REALTORS®, Inc., Miami Association of REALTORS®, Inc., Orlando Regional REALTOR® Association, Inc., Royal Palm Coast REALTOR® Association, Inc., Space Coast Association of REALTORS®, Inc., Northeast Florida Association of REALTORS®, Inc., Central Panhandle Association of REALTORS®, INC.

381. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

382. Article 1 of NAR Code of Ethics states:

*"When representing a buyer, seller, landlord, tenant, or other client as an agent, REALTORS® pledge themselves to protect and promote the interests of their client. This obligation to the client is primary,* but it does not relieveREALTORS® of their obligation to treat all parties honestly..."* [26] (emphasis added)

---

[26] Code of Ethics article 1

383.   In subsequent guides and publications NAR has repeatedly emphasized that "Under NAR's Code of Ethics, steering buyers based on the amount of broker compensation is prohibited"[27] and "Steering is a prohibited practice under NAR policy and the REALTOR® Code of Ethics."[28]

384.   Each Defendant Association is responsible for enforcing it through its Grievance Committee and Professional Standards process.

385.   As documented in the Factual Allegations above, each Defendant Association received specific, written reports of steering violations. Despite these reports, Defendants systematically declined to find violations or issue sanctions—even when the respondents' own communications confirmed commission-based refusal.

386.   While one Defendant Association processed a single violation where a Realtor waived her right to a hearing, that Association treated the offense as a "minor" violation. This isolated, minimal enforcement action stands in stark contrast to all other reported violations that were ignored or dismissed.

387.   This pattern of systematic non-enforcement - interrupted only by a single, self-admitted "minor" infraction - constitutes a concurrent, structurally parallel refusal to uphold mandatory NAR anti-steering policies.

388.   This multi-layered restraint - occurring both internally within each Association's committee of competitors and in parallel across the distinct Associations -

---

[27] https://www.nar.realtor/the-facts/nar-settlement-faqs - NAR Settlement FAQ's - Item 92
[28] NAR Succeeds in Florida Court, Gaining Dismissal of Antitrust Lawsuit - https://www.nar.realtor/magazine/real-estate-news/law-and-ethics/nar-succeeds-in-florida-court-gaining-dismissal-of-antitrust-lawsuit April 14, 2026

constitutes a contract, combination, or conspiracy in restraint of trade in violation of 15 U.S.C. § 1

389. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered antitrust injury to his personal property and service model, including lost transactions and revenue associated with specific real estate opportunities, suppressed consumer demand for Plaintiff's lower-cost service offering, impairment to the reputation, goodwill, and commercial utility of Plaintiff's service, website and registered trademark SnapFlatFee.com®, stigmatization of Plaintiff's service offering as non-standard or unreliable within the marketplace, and injury flowing from the suppression of price competition challenged in this action. These injuries arise directly from the restraints alleged herein and are of the type the antitrust laws were enacted to prevent.

390. As a result of these violations, Plaintiff is entitled to the relief requested in the Prayer for Relief below.

### COUNT II - Violation of Section 1 of the Sherman Act (Concerted Non-Enforcement of the No Commission Filtering Rule)

391. Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

392. This Count applies to the following Defendants: National Association of REALTORS® (NAR), Beaches MLS, Inc., Broward, Palm Beaches and St. Lucie REALTORS®, Inc., Miami Association of REALTORS®, Inc., Florida Gulf Coast Multiple Listing Service, Inc., Royal Palm Coast REALTOR® Association, Inc., Naples

81

Area Board of REALTORS® and Association of Real Estate Professionals, Inc.
(NABOR®), My Florida Regional MLS, Inc. (d/b/a Stellar MLS), Space Coast Multiple
Listing Service, Inc., Space Coast Association of REALTORS®, Inc., Northeast Florida
Multiple Listing Service, Inc. (d/b/a RealMLS), Northeast Florida Association of
REALTORS®, Inc., and Central Panhandle Association of REALTORS®, Inc.

393. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

394. MLS Rules prohibit MLS participants from filtering listings by commission level, and prohibits MLSs from enabling any tool that allows such filtering.

