**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 25-81016-CIV-DIMITROULEAS/MATTHEWMAN

JORGE A. ZEA,

        Plaintiff,

v.

NATIONAL ASSOCIATION OF
REALTORS®, et al.,

        Defendants.

_____/

**DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFF'S FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................................1

II.     SUMMARY OF ALLEGATIONS ..............................................................................3

III.    PROCEDURAL HISTORY...........................................................................................7

IV.     LEGAL STANDARD....................................................................................................9

V.      ARGUMENT ................................................................................................................9

        A.      PLAINTIFF STILL FAILS TO PLEAD ARTICLE III STANDING ..................10

        B.      PLAINTIFF STILL FAILS TO PLEAD ANTITRUST INJURY .........................14

                1.      Plaintiff Cannot Bring an Individual Claim as a Proxy for Alleged
                        Harm to Plaintiff's Business ........................................................................ 14

                2.      Plaintiff's Conclusory Allegations of Harm to His Business Do Not
                        Support Any Harm to Competition.............................................................. 16

        C.      PLAINTIFF STILL FAILS TO PLEAD FACTS SUFFICIENT TO SHOW A
                CONSPIRACY AMONG DEFENDANTS...........................................................17

                1.      Plaintiff Does Not Plausibly Allege That Defendants' Governance
                        Structures Were Used to Further a Conspiracy........................................... 19

                2.      Plaintiff's Group Pleading and Conclusory Allegations As to
                        Conspiracy Are Insufficient to State a Claim ........................................... 20

                3.      Plaintiff's Proffered Plus Factors Do Not Make A Conspiracy More
                        Plausible...................................................................................................... 22

                4.      Plaintiff Does Not Otherwise Plead Sufficient Facts to Establish a
                        Conspiracy Among Any Defendants .......................................................... 25

        D.      NEITHER THE PER SE NOR QUICK LOOK STANDARDS APPLY TO
                PLAINTIFF'S CONSPIRACY ALLEGATIONS................................................29

        E.      PLAINTIFF STILL FAILS TO PLEAD ANTICOMPETITIVE HARM IN A
                PROPERLY DEFINED RELEVANT MARKET .................................................38

                1.      Plaintiff Does Not Plead a Plausible Product Market............................... 39

                2.      Plaintiff Does Not Plead a Plausible Geographic Market........................ 40

                3.      Plaintiff Does Not Plead Anticompetitive Effects in Any Market ........... 42

        F.      PLAINTIFF'S ALLEGATIONS ABOUT THE WRITTEN-BUYER-
                AGREEMENT RULE REMAIN UNDER THE JURISDICTION OF THE
                U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI ....43

        G.      DISMISSAL WITH PREJUDICE IS WARRANTED.........................................44

VI.     CONCLUSION..............................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Albrecht v. Herald Co.*,
    390 U.S. 145 (1968)................................................................................................30

*All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*,
    135 F.3d 740 (11th Cir. 1998) ...............................................................................31

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988)................................................................................................29

*Am. Dental Ass'n v. Cigna Corp.*,
    605 F.3d 1283 (11th Cir. 2010) .......................................................................19, 20

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
    300 F.3d 620 (5th Cir. 2002) .................................................................................42

*Aquatherm Indus. v. Fla. Power & Light Co.*,
    971 F. Supp. 1419 (M.D. Fla. 1997)................................................................31, 33

*Atlanta Fiberglass USA, LLC v. KPI, Co.*,
    911 F. Supp. 2d 1247 (N.D. Ga. 2012)..................................................................42

*Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.*,
    953 F.3d 707 (11th Cir. 2020) ......................................................................... passim

*BanxCorp v. Bankrate Inc.*,
    No. 07-cv-3398, 2012 WL 3133786 (D.N.J. July 30, 2012) .....................25, 37, 38

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................... passim

*Berrocal v. Att'y Gen.*,
    136 F.4th 1043 (11th Cir. 2025) .......................................................................13, 14

*BUC Int'l Corp. v. Int'l Yacht Council Ltd.*,
    No. 02-cv-60772, 2003 WL 27387243 (S.D. Fla. Aug. 29, 2003) .........................16

*Cal. Dental Ass'n v. FTC*,
    526 U.S. 756 (1999)................................................................................................30

*Cha-Car, Inc. v. Calder Race Course, Inc.*,
    752 F.2d 609 (11th Cir. 1985) ...............................................................................38

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*,
No. 24-cv-438, 2025 WL 893403 (N.D. Fla. Mar. 13, 2025)...................................................10

*Consol. Metal Prods., Inc. v. Am. Petrol. Inst.*,
846 F.2d 284 (5th Cir. 1988) ...................................................................................................20

*D'Augusta v. Am. Petrol. Inst.*,
117 F.4th 1094 (9th Cir. 2024) .................................................................................18, 21, 28

*Dean v. Roku, Inc.*,
No. 24-cv-2383, 2025 WL 2299403 (M.D. Fla. Aug. 8, 2025)...................................... passim

*Ferguson Med. Grp., L.P. v. Mo. Delta Med. Ctr.*,
No. 06-cv-8, 2006 WL 2225454 (E.D. Mo. 2006) ...................................................................42

*Fin. Sec. Assur., Inc. v. Stephens, Inc.*,
500 F.3d 1276 (11th Cir. 2007) .................................................................................................9

*Findling v. Realcomp II, Ltd.*,
No. 17-cv-11255, 2018 WL 1425952 (E.D. Mich. Mar. 22, 2018).........................................16

*GDHI Mktg. LLC v. Antsel Mktg. LLC*,
416 F. Supp. 3d 1189 (D. Colo. 2019).....................................................................................37

*Gov't Emps. Ins. Co. v. Glassco Inc.*,
No. 19-cv-1950, 2021 WL 3930508 (M.D. Fla. Sept. 2, 2021)...............................................26

*Hogan v. Amazon.com, Inc.*,
No. 24-1893, 2025 WL 869202 (9th Cir. Mar. 20, 2025)..................................................42, 43

*Homie Tech., Inc. v. Nat'l Ass'n of Realtors*,
No. 24-cv-616, 2025 WL 1938975 (D. Utah July 15, 2025)....................................................16

*In re Aetna UCR Litig.*,
No. 07-cv-3541, 2015 WL 3970168 (D.N.J. June 30, 2015)....................................................36

*In re Am. Online, Inc. Version 5.0 Software Litig.*,
168 F. Supp. 2d 1359 (S.D. Fla. 2001) ....................................................................................40

*In re Delta/Airtran Baggage Fee Antitrust Litig.*,
245 F. Supp. 3d 1343 (N.D. Ga. 2017).....................................................................................24

*In re Domestic Air Transp. Antitrust Litig.*,
148 F.R.D. 297 (N.D. Ga. 1993)...............................................................................................26

*In re January 2021 Short Squeeze Trading Litig.*,
No. 21-md-2989, 2022 WL 1522054 (S.D. Fla. May 13, 2022) ........................................23, 30

*In re Se. Milk Antitrust Litig.*,
　555 F. Supp. 2d 934 (E.D. Tenn. 2008)............................................................................18, 27

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
　626 F.3d 1327 (11th Cir. 2010) .................................................................................. passim

*Jacobson v. Fla. Sec'y of State*,
　974 F.3d 1236 (11th Cir. 2020) ...........................................................................................13

*JES Props., Inc. v. USA Equestrian, Inc.*,
　No. 02-cv-1585, 2005 WL 1126665 (M.D. Fla. May 9, 2005) ..............................................29

*Kifle v. Google LLC*,
　No. 22-cv-4204, 2023 WL 5538289 (N.D. Ga. Aug. 28, 2023).................................11, 15, 17

*L.H. Equity Invs. LLC v. Wade*,
　No. 09-cv-80607, 2010 WL 11505176 (S.D. Fla. Mar. 29, 2010) .........................................39

*Legends Collision Ctr., LLC v. State Farm Mut. Auto. Ins. Co.*,
　No. 14-cv-6006, 2016 WL 7404476 (M.D. Fla. Dec. 22, 2016) ............................................37

*Levine v. Cent. Fla. Med. Affiliates*,
　72 F.3d 1538 (11th Cir. 1996) .......................................................................................10, 40

*Lujan v. Defs. of Wildlife*,
　504 U.S. 555 (1992)....................................................................................................... 9, 10

*Maple Flooring Mfrs. Ass'n v. United States*,
　268 U.S. 563 (1925).............................................................................................................36

*McCullough v. Zimmer, Inc.*,
　No. 08-cv-1123, 2009 WL 775402 (W.D. Pa. Mar. 18, 2009)..............................................16

*Melancon v. Alpha Prime Supps LLC*,
　No. 24-cv-61135, 2025 WL 375903 (S.D. Fla. Jan. 13, 2025)..............................................11

*Midwestern Waffles, Inc. v. Waffle House, Inc.*,
　734 F.2d 705 (11th Cir. 1984) .......................................................................................10, 14

*Morrison v. Morgan Stanley Props.*,
　No. 06-cv-80751, 2008 WL 1771871 (S.D. Fla. Apr. 15, 2008)...........................................44

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
　883 F.3d 32 (2d Cir. 2018)...................................................................................................20

*Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*,
　748 F.2d 602 (11th Cir. 1984) .............................................................................................14

*Ohio v. Am. Express Co.*,
　585 U.S. 529 (2018)......................................................................................................30

*Perez v. Scotts Co. LLC*,
　No. 24-cv-60516, 2024 WL 5219736 (S.D. Fla. Nov. 15, 2024) .............................................9

*PhantomALERT v. Apple, Inc.*,
　762 F. Supp. 3d 8 (D.D.C. 2025) .......................................................................................40

*Pierson v. Orlando Reg'l Healthcare Sys.*,
　619 F. Supp. 2d 1260 (M.D. Fla. 2009) ..............................................................................21

*Q Club Resort & Residences Condo. Ass'n v. Q Club Hotel, LLC*,
　No. 09-cv-60911, 2010 WL 11454483 (S.D. Fla. Jan. 6, 2010)................................40, 41, 42

*Quality Auto Painting Ctr. of Roselle v. State Farm Indem. Co.*,
　917 F.3d 1249 (11th Cir. 2019) .................................................................23, 27, 31, 32

*RX Sols., Inc. v. Caremark, L.L.C.*,
　164 F.4th 436 (5th Cir. 2026) ..........................................................................................42

*S. Collision & Restoration, LLC v. State Farm Mut. Auto. Ins. Co.*,
　173 F. Supp. 3d 1293 (M.D. Fla. 2016)..............................................................................19

*Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns, Inc.*,
　376 F.3d 1065 (11th Cir. 2004) ...............................................................................16, 43

*Spokeo, Inc. v. Robins*,
　578 U.S. 330 (2016)......................................................................................................10

*St. Paul Fire & Marine Ins. Co. v. Barry*,
　438 U.S. 531 (1978)................................................................................................25, 31

*State Oil Co. v. Khan*,
　522 U.S. 3 (1997).........................................................................................................30

*Stoni Med. Staffing v. Ally Fin.*,
　No. 23-cv-3, 2024 WL 644570 (S.D. Ga. Feb. 15, 2024).......................................................12

*T. Harris Young & Assoc., Inc. v. Marquette Elecs., Inc.*,
　931 F.2d 816 (11th Cir. 1991) .........................................................................................40

*Texaco Inc. v. Dagher*,
　547 U.S. 1 (2006).........................................................................................................33

*Thomas v. Pentagon Fed. Credit Union*,
　393 F. App'x 635 (11th Cir. 2010) ......................................................................................9

*United Am. Corp. v. Bitmain, Inc.*,
   530 F. Supp. 3d 1241 (S.D. Fla. 2021) ...............................................................31, 39

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940)..........................................................................................33, 36

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972).................................................................................................37

*Williamson Oil Co. v. Philip Morris USA*,
   346 F.3d 1287 (11th Cir. 2003) .........................................................................25, 34

*YMD Records, LLC v. Ultra Enters., Inc.*,
   361 F. Supp. 3d 1258 (S.D. Fla. 2019) ....................................................................29

## STATUTES AND RULES

Sherman Act Section 1 (15 U.S.C. § 1) ................................................................. passim

## MISCELLANEOUS

*Who We Serve*, Realtor.com, https://www.realtor.com/marketing/who-we-serve/ .......................35

Defendants National Association of REALTORS®; Broward, Palm Beaches and St. Lucie REALTORS®, Inc.; Beaches MLS, Inc.; Miami Association of REALTORS®, Inc.; Orlando Regional REALTOR® Association, Inc.; Space Coast Multiple Listing Service, Inc.; Space Coast Association of REALTORS®, Inc.; Royal Palm Coast REALTOR® Association, Inc.; Florida Gulf Coast Multiple Listing Service, Inc.; Naples Area Board of REALTORS® and Association of Real Estate Professionals, Inc. (NABOR); My Florida Regional MLS, Inc. (d/b/a Stellar MLS); Northeast Florida Multiple Listing Service, Inc. (d/b/a realMLS); Northeast Florida Association of REALTORS®, Inc.; and Central Panhandle Association of REALTORS®, Inc. move to dismiss Plaintiff's First Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## I.      INTRODUCTION

Plaintiff, a real-estate agent and flat-rate broker, and Defendants, professional real-estate associations and multiple listing services, share the same goal: to promote pro-consumer and pro-competitive practices in the real-estate industry.  Plaintiff's First Amended Complaint (Dkt. No. 87, "FAC") confirms this: Plaintiff concedes that the National Association of REALTORS®' rules are "pro-competitive" and specifically aimed at preventing the anticompetitive practice ("steering") that forms the basis of the FAC.  FAC ¶ 362.

