UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No. 25-cv-81016-DIMITROULEAS/MATTHEWMAN

Jorge A. Zea

        Plaintiff, pro se,    )
                           )
        v.                 )
                           )
National Association of REALTORS®  )
(NAR), et al.,             )
                           )
                           )
                           )
Defendants.            )
_____ )

FILED BY _____ D.C.

MAY 2 6 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO ALL DEFENDANTS' MOTION
TO DISMISS OF FIRST AMENDED COMPLAINT AND TO DEFENDANT
NABOR SUPPLEMENT TO DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

I. INTRODUCTION...........................................................................................................1

II. PLAINTIFF HAS STANDING........................................................................................1

III. DEFENDANTS ARE DIRECTLY LIABLE FOR THEIR ACTIONS...................6

IV. THE CAUSE OF ACTION IS GROUP BOYCOTT AND MARKET EXCLUSION; SUPRACOMPETITIVE PRICING IS THE DOWNSTREAM EFFECT.........................................................................................................................9

V. HARM TO COMPETITORS AND TO COMPETITION PLEADED AND DOCUMENTED............................................................................................................ 12

VI. DEFENDANTS CANNOT CLAIM TRADE ASSOCIATION IMMUNITY FOR GOVERNANCE STRUCTURES WEAPONIZED TO EXCLUDE RIVALS........... 16

VII. THE CONSPIRACY ALLEGATIONS ARE SPECIFIC AND SUFFICIENT 20

VIII. PLAINTIFF'S DETAILED PLUS FACTORS ARE HIGHLY PROBATIVE OF A COORDINATED CONSPIRACY........................................................................ 24

IX. PLAINTIFF PLEADS HIGHLY SPECIFIC FACTUAL ALLEGATIONS TO ESTABLISH A CONSPIRACY UNDER ALL COUNTS........................................... 26

    A. Counts I, II, and III: Interlocking Institutional Non-Enforcement.......................... 26

    B. Count IV: The IDX Display Rule Suppression.........................................................27

    C. Count V: Structured Commission Model and Price Signaling................................. 30

X. SPECIFIC INTENT TO RESTRAIN TRADE IS NOT REQUIRED.................. 31

XI. PER SE TREATMENT APPLIES TO THE HORIZONTAL COLLECTIVE DECISION TO PRESERVE A GROUP BOYCOTT; QUICK LOOK AND RULE OF REASON ALSO INDEPENDENTLY SATISFIED.............................................. 33

    A. Defendants' Own Concessions Establish that the Targeted Conduct "Almost Always Harms Competition"................................................................................... 33

    B. The Trade Association Framework Does Not Create a Rule of Reason Presumption When Horizontal Competitors Use It to Execute an Exclusionary Scheme................................................................................................................... 37

    C. Defendants Withhold and Enlist Others to Withhold — The Group Boycott Is Established Under Quality Auto Painting's Own Standard.........................................39

    D. The Per Se Theory is Group Boycott; Supracompetitive Pricing Is the Downstream Effect, Not the Independent Basis for Per Se Treatment........................ 40

    E. Defendants Have Preemptively Foreclosed Any Pro-Competitive Justification....41

    F. If Quick Look Analysis Applies, Defendants Cannot Satisfy It.............................. 42

G.  Rule of Reason — Defendants Cannot Satisfy Even the Initial Burden.................44

**XII.  PLAINTIFF ADEQUATELY PLEADS RELEVANT MARKETS AND ANTICOMPETITIVE EFFECTS..................................................................................44**

**XIII.  THE BUYER BROKER AGREEMENT RULE VIOLATION CLAIMS ARE PROPERLY BEFORE THIS COURT............................................................................46**

**XIV. EACH DEFENDANT'S PARTICIPATION IS SUFFICIENT FOR CO-CONSPIRATOR LIABILITY.................................................................................47**

**XV. CONCLUSION..................................................................................................... 49**

# TABLE OF AUTHORITIES

**CASES**                                                                                      **Page(s)**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
    486 U.S. 492 (1988) ...................................................................................................38

*American Needle, Inc. v. National Football League,*
    560 U.S. 183 (2010) ...................................................................................... 35, 36, 37

*American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.,*
    456 U.S. 556 (1982) ......................................................................................... 9

*Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co.,*
    953 F.3d 707 (11th Cir. 2020) ...................................................................... 16, 22

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................... 15,23,24

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) ................................................................................... 7

*Burnett v. National Association of Realtors,*
    No. 4:19-CV-00332 (W.D. Mo.) ...............................................15, 32, 33, 44, 46, 47, 49

*D'Augusta v. Am. Petrol. Inst.,*
    117 F.4th 1094 (9th Cir. 2024) ................................................................. 27, 30

*Dean v. Roku, Inc.,*
    No. 24-cv-2383, 2025 (M.D. Fla. 2025)...................................................... 2,3

*Fashion Originators' Guild of America v. FTC,*
    312 U.S. 457 (1941) ..................................................................................... 34

*Green-Cooper v. Brinker Int'l, Inc.,*
    73 F.4th 883 (11th Cir. 2023) .............................................................…... 1

*Homie Tech., Inc. v. Nat'l Ass'n of Realtors,*
    No. 24-cv-616, 2025 WL 1938975 (D. Utah) ......................................... 10, 11

*In re January 2021 Short Squeeze Trading Litig.,*
  105 F.4th 1346 (11th Cir. 2024) ...................................................................... 35, 43

*Interstate Circuit, Inc. v. United States,*
  306 U.S. 208 (1939) ...................................................................... 18, 19, 20

*Jacobs v. Tempur-Pedic Int'l, Inc.,*
  626 F.3d 1327 (11th Cir. 2010) ...................................................................... 24, 33

*Kifle v. Google LLC,*
  No. 1:22-cv-04204-JPB (N.D. Ga. 2023) ...................................................................... 2, 3, 7

*Klor's, Inc. v. Broadway-Hale Stores, Inc.,*
  359 U.S. 207 (1959) ...................................................................... 13,34

*Martin v. Phillips Petroleum Co.,*
  365 F.2d 629 (5th Cir. 1966) ...................................................................... 5

*Midwestern Waffles, Inc. v. Waffle House, Inc.,*
  734 F.2d 705 (11th Cir. 1984) ...................................................................... 7

*Moehrl v. Nat'l Ass'n of Realtors,*
  Case No. 1:19-cv-01610 (N.D. Ill.) ...................................................................... 12 ,13, 43 ,44

*Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.,* ...................................................................... 3
  748 F.2d 602 (11th Cir. 1984)

*Ohio v. American Express Co.,*
  585 U.S. 529 (2018) ...................................................................... 38

*Quality Auto Painting Ctr. of Roselle v. State Farm Indem. Co.,*
  917 F.3d 1249 (11th Cir. 2019) ...................................................................... 24, 39, 40

*State Oil Co. v. Khan,*
  522 U.S. 3 (1997) ...................................................................... 34

*Thompson v. Metropolitan Multi-List, Inc.,*
  934 F.2d 1566 (11th Cir. 1991) ...................................................................... 5,6

*Todorov v. DCH Healthcare Auth.,*
  921 F.2d 1438, (11th Cir. 1991) ...................................................................... 6

*United States v. Griffith,*
 334 U.S. 100 (1948) ..................................................................... 32, 33

*United States v. Masonite Corporation,*
 316 U.S. 265 (1942) ........................................................................... 32

*United States v. Patten,*
 226 U.S. 525 (1913) ........................................................................... 32

*United States v. Socony-Vacuum Oil Co., Inc.,*
 310 U.S. 150 (1940) ........................................................................... 16

*United States v. Topco Associates, Inc.,*
 405 U.S. 596 (1972) ........................................................................... 41

*Veamcast Corp. v. Facebook,*
 No. 8:20-cv-02667-CEH-AEP (M.D. Fla.) ......................................... 2

*Veamcast Corp. v. Roku,*
 No. 8:24-cv-02113-SDM-AEP (M.D. Fla.) .......................................... 2

**STATUTE**

Sherman Antitrust Act, Section 1, 15 U.S.C. § 1 ......................................passim

**STATEMENT OF INTEREST**

Statement of Interest of the United States, Davis v. Hanna Holdings, Inc., No.
2:24-cv-02374-WB, Doc. 115 (E.D. Pa. Dec. 19, 2025) ................................ 13, 33, 34, 38

**OTHER**

National Association of REALTORS®, *The Answer Book: The Source of
 REALTOR® Association Management Leaders* (January 2024) ................................. 34

National Association of REALTORS®, *Handbook on Multiple Listing Policy* ....... 17, 33

National Association of REALTORS®, *Code of Ethics and Arbitration Manual* …….. 17

FTC-DOJ Workshop, *What's New in Residential Real Estate Brokerage Competition* (2018) ....................................................................................... 13

## I.   INTRODUCTION

Defendants' Motion to Dismiss rests on four recycled premises: that others did the steering (and signaling), not Defendants; that even if they did, they never coordinated between them; that Plaintiff cannot recover because the harm belongs to the company; and that any injury was not personal, but to the company.

The remainder of the MTD hangs from these four hooks - and every one of them is a misreading of the First Amended Complaint ("FAC") or mischaracterization. Defendants constructed a complaint they wished had been filed, then argued against it, leaving the actual factual allegations entirely unaddressed.

What is absent from the MTD is any factual controversy about what the case actually is: that the rules (and policy) exist; they are mandatory; they are designed to protect consumers and competition; each Defendant holds an explicit responsibility and enforcement role; the rules are systematically violated; and Defendants have collectively decided to leave pro-competitive rules unenforced. Also absent are any procompetitive justification for that decision. Defendants offer none, because none exists. Once this Response corrects these, the MTD has nothing left to stand on.

