**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-81016-CIV-DIMITROULEAS/MAYNARD**

**JORGE A. ZEA,**

**Plaintiff,**

**v.**

**NATIONAL ASSOCIATION OF REALTORS, et al.,**

**Defendants.**
______________________________________/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before me on Defendants' Motion to Dismiss Plaintiff's First Amended Complaint ("Motion"). DE 90. Plaintiff Jorge A. Zea, proceeding *pro se*, has filed a Response in Opposition. DE 92. Defendants filed a Reply. DE 93. Presiding U.S. District Judge William P. Dimitrouleas has referred the Motion to me for recommended disposition. DE 95.

Because the First Amended Complaint still fails to plead facts plausibly showing an agreement among Defendants to restrain trade, I recommend that the Motion be **GRANTED** and Plaintiff's First Amended Complaint be **DISMISSED WITH PREJUDICE**.

## BACKGROUND

### I. Plaintiff's First Amended Complaint ("FAC")

Plaintiff is a licensed Florida real-estate broker who alleges that he personally operates SnapFlatFee.com®, a low-cost, limited-service listing platform. DE 87 ¶¶ 4, 15, 24, 33. He alleges that sellers using the platform pay a flat fee for an MLS listing and related syndication

but remain responsible for showings, negotiations, and other aspects of the transaction. *Id.* ¶ 18. Plaintiff further alleges that he owns the SnapFlatFee.com® trademark and domain name personally and, although he is the qualifying broker of Blue Lighthouse Realty, Inc., he operates the SnapFlatFee.com® service individually rather than through that corporation. *Id.* ¶¶ 25–35.

Defendants are the National Association of REALTORS® ("NAR"); eight local or regional REALTOR® associations (the "Associations"): Broward, Palm Beaches and St. Lucie REALTORS®, Inc., Miami Association of REALTORS®, Inc., Orlando Regional REALTOR® Association, Inc., Royal Palm Coast REALTOR® Association, Inc., Naples Area Board of REALTORS® and Association of Real Estate Professionals, Inc., Space Coast Association of REALTORS®, Inc., Northeast Florida Association of REALTORS®, Inc., and Central Panhandle Association of REALTORS®, Inc.; and five multiple listing services (the "MLSs"): Beaches MLS, Inc., My Florida Regional MLS, Inc. (doing business as Stellar MLS), Florida Gulf Coast Multiple Listing Service, Inc., Space Coast Multiple Listing Service, Inc., and Northeast Florida Multiple Listing Service, Inc. (doing business as RealMLS). *Id.* ¶¶ 37–52.

Plaintiff alleges that the Associations comprise licensed real-estate professionals who compete with one another and with him, and that NAR promulgates mandatory policies governing affiliated associations and MLSs, including the Code of Ethics and MLS/Internet Data Exchange ("IDX") rules. *Id.* ¶¶ 36–58. Certain rules are designated "mandatory," requiring affiliated associations and MLSs to incorporate, supervise, and enforce them. *Id.* ¶ 59. According to the FAC, representatives of local and regional associations, MLSs, brokerages, and other market participants serve within NAR's governance structure; mandatory rules "flow downwards" from NAR to affiliated associations and MLSs; and associations and

MLSs maintain their own compliance and enforcement mechanisms. Id. ¶¶ 60–80. Plaintiff characterizes this structure as "interdependent," creating a uniform framework for rulemaking, participation, and enforcement. *Id.* ¶¶ 61, 71–80. Plaintiff's central theory is that Defendants adopted rules he characterizes as pro-competitive but collectively declined to enforce them. *Id.* ¶¶ 1–3, 84–85. The FAC asserts concerted action at two levels. At the local level, Plaintiff contends that each association or MLS is a collective body of competitors, making a board's or committee's decision not to investigate or enforce a rule a collective decision. *Id.* ¶¶ 86–88. At the national level, he alleges that associations and MLSs participate jointly in NAR governance, where they "sit together, vote together, and collectively set the rules and enforcement standards that govern all of them[.]" *Id.* ¶¶ 89–93.

