IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 25-81016-CIV-DIMITROULEAS/MAYNARD

FILED BY PCC D.C.
OCT 30 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

**JORGE A. ZEA,** (Pro Se)

Plaintiff,

v.

**NATIONAL ASSOCIATION OF REALTORS, et al.,**

Defendants.

---

**PLAINTIFF'S OBJECTIONS TO THE REPORT AND RECOMMENDATION (DE 96)**

1. Plaintiff Jorge A. Zea, appearing pro se, respectfully objects to the Report and Recommendation ("R&R") (DE 96) under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). The Court decides each objected-to part of the R&R anew (de novo). Fed. R. Civ. P. 72(b)(3).

## I. Background: The Two Levels of Agreement

2. Before addressing the objections, Plaintiff briefly summarizes the two levels of agreement pleaded in the First Amended Complaint ("FAC") (DE 87) and recognized in the R&R.

3. Plaintiff separates them because each is shown differently under Section 1: "Local-Level Agreements" (within each Defendant) by direct evidence of collectively agreed decisions, and "National-Level Agreement" (among Defendants) by Defendants'

actions, votes and mandates through NAR, supported by parallel conduct and plus factors.

4. The R&R recognizes that "the FAC asserts concerted action at two levels": a "local level," where "each association or MLS is a collective body of competitors," and a "national level," where associations and MLSs "participate jointly in NAR governance." R&R at 3.

5. It then addresses the two separately: "First, [Plaintiff] contends that competing brokers expressly agreed not to enforce the challenged rules through collective deliberations and decisions within Defendants' governance bodies. … Alternatively, he argues that Defendants' similar enforcement outcomes, considered alongside the alleged plus factors, support an inference of a tacit agreement among the Associations, MLSs, and NAR. … I address each theory in turn." R&R at 8–9.

**A. Local-Level Agreements (within each Defendant):**

6. Each Defendant is made up of licensees (REALTORS®) who compete with one another. DE 87 ¶¶ 56–57, 86–88. Associations and MLSs decide complaints of rule violations through subgroups of those competing members through their Ethics Grievance Committees and Professional Standards panels, and through their Board of Directors. *Id.* ¶¶ 114–116.

7. Plaintiff filed complaints of violations and those members of the committees and Boards agreed, on behalf of the Defendants, to a specific outcome and rendered a written decision.

8. The Local-Level Agreements are those reflected in these joint decisions, pleaded Defendant by Defendant. No parallel conduct or plus factors among Defendants are needed to show them: the decisions themselves, and their departure from NAR's mandatory rules, show the agreement. *Id.* ¶¶ 342, 375–376.

**B. National-Level Agreement (among Defendants).**

9. NAR's rules are adopted by vote of NAR's committees and Board of Directors, where Defendants' elected representatives sit. The rules are mandatory: each Association and MLS must adopt them, supervise compliance, and enforce them. NAR has the tools to enforce its mandates against the Associations and MLSs, including withdrawal of insurance and revocation of the charter. DE 87 ¶¶ 54–65. Through NAR, Defendants thus agreed on the rules, on their mandatory force, and on how they must be enforced. The National-Level Agreement challenged here is the agreement not to enforce them: the Associations and MLSs allow violations locally, contrary to NAR's mandates, and NAR does not enforce its mandates against them, despite having the tools to do so. *Id.* ¶¶ 90–91.

10. The R&R recognizes the same two levels. It asks whether there is an agreement "within an individual association or among the separate associations and MLSs." R&R at 19–20; see also *id.* at 3, 6, 8–9. And it frames its test for the combination as agreements by "Defendants or their members." R&R at 10–11. In these objections, Local-Level are the agreements among "their members" within each Defendant, and National-Level is the agreement among "Defendants."

11. These are two separate kinds of agreement. The local-level agreements are shown by the joint decisions of each Defendant's own committees and Board, and by those decisions' departure from NAR's mandatory rules, without parallel conduct or plus factors among Defendants; they are judged Defendant by Defendant.