395. Each Defendant MLS (and the Associations that have direct control over it) are responsible for enforcing this rule.

396. As documented in the Factual Allegations above, no Defendant MLS implemented a systemic enforcement program, conducted proactive audits, or penalized filtering behavior or filtering-enabled platform features - despite specific notice from Plaintiff of widespread non-compliance.

397. This concurrent, structurally parallel non-enforcement within a shared governance structure constitutes concerted action in restraint of trade within the meaning of Section 1 of the Sherman Act.

398. The practical effect is a de facto group boycott and horizontal market allocation by commission level. By allowing agents to filter out listings based on compensation, the Defendants facilitate a price stabilization scheme where 'standard' commission levels are enforced through the threat of exclusion from the market.

399.   This non enforcement forces a 'pay-to-play' environment: sellers and listing brokers are pressured to offer 'standard' commissions or face a systematic refusal to deal by buyer agents who utilize these filters to shield their clients from lower-cost alternatives.

400.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered antitrust injury to his personal property and service model, including lost transactions and revenue associated with specific real estate opportunities, suppressed consumer demand for Plaintiff's lower-cost service offering, impairment to the reputation, goodwill, and commercial utility of Plaintiff's service, website and registered trademark SnapFlatFee.com®, stigmatization of Plaintiff's service offering as non-standard or unreliable within the marketplace, and injury flowing from the suppression of price competition challenged in this action. These injuries arise directly from the restraints alleged herein and are of the type the antitrust laws were enacted to prevent.

401.   As a result of these violations, Plaintiff is entitled to the relief requested in the Prayer for Relief below.

### COUNT III - Violation of Section 1 of the Sherman Act (Concerted Non-Enforcement of the Buyer-Broker Agreement Rule)

402.   This Count applies to the following Defendants: National Association of REALTORS® (NAR), Beaches MLS, Inc., Broward, Palm Beaches and St. Lucie REALTORS®, Inc., Miami Association of REALTORS®, Inc., Florida Gulf Coast Multiple Listing Service, Inc., Royal Palm Coast REALTOR® Association, Inc., Naples

Area Board of REALTORS® and Association of Real Estate Professionals, Inc.

(NABOR®), My Florida Regional MLS, Inc. (d/b/a Stellar MLS), Space Coast Multiple

Listing Service, Inc., Space Coast Association of REALTORS®, Inc., Northeast Florida

Multiple Listing Service, Inc. (d/b/a RealMLS), Northeast Florida Association of

REALTORS®, Inc., and Central Panhandle Association of REALTORS®, Inc.

403.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth

herein.

404.    MLS Rules require buyer agents to execute written agreements with buyers

before showing properties, disclose a specific objective compensation amount, and not

receive compensation from any source exceeding the agreed amount. The Rule is

mandatory under NAR's Multiple Listing Policy Handbook and is binding on all

NAR-affiliated MLSs and their participants.

405.    Each Defendant MLS (and the Associations that have direct control over it)

is responsible for monitoring and enforcing it.

406.    As documented in the Factual Allegations above, no Defendant MLS or

NAR implemented any mechanism to verify Buyer Broker Agreement execution, confirm

the agreed compensation amount, or enforce the compensation cap - despite specific,

individualized requests from Plaintiff. Each entity confirmed the absence of any such

mechanism and directed Plaintiff elsewhere in a circular chain of non-responsibility.

407.    This concurrent, structurally parallel failure to implement any enforcement

infrastructure - within a governance structure that disseminated the non-enforcement

approach from NAR to each Defendant MLS - constitutes concerted action in restraint of

84

trade within the meaning of Section 1 of the Sherman Act. The steering incentive the Buyer Broker Agreement Rule was specifically enacted to eliminate remains fully operative.

408.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered antitrust injury to his personal property and service model, including lost transactions and revenue associated with specific real estate opportunities, suppressed consumer demand for Plaintiff's lower-cost service offering, impairment to the reputation, goodwill, and commercial utility of Plaintiff's service, website and registered trademark SnapFlatFee.com®, stigmatization of Plaintiff's service offering as non-standard or unreliable within the marketplace, and injury flowing from the suppression of price competition challenged in this action. These injuries arise directly from the restraints alleged herein and are of the type the antitrust laws were enacted to prevent.