Plaintiff does not allege that Defendants themselves have engaged in "steering"—which Plaintiff alleges is the practice of real-estate agents diverting buyers away from properties based on the level of buyer-broker compensation offered by the seller. *Id.* ¶ 111.  Of course, the absence of such an allegation makes sense because Defendants—national and local REALTOR® Associations and multiple listing services—cannot engage in steering because they are not in the business of representing home buyers or home sellers.  So, Plaintiff takes the unusual and legally baseless path of conjuring a grand antitrust conspiracy where each Defendant has agreed *not to*

1

*enforce their own pro-competitive rules* to supposedly disadvantage Plaintiff's flat-rate brokerage model and others like it. *Id.* ¶¶ 3, 12. And Plaintiff even goes beyond alleging underenforcement, asserting that Defendants should have additional rules, or should interpret their current rules differently, in order to achieve (in Plaintiff's view) better outcomes. *Id.* at 91.

The FAC is in large part a retread of the same pleading this Court dismissed previously. Once again, the deficiencies with Plaintiff's approach of pursuing his preferred outcomes by bringing an antitrust case are myriad and all of the claims in the FAC suffer from a fundamental flaw: federal antitrust law is incompatible with Plaintiff's disparate and anecdotal concerns with the real-estate industry. Plaintiff also again asserts five counts for conspiracy but does not plead any facts that Defendants as a whole, or that any group of them, agreed not to enforce the very rules they put in place to achieve pro-competitive ends. Likewise, Plaintiff still fails to articulate the relevant product and geographic markets in which the alleged harm occurs—again mistakenly focusing on the products and services Defendants provide rather than any properly defined antitrust market in which the alleged underenforcement caused harm. Plaintiff also fails to plead injury-in-fact or antitrust injury because Plaintiff, an individual, cannot suffer antitrust injury based on harm that occurred to his business. And even if those harms were actionable here, Plaintiff does not plead facts that show harm to competition—rather than harm to Plaintiff's business entity (a non-party)—as is required for antitrust standing.

In short, Plaintiff's grievances are many but his factual allegations are few. In drafting his FAC, Plaintiff had the benefit of Defendants' first motion to dismiss and the Court's Report and Recommendation dismissing Plaintiff's initial complaint. Yet Plaintiff has elected to continue moving forward with his fundamentally flawed antitrust claims. Because there is no way to amend Plaintiff's antitrust claims to cure these deficiencies, the case should be dismissed with prejudice.

2

## II.     SUMMARY OF ALLEGATIONS

Plaintiff Jorge Zea operates a "Real Estate listing service" through an online platform called www.snapflatfee.com® that allows home sellers to pay a fee for a "limited" brokerage service.  FAC ¶ 18.  The service includes listing exposure on the corresponding multiple listing service ("MLS").  *Id.* ¶¶ 18, 20.  National Association of REALTORS® ("NAR") is a national trade organization that provides support to its members (including real-estate brokers, agents, and others in the real-estate industry), throughout the United States.  *Id.* ¶ 37.  Plaintiff's FAC is based on the implementation of rules promulgated by NAR and enforced by the other Defendant Associations and MLSs—rules and policies that Plaintiff concedes are "designed to prevent anticompetitive practices."  *Id.* ¶ 3.  NAR maintains a Code of Ethics and Arbitration Manual, which contains the principles that NAR requires its member REALTOR® associations to enforce with respect to NAR members, and information on enforcement.  *Id.* ¶¶ 37, 58.  NAR also publishes an MLS Handbook that includes an Antitrust Policy.  *Id.* ¶ 421.

Plaintiff names eight local REALTOR® Associations as Defendants: Broward, Palm Beaches and St. Lucie REALTORS®, Inc.; Orlando Regional REALTOR® Association, Inc.; Miami Association of REALTORS®, Inc. ("MAR"); Royal Palm Coast REALTOR® Association, Inc.; Naples Area Board of REALTORS® and Association of Real Estate Professionals, Inc. ("NABOR"); Space Coast Association of REALTORS®, Inc.; Northeast Florida Association of REALTORS®, Inc. ("NEFAR"); and Central Panhandle Association of REALTORS®, Inc. ("CPAR").  The local REALTOR® Associations facilitate members' ability to participate in the REALTOR® network and also uphold and enforce the NAR Code of Ethics.  *Id.* ¶¶ 61–62, 68.

Plaintiff also names five MLSs as Defendants: Beaches MLS, Inc.; Florida Gulf Coast Multiple Listing Service, Inc.; My Florida Regional MLS, Inc. (d/b/a Stellar MLS); Space Coast Multiple Listing Service, Inc. ("Space Coast MLS"); and Northeast Florida Multiple Listing

3

Service, Inc. (d/b/a realMLS).  As is relevant to the MLS Defendants, MLSs must adopt and enforce certain rules in NAR's MLS Handbook.  *Id.* ¶¶ 66, 58.

**"Steering."**  Plaintiff alleges that steering involves "restricting access to properties that otherwise meet the buyer's stated criteria based on the level of compensation offered."  *Id.* ¶ 113. Plaintiff does not allege that the rules and policies he challenges are themselves anticompetitive. He alleges the opposite—that Defendants have issued guidance and enacted anti-steering rules that are "pro-competitive."  *Id.* ¶ 362.  Plaintiff alleges instances where brokers purportedly took action to steer clients away from Plaintiff's properties.  *Id.* ¶¶ 154, 178, 191, 193, 199, 239–41, 251, 281. But Plaintiff did not bring this case against the brokers that allegedly engaged in steering.  Plaintiff points to NAR's own statements and policies in emphasizing that "steering is a prohibited practice under NAR policy and the Code of Ethics."  *Id.* ¶ 383.  Plaintiff alleges that Defendants have "systematically declined to find violations or issue sanctions."  *Id.* ¶ 385.  Plaintiff alleges that even with mechanisms in place through the Code of Ethics, Buyer-Broker Agreement Rule, the Internet Data Exchange ("IDX") display rule, and the MLS non-filtering rule, Defendants have collectively failed to enforce the rules.  *Id.* ¶ 387.

**The Buyer-Broker Agreement Rule.**  Plaintiff alleges that this rule requires that before touring a property, a buyer agent must have an executed Buyer-Broker Agreement that meets four requirements: (1) discloses the rate of any compensation that the MLS participants will receive; (2) ensures that the amount of compensation is objectively ascertainable and not open-ended; (3) includes a statement that MLS participants may not receive compensation from any source that exceeds the amount agreed to with the buyer; and (4) discloses in conspicuous language that broker commissions are not set by law and are fully negotiable.  *Id.* ¶ 119; *see also* Corrected Settlement Agreement ¶ 58(vi), *Burnett et al. v. Nat'l Ass'n of REALTORS®, et al.*, No. 19-cv-332 (W.D. Mo.

Apr. 19, 2024), ECF No. 1458-1.  This rule was implemented as part of a final settlement of class action litigation.  *See* Order at 87, *Burnett et al. v. Nat'l Ass'n of REALTORS®, et al.*, No. 19-cv-332 (W.D. Mo. Nov. 27, 2024), ECF No. 1622.

Plaintiff alleges this rule is incorporated as a mandatory rule in NAR's MLS Handbook and is supervised and enforced by the MLSs.  FAC ¶¶ 119, 121.  Plaintiff alleges that MLS Defendants failed to implement any mechanism to enforce this rule.  *Id.* ¶ 406.  Plaintiff alleges that he contacted NAR asking how the rule was enforced.  *Id.* ¶¶ 143–44.  Plaintiff does not allege any rule that requires NAR or any other Defendant to monitor compliance with the compensation offered and his other allegations would contradict such an assertion anyway.  Plaintiff alleges NAR informed him "[i]f there is a breach of an agreement, then the parties can take appropriate action which includes any proper legal recourse, an ethics complaint, or contacting the appropriate state or local agency."  *Id.* ¶ 152.  Plaintiff alleges several other anecdotes of contacting Defendants: (1) he alleges he received no response from MAR to an inquiry made in 2026 (*id.* ¶ 185) but also alleges that MAR previously directed him to file an ethics complaint to flag a non-compliant buyer agent (*id.* ¶ 189); (2) he alleges Stellar MLS suggested a confidential complaint filing process (*id.* ¶ 202); (3) he alleges he did not receive a satisfactory answer from NABOR (*id.* ¶ 226); (4) he alleges a CPAR hearing panel "found no violation" after considering an ethics complaint Plaintiff filed (*id.* ¶ 261); and (5) he alleges NEFAR considered and dismissed a complaint by Plaintiff regarding a buyer agent who he asserts violated the Buyer-Broker Agreement rule (*id.* ¶ 230).

**IDX Display Rule.**  Plaintiff alleges that this is a mandatory rule in NAR's MLS Handbook that was enacted in 2021.  *Id.* ¶ 122.  The rule requires websites displaying feeds from MLSs (i.e., IDXs) to "identify the listing firm, and the email or phone number provided by the listing Participant in a reasonably prominent location . . . ."  *Id.*  NAR enacted this rule so consumers

5

could contact the listing broker and have their questions answered.  *Id.* ¶ 123.  Plaintiff describes this rule as "a consumer interest and transparency measure."  *Id.*

Plaintiff alleges that "no Defendant MLS enforced this requirement systemically" and that one MLS "simultaneously and actively fined Plaintiff for placing contact information in a public MLS field."  *Id.* ¶¶ 413, 415.  Plaintiff alleges that MLS users were failing to comply with the rule.  *E.g.*, *id.* ¶¶ 209, 271.  Plaintiff acknowledges that each individual Defendant MLS "is responsible for enforcing it within its platform and among its participants."  *Id.* ¶ 412.

Plaintiff alleges that he has contacted Defendants to request enforcement of the rule and did not receive satisfactory responses.  *Id.* ¶¶ 172–77, 208–15, 245–250, 268–80.  But the communication from the CEO of Space Coast Association of REALTORS®, for example, confirms this Association did take action by submitting an urgent email to all vendors to ensure proper display and committing to investigate further.  *Id.* ¶ 275.  Plaintiff also acknowledges that an NAR representative informed him that "local MLSs own and operate their MLSs and are solely responsible for providing feeds to participants" and "directed Plaintiff to raise the issue with the local MLS directly."  *Id.* ¶¶ 268–269.