## II.   PLAINTIFF HAS STANDING

Under Green-Cooper v. Brinker Int'l, Inc., 73 F.4th 883, 889 (11th Cir. 2023) - the three-part test the R&R applied - Plaintiff satisfies all elements: (1) concrete and particularized injury (loss of listings, clients, goodwill and brand value); (2) causation traceable to Defendants' collective non-enforcement; and (3) redressability through injunctive enforcement of Defendants' own rules.

1

Plaintiff clearly described in the FAC (Dkt. No. 87 ¶¶ 24-35) what this Court requested regarding the structure of the business *SnapFlatFee.com*® (See Report and Recommendation, ("R&R") (Dkt. 84 p. 11)

Plaintiff is suing in his individual capacity, not on behalf of any entity. Blue Lighthouse Realty Inc. ("BLR") and Zea are different legal persons; BLR is a multi-owner stock corporation in which Zea holds shares but is not the sole proprietor.

*SnapFlatFee.com*® is not a legal entity at all; it is Zea's personal registered trademark and the (website) platform through which he individually provides listing services; the domain is registered to Zea personally. These assets belong to Zea, not to BLR or any of BLR shareholders. Neither BLR or any of its shareholders could claim injury to them. If a lawsuit would recover monetary damages, the uninjured stockholders would be proportionally unjustly enriched if BLR was the one bringing this action (as Defendants argue repeatedly in their Motion to Dismiss FAC ("MTD") (Dkt. 90). Harm to *SnapFlatFee.com*® and to Zea's real estate practice is direct personal harm to Zea.

The injury follows Zea, not BLR. If Zea transferred his license to another brokerage tomorrow, he would take his brand, goodwill, website, domain, reputation, and injury with him - BLR would continue operating under a new qualifying broker, undisturbed. The harmed assets are personal and portable.

Hence the cases used by Defendants, *Dean v. Roku, Inc., and Kifle v. Google LLC*, don't apply in this context. In *Dean v Roku* the plaintiff (Dean) had previously filed several lawsuits on behalf of Veamcast Corp (*See Veamcast Corp v Facebook*, Case 8:20-cv-02667 and *Veamcast Corp v Roku*, Case 8:24-cv-02113, Middle

2

District of Florida) without an attorney and were dismissed. By filing for Veamcast, Dean preemptively argued that the harm belonged to the corporation. Later, Dean filed pro-se claiming (*Dean v. Roku, Inc.*, the case cited by Defendants) the same harms but as if they were his, a fact that he had already defeated by filing the initial complaints.

In *Kifle v. Google LLC*, the lawsuit was dismissed because similarly to Dean, Kifle attempted to recover personal harms that belonged to his company as described by him: "Google and YouTube's monopolistic conduct has resulted in "*devastating damage to Mereja TV*" (emphasis added) (see Order Granting; *Kifle v. Google LLC* Case 1:22-cv-04204-JPB, Dkt. No. 17 at 2). While both of these cases are District Court orders; Dean is still pending appeal at the 11th Circuit Court of Appeals.

*Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984), bars an officer or employee from suing in his own name for antitrust violations that injured the corporation - it does not bar a natural person from suing for injury to his own personal property that the corporation never owned. Zea is not an officer suing for Blue Lighthouse Realty's harms; he is the registered owner of SnapFlatFee.com®, suing for injury to assets that belong to him personally and never passed to BLR.

The current case doesn't assimilate to either of the cited authority because Zea has not pleaded that the harm is to the BLR (or any other entity), nor that the assets harmed belong to the BLR (or any other entity); nor has he filed a lawsuit on behalf of BLR.

What appears to be the mischaracterization (or misunderstanding) is that when Plaintiff refers to *business*, he is referring to and *SnapFlatFee.com*® (as the court appears to understand when requesting clarification of the "structure of the business www.SnapFlatFee.com®" (Dkt. 84 p. 11). Defendants appear to incorrectly assume that the business is BLR. This distinction is misunderstood by Defense counsel, but not by Defendant NAR.

Defendant NAR describes each Realtor® as a separate economic unit and describes it as a *business* regardless of any legal incorporation structure.

NAR's own educational frameworks explicitly recognize that individual agents possess distinct business with individual professional value, proprietary branding, and intangible business assets completely independent of a corporate shell.

NAR itself, as controlling registrar of the .Realtor and .RealEstate top-level domains, expressly states, when offering them to Realtors®, that this personal domain "provides REALTORS® with everything they need to stand out, attract clients, and grow *their business* online." [1] (emphasis added), and that "*your Business simply means your real estate practice, regardless of legal structure.*" (emphasis added; email text from support@get.realestate, original preserved with metadata).

This clarifies that business - within the context of this lawsuit - means the individual economic activity of Plaintiff as an individual - definition recognized by NAR. Defense counsel interpret *business* as a separate legally structured incorporated entity, but that is not the application of the term in this case's context. Hence when Plaintiff refers to

---

[1] Website: *.RealEstate: Your Online Presence,* URL https://www.nar.realtor/realestate-your-online-presence, last visited on May 22, 2026

4

"*business*", he's not referring to BLR (the corporation), he's referring to

SnapFlatFee.com® the brand (including its intangible assets) and to Zea's professional

service.

As for standing, a binding authority from the 11th Circuit is *Thompson v. Metropolitan Multi-List, Inc.* Case, 934 F.2d 1566 (11th Cir. 1991), gives us a direct equivalent description of how Plaintiff establishes antitrust standing. The parallel to this case is telling on its own. Thompson, a real estate broker, individually filed an antitrust lawsuit against Metropolitan Multi-List, Inc, (an MLS) because the MLS used a rule to exclude him from the market via group boycott. This is what the court wrote:

> "Thompson has standing to litigate the tying claim and the *group boycott* claim. Thompson applied to use Metro's multilist service but his application was denied because he refused to purchase the tied product, membership in the Realtors. Our circuit has recognized, in a related context, that an attempt to enter a market coupled with a showing of preparedness is sufficient to establish an injury in fact, which is one of the bases of standing. See *Martin v. Phillips Petroleum Co.*, 365 F.2d 629, 633 (5th Cir. 1966). Therefore, in cases such as Thompson's, a defendant cannot benefit by the application of the standing doctrine from the fact that it is able to prevent the plaintiff from becoming a consumer of its product. As long as the plaintiff made a reasonable attempt to enter the market, *our Circuit's case law recognizes that the plaintiff has standing to contest antitrust violations which create barriers to that market.* Therefore, Thompson can litigate the validity of the entry barriers which prevented his use of the multilist service. *These entry barriers constitute the bases of the tying claim and the group boycott claim.* Moreover, the injuries which stem from Metro's ability to prevent Thompson from becoming a multilist service user are antitrust injuries and Thompson would be an *efficient enforcer* of the antitrust laws because the injuries are suffered directly." (emphasis added). *Thompson v. Metropolitan Multi-List, Inc.* at 1572.

This binding framework directly parallels the FAC. In *Thompson*, the

Eleventh Circuit confirmed that a real estate professional attempting to enter or operate

5

within a market has standing to challenge trade association barriers that block access to vital commercial infrastructure.

*Thompson* supports Plaintiff antitrust standing. The Eleventh Circuit held that injuries stemming from a defendant's ability to prevent plaintiff from accessing the multilist service "are antitrust injuries" and that plaintiff "would be an efficient enforcer of the antitrust laws because the injuries are suffered directly." *Thompson v. Metropolitan Multi-List, Inc*, 1580 (satisfying both prongs: antitrust injury suffered directly, and Plaintiff is the efficient enforcer as the immediate victim of market exclusion. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1449 (11th Cir. 1991)).

Here, Zea - a real estate broker similarly positioned to Thompson, targeted by real estate associations' regulatory conduct - suffers the same direct, non-speculative injury the Sherman Act was enacted to prevent. The injury attaches at the point of refusal to enforce. Plaintiff is an efficient enforcer under Section 1.

Accordingly, Plaintiff in this case has Antitrust Standing, Article III Standing and is an Efficient Enforcer. The issue of standing is recycled in Defendants motion throughout the MTD; arguments that must be rejected.

## III.   DEFENDANTS ARE DIRECTLY LIABLE FOR THEIR ACTIONS

Defendants misread the FAC. The case has never been that Defendants personally steered clients - it is that Defendants collectively administer the framework and affirmatively promote, enable, and protect the restraint. When Defendants argue that individual Realtors did the steering, they are defending against a premise never stated.

6

The FAC alleges that Defendants condone, endorse, permit, and enable the boycott through collective institutional decisions - not that they turned buyers away themselves.

When Defendants argue there are no allegations that they enter into agreements with one another, they ignore what the FAC actually pleads: horizontal competitors sitting together on the same committees, deliberating, reaching a meeting of minds, and producing a collective response. That is the agreement.

These two deflections - "we didn't steer" and "we didn't agree" - are so intertwined that they form nearly the entire load-bearing structure of Defendants' defense. As they now stand clarified, the MTD has nothing left to stand on. Both fail for the same reason: they attack a case that was never filed while ignoring the one that was.

Defendants central distancing argument - that individual brokers steered, not Defendants - is not a defense. It is the description of how the conspiracy operates and they are liable for it. Using Defendants' authority *Kifle v. Google LLC*, Dist. Court, ND Georgia 2023 the court wrote that

> "The harm "'should reflect the anticompetitive effect either of the violation or of anticompetitive *acts made possible by the violation.*'" Id. (quoting Brunswick, 429 U.S. at 489). This element of antitrust standing "ensures that the plaintiff, although motivated by private interests, is seeking to vindicate *the type of injury to the public that the antitrust laws were designed to prevent.*" Id. Importantly, an antitrust plaintiff "must be one against whom anticompetitive activity is directed, and not one who has merely suffered indirect, secondary, or remote injury." Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 710 (11th Cir. 1984)." (emphasis added). *Kifle v. Google LLC* at 15.

Therefore Defendants do not need to physically steer each client away from properties offering low or no compensation, to inflict a direct injury and be liable under

7

Sherman Section 1, they simply must make the violation possible, which reflects the anticompetitive effect, this is properly pleaded in the FAC.