The rules Plaintiff says Defendants collectively failed to enforce fall into four principal categories. First, Plaintiff alleges that Defendants failed to enforce rules prohibiting commission-based steering, which he defines as a buyer's agent directing a client toward or away from properties based on the compensation offered to the agent rather than the buyer's stated preferences and needs. *Id.* ¶¶ 111–116. Second, he alleges that Defendants failed to enforce rules prohibiting commission filtering, which he describes as filtering or restricting MLS listings presented to consumers based on the existence or amount of compensation offered to a cooperating broker or the identity of a brokerage or agent. *Id.* ¶¶ 117–118. Third, he alleges that Defendants failed to enforce the buyer-broker written agreement rule, which requires, according to the FAC, an MLS participant working with a buyer to execute a written agreement before touring a home, disclose an objectively ascertainable amount or rate of compensation, and refrain from receiving compensation from any source exceeding the amount agreed to by the buyer. *Id.* ¶¶ 119–121. Fourth, he alleges that Defendants failed to enforce

the IDX listing-broker contact-display rule, which requires IDX websites to identify the listing firm and prominently display an email address or telephone number for the listing participant. *Id*. ¶¶ 122–123.Apart from these non-enforcement theories, Plaintiff alleges that NAR violated its own antitrust-compliance policy through public messaging concerning commission levels, full-service representation, and alternative brokerage models. *Id.* ¶¶ 125, 419–425. He contends that the challenged non-enforcement and message practices suppress competition from lower-cost and limited-service brokers, preserve prevailing commission structures, divert leads, and reduce consumer choice. *Id.* ¶¶ 309–318.

The FAC asserts five claims under Section 1 of the Sherman Act. Count I alleges a concerted refusal to enforce Code of Ethics rules prohibiting commission steering. *Id*. ¶¶ 380–390. Count II alleges concerted non-enforcement of the rule prohibiting commission filtering. *Id*. ¶¶ 391–401. Count III alleges concerted non-enforcement of the buyer-broker written agreement rule. *Id*. ¶¶ 402–409. Count IV alleges concerted non-enforcement of the IDX listing-broker contact-display rule. *Id*. ¶¶ 410-418. Count V, asserted against NAR, alleges a direct violation of the MLS antitrust-compliance policy through price signaling, group-boycott conduct, and market allocation. *Id.* ¶¶ 419-425.

**II. Judge Matthewman's Prior Report and Recommendation**

This is Plaintiff's second attempt to plead his antitrust claims. The original 122-page complaint likewise alleged that Defendants' failure to enforce NAR rules violated Section 1 of the Sherman Act. *See* DE 84 at 2–6. After Defendants moved to dismiss, then-Chief United States Magistrate Judge William Matthewman issued a Report and Recommendation on March 24, 2026, recommending dismissal without prejudice. *Id.* at 19–20. The Report identified

several pleading defects, including insufficient allegations of antitrust standing and improper group pleading. *Id.* at 10–16.

Most pertinent here, the prior Report concluded that Plaintiff had not plausibly alleged a conspiracy or agreement. *Id.* at 16–19. Judge Matthewman explained that Section 1 requires an express or tacit agreement and that parallel conduct, standing alone, is insufficient to establish one. *Id.* at 13–14, 18. The Report rejected Plaintiff's argument that a trade association's structure as a collective body of competitors, without more, satisfied the concerted-action requirement, emphasizing that the term "concerted action" does not eliminate the need to plead an agreement. *Id.* at 17–18. It also rejected Plaintiff's hub-and-spoke theory because Plaintiff did not plausibly allege the horizontal "rim" connecting the alleged spokes. *Id.* at 19.[1]

The District Court adopted the Report and afforded Plaintiff one additional opportunity to amend. DE 85. Plaintiff filed the 96-page FAC on April 27, 2026. DE 87. The FAC adds substantial factual detail, reorganizes allegations by Defendant, expands the allegations concerning Plaintiff's standing and competitive injury, and expressly attempts to plead a "meeting of minds" through Defendants' governance structures and allegedly parallel non-enforcement decisions. *See, e.g.*, DE 87 ¶¶ 15–35; ¶¶ 79–96; ¶¶ 309–369.

**III. Defendants' Motion to Dismiss and Plaintiff's Response in Opposition**

Defendants move to dismiss the FAC on numerous grounds. DE 90. They argue that Plaintiff still fails to establish Article III standing or plead antitrust injury; plausibly allege an agreement or conspiracy among Defendants; or establish that the alleged restraints warrant per

[1] The prior Report also questioned the reliability of Plaintiff's legal authorities and analysis, noting the use of apparently hallucinated cases and fictitious legal concepts. DE 84 at 15. My review of Plaintiff's response to the motion to dismiss the FAC, however, did not reveal the use of hallucinated cases.

se or "quick look" treatment. They further contend that the FAC fails to allege anticompetitive harm in a properly defined relevant market and that Plaintiff's claims concerning the buyer-broker written agreement rule remain within the jurisdiction of the Western District of Missouri. DE 90 at 10–44. Defendants also seek dismissal with prejudice. *Id.* at 44–45.