12. The national-level agreement is an agreement among Defendants through NAR, supported by parallel conduct and plus factors. Neither depends on the other. They are brought together in one case for judicial economy, because they arise from the same mandatory rules and concern the same restraints. Fed. R. Civ. P. 20(a)(2). The R&R, however, applied the same added requirement to both and recommended dismissing both together. If the Court finds that the claims should not proceed together, the remedy is severance, not dismissal. Fed. R. Civ. P. 21 ("Misjoinder of parties is not a ground for dismissing an action."). Plaintiff is prepared to proceed separately against each Defendant if the Court so directs.

## II. The Objections and Their Role

13. The R&R recommends dismissal with prejudice on a single ground: that the FAC "fails to plead facts plausibly showing an agreement among Defendants *to* restrain trade". R&R at 1. Objection 1 addresses that ground and is Plaintiff's main objection as it is the sole supporting theory for the recommendation.

14. The remaining objections respond to the reasoning the R&R used along the way. They are not separate grounds for the recommended dismissal. Plaintiff raises them to clarify the record and to preserve each point for further review.

### A. Objection 1: The R&R Adds a *Purpose* Requirement that is not in the Law

15. Section 1 of the Sherman Act forbids "[e]very contract, combination . . . or conspiracy, in restraint of trade." A claim requires "(1) a conspiracy that (2) unreasonably (3) restrains interstate or foreign trade." R&R at 7–8 (quoting 15 U.S.C. § 1 and *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019)). The R&R correctly states what the first element means: the statute's terms "capture the concept of concerted action, that is an 'agreement,'" and the "crucial question" is whether the conduct results "from independent decision-making or from 'an agreement, tacit or express.'" R&R at 8. Nothing in that statement of the law asks about explicit intent or purpose.

16. The R&R then adds the purpose requirement. It asks for an agreement "to restrain trade" (R&R at 1, 6, 8); "shared a commitment to suppress competition" (R&R at 10); an agreement "to suppress competition" (R&R at 11); and competitors who "expressly agreed to suppress competition" (R&R at 12). It applies that requirement at both levels. R&R at 10–12.

17. Plaintiff devoted a full section of his Response to this precise point: "Specific Intent to Restrain Trade Is Not Required." DE 92 at 31–33 (Section X). The R&R did not address it. Plaintiff renews that argument here.

18. This is not a matter of wording. The law requires an agreement *that* restrains trade. The R&R requires, again and again, an agreement *to* restrain trade. That is not what the statute says, and it is not what Congress enacted.

19. Even the case the R&R cites for its "threshold question" asks the court "to locate the agreement *that* restrains trade." R&R at 8 (emphasis added) (quoting *Tidmore Oil Co. v. BP Oil Co.*, 932 F.2d 1384, 1388 (11th Cir. 1991)). The distinction is material. Section 1 requires an agreement concerning the challenged conduct and an unreasonable restraint of trade; it does not invariably require proof that the participants specifically intended to suppress competition. The inquiry therefore must distinguish the existence of the agreement from the unlawfulness of its alleged effects.

20. The United States has addressed this same error. In *Tesla, Inc. v. Louisiana Automobile Dealers Ass'n*, the district court dismissed a Section 1 claim against members of a state motor-vehicle commission that included competing car dealers. The United States' amicus brief describes that ruling:

> The court reasoned, first, that the amended complaint did not plausibly allege that "an agreement was made." . . . In an apparent alternative holding, the district court then stated: "Nor do Tesla's allegations 'demonstrat[e] an intention on the part of' the commissioners 'to engage in a conspiracy' for the purpose of 'restrain[ing] trade.' " . . . The court explained that "Tesla has not plausibly alleged that the commissioners reached an agreement with LADA to investigate Tesla's business operations in Louisiana, much less that any such agreement was made with the intention 'to achieve an unlawful objective.' "

Brief for the United States as Amicus Curiae in Support of Neither Party at 4–5, *Tesla, Inc. v. La. Auto. Dealers Ass'n*, No. 23-30480 (5th Cir. Oct. 19, 2023), Doc. 70 ("DOJ Br.") (citations and emphasis omitted).

21. The Antitrust Division told the Fifth Circuit that this was error:

> The district court erred in stating that Tesla was required to show that the commissioners had a "purpose" of restraining trade or "inten[ded] to

> achieve an unlawful objective" . . . . There is no such requirement to state a claim under Section 1. Anticompetitive purpose is not required to satisfy either primary element of a Section 1 claim: (1) concerted action (a contract, combination, conspiracy, or other form of agreement) that (2) is unreasonable (i.e., anticompetitive). Rather, it can suffice to show that an agreement has an anticompetitive effect.