409.    As a result of these violations, Plaintiff is entitled to the relief requested in the Prayer for Relief below.

**COUNT IV - Violation of Section 1 of the Sherman Act (Concerted Non-Enforcement of the IDX Listing Broker Contact Display Rule)**

410.    Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

411.    MLS Rules requires that every IDX display identify the listing firm with its email or phone number in a *reasonably prominent location*, in a readily visible color and typeface not smaller than the median used in the display.

85

412.   Each Defendant MLS is responsible for enforcing it within its platform and among its participants.

413.   As documented in the Factual Allegations above, no Defendant MLS enforced this requirement systemically. IDX Broker, a Vendor, publicly admitted placing listing broker contact information "at the very bottom of the page in an inconspicuous location"; all Defendants were placed on notice and none acted.

414.   Defendants variously disclaimed jurisdiction, offered only case-by-case investigation, or mischaracterized the mandatory rule as voluntary.

415.   Stellar MLS simultaneously and actively fined Plaintiff for placing contact information in a public MLS field while refusing to enforce the rule requiring that same information be prominently displayed publicly - selective enforcement that directly penalizes Plaintiff while protecting the competing conduct the rule was designed to prevent.

416.   This concurrent, structurally internal and parallel non-enforcement constitutes concerted action in restraint of trade within the meaning of Section 1 of the Sherman Act. By suppressing listing broker contact information across IDX-fed platforms, Defendants eliminate the primary channel through which consumers would directly contact alternative-model listing brokers - channeling every inquiry instead through buyer-agent intermediaries with a commission-based incentive to steer away from Plaintiff's listings.

417.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered antitrust injury to his personal property and service model, including lost

86

transactions and revenue associated with specific real estate opportunities, suppressed consumer demand for Plaintiff's lower-cost service offering, impairment to the reputation, goodwill, and commercial utility of Plaintiff's service, website and registered trademark SnapFlatFee.com®, stigmatization of Plaintiff's service offering as non-standard or unreliable within the marketplace, and injury flowing from the suppression of price competition challenged in this action. These injuries arise directly from the restraints alleged herein and are of the type the antitrust laws were enacted to prevent.

418.    As a result of these violations, Plaintiff is entitled to the relief requested in the Prayer for Relief below.

**COUNT V - Violation of Section 1 of the Sherman Act (Direct Violation of the MLS Antitrust Compliance Policy - Price Signaling, Group Boycott and Market Allocation)**

419.    This Count Applies to National Association of REALTORS® (NAR)

420.    Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

421.    MLS Handbook's Antitrust Policy section expressly prohibits Defendant Associations and MLSs from fixing, controlling, recommending, or suggesting commissions or fees for real estate brokerage services, or cooperative compensation offered by listing brokers.

422.    As documented in the Factual Allegations above, Defendants violated this policy directly and affirmatively by publishing and endorsing, through official NAR and co-branded and copyrighted Realtor.com® channels, specific commission rate ranges

(5–6%, "about 6%," "4–7%") as "standard," "customary," or "typical"; by instructing sellers to offer buyer-agent compensation "as a way of marketing" their properties; by characterizing alternative-model and flat-fee brokerage as "dangers" to the industry (DANGER Report); and by funding and airing a national consumer advertising campaign ("Right by You" / "Don't DIY," March 2025) - using dues collected from all NAR members including Plaintiff - that depicted full-service representation as the sole legitimate REALTOR® offering and consumer self-directed transactions as risky.

423.   This conduct plausibly constitutes coordinated signaling and concerted conduct inconsistent with the Association's own antitrust compliance policy, a policy adopted to prevent collective conduct associated with price-fixing, group boycott, and market allocation. Plaintiff alleges Defendants acted contrary to that policy through the conduct challenged herein, in violation of Section 1 of the Sherman Act.