**MLS Non-Filtering Rule.**  Plaintiff alleges this is a mandatory rule in NAR's MLS Handbook that was adopted in 2021.  *Id.* ¶ 117.  This rule states that "MLS participants and subscribers must not, and MLSs must not enable the ability to, filter out or restrict MLS listings that are communicated to consumers or clients based on the existence or level of compensation offered to the cooperating broker or the name of a brokerage or agent."  *Id.*  Plaintiff concedes this rule is "pro-competitive."  *Id.* ¶ 365.  Plaintiff alleges that "no Defendant MLS implemented a systemic enforcement program, conducted proactive audits, or penalized filtering behavior or filtering-enabled platform features - despite specific notice from Plaintiff of widespread non-

compliance." *Id.* ¶ 396.  Plaintiff also acknowledges that each Defendant MLS is individually responsible for enforcing this rule.  *Id.* ¶ 395.  Plaintiff does not cite examples of specific non-compliant MLSs or local associations.

**Commissions.**  Plaintiff alleges that the 2024 MLS Antitrust Compliance Policy in NAR's MLS Handbook states:

> Boards and associations of Realtors® and their MLSs shall not: 1. Fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services. 2. Fix, control, recommend, or suggest the cooperative compensation offered by listing brokers to potential cooperating brokers.

*Id.* ¶ 125.  Plaintiff alleges that this policy is not enforced.  *Id.* ¶ 322.  Plaintiff alleges that "Defendants continue to publish 'guides' and educational materials . . . that reference 'typical,' 'standard,' or 'traditional' compensation . . ." and that this "signal[s] a collective commitment to Price Stabilization."  *Id.* ¶ 356.  Plaintiff's support for this allegation is apparently based mainly on publications from Realtor.com, a consumer-facing website whose content he alleges bears a shared copyright notice attributing ownership to both NAR and Move, Inc., a third party.  *Id.* ¶ 131. Plaintiff's only additional support for this allegation are op-eds, articles, and interviews with affiliates of NAR noting loosely that if a seller offers buyer-agent compensation as part of a listing, the listing could attract more buyers.  *Id.* ¶¶ 137–39.  Plaintiff does not allege that NAR in any way attempted to "fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services" and Plaintiff fails to allege any specific instances where enforcement mechanisms were tested and failed.

## III.   PROCEDURAL HISTORY

Plaintiff filed his original complaint on August 15, 2025.  Dkt. No. 1.  On August 27, 2025, Plaintiff filed a motion for preliminary injunction to compel Defendants' compliance with certain mandatory rules.  Dkt. No. 8.  On October 8, 2025, Defendants filed an opposition to Plaintiff's

motion for a preliminary injunction (Dkt. No. 62) and a joint motion to dismiss for failure to state a claim (Dkt. No. 59), Defendant NABOR filed a supplement to that motion (Dkt. No. 61), and then-Defendants Connecticut Association of REALTORS®, West and Southwest REALTORS® of the Valley, and Smart MLS, Inc. filed a motion to dismiss for lack of personal jurisdiction and *forum non conveniens* (Dkt. No. 60). All these motions were fully briefed. *See* Dkt. Nos. 63, 65, 68–70. On January 14, 2026, United States Magistrate Judge Matthewman found Plaintiff "ha[d] not established irreparable harm" in his motion for preliminary injunction and recommended denial of Plaintiff's motion for a preliminary injunction (Dkt. No.78 at 10), a recommendation which this Court adopted on January 29, 2026 (Dkt. No. 79).

On February 20, 2026, Judge Matthewman issued a Report and Recommendation recommending dismissal for lack of personal jurisdiction and on *forum non conveniens* grounds of Connecticut Association of REALTORS®, West and Southwest REALTORS® of the Valley, and Smart MLS, Inc. Dkt. No. 81. This Court adopted that report on March 12, 2026. Dkt. No. 82.

On March 24, 2026, Judge Matthewman issued a Report and Recommendation recommending that Defendants' motion to dismiss the complaint be granted. Dkt. No. 84 ("Report"). Judge Matthewman found that: (1) Plaintiff's "allegations do not focus on harm to competition; rather, they only allude to the impact on Plaintiff and his business," (2) Plaintiff "improperly grouped together Defendants in a manner" and deemed the Complaint deficient under Rule 8, (3) "Plaintiff has taken th[e] phrase [concerted action] out of context and invented law that states that an association of competitors' coordinated conduct satisfies the concerted-action requirement," and (4) "Plaintiff's Complaint is deficiently pled," and "Plaintiff has failed to properly respond to the Motion." *Id.* at 13, 16, 18, 19. Judge Matthewman also found that Plaintiff's opposition to Defendants' motion was "rife with hallucinated case law, and [that]

8

Plaintiff [] waived any responsive arguments supported by real law." *Id.* at 19.  On April 13, 2026, this Court adopted the Report and permitted Plaintiff "one additional opportunity to file an amended complaint" by April 27, 2026.  Dkt. No. 85 at 2.  Plaintiff filed the FAC on April 27, 2026.  Dkt. No. 87.

## IV.   LEGAL STANDARD

A complaint that fails to plead Article III standing will be dismissed under Rule 12(b)(1) for lack of subject-matter jurisdiction.  *Perez v. Scotts Co. LLC*, No. 24-cv-60516, 2024 WL 5219736, at *2, 5 (S.D. Fla. Nov. 15, 2024).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  There must be "specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* at 558.  A plaintiff must allege more than "labels and conclusions." *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007) (citing *Twombly*, 550 U.S. at 554–55).

Although pro se pleadings are given greater leniency than pleadings drafted by lawyers, such leniency "does not require or allow courts to rewrite an otherwise deficient pleading in order to sustain an action." *Thomas v. Pentagon Fed. Credit Union*, 393 F. App'x 635, 637 (11th Cir. 2010) (affirming dismissal of pro se complaint where the plaintiff failed to present any specific allegations of the defendants' conduct to sustain its claim).

## V.   ARGUMENT

Plaintiff alleges violations of only one law: Section 1 of the Sherman Act.  FAC ¶ 1.  To state any claim under federal law, Plaintiff must, as a threshold matter, plead Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  And to state a claim under the Sherman

Act, Plaintiff must also plead antitrust standing. *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 710 (11th Cir. 1984).  Yet Plaintiff pleads neither.

As to the merits of his claims, Plaintiff must plausibly plead a conspiracy among the Defendants named in the FAC. *Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020).  But Plaintiff does not plead facts plausibly supporting a conspiracy among the fourteen Association and MLS Defendants not to enforce the rules he admits are pro-competitive.  Plaintiff's misguided attempts to frame his allegations as conduct rising to per se violations of antitrust law—group boycotts, market allocation, and price fixing—evidence a fundamental misunderstanding of the nature of the conspiracy he alleges.  Nor does Plaintiff plead facts supporting essential elements of a rule-of-reason claim, including a properly defined relevant market and anticompetitive effects resulting from Defendants' exercise of market power in that market.  *Levine v. Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1551 (11th Cir. 1996).

Plaintiff's FAC is internally inconsistent, conclusory, and should be dismissed under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

### A.    PLAINTIFF STILL FAILS TO PLEAD ARTICLE III STANDING

The "irreducible constitutional minimum" of Article III standing has three elements: (1) an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) is likely to be redressed by a favorable decision of the court. *Lujan*, 504 U.S. at 560–61.  "[T]he injury-in-fact requirement requires a plaintiff to allege an injury that is both 'concrete *and* particularized.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 334 (2016) (vacating judgment where the court failed to consider the concreteness of the alleged injury).

Plaintiff bears the burden of establishing he has Article III standing to assert each claim. *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, No. 24-cv-438, 2025 WL 893403, at *1 (N.D. Fla. Mar. 13, 2025).  The requirements to state a claim apply to Article III standing, and "[a]

10

complaint must contain enough facts to plausibly allege the required elements." *Melancon v. Alpha Prime Supps LLC*, No. 24-cv-61135, 2025 WL 375903, at *2 (S.D. Fla. Jan. 13, 2025) (finding the plaintiffs lacked standing where they failed to demonstrate a concrete injury).

Here, Plaintiff still fails to plead he suffered injury-in-fact. Plaintiff also fails to plead traceability because he does not allege that any of his harms resulted from Defendants' conduct; instead, his allegations make clear that any harm was caused by non-parties who Plaintiff does not name in the FAC. As a result, Plaintiff has not met his burden to establish Article III standing, requiring dismissal of his claims.

*Pro Se Status.* As the Court found, "Plaintiff cannot file a *pro se* lawsuit on behalf of his business, especially when no information has been provided or alleged about the business structure of the business, www.snapflatfee.com®." Report at 11. Plaintiff appears to have attempted to comply with the Court's guidance that he "make clearer allegations as to his own Article III standing" (*id.*) by alleging additional facts about how his business is organized. *See, e.g.*, FAC ¶¶ 24–35. But these allegations only further establish that Plaintiff is attempting to bring claims on behalf of his business. Plaintiff attempts to convince the Court that he and his business are one and the same, but that does not save Plaintiff's lack of personal injury. *See Dean v. Roku, Inc.*, No. 24-cv-2383, 2025 WL 2299403, at *4 (M.D. Fla. Aug. 8, 2025) (holding that the pro se plaintiff and the corporation he owned were "not interchangeable plaintiffs"); *Kifle v. Google LLC*, No. 22-cv-4204, 2023 WL 5538289, at *6 (N.D. Ga. Aug. 28, 2023) (dismissing claims of pro se plaintiff who failed to show antitrust injury where the alleged harms were to his business). Plaintiff's allegations that he and www.snapflatfee.com® are interchangeable do not establish that *Plaintiff* has been personally injured. Plaintiff's allegations also are insufficient to allow Plaintiff to circumvent the prohibition against a pro se plaintiff litigating on behalf of his business.

***Injury-in-Fact.***  Plaintiff still fails to plead individual injury separate from the injury to his business.  Plaintiff claims he has suffered injuries from steering, lead diversion, and stigmatizing messaging.  *See*, *e.g.*, FAC ¶¶ 309–16.  But none of these claimed harms is concrete or particularized to Plaintiff *as an individual*.  For example, Plaintiff's alleged interactions with other brokers (*e.g.*, *id.* ¶ 154) were in his capacity as the broker of his business.  Even in attempting to allege injury to himself, Plaintiff further digs himself into the hole of alleging injury to his business only.  *See, e.g.*, *id.* ¶ 389 (repeating, for each count, that "Plaintiff has suffered antitrust injury to his personal property and service model, including lost transactions and revenue associated with specific real estate opportunities, suppressed consumer demand for Plaintiff's lower-cost service offering, impairment to the reputation, goodwill, and commercial utility of Plaintiff's service, website and registered trademark SnapFlatFee.com®, stigmatization of Plaintiff's service offering as non-standard or unreliable within the marketplace, and injury flowing from the suppression of price competition challenged in this action").  Plaintiff's failure to identify any injury-in-fact to himself, as an individual—as opposed to injury to his business—is fatal to his claims.  *See Stoni Med. Staffing v. Ally Fin.*, No. 23-cv-3, 2024 WL 644570, at \*4–5 (S.D. Ga. Feb. 15, 2024) (dismissing pro se plaintiff attempting to bring claims on behalf of a business for lack of Article III standing because the plaintiff could not show independent individual injury).

***Traceability***.  Plaintiff's claims also suffer from the fundamental lack of traceability to any conduct of *Defendants*.  Plaintiff generally alleges that Defendants do not enforce rules to prevent steering in different aspects of the real-estate industry.  But when Plaintiff's claims are actually examined, it is clear that the conduct he complains of is not attributable to Defendants.  *See, e.g.*, FAC ¶ 311 (alleging that alternative pricing models are functionally boycotted through steering and lead diversion, which is attributed to individual brokers, and through public messaging, which

Plaintiff attributes to NAR).  For example, with respect to his claim that Defendants do not enforce the Buyer-Broker Agreement Rule, all of Plaintiff's examples of non-compliant agreements acknowledge that it is *individual brokers*, not Defendants, who create these agreements.  Plaintiff claims that flat-fee brokerages, or brokers who do not offer buyer-agent compensation, are subject to having their listings ignored by buyer agents who benefit from underenforcement of the Buyer-Broker Agreement Rule and the Non-Filtering Rule.  *Id.* ¶ 307.  But this conduct is perpetuated, if at all, by *individual* buyer agents.  Similarly, with the IDX display rule, Plaintiff acknowledges that it is vendors and members who are responsible for the IDX display—not Defendants.  *See, e.g.*, *id.* ¶ 74 ("Members who receive IDX data enter into data licensing agreements with the MLS.  MLSs also provide this data IDX feed to third-party vendors who provide products and services to Association members, including websites with integrated IDX display."); *id.* ¶ 209 ("[A]lmost none of the members using the IDX feed were complying.").  Again, Plaintiff's only allegation connecting this conduct to Defendants is that Defendants purportedly tolerate the non-compliance. However, because Plaintiff complains of conduct performed by independent non-parties, rather than conduct attributable to the named Defendants, he has failed to establish traceability.  *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253–54 (11th Cir. 2020) (rejecting argument that actions done by independent parties could be imputed to the defendant "for purposes of establishing traceability").