Defendants' attribution to "others" regarding their signaling on pricing and commission structure, also fails on several fronts. The President of NAR and NAR's Chief Economist are not merely "affiliated with NAR" (Dkt. 90 at 7), as Defendants describe them.  They communicate with actual authority on behalf of NAR and on behalf of all Defendants. The actual authority given to NAR's President was given by each and every association (including Defendant Associations) via their voting participation in their Board of Directors. Defendants can't argue, now that NAR's President is somehow only speaking for NAR (there is no possible separation of NAR from Defendants' Associations and MLS, because without the last two, there is no NAR).

Regarding the MLS Antitrust Compliance Policy (MTD at 7), Defendants do not contend that Plaintiff's factual allegations of violations and non enforcement decisions would comply with the Policy, nor do they meaningfully dispute the substance of the alleged conduct. Instead, Defendants attempt to avoid attribution altogether by treating the relevant actors as if they were merely detached "affiliates" of NAR or independent third parties. Defendants therefore cannot recharacterize official institutional conduct as the disconnected acts of unrelated outsiders merely to escape attribution.

The same deflection runs through Realtor.com. Defendants argue its content cannot be attributed to NAR because NAR does not own the operating company. (MTD p. 34-35). That is the wrong test. Realtor.com expressly identifies "National Association of REALTORS® and Move, Inc." in its copyright notice, historically positions itself as

8

the "official site of the National Association of REALTORS®," and NAR directly from its website links to its content. The issue is not which corporate agreement allocates backend editorial control - it is apparent authority and public attribution. A reasonable market participant encountering content on Realtor.com communicating "typical," "standard," and "traditional" commission rates would perceive it as carrying NAR's institutional weight. Defendants cannot administer the Realtor.com® trademark, brand the platform, license the trademark - and then disclaim the public understanding and the conduct this produces.

As the Supreme Court held in *American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 US 556 81982, at 574), the court wrote: "Whether they intend to benefit ASME or not, ASME's agents exercise economic power because they act with the force of the Society's reputation behind them." Therefore, a trade association shouldn't be allowed to evade antitrust scrutiny by disclaiming responsibility for anticompetitive conduct carried out through agents acting with the force (and on behalf) of Defendants' authority. Defendants' attempts to dispose their responsibility onto others should be rejected.

## IV. THE CAUSE OF ACTION IS GROUP BOYCOTT AND MARKET EXCLUSION; SUPRACOMPETITIVE PRICING IS THE DOWNSTREAM EFFECT

A *consumer plaintiff* must trace injury through the full causal chain down to the supracompetitive price paid which is the point of antitrust injury for them, on the other hand a *competitor plaintiff* foreclosed from the market sustains antitrust injury at the boycott itself, in this case the downstream price effect is confirmation of the

9

effectiveness of the restraint, not a required element of proof of what it pleaded: group boycott.

Defendants invoke *Homie Tech., Inc. v. Nat'l Ass'n of Realtors*, No. 24-cv-616, 2025 WL 1938975 (D. Utah July 15, 2025), for the proposition that a low-cost brokerage cannot suffer antitrust injury from a conspiracy among competitors to raise prices. That concept is irrelevant in this case.

First, *Homie* carries no settled precedential weight. *Homie* is a July 2025 district court decision from the District of Utah - a court with no supervisory authority over this Court - and it is currently on appeal to the Tenth Circuit. A non-final district court opinion under active appellate review is entitled to the least possible persuasive weight.

Second, the Homie holding has no application here. That case relied on the assumption that a low-cost brokerage cannot be harmed by a price conspiracy because it could simply undercut the competition's price to win clients. But the Plaintiff here is not claiming that high commissions directly harmed him. Rather, the Plaintiff is showing that the Defendants' market restraint makes undercutting commissions completely impossible.

In a conventional market (as in *Homie's* quoted statement), a seller sets a price and a buyer decides whether to purchase it. If competitors fix their prices high, a low-cost entrant can easily attract buyers directly by offering a better deal. In that normal world, the competitive advantage naturally flows to the cheaper alternative.

10

The Defendants attempt to frame this using traditional, but completely inapplicable economic theory about how buyers choose between substitute products when the price of the other is modified (cross-elasticity of demand (MTD at 39)). But this theory breaks down entirely in the real estate intermediation market because a *housing unit* and *broker's services* are not competing substitute products.

*In a normal market, lower prices act as a magnet for consumers. In this distorted market, lower commissions act as a repellent for the intermediaries who control consumer access.* Because buyer agents capture the buyer's attention and act as strict gatekeepers between buyer and seller (or its listing agent), they do not evaluate a property based on what is best or cheapest for their client - they evaluate it based on what the seller or listing agent will pay them. A lower home price cannot attract a buyer if the buyer's agent hides the listing and steers the buyer away. Ultimately, this structural capture turns the broker's paycheck into a weapon to exclude low-cost competitors, with the downstream stabilization of high commissions as proof that the exclusion worked.

The injury to Plaintiff is therefore not that Defendants' rules made his pricing uncompetitive. *The injury is that Defendants' actions made his pricing irrelevant* - by interposing a financially conflicted intermediary between Plaintiff's listings and the buyers, and by collectively dismissing violations of the rules, rewarding that intermediary for excluding low-commission competitors. That is injury by market exclusion through intermediary capture as claimed by Zea, not injury by high price-fixing (as explained by Defendants with *Homie*). Defendants' reliance on *Homie* should be rejected.

11

## V.    HARM TO COMPETITORS AND TO COMPETITION PLEADED AND DOCUMENTED

Defendants allege that FAC pleadings are insufficient to show harm to: 1) competition and 2) similarly situated competitors. (MTD Sec 2(b)). Defendants appear to confuse competition with competitors.  Competition is a much more broad concept, where competitors are just one of the elements of competition and Plaintiff's FAC dedicates an entire section to describing the harm to competition (FAC ¶¶ 299 to 318). These arguments stand uncontested in the MTD, but Plaintiff will expand now that Defendants argue absence of some elements.

First, on harm to other competitors. Reading the citations in the Factual Allegations (Section X) of FAC, it is clear that the boycott is not only targeted at Plaintiff in particular but at the entire subset of brokers that offer reduced or no buyer-broker compensation.

The following statements from the FAC are targeted steering of all competitors situated similarly to Plaintiff: "They are not interested in paying me as a buyers broker and with your compensation program I don't work for nothing" (FAC ¶ 154), "Not showing any %1 properties!!!  Debi", and "No one is going to show a house that the seller is paying one percent commission. Please do not email me.!!!" (FAC ¶ 166); "We have decided not to show it since they don't offer any compensation. Good luck." (FAC ¶ 259).  The FAC documents several additional, substantially identical refusals from separate agents across separate and identified Defendants' jurisdiction. See FAC ¶¶ 154, 191, 193, 228, 239, 259, 265. These are instances when the enabled steering

12

target equally other competitors similarly situated as Plaintiff (those who offer low or no compensation to buyer agents).

Nevertheless, pleading that the restraint harmed other similarly positioned competitors is irrelevant under " *Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207 at 213, (1959).*

> "*A group boycott is not to be tolerated merely because the victim is just one merchant* whose business is so small that his destruction makes little difference to the economy. Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups." (emphasis added)

All Defendants, and particularly NAR, were already reasonably on notice that the market restraints alleged here do not occur in isolation or just to Plaintiff, but are part of a largely documented, nationwide pattern.

Nevertheless, in addressing Defendants' argument of lack of harm to similarly situated competitors, this Court may take judicial notice of public records, dockets, and evidentiary submissions from related federal antitrust litigation to demonstrate the systemic nature and harm to similar competitors.

In *Moehrl v. Nat'l Ass'n of Realtors*, Case No. 1:19-cv-01610 (N.D. Ill.), the plaintiffs formally introduced extensive evidence into the class certification record documenting market-wide steering. Specifically, in the Memorandum in Support of Class Certification, *Moehrl* Doc. 324 (see *Moehrl,* Fried Decl. Doc. No. 324-4), and Expert Class Certification Report of Professor Einer Elhauge (*Moehrl* Doc. No. 324-6 ¶¶ 202-203), the record incorporates over 600 recorded telephone calls where buyer-brokers affirmatively steered clients away from listings offered by REX Real Estate - a

now-closed brokerage - specifically because REX did not provide a blanket, unilateral offer of buyer-agent commission. Regardless of why the case was ultimately dismissed, the overwhelming evidence of steering addresses Defendants' request for other similar participants impacted by their decision.

In that same case plaintiffs introduced a statement where Trelora's (a low cost brokerage) former CEO Joshua Hunt testified at a 2018 FTC-DOJ workshop[2] that after offering flat-fee buyer-agent compensation of $2,500, "we've had bricks thrown through car windows. We've had our cars egged... I've got here a list of over 719 brokerages in Denver alone that have flat out said, we will not show TRELORA listings.'" *Moehrl,* Dkt. 324-6 ¶ 205.

This Court should take judicial notice of these patterns of evidence, as they confirm a wide and documented pattern of market-wide exclusionary conduct against similarly situated competitors rather than isolated individual anecdotes.

The United States Department of Justice, in a Statement of Interest filed December 19, 2025, confirmed the scale and seriousness of the competitive harm at issue. *Statement of Interest of the United States, Davis v. Hanna Holdings,* Inc., No. 2:24-cv-02374-WB, Doc. 115 (E.D. Pa. Dec. 19, 2025). "The DOJ affirmed that broker commissions and related costs totaled $170 billion in 2024 - 0.6% of total U.S. GDP" *Id* at 1).