Plaintiff responds that the FAC cures the deficiencies identified in the prior Report and adequately alleges standing, competitive injury, relevant markets, and actionable restraints of trade. DE 92 at 1–49. As to conspiracy, Plaintiff maintains that the FAC alleges both express agreements arising from competitors' collective deliberations and decisions within Defendants' governance structures, and a tacit agreement inferred from parallel non-enforcement and the alleged "plus factors." *Id.* at 16–25. Defendants reply that the FAC merely repackages theories previously rejected: participation in a common governance structure does not establish an agreement, the FAC still fails to allege a horizontal agreement among the named Defendants, and the asserted plus factors do not render conspiracy more plausible than independent action. DE 93 at 8–14.

Upon careful review, I conclude that the FAC does not cure the threshold defect identified in the prior Report: it does not plausibly allege an agreement to restrain trade. Because this deficiency is fatal to Plaintiff's Section 1 claims, I address the agreement requirement and need not reach Defendants' remaining arguments.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for failure to state a claim upon which relief can be granted. In evaluating a Rule 12(b)(6) motion, the Court must accept all well-pleaded factual allegations as true and construe them in the light most favorable to the plaintiff. *Twombly*, 550 U.S. at 555-56. To survive dismissal, a complaint must contain

sufficient factual matter to state a claim that is plausible on its face. *Id*. at 570. A claim is plausible when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A plaintiff need not detail all the facts on which his claim is based; rather, Rule 8(a)(2) requires only a short, plain statement giving the defendant fair notice of the claim and its grounds. *Twombly*, 550 U.S. at 555–56; *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). The allegations must, however, be enough to raise a right to relief above the speculative level. *Id*. The Federal Rules demand "more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Iqbal*, 556 U.S. at 662. "Mere 'labels and conclusions or a formulaic recitation of the elements of a cause of action will not do,' and a plaintiff cannot rely on 'naked assertions devoid of further factual enhancement.'" *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (citation omitted). "[I]f allegations are indeed more conclusory than factual, then the court does not have to assume their truth." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012).

Because Plaintiff proceeds *pro se*, I construe his pleadings liberally. *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). Liberal construction, however, "does not give a court license to serve as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action." *Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1168–69 (11th Cir. 2014) (citation and quotation marks omitted).

**DISCUSSION**

Section 1 of the Sherman Act provides that "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations,

is declared to be illegal." 15 U.S.C. § 1. Although the statute uses different terms, "there is no magic unique to each term in § 1; the terms 'contract,' 'combination,' and 'conspiracy' are used interchangeably to capture the concept of concerted action, that is an 'agreement.'" *Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*, 989 F.3d 1224, 1232 (11th Cir. 2021) (quotation omitted). The "crucial question" is whether the challenged anticompetitive conduct results from independent decision-making or from "an agreement, tacit or express." *Twombly*, 550 U.S. at 553-54 (cleaned up) (citing *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). Moreover, "in interpreting § 1, the Supreme Court has long concluded that Congress intended only to prohibit 'unreasonable' restraints on trade." *Id*. (quotation omitted). Thus, to state a § 1 claim, a plaintiff must plausibly allege: (1) a conspiracy that (2) unreasonably (3) restrains interstate or foreign trade. *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co*., 917 F.3d 1249, 1260 (11th Cir. 2019).

The threshold question, then, is whether Plaintiff has plausibly alleged an agreement to restrain trade. *See Tidmore Oil Co. v. BP Oil Co.*, 932 F.2d 1384, 1388 (11th Cir. 1991) ("The first inquiry, in an § 1 claim … is to locate the agreement that restrains trade."). Because direct evidence of an antitrust conspiracy is "extremely rare," a plaintiff may rely on circumstantial facts that, viewed collectively, plausibly support the inference that defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *In re Jan. 2021 Short Squeeze Trading Litig*., No. 21-2989-MDL, 2022 WL 1522054, at *14-15 (S.D. Fla. May 13, 2022) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

**I. Counts I-IV: Alleged Concerted Nonenforcement of Mandatory Rules**

In Counts I-IV, Plaintiff advances two alternative theories of agreement under Section 1. First, he contends that competing brokers expressly agreed not to enforce the challenged

rules through collective deliberations and decisions within Defendants' governance bodies. DE 92 at 22–23. Alternatively, he argues that Defendants' similar enforcement outcomes, considered alongside the alleged plus factors, support an inference of a tacit agreement among the Associations, MLSs, and NAR. *Id.* at 23–25. I address each theory in turn.[2]