DOJ Br. at 6.

22. Indeed, "[e]ven an indisputably procompetitive agreement would satisfy the concerted-action element of a Section 1 claim." *Id.* (citation omitted). The brief is persuasive, not binding, and the Fifth Circuit later resolved the appeal without reaching this issue. *Tesla, Inc. v. La. Auto. Dealers Ass'n,* 113 F.4th 511 (5th Cir. 2024). But the brief relies on an Eleventh Circuit decision that is binding here. DOJ Br. at 12.

23. In the case the DOJ relies on, the Eleventh Circuit addressed committees of competing doctors deciding on a competitor. A plaintiff "need not prove an intent on the part of the co-conspirators 'to restrain trade or to build a monopoly.' … So long as the purported conspiracy has an anticompetitive effect, the plaintiff has made out a case under section 1." *Bolt v. Halifax Hosp. Med.* Ctr., 891 F.2d 810, 819–20 (11th Cir. 1990) (holding that § 1 does not require proof of intent to restrain trade), *overruled in part on other grounds by City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365 (1991); see also *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 243 (1980) ("[I]n a civil action under the Sherman Act, liability may be established by proof of either an unlawful purpose or an anti-competitive effect.") (stating the same principle in the course of addressing Sherman Act jurisdiction).

24.

25.

26.

27.

28. In the portion relevant here, Bolt examined whether the evidence established the concerted-action element of Section 1, in reviewing a directed verdict.. 891 F.2d at 818. At the pleading stage, the FAC need only plausibly allege the same showing.

29. The R&R's standard comes from *Monsanto*: facts showing a "conscious commitment to a common scheme designed to achieve an unlawful objective." R&R at 8. Defendants relied on the same phrase. DE 93 at 10. *Bolt* applied that very language and explained what it requires: "the evidence must tend to prove (1) an intent to adhere to an agreement (2) designed to achieve an unlawful objective; but the evidence need not show that the co-conspirators specifically intended to restrain trade or to monopolize." 891 F.2d at 820. An "unlawful objective" means only that the agreement "(1) was not designed to achieve a legitimate business purpose and (2) had an anti competitive effect." *Id.* Defendants themselves acknowledge that specific intent need not be shown where a restraint is the "necessary and direct" result of the conduct. DE 93 at 10–11.

30. So the question has two steps. *First*, was there an agreement? The R&R's own test asks whether "Defendants or their members" agreed. R&R at 10; *see also id.* at 11. Remove the added requirements, the intent ("to suppress competition") and the pattern ("systematically"), and what remains is whether "their members" agreed. Here, they did.

31. Committees and Boards of competing members decided Plaintiff's complaints by joint decisions: the Grievance Committee, then the Professional Standards hearing panel, then the Board of Directors. The R&R itself recognizes that such a decision "may reflect agreement about how to resolve that complaint." R&R at 11. The FAC also pleads why these decisions cannot be squared with the rules' own text and Defendants' stated purposes. DE 87 ¶¶ 109, 162–165, 326–333.[1] Under Bolt, that is the kind of showing that supports an agreement "not designed to achieve a legitimate business purpose." 891 F.2d at 820.

32. For example, the members of an ethics hearing panel of Broward, Palm Beaches and St. Lucie REALTORS®, Inc. agreed not to find any violation against a member who had written, "Not showing any %1 properties!!!", and who admitted at the hearing that she would not show a property offering a 1% commission. DE 87 ¶¶ 166–169.

33. Likewise, a CPAR hearing panel found no violation against a member who had written, "We have decided not to show it since they don't offer any compensation," accepting as a "buyer instruction" a clause added to the buyer-broker agreement limiting showings to properties where the "seller offers Buyer Broker Compensation." *Id.* ¶¶ 256–263.