424.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered antitrust injury to his personal property and service model, including lost transactions and revenue associated with specific real estate opportunities, suppressed consumer demand for Plaintiff's lower-cost service offering, impairment to the reputation, goodwill, and commercial utility of Plaintiff's service, website and registered trademark SnapFlatFee.com®, stigmatization of Plaintiff's service offering as non-standard or unreliable within the marketplace, and injury flowing from the suppression of price competition challenged in this action. These injuries arise directly from the restraints alleged herein and are of the type the antitrust laws were enacted to prevent.

425.   As a result of these violations, Plaintiff is entitled to the relief requested in the Prayer for Relief below.

## XVII. PRAYER FOR RELIEF

While the requested relief applies jointly and severally to all Defendants, each Defendant, whether association or MLS, bears independent authority and responsibility to act.

Under NAR's own policy framework, local and regional entities may adopt and enforce rules that do not conflict with national mandatory standards, including rules for antitrust conduct prevention, specifically "rules or policies necessary to prevent illegal collective action, including price-fixing and boycotts."[29]

This Complaint seeks judicial intervention and provides additional notice and opportunity for voluntary compliance.

The rules at issue are already written, enacted by Defendants, acknowledged as mandatory, integrated into Defendants' own policies, and capable of implementation.

Consumers are deprived of transparent and competitive options, innovative entrants are excluded, and Plaintiff continues to suffer ongoing injury.

Plaintiff has made good-faith efforts to resolve these issues without litigation. Where private actors promulgate rules represented as pro-competitive and mandatory, they cannot nonetheless fail to ensure compliance with and enforcement of those rules.

---

[29] National Association of REALTORS®, 2024 *Multiple Listing Policy Handbook*, Part Two, A *Policies, MLS Antitrust Compliance Policy*, at 21 (Aug. 2024).

As injunctive relief sought is direct and narrow, Plaintiff asks the Court to compel Defendants to comply with, monitor, and enforce the rules they have already promulgated, in the form and intent they publicly endorsed.

Accordingly, Plaintiff respectfully seeks all remedies authorized under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), including but not limited to permanent injunctive relief, treble damages, costs of suit, and reasonable attorneys' fees.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants and award the following relief:

## A.      Injunctive Relief

Defendants have adopted comprehensive rules designed to promote competition and consumer transparency. The Court need not craft expansive remedies or navigate complex regulatory questions - only and simply compel faithful implementation of binding obligations that *Defendants impose on themselve*s, yet have systematically neglected.

This narrow, simple and targeted relief will start to restore competitive balance while requiring *Defendants to uphold commitments they have voluntarily undertaken and publicly defended.*

Plaintiff respectfully requests a permanent injunction as follows:

### 1. Steering Prohibition Enforcement

Order Defendants, in consensus amongst them all to meet and confer:

**a.**     To issue market-wide compliance guidance for REALTORS® and enforcement guidelines for Associations, clarifying that steering - defined as the practice of directing buyers away from certain properties based on commission structure or listing agent name or brokerage affiliation - is prohibited under Article 1 of the NAR Code of Ethics and its corresponding MLS Rule and must be strictly complied by, monitored and enforced accordingly;

**b.**     To amend their rules and regulations including the MLS Handbook and add a direct affirmative unambiguous Rule prohibiting Steering.

**c.**     To issue public, market-wide guidance and official interpretation clarifying that all forms of steering described in this Complaint - when undertaken with knowledge of the conspiracy in restraint of trade and in furtherance of it - constitute participation in a horizontal conspiracy in violation of Section 1 of the Sherman Act and that Steering; is not merely an individual minor ethical lapse or rule violation … It is a knowing act that advances the anticompetitive scheme, rendering the actor a liable as co-conspirator, even if they joined the conspiracy at a later stage or acted independently.

**d.**     To take all necessary steps to ensure that enforcement bodies, compliance staff, and decision-making committees are adequately equipped and trained to identify, evaluate and address conduct under existing basic antitrust and contract law principles, including but not limited to the identification of steering practices that constitute unlawful restraints of trade under Section 1 of the Sherman Act, professional standard violation under Article 1 of the Code of Ethics and MLS rule.