    *Redressability.*  Without an injury-in-fact or conduct that is traceable to Defendants, there is nothing for this Court to redress.  *Berrocal v. Att'y Gen.*, 136 F.4th 1043, 1052 (11th Cir. 2025) ("A decision in the plaintiff's favor must significantly increase the likelihood that she would obtain relief that directly redresses the injury that she claims to have suffered." (citation modified)).  For the same reasons Plaintiff cannot establish traceability, he cannot establish redressability because

his theory of redressability depends on possible future actions of non-parties, who are not part of this action. *Id.* (declining to find redressability where the district court's judgment against the named defendants would not redress the plaintiff's injury involving a party not before the district court and declining to rely on "a series of speculative events" to establish redressability).

## B.   PLAINTIFF STILL FAILS TO PLEAD ANTITRUST INJURY

In addition to Article III standing, an antitrust plaintiff must have antitrust standing—that is injury of the type that the antitrust laws are designed to prevent and which flows from that which makes the defendant's acts unlawful. *Midwestern Waffles*, 734 F.2d at 710. Plaintiff does not plead antitrust injury because (1) he cannot bring personal claims as a proxy for injuries to his brokerage and (2) his allegations do not reflect injury to competition, only injury to his business.

### 1.   Plaintiff Cannot Bring an Individual Claim as a Proxy for Alleged Harm to Plaintiff's Business

As discussed above, Plaintiff pleads a series of harms and injuries that are not injuries to Plaintiff as an individual but rather injuries to Plaintiff's *brokerage*, meaning Plaintiff lacks antitrust standing to bring this case. FAC ¶¶ 299–318. It is well-established that a pro se plaintiff cannot represent a corporation in a lawsuit, and the same holds true for a pro se plaintiff attempting to bring an antitrust suit on behalf of his business. *Dean*, 2025 WL 2299403, at *4 ("Neither an officer nor an employee of a corporation has standing to bring an action in his own right for an antitrust violation causing injury to the corporation and its business." (quoting *Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984))). Plaintiff may not substitute himself as a proxy for his business, either. *Dean*, 2025 WL 2299403, at *4 (holding that the pro se plaintiff and the corporation he owned were "not interchangeable plaintiffs").

Plaintiff operates a "Real Estate listing service" through an online platform (www.snapflatfee.com®) that allows home sellers to pay a fee for a "limited" brokerage service.

14

FAC ¶ 18.  Plaintiff attempts to differentiate this service from his brokerage business.  *Id.* ¶¶ 25–35.  However, Plaintiff concedes that under Florida law his brokerage, Blue Lighthouse Realty, Inc., must be identified in advertisements for the snapflatfee.com® service and in any listings using that brand.  *Id.* ¶ 27.  The Court should disregard Plaintiff's attempt to plead around and obscure this relationship by characterizing snapflatfee.com® as a service rather than a business.

In reality, Plaintiff pleads injuries that are only experienced by his brokerage rather than by Plaintiff in his individual capacity.  For example, he alleges Defendants' conduct: (1) "impair[s] Plaintiff's service model" (*id.* ¶ 300), (2) stigmatizes his flat-rate brokerage business model (*id.* ¶¶ 301, 304), (3) diverts leads away from models like his (*id.* ¶ 303), and (4) functionally excludes his business model from competition (*id.* ¶ 311).  Plaintiff's request for monetary damages is also based on damages only to his business, including: "lost profits, lost business opportunities, and loss of business value."  *See id.* at 93.  These injuries to Plaintiff's business, rather than Plaintiff himself, vitiate antitrust standing.  *See Dean*, 2025 WL 2299403, at *4 (dismissing claims and holding allegations of "lost revenue, . . . market share and business opportunities" indicates harm to the pro se plaintiff's business rather than to the plaintiff himself).  Since Plaintiff cannot be a proxy for his brokerage, his claims should be dismissed for lack of antitrust standing.  *Id.* at *6 (holding that a plaintiff simply "cannot rely on the alleged harm to [his business] as if it belonged to him individually"); *Kifle*, 2023 WL 5538289, at *6 (dismissing claims for lack of antitrust injury and standing where the alleged harms were to his business and where any personal harms, such as lost income, were deemed to be *indirect* results of the allegedly anticompetitive conduct and thus not able to establish antitrust injury).

### 2. Plaintiff's Conclusory Allegations of Harm to His Business Do Not Support Any Harm to Competition

Plaintiff still cannot establish antitrust injury even if alleged injuries to his business could be considered individual injury-in-fact "because antitrust law protects competition, not individual competitors." *See Dean*, 2025 WL 2299403, at *5; *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, No. 02-cv-60772, 2003 WL 27387243, at *3–4 (S.D. Fla. Aug. 29, 2003) (dismissing case for failure to establish antitrust injury where only harms to the plaintiff, and not competition, were alleged); *see also Spanish Broad. Sys. of Fla. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 (11th Cir. 2004) ("[A]n antitrust plaintiff must show harm to competition in general, rather than merely damage to an individual competitor.").

Plaintiff's conclusory allegations about suppression of similarly situated business models lack factual support because Plaintiff pleads no facts about other similar businesses or any of Plaintiff's competitors. *See, e.g.*, *Findling v. Realcomp II, Ltd.*, No. 17-cv-11255, 2018 WL 1425952, at *2 (E.D. Mich. Mar. 22, 2018) (rejecting vague allegations about injuries to unidentified actors where the plaintiff did not allege facts about who the competitors were). Merely indicating that "[a]ny listing broker, seller, or agent who offers reduced, flat-fee, or no buyer-agent compensation will encounter the identical set of restraints" (FAC ¶ 307) is insufficient to identify or to establish the imminent threat of harm to these unnamed competitors. *McCullough v. Zimmer, Inc.*, No. 08-cv-1123, 2009 WL 775402, at *10 (W.D. Pa. Mar. 18, 2009) (finding no anticompetitive effects where the plaintiff made "vague references to 'unnamed competitors'").

Plaintiff offers "price stabilization and control" as an antitrust injury, but neither he (a broker) nor his brokerage have standing to sue for upward price pressure on broker commissions. *See Homie Tech., Inc. v. Nat'l Ass'n of Realtors*, No. 24-cv-616, 2025 WL 1938975, at *9 (D. Utah July 15, 2025) (holding that a low-cost brokerage could not allege antitrust injury because "a

16

plaintiff cannot suffer an antitrust injury caused by a conspiracy among its competitors to raise prices"). Plaintiff does not allege that he is a purchaser of real-estate brokerage services. While Plaintiff asserts that his allegations are supported by a "substantial body of legal actions, empirical economic studies and scholarly papers demonstrating that [compensation steering and selective non-enforcement of MLS rules] systematically distorts market structures, inflates consumer costs, and stifles innovation" (FAC ¶ 313), he cites only a single jury finding in a case against NAR and several brokerage defendants and that case did not involve allegations of non-enforcement of MLS rules (*id.* ¶ 314 (citing *Burnett v. Nat'l Ass'n of Realtors*, No. 19-cv-332 (W.D. Mo. Oct. 31, 2023))).

Any harm that Plaintiff allegedly suffered personally would be indirect injury too attenuated from the alleged anticompetitive conduct to establish an actionable antitrust injury. *Kifle*, 2023 WL 5538289, at *5 (dismissing the pro se plaintiff's claims and holding that "personal harms" are "the indirect result of the allegedly anticompetitive conduct that . . . cannot establish antitrust injury"); *Dean*, 2025 WL 2299403, at *4 (finding "wasted development costs and resources" and "lost revenue" insufficient to show antitrust injury).

In sum, Plaintiff fails to adequately plead antitrust injury because he pleads only harm to his business rather than harm to competition, fails to describe specific anticompetitive harm, and because, as a pro se plaintiff, he does not have standing to bring claims on behalf of his brokerage. Without antitrust injury, Plaintiff's FAC should be dismissed.

## C.   PLAINTIFF STILL FAILS TO PLEAD FACTS SUFFICIENT TO SHOW A CONSPIRACY AMONG DEFENDANTS

A conspiracy under Section 1 requires a plaintiff to allege "facts that plausibly suggest an agreement or conspiracy" among the defendants. *Auto. Alignment & Body Serv.*, 953 F.3d at 726. The "crucial question is whether the challenged anticompetitive conduct stems from independent

17

decision or from an agreement, tacit or express." *Id.* (quoting *Twombly*, 550 U.S. at 553); *see also D'Augusta v. Am. Petrol. Inst.*, 117 F.4th 1094, 1104 (9th Cir. 2024) ("[T]o support such a plausible inference [of conspiracy], a plaintiff must plead 'who, did what, to whom (or with whom), where, and when.'"); *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 942 (E.D. Tenn. 2008) ("To allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin.").

Allegations of mere parallel conduct fail to raise an inference of a conspiracy. *Auto. Alignment & Body Serv.*, 953 F.3d at 726. Instead, claims based on parallel conduct must include sufficient "'plus factors' to make the parallel conduct 'more probative of conspiracy than of conscious parallelism.'" *Id.* Plus factors that would support a plausible inference of conspiracy include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties;" conduct indicating "the sort of restricted freedom of action and sense of obligation that one generally associates with agreement;" or "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Twombly*, 550 U.S. at 556 n.4. Still, the threshold requirement of any Section 1 claim is the allegation of an agreement. *See id.* at 553–54.

Plaintiff's FAC fails in its entirety because Plaintiff does not allege the existence of an agreement, a critical element of a Section 1 claim. Plaintiff's failure to allege facts plausibly suggesting a conspiracy among Defendants requires dismissal of five conspiracy counts.

18

### 1. Plaintiff Does Not Plausibly Allege That Defendants' Governance Structures Were Used to Further a Conspiracy

The Court dismissed Plaintiff's original complaint for failing to plausibly allege the existence of a conspiracy to restrain trade. Report at 16. The Court also found that Plaintiff did not respond to Defendants' arguments that he failed to allege the "rim" (i.e., horizontal agreements between the local association Defendants) in his purported hub-and-spoke conspiracy. *Id.* at 16–19. Though the FAC removes explicit references to a hub-and-spoke concept, Plaintiff's underlying theory of conspiracy remains unchanged: Plaintiff asserts that Defendants' joint participation in a unified governance structure as chapters of a trade association is the mechanism of the conspiracy. FAC ¶ 92. But Plaintiff acknowledges he cannot allege that individual associations have communicated with each other to create a joint scheme to harm competition or to exclude low-cost brokerages. *Id.* ("Individual Associations do not need to have communicated directly with one another for concerted action to exist. Their joint participation in NAR's governance—where they sit together, vote together, and collectively set the rules and enforcement standards that govern all of them—is itself the mechanism of coordination."). Instead, he asks this Court to infer the existence of a conspiracy to restrain trade from his allegation that Defendants reached similar decisions not to pursue specific enforcement actions against brokers or agents accused of violating NAR's rules. *Id.* ¶¶ 95–96.

But Defendants jointly participating in a trade association's governance structure is not sufficient to establish a Sherman Act conspiracy under Eleventh Circuit precedent. *S. Collision & Restoration, LLC v. State Farm Mut. Auto. Ins. Co.*, 173 F. Supp. 3d 1293, 1301 (M.D. Fla. 2016) (granting motion to dismiss and finding that "participation in trade associations and similar organizations provides no indication of a conspiracy"); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1296 (11th Cir. 2010) (granting motion to dismiss and finding that participation in trade

19

organizations provides no indication of conspiracy and "[t]he establishment and monitoring of trade standards is a legitimate and beneficial function of trade associations" (quoting *Consol. Metal Prods., Inc. v. Am. Petrol. Inst.*, 846 F.2d 284, 293–94 (5th Cir. 1988))). And Plaintiff's allegation that NAR's decision not to act against Associations that fail to enforce certain rules constitutes "concerted action among those Associations acting through their shared national organization" (FAC ¶ 90), also attempts to establish conspiracy based on governance structure.