---

[2] *What's New in Residential Real Estate Brokerage Competition – An FTC-DOJ Workshop*
URL://www.ftc.gov/news-events/events/2018/06/whats-new-residential-real-estate-brokerage-competition-ftc-doj-workshop

14

Second in regards to harm to competition. NAR contends that Plaintiff's reference in FAC ¶ 313 to a "substantial body of legal actions, empirical economic studies and scholarly papers" is unsupported because the FAC cites only the *Burnett* jury verdict." That argument misapprehends the pleading standard and ignores the public documentary record.

The standard is plausibility. *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)*. FAC ¶ 313's allegation that such a body exists is a factual allegation the Court must accept as true at this stage. NAR's demand for itemization at the pleading stage is a demand for proof, not plausibility.

Nevertheless, since NAR has placed the allegation directly at issue, Plaintiff identifies the following, which constitutes precisely the substantial support that Defendant argues is missing.

The aggregate weight of literature spanning a Supreme Court judgment, decades of DOJ enforcement, multiple federal Statements of Interest, a DOJ amicus brief, FTC supports, a $1.78 billion jury verdict, multiple pending federal antitrust actions across multiple circuits, FTC/DOJ workshops and abundant peer-reviewed and expert economic analyses (Exhibit 1) - is part of the "substantial body" Plaintiff alleged. That body does not merely establish plausibility. It establishes that buyer-broker steering is endemic and anti-competitive creating market distortion with deep competitive and market harm; and that it operates through precisely the mechanisms - horizontal agreements of group boycott (via enabled steering) and market allocation described in the FAC.

15

Additionally, when Defendant NABOR argues (Dkt. 91) that Plaintiff only describes one overt act by NABOR, is irrelevant. Sherman Act, Section 1 liability attaches upon the agreement itself; personal commission of acts by each member is unnecessary (yet they are asserted in the FAC). As described in *United States v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150, 225 (1940). "And it is likewise well settled that conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring. *Nash v. United States*, 229 U. S. 373, 378.""

## VI.   DEFENDANTS CANNOT CLAIM TRADE ASSOCIATION IMMUNITY FOR GOVERNANCE STRUCTURES WEAPONIZED TO EXCLUDE RIVALS

The Defendants argue on page 19 of their MTD that their joint participation in a trade association's governance structure is insufficient to establish a Sherman Act conspiracy. They contend that because "not every action by a trade association is concerted action," the local panels' disciplinary and enforcement decisions are merely ordinary features common to professional trade association self-governance rather than an actionable antitrust conspiracy. This argument severely misstates the FAC. The Plaintiff does not argue that the mere existence of a governance structure is illegal. Rather, Plaintiff alleges that horizontal competitors actively subverted and weaponized that governance structure to execute a horizontal restraint of trade. It is the horizontal meeting of minds by direct competitors that restrains trade and is actionable.

In *Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins.* Co., 953 F.3d 707, 726 (11th Cir. 2020)—a case the Defendants themselves cite as a threshold requirement—the court held: "The crucial question is whether the challenged

16

anticompetitive conduct stems from independent decision or from an agreement, tacit or express."

When horizontal competitors acting on behalf of the organization, look at undisputed, written admissions of anti-competitive steering and unanimously vote "No Violation," that outcome cannot legally or economically be categorized as "independent decision-making.", neither as competition enhancing or consumer protecting.

By utilizing the Association's structural committees to systematically immunize steering against low commission listings, the competitors collectively altered the operational rules of the local market.

The Defendants' contention that the FAC must be dismissed for failure to allege a horizontal "rim" is both legally and factually deficient. As an initial matter, the Plaintiff has not labeled or restricted the antitrust claims to a vertical hub-and-spoke theory in the FAC. However, because the Defendants' MTD explicitly invites this structural analysis, the Plaintiff demonstrates below that the FAC more than adequately alleges a complete, multi-tiered conspiratorial architecture containing all necessary horizontal elements.

Contrary to the Defendants' mischaracterization, the operational reality of this conspiracy does not rely on single, broken wheels. Rather, the FAC sets forth a coordinated, two-tiered hierarchical conspiracy where the horizontal "rim" or agreement is explicitly formed and maintained at two distinct operational levels. Even though a hub and rim are not indispensable for proving antitrust liability (only when hub and spoke is

17

invoked), Plaintiff describes the functioning conspiracy in these terms, just to satisfy it in form, not in necessarily to define it as hub and spoke model, which is not pleaded.

Tier 1: The Macro-Conspiracy. At the macro-level, NAR functions as the centralized hub, with the Defendant Associations and MLSs acting as the spokes. The horizontal glue (the rim-equivalent) that binds these independent associations together is their systemic, *surrender of individual business autonomy to a single, uniform set of mandates*. NAR issues identical, non-negotiable marching orders to each Defendant Association and MLS, including the mandatory Handbook on Multiple Listing Policy, the Code of Ethics, the Internet Data Exchange (IDX) rules, and the strict Code of Ethics and Arbitration Manual.

By accepting these uniform guidelines, each local spoke knowingly surrenders its independent capacity to make localized, autonomous administrative decisions. To establish a conspiracy in this situation,  antitrust law does not require proof of direct, cross-communication between the individual local associations. As the Supreme Court explicitly established in *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 227 (1939):

> "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. *Schenck v. United States*, 253 F. 212, 213, aff'd, 249 U.S. 47; *Levey v. United States*, 92 F.2d 688, 691. Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act.""

Tier 2: The Local-Conspiracy (The Local Association and MLS / members) At the local-level, the multi-tiered structure repeats itself: the Defendant Associations and

18

MLSs shift from spokes into localized "Sub-Hubs," while their individual member brokers function as the spokes. At this second tier, the horizontal "rim" is established through direct, explicit face-to-face communication, coordinated discussion agreement and voting among the competing brokers. This horizontal agreement is forged inside private grievance committee meetings, board of directors meetings, and the closed-door ethics "Executive Sessions" specifically organized to process, manipulate, and dispose of documented steering and other steering-enabling violations.

Therefore, even though a formal "hub-and-spoke" label is not required to be pled in the FAC, the underlying factual architecture is clearly defined. The two-tier structure contains both the vertical national level (via uniform surrender of individual autonomy) and horizontal at the local level (via direct explicit coordination inside Defendants MLSs and Associations).

Defendants cannot simultaneously invoke governance and deny agreement. Their motion argues that NAR's ethics panels, MLS enforcement structures, and rules committees are legitimate trade association activity deserving deference. But governance is the agreement. A grievance committee that votes to enable and allow to maintain the violations - is acting collectively, on behalf of member Realtors® who participate in and decide rules violations. An ethics panel that adjudicates non-compliance with those rules is not a neutral arbiter - it is an enforcement mechanism of the conspiracy. Defendants cannot point to governance structures as evidence of legitimacy in one sentence and deny concerted action in the next. The governance they invoke is the concerted action Plaintiff alleges. If there was no agreement, there is nothing to govern. If there was governance,

19

there was an agreement. These defenses are mutually exclusive, and Defendants have pleaded both.

## VII.   THE CONSPIRACY ALLEGATIONS ARE SPECIFIC AND SUFFICIENT

The Defendants' contention on page 20 that the FAC relies on impermissible group pleading and conclusory assertions completely mischaracterizes the exhaustive factual layout of the complaint. At the Motion to Dismiss stage, the Plaintiff is required only to state facts that plausibly suggest a conspiracy, not to prove its existence. The FAC handily beats this standard by moving beyond generalized placeholders and identifying explicit, separate courses of conduct for each named Defendant.

Defendants complain that the FAC uses "Defendants" collectively without specifying which Defendant did what. Here Defendant misreads both the FAC and the law. FAC ¶ 93 alleges that Defendants collectively designed and enforced the commission-tier system as a coordinated institutional architecture — not a series of independent acts. FAC ¶ 315 alleges that each Defendant participated in and benefited from that architecture. Under *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939), "Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."

Defendants misread the use of "Defendants" as a pleading defect. It is structural accuracy. NAR has no independent will - every rule it issues was voted on by committees of Defendant associations' representatives; when NAR speaks, the Defendant

20

associations speak, and NAR sits above all, distributing uniform principles downward through every layer. Defendant Associations and MLSs have no independent will other than the will of their members; when they speak, their members speak - members who are simultaneously members of their local association, their local MLS, and NAR itself. Each Defendant MLS is owned or controlled by a Defendant association; an MLS enforcement decision is an association decision executed through a subsidiary vehicle. CPAR has no separate MLS at all - its ethics panels are committees of active member brokers who are direct competitors of Plaintiff.

It is Defendants who chose to act in unison - through shared rules, shared governance, shared guidance and shared enforcement machinery. Having conspired as a unified network, they cannot now demand that the FAC surgically disaggregate what they deliberately integrated. Defendants cannot invoke NAR's governance authority to resist liability and simultaneously disclaim it to defeat attribution. The structural unity they cite for immunity is the same structural unity that makes "Defendants" the correct collective term when addressing the intertwined framework. Collective attribution tracks collective action. That is not a defect - it is the conspiracy described with precision.

Plaintiff is not required to allege that a named executive from any Defendant personally told a buyer's broker to steer away from low offering commissions. It is sufficient - and it is pleaded - that Defendants jointly constructed and enforced the system that made steering the only rational economic choice. Collective institutional pleading is not a defect; it is the correct way to describe a conspiracy that operated through strict interrelated governance structures, not memos.

21

The Defendants attempt to frame the allegations as passive, unilateral marketplace drift. Section X of the FAC explicitly documents that the Defendants' responses to notices of violations were highly formal, coordinated administrative interventions. For each named entity, the FAC details exactly who did what, when, and how: The Grievance and Professional Standards Panels: Competing brokers were assembled into formal committees, reviewed uncontradicted written confessions of steering, conducted hearings, entered into private "Executive Sessions," discussed and reached a meeting of minds, and collectively rendered written decrees. The Executive Board Appellants: Board members met at the directorial level to process, evaluate, and formally affirm those panel dismissals via a meeting of minds. The Top-Down Coordination: Documented communications reveal specified local spokes (such as NABOR, Space Coast and Broward Palm Beach and St Lucie Associations) actively corresponding with NAR to orchestrate responses and defensive postures and synchronize their administrative outcomes and communications. These are not allegations of automated, independent, passive non-feasance. They are explicit descriptions of structural processes, affirmative actions undertaken through formal organizational mechanisms to immunize market exclusion..