### A. The FAC Does Not Plausibly Allege an Express Agreement Not to Enforce Defendants' Pro-Competitive Rules

Plaintiff first attempts to establish an express agreement not to enforce mandatory pro-competitive rules through Defendants' organizational and governance structures. He alleges that the local and regional REALTOR® associations and MLSs are composed of competing real-estate professionals; that those entities participate in NAR's governance through boards, committees, and related bodies; and that representatives of associations, MLSs, and brokerages participate together in adopting rules and setting enforcement policies. According to Plaintiff, the resulting collective decisions failed to enforce rules intended to prevent steering, filtering, and other allegedly anticompetitive practices. DE 87 ¶¶ 79–96. Plaintiff emphasizes that the associations "sit together, vote together, and collectively set the rules and enforcement standards that govern all of them," contending that this conduct itself establishes an express agreement or "meeting of the minds." *Id.* ¶¶ 92, 94.

---

[2] Defendants characterize Plaintiff's approach to pleading a conspiracy as a "kitchen-sink approach." DE 90 at 26. Indeed, the FAC and Plaintiff's response invoke numerous overlapping characterizations of the alleged conspiracy, including a "macro conspiracy," "local conspiracy," "hub-and-spoke" conspiracy, "institutional capture," "structural interdependence," and "nod and a wink" signaling. *See generally* DE 87; DE 92. Despite these varying labels, Plaintiff's theories largely rest on the same underlying allegations: Defendants' shared governance structures, their alleged failure to enforce mandatory rules, and their asserted economic incentives to preserve traditional brokerage practices. In assessing whether the FAC plausibly alleges an agreement to restrain trade, I consider the substance of Plaintiff's allegations rather than the labels Plaintiff uses to describe them.

Without more, these allegations do not plausibly allege an agreement to refrain from enforcing rules designed to promote competition. The Eleventh Circuit has explained that "it was well-settled before *Twombly* that participation in trade organizations provides no indication of conspiracy." *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1296 (11th Cir. 2010) (*citing Twombly*, 550 U.S. at 567 n. 12); *see also Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293-94 (5th Cir. 1988) ("A trade association by its nature involves collective action by competitors. Nonetheless, a trade association is not by its nature a 'walking conspiracy' … [T]he establishment and monitoring of trade standards is a legitimate and beneficial function of trade associations."). Organizational decisions by trade association members do not inherently constitute concerted action under Section 1. *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 40 (2d Cir. 2018). Rather, a plaintiff must first establish "the existence of *an illegal* contract or combination" before demonstrating "that the agreement constituted an unreasonable restraint of trade." *Id.* (emphasis in original) (quotation omitted). The relevant question is whether trade association members committed themselves to the alleged unlawful common scheme, not merely whether they interacted, deliberated, voted, or made organizational decisions. *Id.*

The distinction is critical here. Plaintiff does not allege that Defendants agreed to adopt anticompetitive rules. Rather, he alleges that they adopted rules intended to promote competition but agreed not to enforce them. DE 87 ¶¶ 84–85. Thus, the relevant agreement is not simply an agreement to administer common rules or resolve disciplinary matters through committees. Plaintiff must plausibly allege facts showing that Defendants or their members shared a commitment to suppress competition from low-cost brokers by systematically declining to enforce the challenged rules.

The FAC repeatedly equates Defendants' organizational processes with the alleged agreement. For example, Plaintiff alleges that each enforcement decision is the product of a "formal collective deliberative process," that each dismissal therefore represents a "meeting of minds," and that the local committees' collective decisions constitute express agreements among the competitors serving on them. DE 87 ¶¶ 93–94 at 23–24. In his response, Plaintiff states the theory more directly: "horizontal competitors sitting together on the same committees, deliberating, reaching a meeting of minds, and producing a collective response" is the agreement. DE 92 at 7.

But those allegations fall short of what Plaintiff must plead. A committee's collective disposition of a particular complaint may reflect agreement about how to resolve that complaint. It does not necessarily reflect an agreement to suppress competition by declining to enforce pro-competitive rules. Nor does a vote finding no rule violation, without additional factual circumstances, plausibly establish a broader agreement to engage in systemic non-enforcement. Plaintiff must connect the alleged collective decisions to the specific anticompetitive agreement he asserts. The FAC does not do so.