34. These were not routine administrative matters. The rules at issue (the prohibition on commission-based steering, the IDX display rule, and the limits on

---

[1] Pages 35–38 of the FAC (¶¶ 154–171, in part) do not appear in the copy docketed as DE 87. Plaintiff is filing a notice attaching them. See Plaintiff's Notice of Filing Pages 35–38 Omitted from the Docketed First Amended Complaint (filed herewith).

buyer-broker compensation) exist to preserve competition and protect consumers, as NAR itself states. *Id.* ¶¶ 109, 129, 329.

35. Steering is the means by which commissions stay where they were: by permitting it, Defendants "sustain a market in which real estate brokerage compensation is maintained near historic 'standard' levels." *Id.* ¶ 310; *see id.* ¶ 10. NAR has published express guidance on this very point: "Under NAR's Code of Ethics, steering buyers based on the amount of broker compensation is prohibited." *Id.* ¶ 113; *see id.* ¶¶ 112, 158.

36. A decision not to enforce these rules is a decision about competition. Under Bolt, when a committee's conclusions are "so baseless that no reasonable [reviewer], considering the same set of facts, could have reached those conclusions," a factfinder may infer "an agreement designed to achieve an end not dictated by legitimate business concerns." 891 F.2d at 821. The Bolt court's "medical practitioner" was a peer reviewer sitting in judgment of a competitor—the same functional role as the committee, panel or Board members here. The principle is not limited to medicine; it applies to any panel of competitors reviewing a competitor's conduct.

37. No reasonable reviewer, reading a member's own written refusal to show a property because of the commission offered, could find no violation of rules that prohibit exactly that. No legitimate business reason explains those decisions; the restraint does. Hence, the agreement element of Section 1 is met.

38. This point is narrow. The recorded decisions are offered for the agreement element only. A committee decision is not, by itself, a Sherman Act violation, and the FAC doesn't plead it this way. *See* DE 87 ¶ 377 ("Only those collective decisions or

actions that unreasonably restrain trade are actionable under the Sherman Act and are challenged in this Complaint.").

39. *Second*, did the agreement unreasonably restrain trade? The R&R did not reach that step: "Because this deficiency is fatal to Plaintiff's Section 1 claims, I address the agreement requirement and need not reach Defendants' remaining arguments." R&R at 6. The FAC pleads that step, the harm to competition and the restraint, in detail, and those allegations remain unaddressed. DE 87 ¶¶ 299–318, 367–372. The R&R itself recognizes that the FAC "adds substantial factual detail, reorganizes allegations by Defendant, [and] expands the allegations concerning Plaintiff's standing and competitive injury." R&R at 5.

40. If intent to harm competition were required, almost any case would fail as soon as the competitors said they did not mean to harm anyone. Because the R&R applied the wrong test, it should not be adopted. And because the FAC is well pleaded, the Motion to Dismiss should be denied.

**B. Objection 2: A "Systemic" Pattern is Not Required**

41. The R&R requires "a broader agreement to engage in systemic non-enforcement." R&R at 11. It frames the local-level theory as "an Express Agreement Not to Enforce Defendants' Pro-Competitive Rules." R&R at 9. But each decision was itself an express agreement on how to dispose of a complaint, and its result was non-enforcement of the rule. The FAC need not also plead a separate, broader agreement whose object was non-enforcement. No pattern is needed. One joint decision is an agreement, and it is actionable if it unreasonably restrains trade.

42. The local-level agreements stand or fall Defendant by Defendant, on each Defendant's own decisions. That other Defendants took different steps, or that ORRA made a finding in one proceeding (R&R at 18–19), does not erase the decisions of the others. As the R&R notes, "varied outcomes do not foreclose coordination." R&R at 19. Nor is ORRA the exception the R&R describes. *Cf.* R&R at 14. ORRA's Grievance Committee first dismissed the complaint, and the matter went forward only because Plaintiff appealed. DE 87 ¶¶ 194–195. Before any hearing, the respondent waived it and acknowledged the conduct. *Id.* ¶ 196. The Ethics Hearing Panel's finding then confirmed what the respondent had already admitted; it was not the result of a contested hearing. *Id.*¶ 197. Even then, no referral was made to the MLS for the parallel MLS rule violation. *Id.* ¶ 198. And in a second ORRA matter, the Grievance Committee dismissed a complaint in which the member had written that her buyers "only pursue homes where the seller is paying the commission." *Id.* ¶¶ 199–200.