91

## 2. Buyer-Broker Agreement Rule Compliance

**a.**      Order Defendants to monitor and enforce compliance with the Buyer-Broker Agreement Rule in full, consistent with its stated terms and intended application.

**b.**      Order Defendants to implement and maintain comprehensive education and training programs for Associations, MLSs, members, and consumers, covering the fundamental elements of a contract and the specific requirements of the Buyer-Broker Agreement Rule - including the duty to act in good faith and the prohibition against entering into agreements lacking genuine intent to perform.

**c.**      Order defendants to expressively prohibit vague wording and/or self-steering clauses built into the buyer-broker agreement or any indication or insinuation that the seller will pay any compensation or self steering language.

**d.**      Order defendants to implement a mandatory contract training to educate all members on basic elements of a contract; emphasis in Buyer Broker Agreements.

**e.**      Order defendants to require specific wording in the buyer-broker agreement stating the buyer will pay the buyer agent compensation.

## 3. IDX Listing Broker Contact Display Compliance

Order all Defendants to immediately comply with, monitor, and enforce the existing IDX Listing Broker Contact Display Rule, as written and intended, directly and indirectly (Vendors and third parties with IDX access)  by ensuring that the listing firm's contact information is displayed (in all MLS-fed websites, portals and platforms) clearly

and prominently - *at least as prominently as any other contact information or lead form on the site.*

### 4. Immediate Cessation of Enabling Conduct, Price Signaling and Commission and Transaction Structure.

Order Defendants to immediately cease, (and remove from all platforms, website and materials) any and all material, statements, publications, articles, blogs, podcasts, videos, guides, or training content that directly or indirectly promote, suggest, recommend, or condone: (1) the practice of sellers offering blanket, advance compensation to buyer agents; (2) any price (commission) signaling, including references to "standard," "customary," "traditional," "historic," "local" or "typical" commission rates or splits; and (3) any guidance or messaging that implies or states that sellers are expected to, or should pay both the listing and buyer agent commissions.

**B.      Monetary Relief**

### 1. Compensatory Damages

Plaintiff seeks recovery of all monetary damages arising from Defendants' unlawful conduct, including but not limited to lost profits, lost business opportunities, and loss of business value.

These damages are current and continue to accrue as a direct and foreseeable result of the concerted restraints on competition described in this Complaint. Plaintiff also seeks recovery for all damages incurred during the pendency of this action.

### 2. Treble Damages

Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff seeks an award of treble damages for all antitrust injuries sustained as a result of Defendants' concerted and unlawful conduct.

### 3. Prejudgment Interest

To ensure full compensation and to account for the time value of money, Plaintiff seeks prejudgment interest on all damages, including those incurred prior to the filing of this action and during its pendency, as permitted by federal law and the equitable powers of this Court.

### 4. Post-Judgment Interest

Plaintiff further seeks post-judgment interest on the total amount awarded, including any treble damages, from the date of entry of judgment until payment is made in full, in accordance with 28 U.S.C. § 1961.

### 5. Costs and Fees

Although Plaintiff is appearing pro se, Plaintiff seeks reimbursement of all costs incurred in this action and expressly reserves the right to seek attorneys' fees should counsel be retained during the course of this litigation, as permitted by law.

### C.      Other Relief as Just and Proper

Any additional relief this Court deems just, necessary, and proper under the circumstances, including but not limited to expedited discovery, preliminary injunctive relief, evidentiary hearings on such relief, or other equitable measures required to prevent further harm and to restore competitive conditions in the market.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: April 27, 2026

Jorge A Zea
Plaintiff, pro se
2234 N Federal HWY
Boca Raton FL 33431
305-244-7242
antitrust@jorgezea.com

95

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of April, 2026, I presented the foregoing First

Amended Complaint to the Clerk of the Court for filing. I further certify that all counsel

of record are registered CM/ECF users and that service will be accomplished by the

CM/ECF system.

By: _____

Jorge A Zea
Plaintiff, pro se
2234 N Federal HWY
Boca Raton FL 33431
305-244-7242
antitrust@jorgezea.com

96