Plaintiff's allegation that each Association and MLS is itself a "collective body composed of competing real estate professionals" (*id.* ¶ 87) is also insufficient to establish an anticompetitive conspiracy among the *named* Defendants. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 40 (2d Cir. 2018) (affirming denial of a motion for a preliminary injunction because the plaintiff was not likely to succeed on the merits of showing a conspiracy to restrain trade because "not every action by a trade association is concerted action by the association's members" (citation modified)). That Defendants' grievance committees and hearing panels are composed of active market participants who compete with one another and with Plaintiff, does not transform their enforcement decisions into concerted anticompetitive action. *Am. Dental Ass'n*, 605 F.3d at 1296. Plaintiff's characterization of this arrangement as "competitors judging competitors" (FAC ¶¶ 340–42) describes a feature common to professional trade association self-governance and disciplinary processes generally—not evidence of a conspiracy to restrain trade.

### 2. Plaintiff's Group Pleading and Conclusory Allegations As to Conspiracy Are Insufficient to State a Claim

Plaintiff's indiscriminate group pleading about Defendants' alleged intent in the conspiracy is also insufficient to state a claim. Plaintiff's allegations about specific Defendants, where they exist, do not establish the existence of a conspiracy. Plaintiff's remaining allegations that Defendants engaged in concerted action are conclusory and non-specific about the roles that each

Defendant purportedly played in any conspiracy to restrain trade.  This Court deemed Plaintiff's initial complaint deficient under Rule 8 because Plaintiff improperly grouped together Defendants, and because allegations against seven of the Defendants were "clearly insufficient."  Report at 16.

Plaintiff did not cure these pleading deficiencies in his FAC.  Plaintiff continues to refer to "Defendants" throughout the FAC without specifying how each Defendant engaged in the anticompetitive conduct he complains of.  *See, e.g.*, FAC ¶ 324 ("Defendants have entered into a 'meeting of the minds' to maintain a restraint that is manifestly anticompetitive by its very nature."); *id.* ¶ 349 ("Defendants' parallel inaction is reinforced by a continuous stream of public signaling . . . ."); *id.* ¶ 355 ("Defendants have funded and executed national advertising campaigns and 'consumer guides' . . . ."); *id.* ¶ 364 ("Defendants send a clear, unwritten message to the market that these conduct (described in this complaint) are 'permitted' and will face no meaningful sanction.").  But Plaintiff must plead specific allegations for each Defendant.  *See Pierson v. Orlando Reg'l Healthcare Sys.*, 619 F. Supp. 2d 1260, 1271–74 (M.D. Fla. 2009) (rejecting antitrust claims as impermissible group pleading where the plaintiff's "extensive reliance" on a group term for the defendants "without differentiation among individual defendants" meant that "the reader [wa]s left to wonder about the identities of the parties involved" in the alleged conduct).  Plaintiff does not plead "who, did what, to whom (or with whom), where, and when" required to support a plausible inference of conspiracy.  *D'Augusta*, 117 F.4th at 1104.

Plaintiff has also not established that any alleged concerted action was intended to accomplish an unlawful end or restrain trade.  Plaintiff alleges that "the suppression of Plaintiff's SnapFlatFee.com® personal service is the direct and intended result of Defendants' actions" (FAC ¶ 12), but this is once again a conclusory, group pleading, unsupported by allegations of each individual Defendant's intent.

21

### 3. Plaintiff's Proffered Plus Factors Do Not Make A Conspiracy More Plausible

An assertion that Defendants conspired to refuse to enforce their own rules must go beyond allegations suggestive of mere independent inaction. *See Twombly*, 550 U.S. at 566 (finding that an antitrust complaint must be dismissed where "nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy").

Plaintiff's allegations of Defendants' failure to enforce their own rules are unsupported. For example, while Plaintiff asserts "[t]here is no passive inaction" and that "[e]ach enforcement decision within Defendants' governance structures - including the decision not to enforce or to dismiss direct steering cases - is the product of a formal collective deliberative process" (FAC ¶ 93), he does not establish that Defendants reached an agreement not to act. It is equally plausible that Defendants each reached independent decisions not to take certain enforcement actions in light of the circumstances, and Plaintiff's assertion to the contrary does not "nudge[] [his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Plaintiff relies on his own observation of the consistency of this approach (*see, e.g.*, FAC ¶¶ 95, 127), but he does not plead sufficient facts to show this was a pattern of behavior. Nor does he plead sufficient facts to establish the relative frequency of enforcement actions. Plaintiff does not allege, for example, the total number of enforcement complaints or requests received by any Defendant, the rate at which Defendants acted on such complaints, or any other baseline from which the Court could infer that the alleged non-enforcement is "systematic" rather than episodic. And Plaintiff's own allegations undercut any inference of systematic non-enforcement—the FAC acknowledges that at least one Defendant processed a violation against a REALTOR® for steering (FAC ¶ 386) and that another Defendant took affirmative corrective action in response to Plaintiff's complaints (*id.* ¶ 275). Without factual allegations establishing the denominator against which Defendants' enforcement

decisions can be measured, Plaintiff's assertion of a "consistent" pattern is precisely the type of "labels and conclusions" the Court need not accept. *Twombly*, 550 U.S. at 555.

"[E]vidence of conscious parallelism alone does not permit an inference of conspiracy unless the plaintiff either establishes that, assuming there is no conspiracy, each defendant engaging in the parallel action acted contrary to its economic self-interest, or offers other 'plus factors' tending to establish that the defendants were . . . in a collusive agreement to fix prices or otherwise restrain trade." *Quality Auto Painting Ctr. of Roselle v. State Farm Indem. Co.*, 917 F.3d 1249, 1261–62 (11th Cir. 2019).  Plaintiff offers several purported "plus factors" that he contends warrant an inference of conspiracy.  But none of Plaintiff's plus factors make his alleged conspiracy a more plausible explanation than that Defendants acted independently.

Plaintiff alleges that Defendants' "systematic failure to enforce their own Rules stands in direct contradiction to their stated purpose and economic interests." FAC ¶ 329.  But Plaintiff does not allege that Defendants had an *economic* interest in vigorous enforcement of the identified rules, merely that their alleged failures come at the cost of the perceived integrity of their data. *Id.* ¶ 326.  Absent any factual allegations about the costs of enforcing each rule or of bringing individual enforcement actions against non-complying vendors or brokers, the FAC does not negate the reasonable inference that any enforcement decisions alleged to have been made by Defendants were the result of independent, cost-based decisions about how to allocate enforcement efforts. *See In re January 2021 Short Squeeze Trading Litig.*, No. 21-md-2989, 2022 WL 1522054, at *21 (S.D. Fla. May 13, 2022) (holding that the plaintiffs failed to sufficiently allege that the defendants were acting against their unilateral self-interests to make out a plus factor where the defendants had independent business reasons for their actions).

Plaintiff's other purported "plus factors" amount to arguing that Defendants had the motive and opportunity to conspire. Plaintiff alleges that some of Defendants' *members* may have had the opportunity and motive to conspire to restrain trade. *See* FAC ¶ 78 ("Within this structure, these individuals [real-estate professionals] may encounter situations in which a decision that advances the interests or policies (or legal risks) of the Association or MLS could have a different or adverse impact on their own firm or personal business interests."); *id.* ¶¶ 343, 356 (alleging that Association committee members are bound by fiduciary duties to maximize profits, and that Defendants and their members have a financial motive to protect standard commission norms). While this may establish motive on the part of individual brokers, it does not establish either motive or opportunity as to Defendants. To the contrary, Plaintiff acknowledges that the Associations' and MLSs' interests may diverge from those of their members who compete against each other. *See id.* ¶ 78. Additionally, the desire to make a profit alone cannot be a plus factor because conscious parallelism is profit-maximizing behavior. *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1342 (11th Cir. 2010). Elsewhere, Plaintiff alleges that NAR has "identifie[d] flat-fee business models and enhanced For Sale By Owner alternatives as threats and dangers to the industry." FAC ¶¶ 140, 355. But these allegations of messaging that might stigmatize flat-fee business models are not made against the other Defendants and do not support the conclusion that they have a motive to conspire to exclude these business models. And allegations that other Defendants have engaged in this messaging are too vague to support a plausible claim because the allegations do not identify any other Defendants who have purportedly participated in or contributed to these advertising campaigns. *Id.* ¶ 350. Regardless, common motive does not suggest an agreement. *See In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343,

1380 (N.D. Ga. 2017) (collecting Eleventh Circuit and out-of-circuit authority casting doubt on whether motive could ever be a plus factor).

Plaintiff's remaining plus factors seek to establish that Defendants had opportunities to conspire through their shared governance structure. *Id.* ¶ 340 (alleging that adjudicatory bodies are comprised of brokers who compete in the alleged market); *id.* ¶ 342 (alleging that Association committees are made up of Plaintiff's rivals); *id.* ¶ 348 (alleging that "Defendants share a common governance structure and meet regularly at regional and national events"). But, as discussed above, merely participating in the joint trade association governance structure is not sufficient to establish the existence of a Sherman Act conspiracy. *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1319 (11th Cir. 2003) ("The mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy.").

### 4. Plaintiff Does Not Otherwise Plead Sufficient Facts to Establish a Conspiracy Among Any Defendants

Each of Plaintiff's five counts alleges a conspiracy related to specific "underenforcement" conduct. Plaintiff attempts to frame the conduct underlying each of his five counts as group boycott, market allocation, and price-fixing conspiracies.

To plead a group boycott, a plaintiff must present, "as a prerequisite[,] sufficient allegations of an agreement or conspiracy" and allegations of "pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *Auto. Alignment & Body Serv.*, 953 F.3d at 727 (quoting *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978)).

To plead a market allocation conspiracy, a plaintiff must plead "(1) the existence of an agreement to engage in the alleged scheme, here, market division/customer allocation, and (2) that the conspiracy imposed an unreasonable restraint on trade." *BanxCorp v. Bankrate Inc.*, No. 07-

25

cv-3398, 2012 WL 3133786, at *7 (D.N.J. July 30, 2012), *modified on reconsideration*, 2012 WL 3988182 (Sept. 11, 2012).

To plead a price-fixing conspiracy, a plaintiff must establish that the defendants "had a conscious commitment or common design or understanding to achieve [the] unlawful objective" of fixing prices. *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 315 (N.D. Ga. 1993). That "vertical agreement consists of an agreement between 'businesses operating at different levels of the same product's production chain or distribution chain.'" *Gov't Emps. Ins. Co. v. Glassco Inc.*, No. 19-cv-1950, 2021 WL 3930508, at *2 (M.D. Fla. Sept. 2, 2021). To state a claim for vertical price fixing, a plaintiff must show an agreement or practice that allows one link in a chain of distribution to control downstream market prices on resale. *Id.* at *2 n.2.

Plaintiff's kitchen-sink approach to pleading a conspiracy lacks actual allegations that establish a conspiracy. Even crediting Plaintiff's faulty group pleading, Plaintiff fails to allege a conspiracy on any count.

*Count I.* Plaintiff alleges that Defendants engaged in a conspiracy *not to enforce* an explicit anti-steering rule. *See, e.g.*, FAC ¶ 385. Plaintiff acknowledges there are, in fact, rules in place that prevent steering and condemn it as a "prohibited practice." *Id.* ¶ 383. Plaintiff alleges that Defendants have a "pattern of systematic non-enforcement" though he acknowledges an instance where one Defendant processed a violation against a REALTOR® for purportedly engaging in steering. *Id.* ¶¶ 386–87. Plaintiff pleads no facts suggesting any *agreement* amongst Defendants not to enforce such a rule. Plaintiff alleges that "[e]ach enforcement decision within Defendants' governance structures - including the decision not to enforce or to dismiss direct steering cases - is the product of a formal collective deliberative process." *Id.* ¶ 93. But this allegation focuses on Defendants' *members*; there is no allegation that Defendants engaged with other Defendants in

26

making enforcement decisions.  At best, these allegations suggest parallel conduct by Defendants. *See Auto. Alignment & Body Serv.*, 953 F.3d at 726 (finding allegations of parallel conduct "insufficient standing alone to raise an inference of conspiracy"); *Quality Auto Painting Ctr.*, 917 F.3d at 1272 (same).