Using the exact precedent the Defendants invoke "Auto. Alignment & Body Serv. v. State Farm Mut. Auto. Ins. Co., 953 F.3d 707, 726 (11th Cir. 2020), "The "crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, *tacit or express*.". (emphasis added) (quoting

22

*Twombly*, 550 U.S. at 553). The FAC cleanly satisfies both paths (the express agreement and the tacit agreement) to establishing a Section 1 agreement (p. 24):

The Express Agreement Path: An express antitrust agreement occurs when independent, horizontal centers of decision-making meet with a unity of purpose and form a conscious commitment to a common scheme. The FAC explains that the local committee panels and executive sessions are the structural vehicles where these horizontal agreements are forged. Because the Defendants enforce total secrecy (as a black box) over these sessions - leaving no transcripts or minutes -the signed, final written "No Violation" order represents the physical, explicit text of their mutual agreement to insert an unwritten anticompetitive exemption into the local marketplace.

Here a group of horizontal competitors, Realtors®, meet in private to discuss and render a decision via the meeting of minds; this is horizontal agreement.  And when the decisions (which is the only window into the *black box*) is always denial of enforcement of explicit admitted violation of pro competitive rules … the expected effect is anticompetitive (market exclusion via group boycott).

The Tacit Agreement Path (Parallel Conduct + Plus Factors): To the extent that the "Black Box" masks the explicit dialogue of the conspirators, the FAC additionally describes the tacit agreement via a systemic parallel pattern. Multiple separate times across distinct jurisdictions, independent panels faced the exact same input - admitted steering violation - and executed the exact same rule-contradictory response: an acquittal.

23

All Defendants were fully aware of their mandatory pro-competitive rules, were handed undisputed evidence of violations, and chose to uniformly exercise their administrative veto power. This identical, cross-market pattern of subverting pro-competitive rules to suppress low-cost listing options, the detailed plus factors, and documented harm to competitors and to competition (market harm) are the "further factual enhancement" required by *Bell Atl. Corp. v. Twombly*, to push the claim past the line of mere possibility into absolute antitrust plausibility.

## VIII.   PLAINTIFF'S DETAILED PLUS FACTORS ARE HIGHLY PROBATIVE OF A COORDINATED CONSPIRACY

The Defendants contend in the MTD that the parallel systematic failure to enforce anti-steering and display rules was merely a series of independent, cost-based resource allocation decisions, and that a shared profit motive cannot serve as a plus factor under *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1342 (11th Cir. 2010). This defense misstates the circumstantial pleading standard under Section 1. Under the controlling framework of *Quality Auto Painting Ctr. of Roselle v. State Farm Indem. Co.*, 917 F.3d 1249, (11th Cir. 2019), the court, in its conclusion wrote:

> "None of this is to suggest that any of these plus factors or facilitating factors, standing alone, would allow the plaintiff in another case to survive a motion to dismiss. The plus factor inquiry is wholistic. We cannot analyze each possible plus factor in isolation, accept or reject it, and move on to the next. Instead, we view all the possible plus factors and the allegations that support them in their proper economic context. And only then we decide, whether, viewed as a whole, there is enough to "nudge the claim across the line from conceivable to plausible." Jacobs, 626 F.3d at 1333 (internal quotation marks and citations omitted)."

24

The FAC sets forth separate, highly specific plus factors that handily satisfy this threshold when considered as a whole in context with the entire allegations. Actions Contrary to Economic Self-Interest: Associations and MLSs derive their commercial utility from the absolute integrity of their shared data platforms. Permitting unpunished steering and non-compliance degrades that data stream. No rational administrative entity would independently choose to corrupt its own platform - unless acting in tandem under a collective horizontal agreement to insert an unwritten safe harbor protecting traditional commissions. Adding to this the fact that all Defendants are not-for profit organizations (or entirely owned by one as in the case of some MLSs), the share profit motive is not in the best interest of the associations.

Direct Horizontal Financial Motivation: The limitation on profit maximization (as a plus factor) does not immunize horizontal competitors who sit as joint adjudicators over a rival's business model. Because the local panels are composed entirely of active local brokers, voting to dismiss a written confession of steering provides an immediate, reciprocal financial gain: it legalizes their own traditional firms (and all others) to steer clients away from the Plaintiff without fear of sanctions.

Top-Down Institutional Control and Uniformity: The local spokes did not act in an informational vacuum. NAR issued the D.A.N.G.E.R. Report, explicitly branding flat-fee business models as existential threats to the industry, executed national "Don't DIY" campaigns, maintain a flow of information pushing sellers to offer buyer agent compensation, pay both sides of the commission, and describe the "standard" compensation amount. The subsequent, evident uniformity across separate local

25

jurisdictions - universally adopting a non-spoken policy to bury confessed steering cases - cannot be credited to independent administrative decisions.

## IX.   PLAINTIFF PLEADS HIGHLY SPECIFIC FACTUAL ALLEGATIONS TO ESTABLISH A CONSPIRACY UNDER ALL COUNTS

Defendants' contention that the FAC lacks specific pleading details is directly refuted by the record. The Factual Allegation section X of the FAC is explicitly itemized by specific Defendant, date, and administrative file, establishing separate, actionable Section 1 conspiracies across all five counts:

### A.   Counts I, II, and III: Interlocking Institutional Non-Enforcement

Counts I, II, and III allege separate, yet interlocking actions under NAR's mandatory framework where the violation of one is proof of the others . A valid, good-faith Buyer-Broker Agreement (BBA) renders a seller's offered compensation entirely irrelevant (as stated by NAR[3]) to whether an agent shows a property . The moment an agent refuses to show a listing because the seller offers no compensation, that agent confesses that no compliant BBA exists. Counts I (anti-steering non-enforcement) and II (MLS non-filtering rule) are self-proving components of Count III; the MLS Defendants' decision to freeze audits of BBAs serves as the institutional safe harbor that makes the entire exclusionary loop consequence-free. Matter L.3 (FAC ¶¶ 256–263) illustrates this convergence . Faced with an uncontradicted written confession of steering - where an agent explicitly stated, "We have decided not to show it since they don't offer any compensation"- the Association (CPAR) convened a formal Professional Standards

---

[3] Get the Facts NAR Settlement FAQs #93. URL: https://www.nar.realtor/the-facts/nar-settlement-faqs#realestate Last visited on May 23rd 2026.

Panel composed entirely of active local brokers. Rather than enforcing their mandatory rules, these horizontal competitors heard the case, entered an executive session and issued a unanimous decree of "No Violation" along with an official advisory letter . The panel's advisory letter explicitly coached the violating agent and other members. The advisory letter in part reads:

> "When engaging in conversations regarding offers of compensation, it is crucial to ensure that discussions remain focused on the needs and desires of the client. Any indication that an agent is guiding a client away from certain properties based on compensation structures could be perceived as steering, which is strictly prohibited. Transparency and diligence in these conversations help maintain public trust..." (CPAR Advisory Hearing Panel Advisory Letter) (Exhibit 2).

This correspondence functions as an operational tutorial on liability evasion rather than an ethical reprimand. The panel was not concerned with preventing steering; it was concerned with teaching market participants how to alter the optics of steering to avoid future regulatory exposure. By instructing the agent how to conceal the violation from other brokers and insulate the exclusionary behavior from sanctions, this collective use of association machinery by direct market rivals constitutes an explicit horizontal agreement to facilitate and permit a group boycott . Under Section 1 of the Sherman Act, an explicit horizontal arrangement among competitors to enforce market exclusion is a *per se* antitrust violation, unlawful on its face .

**B.      Count IV: The IDX Display Rule Suppression**

Defendants rely on *D'Augusta v. Am. Petrol. Inst.*, 117 F.4th 1094, 1104 (9th Cir. 2024), to claim Plaintiff has not pled "who, what, where, and when." This is incorrect. The FAC identifies each IDX-responsible Defendant: Beaches MLS, Stellar MLS, realMLS, Space Coast MLS, and Florida Gulf Coast MLS by name, each receiving

precise, documented notification of non-compliance with the mandated contact display fields. None corrected the violation.

The structural flaw in Defendants' argument runs deeper. A trade association has no independent will - it acts only when its members, who are horizontal competitors, exercise actual authority through it. Defendants cannot point to "the association" as the actor and simultaneously disclaim the concerted action of the competitors who are the association. That reasoning would immunize every trade association from antitrust liability by laundering horizontal agreements through institutional form.

Enforcement is a decision. Each MLS Defendant's concurrent choice to freeze enforcement after documented notification is not independent inaction - it is coordinated suppression through the same institutional channel that created the rule. That is concerted action. The conspiracy does not live in the association's bylaws — it lives in each Defendant's decision to act through them allowing the restraint.

Defendants inadvertently provided the most compelling demonstration of the IDX display rule violation in this very case. In opposing Plaintiff's Motion for Preliminary Injunction (Dkt. 62), Defendants submitted a declaration specifically to disprove that non-compliance is "systematic, pervasive, and the result of a grand conspiracy." Dkt. No. 62 at 7. To that end, Defendants - through counsel - curated and submitted Exhibits F through P as affirmative examples of proper IDX compliance. See Dickens Decl., Dkt. No. 62-1 ¶ 10. Among them: a property printout certified as compliant because the listing agent's contact information was properly displayed after a

28

click. See Exhibit I to Dickens Decl., Dkt. No. 62-10. It was not. The contact displayed was Mr. Eddie Blanco - the Chairperson of Defendant MAR - not the listing agent for the property. See Exhibit J to Dickens Decl., Dkt. No. 62-11. Dickens declared under oath that this is a " listing by REALTOR® Eddie Blanco sourced from Miami and Miami REALTORS®", this is false.