The national-level allegations suffer from the same deficiency. Plaintiff alleges that representatives of local and regional associations participate in NAR's governance and collectively adopt rules and shape national policy. DE 87 ¶¶ 80, 89–92 at 21, 23. He does not, however, identify a vote, communication, directive, policy, meeting, or other factual event suggesting that the named Defendants or their members agreed not to enforce the challenged rules. Instead, he broadly characterizes NAR's alleged failure to intervene in local enforcement matters as a "second layer of concerted inaction." *Id.* ¶¶ 90–91 at 23. That allegation is

conclusory and supplies no factual connection between Defendants' governance structure and the alleged agreement.

Nor do Plaintiff's labels for the alleged conspiracy, including "macro conspiracy," "local conspiracy," or hub-and-spoke arrangement, cure the problem. DE 92 at 17–19. Judge Matthewman rejected the earlier hub-and-spoke theory because the original complaint did not plausibly allege the horizontal agreement connecting the alleged spokes. DE 84 at 19. Although the FAC describes the governance structure in greater detail, it still does not plausibly allege a shared commitment to not enforce the challenged rules. Indeed, Plaintiff maintains that individual associations "do not need to have communicated directly with one another" because participation in NAR governance is itself the coordinating mechanism. DE 87 ¶ 92 at 23. But participation in a common governance structure is not equivalent to an agreement to pursue the alleged restraint of trade.

In short, the FAC alleges that competitors participate in common governance bodies and collectively make decisions concerning the administration and enforcement of association rules. It does not plausibly allege that those competitors expressly agreed to suppress competition through systematic non-enforcement of those rules. I therefore turn to Plaintiff's alternative theory: that an agreement may be inferred from Defendants' parallel conduct and the surrounding circumstances.

**B. The FAC Does Not Plausibly Allege an Agreement Based on Parallel Conduct and Plus Factors**

Because direct evidence of an antitrust conspiracy is rare, plaintiffs generally must rely on parallel conduct and other circumstantial evidence to establish an agreement. *Harcros*, 158 F.3d at 569; *Williamson Oil*, 346 F.3d at 1301. But parallel conduct alone is insufficient. Such

allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. "Standing alone, parallel conduct is inconclusive, as it is consistent with an unlawful conspiracy, as well as rational and competitive business strategy prompted by common perceptions of the market." *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1258–59 (S.D. Fla. 2021) (citing *Twombly*, 550 U.S. at 554).

In deciding a dispositive motion in an antitrust conspiracy case, a court "looks to all the evidence suggesting agreement, or 'plus factors,' which can be in the form of economic or non-economic evidence." *In re January 2021 Short Squeeze Trading Litigation*, 2022 WL 1522054, *15. The list of potential plus factors is not exhaustive, and courts consider the alleged circumstances together in determining whether they plausibly suggest an agreement. *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003). Any factor that "tends to exclude the possibility of independent action" may qualify as a plus factor. *Id.* (quoting *Harcros*, 158 F.3d at 571 n. 35); *see also Monsanto*, 465 U.S. at 764. But "[m]erely labeling something a 'plus factor' does not make it so …". *Holiday Wholesale*, 231 F. Supp. 2d at 1272. A purported plus factor "needs to have some substance in order to tilt the balance[.]" *Id.*

Ultimately, if the alleged conduct is as consistent with lawful, independent business conduct as with an anticompetitive agreement, then the complaint does not satisfy Section 1's agreement requirement. *See Matsushita Elec. Inds. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) ("[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."). "*Twombly* demonstrates that courts should dismiss antitrust conspiracy complaints for failure to state a

claim when the allegations, taken as true, could just as easily reflect innocent conduct or rational self-interest." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 351 (7th Cir. 2022).

I first consider whether the FAC plausibly alleges parallel conduct. Plaintiff alleges a "parallel and substantially identical pattern of non-enforcement" across Defendants. DE 87 ¶ 96. According to the FAC, Defendants received similar complaints under the same mandatory rules during the same general period, yet repeatedly declined to enforce those rules. *Id.* ¶¶ 94–96. The FAC adds Defendant-specific details absent from the original complaint. Those allegations reflect some similarities in outcomes, but also meaningful differences.