43. A pattern matters only at the national level, where parallel conduct is offered, if needed, to infer coordination among separate Defendants. Whether an agreement exists does not depend on how widespread the non-enforcement was.

### C. Objection 3: Local-Level Decisions Are Joint, Not Independent Conduct

44. The R&R concludes that the allegations do not show "concerted action as opposed to independent conduct" (R&R at 20), and it discusses the motives of individual "brokers" and "members" (R&R at 16–17). But the FAC does not challenge what individual brokers decided on their own. It challenges collective decisions of committees

and Boards made up of competing members, not employees. Those are joint decisions by competitors, not the act of a single member. *American Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010) (asking whether the conduct joins "separate economic actors pursuing separate economic interests") (internal quotation marks omitted). No member decides a panel's disposition alone, and the R&R does not identify who the independent actors would be.

45. In *Bolt*, the defendants argued that the hospital and its medical staff "were legally one entity and therefore incapable of concerted action." 891 F.2d at 818. The Eleventh Circuit disagreed: "We perceive no basis . . . for holding that the members of a medical staff are legally incapable of conspiring with one another. Each member practices medicine in his individual capacity; each is a separate economic entity potentially in competition with other physicians." *Id.* at 819. The same is true of the competing members who sit on Defendants' committees and Boards. DE 87 ¶¶ 56, 342.

**D. Objection 4: The FAC Does Not Rely on Participation Alone**

46. The R&R treats the FAC as resting on participation in trade associations and common governance. Plaintiff agrees that membership and participation alone are not an agreement. The FAC never pleaded otherwise. It points to specific decisions on specific complaints. The structure is simply the framework through which these collective decisions exist. R&R at 9–10, 17–18.

47. The R&R describes the FAC as attempting to plead a "meeting of minds" "through Defendants' governance structures." R&R at 5. The agreements are the decisions competitors reached together within that structure, in the Grievance

Committees, Professional Standards (ethics) hearing panels, and Boards of Directors that decided Plaintiff's complaints. The R&R itself later describes the theory this way: "horizontal competitors sitting together on the same committees, deliberating, reaching a meeting of minds, and producing a collective response." R&R at 11 (quoting DE 92 at 7).

**E. Objection 5: Plus Factors Apply Only to National-Level**

48. At Local-Level, the agreement is shown directly, by concerted written decisions. The R&R itself recognizes that plus factors are the route only when direct evidence is lacking. R&R at 8, 12. Plaintiff objects to the R&R's use of the plus-factor analysis to reject Local-Level. R&R at 16–20. The parallel conduct and plus factors in the FAC could support National-Level, if needed. DE 87 ¶¶ 94–96, 325–366.

**F. Objection 6: National-Level Is Pleaded Through NAR's Members' Collective Decisions, Guidance and Mandates**

49. The R&R finds no "vote, communication, directive, policy, meeting, or other factual event suggesting that the named Defendants or their members agreed not to enforce the challenged rules," and finds the national-level allegations conclusory. R&R at 11–12. Respectfully, the FAC pleads these events. The votes come first: NAR's mandatory rules, including how compliance must be enforced, are adopted by NAR's committees, Executive Committee, and Board, where Defendants' representatives sit. DE 87 ¶¶ 54–65. That is where Defendants agreed, through NAR, on what must be enforced. The communications and decisions that followed show that those rules are not enforced.

50. The FAC also pleads the communications the R&R found missing. NABOR's MLS Director declined to verify compliance, stating: "We are following the guidelines set by NAR." DE 87 ¶ 225. When Plaintiff reported IDX violations to NAR,

NAR deferred to the local MLS and copied Space Coast's CEO, who acknowledged the violation; it continues. *Id.* ¶¶ 273–277. And Beaches MLS and NAR's General Counsel gave Plaintiff the same answer: steering is addressed only through the Code of Ethics, not the MLS rules. *Id.* ¶¶ 157–158, 171. The other Defendants, faced with the same kinds of complaints under the same mandatory rules, reached the same result: no enforcement. *Id.* ¶¶ 94–96, 166–282.