Plaintiff also fails to explain the contours of the agreement not to enforce an anti-steering rule, such as when the agreement was communicated, who was involved, or what it entailed, as is necessary to plausibly plead a conspiracy.  *See In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d at 942 ("To allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin.").

*Count II*.  Plaintiff alleges that Defendants failed to implement a systemic enforcement program for the MLS Non-Filtering Rule.  FAC ¶ 396.  Plaintiff claims this constitutes a group boycott conspiracy and a "systematic refusal to deal by buyer agents who utilize these filters to shield their clients from lower-cost alternatives."  *Id.* ¶¶ 398–99.  But Plaintiff's allegations of a broader conspiracy lack factual support.  *Twombly*, 550 U.S. at 564 (holding "a few stray statements speak[ing] directly of agreement" that read as "legal conclusions" were insufficient to state a claim of conspiracy).  Additionally, Plaintiff fails to plead an agreement between NAR and each Defendant; he simply states that Defendants' "parallel non-enforcement" takes place within a "shared governance structure."  FAC ¶ 397.  Plaintiff does not explain which Defendants entered into an agreement not to enforce the non-filtering rule, preventing any inference that there was any agreement establishing a conspiracy.

*Count III*.  Plaintiff alleges that Defendants do not have mechanisms in place to enforce the Buyer-Broker Agreement Rule and do not monitor whether the compensation exchanged

27

between brokers under these agreements comply with the rule. *Id.* ¶ 406. In support, Plaintiff alleges that after emailing several Defendants asking about the procedures for enforcing the Buyer-Broker Agreement Rule, he received deficient responses. *See, e.g.*, *id.* ¶ 143 (regarding an inquiry to NAR); *id.* ¶ 201 (regarding an inquiry to Stellar MLS); *id.* ¶ 221 (regarding an inquiry to NABOR). Plaintiff also alleges that some Defendants did not respond to his inquiries regarding potential violations of this rule. *See, e.g.*, *id.* ¶ 186 (regarding an inquiry to MAR).

Regardless, Plaintiff again cites no facts suggesting that these allegations, even if accepted as true, were the result of agreements among Defendants. *See D'Augusta*, 117 F.4th at 1104 (holding that "bare allegations" are not enough to establish a conspiracy and dismissing case where no direct or "circumstantial evidence of any parallel conduct" was pleaded (citation modified)). And Plaintiff alleges nothing improper: the Buyer-Broker Agreement Rule itself requires "a written agreement with a buyer prior to touring a home." FAC ¶ 119. There is no requirement that an Association audit or inspect a broker's compensation. *See id.* Without more, these allegations "do[] not suggest a conspiracy." *Twombly*, 550 U.S. at 556–57.

*Count IV.* Plaintiff alleges that Defendants' "concurrent, structurally internal and parallel non-enforcement" of the IDX rule restrained trade in violation of Section 1 by suppressing listing broker contact information on IDX platforms. FAC ¶ 416. Plaintiff alleges he received unsatisfactory responses to his inquiries about IDX compliance from Beaches MLS (*id.* ¶ 176), Stellar MLS (*id.* ¶¶ 207, 214), realMLS (*id.* ¶ 237), Florida Gulf Coast MLS (*id.* ¶ 249), Space Coast Association of REALTORS® (*id.* ¶ 276), and non-party SmartMLS (*id.* ¶ 289).

But Plaintiff does not allege that each Defendant entered into an agreement to violate the rule. The facts alleged do not indicate that Defendants worked *with each other* in a conspiracy to engage in these alleged violations. *D'Augusta*, 117 F.4th at 1104 (requiring allegations of "who,

28

did what, to whom (or with whom), where, and when," support a plausible inference of conspiracy); *YMD Records, LLC v. Ultra Enters., Inc.*, 361 F. Supp. 3d 1258, 1264–65 (S.D. Fla. 2019) (granting motion to dismiss where the plaintiff failed to allege the "when and where" of the alleged agreement or plead any facts tending to show an agreement between defendants).

*Count V.*  Plaintiff alleges that Defendants violated the Sherman Act and their own policies by suggesting standard commissions rates for real-estate brokerage services.  FAC ¶ 423.  While Plaintiff summarily asserts that all Defendants take part in this signaling, the FAC's factual allegations about messaging efforts only describe publications made by Defendant NAR.  *See, e.g.*, *id.* ¶¶ 304–05, 349–54.  Such unilateral action does not violate Section 1 of the Sherman Act.

## D.     NEITHER THE PER SE NOR QUICK LOOK STANDARDS APPLY TO PLAINTIFF'S CONSPIRACY ALLEGATIONS

Plaintiff alleges that Defendants' conduct should be treated as per se unlawful under Section 1 of the Sherman Act.  *See* FAC ¶¶ 319–24.  Without any allegations supporting a conspiracy, analysis of Plaintiff's substantive claims is unnecessary.  In any event, per se treatment is reserved for a very small number of antitrust restraints "whose character is well understood and that almost always harm competition."  *Jacobs*, 626 F.3d at 1334; *JES Props., Inc. v. USA Equestrian, Inc.*, No. 02-cv-1585, 2005 WL 1126665, at *14 (M.D. Fla. May 9, 2005) ("Since under a per se analysis there is no inquiry into possible justifications for the challenged restraint, the per se doctrine should not be extended to restraints that are of ambiguous effect.").  Such conduct includes "business relationships that, in the courts' experience, virtually always stifle competition."  *Jacobs*, 626 F.3d at 1334.  Plaintiff does not plead any such conduct.

When challenged as anticompetitive, activities of private trade associations are most often evaluated under the rule of reason because of these organizations' potential for pro-competitive benefits.  *See* Report at 18 (citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492,

500 (1988)). Likewise, "[n]early every vertical restraint—'restraints imposed by agreement between firms at different levels of distribution'—is evaluated under the rule of reason." Report at 14 (citing *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018)). And, as the Supreme Court stated in *State Oil Co. v. Khan*, which Plaintiff appears to quote without citing (FAC ¶ 319), per se treatment is appropriate only when "experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." 522 U.S. 3, 10 (1997) (overruling *Albrecht v. Herald Co.*, 390 U.S. 145 (1968) and holding that vertical maximum price fixing is not a per se violation of the Sherman Act).

Plaintiff argues that Defendants also violated the Sherman Act under the "quick look" analysis. *See, e.g.*, FAC ¶ 367. But the quick look analysis is proper only where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). Thus, the quick look standard is inappropriate here for the same reasons the per se standard is inappropriate—Plaintiff does not allege conduct that has clear anticompetitive effects or that almost always harms competition. *See In re January 2021 Short Squeeze Trading Litig.*, 2022 WL 1522054, at *25 (refusing to apply quick look analysis or per se standard in an "unusual" case where the "features of the arrangements are unique" (citation modified)).

Plaintiff alleges that failure to enforce anti-steering rules is per se unlawful under the Sherman Act. FAC ¶¶ 321–22. But Plaintiff does not allege that *Defendants* engaged in steering; instead, he alleges they have not done enough to stop it. *See, e.g.*, *id.* This convoluted allegation is far removed from the type of conduct that is treated as per se unlawful because the economic impacts are unclear and untested. Per se treatment is not appropriate here because Plaintiff has

30

not, and cannot, establish that the character of the challenged conduct is "well understood" and "almost always harm[s] competition." *Jacobs*, 626 F.3d at 1334.

Furthermore, as discussed above, Plaintiff does not plausibly plead a conspiracy—at all— let alone a group boycott, market allocation, or "horizontal price stabilization" conspiracy. While the FAC mentions these "conspiracies," Plaintiff's attempts to force the conduct at issue into an antitrust claim should be rejected. *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 746 (11th Cir. 1998).

***Plaintiff's allegations do not constitute a group boycott.*** A group boycott exists when a group of competitors agrees to withhold, or to enlist others to withhold, "patronage or services from the target." *Quality Auto Painting Ctr.*, 917 F.3d at 1271. The target of such conduct "can be either a competitor or 'a customer of some or all of the [boycotters] who is being denied access to desired goods or services because of a refusal to accede to particular terms set by some or all of the [boycotters]." *Id.* For group boycotting to be per se illegal, it must involve horizontal agreements among direct competitors. *Id.*

Plaintiff alleges that Defendants' actions amount to a group boycott of "Plaintiff's service model," "alternative pricing models," and "'Limited Service' models like SnapFlatFee.com®." FAC ¶¶ 311, 321. But Plaintiff does not allege that Defendants are withholding from him any "patronage or services" or that Defendants have enlisted others from withholding any "patronage or services." Without such allegations, Plaintiff does not plead a boycott of any kind. *See Aquatherm Indus. v. Fla. Power & Light Co.*, 971 F. Supp. 1419, 1431 (M.D. Fla. 1997) (granting motion to dismiss where the plaintiff failed to state a claim for group boycott because he failed to allege "withholding, or enlisting [of] others to withhold, patronage or services" (quoting *St. Paul Fire & Marine Ins. Co.*, 438 U.S. at 541)); *see also United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp.

31

3d 1241, 1273–74 (S.D. Fla. 2021) (granting motion to dismiss where the conduct that plaintiff alleged did "not fit the category of a group boycott").

Plaintiff asserts that coordinated messaging has the effect of stigmatizing or marginalizing low-cost brokerage models as risky or inferior to traditional brokerage models.  FAC ¶ 304.  But this also is insufficient to state a group boycott claim because he does not sufficiently plead that this is a coordinated action, and because this messaging is not an enlistment to others to withhold their patronage of his business.  Plaintiff's allegation that messaging around the relative risks or values of low-cost brokerage models is "coordinated" among Defendants is not enough.  *See, e.g., id.* ¶ 350 (alleging that "Defendants [as a group] engage in coordinated signaling" while failing to identify any publications made by Defendants other than NAR); *id.* ¶¶ 422–23 (asserting that Defendants' use of similar phrasing about "'standard,' 'customary,' or 'typical'" commission rate ranges plausibly constituted coordinated signaling).  For example, Plaintiff alleges that a report commissioned by NAR "stigmatize[s]" "innovative, lower-cost approaches like SnapFlatFee.com" (*e.g.*, *id.* ¶¶ 104, 304), but even accepting Plaintiff's allegations, Plaintiff does not allege that Defendants *agreed* to "stigmatize" Plaintiff's business model—which is required to state a conspiracy claim.  Mere allegations that Defendants published similarly worded materials do not suggest coordination, without more.  *See Quality Auto Painting Ctr.*, 917 F.3d at 1271 (allegations that insurance companies used similar messaging techniques to steer insureds away from defendants' body shops were not sufficient to establish that defendants engaged in "identical tactics" or to rule out the possibility of independent actions).  While Plaintiff asserts that all Defendants take part in this signaling, the FAC's factual allegations about messaging efforts only describe specific publications made by Defendant NAR.  *See, e.g.*, FAC ¶¶ 304–05, 349–54.  Such unilateral action is not proscribed by Section 1 of the Sherman Act.

32

Further, even if Plaintiff had plausibly pleaded the existence of an agreement to coordinate messages that "stigmatized" or "marginalized" Plaintiff's brokerage model, this messaging falls far short of the allegations of "enlisting others to withhold patronage" necessary to state a group boycott claim. *See Aquatherm Indus.*, 971 F. Supp. at 1431 (allegations that the defendant merely recommended certain products over the plaintiff's product did not establish that the defendant refused to allow participating contractors to buy the plaintiff's product). To bring a claim for a group boycott, Plaintiff would need to be able to do more than allege that Defendants identified his brokerage model in an industry report as a potential disrupter to the real-estate industry.