Exhibit I - J is not an outlier. It is the rule. A review of the remaining exhibits Defendants submitted as proof of compliance reveals the same systemic failure across every platform examined.

Exhibits F, G, K, and N display Plaintiff's own listings on Realtor.com. None comply. The listing agent's contact information - the data field the IDX Display Rule mandates prominently displayed - is buried below a cascade of advertisements, promoted content, information and multiple calls-to-action (CTA) that do not lead to the listing agent at all. Exhibit H, drawn from a different brokerage, replicates the same structure: contact information relegated to the very bottom of a long scroll, invisible to any consumer who does not search for it. Exhibit O repeats the pattern once more - contact information concealed in a bottom disclaimer, accessible only after exhausting all property content above it.

Exhibit M is the most instructive. It shows that a prominent display of the listing agent is technically achievable — but only when the listing agent pays for a "spotlight" placement. In practice, IDX display compliance is not a rule; it is a premium feature. The agent must pay to be seen, and even then the required contact details - email and phone - remain absent. The rule mandates display; the market charges for it.

29

Exhibit P from Zillow raises a separate concern. The screenshots appear screen-size manipulated and selectively cropped: listing images are cut off at the top because the contact information becomes visible only after scrolling, and the exhibit omits entirely the prominent, sticky blue calls-to-action anchored at the bottom (usually on the side in non-horizontally-manipulated screens) of the live page - elements that dominate the consumer's attention and direct it away from the listing agent.

Defendants submitted ten exhibits to prove the violation is not systematic. Not one of them shows compliance. The restraint is not a defect in implementation - it is the implementation.

The consequence is decisive. Defendants are the authors of the IDX Display Rule. They enforce it through their MLSs. They are the most knowledgeable actors in this litigation and understand what compliance looks like. And when they went looking - deliberately, for this Court - for an exhibit that showed the rule working as intended, they landed directly into the restraint of their own making. The suppression was so well-executed, so entrenched, so systemic, that Defendants could not produce a single compliant example even when that was the entire purpose of the submission.

That is not a pleading deficiency. That is the conspiracy proving itself. The *D'Augusta* pleading standards are surpassed by Defendants' own sworn submission.

### C.     Count V: Structured Commission Model and Price Signaling

Defendants misread Count V entirely. The FAC does not plead price-fixing - it explains structural normalization. NAR's public messaging on "standard" commissions operates on two audiences simultaneously: it tells consumers what to

expect, and it tells every Realtor® what NAR considers acceptable - creating the market expectation that panel members and buyer agents then enforce through steering. That is not price-fixing; it is the mechanism that makes the boycott self-sustaining without requiring explicit coordination.

Defendants' characterization of these materials as "consumer-facing" is therefore beside the point. A message broadcast by NAR's President to 1.5 million members and the general public simultaneously does not lose its coordinating effect because consumers also receive it. The FAC alleges that when Plaintiff encountered agents steering away from his listings, that conduct was normalized - to the agent, to the buyer, to the seller and to the ethics panels that acquitted it - by NAR's institutional endorsement of the "standard" commission structure. Count V is a pillar supporting the broader conspiracy, not a standalone price-fixing claim.

NAR's own MLS Handbook prohibits member associations from "fix[ing], control[ling], recommend[ing], or suggest[ing]" commissions — the self-imposed prohibition is the admission that the line exists and these publications cross it. Count V is adequately pleaded.

## X.    SPECIFIC INTENT TO RESTRAIN TRADE IS NOT REQUIRED

Defendants' contention that the Plaintiff failed to plead a subjective or specific intent to restrain trade completely misstates controlling antitrust jurisprudence (MTD p. 21). In a civil action brought under Section 1 of the Sherman Act, a plaintiff is not required to uncover a defendant's internal malice or unexpressed thoughts. Rather, the United States Supreme Court has explicitly established that antitrust intent is evaluated

31

under an objective standard. As the Supreme Court held in *United States v. Griffith*, 334 U.S. 100, (1948), courts do not look at the inner state of mind of the conspirators because:

> "It is, however, not always necessary to find a specific intent to restrain trade or to build a monopoly in order to find that the antitrust laws have been violated. It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements. *United States v. Patten*, 226 U. S. 525, 226 U. S. 543; *United States v. Masonite Corporation*, 316 U. S. 265, 316 U. S. 275" *United States v. Griffith*, Page 334 U. S. 105.

This binding standard highlights the deficiency of the Defendants' Motion to Dismiss. The factual record before the local panel contained an undisputed, written admission of anticompetitive buyer-agent steering targeting the Plaintiff. Armed with this knowledge, the horizontal competitors on the panel entered an executive session and emerged with a unanimous decision declaring this conduct a "No Violation". Crucially, the panel members did not act in an informational vacuum. As licensed real estate professionals and active Realtors, the Defendants possessed actual and constructive knowledge of the industry's changing legal landscape. They were intimately familiar with the historic multi-billion dollar verdict in *Burnett v. National Association of Realtors*, No. 4:19-CV-00332 (W.D. Mo.), which explicitly penalized the mandatory cooperative compensation rule because it naturally incentivized brokers to illegally steer buyers away from competitive, alternative listing models. They knew from their own corporate compliance training and industry-wide disclosures that the unavoidable, systematic result of permitting steering is the total market exclusion of disobedient competitors.

32

The natural, necessary, and foreseeable business consequence of their collective vote was the creation of a local regulatory safe harbor for group boycotts, which effectively immunized the steering practice and excluded low-commission listings from the marketplace. Because the panel members were fully aware that this anticompetitive restraint was a substantial certainty of their decision - knowledge reinforced directly by the Burnett precedent - their intent to restrain trade was established under *Griffith*. The law presumes they intended the natural and necessary consequences of their collective act, and no further pleading of subjective intent is required to survive a motion to dismiss

## XI.   PER SE TREATMENT APPLIES TO THE HORIZONTAL COLLECTIVE DECISION TO PRESERVE A GROUP BOYCOTT; QUICK LOOK AND RULE OF REASON ALSO INDEPENDENTLY SATISFIED

Per se treatment is established here at multiple independent levels. Binding Supreme Court and Eleventh Circuit precedent, Defendants' own institutional record, NAR's own published guidance, and the United States Department of Justice all converge on the same conclusion.

### A.   Defendants' Own Concessions Establish that the Targeted Conduct "Almost Always Harms Competition"

Defendants invoke *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1334 (11th Cir. 2010), for the proposition that per se treatment is "reserved for a very small number of antitrust restraints 'whose character is well understood and that almost always harm competition.'" That standard is fully met here — and Defendants themselves met it.

The "well understood" and that "almost always harms competition" threshold applies to the category of restraint, not to the specific mechanism through which a familiar restraint is executed in a given case.

Group boycotts have been a *per se* category since *Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207 (1959)*, where the Supreme Court held: "Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category." (*Klor's* at 212). The character of this restraint - horizontal competitors using governance mechanisms to collectively immunize market exclusion - is not novel. It was condemned in *Fashion Originators' Guild of America v. FTC*, 312 U.S. 457 (1941), where the Supreme Court held that "the combination is in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations, and thus 'trenches upon the power of the national legislature and violates the statute.'" (*Fashion Originators' Guild.* at 465). That description is a factual match for what the FAC alleges: private ethics panels populated by horizontal competitors, operating in closed executive sessions, rendering uniform immunity decrees for admitted steering violations.

Defendants also invoke *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997), for the proposition that per se treatment applies only when "experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." That experience exists, and Defendants contributed to it, via Defendants' own

34

adoption of anti-steering rules, its Code of Ethics prohibiting steering as a breach of fiduciary duty, its rationale and enacting of anti steering rules and IDX display rules.

The DOJ's Statement of Interest ("SOI") of the *United States, Davis v. Hanna Holdings, Inc.*, No. 2:24-cv-02374-WB, Doc. 115 (E.D. Pa. Dec. 19, 2025) confirmed it again, writing: "...when the rules are inherently anticompetitive, they are per se illegal, just like other inherently anticompetitive agreements, regardless of whether they are embodied in association governance." (*DOJ SIO in Davis v Hanna* at 10).

Additionally the same statement reads:

Antitrust law focuses on substance, not form." Am. Needle, 560 U.S. at 195 (citation omitted). When parties enter into an inherently anticompetitive agreement, the agreement is per se unlawful whether it takes the form of an association rule or something else. For that reason, the Supreme Court has repeatedly applied the per se rule in cases involving association rules, including real-estate association rules. (*DOJ SIO in Davis v Hanna* at 22).

Defendants cannot simply ignore the public record, spend decades publicly establishing that compensation-based steering is strictly prohibited - in rules, consent decrees, settlement agreements, ethics codes, public statements and training materials - and then argue here that there is still doubt that steering has any anticompetitive effect and attempt litigate the per se threshold in this Court as an open question. The publicly available documentation and their own institutional record closes it.

Defendants' reliance on *In re January 2021 Short Squeeze Trading Litig.* fails. That court refused per se treatment because defendants reacted to emergency regulatory capital mandates during an unprecedented market anomaly with genuinely ambiguous competitive effects.

35

Group boycotts are none of those things and Defendants know it. NAR's own Answer Book, published for its Associations and MLSs' director and management teams, states: "*group boycotts are considered per se violations of the antitrust laws . . . so inherently anticompetitive that their anticompetitive effects on trade are presumed. Defendants will be given no opportunity to demonstrate the reasonableness of the restraint.*"[4].

Defendants cannot teach their executives that group boycotts is a per se violation requiring no reasonable inquiry and then argue the contrary here.