Regarding commission-based steering, for example, Plaintiff alleges that multiple associations dismissed ethics complaints or conducted hearings that resulted in findings of no violation. *Id.* ¶¶ 191–200, 227–231, 238–244, 256–267. Most proceedings therefore resulted in no sanctions. There is, however, one notable exception: the Orlando Regional REALTOR® Association ("ORRA") reversed an initial dismissal, held a hearing, found an Article 1 violation, and imposed sanctions. *Id.* ¶¶ 193–200. ORRA's affirmative enforcement action undermines Plaintiff's assertion that Defendants uniformly declined to enforce the commission-based steering rules.

Regarding the IDX listing-broker contact-display rule, Plaintiff alleges that multiple MLSs acknowledged his complaints about missing contact information but failed to take the corrective action he sought. *Id.* ¶¶ 172–177, 204–215, 232–237, 245–250, 268–277. Although some MLSs opened vendor tickets, offered audits, or referred the issues for further review, Plaintiff alleges that the deficiencies persisted. These allegations reflect similar outcomes, despite differences in the steps taken to address the complaints.

Regarding written buyer-broker agreements, Plaintiff alleges that multiple organizations failed to provide the verification or enforcement he requested. *Id.* ¶¶ 143–153, 183–190, 201–203, 216–226. But the underlying alleged inquiries and responses varied, including requests for information, confidentiality objections, jurisdictional referrals, and requests for supporting documentation. These differences complicate Plaintiff's characterization of the responses as a uniform refusal to enforce the same rule.

Plaintiff's commission-filtering allegations largely arise from the same incidents underlying his steering complaints. He alleges that several associations failed to refer unsuccessful steering complaints to their MLSs for separate enforcement under the filtering rules. *Id.* ¶¶ 198, 200, 231, 243, 263, 267. Although these allegations describe similar failures to refer matters for additional enforcement, they do not necessarily establish that the MLSs themselves received and independently declined to pursue filtering complaints.

Taken together, the allegations show that multiple Defendants received complaints concerning mandatory rules that generally did not result in sanctions or corrective action. Differences in investigative procedures or intermediate steps do not necessarily defeat an inference of parallel conduct. *See, e.g., In re Turkey Antitrust Litigation*, 642 F. Supp. 3d 711, 723 (N.D. Ill. 2022) ("Plaintiffs do not need to allege that defendants restricted supply in an identical manner."). Nevertheless, ORRA's affirmative enforcement action and the variations in the buyer-broker and filtering complaints weaken Plaintiff's assertion that Defendants uniformly declined to enforce the rules. I need not resolve whether the FAC sufficiently alleges parallel conduct, however, because even assuming it does, parallel non-enforcement alone does not plausibly establish an agreement under Section 1.

I therefore turn to whether the alleged plus factors support an inference of agreement. *See Twombly*, 550 U.S. at 556–57. Plaintiff identifies several purported "plus factors" that he contends support an inference that Defendants' alleged nonenforcement of mandatory rules resulted from agreement rather than independent action. DE 87 ¶¶ 69–77, 325–366. These allegations fall into five general categories: (1) a common economic motive to preserve traditional brokerage practices; (2) conduct allegedly contrary to Defendants' independent economic interests; (3) opportunities to coordinate through trade associations and overlapping governance structures; (4) the asserted statistical improbability of widespread nonenforcement; and (5) public messaging and signaling.

**First, common economic motive.** Plaintiff alleges that Defendants shared a common economic motive to protect the traditional brokerage model, including what he calls the "5–6% commission norm," from competition by discount and limited-service brokers. DE 87 ¶¶ 346–48. Plaintiff's theory offers a conceivable reason why brokers benefiting from traditional commission practices might prefer less vigorous enforcement of rules protecting lower-cost competitors. But a common economic motive does not, without more, plausibly establish anagreement. Courts have questioned whether a common economic motive properly qualifies as a plus factor. *See, e.g., Holiday Wholesale*, 231 F. Supp.2d at 1306 ("As an initial matter, the court notes that the characterization of motive as a 'plus factor' is questionable."); *In re Musical Instrument Equip. Antitrust Litigation*, 798 F.3d 1186, 1194 (9th Cir. 2015) ("[C]ommon motive does not suggest an agreement[.]"); *S. Collision & Restoration, LLC*, 173 F. Supp.3d at 1300 ("The mere desire to make a profit cannot constitute a 'plus factor'[.]") (citing *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1342 (11th Cir. 2010)). As Plaintiff's theory suggests, each Defendant or its members could independently have an economic

incentive to protect traditional brokerage practices. "If existence of a profit motive was enough to make it plausible that the defendants had colluded to fix prices, then essentially every alleged price fixing agreement would survive a motion to dismiss." *S. Collision and Restoration LLC*, 173 F. Supp.3d 1293, 1300.