51. Where some Defendants state on the record that they follow NAR's guidelines, and NAR gives the same answer they do, it is a reasonable inference that the others reached the same result the same way, through NAR. *See Bolt*, 891 F.2d at 827–28 (reliance by separate hospitals on "the same baseless conclusions" supported an inference of "a scheme to achieve a common illicit end").

52. At the pleading stage, these facts need only raise "a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

53. Furthermore, the local Associations and MLSs have no power to decide whether these rules apply. They must adopt NAR's mandatory rules, supervise compliance, and enforce them as NAR mandates. DE 87 ¶¶ 59, 62–64. What remains local is enforcement, decided case by case collectively by the members of each Defendant's own committees and Board.

54. Two things then happen together: the Associations and MLSs allow violations locally (which is in itself a violation of NAR policies), contrary to NAR's

mandate, and NAR, which has the tools to enforce them against the Associations and MLSs, does not. *Id.* ¶¶ 65, 90–91.

### G. Objection 7: The Parallel-Conduct and Plus-Factor Findings

55. Plaintiff objects to the R&R's treatment of the parallel conduct and of each plus factor, alone and together. R&R at 14–20; see DE 92 at 23–25. At the pleading stage, the parallel conduct and plus factors, considered together, need only plausibly suggest an agreement among Defendants rather than merely independent action. Plaintiff submits that the FAC meets this standard and that the pleaded facts must be considered collectively, with reasonable inferences drawn in Plaintiff's favor. *See*. R&R at 13–14. In particular, the FAC pleads what the R&R looked for. Non-enforcement "does not promote competition, increase efficiency, or benefit consumers"; it "permits conduct Defendants represented as harmful to competition to persist." DE 87 ¶ 318. "There is no legitimate, pro-competitive justification for a concerted failure to enforce mandatory rules designed to ensure market transparency and fair dealing." *Id.* ¶ 368.

56. The only independent reason the R&R suggests, that each Defendant or its members "could independently have an economic incentive to protect traditional brokerage practices" (R&R at 16–17), is the very restraint the rules were adopted to prevent. Plaintiff also objects to discounting the pattern of outcomes for lack of complaint baselines or statistics after recognizing that "Plaintiff need not plead a statistical analysis." R&R at 18. Plaintiff asks that all the pleaded facts be weighed together under the correct standard.

**H. Objection 8: Count V**

57. Count V pleads an agreement "among competing members acting through NAR." R&R at 20–21; DE 87 ¶¶ 54–55, 60. Plaintiff objects to the dismissal of Count V for the same reasons as Objection 1.

58. NAR has no voice of its own apart from its members. Its decisions, rules and policies are decided by committees and a Board made up of competing REALTORS®, and its messaging is paid for with all members' dues. DE 87 ¶¶ 53–55, 60, 422. When NAR's President writes about buyer-agent compensation, or NAR publishes "customary" commission ranges, NAR's competing members are speaking together through the body they control. *Id.* ¶¶ 137–138, 422. Count V pleads that this messaging is itself "concerted conduct" (*Id.* ¶ 423), and it also supports the broader conspiracy (DE 92 at 30–31).

**I. Objection 9: Dismissal With Prejudice; Futility**

59. The R&R recommends dismissal with prejudice because amendment would be futile. R&R at 21–22. The futility finding follows from the added *purpose* requirement, and it was made without deciding whether any other deficiency remains.

60. The R&R finds futility in part because Plaintiff already had a chance to cure after the prior Report "specifically identified his failure to plausibly allege an agreement among Defendants." R&R at 22 (citing DE 84 at 16–19). The prior Report identified a missing agreement; it did not require that the agreement be intended to suppress competition. *See* DE 84 at 16–19. The FAC answered that Report by pleading the local-level agreements reached in Defendants' committees and Boards. The purpose

requirement was raised only later, by Defendants, who argued that no concerted action "was intended to accomplish an unlawful end or restrain trade." DE 90 at 21. Plaintiff answered that argument in a full section of his Response. DE 92 at 31–33. The R&R adopted the requirement without addressing that answer. A deficiency the prior Report never identified, and that rests on a requirement that is not the law, cannot support a finding that further amendment would be futile.