*Plaintiff's allegations do not constitute price fixing.* Price fixing is defined as any "combination formed for the purpose and with the effect of raising, depressing, fixing, or stabilizing the price of a commodity" or service. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (reversing finding of per se horizontal price fixing agreement because the defendants "did not compete with one another in the relevant market"). The challenged conduct must therefore relate to the *price* of some commodity or service. Only two of the FAC's counts contain allegations connecting the challenged conduct to price. Each of these is deficient. In Count II, Plaintiff asserts that Defendants' failure to enforce the rule against filtering listings by commissions has the effect of "facilitat[ing] a price stabilization scheme where 'standard' commission levels are enforced through the threat of exclusion from the market." FAC ¶ 398. In Count V, Plaintiff alleges that Defendants violated internal policy prohibiting associations and MLS from "fixing, controlling, recommending, or suggesting commissions or fees" (*id.* ¶ 421) by publishing and endorsing certain commission ranges as standard (*id.* ¶ 422). Plaintiff contends that this signaling "operates to

reduce downward price pressure from lower-cost or alternative service offerings and to reinforce prevailing compensation structures at artificial levels." *Id.* ¶ 322.

However, concerted actions with the effect of "stabilizing" prices are not per se violations of the Sherman Act where the complaint does not plausibly allege a conspiracy to fix prices. *See above* § V.C. Nor do Plaintiff's references to "commission price signaling" (*e.g.*, FAC ¶ 3) indicate a conspiracy to fix prices. First, price-signaling theories require allegations that the communications were intended for and understood by competitors as a mechanism to coordinate price. *See Williamson Oil Co.*, 346 F.3d at 1307 (rejecting theory that the defendant's announced plan not to increase prices was a signal to competitors and instead affirming finding that the signal was a legitimate communication in the market). Plaintiff does not allege that messaging on standard or typical real-estate commissions rates was shared by NAR to communicate an agreed-upon price strategy *to its competitors* pursuant to a conspiracy. Rather, Plaintiff's own allegations acknowledge that the publications he identifies are consumer-facing educational materials to provide general information about the usual costs of REALTOR® representation so that home sellers and home buyers can appropriately budget before a significant transaction. *See* FAC ¶¶ 132–34 (describing messaging on standard or typical commission rates in materials directed to home sellers and buyers). Plaintiff does not allege that any broker or agent used these consumer-facing materials as a basis for setting their own commission rates, or that the publications were understood within the industry as directives rather than general consumer guidance.

Indeed, Plaintiff does not plausibly attribute articles published on Realtor.com to NAR: a copyright footer does not establish that NAR exercised editorial control over the specific articles Plaintiff cites, directed their content, or published them as statements of NAR policy. And in fact, the Realtor.com website, which Plaintiff cites, negates the implication Plaintiff is trying to make.

34

*See Who We Serve*, Realtor.com, https://www.realtor.com/marketing/who-we-serve/ ("While NAR licenses the REALTOR® trademark to Realtor.com® and owns the Realtor.com® URL, NAR does not own the company that operates Realtor.com®, and no dues dollars go to fund the site."). Plaintiff does not allege any facts about NAR's operational relationship with Realtor.com, such as who authored or approved the cited articles, or any mechanism by which NAR supposedly directed the editorial content of the site. Absent such allegations, a copyright notice is insufficient to attribute the substance of these consumer-facing articles to NAR as acts in furtherance of an antitrust conspiracy. And while Plaintiff alleges that NAR provided a link to a third-party resource on a consumer education page, this is not the same as publishing the "First-time Homebuying 101" e-book, and does not indicate that NAR had any control over the content. FAC ¶ 134.

And Plaintiff acknowledges several times that NAR's messaging to brokers and agents sends an equally strong message that broker fees and commissions are expected to be negotiated between a broker or agent and the buyer they are representing, and associations are not permitted to control or suggest commissions rates. *See id.* ¶ 119 (quoting NAR's 2024 MLS Handbook's mandatory requirement that a Buyer-Broker Agreement include "a conspicuous statement that broker fees and commissions are not set by law and are fully negotiable"); *id.* ¶ 125 (quoting the MLS Handbook: "Boards and associations of Realtors® and their MLSs shall not: 1. Fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services. 2. Fix, control, recommend, or suggest the cooperative compensation offered by listing brokers to potential cooperating brokers"). Crucially, the publications Plaintiff cites do not recommend or suggest that brokers charge any particular rate—they describe, in general terms and with qualifications, the range of rates that consumers may encounter in the marketplace. There is a well-recognized distinction between disseminating general market information and fixing or

35

suggesting prices. *See Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 582–83 (1925) (holding that the dissemination of trade statistics, including average pricing information, does not violate the Sherman Act where there is no agreement to fix prices). The publications Plaintiff cites confirm this distinction—they expressly state that actual rates "depend[] on" variable factors including "[l]ocal market conditions, [a]gent experience, [and] [s]cope of services," which is the antithesis of a fixed or suggested price. *See* FAC ¶¶ 132–33 (quoting a Realtor.com article). And the publications that Plaintiff quotes clearly indicate what is "average," "standard," or provide a range of commission percentages. *Id.*

As to the FAC's other counts, Plaintiff fails to explain how Defendants' purported failure to enact a prohibition on steering or to enforce a prohibition on steering as a violation of the Code of Ethics shows a conspiracy amongst Defendants to fix prices—or relates to price at all. Plaintiff does not allege how, even if Defendants did enter into some sort of agreement regarding underenforcement (which Plaintiff fails to allege), that agreement involves the price of a commodity or service. *See In re Aetna UCR Litig.*, No. 07-cv-3541, 2015 WL 3970168, at *24 (D.N.J. June 30, 2015) ("But while labelling such conduct as an agreement to fix *price*, plaintiffs actually fail to allege that the price of any product or service has been fixed or restrained."); *Jacobs*, 626 F.3d at 1343 (affirming dismissal of price fixing claims where the complaint lacked allegations of any signaling regarding price). Nor does Plaintiff allege that such an agreement was made "for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity." *Socony-Vacuum Oil Co.*, 310 U.S. at 223.

Plaintiff similarly does not connect his allegations about the IDX Display Rule to prices—let alone to a price for a specific commodity. *Jacobs*, 626 F.3d at 1343. Plaintiff proceeds into a litany of allegations that the IDX Display Rule is supposedly not enforced. *See, e.g.*, FAC ¶¶ 172–

77, 204–15, 268–80.  But none of these allegations describe conduct by Defendants that has a direct impact on price.  And Defendants are not liable for the conduct of third parties.

Plaintiff's assertion that every type of challenged conduct constitutes a price fixing conspiracy reflects the indiscriminate and undiscerning nature of his FAC.  Plaintiff fails to plead facts about any Defendant agreeing to fix prices as discussed *above* § V.C, and substantively, the two counts that mention price at all (Counts II and V) fail.  None of Plaintiff's claims can stand as a price-fixing claim.  *See Legends Collision Ctr., LLC v. State Farm Mut. Auto. Ins. Co.*, No. 14-cv-6006, 2016 WL 7404476, at \*3, 6–7 (M.D. Fla. Dec. 22, 2016) (dismissing price fixing claims where allegations of direct evidence "ha[d] nothing to do with price fixing," and the plaintiff otherwise failed to plead a price-fixing conspiracy).

***Plaintiff's allegations do not constitute market allocation.***  Market allocation is a "[horizontal] agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition."  *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972); *GDHI Mktg. LLC v. Antsel Mktg. LLC*, 416 F. Supp. 3d 1189, 1207 (D. Colo. 2019) (dismissing market allocation claims "because there are insufficient allegations that the Defendants [who were franchisees and franchisors] are competitors at the same market level").  Plaintiff must allege that Defendants "refrain from selling in one another's territories, soliciting or selling to one another's customers, or expanding into a market in which another participant is an actual or potential rival."  *BanxCorp*, 2012 WL 3133786, at \*7 (citation modified).

Plaintiff alleges that Defendants' actions result in "[m]arket [a]llocation through [s]tigmatization" (FAC ¶ 323) and "horizontal market allocation by commission level" (*id.* ¶ 398).  But none of the conduct in each of Plaintiff's five counts states a successful claim for market allocation because Plaintiff fails to allege facts that Defendants are competitors who have agreed

37

with each other (or with anyone else) not to: sell in each other's territories, solicit each other's customers, or expand into each other's markets. *See BanxCorp*, 2012 WL 3133786, at *7; *see also Cha-Car, Inc. v. Calder Race Course, Inc.*, 752 F.2d 609, 614 (11th Cir. 1985) (affirming decision not to apply per se rule to alleged market allocation because race tracks did not compete for customers or for horses); *see e.g.*, FAC ¶ 38 (alleging that Beaches MLS is controlled by Broward, Palm Beaches and St. Lucie REALTORS®); *id.* ¶¶ 39–41 (alleging that MAR operates in a coverage area that overlaps with that of Broward, Palm Beaches and St. Lucie REALTORS®); *id.* ¶ 45 (alleging that Florida Gulf Coast MLS "operates the MLS through control of Royal Palm Coast REALTORS® Association, Inc. and [NABOR]"); *id.* ¶¶ 43–44 (alleging that Orlando Regional REALTOR® Association is a shareholder of and operates in a county overlapping with those served by Stellar MLS); *id.* ¶¶ 48–49 (alleging that Space Coast MLS is under the control of and operates in the same county as Space Coast Association of REALTORS®); *id.* ¶¶ 50–51 (alleging that NEFAR directly controls and operates in the same counties as realMLS).

### E.   PLAINTIFF STILL FAILS TO PLEAD ANTICOMPETITIVE HARM IN A PROPERLY DEFINED RELEVANT MARKET

Because Plaintiff fails to plead any claim warranting per se treatment as discussed *above* § V.D, his claims should be assessed under the rule of reason, whereby "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Jacobs,* 626 F.3d at 1333 (citation modified). Plaintiff has additional burdens under this standard: in addition to pleading facts sufficient to establish the existence of a conspiracy under Section 1, to survive dismissal under a rule-of-reason analysis Plaintiff must plead that Defendants have market power in a properly defined relevant market, which includes a product component and a geographic component. *Id.* at 1336. Plaintiff must also allege that anticompetitive effects occurred in those markets. *Id.* He alleges neither.

### 1.     Plaintiff Does Not Plead a Plausible Product Market

A properly pleaded product market must comprise products that are reasonably interchangeable for the purposes for which they are produced. *L.H. Equity Invs. LLC v. Wade*, No. 09-cv-80607, 2010 WL 11505176, at *3 (S.D. Fla. Mar. 29, 2010). Plaintiff's attempted product market is legally insufficient. Plaintiff says that the relevant product market is "residential real estate brokerage services for sellers seeking to list and sell residential properties and buyers looking to purchase those properties." FAC ¶ 97. But Defendants do not compete in that market for sellers, nor does Plaintiff allege that Defendants operate as real-estate brokerages. *See id.* ¶ 98. Defendants are not brokers or real-estate agents; their members and participants are.

Plaintiff's "real estate brokerage services market" fails because he does not define it. Plaintiff includes only a single paragraph of wholly conclusory allegations in the FAC that suggest this market comprises both "limited-service" and "full-service" participants (*id.* ¶ 98) but does not describe which brokerage services a "full-service" brokerage offers that would make it comparable to those offered by Plaintiff's service model. *Cf. id.* ¶¶ 18–19 (describing Plaintiff's flat-fee brokerage model). Nor does Plaintiff provide any well-pleaded factual allegations about customer demand for each type of brokerage service. Because customers may plausibly view "full service" and "limited service" brokerages as distinct types of brokerages, it cannot be concluded at this stage that the two are reasonably interchangeable.

In fact, Plaintiff's allegations that higher prices for "traditional" brokerage service models do not lead customers to flock to lower-cost or flat fee models (*id.* ¶¶ 103–05) are at odds with the assertion that the two service models compete in a single market. *See United Am. Corp.*, 530 F. Supp. 3d at 1268 ("Courts thus pay particular attention to evidence of the cross-elasticity of demand—the extent to which consumers demand less of the particular product as the price for its alleged substitute declines." (citation modified)).