The Department of Justice has confirmed the governing principles directly applicable here. "... Congress broadly defined the concept of concerted action under Section 1 of the Sherman Act to encompass the many ways independent economic actors can be joined together. Whether in the form of trade-association rules or otherwise, the combination of distinct economic forces "'inherently is fraught with anticompetitive risk' insofar as it 'deprives the marketplace of independent centers of decisionmaking that competition assumes and demands.'" *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984))" (*DOJ SIO in Davis v Hanna* at 2)

The DOJ further states that the position of the U.S. is that "it is essential that the antitrust laws provide a remedy when real-estate brokers agree to stop competing with one another — whatever form that agreement takes," *Id.* at 9, and that "when the

---

[4] NAR's The Answer Book, The Source of REALTOR® Association Management Leaders, January 2024. (section 2.2 page 18)

36

rules are inherently anticompetitive, they are per se illegal, just like other inherently anticompetitive agreements." *Id.* at 10.

Under these frameworks, an association's coordinated refusal to enforce its own procompetitive rules — with the documented effect of excluding low-cost competitors - is the functional equivalent of enforcing and inherently anticompetitive rule. The DOJ's analysis directly forecloses Defendants' attempt to escape per se treatment by wrapping their restraint in governance language.

**B.     The Trade Association Framework Does Not Create a Rule of Reason Presumption When Horizontal Competitors Use It to Execute an Exclusionary Scheme**

The Supreme Court has defined the controlling test: "The inquiry is whether the agreement in question joins together "separate economic actors pursuing separate economic interests," Copperweld, 467 U. S., at 768, such that it "deprives the marketplace of independent centers of decision-making," id., at 769, and therefore of diversity of entrepreneurial interests and thus of actual or potential competition." *American Needle, Inc. v. National Football League,* 560 US 184 - Supreme Court 2010.

That test is satisfied here. NAR's own governance materials describe each Realtor® as "a separate economic unit" - confirming the separate economic actors with separate economic interests the test requires and the already explained the "contract, combination ..., or conspiracy" amongst them. Additionally, separate actors are not independent when they have surrendered their decision-making to a unified rulebook, a mandatory Code of Ethics, and institutional mandates that flow from NAR downward. When, as examples, NABOR, the Broward, Palm Beach and St. Lucie Association, Space

37

Coast MLS, follow NAR's guidance without deviation, the marketplace is not benefiting from diversity of entrepreneurial interests - it has been stripped of it. The agreement does not merely restrain competition; it replaces independent judgment with coordinated uniformity.

Defendants invoke *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988), for the general proposition that trade association activities are "most often" evaluated under the rule of reason. That proposition, correctly read, works against them.

"[T]here is no doubt that the members of such associations often have economic incentives to restrain competition and that the product standards set by such associations have a serious potential for anticompetitive harm." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988). The Court also states that "private standard-setting associations have traditionally been objects of antitrust scrutiny" and that "it is this potential for procompetitive benefits that has led most lower courts to apply rule-of-reason analysis to product standard-setting by private associations." *Id.* at 501.

That predicate is absent here. Defendants identify no procompetitive benefit produced by systematically steering consumers away from certain types of listings and by Defendant enabling it. The rule of reason presumption exists precisely because associations sometimes generate procompetitive value. Where Defendants offered none, the predicate for rule of reason treatment does not exist, and per se analysis governs.

Defendants also invoke *Ohio v. American Express Co.*, 585 U.S. 529, 541 (2018), for the rule that "nearly every vertical restraint" is evaluated under the rule of

38

reason. But the restraint at issue, as already explained, is mostly horizontal; all members of all Defendants are direct horizontal competitors. The ethics and grievance panels that collectively vote to immunize steering violations are composed of the Plaintiff's direct horizontal competitors - brokers competing in the same local markets for the same clients. When those horizontal competitors enter an executive session, discuss a direct competitor's complaint, and unanimously find "no violation," the resulting decision is a horizontal agreement, not a vertical one.

C.      **Defendants Withhold and Enlist Others to Withhold — The Group Boycott Is Established Under Quality Auto Painting's Own Standard**

Defendants argue that no group boycott is pleaded because *Quality Auto Painting Ctr. of Roselle v. State Farm Indem.* Co., 917 F.3d 1249, 1271 (11th Cir. 2019), requires a showing that Defendants withheld "patronage or services" or "enlisted others to withhold" such patronage or services from Plaintiff. That standard is satisfied on two independent grounds.

First, MLS enforcement is the service withheld directly by Defendants. Every MLS participant - including Plaintiff - holds a membership right to the enforcement of mandatory pro-competitive rules as a condition of that membership. The IDX display requirement, the non-filtering rule, the steering prohibition of the code of ethics, and the Buyer-Broker Agreement rule are not aspirational guidelines; they are mandatory conditions of MLS participation, enforceable against every member. When Plaintiff documented violations and submitted complaints, MLS Defendants - through their governance panels - uniformly refused to examine, investigate, or sanction the

admitted conduct. That refusal is the withholding of the enforcement service Plaintiff was entitled to as an MLS participant. As self-regulatory organizations ("SROs"), Defendants are both the rulemaker and the withholder of enforcement service.

Second, through collective non-enforcement, Defendants have enlisted every buyer-agent operating in their markets to withhold routing from Plaintiff's listings. *Quality Auto Painting* expressly includes "enlisting others to withhold" patronage as a basis for the group boycott theory. The regulatory safe harbor that Defendants created through uniform non-enforcement communicates to every member broker that steering against zero (low) commission listings carries no sanction risk.

The December 2025 DOJ Statement of Interest recognized precisely this dynamic: "it is essential that the antitrust laws provide a remedy when real-estate brokers agree to stop competing with one another - *whatever form that agreement takes.*" (emphasis added) *Davis v. Hanna Holdings, No. 2:24-cv-02374-WB, Doc. 115, at 9*. That enlistment is not speculation - it is the documented, replicated outcome across multiple local jurisdictions and multiple Defendant associations.

### D. The Per Se Theory is Group Boycott; Supracompetitive Pricing Is the Downstream Effect, Not the Independent Basis for Per Se Treatment

Defendants devote considerable briefing to arguing that no price-fixing conspiracy is adequately pleaded. That argument misses the structure of Plaintiff's claim. Plaintiff's primary per se theory is group boycott and market exclusion - not horizontal price fixing. A consumer plaintiff must trace injury through the full causal chain from the boycott, through market exclusion, down to the supracompetitive price paid at the end. A

40

competitor plaintiff foreclosed from the market sustains antitrust injury at the boycott itself. The downstream price stabilization is confirmation of the restraint's effectiveness, not a required element of Plaintiff's proof.

On market allocation, Defendants invoke *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608 (1972), which defines market allocation as a "horizontal agreement between competitors at the same level of the market structure to allocate territories." The FAC's market allocation theory is not territorial - it is by commission tier. By collectively immunizing compensation-based steering, Defendants have allocated all buyer-agent routing to "standard commission level" listings and systematically excluded zero-commission and low- commission competitors from meaningful market access. That is, horizontal allocation of the market by compensation level, which is as per se violation as territorial market allocation, confirmed by *Tapco* when the prohibition to sell at wholesale level was also found to be per se market allocation. *Tapco* actually condemns beyond mere geographic allocation: "*Topco's* limitations upon reselling at wholesale are for the same reason per se invalid under § 1. (*United States v. Topco Associates, Inc.*; at 597)

### E.      Defendants Have Preemptively Foreclosed Any Pro-Competitive Justification

Per se treatment forecloses inquiry into pro-competitive justifications by definition and Defendants admit this. But Defendants have gone further - they have affirmatively established, in their own institutional voice, that no pro-competitive justification exists for what they have done.

41

Defendants argue that their enforcement decisions are protected governance activity. But Defendants cannot simultaneously maintain that (a) steering is "strictly prohibited" because it is unethical, (b) the anti-steering (including the IDX display) rules were adopted to protect consumers and promote competition, and (c) the collective decision not to enforce those rules against admitted violations serves pro-competitive ends. These positions are mutually exclusive. A governance decision to immunize conduct that the same governance body has declared anticompetitive produces one result: the anticompetitive conduct continues. Defendants provide no pro-competitive account of that result because none exists.

If Defendants attempt to argue for Quick Look or Rule of Reason, they must at the very least needed to identify a competitive justification for their actions. They have listed none. As this Court would find under either standard: collective non-enforcement of rules expressly designed to prevent market exclusion, with the documented effect of excluding a market participant, advances no pro-competitive purpose and are per se illegal. Defendants' own Code of Ethics, their own MLS Handbook, and their own documentation confirms this.

F.      **If Quick Look Analysis Applies, Defendants Cannot Satisfy It**

Even if this Court declines per se treatment at this stage, quick look analysis applies. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999), established that quick look analysis is proper where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."

42

An observer presented with the following facts would not need an economic study: (1) a group of horizontal competitors sits on an ethics panel; (2) a written admission of compensation-based steering — conduct the panel's own Code of Ethics calls "strictly prohibited" — is placed before them; (3) the panel enters a private executive session; (4) the panel finds "no violation"; (5) the panel then issues an advisory instructing the respondent on how to conduct the same practice without triggering disclosure. That sequence is not ambiguous. It does not require extended market analysis. Its anticompetitive effect is immediate and obvious: direct market exclusion is tolerated and enables group boycott; it signals to every broker in the local market that steering against low-commission listings carries no regulatory risk. The 600 documented calls and Treloras' example in *Moehrl,* Dkt. Nos. 324-4 and 324-6, *Moehrl v. Nat'l Ass'n of Realtors,* No. 1:19-cv-01610 (N.D. Ill.) are the evidence that the signal was received.

Defendants invoke In re January *2021 Short Squeeze Trading Litigation,* 105 F.4th 1346 (11th Cir. 2024), for the proposition that quick look is unavailable in "unusual" cases with "unique features." Group boycotts executed through trade association governance machinery are not unusual. They are a recognized category with a documented enforcement history spanning eight decades. The "unusual case" exception applies to genuinely novel economic arrangements whose effects cannot be assessed without extended market analysis - not to classic horizontal exclusion wearing institutional clothing. It is such a recognized per se category that the DOJ intervened in an antitrust case to state the exact same argument of this case.