**Second, conduct allegedly contrary to economic interests.** Plaintiff alleges that Defendants acted against their own economic interests by failing to enforce rules they publicly promote as protecting transparency, competition, and the integrity of their services. DE 87 ¶¶ 326–333. The Eleventh Circuit has recognized, however, that courts "must exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest we be too quick to second guess well-intentioned business judgments of all kinds." *Williamson Oil*, 346 F.3d at 1310. The conclusory assertion that nonenforcement undermines Defendants' reputational interests does not establish that their enforcement decisions were economically inexplicable absent an agreement. This factor therefore adds little to the inference of conspiracy.

**Third, opportunities to coordinate.** Plaintiff alleges that Defendants had opportunities to conspire through their participation in trade associations, overlapping membership and governance, and the involvement of competing brokers in grievance and professional-standards proceedings. DE 87 ¶¶ 79–96, 334–345. He contends that these arrangements create structural conflicts of interest and permit incumbent brokers to influence enforcement decisions for their own financial benefit. These allegations may suggest opportunities for communication and self-interested decision-making, but an opportunity to conspire is not an agreement to do so. The Eleventh Circuit has repeatedly held that "the mere opportunity to conspire among antitrust defendants does not, standing alone, permit the

inference of conspiracy." *Williamson Oil*, 346 F.3d at 1319 (quoting *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991)); *see also Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1574 (11th Cir. 1991) (same). Likewise, "participation in trade associations provides no indication of a conspiracy." *Am. Dental Ass'n v. Cigna Corp*., 605 F.3d 1283, 1295–96 (11th Cir. 2010) (citing *Twombly*, 550 U.S. at 567 n. 12). As discussed above, Plaintiff's allegations of shared governance do not supply the missing link between Defendants' opportunities to coordinate and an agreement to engage in systematic non-enforcement.

**Fourth, the asserted statistical improbability of widespread non-enforcement.** Plaintiff contends that Defendants' allegedly widespread failure to enforce the same mandatory rules is too unlikely to have occurred through independent decision-making. He describes the outcomes as "statistically improbable" and their uniformity as "historically unprecedented." DE 87 ¶ 366. But the FAC provides no factual basis for evaluating these assertions. It does not identify how many complaints Defendants received, how often complaints resulted in findings of violations or sanctions, or how the responses to Plaintiff's complaints compared with ordinary enforcement practices. Plaintiff need not plead a statistical analysis to state a conspiracy claim, but merely labeling selected outcomes statistically improbable does not substantiate that characterization. Moreover, the alleged responses were not uniform: Defendants took different procedural steps, and the ORRA found a violation and imposed sanctions in at least one proceeding. *See id.* ¶¶ 183–215, 230–280, including ¶ 275. These

varied outcomes do not foreclose coordination, but they weaken Plaintiff's premise that the responses were so consistently alike as to suggest a common agreement.

**Fifth, public messaging and signaling.** Plaintiff relies on public messaging that he characterizes as signaling support for traditional brokerage practices, including NAR's D.A.N.G.E.R. Report, advertising concerning do-it-yourself services, references to historical commission levels, and statements about buyer-agent compensation. *Id.* ¶¶ 349–365. Even accepting Plaintiff's interpretation of those statements, the FAC does not plausibly connect them to an agreement among the other associations and MLSs not to enforce the mandatory rules at issue. Nor does it allege facts connecting those public statements to the particular enforcement decisions or showing that other Defendants understood and accepted them as an invitation to coordinate non-enforcement. Plaintiff's asserted "nod and a wink" understanding, *id.* ¶¶ 362–65, is speculative and unsupported by factual allegations connecting the messaging to the challenged enforcement decisions.

Considered collectively, these factors make Plaintiff's theory conceivable, but not plausible. They suggest that brokers who benefit from traditional compensation practices may have wanted to preserve them; that Defendants' association structures provided opportunities for communication and influence; that Plaintiff encountered multiple enforcement outcomes he considered inadequate; and that NAR publicly promoted aspects of the traditional brokerage model. They do not, however, supply facts plausibly connecting those circumstances to an agreement, whether within an individual association or among the separate associations and

MLSs, to refrain from enforcing rules against steering or other practices that disadvantage lower-cost competitors.