61. The R&R itself twice describes the FAC as adding "*substantial factual detail.*" R&R at 5, 22 (emphasis added). That is an accurate description: the FAC pleads specific complaints, dates, decision-makers, written decisions, and Defendants' own statements, not labels. At this stage those facts must be accepted as true. That description is difficult to reconcile with the finding that the allegations are "conclusory," *id.* at 11–12, and with the conclusion that amendment would be futile, *id.* at 21–22. Several of the facts the R&R found missing (communications with NAR, and concrete decisions that cannot be squared with the rules) are pleaded on pages 35–38 of the FAC, which do not appear in the docketed copy. DE 87 ¶¶ 154–171; *see* Notice (filed herewith).

62. The R&R identifies no flaw that cannot be cured, and the remaining fatal basis, *intent*, is not the law. Plaintiff does not contend that amendment is automatic. But futility does not apply, and leave to amend should be granted so that this case is decided on its merits. Plaintiff asked for leave in his Response. DE 92 at 50. A dismissal for failure to plead facts is not a ruling that the facts do not exist.

## III. Issues the R&R Did Not Reach

63. The R&R did not reach standing, antitrust injury, causation, the relevant markets, per se treatment, or the effect of the buyer-broker settlement proceedings in the Western District of Missouri. R&R at 5–6. Plaintiff does not attribute to the R&R findings it did not make. Plaintiff relies on the FAC and his Response (DE 92) on each of those issues and preserves them.

## IV. Requested Relief

64. Plaintiff respectfully requests that the Court sustain these objections and decline to adopt the R&R (DE 96), including its recommendation of dismissal with prejudice.

65. Plaintiff respectfully requests that the Court recommit the fully briefed Motion to Dismiss (DE 90) to Magistrate Judge Maynard, with instructions to consider it under the proper legal standard, including the remaining issues the R&R did not reach. 28 U.S.C. § 636(b)(1). This would allow the Court to benefit from her consideration of those matters.

66. Alternatively, Plaintiff respectfully requests that the Court make its own de novo determination of the fully briefed Motion to Dismiss, on DE 87, DE 90, DE 92, and DE 93, and deny the Motion in its entirety.

67. Should the Court identify any remaining pleading deficiencies warranting dismissal, Plaintiff alternatively requests leave to amend rather than dismissal with prejudice, for the reasons in Objection 9. At a minimum, any dismissal should be without prejudice.

68. Plaintiff respectfully leaves the choice between recommittal and the Court's own determination to the Court's discretion. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3).

69. In short, the R&R's own words, "Defendants or their members" (R&R at 10), recognize that a Defendant's competing members can agree through that Defendant's own committees and Board, whether or not any other Defendant did the same. The FAC pleads those decisions, and it pleads the restraint and the harm separately. The R&R stopped at the agreement element while requiring a *purpose* to suppress competition and a systemic pattern. Under the correct standard, the recommendation should not be adopted.

## V. Request for Hearing

70. Under Local Rule 7.1(b)(2), Plaintiff respectfully requests a hearing on these objections and on the Motion to Dismiss (DE 90) as a whole. A hearing would help the Court because (1) the objections turn on a single legal question, whether Section 1 requires an agreement intended to restrain trade; (2) the FAC pleads a local-level and a national-level agreement, and a hearing would let Plaintiff show where each is pleaded; (3) the remaining grounds of the Motion, including standing, antitrust injury, and the relevant markets, have not yet been decided; and (4) the recommendation is dismissal with prejudice, which would end the case.

71. As a pro se litigant, Plaintiff would welcome the opportunity to answer any questions the Court may have directly. Plaintiff estimates 30 minutes per side.

72. Plaintiff respectfully requests that the hearing (if the Court finds it necessary) be held in person.

Dated: October 30, 2026

Respectfully submitted,

Jorge A. Zea, pro se
2234 N Federal Hwy
Boca Raton, FL 33431
305-244-7242
antitrust@jorgezea.com

**Certificate of Service**

I HEREBY CERTIFY that on this 30th day of October, 2026, I filed the foregoing Plaintiff's Objections to the Report and Recommendation (DE 96) in person with the Clerk of the Court, West Palm Beach Division.

I further certify that all counsel of record are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Jorge A. Zea, pro se
2234 N Federal Hwy
Boca Raton, FL 33431
305-244-7242
antitrust@jorgezea.com