39

While the parameters of a given market are questions of fact, "antitrust plaintiffs still must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs*, 626 F.3d at 1336 (explaining that every Section 1 plaintiff must define the product market); *PhantomALERT v. Apple, Inc.*, 762 F. Supp. 3d 8, 22 (D.D.C. 2025) (explaining that both subproduct markets and broader product markets must be defined (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962))).

### 2. Plaintiff Does Not Plead a Plausible Geographic Market

Because Plaintiff failed to plead a product market, it is not necessary to assess whether Plaintiff pleads a geographic market. *Levine*, 72 F.3d at 1553 n.17 (declining to reach whether the plaintiff pleaded a proper geographic market after finding that the plaintiff "failed to adequately define the relevant product market"). Regardless, Plaintiff also does not plead a plausible geographic market.

The geographic market "is the area in which the product or its reasonably interchangeable substitutes are traded." *T. Harris Young & Assoc., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991). Although "the definition of the relevant market is essentially a factual question," *Q Club Resort & Residences Condo. Ass'n v. Q Club Hotel, LLC*, No. 09-cv-60911, 2010 WL 11454483, at *2 (S.D. Fla. Jan. 6, 2010), Rule 12(b)(6) dismissal is appropriate where a plaintiff's description of the geographic market is legally inadequate or wholly conclusory. *See In re Am. Online, Inc. Version 5.0 Software Litig.*, 168 F. Supp. 2d 1359, 1375 (S.D. Fla. 2001) (granting motion to dismiss where the plaintiff failed to adequately describe the geographic scope of the relevant market); *see also Q Club Resort*, 2010 WL 11454483, at *2 (rejecting geographic market that did not "correspond to the commercial realities of the industry").

Plaintiff pleads separate relevant geographic markets for each Defendant of "the geographic area served by the applicable Defendant MLS and Associations." FAC ¶ 99. To the

40

extent Plaintiff intended to plead a national market based on the national scope of Defendant NAR's activities, such a market is overly broad as it does not reflect Plaintiff's own allegations about the commercial realities of the industry: Plaintiff alleges residential brokerage competition is "inherently local." *Id.*; *see also Q Club Resort*, 2010 WL 11454483, at *2.

And as to the remaining markets, it is impossible to evaluate them because Plaintiff's purported product market of brokerage services does not correspond to Plaintiff's alleged geographic boundaries from the perspective of a consumer of brokerage services. Aside from recognizing that real-estate brokers use tools like MLSs in the areas for which those tools were designed (*see, e.g.*, FAC ¶ 100), Plaintiff does not sufficiently explain why the relevant markets for brokerage services (in which potential homebuyers and home sellers seek representation for residential real-estate purchases) are constrained by each Defendant's service area, nor why each Defendant's service area should constitute its own separate market. *See Q Club Resort*, 2010 WL 11454483, at *2 (finding that a pleaded geographic market was too narrow as a matter of law because it did "not correspond to the realities of the real-estate industry when there exist numerous other beach locations where consumers can practically seek alternative sources of the product" (citation modified)). Plaintiff's contention that participation in the brokerage services market depends on a broker's access to the MLSs that are controlled by certain Defendants—and that there are no practical substitutes for these MLSs—is unsupported. *Id.*

Plaintiff's geographic market allegations are also deficient because they rely on circular definitions that limit the geographic market to the local "geographic area served by the applicable Defendant MLS and Association." FAC ¶ 99. This gerrymandered geographic market defines the geographic scope of the market in terms of Defendants' actions and corresponds to Plaintiff's allegations of anticompetitive conduct, not to the commercial realities of the real-estate industry.

*See Q Club Resort*, 2010 WL 11454483, at *2 (citing *Ferguson Med. Grp., L.P. v. Mo. Delta Med. Ctr.*, No. 06-cv-8, 2006 WL 2225454, at *3 (E.D. Mo. 2006) ("geographic market that was 'gerrymandered' to exclude nearby geographic areas that provided alternative sources of the product was 'implausible' and insufficient as a matter of law") and *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 633 (5th Cir. 2002) ("geographic market limited to city-owned buildings insufficient as a matter of law because it did not correspond to the realities of the food and beverage industry")); *see also RX Sols., Inc. v. Caremark, L.L.C.*, 164 F.4th 436, 443 (5th Cir. 2026) (rejecting proposed geographic market—defined merely by where the defendants operated—as legally insufficient).  Accordingly, there is no mechanism or pleaded fact to evaluate the area of competition for a product market that has not been articulated.

### 3.      Plaintiff Does Not Plead Anticompetitive Effects in Any Market

Finally, Plaintiff's injury must have occurred in the alleged geographic and product market, but Plaintiff does not explain which associations or MLSs he is a member of or where his injury occurred.  *Atlanta Fiberglass USA, LLC v. KPI, Co.*, 911 F. Supp. 2d 1247, 1261 (N.D. Ga. 2012) ("[T]o state a claim under [Section 1 of the Sherman Act], a claimant must allege a relevant geographic market . . . *in which* harm to competition is occurring or will occur." (emphasis added)).  Plaintiff fails to tie his allegations of anticompetitive harm to the markets he alleges.

Plaintiff claims to have suffered harm because other brokers are at liberty to "steer" potential homebuyers away from properties that are listed using his brokerage service.  But that alleged harm does not occur in a putative market for brokerage services because Plaintiff does not sufficiently allege that there is a single market for these services that also encompasses the services offered by Plaintiff's brokerage model.  *See above* § V.E.1.  And because he does not allege that MLSs or associations are excluding him, Plaintiff does not allege any harm or injury suffered in the geographic antitrust markets he alleges are restrained.  *See Hogan v. Amazon.com, Inc.*, No.

24-1893, 2025 WL 869202, at *1 (9th Cir. Mar. 20, 2025) (affirming dismissal of complaint where the plaintiffs failed to allege antitrust injury in the relevant market because "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained").  By omitting allegations as to which geographic or product markets were harmed by any purported anticompetitive effects caused by Defendants, Plaintiff has failed to properly allege a relevant market.  *Spanish Broad. Sys. of Fla.*, 376 F.3d at 1074 ("[The] 'relevant market' must have been harmed by an unreasonable restraint on trade").

**F.      PLAINTIFF'S ALLEGATIONS ABOUT THE WRITTEN-BUYER-AGREEMENT RULE REMAIN UNDER THE JURISDICTION OF THE U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI**

Count III challenges Defendants' purported "parallel failure to implement any enforcement infrastructure" for the written-buyer-agreement rule.  FAC ¶ 407.  Plaintiff also seeks injunctive relief (*id.* ¶ 409) that goes far beyond the requirements of the rule itself, including monitoring and enforcing compliance with the "intended application" of the rule, ordering Defendants "to implement and maintain comprehensive education and training programs" concerning the rule, ordering Defendants to "expressively prohibit vague wording and/or self-steering clauses built into the buyer-broker agreement or any indication or insinuation that the seller will pay any compensation," and to order Defendants "to require specific wording in the buyer-broker agreement stating the buyer will pay the buyer agent compensation."  *Id*. at 92.

In addition to there being no basis for this relief in Plaintiff's deficient FAC, the relief sought with respect to this rule is particularly improper because the rule is governed by the settlement agreement reached in the *Sitzer/Burnett* case in the United States District Court for the Western District of Missouri resolving claims between NAR and home sellers related to broker compensation.  Plaintiff already attempted to challenge the settlement in the Western District of Missouri.  Order at 1, *Sitzer v. Nat'l Ass'n of REALTORS®.*, No. 19-cv-332 (W.D. Mo. Apr. 22,

43

2025), ECF No. 1691 ("Mr. Zea requests 'declaratory relief confirming that steering remains unlawful under both the Settlement Agreement and Section 1 of the Sherman Act,'" among other things."). The court rejected Mr. Zea's challenge, holding that he did not have standing to seek relief in that action because he did not move to intervene and he did not have standing to object to the settlement because he did not claim to be a class member. *Id.* at 1–2.

Furthermore, the *Sitzer/Burnett* Court (and *Sitzer/Burnett* Plaintiffs) "have authority to enforce the Settlement Agreement directly against the vast majority of MLSs in the United States," which have opted in and "agree[d] to submit to the Court's jurisdiction, including for purposes of enforcing the settlement." Final Approval Order at 21–22, *Sitzer v. Nat'l Ass'n of REALTORS®*, No. 19-cv-332 (W.D. Mo. Nov. 27, 2024), ECF No. 1622. The court explicitly rejected an objection that there was no enforcement mechanism under the NAR settlement because "the NAR Settlement Agreement expressly provides that 'the Court shall retain jurisdiction over the implementation and *enforcement of*' the Settlement Agreement, including its practice change provisions.'" *Id.* at 21 (citation modified); *see also id.* at 87 ("The Court retains continuing and exclusive jurisdiction over all matters relating to the administration and consummation of the Settlements and to interpret, implement, administer, and enforce the Settlements."). Plaintiff's attempt to circumvent that court's order is improper and outside of this Court's jurisdiction. Count III should be dismissed on these grounds alone.

## G.   DISMISSAL WITH PREJUDICE IS WARRANTED

Dismissal with prejudice is appropriate where, as here, Plaintiff has had multiple opportunities to state a cognizable claim and has been unable to correct identified pleading deficiencies. *See Morrison v. Morgan Stanley Props.*, No. 06-cv-80751, 2008 WL 1771871, at *11 (S.D. Fla. Apr. 15, 2008) (dismissing a pro se complaint with prejudice). Indeed, this FAC

was Plaintiff's "one additional opportunity to file an amended complaint."  Order Adopting and Approving R. & R. at 2, No. 25-cv-81016 (S.D. Fla. Apr. 13, 2026), Dkt. No. 85.

Plaintiff has had two opportunities to plead his claims.  He has been alerted to his pleading deficiencies by Defendants' motion to dismiss and by the Report and Recommendation, yet he continues to rely on conspiracy theories rejected by this Court.  Plaintiff has pleaded his best case and should not be given further leave to amend under the circumstances.  The Court should dismiss the FAC with prejudice.

## VI.   CONCLUSION

For these reasons, the Court should dismiss the First Amended Complaint with prejudice.

Dated: May 11, 2026

Respectfully Submitted,

**WHITE & CASE LLP**

*/s/ Zachary B. Dickens*
Zachary B. Dickens
Florida Bar No. 98935

Southeast Financial Center
200 South Biscayne Blvd., Ste. 4900
Miami, FL 33131-2352
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
E-mail: zdickens@whitecase.com

*Counsel for Defendants National Association of REALTORS®, Beaches MLS, Inc., Broward, Palm Beaches and St. Lucie REALTORS®, Inc., Miami Association of REALTORS®, Orlando Regional REALTOR® Association, Inc., Florida Gulf Coast Multiple Listing Service, Inc., Royal Palm Coast REALTOR® Association, Inc., Space Coast Multiple Listing Service, Inc., Space Coast Association of REALTORS®, Inc., Northeast Florida Multiple Listing Service, Inc. (d/b/a realMLS), Northeast*

*Florida Association of REALTORS®, Inc.,
and Central Panhandle Association of
REALTORS®, Inc.*

**GRAY | ROBINSON, P.A.**

*/s/ John A. Boudet*
John A. Boudet
Florida Bar No. 515670

301 East Pine Street, Suite 1400
Orlando, FL 32801
Telephone: (407) 843-8880
Facsimile: (407) 244-5690
E-mail: john.boudet@gray-robinson.com

*Counsel for Defendant My Florida Regional
MLS, Inc. (d/b/a Stellar MLS)*

**Bilzin Sumberg Baena Price & Axelrod,
LLP**

*/s/ Scott N. Wagner*
Lori P. Lustrin, Esq.
Florida Bar No. 59228
Robert W. Turken, Esq.
Florida Bar No. 306355
Scott N. Wagner, Esq.
Florida Bar No. 51662

1450 Brickell Avenue
Suite 2300
Miami, Florida 33131
Telephone: (305) 374-7580
Facsimile: (305) 351-2265
E-mail: rturken@bilzin.com
E-mail: swagner@bilzin.com
E-mail: llustrin@bilzin.com
E-mail: eservice@bilzin.com

*Counsel for Defendant Naples Area Board
of REALTORS® and Association of Real
Estate Professionals, Inc. (NABOR)*

46