43

**G.      Rule of Reason — Defendants Cannot Satisfy Even the Initial Burden**

Under the rule of reason, the plaintiff bears the initial burden of demonstrating anticompetitive effect. *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018). Plaintiff's initial burden is satisfied by the record established above - 600 documented calls in *Moehrl*, the *Burnett* jury's verdict, and the DOJ's quantification of $170 billion in affected transactions annually, among further support introduced as Exhibit 1.

Once the initial burden is met, as here, the burden shifts to Defendants to demonstrate pro-competitive justifications. Defendants did not and cannot meet that burden (they actually simply ignore it) because they have already conceded - in their rules, their training materials, their settlement representations, and their MTD - that the targeted conduct (compensation-based steering) produces no pro-competitive benefit. A governance process that acquits admitted steering violations and then instructs the respondent on how to repeat the conduct more discreetly is not a pro-competitive justification.

Defendants do not contest the per se violations conduct, they merely contest the label. That is not a per se defense - it is a concession wearing one.

## XII.   PLAINTIFF ADEQUATELY PLEADS RELEVANT MARKETS AND ANTICOMPETITIVE EFFECTS

Defendants' market definition challenge fails at the threshold. Plaintiff's group boycott and market allocation claims are cognizable under per se and quick look analysis — neither of which requires market definition or proof of market power. To the extent this Court reaches the rule of reason, detailed market definition is a factual inquiry

44

not required at the pleading stage - plausibility is the standard. The FAC satisfies that standard regardless.

FAC ¶ 97 defines the relevant product market as residential real estate brokerage services for sellers seeking to list and buyers seeking to purchase residential properties. Defendants attempt to carve a distinction between "full-service" and "flat-fee" models. But all participants compete for the same sellers and the same buyers. The product is identical regardless of fee structure. Defendants' collective non-enforcement of anti-steering and filtering rules corrupts this unified market by insulating traditional commission models from downward price pressure.

FAC ¶ 99 defines the relevant geographic market as the territory served by each applicable Defendant MLS and Association - Real Estate is inherently localized, as consumers do not cross vast distances to buy or list homes. The FAC individually names each Defendant alongside its specific territorial boundaries. FAC ¶ 100 supplies the market power allegation: "Defendants exercise market power through that control, and no participant can compete effectively for the same sellers and buyers outside the structure Defendants govern."

Finally, the Defendants claim that the Plaintiff has failed to show market-wide harm to competition, attempting to reduce the FAC to an isolated, personal grievance. This defense is totally dismantled. When a panel of horizontal competitors uses its collective administrative authority to legalize group boycotts and admitted steering violation, the anticompetitive effect is structural and immediate: it signals to

45

every broker in that local geographic market that they can continue to boycott zero-commission listings with absolute impunity.

The market-wide injury is not speculative; it is the active, top-down and horizontal suppression of commission price competition and the systematic exclusion of lower-cost alternative business models across all defined territories. The factual allegations of the FAC more than adequately define the product, geography, and structural harms necessary to survive a motion to dismiss.

## XIII. THE BUYER BROKER AGREEMENT RULE VIOLATION CLAIMS ARE PROPERLY BEFORE THIS COURT

Defendants claim Plaintiff's BBA allegations are a collateral attack on the *Burnett* settlement, reserved for the Western District of Missouri. That argument collapses on its own logic. The Burnett court's mandate ended at the rule's creation and mandatory inclusion in every local Defendant's set of rules and regulations (that was the court approved settlement and up to here its reach).

It did not deputize a federal court in Missouri to supervise every local enforcement decision across the country - nor could it. NAR itself is explicit that MLS rules are enforced at the local level, by local associations and MLSs. Plaintiff does not ask this Court to police individual transactional breaches. He asks this Court to recognize that the Florida Defendants - as the locally designated enforcement bodies - engaged in a coordinated horizontal decision to dismantle the rule's efficacy entirely by refusing to implement any verification or compliance mechanism. That claim belongs here, where the behavior occurs and where Plaintiff was excluded from commerce.

46

## XIV.   EACH DEFENDANT'S PARTICIPATION IS SUFFICIENT FOR CO-CONSPIRATOR LIABILITY

As an initial matter, some Defendants attempt to isolate themselves by arguing they are only mentioned sporadically. Not every co-conspirator must act all the time, on every act to be held liable. A single act in furtherance of the conspiracy is enough to bind that actor to the whole conspiracy. Here, each local spoke pulled the administrative trigger within its own jurisdiction, executing an identical exclusionary outcome against the Plaintiff's flat-fee model. As the Supreme Court held in *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939): "It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it."

Specific to NABOR's supplement (ECF. 91) invokes the *Sitzer/Burnett* settlement as a shield against the precise enforcement obligation the settlement was designed to create. The argument fails at the most basic level of textual reading.

First, Plaintiff did not ask NABOR to disclose the commission negotiated between a buyer and the buyer agent. Plaintiff asked NABOR to verify that the BBA, and specifically that it complied with the mandatory cap. Those are categorically different inquiries. NABOR's MLS Director responded that NAR's guidance prevented any comment on compensation.

The settlement provision NABOR invokes states:

"eliminate all broker compensation fields on the MLS, and prohibit the sharing of offers of compensation *to buyer brokers or other buyer representatives* via any

47

other fields on the MLS." Corrected Settlement Agreement ¶ 58(iii) p. 28, *Sitzer et al. v. Nat'l Ass'n of REALTORS®*, No. 19-cv-00332 (W.D. Mo. Apr. 19, 2024), ECF No. 1458-1.

That provision prohibits sellers from broadcasting compensation offers to *buyer brokers* - the exact practice that enabled steering. It says nothing about an association's obligation to verify BBA compliance. No provision of the *Sitzer* settlement prohibits an MLS, an association, or NAR from confirming that a buyer-side agreement meets the rule's own mandatory requirements. NABOR did not find a prohibition in the settlement. It manufactured one, on NAR's instruction, adhered to their guidance and called it compliance. Not to mention that Plaintiff is a listing agent, *not a buyer broker* and NABOR isn't a buyer broker either; neither is covered by the prohibition.

The internal contradiction is fatal to their position: the settlement mandated a commission cap precisely because buyer-agent compensation was driving steering. If verifying that cap were also prohibited, the rule would be unenforceable by design - a mandate written to be ignored. NABOR's admission that no verification mechanism exists, guided vertically by NAR, is not a defense. It is a direct confirmation that the rule was implemented as a structural placeholder to neutralize the settlement's procompetitive purpose while leaving the steering incentive fully intact and that the vertical restraint exists and is effective. NABOR didn't attempt to rationalize the issue and merely surrendered and followed NAR's lead.

NABOR's defense is that NAR told it not to comment on commissions, so it cannot verify BBA compliance. That is not a legal argument — it is a chain of obedience

with a non sequitur at its center. The settlement prohibits sharing seller-offered compensation with *buyer brokers* (neither the Association or Zea are buyer brokers) to prevent steering. It has nothing to do with an association verifying that its own members' buyer agreements meet a mandatory rule. NAR told NABOR to conflate the two. NABOR complied without question. The result is an association that simultaneously claims to enforce the BBA rule and admits it has no mechanism to do so - because its national hub instructed it to treat enforcement and prohibited conduct as the same thing applying to all. That is not compliance with the *Burnett* settlement. That is using the *Burnett* settlement as cover to ensure the rule it created can never be enforced.

NABOR's argument that it appears only once in the FAC is not a defense — it is a concession. One documented act of vertical submission to NAR's anticompetitive instruction, resulting in deliberate non-enforcement of a mandatory rule against Plaintiff, is one act of conspiracy. The Sherman Act does not require a defendant to be caught repeatedly. It requires that a defendant joined the agreement and acted on it. NABOR did both in a single communication.

## XV.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss in its entirety. The FAC pleads specific, documented, and legally sufficient allegations of a Sherman Act Section 1 conspiracy: mandatory pro-competitive rules, identified Defendants with explicit enforcement obligations, systematic and documented violations, collective institutional decisions to leave those violations unchecked, and direct antitrust injury to Plaintiff as an efficient

49

enforcer. Defendants' motion attacks premises never pled, offers no procompetitive justification for enabling systemic violations of their own rules, and leaves the actual factual record unanswered. Nothing in the MTD warrants dismissal.

Defendants' request for dismissal with prejudice should be denied. The FAC is the product of this Court's prior guidance and represents a substantive, good-faith amendment. No basis exists for the extreme remedy of prejudicial dismissal where the allegations are specific, the law supports the claims, and Plaintiff has demonstrated the capacity to cure any deficiency identified by the Court.

Should the Court find any count insufficiently pled, Plaintiff respectfully requests leave to amend pursuant to Fed. R. Civ. P. 15(a).

Should the Court find oral argument useful to its determination. Plaintiff is available (preferably) for an in-person hearing at the Court's convenience.

Respectfully submitted,

Dated: May 26, 2026

Jorge A Zea
Plaintiff, pro se
2234 N Federal HWY
Boca Raton FL 33431
305-244-7242

52

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of May, 2026, I presented the foregoing

"Plaintiff's Response on Opposition to Defendants' Motion to Dismiss of First Amended

Complaint and to Defendant NABOR Supplement to Defendants' Motion To Dismiss

Plaintiff's First Amended Complaint" to the Clerk of the Court for filing. I further certify

that all counsel of record are registered CM/ECF users and that service will be

accomplished by the CM/ECF system.

By:_____
Jorge A Zea
Plaintiff/pro se
2234 N Federal HWY
Boca Raton FL 33431
305-244-7242
antitrust@jorgezea.com

52