A common preference for traditional brokerage practices is not, by itself, an agreement to disregard particular enforcement rules. And although the allegations must be considered together, their combined force does not sufficiently distinguish an agreed course of nonenforcement from independent decisions influenced by similar economic incentives and institutional considerations. Even considered together, the allegations do not plausibly show concerted action as opposed to independent conduct. *See Twombly*, 550 U.S. at 556–57, 570; *Williamson Oil*, 346 F.3d at 1301. Accordingly, Plaintiff fails to plausibly allege the agreement required to state a claim under Section 1, and Counts I–IV of the FAC must be dismissed.

**II. Count V: Alleged Violation of NAR's Antitrust-Compliance Policy**

Count V, asserted against NAR alone, challenges public statements and advertising that Plaintiff contends promoted traditional commission levels and full-service brokerage in violation of NAR's antitrust-compliance policy. DE 87 ¶¶ 419–425. In his Response, Plaintiff clarifies that Count V does not allege a separate price-fixing agreement, but instead identifies public messaging that allegedly reinforced the broader conspiracy. DE 92 at 30–31. As discussed above, I have considered this messaging in conjunction with Plaintiff's other allegations as a purported plus factor supporting an inference of concerted non-enforcement. For the reasons already explained, those allegations do not plausibly establish an agreement among Defendants to restrain trade.

Nor does Count V independently state a claim under Section 1. Although Plaintiff characterizes NAR's public messaging as price signaling, group boycott, and market allocation, the factual allegations do not plausibly support those characterizations. The FAC does not

allege facts showing that NAR's statements concerning customary commission rates were understood by competing brokers as an invitation to coordinate pricing or that any such agreement resulted. *See Williamson Oil*, 346 F.3d at 1307 (explaining that public pricing announcements and competitors' economically rational responses to those announcements did not support an inference of price-fixing where the conduct was consistent with independent "economically rational, self-interested" behavior). Likewise, NAR's alleged promotion of traditional brokerage services and unfavorable portrayal of alternative brokerage models do not, without more, establish an agreement among competitors to boycott lower-cost brokers or to allocate customers or business opportunities. *See Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1271 (11th Cir. 2019) (en banc) (explaining that a group-boycott claim requires sufficient allegations of an agreement or conspiracy and that parallel conduct consistent with independent business decisions does not suffice). The FAC thus fails to allege facts plausibly establishing an anticompetitive agreement between NAR and another Defendant or among competing members acting through NAR.

Finally, Plaintiff's allegation that NAR's messaging violated its own antitrust-compliance policy does not alter the analysis. Even assuming NAR's statements were inconsistent with that policy, an internal policy violation does not, without more, establish the agreement necessary to state a claim under Section 1. Accordingly, Count V fails to state a claim.

## CONCLUSION

To state a claim under Section 1 of the Sherman Act, it is not enough to allege conclusorily that certain actions resulted from a conspiracy; the plaintiff must allege facts that make the existence of an agreement plausible. Plaintiff has not done so here. Plaintiff has

already been afforded an opportunity to amend his complaint after Judge Matthewman specifically identified his failure to plausibly allege an agreement among Defendants. DE 84 at 16-19; DE 85. Although the FAC adds substantial factual detail and advances additional theories of concerted action, including theories based on NAR's public messaging, it fails to cure that fundamental deficiency. Plaintiff has therefore had a meaningful opportunity to address the pleading defect, and the substantially expanded allegations in the FAC provide no basis to conclude that further amendment would produce a different result. Under these circumstances, I find that further amendment would be futile and recommend dismissal with prejudice. *See Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1132-33 (11th Cir. 2019) (explaining that leave to amend is futile when the amended complaint would still be subject to dismissal).

Accordingly, I respectfully **RECOMMEND** that Defendants' Motion to Dismiss, DE 90, be **GRANTED** and that the First Amended Complaint, DE 87, be **DISMISSED WITH PREJUDICE**.

**NOTICE OF RIGHT TO OBJECT**

The parties shall have fourteen days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with United States District Judge William P. Dimitrouleas. Failure to file timely objections may limit appellate review of unobjected-to factual and legal conclusions. *See* 28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1; *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989). **Conversely, if a party does not intend to object to this Report and Recommendation, then that party shall file a Notice of such within seven days of the date of this Report and Recommendation.**

The Clerk of Court is directed to **MAIL** a copy of this Report and Recommendation to Plaintiff at his mailing address of record and enter a Notice of Compliance confirming same.

**DONE AND RECOMMENDED** in Chambers at West Palm Beach, Florida, on the 16th of October, 2026.

SHANIEK MILLS MAYNARD
U.S. MAGISTRATE JUDGE